UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BETTY ANNE WATERS , as Administratrix of the Estate of KENNETH WATERS,<br><br>     Plaintiff,<br><br> v.<br><br>TOWN OF AYER, NANCY TAYLOR-HARRIS, in her individual capacity, ARTHUR BOISSEAU, in his individual capacity, BUDDY DECOT, in his individual capacity, WILLIAM ADAMSON, in his individual capacity, PHILIP L. CONNORS, in his individual capacity, and JOHN DOE and JANE DOES 1–16, in their individual capacities,<br><br>    Defendants. | Case No.<br><br>**04   10521 GAO**<br><br>MAGISTRATE JUDGE _____<br><br>**COMPLAINT AND JURY DEMAND** |

## INTRODUCTION

1.  Kenneth Waters was imprisoned for nineteen years of a life sentence for a murder and armed robbery that he did not commit. DNA testing of blood evidence recovered at the scene produced indisputable evidence that fully exonerated Mr. Waters of the crimes. His convictions were vacated and the charges against him were dismissed.

2.  Mr. Waters' wrongful conviction was not an accident, but the result of unconstitutional and tortious efforts by the defendant police officers and their supervisors, and municipal policies, customs and practices deliberately indifferent to

civil rights. Despite Mr. Waters' innocence and the utter lack of evidence against him, the defendant officers used unconstitutional techniques to obtain a conviction in a high-profile murder they had been unable to solve for two-and-a-half years. The defendant officers' actions resulted in Mr. Waters' arrest, unfair trial, conviction and lengthy imprisonment.

3.    Acting under color of law, the defendants threatened, coerced and intimidated witnesses into fabricating evidence against Mr. Waters and they withheld and/or destroyed presumptively exculpatory evidence, including alibi and fingerprint evidence.

4.    Beyond compensating Mr. Waters for the years stolen from him, this action seeks to redress the unlawful municipal policies and practices pursuant to which the defendants, acting under color of law, violated his clearly established rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION and VENUE

5.    Title 28 U.S.C. § 1331 provides federal question jurisdiction, and 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law claims.

6.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Massachusetts, the judicial district in which the claim arose and in which, upon information and belief, all defendants resided and/or conducted business at the time of the events in question.

## PARTIES

7.   Plaintiff BETTY ANNE WATERS is the Administratrix of the Estate of KENNETH WATERS, having been duly appointed by the Probate Court of Middletown, Rhode Island, after he died on September 18, 2001. She is KENNETH WATERS' sister and a resident of Middletown, Rhode Island. She brings this suit in her capacity as the Administratrix of the Estate.

8.   Defendant TOWN OF AYER ("Town"), is an incorporated township within the County of Middlesex. At all times relevant to this action, the Ayer Police Department ("APD") was a department of the TOWN OF AYER. During the investigation and trial of Mr. WATERS, the final policymakers for the Ayer Police Department included, without limitation, Police Chiefs Philip L. Connors and William Adamson, and the Board of Selectmen.

9.   Defendant NANCY TAYLOR-HARRIS was at all time relevant to this complaint employed by the APD and acting under color of law. She is sued in her individual capacity. At the time of the investigation and trial of KENNETH WATERS, she was known as NANCY TAYLOR, and will be referred to as such in this complaint.

10.   Defendant ARTHUR BOISSEAU was at all times relevant to this complaint employed by the APD and acting under color of law. He is sued in his individual capacity.

11.   Defendant BUDDY DECOT was at all times relevant to this complaint employed by

3

the APD and acting under color of law. He is sued in his individual capacity.

12.    Defendant former police chief WILLIAM ADAMSON was at all times relevant to this complaint employed by the APD and acting under color of law. He is sued in his individual capacity.

13.    Defendant former police chief PHILIP L. CONNORS was at all times relevant to this complaint employed by the APD and acting under color of law. He is sued in his individual capacity.

14.    Defendant JOHN and JANE DOES 1-8 were at all times relevant to this complaint employed by the APD and acting under color of law. They were other officers involved in the investigation and prosecution of KENNETH WATERS. At this time, their identities are unknown. They are named in their individual capacities.

15.    Defendant JOHN and JANE DOES 9–16 were at all times relevant to this complaint employed by the APD and the supervisors of the individual named defendants. At this time, their identities are unknown. They are named in their individual capacities.

