**EXHIBIT G**

```
VOLUME:    I
PAGES:     1 - 225
EXHIBITS:  I - 6
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. # 04-CV-10521-GAO

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

BETTY ANNE WATERS, as Administratrix of the
Estate of KENNETH WATERS
        Plaintiff,


vs.

TOWN OF AYER, NANCY TAYLOR-HARRIS,
In Her Individual Capacity, ARTHUR BOISSEAU,
In his Individual Capacity, BUDDY DECOT, In
His Individual Capacity, WILLIAM ADAMSON, in
His Individual Capacity, PHILIP L. CONNORS,
In His Individual Capacity, and JOHN DOE and
JANE DOES 1-16, in Their Individual Capacities,
        Defendants.
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEPOSITION OF BRENDA L. MARSH**, a witness called on behalf of the Defendants, pursuant to Massachusetts Rules of Civil Procedure, before Carolyn McGill, a Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, for Kopelman & Paige, P.C., 101 Arch Street, Boston, Massachusetts, held at 340 Main Street, Worcester, Massachusetts on Wednesday, November 1, 2006 commencing at 11:20 a.m.

*Leavitt Reporting, Inc.*

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

205

1 there's a quote within a quote, "that he had
2 killed a woman in Ayer in a breaking and
3 entering and that she (female) had better keep
4 in line or he could do the same to her." Do you
5 see that?
6    A.  Yes, I do.
7    Q.  The sentence in paragraph three goes
8 on to say that this informant further said that
9 the female remembers washing Waters' blood
10 soaked clothing for him the day of murder but
11 that Waters explained the blood as coming from
12 his duties of meat cutting at his place of
13 employment. Do you see that?
14   A.  Yes.
15   Q.  Do you recall that Mr. Osborne had
16 apparently told Nancy Taylor and the Ayer Police
17 that you helped Kenny wash his clothes on the
18 morning after the murder?
19   A.  Yes.
20   Q.  That wasn't true, correct?
21   A.  Right.
22   Q.  To the best of your memory you never
23 told Nancy Taylor or the Ayer Police that this
LEAVITT REPORTING, INC.

206

1 statement was attributed to you by Mr. Osborne,
2 correct?
3   A.  Right.
4   Q.  Do you recall whether Officer Taylor
5 specifically asked you whether you had assisted
6 washing bloody clothes?
7   A.  I don't remember.
8   Q.  But you don't have any memory of ever
9 telling her that, correct?
10  A.  No.
11  Q.  The Affidavit goes on. In paragraph
12 four it says the statements the male informant
13 attributes to me are false. Kenny Waters never
14 told me that he killed a woman in Ayer in a
15 breaking and entering and he didn't threaten to
16 quote "keep me in line" or he would do the same
17 to me. He never came home the day of the murder
18 in clothing soaked in blood and explained the
19 blood as coming from his duties of meat cutting.
20 I never told anything like that to Robert
21 Osborne. That's true, correct?
22  A.  Yes.
23  Q.  The next paragraph, paragraph five,
LEAVITT REPORTING, INC.

207

1 says Miss Marsh, one day, probably in October of
2 1982 Police Officer Nancy Taylor and Chief
3 Connors showed up at my house asking me about
4 the Brow case.
5       Do you remember if they actually
6 physically came to your house or was that the
7 evening you went to Maxwell Silverman's or do
8 you not recall specifically when they came to
9 your house?
10   A.  I don't remember.
11   Q.  This paragraph goes on to say in
12 paragraph five of the Affidavit, they told me
13 that they knew I had information about Katy
14 Brow's murder, that I would be charged as an
15 accessory after the fact and receive ten years
16 in state prison if I didn't help them and that I
17 could lose my children.
18        You testified earlier today I
19 believe that's something that sticks out in your
20 mind?
21   A.  Yes.
22   Q.  Based on what I understood your
23 testimony this morning, did you have concern in
LEAVITT REPORTING, INC.

