Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 1474579 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

C
F.D.I.C. v. R.W. Beck, Inc.
D.Mass.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
FEDERAL DEPOSIT INSURANCE CORPORA-
TION
v.
R.W. BECK, INC., et al.
**No. Civ.A.01-CV-11982RGS.**

July 1, 2004.

Floyd Robinson, F.D.I.C., Washington, DC, Paul A.
Winick, Thelen Reid & Priest LLP, New York, NY,
for Plaintiff.
David J. Hatem, Donovan & Hatem, LLP, Neal A.
Rosen, Bingham McCutchen LLP, Boston, MA, Dav-
id S. Blatt, John K. Villa, Margaret Keeley, Vidya
Atre, Williams & Connolly, Washington, DC, for De-
fendants.

*MEMORANDUM AND ORDER ON DEFENDANTS'*
*MOTION TO COMPEL*
STEARNS, J.
**\*1** On May 3, 2004, the law firm of Bingham Dana
LLP (Bingham), the defendant in a legal malpractice
action brought by the Federal Deposit Insurance
Corp. (FDIC), filed a motion to compel the FDIC to
produce various documents that had been withheld on
claims of attorney client privilege and work product
doctrine protection. On May 21, 2004, a co-defendant
engineering firm, R.W. Beck, Inc. (Beck), joined in
the motion. Bingham argues that the FDIC, as the Re-
ceiver for the failed Bank of New England, N.A.
(BNE),FN1 waived any asserted privilege by placing
allegations of malpractice "at issue."

> FN1. BNE had provided the financing for
> Megan Racine Associates, Inc. (MRA), to
> construct a co-generation electric power
> plant in Canton, New York. When MRA
> went bankrupt, the FDIC, through the RE-
> COLL    Management    Corporation
> (RECOLL), became the operator of the
> plant. According to the FDIC, it engaged

Bingham and Beck to develop a plan to as-
sure the plant's "QF status" under Federal
Energy Regulatory Commission (FERC)
regulations. While Bingham disputes the
FDIC's description of its responsibility for
overseeing the operating status of the plant,
for purposes of deciding what is "at issue" in
this litigation, I will adopt the characteriza-
tion of Bingham's role, as it is set out in the
FDIC's Complaint.

The attorney-client privilege "must be narrowly con-
strued because it comes with substantial costs and
stands as an obstacle of sorts to the search for truth."
*In re XYZ Corp.,* 348 F.3d 16, 22 (1st Cir.2003). As
with any privilege, attorney-client privilege can be
waived, even implicitly (although implied waivers
are hen's teeth rare). *Greater Newburyport Clamshell
Alliance v. Public Serv. Co. of N.H.,* 838 F.2d 13, 17
(1st Cir.1988). This is especially true in a civil pro-
ceeding where, because the privilege lacks a constitu-
tional dimension, the "liberal federal policy favoring
discovery is of substantially greater relative weight."
*Id.* at 19.

It is settled law that by placing privileged communic-
ations or attorney work product "at issue" in civil lit-
igation, a party waives any applicable claim of priv-
ilege where nondisclosure would cause manifest un-
fairness to the opposing party.FN2 *Hearn v. Rhay,* 68
F.R.D. 574, 581 (E.D.Wash.1975). A waiver, as the
First Circuit made clear in *Clamshell Alliance,* is not
automatic, but like most things judicial, is subject to a
balancing test. The test requires an arbitrating court
to consider whether a defendant has demonstrated the
relevancy of the materials sought, whether there is
any reasonable alternative source for the information
the materials contain, and whether the plaintiff's pre-
sumptively valid interest in preserving the confidenti-
ality of its privileged communications outweighs any
need for disclosure. "[T]he privilege ends at the point
where the defendant can show that the plaintiff's civil
claim, and the probable defenses thereto, are en-
meshed in important evidence that will be unavail-
able to the defendant if the privilege prevails." *Clam-
shell Alliance,* 838 F.2d at 20.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 1474579 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

FN2. While Bingham complains that the FDIC's privilege log is deficient, in the court's judgment it is complete enough to comply with the purpose of Rule 45(d)(2), which is to give an adversary sufficient notice of the documents for which a privilege is asserted. See *In re Grand Jury Subpoena (Newparent, Inc.),* 274 F.3d 563, 575-576 (1st Cir.2001).

