UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BETTY ANNE WATERS, as Administratrix of the Estate of KENNETH WATERS, <br><br>Plaintiff, <br><br>v. <br><br>TOWN OF AYER, NANCY TAYLOR-HARRIS, in her individual capacity, ARTHUR BOISSEAU, in his individual capacity, BUDDY DECOT, in his individual capacity, WILLIAM ADAMSON, in his individual capacity, PHILIP L. CONNORS, in his individual capacity, and JOHN DOE and JANE DOES 1–16, in their individual capacities, <br><br>Defendants. | Case No. 04 Civ. 10521 (GAO) <br><br>**PLAINTIFF'S FOURTH SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |

Comes Now Plaintiff and offers supplemental responses to the following interrogatories from Defendants' First Set of Interrogatories. By further responding to these interrogatories Plaintiff does not waive any privileges or objections.

3.     Please provide a complete and detailed recitation of the decedent's work history, commencing subsequent to his graduation from high school, providing in your response:

a.     the identities and addresses of all employers;

b.     the inclusive dates of the decedent's employment with each such employer;

c.     the identity of the decedent's immediate supervisor at each place of employment;

1

d.    the decedent's gross compensation at each place of employment;

e.    the decedent's reason for leaving such place of employment.

**RESPONSE**: In the mid-1970s, Mr. Waters worked as a superintendent for apartment buildings in Portsmouth, New Hampshire. While he lived in New Hampshire, Mr. Waters also worked as a cook at a local restaurant. After he moved to Worcester, Massachusetts, Mr. Waters worked as a mover at Global Van Lines. In 1979, he moved to Ayer and worked as a cook at the Park Street Diner where his immediate supervisor was Frank Matthews. After moving to Providence, Rhode Island in June of 1980, Mr. Waters worked as cook at a restaurant in Johnston, Rhode Island and at the restaurant Fidas in Providence. At one point in time, Mr. Waters worked at Roto-Rooter. Defendants are also respectfully referred to the deposition of Ms. Waters in which she answered counsel's questions as to her brother's employment.


5.    Please provide the name and address of each person (other than your attorneys) known by you to have witnessed or to have knowledge concerning the occurrences set forth in the Complaint.

RESPONSE: The names of persons with knowledge concerning the occurrences set forth in the Complaint are identified, as per Rule 26(a), in lists served on March 7, 2005, February 12, 2007 and May 9, 2007. Defendants are respectfully referred to those lists for the information requested. Plaintiff further notes that the Court's rules provide for the disclosure of final witness lists prior to trial.


7.    Please give an account, itemized as fully and completely as possible, of all losses which

plaintiff or her legal representatives are claiming were incurred as a result of the occurrences set forth in the Complaint.

RESPONSE:  This request prematurely calls for an expert opinion which will be provided at a later stage pursuant to the Court's scheduling order and Fed. R. Civ. Pro. 26(a)(2)(C).  Notwithstanding this objection and reserving the right to supplement with expert opinions according to the schedule set forth above, as a direct result of the defendants' unconstitutional actions, Mr. Waters sustained the following injuries and damages: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, such as diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.  Plaintiff reserves the right to rely on any other evidence in the record of duly disclosed evidence as it exists at the time of trial to prove the nature of Mr. Waters's injuries.


8.    Please set forth in full and complete detail the nature and extent of all injuries, physical, emotional or mental in nature, allegedly suffered by the decedent as the result of the occurrences set forth in the Complaint, including in your response the name and address of each hospital, medical professional and mental health professional which rendered treatment to the decedent, providing a complete description of the treatment the decedent received, and the inclusive dates thereof.

RESPONSE:  This request prematurely calls for an expert opinion which will be provided at a later stage pursuant to the Court's scheduling order and Fed. R. Civ. Pro. 26(a)(2)(C). Notwithstanding this objection and reserving the right to supplement with expert opinions according to the schedule set forth above, as a direct result of the defendants' unconstitutional actions, Mr. Waters suffered nineteen years of loss of personal freedom in every respect, including but not limited to diet, sleep, personal contact, educational and vocational opportunity, athletic opportunity, personal fulfillment, family relations, sexual activity, travel, enjoyment, and expression.

