UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BETTY ANNE WATERS, as Administratrix of the Estate of KENNETH WATERS, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 04 Civ. 10521 (GAO) |
| v. | ) ) | |
| TOWN OF AYER, NANCY TAYLOR-HARRIS, in her individual capacity, ARTHUR BOISSEAU, in his individual capacity, BUDDY DECOT, in his individual capacity, WILLIAM ADAMSON, in his individual capacity, PHILIP L. CONNORS, in his individual capacity, and JOHN DOE and JANE DOES 1–16, in their individual capacities, | ) ) ) ) ) ) ) ) ) | **PLAINTIFF'S THIRD SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |
| Defendants. | ) ) ) | |

Comes Now Plaintiff and offers supplemental responses to the following interrogatories from Defendants' First Set of Interrogatories. By further responding to these interrogatories Plaintiff does not waive any privileges or objections.


3.    Please provide a complete and detailed recitation of the decedent's work history, commencing subsequent to his graduation from high school, providing in your response:

    a.    the identities and addresses of all employers;

    b.    the inclusive dates of the decedent's employment with each such employer;

    c.    the identity of the decedent's immediate supervisor at each place of employment;

1

d.    the decedent's gross compensation at each place of employment;

e.    the decedent's reason for leaving such place of employment.

**RESPONSE**:  In the mid-1970s, Mr. Waters worked as a superintendent for apartment buildings in Portsmouth, New Hampshire.  While he lived in New Hampshire, Mr. Waters also worked as a cook at a local restaurant.  After he moved to Worcester, Massachusetts, Mr. Waters worked as a mover at Global Van Lines.  In 1979, he moved to Ayer and worked as a cook at the Park Street Diner where his immediate supervisor was Frank Matthews.  After moving to Providence, Rhode Island in June of 1980, Mr. Waters worked as cook at a restaurant in Johnston, Rhode Island and at the restaurant Fidas in Providence.  At one point in time, Mr. Waters worked at Roto-Rooter.  Defendants are also respectfully referred to the deposition of Ms. Waters in which she answered counsel's questions as to her brother's employment.


5.    Please provide the name and address of each person (other than your attorneys) known by you to have witnessed or to have knowledge concerning the occurrences set forth in the Complaint.

**RESPONSE:**  The names of persons with knowledge concerning the occurrences set forth in the Complaint are identified, as per Rule 26(a), in lists served on March 7, 2005, February 12, 2007 and May 9, 2007.  Defendants are respectfully referred to those lists for the information requested, which are attached as Exhibit A.  Plaintiff further notes that the Court's rules provide for the disclosure of final witness lists prior to trial.


7.    Please give an account, itemized as fully and completely as possible, of all losses which

2

plaintiff or her legal representatives are claiming were incurred as a result of the occurrences set forth in the Complaint.

**RESPONSE:**   This request prematurely calls for an expert opinion which will be provided at a later stage pursuant to the Court's scheduling order and Fed. R. Civ. Pro. 26(a)(2)(C).   Notwithstanding this objection and reserving the right to supplement with expert opinions according to the schedule set forth above, as a direct result of the defendants' unconstitutional actions, Mr. Waters sustained the following injuries and damages: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, such as diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.  Plaintiff reserves the right to rely on any other evidence in the record of duly disclosed evidence as it exists at the time of trial to prove the nature of Mr. Waters's injuries.


8.      Please set forth in full and complete detail the nature and extent of all injuries, physical, emotional or mental in nature, allegedly suffered by the decedent as the result of the occurrences set forth in the Complaint, including in your response the name and address of each hospital, medical professional and mental health professional which rendered treatment to the decedent, providing a complete description of the treatment the decedent received, and the inclusive dates thereof.

**RESPONSE:** This request prematurely calls for an expert opinion which will be provided at a later stage pursuant to the Court's scheduling order and Fed. R. Civ. Pro. 26(a)(2)(C). Notwithstanding this objection and reserving the right to supplement with expert opinions according to the schedule set forth above, as a direct result of the defendants' unconstitutional actions, Mr. Waters suffered nineteen years of loss of personal freedom in every respect, including but not limited to diet, sleep, personal contact, educational and vocational opportunity, athletic opportunity, personal fulfillment, family relations, sexual activity, travel, enjoyment, and expression.

