JEROME ROGOFF, M. D.
659 CHESTNUT STREET
WABAN, MASSACHUSETTS 02468
Office Telephone 617-964-1805

**FORENSIC PSYCHIATRIC REPORT OF JEROME ROGOFF, M.D. ON KENNETH WATERS**

August 19, 2007

Re: Waters v Town of Ayer, et al

At the request of Debi Cornwall, Esq. of Cochran Neufeld & Scheck, LLP, I reviewed the materials she sent me concerning the above case. She asked me to try to ascertain, as far as possible, what, if any, emotional and psychological suffering and damage was inflicted on Kenneth Waters as a direct result of his incarceration for just under 18 years for a crime that he did not commit. I also interviewed his sister, Betty Ann, on July 12 for 1¾ hours, and I spoke by telephone to his mother, Elizabeth O'Connor, for a ¼ hour. Finally, on July 17, I spoke by phone to another sister, Carolyn, for ¼ hour.

The materials that I reviewed were his prison records, deposition transcripts of Betty Ann Waters and Brenda Marsh, a record of a medical office examination of Kenneth Waters dated 4/25/0l, just after his release from prison, and the Complaint and Jury Demand in this case.

I am a psychiatrist, certified in Psychiatry by the American Board of Psychiatry and Neurology, a Distinguished Life Fellow of the American Psychiatric Association, and a former Councilor and Past President of the Massachusetts Psychiatric Society. I am a Deputy Area Representative in the Assembly of the American Psychiatric Association. I am also a psychoanalyst and a forensic psychiatrist and member of the American Academy of Psychiatry and Law. I was Associate Clinical Professor of Psychiatry at Tufts Medical School from 1976 to 1986 and Lecturer on Psychiatry at Harvard Medical School from 1986 to 1994 and from 2001 to the present. I was Associate Chief of Psychiatry and Chief of Inpatient and Day Hospital Psychiatry at the Faulkner Hospital in Boston from 1975 to 1994. I was for four years Senior Psychiatrist at the Massachusetts Correctional Institution at Norfolk, have been a consultant to the Massachusetts Governor's Board of Pardons and Commutations, to the Parole Board, and to the Probate Court of Plymouth County, Massachusetts, as well as to the Law Enforcement Assistance Administration of the Federal government. I have served as an expert witness in most areas of forensic psychiatry, both civil and criminal. I was a founding partner of the Law and Psychiatry Resource Center, P.C., of Boston. I am now in full-time private practice of psychiatry, psychoanalysis and forensic psychiatry.

It is my professional opinion, with a reasonable degree of medical certainty, that Kenneth Waters suffered a massive psychological regression as a direct result of his incarceration in 1983, causing him to resemble what is known psychiatrically as a Borderline Personality Disorder, characterized by a state of chronic rage, manipulativeness, infantile behavior, attention-seeking hypochondria, unstable affect (emotional states), impulsive self-mutilating acts, suicidal ideation and occasional suicidal behavior and feelings of emptiness (by inference from his statements in the record). He was also subject to recurrent panic-like attacks which I see as part of a chronic Generalized Anxiety Disorder with Agoraphobia. He also suffered from recurrent depressive states. In addition to these formal psychiatric disorders, he suffered from the social opprobrium and ignominy of having these symptoms in the prison setting that marked him as weak in the eyes of other inmates, subjecting him to painful ridicule. Moreover, he contracted chronic Hepatitis C while in prison, which became symptomatic, and led to an ongoing battle with the prison authorities to get adequate treatment, which battle was exacerbated by the authorities' disregard of his agoraphobia (see below), leading to a state of chronic frustration and more rage in Kenny Waters. The data and reasoning on which my opinion is based follow.

Kenneth (Kenny) Waters was born on August 16, 1953, into a Roman Catholic family, the third of 9 children, with two older brothers, two sisters just younger, and four younger siblings. He grew up in Ayer, MA. He never knew his father and he was raised by his mother and his grandparents. The five enumerated siblings above were close to each other. Kenny's sister, Betty Ann, the fourth of the nine siblings, described him when young as a somewhat overweight, mischievous lad who skipped school, but always told the truth, including about his truancy. He fell off of a roof when he was about 10 years old, landing on his head. He was in a coma for a month after that, but recovered fully (from the medical record [7/25/83] and corroborated by his mother and sister). His two sisters describe him in the same terms: happy-go-lucky with a great sense of humor, not a complainer, whiner or ever a hypochondriac, never depressed, easy to talk to, a good listener, one who gave good advice. They both also agreed that he was never sick, other than the fall described above, did not see doctors, never complained of any ailments, and was never overtly self-destructive (leaving aside the covert self-destructiveness of his alcohol abuse) or self-mutilating. He had no sleep problems before entering prison, nor any panic attacks (one sister has them). He was a partier. Carolyn, whom he gave away at her wedding, remembers him as never being on medication and as always having been a positive person. Both sisters say that he was never suicidal, nor was he agoraphobic. Carolyn avers that he was just the opposite: a gregarious crowd-lover. He was serious at work, leaving one job when the place closed and others when he moved. Carolyn worked with him "at a couple of jobs," where "people we worked with loved him." He was comical and often told jokes. Carolyn never saw him become violent, even when drunk. Kenny was close to her children, who were eight and ten years old when he went to prison, and he was close friends with Carolyn's husband.

