5

```
 1                    DIRECT EXAMINATION
 2   BY MS. CORNWALL:
 3        Q.    Good afternoon, Mr. Baliunas.  We have
 4   spoken on the telephone, but this is the first time
 5   we've met in person; right?
 6        A.    Right.
 7        Q.    And were you at one time employed by the
 8   Massachusetts State Police?
 9        A.    Yes, I was.
10        Q.    Were you a fingerprint examiner?
11        A.    Yes.
12        Q.    I'm going to ask you some questions just
13   to establish your background for the state police
14   briefly.  When did you graduate from the police academy?
15        A.    1956.
16        Q.    And did you go straight to the state
17   police after that?
18        A.    Yes.
19        Q.    And when did you become a print examiner?
20        A.    The year?
21        Q.    Approximately the year?
22        A.    Maybe '72.
23        Q.    What sort of work --
24        A.    I would say 1972.  I was in the lab for a
```

```
 1          Q.    And that would be you; right?
 2          A.    Yes.
 3          Q.    SP Holden is state police Holden
 4   barracks?
 5          A.    Yes.
 6          Q.    And you don't have any specific
 7   recollection of calling Officer Pugh to ask for
 8   directions to this crime scene in May of 1980?
 9          A.    No, I don't recall.
10          Q.    It's 27 years ago?
11          A.    Right, oh.
12          Q.    Almost to the day?
13          A.    Yeah.
14          Q.    But certainly you calling for directions
15   to find a crime scene is consistent with how you would
16   have approached responding to a crime scene?
17          A.    Mm-hmm, yes.
18          Q.    Okay.  And, in fact, you did arrive at
19   that crime scene on the day of the murder; right?
20          A.    Yes.
21          Q.    Now please take a look at what we've
22   marked as Exhibit 2, which is this document.  Take a
23   moment to page through it so you'll see what's there.
24   While you do that I'll just put on the record that
```

1  Exhibit 2 consists of 11 pages. The first two pages
2  appear to be a handwritten list of names. Do you see
3  that, the first two pages?
4       A.   This one and this one?
5       Q.   Yes.
6       A.   Yeah.
7       Q.   Is that your handwriting?
8       A.   Gee, I don't know. I don't think so.
9       Q.   Okay. Well, I will represent to you that
10 we received these documents from the state police
11 altogether. Turn to the third page of this report, of
12 this exhibit, yes, the typewritten sheet. This is a
13 photography and fingerprint section report form; right?
14      A.   Mm-hmm, yes.
15      Q.   Thank you. Your name is typed in at the
16 bottom --
17      A.   Right.
18      Q.   -- as the reporting officer. If you go
19 to the top left, the date on this report is 5/21 of '80;
20 right?
21      A.   Correct.
22      Q.   That's the same date as the murder. The
23 type of case; in fact, it's hard to make out, but murder
24 and robbery?

```
 1          A.    That's what it looks like.
 2          Q.    In Ayer, on the next line down; right?
 3          A.    Mm-hmm.
 4          Q.    Now, this is the form of a report that it
 5   was your practice to fill out when you responded to a
 6   crime scene; right?
 7          A.    Right.
 8          Q.    And this was the report that you actually
 9   filled out in this case?
10          A.    Yes.
11          Q.    Now, on the fifth line down from the top
12   under investigators it's written in Lieutenant Arthur
13   Boisseau, Chief Adamson, and Officer Decot, all of Ayer
14   PD.  Do you see that?
15          A.    Mm-hmm, right.
16          Q.    And also on the line above it says, hard
17   to make out, lieutenant someone, Trooper Keene,
18   something DA, and Lieutenant Dwyer.
19          A.    Yeah, Lieutenant Dwyer.
20          Q.    Those would have been the officers at the
21   scene with you?
22          A.    And I guess the other fellows are for the
23   Ayer PD; right.
24          Q.    The Boisseau, Adamson and Decot.
```

1    A.    Right, yeah.

2    Q.    -- how many, if any, latent fingerprints
3 you found at the scene?

4    A.    Yeah.

5    Q.    And you wrote in five?

6    A.    Five.

7    Q.    And then the next line says, Location of
8 prints?

9    A.    Yeah.

10    Q.    And you typed in, Three on dining room,
11 gets cut off there, maybe table.  I'm not sure what the
12 last word is.  Do you see that?

13    A.    Yeah, could be, yeah.

14    Q.    One on faucet?

15    A.    Yes.

16    Q.    One on Ballantine twelve ounce can?

17    A.    Right.

18    Q.    Based on your practice does this indicate
19 to you that you, in fact, lifted five latent prints from
20 this crime scene?