## JURY TRIAL DEMAND

16.    BETTY ANNE WATERS hereby demands a trial by jury on all issues so triable.

## FACTS

### The Crime

17.    At 10:45 a.m. on May 21, 1980, Katherina Reitz Brow was found stabbed to death in her Ayer, Massachusetts trailer home by her daughter-in-law.

18.   Mrs. Brow had last been seen alive by her husband, Charles Brow, a few minutes past 7:00 a.m. that morning.

## The Forensic Investigation of the Crime Scene

19.   The first officers to the scene included APD officer BUDDY DECOT and numerous other officers from neighboring towns, as well as state police officers from the Middlesex District Attorney's Office. APD Lt. ARTHUR BOISSEAU and Chief WILLIAM ADAMSON arrived on the scene a short time later.

20.   Officers DECOT and BOISSEAU, along with other APD officers and state police officers, processed the crime scene and collected evidence.

21.   Mrs. Brow had been stabbed over thirty times and blood was found throughout the house.

22.   The linen closet had been ransacked and the envelope full of Mrs. Brow's excess money and her pocketbook, both of which, according to family members, she kept in the linen closet, were missing.

23.   A bloody paring knife embossed with the name of the Murphy Company was discovered in the kitchen wastebasket. The blade was covered with blood and had an unknown hair on it. It was determined to be the murder weapon. Mr. Brow, who worked at Murphy Knife, later informed police that the knife was from the Brow kitchen.

24.   Two sets of fingerprints were recovered from the crime scene. Corporal John Baliunas

of the State Police Department processed the prints.

25. One set was identified as belonging to Mrs. Brow. Mrs. Brow and the other members of her family were conclusively excluded as the source of the other print, which remained unidentified. The police used this print during the months following the murder to exclude a number of potential suspects.

26. Kathleen M. Higgins, a Senior Chemist with the Commonwealth of Massachusetts Department of Public Safety, was called to collect and examine the extensive blood evidence at the scene. She identified and collected numerous blood stains for further analysis. Ms. Higgins also identified and collected hair samples that had been left at the scene including hair from the victim's clutched fists and the knife found in the wastebasket.

27. Testing on the blood evidence was conducted by John C. Abbott of the Commonwealth of Massachusetts Department of Public Safety. Most of the blood was determined to be Type B blood, which was the same blood type as the victim. The remaining blood was found to be Type O. Most of the Type O blood was on the towels in the linen closet and by the front door. Thus, the police concluded that the Type O blood was left by the perpetrator, who must have been cut during the struggle.

28. Most of the hair at the scene was found to be microscopically similar to Mrs. Brow's head hair, and was assumed to have come from her. However, three unknown hairs, including one hair found in Mrs. Brow's left hand and the hair on the murder weapon,

were found to be microscopically dissimilar to Mrs. Brow's hair. Police concluded that these hairs had been left by the perpetrator.

### Kenny Waters' Alibi

29. On the date of the Brow murder, Mr. WATERS, his girlfriend, Brenda Marsh, and two of her children, one of whom was Mr. WATERS', were living with Mr. WATERS' grandfather in Ayer in a house behind the Brow trailer home.

30. Mr. WATERS worked at the Park Street Diner. On May 20, 1980, the day before the murder, Mr. WATERS left his grandfather's house at 3:30 p.m. to work a double shift at the diner. His shift ended at 8:00 a.m. the next morning, May 21, 1981, the date of the murder. He did not leave the diner until 8:30 a.m., when a waitress from the diner gave him a ride home.

31. Mr. WATERS arrived home at about 8:40 a.m. He changed from his work clothes into a suit, as he had to appear in the Ayer District Court that morning. Brenda Marsh drove Mr. WATERS to Ayer District Court with the children. He met his attorney at the court at about 9:00 a.m. He signed a waiver of a right to initial jury trial, and his attorney put in an appearance for him. He did not leave court until after 10:45 a.m., when Mrs. Brow's body was found, at which time he remembered seeing the officers in court leave upon getting a call to respond to the scene of the murder. After he left the court, Mr. WATERS walked back to the diner, where numerous witnesses saw him, and where he saw police cruisers driving by on their way to the crime scene. He

remained at the diner until he was picked up by Brenda Marsh at 12:30 p.m.

## The APD Initial Investigation of Kenny Waters

32. On May 22, 1980, the day after the murder, APD Officer BOISSEAU, and Jack Dwyer and Pat Keane of the State Police Department went to Mr. WATERS' house and asked him to come to the station to speak with them.