208

1 1982 that there was a chance that you might lose
2 custody of your children?
3   A.  Yes.
4   Q.  Of things that were important to you
5 in 1982, would losing your children be among the
6 things that would give you the most concern?
7   A.  Yes.
8   Q.  When they told you, Officer Taylor and
9 Officer Connors, that you if you didn't help
10 them that you might lose your children, did you
11 believe that they meant what they said?
12   A.  Yes, I did.
13   Q.  Did they explain to you how they would
14 cause you to lose custody of your children?
15   A.  Charges of accessory after the fact.
16   Q.  Paragraph six says, I'm reading from
17 the paragraph, on a number of occasions before I
18 testified for the first time on November 5, 1982
19 Nancy Taylor and Chief Connors met with me and
20 repeated these threats if I didn't cooperate
21 with them. I'm going to ask you, did I read
22 that accurately?
23   A.  Yes, you did.
LEAVITT REPORTING, INC.

209

1  Q. When it says that they repeated the
2  threats if you didn't cooperate with them, did
3  you understand cooperate with them to mean -- in
4  your use of the term in the Affidavit, do you
5  mean to say that if you didn't give them the
6  information Robert Osborne said you possessed
7  they would make good on the threats?
8      MR. FELDMAN: Objection.
9  A. Yes.
10  Q. Then you go on in the same paragraph,
11  the first meeting was with both of them and
12  Robert Osborne at Maxwell Silverman's
13  restaurant?
14  A. Yes.
15  Q. You discussed that a little earlier
16  with Attorney Tehan, correct?
17  A. Yes.
18  Q. It says, at that meeting I was
19  confronted with statements Osborne had made to
20  them about what he claimed I said about the Brow
21  case. I denied that I made the statements
22  Osborne claimed I made and Taylor and Connors
23  kept saying if I didn't cooperate I would be

LEAVITT REPORTING, INC.

210

1  charged as an accessory and lose my kids. Did I
2  read that correctly?
3  A. Yes.
4  Q. I'm going to ask you specifically
5  about the last sentence. It says here in your
6  Affidavit, I denied that I made the statements
7  Osborne claimed I made.
8      Does this help refresh your memory
9  as to whether at the Maxwell Silverman's meeting
10  you at least initially told Officers Taylor and
11  Connors that you didn't make the statement that
12  Osborne said you made?
13      MR. FELDMAN: Objection.
14  A. Yes.
15  Q. Do you remember what reaction they had
16  when you told them other than what is said here
17  in your Affidavit?
18  A. Not really.
19  Q. Just that they kept saying, repeating
20  to you if you didn't cooperate you'd be charged
21  as an accessory and lose your kids?
22  A. Right.
23  Q. Did you understand their response to

LEAVITT REPORTING, INC.

211

1  mean that they did not accept your denial of
2  knowledge of what Osborne said you knew and
3  instead wanted you to agree with what Osborne
4  had said you knew?
5      MR. FELDMAN: Objection.
6  A. Yes.
7  Q. In paragraph seven it says there were
8  a number of meetings where I was picked up and
9  brought to Cambridge for interrogation before I
10  testified. I do not remember when I first began
11  to go along with what they were suggesting, but
12  I was very frightened and scared.
13      First I'm going to ask you about
14  the second sentence. The they was Taylor and
15  Connors, the police?
16  A. Yes.
17  Q. And I can see from the paragraph that
18  you don't have a specific recollection of a
19  particular moment in time where you decided to
20  go along with what Taylor and Connors were
21  suggesting. But is it fair to say, Miss Marsh,
22  that at some point in time the pressure and
23  threats resulted in you agreeing to --

LEAVITT REPORTING, INC.

212

1  A. Yes.
2  Q. -- to give them the information they
3  were looking for?
4      MR. FELDMAN: Objection.
5  A. Yes.
6  Q. That information was the information
7  Osborne said you had?
8  A. Yes.
9  Q. It says here at the end of paragraph
10  seven you were frightened and scared. Was that
11  true?