That Bingham has met the threshold showing of relevance is established by a précis of the core allegations asserted against it in the FDIC's Amended Complaint. According to the Complaint, Bingham's substandard advice to RECOLL on matters of regulatory compliance precipitated a 1995 FERC ruling that MRA's plant had failed to achieve QF status during 1993 and 1994. As a result, MRA was ordered to refund a substantial sum to Niagra Mohawk, its major customer, which in turn forced the FDIC into a global settlement of MRA's bankruptcy obligations. While the FDIC recovered $29.5 million from the liquidation of MRA, the funding of the settlement resulted in a net loss to Bingham of some $30 million.

*2 Bingham and Beck seek the opinions, and the underlying work product on which they were based, that were given to the FDIC and RECOLL by outside and in-house counsel regarding the relevant FERC regulations, the MRA bankruptcy, and the related adversary proceedings. Bingham's defense is built on the premise that its advice was qualitatively no worse, and was perhaps better than any other that the FDIC received, and that in any event, it is being unfairly singled out as the proximate cause of the unfavorable bankruptcy result. [FN3] The legal opinions and advice given by others that may have contributed to the bankruptcy debacle is not only enmeshed with, but central to any defense of Bingham's defense of the FDIC's claims. [FN4] "In a civil damages action ... fairness requires that the privilege holder surrender the privilege to the extent that it will weaken, in a meaningful way, the defendant's ability to defend." *Clamshell Alliance,* 838 F.3d at 20.

FN3. While the FDIC characterizes the thrust of its causation theory differently, paragraph 109 of the Amended Complaint

blames its loss squarely on Bingham's alleged malpractice. "As a direct and proximate result of Bingham's negligent performance of its common law duties to the FDIC, the FDIC ... suffered ... substantial losses in a principal amount exceeding $30 million."

FN4. By definition, given the confidentiality of the advice given to the FDIC by the outside firms of Dickstein, Shapiro, Morin & Oshinsky, Hodgson Russ, Dewey Ballantine, and in-house counsel, there is no legitimate alternative through which Bingham can obtain access to this advice, other than by invoking the court's power to compel disclosure. (Deposition of the FDIC's attorneys is obviously not a feasible alternative as the same privilege issues would arise). While work product doctrine protection "is not as easily waived," *United States v. Massachusetts Inst. of Tech.,* 129 F.3d 681, 687 (1st Cir.1997), the reasonableness of the opinions sought depends on the accuracy of the work product upon which they were based. For that reason, I agree with Bingham that the analysis of an "at issue" waiver is essentially the same with respect to both privileges.

The FDIC argues that Bingham's arguments ignore the Supreme Judicial Court's admonition in *Darius v. City of Boston,* 433 Mass. 274, 283, 741 N.E.2d 52 (2001), that "[a]n 'at issue' waiver, in circumstances where it is recognized, should not be tantamount to a blanket waiver of the entire attorney-client privilege in the case." The admonition, however, which is sandwiched between the Court's criticism of the City of Boston's sweeping and unfocused subpoena and its failure to make "even the most minimal showing of necessity" does not undermine its ultimate holding that in appropriate circumstances, "a litigant may implicitly waive the privilege, at least in part, by injecting certain types of claims or defenses into a case." *Id.* at 284, 741 N.E.2d 52. That said, given the sanctity of the privileges involved, a court is obligated to craft its order in such a way "so as to limit the permissible discovery to what is truly 'at issue.' " *Id.* at 283, 741 N.E.2d 52. Consequently, Bingham's mo-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1474579 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

tion to compel will be *ALLOWED*, but limited to the opinions (and related work product) of counsel [FN5] that involve advice relating to: (1) FERC's application of the QF standard; (2) the MRA bankruptcy litigation; and (3) the related FERC proceeding initiated by Niagra Mohawk; (4) and all of which predate the consummation of the MRA bankruptcy settlement.[FN6]

> FN5. The term "counsel" is used in a deliberately undifferentiated way. As Bingham correctly observes, the law of waiver does not draw a distinction between in-house and outside counsel. Moreover, I agree with Bingham that the FDIC has failed to show the existence of a valid joint defense agreement between itself and MRA.

> FN6. Beck in a perfunctory manner joined in the motion to compel, claiming that Bingham's "persuasive, valid arguments" entitle it to the same extent of discovery, but without any explanation as to how its defense to a claim of engineering malpractice is related to the defense of a legal malpractice claim. Consequently, Beck's motion is *DENIED*.

SO ORDERED.

D.Mass.,2004.
F.D.I.C. v. R.W. Beck, Inc.
Not Reported in F.Supp.2d, 2004 WL 1474579 (D.Mass.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.