As a direct result of his wrongful arrest, prosecution, conviction, and incarceration, Mr. Waters suffered permanent physical and psychological injury, including but not limited to, physical complications and deterioration related to liver cirrhosis, mitroval prolapse and hepatitis C, and severe psychiatric and psychological damage, including but not limited to, panic anxiety attack syndrome, depression, insomnia and suicidal ideations.  From 1983 until 1992, Mr. Waters was treated by Department of Correction Health Services at MCI-Norfolk by Dr. Khan, Dr. Tatarrunis, Dr. Gilligan and Dr. Eccleton.  From 1992 until 1996, Mr. Waters was treated by Department of Correctional Health Services at Old Colony Correctional Center by Dr. Lee and Dr. Ngau.  Ms. Waters' refers the defendants to plaintiff's prison and medical records previously provided to defendants contained in the range of pages Bates stamped DOC0000001–DOC1394 and BAW738-9 and BAW742.

Mr. Waters' also suffered permanent loss of family relationships, including but not limited to damage to his relationship with his daughter, Mandy Marsh.  Furthermore, Mr. Waters suffered damage to his business and property, including but not limited to loss of income and

career opportunities.

After he was exonerated and released from prison, Mr. Waters was actively in the process of seeking psychological treatment for the emotional trauma that he suffered from being wrongfully convicted and incarcerated for nineteen years. In fact, on the day he died, Mr. Waters had visited the Veterans' Administration Hospital in an effort to seek psychological treatment.

Plaintiff reserves the right to rely on any other evidence in the record of duly disclosed evidence as it exists at the time of trial to prove the nature of Mr. Waters's injuries.


9.     Please indicate whether the decedent has been convicted of, or pled guilty to, a crime. If your answer is in the affirmative, please provide:

    a.    a description of each crime of which the decedent was convicted;

    b.    the date, court and docket number of each such conviction or plea.

RESPONSE: Pursuant to Rule 33(d), Mr. Waters's CORI form, previously produced pursuant to Rule 34, is attached hereto as Exhibit B. Upon information and belief, Mr. Waters was convicted pursuant to a plea in or about 1974 in Portsmouth, New Hampshire of assault with a knife arising out of an altercation that erupted when he attempted to evict members of a motorcycle club who were trashing apartments for which Mr. Waters was a superintendent at the time. Upon information and belief, Mr. Waters was convicted of robbery in Providence, Rhode Island in 1972. After reasonable inquiry, the dates, docket numbers, nature of disposition and courts of these convictions are not known. Upon information and belief, the Rhode Island and New Hampshire sentences ran concurrently.

10.    Please set forth the date of decedent's death, the circumstances surrounding his death and the cause of his death, as reflected in his death certificate, attaching a copy of same to your Answers to Interrogatories.

RESPONSE:   The original response to this interrogatory was amended on or about May 4, 2007 in Plaintiff's Second Supplemental Response to Defendants' First Set of Interrogatories, which attached Mr. Waters's death certificate.  Defendants are also respectfully referred to their November 28, 2006 deposition of the plaintiff Betty Anne Waters at pages 37-40, in which she orally answered this question and described Mr. Waters's fall off of a picket fence, fractured skull, frontal lobe injury, coma, and September 18, 2001 death at Rhode Island Hospital. Plaintiff reserves the right to rely on this and any other evidence in the record of duly disclosed evidence as it exists at the time of trial to prove these facts.

12.    Please identify by name and address the "...waitress from the diner..." referenced in Paragraph 30 of the Complaint.

RESPONSE:  After reasonable inquiry, the identity of the waitress from the diner who drove Mr. Waters home after work the morning of the murder is not known.  However, plaintiff has previously disclosed the time cards and tax forms from the Park Street Diner for the relevant time period, which list Park Street Diner employees; the waitress worked briefly for the Park Street Diner in May of 1980 and therefore may or may not be among those names.

13.    Please set forth the factual basis for your contention that the defendants "knew or should have known to be false" the information provided to them by Robert Osborne, as set forth in

Paragraphs 38-40 of the Complaint.