As a direct result of his wrongful arrest, prosecution, conviction, and incarceration, Mr. Waters suffered permanent physical and psychological injury, including but not limited to, physical complications and deterioration related to liver cirrhosis, mitroval prolapse and hepatitis C, and severe psychiatric and psychological damage, including but not limited to, panic anxiety attack syndrome, depression, insomnia and suicidal ideations. From 1983 until 1992, Mr. Waters was treated by Department of Correction Health Services at MCI-Norfolk by Dr. Khan, Dr. Tatarrunis, Dr. Gilligan and Dr. Eccleton. From 1992 until 1996, Mr. Waters was treated by Department of Correctional Health Services at Old Colony Correctional Center by Dr. Lee and Dr. Ngau. Ms. Waters' refers the defendants to plaintiff's prison and medical records previously provided to defendants contained in the range of pages Bates stamped DOC0000001–DOC1394 and BAW738-9 and BAW742.

Mr. Waters' also suffered permanent loss of family relationships, including but not limited to damage to his relationship with his daughter, Mandy Marsh. Furthermore, Mr. Waters suffered damage to his business and property, including but not limited to loss of income and

career opportunities.

After he was exonerated and released from prison, Mr. Waters was actively in the process of seeking psychological treatment for the emotional trauma that he suffered from being wrongfully convicted and incarcerated for nineteen years. In fact, on the day he died, Mr. Waters had visited the Veterans' Administration Hospital in an effort to seek psychological treatment.

Plaintiff reserves the right to rely on any other evidence in the record of duly disclosed evidence as it exists at the time of trial to prove the nature of Mr. Waters's injuries.

9.      Please indicate whether the decedent has been convicted of, or pled guilty to, a crime. If your answer is in the affirmative, please provide:

      a.      a description of each crime of which the decedent was convicted;

      b.      the date, court and docket number of each such conviction or plea.

**RESPONSE:** Pursuant to Rule 33(d), Mr. Waters's CORI form and Mr. Waters's State of Rhode Island Criminal History Record, previously produced pursuant to Rule 34, are attached hereto as Exhibits B and C. Upon information and belief, Mr. Waters was convicted pursuant to a plea in or about 1974 in Portsmouth, New Hampshire of assault with a knife arising out of an altercation that erupted when he attempted to evict members of a motorcycle club who were trashing apartments for which Mr. Waters was a superintendent at the time. After reasonable inquiry, neither the date, docket number, nature of disposition or court of that conviction is known. Upon information and belief, the Rhode Island and New Hampshire sentences ran concurrently.

10.     Please set forth the date of decedent's death, the circumstances surrounding his death and the cause of his death, as reflected in his death certificate, attaching a copy of same to your Answers to Interrogatories.

**RESPONSE:**   The original response to this interrogatory was amended on or about May 4, 2007 in Plaintiff's Second Supplemental Response to Defendants' First Set of Interrogatories, which attached Mr. Waters's death certificate.  Defendants are also respectfully referred to their November 28, 2006 deposition of the plaintiff Betty Anne Waters at pages 37-40, in which she orally answered this question and described Mr. Waters's fall off of a picket fence, fractured skull, frontal lobe injury, coma, and September 18, 2001 death at Rhode Island Hospital. Plaintiff reserves the right to rely on this and any other evidence in the record of duly disclosed evidence as it exists at the time of trial to prove these facts.

12.     Please identify by name and address the "...waitress from the diner..." referenced in Paragraph 30 of the Complaint.

**RESPONSE:**   After reasonable inquiry, the identity of the waitress from the diner who drove Mr. Waters home after work the morning of the murder is not known.  However, plaintiff has previously disclosed the time cards and tax forms from the Park Street Diner for the relevant time period, which list Park Street Diner employees; the waitress worked briefly for the Park Street Diner in May of 1980 and therefore may or may not be among those names.

13.     Please set forth the factual basis for your contention that the defendants "knew or should have known to be false" the information provided to them by Robert Osborne, as set forth in

6

Paragraphs 38-40 of the Complaint.

**RESPONSE:**  The policy manual in effect at the APD in 1982 warned officers to evaluate the reliability of informants by, among other things, determining their motive. Robert Osborne's admitted motive was monetary gain - he was calling "for financial reasons." Boisseau admitted in his deposition that this information weighed against Osborne's credibility. This was the only information known about Osborne before Chief Connors and Nancy Taylor met with Osborne and Brenda Marsh. Despite the policy manual's admonition that officers should investigate the reliability of informants, according to the depositions of both Taylor and Connors, nothing was done before the meeting with Osborne and Nancy Taylor to investigate Osborne's background, his criminal history, his motivation, his relationship with Brenda Marsh, his antipathy toward Kenneth Waters, or his reliability.  As such, the only information known to Taylor and Connors about Osborne weighed against his reliability.