2

Kenny's mother told me that he worked for Roto Rooter as a teenager, at about 16, when she was in the hospital, to make money for the family, as there was little of it at the time. He also worked on his grandfather's farm and was the grandfather's favorite. He was always very helpful to her and to her father. She remembers him as having been "helpful, loyal and loving." He was an animal lover. He was always energetic and active, but not anxious, did not have panic attacks and was never a hypochondriac. Nor did he ever show self-destructive behavior. She confirms that he got hepatitis B at about that time. She too said that he was always very healthy, never complained of illnesses and was never hospitalized other than for the fall and briefly for the hepatitis B. She was not aware of any drug abuse other than the alcohol, which she minimized or did not know the extent of. Betty Ann did not know of any intravenous drug abuse. She thinks he may have tried it, but was never hooked on it. However, the hepatitis B must almost surely have come from a dirty needle, as he did not have any transfusions. Betty Ann knew that he had become drug-seeking in prison, "to find oblivion," she said.

Both of his sisters say that he drank too much. Carolyn averred that they all drank a lot. Betty Ann said that Kenny did not drink all the time, but when he drank, he drank too much and said so himself. According to Brenda Marsh, with whom he lived for a while, he was frequently violently abusive of her when drunk, which was often. He could be quite violent, she said, sometimes not only beating her severely, but threatening to kill her, and once trying to throw her out of a window.

Kenny was charged with a Breaking and Entering in Rhode Island at one point, but the charges were dropped. He was convicted of one episode of violence in Portsmouth, New Hampshire, where he was managing an apartment building and had to evict bikers who wouldn't leave but were trashing the apartment. Kenny beat one of them up severely, cutting his neck and was imprisoned for that (Assault with a Dangerous Weapon). He was also accused of assault on a police officer (for which he was in court on the morning of the murder of which he was convicted). According to Betty Ann, he was on his grandfather's property with a sickle and had cut his uncle's fence. The uncle called the police. Kenny was, according to his sister, carrying the sickle in the appropriately safe manner, which, however, appeared to the police to be aggressive. They ordered him to put the sickle down, and he refused, not understanding why they so ordered him. Eventually he did put it down, but was charged with Assault with a Dangerous Weapon on a police officer.

In commenting on his behavior after release from prison, Betty Ann commented that "he was still a kid." Indeed, the picture that emerges of Kenny Waters at the time of his incarceration is that of an immature, fun-loving, still adolescent 30-year-old alcoholic, who was loving, helpful and considerate while at the same time also capable of irresponsible violence when drunk, or when

threatened or pushed too hard.  He was no angel, nor was he a hardened criminal.  He was an immature kid in no way prepared for the rigors of prison life, especially knowing that he was innocent, unjustly convicted, and did not belong in prison.

The murder of an older woman, a Mrs. Brow, who lived behind where Kenny had been living occurred on May 21, 1980.  Kenny was arrested and indicted on November 8, 1982, tried on May 4, 1983, found guilty of murder and armed robbery on May 11, 1983, and sentenced to Life in Prison, with a concurrent sentence of 8-10 years for the robbery.   On admission to prison, it was noted that he had a 13-year history of alcohol abuse and of smoking three packs of cigarettes a day.

The prison record is utterly replete with evidence of his emotional deterioration from the beginning of his prison term.  I can cite excerpts of the record to document that statement that would fill many pages, and I will cite a number of them as representative, but I will not attempt to list them all, (I do have them documented in my notes.)  As an initial summary, however, here is a list of symptoms, chronic or recurrent, that can be found throughout the record: anxiety, depression, insomnia, headaches, chest pain, dyspnea (shortness of breath), dizziness, blurred vision, decreased ability to concentrate and  various pains.  None of these were, by history, present before he entered prison.  And no physical cause could be found for any of them.  Several of them—chest pain and dyspnea, for example--are suggestive of a heart attack, which Kenny feared he was having several times in prison, but was unrelated to anything cardiac.  Rather, all of these were either psychosomatic or hypochondriacal, indicative of his chronic anxiety and intermittent depression.  In addition to these chronic symptoms, he also had symptoms of hepatitis: fatigue, diarrhea, pruritis (itching) and abdominal cramps.  Already overweight when he entered prison, he gained 45 lbs. while there.

And here is a list (probably not exhaustive, but surely indicative) of the medications, by category, that he was given over the course of his imprisonment to try to deal with the symptoms he presented and the suffering they caused him.  Anxiolytics (anti-anxiety medicines): Valium, Librium, Xanax, Klonopin, Tranxene, Ativan, Inderal.  Anti-depressants: Nardil, Tofranil, Elavil, Trazodone, Sinequan several SSRI's (Prozac, Zoloft,).  Neuroleptics (anti-psychotics): Navane, Mellaril, Stelazine, Trilafon.  Mood stabilizers: lithium, Tegretol.  Sleep medication: the benzodiazepines (some of the anxiolytics listed above, which can also be used to induce sleep), Trazodone, Benadryl.