21    A.    I would presume I did.

22    Q.    That's what this would mean to you based
23 on your practice?

24    A.    Mm-hmm.

```
1    Holden lab then?
2         A.    Yes.
3         Q.    And you were working there for how long?
4         A.    Until I retired in '82.
5         Q.    So approximately '77 to '82 you were
6    doing print work in the Holden lab for the state police?
7         A.    Yeah, I would say something, those years.
8         Q.    Do you remember when in '82 you retired?
9         A.    November 12th.
10        Q.    You know exactly when it was.
11        A.    And it was just like that's it.  It's
12   over.  You're off the roster.  You're off the payroll.
13   You can sit at a desk, but you don't get paid.
14        Q.    So you might as well move on?
15        A.    Right, yeah.
16        Q.    Thank you.  I'm clear on that now.  So
17   we've gone through the practice of collecting the
18   latent, creating the slide, identifying the relevant
19   information on the slide, going back to the barracks,
20   photographing the slide to make an enlargement.  When
21   you do that you generate a negative, right, a
22   photographic negative?
23        A.    Yeah, yes.
24        Q.    And then --
```

1   sink?
2       A.   You're asking if there was a bloody towel
3   in the kitchen sink?
4       Q.   That's my question.
5       A.   I don't recall.
6       Q.   Do you remember if the faucet was running
7   or not running when you arrived?
8       A.   I don't remember.
9       Q.   You were not the first officer at the
10  scene by any stretch?
11      A.   No, no.
12      Q.   Now, we were taking a look at your report
13  from this crime scene.  Was it your practice to keep a
14  copy of this in your file at the Holden barracks?
15      A.   Oh, yes.
16      Q.   Was it also your practice to send a copy
17  to the investigators you had met with at the scene?
18      A.   Yes.
19      Q.   And that would include --
20      A.   Well, no, not all the investigators, but
21  it would be the person who's in charge of the
22  investigation at the Ayer PD and --
23      Q.   Chief Adamson according to your report?
24      A.   Yeah, and I suppose somebody in the

```
 1   district attorney's office.  If they desired a copy one
 2   was filed by me or the Ayer PD.
 3          Q.   That would have been your practice to
 4   make sure the chief investigator at the scene for the
 5   local police got a copy and the DA's office if they
 6   wanted one either from you or the local police?
 7          A.   Correct.
 8          Q.   With a copy that you would keep in your
 9   own file?
10          A.   Yes.
11          Q.   Was it also --
12          A.   Now, this is what I've been looking for.
13   I keep this, you know, I make -- because at that time
14   there were no copy machines or anything, we used carbon
15   paper.  You don't remember those days.
16          Q.   I do remember those days.
17          A.   You had to stack them, make sure they're
18   all in line, and put them in the typewriter, you know.
19   That's why some of those came out poor.  Maybe they got
20   the third copy and maybe that's why it's not so
21   readable.
22          Q.   So you mentioned that you had a practice
23   of keeping copies, carbon copies, of your own reports?
24          A.   Right.
```

1       A.    Yes, yes.

2       Q.    And if there were an arrest and you compared the suspect's fingerprints to latents at a crime scene and you found there was an exclusion, because you were trained that that information was helpful to the defendant, you made sure that that information was documented and referred back to the Ayer police?

9       A.    Yes.

10      MR. TEHAN:  Objection.

11     Q.    As you sit here today do you remember whether you ever generated any other written reports in this case?

14     A.    No.

15     Q.    You don't remember?

16     A.    (Shaking head).

17     Q.    Right?

18     A.    Right.

19     Q.    Okay, and as you sit here today you never made any match between any suspect prints and the latents from this crime scene?

22     A.    No, I haven't.

23     Q.    In fact, you never testified at the trial. No one ever asked you to testify; right?

Case 1:04-cv-10521-GAO   Document 105-2   Filed 09/06/2007   Page 10 of 16

67

1  that?

2  A. Yes.

3  Q. So would you have expected as a matter of
4  standard procedure that if Mr. Waters were arrested for
5  the murder of Katherine Brow and fingerprinted his
6  prints would have been sent to you so that you could
7  compare them to the latents from the scene?

8  MR. TEHAN: Objection.

9  A. I would have expected something, yes.

10 Q. Now, as you sit here today do you have
11 any memory of whether anyone ever sent you his prints?

12 A. No, I don't recall.

13 Q. But if they had you certainly would have
14 reported the results of the comparison that you made?
15 Withdrawn.

16 A. Yes.

17 Q. If someone had sent you, if Ayer had sent
18 you Kenny Waters' fingerprints, you would have compared
19 them to the latents at the crime scene?