33. While the officers were at the house, Brenda Marsh confirmed that Mr. WATERS was in court the previous morning, but they ignored this information.

34. Mr. WATERS voluntarily accompanied the officers to the station for questioning. Mr. WATERS thoroughly accounted for his whereabouts from 7:00 a.m. to 10:45 a.m. on the date of the murder, an accounting that could be corroborated by others. Mr. WATERS informed BOISSEAU and the state police officers that he had been at the diner until 8:30 a.m., had been driven home by a waitress, had changed clothes and immediately left for court with Brenda Marsh for his 9:00 a.m. appearance, and did not leave court until 10:45 a.m.

35. The APD officers determined that neither Mr. WATERS' clothes nor his shoes had any blood on them. Officer Dwyer examined Mr. WATERS' entire body. He did not find a single cut or scratch on him from which he could have bled. Mr. WATERS was released.

36. On September 2, 1980, Officer BOISSEAU again picked up Mr. WATERS and took him to the APD. Mr. WATERS voluntarily submitted to a voice-stress examination,

8

which he passed. On September 6, 1980, NANCY TAYLOR was informed that Mr.
WATERS had passed the voice stress test.

37.   No new evidence was collected and no new leads were established from September
1980 until October 1982. At this point Mrs. Brow's murder had remained unsolved
for almost two-and-a-half years.

### The Targeting of Kenneth Waters

38.   In October 1982, Robert Osborne, who at that time was living with Mr. WATERS'
ex-girlfriend, Brenda Marsh, approached the APD and offered information regarding
the Brow murder. Upon information and belief, Mr. Osborne asked for money in
exchange for this information.

39.   Mr. Osborne told Officer TAYLOR and Chief CONNORS that Ms. Marsh had told
him that Mr. WATERS had confessed to killing a woman in Ayer and that she
remembered washing blood out of Mr. WATERS' clothes after the murder.

40.   Based on this information, which they knew or should have known to be false, the
APD officers, including Officers TAYLOR and BOISSEAU, reopened the
investigation of the Brow murder, focusing exclusively on Kenneth WATERS as the
perpetrator.

41.   Chief CONNORS and Officer TAYLOR interrogated Ms. Marsh regarding Mr.
Osborne's information. Among other things, they told Ms. Marsh that she would be
charged as an accessory to the murder and that she would lose her children if she did

not corroborate Mr. Osborne's claim.

42. Despite this pressure, Ms. Marsh told the officers that the statements Mr. Osborne had attributed to her were not true, that Mr. WATERS had never made such an admission to her and that she did not have any information connecting Mr. WATERS to the Brow murder.

43. Ultimately, however, Ms. Marsh succumbed to defendants' unrelenting threats and pressure, falsely inculpated Mr. WATERS in the Brow murder and agreed to testify against him. The APD defendants knew or should have known that her statements and testimony against Mr. WATERS were false and resulted from their coercive psychological pressure.

### The Malicious Prosecution of Kenny Waters

44. Based on this false information, Officer TAYLOR swore out a complaint and warrant application against Mr. WATERS for the murder of Katherina Brow on October 12, 1982. Mr. WATERS was arrested the next day.

45. Based solely on Ms. Marsh's coerced false testimony at a probable cause hearing in November of 1982, Mr. WATERS was bound over for trial.

46. Mr. WATERS was indicted on November 8, 1992 based on the same coerced false testimony of Ms. Marsh, and, upon information and belief, the additional false testimony of APD officer TAYLOR that the unidentified print, the very print that had previously been used to exclude other suspects, was smeared and therefore could not

10

be compared to Mr. WATERS' prints.

47.  Once they set the prosecution in motion, APD officers conspired to ensure Mr.
WATERS' conviction, in deliberate disregard for Mr. WATERS' factual innocence
and his constitutional rights.

48.  In order to obliterate proof of Mr. WATERS' alibi, Officer DECOT and other
unknown APD officers confiscated Mr. WATERS' time-cards from Berry
Enterprises, which owned and managed the Park Street Diner. Although these records
proved that Mr. WATERS had indeed been at work until at least 8:00 a.m. on the
morning of the murder, and also would have identified the waitress who drove Mr.
WATERS home that morning, the defendants suppressed the time-cards from the
prosecution and defense. When defense counsel subpoenaed Mr. WATERS' Park
Street Diner time records for trial, all the time cards for the week of the murder were
missing.