12  A. Yes.
13  Q. Did you remain frightened and scared
14  of the Ayer Police Department and losing your
15  children from your first interaction in person
16  at the night of the dinner at Maxwell
17  Silverman's right through 1985 when you in
18  Exhibit Five had occasion to give testimony once
19  again --
20  A. Yes.
21  Q. -- in the Waters' matter?
22  A. Yes.
23      MR. TEHAN: I'll object.

LEAVITT REPORTING, INC.

**213**

1  Q. I'm going to turn to paragraph eight
2  which I believe there's actually two paragraph
3  eights, but I will ask you about the first one
4  that starts on page 1 and goes on to page 2.
5      Miss Marsh, it says in paragraph
6  eight that there are certain things that were
7  suggested to you that resulted in your
8  testifying to them at trial and at a pretrial
9  hearing.
10     Paragraph eight A says one of the
11 things that were suggested to you says A) I
12 called the diner the night of May 20, 1980 after
13 Kenny had left to go to work there and asked to
14 speak to Kenny but I was told he was not there.
15 And you go on to say that never happened?
16 A.  Uh-huh.
17 Q.  Do you remember earlier today Attorney
18 Tehan asked you about that and I think I
19 understood you to say you really couldn't say
20 one way or the other whether on the night before
21 the murder you had called the diner?
22 A.  Right.
23 Q.  Now I'm going to ask you a question
                LEAVITT REPORTING, INC.

**214**

1  that is to the best of your memory. Do you have
2  any memory of calling the diner on the night
3  before Miss Brow's murder and being told Kenny
4  was not there?
5  A.  No, I don't.
6  Q.  When you answered Attorney Tehan and
7  you said you can't say one way or the other, did
8  you mean to say it's conceivable that you did
9  but you have absolutely no memory of it?
10     MR. FELDMAN: Objection.
11 A.  No.
12 Q.  So you don't think you called the
13 diner that night?
14     MR. FELDMAN: Objection.
15 A.  No, I don't think I did.
16 Q.  And do I understand your testimony to
17 be the reason why ultimately you had indicated
18 that you may have called the diner that night
19 and was told Kenny was not there is because that
20 was what was suggested to you by Officer Taylor
21 and Officer Connors?
22     MR. FELDMAN: Objection.
23 A.  Yes.
                LEAVITT REPORTING, INC.

**215**

1  Q.  Paragraph B says, I testified that the
2  morning of May 21, when Kenny came home he had a
3  scratch on the left side of his face.
4      Is it fair to say you have no
5  memory of Kenny Waters coming home on the
6  morning of May 21 with a scratch on his face,
7  correct?
8  A.  Right.
9  Q.  The Affidavit goes on to say, had a
10 scratch on the left side of his face from under
11 the eye to below the mouth several inches that
12 he didn't have before he left for work.
13     Your last sentence in this
14 paragraph says, this is not true. I know it was
15 being suggested by Nancy Taylor but I don't know
16 where she came up with it.
17     Miss Marsh, is it fair to say that
18 the reason why you had indicated at some point
19 that Waters came home on the morning of the 21st
20 with a scratch on his face is because that's
21 what Nancy Taylor had suggested you should say?
22     MR. FELDMAN: Objection.
23 A.  Yeah. Yes.
                LEAVITT REPORTING, INC.

**216**

1  Q.  I'm going to jump down to paragraph
2  eight D, so we're one more from the last one.
3  It's a long one but I'll read it quickly if the
4  court reporter will allow me to.
5      I testified that in July of 1980
6  Kenny and I had an argument. He came in drunk,
7  had on new clothes and a new hat and dumped beer
8  over my head and hit me in the back of legs with
9  a plastic bat. That part is true. It's also
10 true that I left after this incident and he
11 didn't know I was leaving. What isn't true and
12 was part of my testimony is that I asked Kenny,
13 "did you kill that woman there?" And he said,
14 "yeah, what's it to you." Kenny never said he
15 killed anyone and no statements like that were
16 made by Kenny the night I left.