RESPONSE:  The policy manual in effect at the APD in 1982 warned officers to evaluate the reliability of informants by, among other things, determining their motive.  Robert Osborne's admitted motive was monetary gain - he was calling "for financial reasons."  Boisseau admitted in his deposition that this information weighed against Osborne's credibility.  This was the only information known about Osborne before Chief Connors and Nancy Taylor met with Osborne and Brenda Marsh.  Despite the policy manual's admonition that officers should investigate the reliability of informants, according to the depositions of both Taylor and Connors, nothing was done before the meeting with Osborne and Nancy Taylor to investigate Osborne's background, his criminal history, his motivation, his relationship with Brenda Marsh, his antipathy toward Kenneth Waters, or his reliability.  As such, the only information known to Taylor and Connors about Osborne weighed against his reliability.

Nonetheless, Nancy Taylor proffered Robert Osborne as a "reliable informant" in an affidavit in support of a search warrant she applied for on or about October 1, 1982, a warrant that, according to the deposition testimony of Chief Connors, Arthur Boisseau and Elizabeth Fahey, no supervisory official knew about or authorized, and for which there was no legitimate law enforcement purpose.

The APD policy and procedure manual also advised officers to constantly test their informant's information for consistency and truth by checking against information received from other sources.  Here, the October 4, 1092 interview with Brenda Marsh, as recorded in Taylor's October 5, 1982 report, was inconsistent from the information provided by Robert Osborne in critical respects:  According to Taylor's October 2, 1982 report of her September 30, 1982 phone

7

call with Robert Osborne, he indicated that his girlfriend washed Waters's bloody clothes after the murder, which would be a highly inculpatory fact. As indicated in the reports of Taylor's meetings with Marsh and subsequent deposition testimony, she never said she washed Waters's bloody clothes. According to standard police procedures as indicated in the manual, Connors and Taylor either did ask or should have asked Marsh this question specifically to corroborate or test Osborne's reliability. Thus, either they did ask that question and she denied washing bloody clothes – a fact that raised additional serious doubts about Osborne's reliability – or, in reckless disregard for their own policies and procedures and the need to determine the reliability of both Osborne and Marsh, they never asked. As such, the evidence and reasonable inferences therefrom would lead a reasonable jury to conclude that defendants either knew or should have known that Osborne's statement was false.

Indeed, as indicated in her April 11, 2001 affidavit and her October 7, 2006 deposition, Brenda Marsh never told Robert Osborne that she had washed Mr. Waters's bloody clothes after the murder, or that Waters had admitted to killing Ms. Brow or that he had threatened to do the same to her, and Brenda Marsh explicitly told Taylor and Connors at the October 4, 1982 meeting that these statements made by Osborne were false.

Plaintiff reserves the right to supplement her response on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other evidence in the record of duly disclosed evidence as it exists at the time of trial to prove this fact.

14.    Please set forth in full and complete detail the nature and extent of the "...coercive

8

psychological pressure" placed upon Brenda Marsh by each defendant as set forth in Paragraph 43 of the Complaint.

RESPONSE:   The nature and extent of the coercive psychological pressure placed upon Brenda Marsh by defendants Taylor and Connors are set forth in detail in Brenda Marsh's April 11, 2001 affidavit, previously disclosed pursuant to Rule 34, and her October 7, 2006 deposition. Briefly, defendants threatened that if Marsh did not cooperate and give incriminating statements in response to leading questions (or statements) about Waters then she would be charged as an accessory to murder and would lose her children; defendants showed Marsh gruesome crime scene photographs of the victim, and used constant pressure to induce her to make statements consistent with what Osborne had told them.  Such threats were particularly coercive where, as here Ms. Marsh had previously given up custody of her children.

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.


15.    Please set forth the factual basis for your contention that defendant Taylor-Harris testified falsely "...that the unidentified [finger] print ... was smeared and therefore could not be compared to Mr. Waters' prints" and that this testimony caused plaintiff's decedent to be indicted, as set forth in Paragraph 46 of the Complaint.