Nonetheless, Nancy Taylor proffered Robert Osborne as a "reliable informant" in an affidavit in support of a search warrant she applied for on or about October 1, 1982, a warrant that, according to the deposition testimony of Chief Connors, Arthur Boisseau and Elizabeth Fahey, no supervisory official knew about or authorized, and for which there was no legitimate law enforcement purpose.

The APD policy and procedure manual also advised officers to constantly test their informant's information for consistency and truth by checking against information received from other sources.  Here, the October 4, 1092 interview with Brenda Marsh, as recorded in Taylor's October 5, 1982 report, was inconsistent from the information provided by Robert Osborne in critical respects:  According to Taylor's October 2, 1982 report of her September 30, 1982 phone

call with Robert Osborne,  he indicated that his girlfriend washed Waters's bloody clothes after the murder, which would be a highly inculpatory fact.  As indicated in the reports of Taylor's meetings with Marsh and subsequent deposition testimony, she never said she washed Waters's bloody clothes.  According to standard police procedures as indicated in the manual, Connors and Taylor either did ask or should have asked Marsh this question specifically to corroborate or test Osborne's reliability.  Thus, either they did ask that question and she denied washing bloody clothes – a fact that raised additional serious doubts about Osborne's reliability – or, in reckless disregard for their own policies and procedures and the need to determine the reliability of both Osborne and Marsh, they never asked.  As such, the evidence and reasonable inferences therefrom would lead a reasonable jury to conclude that defendants either knew or should have known that Osborne's statement was false.

Indeed, as indicated in her April 11, 2001 affidavit and her October 7, 2006 deposition, Brenda Marsh never told Robert Osborne that she had washed Mr. Waters's bloody clothes after the murder, or that Waters had admitted to killing Ms. Brow or that he had threatened to do the same to her, and Brenda Marsh explicitly told Taylor and Connors at the October 4, 1982 meeting that these statements made by Osborne were false.

Plaintiff reserves the right to supplement her response on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other evidence in the record of duly disclosed evidence as it exists at the time of trial to prove this fact.


14.     Please set forth in full and complete detail the nature and extent of the "...coercive

psychological pressure" placed upon Brenda Marsh by each defendant as set forth in Paragraph 43 of the Complaint.

**RESPONSE:**   The nature and extent of the coercive psychological pressure placed upon Brenda Marsh by defendants Taylor and Connors are set forth in detail in Brenda Marsh's April 11, 2001 affidavit, previously disclosed pursuant to Rule 34, and her October 7, 2006 deposition. Briefly, defendants threatened that if Marsh did not cooperate and give incriminating statements in response to leading questions (or statements) about Waters then she would be charged as an accessory to murder and would lose her children; defendants showed Marsh gruesome crime scene photographs of the victim, and used constant pressure to induce her to make statements consistent with what Osborne had told them.  Such threats were particularly coercive where, as here Ms. Marsh had previously given up custody of her children.

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.


15.     Please set forth the factual basis for your contention that defendant Taylor-Harris testified falsely "...that the unidentified [finger] print ... was smeared and therefore could not be compared to Mr. Waters' prints" and that this testimony caused plaintiff's decedent to be indicted, as set forth in Paragraph 46 of the Complaint.

**RESPONSE:**  Fingerprint examiner John Baliunas testified that the prints were of usable quality and that he never told anyone that the prints were smeared.  In addition, the state police

recently disclosed Mr. Baliunas's original crime scene report and copies of latent print slides, previously disclosed pursuant to Rule 34 and attached again hereto as Exhibit D, indicating that he found, documented and lifted 5 latent prints from the crime scene. Nancy Taylor Harris acknowledged in her deposition that her grand jury testimony with respect to smeared prints, the transcript of which was previously produced pursuant to Rule 34, was incorrect.