Kenny had been jailed in November, 1982, and was transferred to prison in May, 1983.  By May 18, depression was already noted.  By August, he had had an anxiety attack.  Throughout his prison career, understandably, he is obsessed with his legal struggle to prove his innocence, and he is on an emotional roller coaster as he first has hope and then it is dashed, and he hires a

new attorney, giving him hope again. In the meantime, he is intermittently depressed and he begins to have suicidal thoughts. A note of 6/7/88 cites an earlier panic attack. Ten days later he is noted to be anxious and very discouraged. Ten days after that (4/27/88) he lacerated his right calf and is confined in a solitary "strip" cell to protect him from himself. No showers, no phone, no smoking, and he is on 15-minute checks. In view of his complaints of chest pain and panic attacks, it is assumed by at least one doctor working in the prison that he has unstable angina and mitral valve prolapse (panic attacks sometimes accompany mitral valve prolapse.) However, on 4/25/88, he is given an echo cardiogram which shows that he does not have a mitral valve prolapse. Despite that conclusive evidence, the finding is later ignored and others cite a mitral valve prolapse as part of his history in attempting to explain his panic attacks. Similarly, at a few points in the record, medical personnel wonder if he has Bipolar II Disorder (periods of depression alternating with hypomanic, but not manic, behavior), since at times his behavior seems hypomanic. However, a careful perusal of the record shows that those seemingly hypomanic episodes were in response to too much anti-depressant medication and not present in the absence of such medication (an occurrence that is sometimes called Bipolar III Disorder)

A word here about his panic attacks. The description of them in the record does indeed accord with the definition of panic attacks, but true panic attacks usually occur out of the blue, with no clear precipitating event or trigger, or at least not consistently with a clear precipitant, as was the case with Kenny Waters. That makes me conclude that they were not true panic attacks in the sense that they were primarily of biologic origin, but rather were severe anxiety attacks in response to specific situations he encountered in prison, reactive to circumstances, that were, however, clinically indistinguishable from true panic attacks (see progress note of 10/31/85 and 4/12/93). The distinction is not academic. The attacks Kenny Waters suffered in prison were a result of, and caused by, his being in prison, rather than something he brought with him to prison. The absence of any such attacks prior to his incarceration argues strongly for that conclusion. On 2/25/86, he is noted to have had two panic attacks in 16 days.

These attacks figured prominently in a long struggle Kenny had to get adequate treatment for the hepatitis C that was first diagnosed in prison, on 2/26/91. He had earlier had hepatitis B, as noted above, but he had a negative titer of the antibody to hepatitis B when tested in prison in 1986, meaning that he did not have a clinical case of hepatitis B. Later, a core antibody to hepatitis B was detected, meaning only that he had had it sometime in his past, but did not have it clinically at that time, reflected in his liver function tests having been normal. By 1988 they were abnormal, and by 1991 they were very elevated, with an enlarged liver, leading to the diagnosis of hepatitis C.

A liver biopsy was recommended in March, 1992, but he was not given it until December of that year. A specialist recommended that he be given alpha interferon, a new treatment at that time for hepatitis, in March, 1992, at the time the recommendation for the biopsy was made, but he was not started on the medication until March, 1993. That was the result of a long and very frustrating struggle Kenny had with the authorities in the prison. Because of his agoraphobia and fear of denigration and abuse if he were seen to be phobic in the company of other inmates, he felt he could not travel to the Lemuel Shattuck Hospital, the hospital used for inmates, in a van full of other inmates, where he felt sure to have an anxiety attack. The same held true for having to wait in a waiting room full of inmates. A note at the Shattuck Hospital on 4/3/88 says that his panic symptoms are "brought on by crowds or stressful situations."

This problem is sympathetically noted in a progress note of 9/16/92 by David Kent, M.D., who orders that Kenny be transported to the hospital when necessary by car rather than by van, obviating his having to wait in a waiting room full of inmates as well as having to travel with them. However, this order is consistently ignored, and each time Kenny is scheduled to see a doctor either to have his biopsy or to receive his interferon treatment, he is scheduled to travel by van and wait in the waiting room with the other inmates. He consistently refuses to do so, citing the order for him to have a car, and each time he is listed as uncooperative and refusing treatment. He keeps writing that he is not refusing treatment, but rather that he desperately wants it, but he cannot risk or endure a panic attack in the presence of the other inmates. He is ignored, frustrating him to the point of suicidal ideation and self-destructive behavior. Although, like Dr. Kent, I have no doubt that his fear was well-founded, there probably was an element of passive-aggressive struggle in his behavior, as he fought mightily to find some way to exert some control over the conditions of his life and to resist the helplessness forced upon him by prison life. Either way, it caused him untold suffering.