20 A. Yes, but I think it was through his
21 admission --

22 Q. Let's just focus on the fingerprints,
23 okay?

24 A. All right.

```
 1          Q.    His name was on that report, yes.  You're
 2   aware that there was an Ayer police officer named Decot
 3   who responded to the scene?
 4          A.    Yes.  How I know him is because I saw his
 5   name on the report, but I don't recall meeting him or
 6   talking with him.  But maybe I did.  I don't know.
 7          Q.    You just don't remember after so long?
 8          A.    I would assume that I probably did, you
 9   know.
10          Q.    Sure.  So do you recognize this
11   handwritten list of names, which we received along with
12   your report and the copies of the slides of the latents,
13   do you recognize that as your handwriting?
14          A.    This is my handwriting?  I don't think
15   it's mine.
16          Q.    Why not?
17          A.    I don't know.  I don't make my letters
18   like some letters are in here.  I don't make other
19   letters like -- they're not mine and I don't know who
20   made this.
21          Q.    Well, was anyone else in the Holden
22   barracks doing any work on any prints from this case?
23          A.    No, I don't think so.
24          Q.    Was it the practice in the Holden
```

```
 1   barracks that once you took latents from a crime scene
 2   you would be the person to compare them with prints that
 3   were submitted to you by the police?
 4        A.   You know, maybe they could have done
 5   something after I had retired, too.  Maybe somebody else
 6   checked it.  Maybe that's where the list came from.
 7        Q.   Well.
 8        A.   Or maybe this is Adamson's list or
 9   Decot's.  No, he's got Decot's name here.
10        Q.   As you sit here today you don't know who
11   wrote this list?
12        A.   No.
13        Q.   Was it ever your practice at the state
14   police to keep a list of names of people whose prints
15   you compared to latents from a crime scene and whether
16   you included or excluded that?
17        A.   Well, not really.  If the print card or
18   whatever was submitted and it wasn't any good, why make
19   extra work for yourself having a list.
20        Q.   Well, a list would keep track of who
21   you've looked at?
22        A.   Well, I would have his card, I would have
23   his print card and file it away in a drawer.
24        Q.   If you weren't asked to return it?
```

1    Q.    Okay. So I will represent to you that on
2 this list of names are suspects and family members of
3 the victim, an officer who responded to the scene. So
4 given that and given that we received this handwritten
5 document from the state police along with your report
6 and the copies of the slides, and given that there was
7 no other person in the state police barracks working on
8 this case, would you agree that it's possible that you
9 wrote this handwritten list of names?
10   A.    No, that's not my handwriting.
11   Q.    Well, whose could it be if it was in the
12 state police file?
13   A.    Ayer Police Department maybe.
14   Q.    You just don't know?
15   A.    Because I, I -- I don't think I would
16 have possession or a place to get these names. I
17 wouldn't have Ms. Brow's family, you know.
18   Q.    If you were provided elimination prints
19 from Ms. Brow's family, then you would have the names on
20 those print cards; right?
21   A.    I would, but I don't recall getting any
22 prints on the Brow family.
23   Q.    Do you recall getting Mr. Hamilton's
24 prints?

```
 1  protocol such that a check mark next to a name meant a
 2  print had been checked?
 3          A.   No, no.
 4          Q.   Now, do you see in the left-hand margin
 5  there's the word Leroy about ten names down?
 6          A.   Mm-hmm.
 7          Q.   Yes?
 8          A.   I can see it.
 9          Q.   And next to that Kenneth Waters?
10          A.   Uh-huh.
11          Q.   You do see that?
12          A.   I see that.
13          Q.   As you sit here today do you know whether
14  or not you compared Kenneth Waters' prints to somebody
15  else's?
16          A.   No.
17          Q.   Let me show you now what's been marked as
18  Exhibit 3, and I think you referred to this as Chief
19  Adamson's log; correct?
20          A.   Mm-hmm, yes.
21          Q.   I'd like to bring you back again to a
22  note in this log dated 8/8/80, which is the last entry
23  on what's been marked as Bates B48.  Do you see that?
24          A.   Yeah.
```

```
 1        A.    Yeah.
 2        Q.    Do you think you made an incomplete
 3   examination of the prints?
 4        A.    I don't know.
 5        Q.    Okay.  Just so I'm clear on something,
 6   and I realize that this is Chief Adamson's writing and
 7   not yours, but it says, Corporal Baliunas called to
 8   advise negative on Hamilton and Bean prints.  Does
 9   negative in that context as you understood it equate
10   with having eliminated them as suspects?
11        A.    Right.
12        Q.    Now, as I understood it in your capacity
13   as a print examiner you would evaluate and compare
14   prints at the request of investigating police officers;
15   correct?
16        A.    Right.
17        Q.    And there was also a mechanism, was there
18   not, where a criminal defense counsel could request
19   comparison of their client's prints to the prints lifted
20   at the scene; isn't that true?
21        A.    True.
22        Q.    And how was that done?
23        A.    I guess you'd have to go through the lab.
24        Q.    Did any defense lawyer for Ken Waters
```

```
 1  ever ask you to compare his prints to any prints that
 2  you had from the murder scene?
 3         A.    No.
 4         Q.    Okay.  Of course you would have done so
 5  if he asked you, would you not?
 6         A.    Right.
 7         Q.    With what frequency did you speak with
 8  Chief Adamson during this investigation?
 9         A.    I would say only the times that if he had
10  a print that he wanted checked out.  Other than that I
11  wouldn't.
12         Q.    Did you like him?
13         A.    Yeah.
14         Q.    Did he seem competent?
15         A.    Yeah.
16         Q.    Did he ever --
17               MS. CORNWALL:  Objection, vague given the
18  litigation and the position you're taking now.
19         Q.    Did he conduct himself in a professional
20  manner in his dealings with you?
21         A.    Yes.
22         Q.    And did he at any point indicate to you
23  any intent whatsoever to frame Kenny Waters for this
24  murder?
```