49.  The APD officers also interviewed employees from Global Van Lines, where Mr.
WATERS had worked prior to 1980. Defendants coerced and manipulated Global
Van Lines employees into falsely stating and later testifying at trial that a knife like
the murder weapon was used in their office, that after Mr. WATERS had left the
company the knife was missing, and that the missing knife looked just like the murder
weapon, all despite Mr. Brow's identification of the knife as being from the Brow
kitchen.

11

50.   The officers, including Defendants TAYLOR and BOISSEAU, tracked down Roseanna Perry, another former girlfriend of Mr. WATERS, and coerced and pressured her into falsely inculpating Mr. WATERS.

51.   The officers first went to Ms. Perry's home. She told them that she had no information linking Mr. WATERS to the murder.

52.   The officers, including defendants TAYLOR, BOISSEAU, and Chief CONNORS, questioned Ms. Perry again, this time at the Providence Police Department, where they told Ms. Perry that Mr. WATERS and his family were dangerous and were threatening to kill her, and that they would charge her as an accessory in this case if she did not tell them what they wanted to hear. Additionally, during three hours of questioning, the officers repeatedly showed Ms. Perry gruesome pictures of the crime scene and the autopsy.

53.   After this three-hour interrogation at the police department, the APD officers, and especially defendant TAYLOR, repeatedly called and came by Ms. Perry's house and told her she was in danger of being killed.

54.   Ms. Perry finally yielded to these coercive tactics and, although she had repeatedly told the officers that she knew nothing, she stated that once when she and Mr. WATERS were both drunk, he might have said something about the Brow murder. The officers, particularly defendant TAYLOR, kept pressuring Ms. Perry until she further succumbed and said that Mr. WATERS had said something about killing and

stabbing the "old German bitch," stealing her jewelry and money, and getting away with it.

55. The APD officers, and specifically defendant TAYLOR, knew or should have known that Ms. Perry's coerced testimony was false, but nonetheless presented her fabricated testimony as true.

56. The defendants took these actions despite the fact that none of the physical evidence at the scene pointed to Mr. WATERS.

57. In addition to coercing false witness statements, upon information and belief, the APD defendants either deliberately failed to compare Mr. WATERS' fingerprints to the unidentified print found at the scene as they had done to exclude other suspects, or had his prints compared and withheld the exculpatory results.

58. The three unknown hairs found at the scene – including the hair in Mrs. Brow's hand and the hair on the knife – were microscopically dissimilar to Mr. WATERS' hairs and could not have come from him.

59. Mr. WATERS had Type O blood, the same type that was found at the crime scene, but Mr. Brow did as well, along with 48% of the population. This evidence did not in any way inculpate Mr. WATERS, however, since, based on Officer Dwyer's thorough examination of Mr. WATERS the day after the murder, the defendants knew he had absolutely no wounds from which he could have left his blood at the crime scene.

## The Fabrication of Evidence and Violations of <u>Brady v. Maryland</u> and <u>Giglio v. United States</u>

60.    The APD defendants fabricated evidence to inculpate Mr. WATERS, including without limitation, the false witness statements from Ms. Marsh, Ms. Perry and Global Van Lines employees.

61.    The APD defendants never disclosed to the prosecutor or defense counsel material exculpatory and/or impeachment information, including without limitation:

   a.    that they coerced Ms. Marsh, Ms. Perry and Global Van Lines employees into implicating Mr. WATERS;

   b.    that they had taken prior inconsistent statements from Ms. Perry and Ms. Marsh initially indicating that they had no information linking Mr. WATERS to the murder;

   c.    that the unknown fingerprint could be compared to Mr. WATERS' prints and they had deliberately failed to conduct the comparison, or that they had conducted the comparison and Mr. WATERS' had been excluded, instead falsely representing that the print was smeared and therefore, unfit for comparison; and, perhaps most significantly,

   d.    that Mr. WATERS' alibi was corroborated by time records at the Park Street Diner.

### The Trial and Conviction of Kenny Waters

62.    Mr. WATERS' trial began on May 4, 1983.

14

63.   On May 11, 1983, the jury found Mr. WATERS guilty of murder and armed robbery, based upon the presentation of the coerced false testimony and without having heard any of the exculpatory evidence withheld by the defendants.