17     I understood from earlier today
18 you have no memory and you do not believe Kenny
19 Waters ever told you he killed Miss Brow,
20 correct?
21 A.  Correct.
22 Q.  The last sentence in paragraph E, I'm
23 not going to read the whole paragraph, the
                LEAVITT REPORTING, INC.

217

1  reason I testified that it was Kenny's knife is
2  that Nancy Taylor kept telling me it was Kenny's
3  knife and I should so testify. Do you see that?
4     A. Yes.
5     Q. Do you remember being encouraged to
6  testify that the photograph of the knife you
7  were shown was Kenny's knife because that's what
8  Nancy Taylor wanted you to say?
9     MR. FELDMAN: Objection.
10    A. Yes.
11    Q. No one in the Waters family has
12 threatened you with any harm or anything over
13 the last twenty years, have they?
14    A. No.
15    Q. When you testified at trial and the
16 pretrial hearing, some of the testimony's been
17 marked as Exhibit Three, Four, Four A and Five,
18 you didn't provide that testimony, Miss Marsh,
19 because you were scared of Kenny Waters, did
20 you?
21    A. No.
22    Q. In fact, your testimony was the result
23 of your desire to do what the Ayer Police

218

1  Department was asking of you?
2     A. Exactly.
3     MR. TEHAN: Objection.
4     Q. If pressure was not applied to you as
5  you described it earlier today by Officer Taylor
6  and the Ayer Police Department, would you have
7  testified the way you testified at Mr. Waters
8  trial?
9     MR. TEHAN: Objection.
10    A. No.
11    Q. At least a large part of your
12 motivation for providing the testimony that you
13 gave was to make sure that you were able to
14 continue to raise your son and daughter,
15 correct?
16    A. Correct.
17    Q. Based on things Officer Taylor said to
18 you, did you ever form a belief as to whether
19 she understood that she was pressuring you?
20    MR. FELDMAN: Objection.
21    A. Repeat that please.
22    Q. Did you have a sense as to whether
23 Officer Taylor knew that she was pressuring you?

219

1     A. Yes.
2     MR. TEHAN: Objection on the basis
3  it's speculative.
4     Q. Upon what did you base that?
5     MR. TEHAN: Objection.
6  Speculative.
7     A. It was the way she was putting things
8  to me.
9     Q. You were asked certain questions today
10 about your trial testimony and whether or not it
11 was truthful. I'm not going to ask you that
12 question, Miss Marsh. I'm just going to ask
13 you, have you over the last several years since
14 you provided the Affidavit and since Mr. Waters'
15 release, have you ever had any concern for your
16 own welfare with respect to any potential
17 perjury charges?
18    A. No.
19    Q. When I say concern, as you sit here
20 today do you have any concern that the Ayer
21 Police Department or the District Attorney's
22 Office might try to mischaracterize what
23 happened in the early 1980's as perjury.

220

1     MR. TEHAN: Objection.
2     A. No.
3     MR. FELDMAN: I don't believe I
4  have anything else at the moment for this
5  witness.
6     MR. TEHAN: I have a couple more.
7  **Examination by Mr. Tehan:**
8     Q. Miss Marsh, you knew that when you
9  testified under oath at criminal proceedings
10 involving Mr. Waters that your testimony was
11 subject to the pains and penalties of perjury,
12 correct?
13    A. I guess so.
14    Q. Well, you knew that, right?
15    A. Yeah.
16    Q. And also you knew that perjury was a
17 crime, correct?
18    A. Yes.
19    Q. And you knew that if convicted of
20 perjury at the Waters trial you might go to
21 jail, correct?
22    A. Yes.
23    Q. And you knew you might lose your kids

LEAVITT REPORTING, INC.