RESPONSE:  As Taylor, Connors and Boisseau testified, Taylor kept control of and/or had access to the police investigative file from the time she served as Chief Adamson's assistant /

secretary when he kept the file in his personal office, through the period of time when Chief

Connors took over.    That file included correspondence and reports by Chief Adamson with

numerous entries indicating that he had solicited fingerprints from other law enforcement

agencies and submitted them to State Police fingerprint examiner John Baliunas for comparison

to latent lifts developed at the crime scene, as well as periodic reports back from Mr. Baliunas

that each of the prints compared had been excluded.  In addition, the state police recently

disclosed Mr. Baliunas's original crime scene report, previously disclosed pursuant to Rule 34

and attached again hereto as Exhibit C, indicating that he found, documented and lifted 5 latent

prints from the crime scene.  A handwritten list of names and copies of the latents from the scene

are also attached.  Based on these records as well as the deposition testimony of Boisseau and the

state police 30(b)(6) fingerprint witness, it was known to APD officers including Adamson and

Taylor that latents were indeed lifted from the scene, and that they were of comparable value

(since Baliunas reported exlcusions).  All of this information was known to Taylor and

documented prior to her grand jury testimony in the prosecution of Kenneth Waters.  The only

reasonable inference from these facts is that Taylor knew there were latents lifted from the crime

scene that were of comparable value but knowingly testified falsely that they were smeared

because Mr. Waters's prints either had not been compared, or had been compared and found not

to match the latents from the crime scene.

As a matter of Massachusetts law, a finding of "true bill" by a grand jury, upon

documents and testimony offered in closed session, is an indictment that charges a suspect with a

felony.  Nancy Taylor's false testimony was one piece of evidence giving rise to the indictment

that charged Mr. Waters with homicide, a crime he did not commit.

10

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, specifically including the deposition of John Baliunas, with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence that exists in the record at the time o trial to prove these facts.

16.    Please set forth the factual basis for your contention that "... APD officers conspired to ensure Mr. Waters' conviction ...," as set forth in Paragraphs 47 and 95 of the Complaint, specifying in your response the identity of each conspiring officer and the actions each took in furtherance of the alleged conspiracy.

**RESPONSE:  XXX**

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.

17.    Please set forth the factual basis for your contention that defendant "... Decot and other unknown APD officers ... confiscated ... [and] suppressed ..." the decedent's time cards from Berry Enterprises, as set forth in Paragraph 48 of the Complaint.

RESPONSE:  Mr. Waters told defendants in his May 22, 1980 interview and testified during postconviction proceedings that he was at work on the morning of May 21, 1980, covering for Roger Van Tassel, and that he then went home to put on a suit, and went to Ayer

11

District Court. Elizabeth Lankford, in her recently signed and disclosed sworn declaration, attests that in 1980, Berry Enterprises regularly kept the punch cards indicating the specific hours worked by Park Street Diner employees. As such, his punch card for the date of the murder was exculpatory in that it proved he could not have been in the Brow residence committing a murder because he was at work that morning.

Defendant Boisseau testified that it would have been standard procedure to investigate a suspect's claimed alibi under the circumstances presented here, where Mr. Waters, when interviewed the day after the murder, on May 22, 1980, told investigators that he had been at work at the diner into the morning of May 21. Defendants Boisseau and Taylor testified that defendant Decot was dispatched, and in fact went, to the Park Street Diner for Kenneth Waters's time card soon after the murder. Elizabeth Lankford's declaration attests that defendant Decot and another unnamed APD officer in fact went to the Park Street Diner soon after the murder asking for Mr. Waters's time card.

In addition, Plaintiff Betty Anne Waters testified in her deposition that she went to the Park Street Diner and Berry Enterprises within days of her brother's arrest in October of 1982 to obtain the time cards that would prove his alibi. She was told that police had just called and inquired about Mr. Waters's time cards for the date of the murder, and that police were on their way, so the time cards would not be disclosed to Ms. Waters.

The defense subpoenaed Mr. Waters's time cards for the week of the murder to be produced at trial. Alice Tessier was produced as a witness on behalf of the Diner and/or Berry Enterprises. She brought all the remaining time cards for the Diner for the week of the murder to trial but those reflecting the specific hours worked by Mr. Waters and Mr. Van Tassel were

12

"missing."   See also the post-conviction affidavit of investigator Joseph Guidetti, from the Middlesex County Superior Court File, Docket No. 82-4115, previously disclosed pursuant to Rule 34.