In addition, as Taylor, Connors and Boisseau testified, Taylor kept control of and/or had access to the police investigative file from the time she served as Chief Adamson's assistant / secretary when he kept the file in his personal office, through the period of time when Chief Connors took over. That file included correspondence and reports by Chief Adamson with numerous entries indicating that he had solicited fingerprints from other law enforcement agencies and submitted them to State Police fingerprint examiner John Baliunas for comparison to latent lifts developed at the crime scene, as well as periodic reports back from Mr. Baliunas that each of the prints compared had been excluded. Based on these records as well as the deposition testimony of Boisseau and the state police 30(b)(6) fingerprint witness, it was known to APD officers including Adamson and Taylor that latents were indeed lifted from the scene, and that they were of comparable value (since Baliunas reported exlcusions). All of this information was known to Taylor and documented prior to her grand jury testimony in the prosecution of Kenneth Waters. The only reasonable inference from these facts is that Taylor knew there were latents lifted from the crime scene that were of comparable value but knowingly testified falsely that they were smeared because Mr. Waters's prints either had not been compared, or had been compared and found not to match the latents from the crime scene.

As a matter of Massachusetts law, a finding of "true bill" by a grand jury, upon

documents and testimony offered in closed session, is an indictment that charges a suspect with a felony. Nancy Taylor's false testimony was one piece of evidence giving rise to the indictment that charged Mr. Waters with homicide, a crime he did not commit.

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence that exists in the record at the time of trial to prove these facts.

16.    Please set forth the factual basis for your contention that "... APD officers conspired to ensure Mr. Waters' conviction ...," as set forth in Paragraphs 47 and 95 of the Complaint, specifying in your response the identity of each conspiring officer and the actions each took in furtherance of the alleged conspiracy.

**RESPONSE:** Defendants Boisseau, Decot, Taylor, and Adamson, later replaced by Connors, worked together as officers in the APD. Individually and collectively, these defendants knew that there were (1) time cards from the Park Street Diner that proved Mr. Waters's alibi, and (2) usable latent fingerprints collected from the crime scene that exculpated Mr. Waters, and conspired among themselves to deprive the prosecutor and, by extension, Mr. Waters, of that exculpatory evidence by hiding and/or destroying it.

According to Boisseau and Connors' 30(b)(6) depositions, all investigative reports related to the Brow homicide were maintained in a case file that was readily accessible to defendants and other APD officers and all physical evidence was logged by Boisseau and accessible to him. In addition, Boisseau and Taylor testified that they knew that Decot was dispatched to get Mr.

11

Waters time cards from the Park Street Diner and thus they were aware that Mr. Waters was

working at the diner that morning. Boisseau also testified that he informed defendants that he

was in court on the morning of the murder and observed Mr. Waters in a suit at approximately

11am. Boisseau also testified that he observed Mr. Waters the morning after the murder and did

not see a scratch on his face. The defendant officers therefore knew that Brenda Marsh was lying

when she implicated Mr. Waters in the murder because Mr. Waters was at work and in court the

morning of the murder and therefore had an alibi for the entire time frame during which Mrs.

Brow could have been murdered and, in contrast to Marsh's statement, did not have a long deep

red scratch on his face the day of the murder. Despite their knowledge of evidence of Mr.

Waters' innocence and the patent falsity of Marsh's statement, the defendant officers went

forward and wrongfully arrested Mr. Waters.

Each individual defendant made an overt act in furtherance of the conspiracy. Decot

collected the time cards showing that Mr. Waters was at work the morning of the murder and

failed to log them into evidence and/or disclose them to the prosecution. Taylor and Connors

coerced, pressured, intimidated, and made promises, rewards, and inducements to Marsh in

exchange for false inculpatory statements. Taylor also coerced Roseanna Perry and promised not

to charge her as an accessory in order to fabricate false statements against Mr. Waters. Boisseau

failed to document that he saw Mr. Water in court on the morning of the murder and, if the time

cards had been turned over to him by Decot, failed to produce them to the prosecutor. In

addition, neither Adamson nor Boisseau documented that Mr. Waters did not have scratch on his

face the day after the murder. Based on this evidence, a jury can reasonably infer that an

agreement took place between the defendants to ensure the wrongful arrest and conviction of Mr.

Waters and each undertook an overt act in furtherance of the conspiracy

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.

17.    Please set forth the factual basis for your contention that defendant "... Decot and other unknown APD officers ... confiscated ... [and] suppressed ..." the decedent's time cards from Berry Enterprises, as set forth in Paragraph 48 of the Complaint.

RESPONSE:  Mr. Waters told defendants in his May 22, 1980 interview and testified during post-conviction proceedings that he was at work on the morning of May 21, 1980, and that he then went home to put on a suit, and went to Ayer District Court.  Elizabeth Lankford, in her recently signed and disclosed sworn declaration, attests that in 1980, Berry Enterprises regularly kept the punch cards indicating the specific hours worked by Park Street Diner employees.  As such, his punch card for the date of the murder was exculpatory in that it proved he could not have been in the Brow residence committing a murder because he was at work that morning.