Even earlier, Kenny did not know what to do with his rage. Angry over a disciplinary report, he put his arm through a window on March 9, 1988, resulting in multiple lacerations. In April, 1988, he had his first Health Services Unit (at MCI, Norfolk) admission for self-inflicted wounds. He is admitted again in 1992 for self-inflicted wounds. A note of 3/3/92 describes his hypochondria as having small problems appear large and then he gets desperate (repeated on 10/16/92). He is noted to be desperate for attention and passive-aggressive. He scratches and lacerates his arm and his penis (so as to claim blood in his urine). He doesn't know what to do with his anger. He has a lot of tightness in his chest due to anxiety. On 7/22/92 he slashed his wrist and forearm. It is called a suicide attempt, but he says it was to relieve anxiety, and he felt "high" afterwards. He is at this point quite infantile and is willing to "cut off his nose to spite his face," or rather to spite another's (the prison authority's) face. He has no frustration tolerance in an environment that systematically breeds frustration. On 8/23/93

he is seen to be "at risk for self-injury." From that point until 9/4/93, he is on suicide watch. "He is well known to psychiatric services for self-abusive behavior." He cut his left arm. On 8/16/95 he cut himself with a razor blade because he wanted immediate shoulder surgery. On 5/2/96 he cut his arm in reaction to his frustration at not getting the medication he wanted. And so on.

Along with this not truly suicidal self-injurious behavior were several real suicide intents, one real attempt and much genuine suicidal ideation. In November, 1985, he finds "Life is not worth living." He cannot relax, nothing interests him. He is "very anxious, depressed in tears and very emotional." In 1/9/90 he has suicidal ideation. On 5/29/90, "Pt is finally past stage of being angry—is finally at the state where he feels he should try to kill self. Feels visits were lousy—all relatives do is cry. Stopped all visits. Visits had bummed him out. Is more hopeless about legal matters & many things. Family hasn't followed through. They don't understand there's no getting out and no parole. Decided the struggle is over—panic is about dying here in prison. At least if he is dead, he'll no longer hassle family….Was thinking of just injecting AIDS—feels it's better than killing self because that would be admission of guilt." On 10/5/92 "on 10th anniversary of his incarceration for a crime he didn't commit," saying, "this is enough. I can't take it anymore." He had written notes to his family hoping they would forgive him and that he had whatever was necessary to do what he planned, threatening to kill himself. States that there is no justice while he is innocent and he is creating so much anguish to the family and he wants to end his life. In 2/20/94 he attempts suicide by hanging. On 3/28/2000 he is quoted as saying, "I'm miserable and have nothing to look forward to and I'm going to kill myself the first chance I get."

Although most of his self-injurious behavior was in the service either of relieving tension or of gaining attention and/or manipulating others, there is no question that Kenny Waters was intermittently—often—depressed, and many times seriously so, and truly suicidal from time to time. On 7/29/94 he complained of having been depressed since coming into the prison 12 years before. That is largely true, judging from the record, despite some relatively brief periods during which he did not seem to be depressed. On 8/24/84 he is "depressed and weeping." Mention of his depression is made in the record on 5/13 and 18/83, 10/20/85, 4/27 to 5/17/88, 10/8/89, 5/29/90, 8/9/90, 4/2/91, 7/29/94, 4/25/95, in addition to the self-mutilating and possibly suicidal behaviors mentioned above.

With so much anguish, it is not surprising that he spent some years in psychotherapy. In 1991 mention is made in the record that he had been in psychotherapy since May, 1988, and the need for ongoing psychotherapy is noted. In July, 1994 he asked to see a psychiatrist because he was depressed. It is not clear to me from the record just how many times and for how long each time he was in psychotherapy, but it is clear that he needed and sought it for support in his misery and anguish. There are progress notes in the medical

7

record by his psychotherapist, but no separate log of psychotherapy notes. At one point the therapist reveals the kind of Catch-22 dilemma every wrongfully committed inmate runs up against and is the source of profound frustration and rage: the rejection and condemnation of the inmate because he will not own up to or face or show sufficient contrition for his crime. For example, from the record at 8/3/84: "He is preoccupied with his court case, says he is innocent of murder…It is difficult to help this man as all he wants to do is prove his innocence to me. I have little to offer right now and suggested he come back in 2-3 weeks."

Kenny Waters did not spend all his time in prison regressed, depressed and suicidal. He also did what he could to make some positive use of his time there. He learned Basic Law Skills at the Norfolk Law Class in 1984, completed a course in Automotive Theory II in 1990, and he was ordained a minister in the Universal Life Church in 1996. He also earned a number of Certificates of Achievement in vocational education by the Commonwealth of Massachusetts in Fundamentals of Automotive, Culinary Arts, Oil Heating, Air Conditioning and Refrigeration, and Drafting Technology, as well as having been involved in the opening of an inmate-run restaurant, the Golden Spoon, at MCI, Norfolk.

Betty Ann Waters had passed her GED exam. Kenny, in his desperation, told her that she had to go to law school so as to be able to find a way to prove his innocence and get him out of prison. Betty Ann started with a community college, then Rhode Island College, majoring in economics. The only law schools at that time were in Boston, and she lived in RI, so she decided to get a Masters degree in Education to teach and attend law school on weekends and evenings, but a year later, Roger Williams University opened a law school. She was accepted, earning her law degree three years later. It was she who started the process that led to the investigation of the original crime, the finding of evidence that had been kept from the defense and the eventual exoneration of her brother by DNA analysis and the revelation of all the improper and illegal procedures that had been employed to convict him. Kenny Waters's conviction was vacated on March 16, 2001, at which time he was released, and all charges were finally dropped on June 19, 2001.