64.   Mr. WATERS was sentenced to life in MCI Walpole-Cedar Junction on the murder charge, and a concurrent sentence of 8 to 10 years on the armed robbery charge.

65.   Kenny WATERS was innocent.

### The Exoneration

66.   After Mr. WATERS' conviction, his sister, BETTY ANNE WATERS began working to prove his innocence. Years after his conviction, after she had gone back to school, put herself through college, and was pursuing a law degree, she was able to find the Type-O blood evidence in this case, which had been preserved in the Middlesex Superior Court Clerk's Office.

67.   In early 2000, the Innocence Project at the Benjamin N. Cardozo Law School and Ms. WATERS were able to persuade the Middlesex District Attorney to agree to testing of the blood evidence found in this case.

68.   The results of DNA testing conducted by Dr. Edward Blake of Forensic Science Associates revealed that Mr. WATERS could not have left the blood at the crime scene, and therefore could not have been the perpetrator.

69.   These dispositive exculpatory results were replicated by the Massachusetts State Police Crime Lab on March 13, 2001.

70.    On March 14, 2001, Ms. WATERS and the Innocence Project filed an unopposed emergency motion for a new trial based on the discovery of this exculpatory DNA evidence.

71.    This motion was granted on March 16, 2001 and Mr. WATERS' convictions were vacated. After 19 years, he was finally released from prison. On June 19, 2001, the Middlesex District Attorney's Office dropped all charges against Mr. WATERS.

72.    On September 19, 2001, having tasted only six months of freedom that these defendants had denied him for nineteen years, Kenny WATERS died in a tragic accident.

73.    Plaintiff BETTY ANNE WATERS was appointed as the administratrix of his estate.

### Supervisory and <u>Monell</u> Facts

74.    Upon information and belief, there was a policy, custom and practice in the Town of Ayer, by and through its final policymakers and John and Jane Doe supervisors, beginning years before the unjust conviction of Mr. WATERS and continuing throughout his incarceration, of failing to adequately investigate serious crimes, deliberately suppressing exculpatory material and coercing witnesses into perjury during criminal investigations.

75.    Upon information and belief, the Town of Ayer, through its final policymakers and John and Jane Doe supervisors, failed to adequately screen, train, supervise, and/or discipline the individual defendants concerning proper investigatory techniques, their

16

obligations to disclose exculpatory and/or impeachment evidence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. U.S.</u>, 405 U.S. 150 (1972), and witness interviewing and interrogation.

76.    Upon information and belief, the Town of Ayer, through its final policymakers and John and Jane Doe supervisors, failed to adequately screen, hire, supervise and discipline officers in order to avoid hiring individuals with a propensity for abusing their police authority.

### Damages

77.    As a direct result of the defendants' unconstitutional actions, Mr. WATERS sustained the following injuries and damages: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, such as diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

### CAUSES OF ACTION

### COUNT I:
**42 U.S.C. § 1983 Fourteenth Amendment Due Process Claims for Failure to Disclose Material Exculpatory Evidence and Impeachment Evidence, and Fabrication of Inculpatory Evidence**

17

78.   Plaintiff hereby incorporates all of the foregoing as if set forth herein and further
      alleges as follows:

79.   Defendants TAYLOR, BOISSEAU, DECOT, CONNORS, and JOHN and JANE
      DOES 1–16 failed to disclose to the prosecutor and the defense attorney material
      information that was favorable to Mr. WATERS. This undisclosed information
      included, but was not limited to:

      a.   the time records they had seized from the Park Street Diner;

      b.   the exculpatory statements made by Ms. Perry and Ms. Marsh before they
           succumbed to the coercive interrogation tactics used by the police;

      c.   the fact that the inculpatory statements of Ms. Perry, Ms. Marsh and the Global
           Van Line employees were the result of coercive interrogation tactics used by
           the police; and

      d.   the fact that they had successfully compared other suspects' prints to the
           unknown fingerprint left at the scene, and that they had either excluded Mr.
           WATERS based on the same kind of comparison or deliberately failed to
           compare Mr. WATERS' prints, instead representing that the print was smeared
           and therefore, unfit for comparison.

80.   Defendants TAYLOR, BOISSEAU, DECOT, CONNORS, and JOHN and JANE
      DOES 1–16 deliberately fabricated inculpatory evidence by coercing false witness
      statements and perjured testimony from witnesses including, without limitation,

18