From this evidence a jury could reasonably infer that Mr. Decot and another unnamed APD officer obtained Mr. Waters's time card, that it was exculpatory, and that it was in the custody of Ayer police but not disclosed at the time of trial.  Defendant Boisseau testified that, as the evidence officer for APD during this time period, he ensured that all APD employees knew that any item, documentary or otherwise, with evidentiary value, must be logged in to evidence for chain of custody purposes.  He has no recollection of logging in, nor has any chain of custody documentation been produced, demonstrating that the time card was formally documented in APD custody.  From these further facts a reasonable jury may infer that the APD defendants recognized that the time cards contradicted the statements of Robert Osborne and Brenda Marsh and instead proved Mr. Waters's alibi, and chose not to safeguard and/or disclose these exculpatory records.

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.


18.    Please set forth the factual basis for your contention that "Defendants coerced and manipulated Global Van Lines employees..." into falsely inculpating the decedent, as set forth in Paragraph 49 of the Complaint.

RESPONSE:  Police reports reflect that the victim's husband identified the knife defendants recovered from the trashcan at the murder scene as his own, and therefore any testimony from any other individual purporting to identify the knife was false.  According to the trial testimony of Arthur Johnson, who had a very limited grade-school education and therefore was more open to suggestive interview techniques, defendant Nancy Taylor showed him a photograph of the recovered knife and elicited his statement in which he identified it as a knife Mr. Waters used at Global Van Lines that had gone missing since Mr. Waters had stopped working there prior to the murder.  Indeed, when Johnson testified in court at trial and was for the first time shown the recovered knife, he did not recognize it as Mr. Waters's knife.  A reasonable jury could conclude from these facts that Taylor deliberately used suggestion, manipulation and coercion to induce Johnson into identifying the photograph she showed him of the recovered knife as Mr. Waters's although she knew the victim's husband had already identified it as coming from the family's own kitchen.

Plaintiff reserves the right to supplement her answer with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.


19.    Please set forth the factual basis for your contention that "[t]he APD officers, and specifically defendant Taylor knew or should have known that [the testimony of Roseanna Perry inculpating the decedent] was false," as set forth in Paragraph 55 of the Complaint.

RESPONSE:  As set forth in the October 15, 1984 affidavit of Roseanna Perry attesting

14

to the transcript of her July 15, 1983 interview with attorney Herb DeSimone, and the signed affidavit of Rose Perry, both of which have previously been disclosed pursuant to Rule 34, Nancy Taylor coercively displayed crime scene photographs of the victim to Roseanna Perry to induce her to make inculpatory statements against Waters in reckless disregard for the likelihood that such measures would lead Roseanna Perry to give false statements, Roseanna Perry told Nancy Taylor she and Mr. Waters had been "absolutely plastered" on the night when Mr. Waters made statements to her about the victim and therefore she could not be sure what Mr. Waters had said, and, specifically, whether he had ever made incriminating statements about the victim, and Taylor told her not to testify that she had been plastered but instead to testify at trial that they had merely been "drinking."

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.

20.    Please set forth your contention as to the motive for the defendants to fabricate or suppress evidence to inculpate the decedent.

RESPONSE:    Plaintiff has no burden to prove motive as an element of any of her claims and as such reserves the right to argue any motive, or none, at trial as the evidence develops.

21.    Please describe in full and complete detail all "... exculpatory evidence withheld by the defendants," as set forth in Paragraph 63 of the Complaint.

15

RESPONSE:  Defendants withheld the exculpatory time card proving Mr. Waters's time card for the first hours of the established "time of death window" as set forth above in response to Interrogatory 17, and never documented in any report that they went to the Ayer Street Diner and Berry Enterprises to collect the time card.  Elizabeth Fahey testified in her deposition that she had no knowledge this ever occurred.

Defendants never disclosed to prosecutor Fahey that they pressured, threatened, cajoled, promised, induced and generally coerced Brenda Marsh and Roseanna Perry into making the falsely inculpatory statements they did, as described above in response to Interrogatories.  Elizabeth Fahey testified in her deposition that she had no knowledge this ever occurred.