Defendant Boisseau testified that it would have been standard procedure to investigate a suspect's claimed alibi under the circumstances presented here, where Mr. Waters, when interviewed the day after the murder, on May 22, 1980, told investigators that he had been at work at the diner into the morning of May 21.  Defendants Boisseau and Taylor testified that defendant Decot was dispatched, and in fact went, to the Park Street Diner for Kenneth Waters's

13

time card soon after the murder. Elizabeth Lankford's declaration attests that defendant Decot

and another unnamed APD officer in fact went to the Park Street Diner soon after the murder

asking for Mr. Waters's time card.

In addition, Plaintiff Betty Anne Waters testified in her deposition that she went to the

Park Street Diner and Berry Enterprises within days of her brother's arrest in October of 1982 to

obtain the time cards that would prove his alibi. She was told that police had just called and

inquired about Mr. Waters's time cards for the date of the murder, and that police were on their

way, so the time cards would not be disclosed to Ms. Waters.

The defense subpoenaed Mr. Waters's time cards for the week of the murder to be

produced at trial. Alice Tessier was produced as a witness on behalf of the Diner and/or Berry

Enterprises. She brought all the remaining time cards for the Diner for the week of the murder to

trial but those reflecting the specific hours worked by Mr. Waters and Mr. Van Tassel were

"missing."  See also the post-conviction affidavit of investigator Joseph Guidetti, from the

Middlesex County Superior Court File, Docket No. 82-4115, previously disclosed pursuant to

Rule 34.

From this evidence a jury could reasonably infer that Mr. Decot and another unnamed

APD officer obtained Mr. Waters's time card, that it was exculpatory, and that it was in the

custody of Ayer police but not disclosed at the time of trial. Defendant Boisseau testified that, as

the evidence officer for APD during this time period, he ensured that all APD employees knew

that any item, documentary or otherwise, with evidentiary value, must be logged in to evidence

for chain of custody purposes. He has no recollection of logging in, nor has any chain of custody

documentation been produced, demonstrating that the time card was formally documented in

14

APD custody. From these further facts a reasonable jury may infer that the APD defendants

recognized that the time cards contradicted the statements of Robert Osborne and Brenda Marsh

and instead proved Mr. Waters's alibi, and chose not to safeguard and/or disclose these

exculpatory records.

Plaintiff reserves the right to supplement her theory on this issue with any discovery

produced after this supplemental response is served, and with expert testimony to be disclosed

according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed

evidence in the record as it exists at the time of trial to prove these facts.


18.    Please set forth the factual basis for your contention that "Defendants coerced and

manipulated Global Van Lines employees..." into falsely inculpating the decedent, as set forth in

Paragraph 49 of the Complaint.

RESPONSE: Police reports reflect that the victim's husband identified the knife

defendants recovered from the trashcan at the murder scene as his own, and therefore any

testimony from any other individual purporting to identify the knife was false. According to the

trial testimony of Arthur Johnson, who had a very limited grade-school education and therefore

was more open to suggestive interview techniques, defendant Nancy Taylor showed him a

photograph of the recovered knife and elicited his statement in which he identified it as a knife

Mr. Waters used at Global Van Lines that had gone missing since Mr. Waters had stopped

working there prior to the murder. Indeed, when Johnson testified in court at trial and was for

the first time shown the recovered knife, he did not recognize it as Mr. Waters's knife. Likewise

previously disclosed documents from the criminal defense file indicate that Everett Lapore was

pressured to identify the knife as Mr. Waters's.  A reasonable jury could conclude from these facts that Taylor deliberately used suggestion, manipulation and coercion to induce Global Van Lines employees into identifying the photograph of the recovered knife as Mr. Waters's although she knew the victim's husband had already identified it as coming from the family's own kitchen.

Plaintiff reserves the right to supplement her answer with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.

19.    Please set forth the factual basis for your contention that "[t]he APD officers, and specifically defendant Taylor knew or should have known that [the testimony of Roseanna Perry inculpating the decedent] was false," as set forth in Paragraph 55 of the Complaint.