Even as his case entered a new phase due to the efforts of his sister, hopefulness came slowly, while frustration continued to reign. Beginning in 1999, when the possibility of new evidence in his case based on DNA was broached, he began to think that release was imminent. However, such was not yet to be the case, and he had to endure a series of delays in the legal system, and in March, 2000, it is noted that he is still suicidal, but with "suicidal plans nonspecific." He was placed on watch. However, by August, 2000, he seems to have turned an emotional corner, and speaking with his lawyer seems to have convinced him that he will indeed soon be released. In Sept, 2000, he is described as optimistic and forward looking. In Oct., "He feels he may be out within next 30 days. He is optimistic and excited to the point where it's sometimes hard to sleep. He is [sic] good spirits to say the least. Personally

elated mood.  Feels he is in end stage of his incarceration."  By November, "he says it's still an 'emotional rollercoaster'.  His spirits are high.  He is confident that his innocence will soon be proven.  He says sometimes it's hard to sleep b/c of his excitement.  He seems to be handling this situation as well as can be expected.  He receives support and encouragement from family and legal team."  As release became imminent, he became nervous, breaking out in a neurodermatitis (nervous rash) and having trouble sleeping, but he remained "excited and very upbeat."  Clearly, as the possibility of his release became a reality and then an inevitability, his depression evaporated, along with his suicidality and many, if not all, of his symptoms and pathologic behaviors.  The nervousness described as release approached has the flavor of normalcy rather than pathology.

After he was released, he was seen by an internist on April 4.  He continued to suffer symptoms of hepatitis C.  He continued to have shortness of breath on exertion, which probably was due to his obesity.  He suffered nausea, bruised easily, had aches, spasms and limited range of motion of his legs, mildly high blood pressure, a tender abdomen with positive bowel sounds, an enlarged liver that was felt four fingerbreadths below the rib cage and was tender, mild swelling of his ankles and a slow gait.  At that time his affect was described as good.  Further treatment of his hepatitis was planned pending the results of his lab tests.

Tragically, Kenny Waters died on September, 19, 2001, while running back to his home from a nearby restaurant to see if someone there wanted food brought back.  He took a shortcut and while attempting to climb over a fence or wall, he fell 15 feet and, ironically in repetition of his fall at age 10, he landed on his head, only this time he died.

In all of this, there can be no doubt that Kenny Waters suffered miserably the entire time he was incarcerated.  Not only did he respond to imprisonment by regressing to an infantile, dependent, whining, complaining and hypochondriacal state, he became self-mutilative and at times suicidal.  He contracted hepatitis C in prison, and lived with the fear of death from it.  He was symptomatic with it, as described above.  He lived with chronic severe anxiety and extreme anxiety (panic) attacks, chronic frustration and guilt over the trouble and anguish he was causing his family, intermittent severe depression, a pervasive feeling of hopelessness and a constant and impotent rage.  In other words, he lived the entire time from May, 1983 to March, 2001, in a state of abject misery and profound unhappiness and anguish, deprived of just about every joy, satisfaction and contentment an ordinary life might have provided.  His tragic end, coming so soon after his release, meant that he never could even begin in earnest to find those satisfactions in whatever life would have remained to him, thereby gaining some solace in a life not entirely wasted and making up some of what he was deprived of for almost 18 years.

I declare under the pains and penalties of perjury that the foregoing is true.

Jerome Rogoff, M.D.
August 21, 2007

CASES IN WHICH I HAVE TESTIFIED DURING THE PAST FOUR YEARS

'03
In Re The Estate of Jeffrey Katz (Alan Garber, Esq.) March
Citizens Bank of Massachusetts, Successor to US Trust v.John Kuzinevich,
        (Michael Wirtz, Esq.) June

'05
Commonwealth v. Saoul Rahman (George Crane, Esq.) Probable Cause Hearing, March
Commonwealth v. Saoul Rahman (George Crane, Esq.) Trial, September

'06
Commonwealth v. John McIntire (CPCS) January
William Harris v. Sex Offender Registry Board, (Bernard Grossberg, Esq.) February
Commonwealth v. Nicholas Rheult, (John Swomley, Esq.) June
Sarsfield v. City of Marlborough, et al. (Barry Scheck, Esq.) August

My fee for all forensic work is $450/hour. This includes all review, reports, in-person or telephone interviews or conferences, research, travel time and testimony.

Jerome Rogoff, M.D.
August 19, 2007

# CURRICULUM VITAE

Name: Jerome H. Rogoff, M.D.