Defendants never disclosed to the prosecutor that there were usable latent prints of comparable value lifted from the crime scene.  Defendants either intentionally did not send Mr. Waters's prints to the print examiner, John Baliunas, for comparison with the latents he lifted from the crime scene, or did so and intentionally did not report to the prosecutor that Mr. Waters was excluded as the source of the latents lifted from the scene.  Elizabeth Fahey testified in her deposition that she had no knowledge that there were any latent prints lifted at the scene or that any comparisons were conducted.

Plaintiff reserves the right to supplement her response with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.

22.    Please set forth the factual basis for your contention that "there was a policy, custom and

16

practice in the Town of Ayer ... of failing to adequately investigate serious crimes, deliberately

suppressing exculpatory material and coercing witnesses into perjury during criminal

investigations," as set forth in Paragraph 74 of the Complaint.

**RESPONSE**:

In the instant case, as described in detail in response to the above interrogatories, the

defendant officers coercively showed Marsh and Perry gruesome crime scene photographs,

subjected them to constant pressure and intimidation, and repeatedly threatened to charge them as

accessories to murder with reckless disregard to the likelihood that their improper and unlawful

interrogation techniques would cause Marsh and Perry to falsely inculpate Mr. Waters. None of

this was disclosed to the prosecution or defense counsel. In addition, the defendant officers

engaged in the destruction or spoliation of evidence when they collected the time cards of Mr.

Waters and Mr. Van Tassel for the date of the murder yet failed document their visits to the Park

Street Diner in police reports, failed to log the time cards into evidence, and deliberately

suppressed this material exculpatory evidence from the prosecution and defense counsel. Indeed,

not only did they fail to disclose the existence of the time cards and their coercion of witnesses

and fabrication of false inculpatory statements to the prosecution, the defendant officers failed to

disclose that usable latent prints of comparable value were lifted from the crime scene and used

to exclude other suspects and intentionally either failed to have Mr. Waters' prints compared to

crime scene prints or did so and failed to disclose the exculpatory results to the prosecution.


This egregious and unconstitutional misconduct was not limited to Mr. Waters' case, but

rather was a direct and proximate consequence of the defendant Town of Ayer's custom, pattern,

and practice of (1) coercing, pressuring, intimidating, and making promises, rewards, and inducements to witnesses to fabricate false statements or testimony against suspects in criminal cases; (2) engaging in the destruction or spoliation of exculpatory evidence; (3) and deliberately suppressing material exculpatory and impeachment evidence to the prosecution and defense counsel.

In the Downing case, for example, which occurred shortly before the misconduct perpetrated against Mr. Waters in this case, APD officers, with the actual or constructive knowledge of Chief Adamson, employed coercive tactics to pressure a fifteen-year-old vulnerable, frightened, and suggestible minor, Richard Boucher, into falsely accusing APD officer Ernest Downing of molesting him. At Adamson's direction, APD officer Dominick Pugh subsequently filed a false complaint against Downing alleging that he had oral sex with Boucher on two occasions in June 1979. Downing was targeted by Adamson, Pugh, and others in the APD as a retaliatory measure because Downing had reported to the District Attorney's Office that several other APD officers were engaged in serious misconduct, including involvement in drugs and the abuse of prisoners. Just as the defendant officers used scare tactics and threatened to charge Marsh and Perry with crimes in this case to fabricate false inculpatory statements against Mr. Waters, APD officers fabricated evidence against Downing by threatening to charge the alleged complainant Boucher with a crime if he did not make false statements against Downing. Similar to the misconduct that occurred in the instant case, upon information and belief, APD officers failed to disclose to the prosecutor in the Downing case the material exculpatory fact that they used coercive and improper interrogation tactics with the main witness in the case and fabricated his false inculpatory statements against Downing. The misconduct of

18

these APD officers was only discovered because Boucher himself wrote two letters to Downing wherein he apologized to Downing for lying about the charges against him and admitted that he had been coerced and pressured by APD officers who threatened to charge him with a crime if he did not falsely implicate Downing and promised that he would not go to jail if he did falsely implicate Downing.