RESPONSE:  As set forth in the October 15, 1984 affidavit of Roseanna Perry attesting to the transcript of her July 15, 1983 interview with attorney Herb DeSimone, and the signed affidavit of Rose Perry, both of which have previously been disclosed pursuant to Rule 34, Nancy Taylor coercively displayed crime scene photographs of the victim to Roseanna Perry to induce her to make inculpatory statements against Waters in reckless disregard for the likelihood that such measures would lead Roseanna Perry to give false statements, Roseanna Perry told Nancy Taylor she and Mr. Waters had been "absolutely plastered" on the night when Mr. Waters made statements to her about the victim and therefore she could not be sure what Mr. Waters had said, and, specifically, whether he had ever made incriminating statements about the victim, and Taylor told her not to testify that she had been plastered but instead to testify at trial that they had

16

merely been "drinking." Coercion obviously runs a high risk of generating false statements.

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.

20.    Please set forth your contention as to the motive for the defendants to fabricate or suppress evidence to inculpate the decedent.

RESPONSE:   Plaintiff has no burden to prove motive as an element of any of her claims and as such reserves the right to argue any motive, or none, at trial as the evidence develops.

21.    Please describe in full and complete detail all "... exculpatory evidence withheld by the defendants," as set forth in Paragraph 63 of the Complaint.

RESPONSE:   Defendants withheld the exculpatory time card proving Mr. Waters's time card for the first hours of the established "time of death window" as set forth above in response to Interrogatory 17, and never documented in any report that they went to the Ayer Street Diner and Berry Enterprises to collect the time card.  Elizabeth Fahey testified in her deposition that she had no knowledge this ever occurred.

Defendants never disclosed to prosecutor Fahey that they pressured, threatened, cajoled, promised, induced and generally coerced Brenda Marsh and Roseanna Perry into making the falsely inculpatory statements they did, as described above in response to Interrogatories. Elizabeth Fahey testified in her deposition that she had no knowledge this ever occurred.

17

Defendants never disclosed to the prosecutor that there were usable latent prints of usable value lifted from the crime scene. Defendants either intentionally did not send Mr. Waters's prints to the print examiner, John Baliunas, for comparison with the latents he lifted from the crime scene, or did so and intentionally did not report to the prosecutor that Mr. Waters was excluded as the source of the latents lifted from the scene. John Baliunas testified that Chief Adamson was his main contact with the investigating authorities, and that he relied on Mr. Adamson to convey information about the results of fingerprint analysis to the prosecutor. Elizabeth Fahey testified in her deposition that she had no knowledge that there were any latent prints lifted at the scene or that any comparisons were conducted, and that if she had known these facts she certainly would have promptly disclosed them to the defense. No such disclosure was ever made. Ms. Fahey testified in deposition that she never saw the Adamson police reports indicating his contact with John Baliunas and the elimination of suspects on the basis of their exclusion as the source of the latent prints collected at the crime scene.

Plaintiff reserves the right to supplement her response with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.


22.    Please set forth the factual basis for your contention that "there was a policy, custom and practice in the Town of Ayer ... of failing to adequately investigate serious crimes, deliberately suppressing exculpatory material and coercing witnesses into perjury during criminal investigations," as set forth in Paragraph 74 of the Complaint.

**RESPONSE**:  In the instant case, as described in detail in the response to the above interrogatories, the defendant officers coercively showed Marsh and Perry gruesome crime scene photographs, subjected them to constant pressure and intimidation, and repeatedly threatened to charge them as accessories to murder in order to falsely inculpate Mr. Waters.  None of this was disclosed to the prosecution or defense counsel.  In addition, the defendant officers engaged in the destruction or spoliation of evidence with respect to the time cards, which they collected yet never logged into evidence or disclosed to the prosecutor.  Not only did they fail to disclose the existence of the time cards and their coercion of witnesses and fabrication of false inculpatory statements to the prosecution, the defendant officers failed to disclose that usable latent prints of comparable value were lifted from the crime scene and used to exclude other suspects and intentionally either failed to have Mr. Waters' prints compared to crime scene prints or did so and failed to disclose the exculpatory results to the prosecution.

This egregious and unconstitutional misconduct was not limited to Mr. Waters' case, but rather was the direct and proximate consequence of the defendant Town of Ayer's custom, pattern, and practice of (1) coercing, pressuring, intimidating, and making promises, rewards, and inducements to witnesses to fabricate false statements or testimony against suspects in criminal cases; (2) engaging in the destruction or spoliation of exculpatory evidence; (3) and deliberately suppressing material exculpatory and impeachment evidence to the prosecution and defense counsel.