Address: 659 Chestnut St., Waban, MA O2468

Date of Birth: December 2I, I938

Place of birth: Detroit, Michigan

Education:

| | |
|---|---|
| 196O | A.B. Harvard College, <u>Cum Laude</u> (History and Literature) |
| 1965 | M.D. Western Reserve University Medical School |

Postdoctoral Training:

| | |
|---|---|
| 1965 | Clinical Neurology, Radcliffe Infirmary, Oxford, England (Two months) |
| 1965-1966 | Intern in Medicine, Michael Reese Hospital, Chicago, Illinois |
| 1968-1971 | Resident in Psychiatry, Massachusetts Mental Health Center, Boston |
| 197I-1972 | Fellow, Massachusetts Mental Health Center (Adams House), Boston |
| 1972-1973 | Chief Fellow, Massachusetts Mental Health Center (Adams House),                              Boston |
| 1977 | Graduate, Boston Psychoanalytic Institute |

Licensure and Certification:

| | |
|---|---|
| 1965 | National Board of Medical Examiners |
| 1968 | Massachusetts Medical License, Registration No. 30835 |
| 1978 | American Board of Psychiatry and Neurology, Certificate No. 18476 |

Academic Appointments:

| | |
|---|---|
| 1968 | Teaching Fellow in Psychiatry, Harvard Medical School |
| 1969-197I | Clinical Fellow in Psychiatry, Harvard Medical School |
| 1975-1979 | Clinical Instructor in Psychiatry, Harvard Medical School |
| 1977-1986 | Associate Clinical Professor of Psychiatry, Tufts Medical School |
| 1980-1981 | Lecturer on Psychiatry, Harvard Medical School |

1981-1985   Adjunct Assistant Professor, Simmons College School
      of Social Work, Boston
1984-1994,
2001-       Lecturer on Psychiatry Harvard Medical School

Hospital Appointments:

1972-1974   Westwood Lodge Hospital, Westwood, MA
      Staff Psychiatrist
1975-1994   Faulkner Hospital, Boston
      Associate Chief of Psychiatry
      Director of Inpatient Psychiatry
      Director of Day Hospital
      Ambulatory and Emergency Care Committee
1994-       Medical Staff
1983-1994   Pharmacy and Therapeutics Committee
1975-1984   The Arbour (formerly Glenside Hospital)
      Admitting Psychiatrist

Other Professional Positions:

1966-1968   Peace Corps Physician, Kathmandu, Nepal (USPHS)
1971-1973   Senior Psychiatrist, Massachusetts Correctional Institution,
Norfolk, MA
1971-1978   Consultant Psychiatrist, Massachusetts Governor's Executive
Council,        Massachusetts Parole Board, Governor's Board of
Pardons and
      Commutations
1972-1975   Consultant psychiatrist, Probate Court of Plymouth County, MA
1972-1974   Consultant Psychiatrist, Law Enforcement Assistance
Administration
      (LEAA), Washington, D.C.
1974-1975   Medical/Psychiatric Director, Boston TASC-A (Federally funded
City of          Boston court diversion program for drug
addicts)
1981-1994   Founding Director and Treasurer, The Guild for Continuing
Education,
      Boston
1981-       Founding Member and Director, The Law and Psychiatry
Resource        Center, P.C., Boston
1981-1988   Reviewer, American Journal of Psychiatry
1988-       Member, Panel of Experts, Massachusetts Board of
Registration in
      Medicine
1988-1989   Listing, Who's Who in the East, Marquis Publications
1990-       Listing, Who's Who in America, Marquis Publications

| 1994- | Listing, <u>Who's Who in the World</u>, Marquis Publications |
| 2003- | Listing, <u>Who's Who in Science and Engineering</u>, Marquis |
| Publications | |

## Memberships, Offices and Committee Assignments in Professional Societies:

| 1975- | Massachusetts Psychiatric Society |
| 1976 | Member, Committee of Directors of General Hospital Inpatient Services |
| 1976 | Nominating Committee |
| | Representative to the Mass. Health Planning Council |
| 1979-1980 | Chair, Committee on Public-Private Interface in Psychiatric Care Delivery (with Mass. Hospital  Association and Public Health Council) |
| 1981 | Representative to Mass. Public Health Council Task Force on Guidelines for Delivery of Inpatient Care |
| 1983 | Nominating Committee |
| 1988-1994 | Councillor |
| | Chair, Public Affairs Committee |
| 1990 | Chair, Nominating Committee |
| 1997 | Chair, Awards Committee |
| 1998-1999 | President-Elect |
| 1999-2000 | President |
| 2000-2001 | Immediate Past President |
| 2001- | Representative to Assembly of American Psychiatric |
| Association | |

| 1975- | American Psychiatric Association |
| 1987- | Fellow |
| 1988-1994 | Public Affairs Representative |
| 1996-2002 | Member, Budget Committee |
| 2001- | Assembly Representative |
| 2003-2004 | Chair, Assembly Reference Committee: Advocating for the Profession |
| 2004- | Chair, Corresponding Committee on Confidentiality |
| 2004- | Distinguished Fellow |
| 2005- | Member, Task Force to Revise Ethics Annotations |
| 2005- | Distinguished Life Fellow |

| 1977-2004 | Boston Psychoanalytic Society |
| 1983-1984 | Director of Publicity, 50th Anniversary Planning Committee |
| 1985-1992 | Member, Symposium Committee |
| 1989-1995 | Member, Public Information Committee |