The Ties incident and the Randall investigation provide additional evidence that APD officers routinely engaged in the suppression, destruction, and/or spoliation of critical evidence and the fabrication of evidence. In 1980, only a few months before the Brow murder and shortly before the misconduct perpetrated against Mr. Waters in this case, APD officer Stanley Randall discovered that four APD officers, including Chief Adamson's son, were the perpetrators of the February 1980 breaking and entering and malicious destruction of property at Ties Construction, a company that hired off-duty APD officers to guard its property. According to his deposition testimony, Randall reported the case to the Attorney General's Office when he discovered that a knife that he had collected from the crime scene and logged into evidence in the case had suspiciously disappeared from the evidence locker. Just as the time cards collected by Officer Decot and another APD officer were not maintained in the proper chain of custody and could not be located, evidence critical to the criminal case against the suspected officers in the Ties incident conveniently went missing. Rather than properly investigating the serious charges brought against his son and the other suspected officers, Adamson brought disciplinary charges against Randall, which were ultimately dismissed in October 1981. In the Fall of 1981, just prior to the date Randall was scheduled to testify in grand jury proceedings brought by the Attorney General's Office against the suspected officers, Nancy Taylor, with the actual knowledge of

19

Chief Adamson, falsely reported that a woman named Lisa Frawley, a close friend of one of the

suspected officers, was raped by APD Officer Stanley Randall in broad daylight in the parking lot

of a diner in Acton, Massachusetts. Similar to the Downing case, Adamson, Taylor, and others at

the APD, targeted Randall as a retaliatory measure due to his investigation of the Ties incident.

Frawley ultimately dropped the rape complaint against Randall and charges were never brought

against him.

Plaintiff reserves the right to supplement her theory on this issue with any discovery

produced after this supplemental response is served, and with expert testimony to be disclosed

according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed

evidence in the record as it exists at the time of trial to prove these facts.

23.    Please set forth the factual basis for your contentions that Town of Ayer "... failed to

adequately screen, train, supervise and/or discipline the individual defendants concerning proper

investigatory techniques, their obligations to disclose exculpatory and/or impeachment evidence

... witness interviews and interrogation" and "... failed to adequately screen, hire, supervise and

discipline officers in order to avoid hiring individuals with a propensity for abusing their police

authority," as set forth in Paragraphs 75 and 76 of the Complaint.

**RESPONSE**: XXX

In the years leading up to Mr. Waters' conviction, defendant Town of Ayer, by and through its final policymakers, had a custom, pattern, and practice of providing woefully inadequate supervision and training to APD officers.

*this case / ties / randall / downing / special officer / lack of supervision / taylor personnel file / connors dep*

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.

24.    Please set forth the factual basis for your contention that the defendants' conduct "... directly and proximately caused Mr. Waters to be wrongfully convicted ...," as set forth in Paragraph 82 of the Complaint.

RESPONSE:  There was no forensic evidence traced to Mr. Waters identified at the scene.  Indeed, hairs and, upon information and belief, latent fingerprints, excluded him.  The only inculpatory evidence introduced against him was the testimony of Brenda Marsh and Roseanna Perry, that had been coerced and fabricated before trial by defendants Taylor and Connors – testimony that defendants knew or should have known was false.  Likewise, defendants Taylor, Decot, Boisseau, Adamson and/or Connors knew about but failed to disclose all of the aforementioned exculpatory and impeachment evidence which, if disclosed, would

have dispositively proven Mr. Waters's alibi and innocence. The wrongful conviction of Mr.

Waters for a homicide he did not commit was the direct, but-for and foreseeable result of

defendants' deliberate fabrications, coercion, suppression of material exculpatory and

impeachment information, and conspiracy to do so.

Plaintiff reserves the right to supplement her theory on this issue with any discovery

produced after this supplemental response is served, and with expert testimony to be disclosed

according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed

evidence in the record as it exists at the time of trial to prove these facts.

Dated: May 15, 2007

_____
Barry C. Scheck, Esq. (BS 4612)
Deborah L. Cornwall, Esq. (DC 2186)
Monica R. Shah, Esq. (MS 9846)
COCHRAN NEUFELD & SCHECK, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Tel. (212) 965-9081 / Fax (212) 965-9084

Robert N. Feldman
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA 02210-1108
Tel. (617) 307-6130 / Fax (617) 307-6101

**Attorneys for Plaintiff Betty Anne Waters**