In the Downing case, for example, which occurred shortly before the misconduct perpetrated against Mr. Waters in this case, APD officers, with the actual or constructive knowledge of Chief Adamson, employed coercive tactics to pressure a fifteen-year-old

19

vulnerable, frightened, and suggestible minor, Richard Boucher, into falsely accusing APD officer Ernest Downing of molesting him. At Adamson's direction, APD officer Dominick Pugh subsequently filed a false complaint against Downing alleging that he had oral sex with Boucher on two occasions in June 1979. Downing was targeted by Adamson, Pugh, and others in the APD as a retaliatory measure because Downing had reported to the District Attorney's Office that several other APD officers were engaged in serious misconduct, including involvement in drugs and the abuse of prisoners. Just as the defendant officers used scare tactics and threatened to charge Marsh and Perry with crimes in this case to fabricate false inculpatory statements against Mr. Waters, APD officers fabricated evidence against Downing by threatening to charge the alleged complainant Boucher with a crime if he did not make false statements against Downing. Similar to the misconduct that occurred in the instant case, upon information and belief, APD officers failed to disclose to the prosecutor in the Downing case the material exculpatory fact that they used coercive and improper interrogation tactics with the main witness in the case and fabricated his false inculpatory statements against Downing. The misconduct of these APD officers was only discovered because, according to a news report previously disclosed, Boucher himself wrote two letters to Downing wherein he apologized to Downing for lying about the charges against him and admitted that he had been coerced and pressured by APD officers who threatened to charge him with a crime if he did not falsely implicate Downing and promised that he would not go to jail if he did falsely implicate Downing.

The Ties incident and the Randall investigation provide additional evidence that APD officers routinely engaged in the suppression, destruction, and/or spoliation of critical evidence and the fabrication of evidence. In 1980, only a few months before the Brow murder and shortly

20

before the misconduct perpetrated against Mr. Waters in this case, APD officer Stanley Randall discovered that four APD officers, including Chief Adamson's son, were the perpetrators of the February 1980 breaking and entering and malicious destruction of property at Ties Construction, a company that hired off-duty APD officers to guard its property.  According to his deposition testimony, Randall reported the case to the Attorney General's Office when he discovered that a knife that he had collected from the crime scene and logged into evidence in the case had suspiciously disappeared from the evidence locker.  Just as the time cards collected by Officer Decot and another APD officer were not maintained in the proper chain of custody and could not be located in Mr. Waters' case, evidence critical to the criminal case against the suspected officers in the Ties incident conveniently went missing.  In the Fall of 1981, just prior to the date Randall was scheduled to testify in grand jury proceedings against the suspected officers, Nancy Taylor, with the actual knowledge of Chief Adamson, falsely reported that a woman named Lisa Frawley, a close friend of the suspected officers, was raped by APD Officer Stanley Randall in broad daylight in the parking lot of a diner in Acton, Massachusetts.  In fact, Frawley ultimately dropped the rape complaint against Randall and charges were never brought against him.

In addition, APD officers engaged in similar misconduct in the Dennis Maher case, which though it occurred shortly after the misconduct in this case is directly relevant to Plaintiff's *Monell* claims.  According to the deposition testimony of M.G., the complainant in Maher's case, Nancy Taylor promised to drop pending charges against M.G. in exchange for her cooperation and false testimony against Dennis Maher.  The evidence of this promise, reward, and/or inducement for M.G.'s false inculpatory statements was never disclosed to the prosecution or defense counsel, just as the promises, inducements and rewards to Brenda Marsh and Roseanna

21

Perry were not disclosed prior to Mr. Waters's conviction.

From this evidence and the facts of Mr. Waters' case, a reasonable jury could infer that defendant Town of Ayer had a custom, pattern, and practice of (1) coercing, pressuring, intimidating, and making promises, rewards, and inducements to witnesses to fabricate false statements or testimony against suspects in criminal cases; (2) engaging in the destruction or spoliation of exculpatory evidence; (3) and deliberately suppressing material exculpatory and impeachment evidence from the prosecution.

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, specifically including any materials disclosed pursuant to the pending motion to compel *Monell* evidence, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.