1977-2004    American Psychoanalytic Association

1977-2004    International Psychoanalytic Association

1984-        American Academy of Psychiatry and The Law

<u>Other Professional Activities:</u>

1978            Organizer and Chairman, Symposium "The Effects of the
                Holocaust on Survivors and Their Children," Brandeis University,
                Waltham, MA
1980            Panelist, "Public-Private Interface in Psychiatric Care", Scientific
                Meeting, Massachusetts Psychiatric Society
1980            Panelist, Issues Workshop "Should General Hospitals Accept
                Involuntary Patients?," Annual Meeting, American Psychiatric
                Association, San Francisco
1981            Chairman and Moderator, Symposium, "The Treatment of the
                Borderline Individual:  Psychotherapeutic Approaches," The
                Mental Health Collaborative, Boston
                Featured Speaker, "Psychiatry and The Law,"  Scientific Meeting,
                Massachusetts Psychiatric Society
1982-1984     Continuing Medical Education Course Faculty, "Law and
                Psychiatry Update for Clinicians," Annual Meeting, American
                Psychiatric Association
1985            Presenter of paper, "Primum non nocere: the inpatient
                psychotherapy of depression, in Symposium, "Primum Non
                Nocere: The Psychotherapy  of Inpatients," Annual Meeting, The
                American Psychiatric Association, Dallas
1985-1986     Continuing Medical Education Course Faculty, "Psychiatric
                Malpractice  Prevention for Clinicians,"  Annual Meetings,
1988-1991    American Psychiatric  Association, Dallas, Washington, D.C.,
                Montreal,  San Francisco,  New York, New Orleans, San
1993-1994     Francisco, Philadelphia
1990            Workshop Leader, "Legal Liability for Doing Supervision," Mass.
                Psychiatric Society's Spring Scientific program, "Boundary
                Violations in Psychiatry."
                Speaker, Frontiers in Education, The Arbour Hospital, Boston, on
                "Specific Aspects of  Inpatient Psychiatry."
1991            Featured Speaker, faculty forum, Psychoanalytic Institute of
1992            New England, East, on "Risk Management."
                Featured Speaker, Fall Psychiatric Symposium, Westwood
                Lodge Hospital, "The Role of Short-Term Inpatient Treatment for
                Long-Term Psychiatric Illness."
                Featured Presenter, Fall Seminar Series, Whitman Counseling
                Center, "The Role of Hospitalization in the Long-term Treatment
                of the Borderline Patient.

Speaker, Emerson Hospital, Concord, MA, "Hospital Treatment of
Borderline Patients Under Managed Care."
Featured Speaker, Massachusetts Psychiatric Society Symposium,
"Surviving in a Managed Care Environment."
1994         Featured Speaker, Westwood (MA) Lodge Hospital Spring
Academic Conference Series, "Managed Care and Health
Reform: What Psychiatry Should Be Supporting, But Isn't."
Featured Speaker, Bournewood Hospital Lecture Series, "Going
Swimming with Jaws: Medical-Legal Pitfalls in Inpatient
Psychiatry
Featured Speaker, The Inns of Court, "The Emotional Management
of Losing a Case: Client and Self."
2002         Speaker, Workshop presented at the Annual Meeting of the
American Psychiatric Association, Philadelphia, May 18-23.
Lurie LB, Gudeman JE, Chester JG, Clemens NA, Rogoff JH,
Silk KR: The Mental Health Carveout: Strategies to Erase the
Stigma.
2005         Featured Speaker, Retired Men's Association of Weston,
Wayland, Sudbury, "Forensic Psychiatry."
2006         Panelist, Workshop on Electronic Health Records,
"Confidentiality"
Annual Meeting, American Psychiatric Association, Toronto

## Major Extra-Curricular Committee Assignments:

1972         Board of Directors, Massachusetts Council for Public Justice
1971-1974    Board of Directors, Newton Mental Health Association
1972-1974    Advisory Board, Boston Visiting Nurse Association
1975         Chair, Task Force on Standards for Mental Health Care Delivery in
U.S. Prisons and Jails,  U.S. Public Health Association
1975         Combined Jewish Philanthropies, Boston
1978-1983     Chair, Psychiatry Team
1984-1987    Associate Chairman, Medical Division
1987-1991    Member, Board of Directors, Jewish Vocational Service, Boston
1986,1988,
1991         Member, Combined Jewish Philanthropies Mission to Israel
1991-1998    Member, National Agencies and Community Relations
Sub-committee of Social Planning and Allocations
Committee
1995-1999    Member, Social Planning and Allocations Committee
1999-2001    Member, People with Disabilities Subcommittee
1999-        Member, Community Services Committee