23.    Please set forth the factual basis for your contentions that Town of Ayer "... failed to adequately screen, train, supervise and/or discipline the individual defendants concerning proper investigatory techniques, their obligations to disclose exculpatory and/or impeachment evidence ... witness interviews and interrogation" and "... failed to adequately screen, hire, supervise and discipline officers in order to avoid hiring individuals with a propensity for abusing their police authority," as set forth in Paragraphs 75 and 76 of the Complaint.

**RESPONSE**: In the years leading up to Mr. Waters' conviction, defendant Town of Ayer, by and through its final policymakers, had a custom, pattern, and practice of providing woefully inadequate supervision and training to APD officers. As described in greater detail in

the response to Interrogatory 22, the Downing, Ties, Randall, and Maher cases and the
misconduct perpetrated against Mr. Waters demonstrate that APD was a dysfunctional and
corrupt police department, where police officers felt free to coerce and threaten witnesses into
making false inculpatory statements against criminal defendants, fail to maintain the proper chain
of custody of critical pieces of evidence, and suppress material exculpatory and impeachment
evidence from the prosecution and defense.  From this evidence alone, a reasonable jury could
infer that the APD suffered from a total absence of adequate supervision and training.

In addition, however, according to Nancy Taylor's deposition testimony and personnel
file, Taylor had not attended the police academy and merely held the position of dispatcher,
executive secretary, and special officer during the period of time that she investigated the Brow
homicide.  Taylor's role as special officer was limited to investigating rape cases, and she had no
experience investigating homicides.  Further, she had not received any training in basic homicide
investigations, much less interrogation techniques, search warrant affidavits, and the obligation
to disclose Brady material.  At her deposition, Taylor also testified that she had never seen, read
or heard about any of the policy manuals in effect in 1982 in the APD, including the policy
manual that specifically addressed guidelines for assessing the credibility of informants,
interviewing witnesses, or handling evidence.  According to Taylor's personnel file and the
Connors deposition, Connors and the Board of Selectmen had actual knowledge of Taylor's total
lack of training and serious limitations as an investigating officer yet permitted her to be the lead
investigator of the Brow homicide.

Plaintiff reserves the right to supplement her theory on this issue with any discovery
produced after this supplemental response is served, and with expert testimony to be disclosed

according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.

24.    Please set forth the factual basis for your contention that the defendants' conduct "... directly and proximately caused Mr. Waters to be wrongfully convicted ...," as set forth in Paragraph 82 of the Complaint.

RESPONSE: There was no forensic evidence traced to Mr. Waters identified at the scene. Indeed, hairs and, upon information and belief, latent fingerprints, excluded him. The only inculpatory evidence introduced against him was the testimony of Brenda Marsh and Roseanna Perry, that had been coerced and fabricated before trial by defendants Taylor and Connors – testimony that defendants knew or should have known was false. Likewise, defendants Taylor, Decot, Boisseau, Adamson and/or Connors knew about but failed to disclose all of the aforementioned exculpatory and impeachment evidence which, if disclosed, would have dispositively proven Mr. Waters's alibi and thus his innocence. The wrongful conviction of Mr. Waters for a homicide he did not commit was the direct, but-for and foreseeable result of defendants' deliberate fabrications, coercion, suppression of material exculpatory and impeachment information, and conspiracy to do so.

Plaintiff reserves the right to supplement her theory on this issue with any discovery produced after this supplemental response is served, and with expert testimony to be disclosed according to the Court's scheduling order and Rule 26(e), and to rely on any other duly disclosed evidence in the record as it exists at the time of trial to prove these facts.

Dated: May 21, 2007

Barry C. Scheck, Esq. (BS 4612)
Deborah L. Cornwall, Esq. (DC 2186)
Monica R. Shah, Esq. (MS 9846)
COCHRAN NEUFELD & SCHECK, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Tel. (212) 965-9081 / Fax (212) 965-9084

Robert N. Feldman
Birnbaum & Godkin, LLP
280 Summer Street
Boston, MA 02210-1108
Tel. (617) 307-6130 / Fax (617) 307-6101

**Attorneys for Plaintiff Betty Anne Waters**

**Certificate of Service**

I, Micah West, being over eighteen years of age, hereby certify pursuant to the laws of the Commonwealth of Massachusetts that I served the following parties by electronically filing this document through the Court's ECF system, and by placing a copy thereof in the United States Postal Service mailbox, today, May 21, 2007.

Joseph L. Tehan, Jr.
Gregg J. Corbo
Jeffrey T. Blake
Janelle Austin
Kopelman & Paige, PC
101 Arch Street, 12th Floor
Boston, MA 02116

Micah West