## Teaching Experience:

| | |
|---|---|
| 1976-1994, 2001- | Teaching general psychiatry to residents, fellows and medical students, Faulkner Hospital, Boston |
| 1978 | Case Conference, Cambridge Court Clinic |
| 1979 | Adult Psychiatry Conference, Tufts New England Medical Center |
| 1981-1985 | Instructor, Course in Psychopathology, Simmons Graduate School of Social Work |
| 1982 | Grand Rounds, Tufts Dept. of Psychiatry and Grand Rounds, Mass. Mental Health Center, "Anatomy as Destiny: Female Sexual Anatomy and Self-Esteem." |
| 1981 | Grand Rounds, Tufts Dept. of Psychiatry and |
| 1983 | Grand Rounds, Mass. Mental Health Center, "Superego, Ego Ideal, Affects, and a Typology of Depressive Illness." |
| 1986 | Clinical Conference, Mt. Auburn Hospital Dept. of Psychiatry and Grand Rounds, Beth Israel Hospital Dept. of Psychiatry, "Going Swimming with Jaws: Malpractice Risks Inherent in Inpatient Psychiatry, A Case Presentation." Presentation, Members' Seminar, Boston Psychoanalytic Society,  "Inheriting the Resolution of the Oedipus Complex: Superego, Ego Ideal, and Affects." Nursing Staff Inservice Seminar, Faulkner Hospital,  "Manic Depressive Illness." |
| 1987 | Clinical conferences, Mt. Auburn Hospital, Carney Hospital, Tufts New England Medical Center |
| 1988 | Inpatient Grand Rounds, Massachusetts General Hospital, Lindemann Center, Boston, "Malpractice Risks Inherent in Inpatient Psychiatry." Clinical Conference, Carney Hospital, Boston Clinical Conference, Westwood Lodge Hospital Grand Rounds, Human Resource Institute, Brookline, MA, "Long-term Treatment of the Borderline Patient on a Short-term Unit." |
| 1989 | Grand Rounds, Beth Israel Hospital, Boston, "Elements of Malpractice Risk Prevention." Inpatient Grand Rounds, Lindemann Center,  Massachusetts General Hospital, Boston, "Swimming with Jaws: Further Adventures in the Shark-pool of Malpractice." Psychiatry Grand Rounds, Mt. Auburn Hospital, "Testifying in Court and at Depositions." Psychiatry Grand Rounds, Leonard Morse Hospital, Natick, MA, "Long-term Treatment of the Borderline Patient on a Short-term Unit." Psychiatry Grand Rounds, Danvers State Hospital,  Danvers, MA, "Malpractice Risks on Inpatient Services." Featured Presenter, Guild for Continuing Education |

|        | Symposium, Boston, "Long-term Treatment of the Borderline on a Short-term Unit." |
|--------|---|
|        | Case Conference, Carney Hospital, Boston |
|        | Workshop Instructor, Boston Institute for Psychotherapies, "Malpractice Prevention." |
| 1990   | Morbidity Conference, Waltham-Weston (MA) Hospital |
|        | Mortality Conference and Clinical-forensic Consultation, McLean Hospital, Belmont, MA |
|        | Clinical Conference, Psychiatric Emergency Department, Tufts New England Medical Center. |
| 1990   | Featured Presenter, Academic Conference, Westwood Lodge Hospital, Westwood, MA, "Inpatient Contribution to the Long-term Management of the Borderline Patient" |
|        | Attending Rounds, "Forensic Issues," Lindemann Center, Boston. |
|        | Presenter, Psychiatric Academic Clinical Conference, Framingham (MA) Union Hospital, "The Role of Hospitalization in the Long-term Treatment of the Borderline Patient," |
| 1992   | Psychiatric Grand Rounds, Mt. Auburn Hospital, Cambridge, MA, "Long Term Treatment of the Borderline On a Short-term Unit." |
| 1995,1996 | Faculty, Winter Trial Advocacy Workshop, Harvard Law School. |
| 1997   | Teaching clinical/forensic conference, Carney Hospital, Boston, MA |
| 1998   | Psychiatric Grand Rounds, Mt. Auburn Hospital, Cambridge, MA |

Publications:

  "Double-outlet right ventricle with pulmonary valve atresia." Case report, American Heart Journal, 72/2:259-264, 1966.

  Peace corps, Nepal, Medical Survival and Preventive Medical Training Manual, l967.

  Report of conference, "Fathers and sons: the oedipus complex in the 19th century," Professor Bruce Mazlish, Journal of the Philadelphia Association for Psychoanalysis, 1/2:182-183, July, 1974.

  "Guidelines for mental health services in prisons and jails," American Public Health Association, 1976.

  "The neglected alliance: the inpatient unit as consultant to referring therapists," Hospital and Community Psychiatry, 33/5:377-38l,1982.

8

"Mental health care planning for the 80's: psychiatry's crucial role, "General Hospital Psychiatry, 3:245-249, 1981.

"Individual Psychotherapy, in "Inpatient Psychiatry: Diagnosis and Treatment, Sederer, L.I., editor, Williams & Wilkins, Baltimore, 1982; revised (second edition), 1986.

Book review, "Dangerous Diagnostics: The Social Power of Biological Information, " in General Hospital Psychiatry, 13/6:411-412, 1991.

Book review, "Money and Outpatient Psychiatry: Practice Guidelines From Accounting to Ethics," in Psychiatric Services, 57/7:1051, 2006, American Psychiatric Association.