1                    COMMONWEALTH OF MASSACHUSETTS

2    MIDDLESEX, SS.                              GRAND JURY,

3

4                         COMMONWEALTH

5

6                            VS.

7

8                       KENNETH WATERS

9

10   PRESENTED BY:  Ms. Fahey, Assistant District Attorney,
                    Middlesex County

11

12

13

14

15                              WITNESS                PAGE

16                              Brenda Marsh..........2

17                              Nancy Taylor..........11

18

19                              Wednesday, November 10, 1982
20                              Middlesex County

21

22

23

24

                         *JGF Court Reporters*
                           *Superior Courthouse*
                  *East Cambridge, Massachusetts 02141*

2.

            MS. FAHEY:  This letter alleges
that Kenneth Waters, being armed with a dangerous
weapon, to wit; a knife, did assault Katharina
Reitz Brow with the intent to rob her, and thereby
did rob and steal from the person of said Katharina
Reitz Brow money on May 21st of 1980, in Ayer.

            Also, that Kenneth Waters did
assault and beat Katharina Reitz Brow with intent
to murder the said Katharina Reitz Brow, and by
such assault and beating, did kill and murder the
said Katharina Reitz Brow on May 21st, 1980, in
Ayer.

                        BRENDA MARSH, Sworn

Q    (By Ms. Fahey)  Will you identify yourself, please,
to the Grand Jury?

A    Brenda Marsh.

Q    And where do you live?

A    Worchester.

Q    And in May of 1980, where were you living?

A    Ayer.

Q    Ayer, Massachusetts?

A    Yes.

*JGF Court Reporters*
*Superior Courthouse*
*East Cambridge, Massachusetts 02141*

3.

1

2    Q    And who were you living with in Ayer?

3    A.    Kenneth Waters and his grandfather and my

4    two children.

5    Q    Please keep your voice up.

6    A.    Okay.

7    Q    And what was your address in Ayer when you lived

8    with Kenneth Waters?

9    A.    7 Vernon Street.

10    Q    Vernon Street?

11    A.    Yes.

12    Q    And in May of 1980, was he employed?

13    A.    Yes.

14    Q    And where was he working?

15    A.    Park Street Diner -- I think that's the name

16    of it.

17    Q    And that was a diner in Ayer?

18    A.    Yes.

19    Q    And May 20th of 1980, did he leave the house to

20    go to work?

21    A.    Yes, he did.

22    Q    And was that in the evening?

23    A.    Yes.

24

4.

1

2  Q    And did you have occasion to call the diner sometime

3       late that night looking for him?

4  A.   Yes.

5  Q    And what were you told when you called the diner?

6  A.   He wasn't there.

7  Q    And on the morning of May 21st of 1980, did he arrive

8       home?

9  A.   Yes.

10 Q    And about what time did he arrive home?

11 A.   About ten-thirty.

12 Q    And did you have some conversation with him?

13 A.   Well, he went up and went to bed -- upstairs

14      and went to sleep.

15 Q    And that morning had you heard that something had

16      happened on Rosewood Drive near where your house

17      is located?

18 A.   Yes.

19 Q    And what had you learned had happened?

20 A.   Someone was killed.

21 Q    And did you have some conversation with Mr. Waters

22      with regard to that murder?

23 A.   I went upstairs, woke him up and told him

24

5.

2  something happened, and he said he didn't care.  If

3  the Ayer Police came to talk to him, he wasn't

4  there.

5  Q  Okay.

6  A.  And he went back to sleep.

7  Q  And the next day, May 22nd, did the Ayer Police come

8  to your home and leave with Mr. Waters?

9  A.  Yes.

10  Q  And did Mr. Waters then go to the police station and

11  have an interview with the Ayer Police?

12  A.  Yes.

13  Q  And at the end of the interview, he was allowed to

14  leave the police department and return to your home;

15  is that right?

16  A.  Yes.

17  Q  And when he arrived back at your home on Vernon

18  Street, what, if anything, did Mr. Waters say?

19  A.  We were leaving, going to Providence.

20  Q  And did he say why?

21  A.  He was being blamed for something he didn't do,

22  he said.

23  Q  And prior to that week, May 21st of 1980, had you

24

6.

had any conversation with Kenneth Waters with regard

to Katharina Brow, the woman who was killed?

A.   Yes.

Q   And what was the conversation you had had with

Mr. Waters?

A.   He said she went in the diner and talked about

having a lot of money, and he said he'd like to get

the money.

Q   And did he tell you what she had the money for?

A.   Going home back to Germany.

Q   And shortly after Mr. Waters was interviewed by the

Ayer Police on May 22nd, 1980, did you in fact

move with him from Ayer to Providence, Rhode Island?

A.   Yes.

Q   And in July of 1980, some two months after the

murder, did you have a conversation with Mr. Waters

with respect to the murder?

A.   Yes.

Q   And what was that conversation?

A.   All that was said was I asked him if he did

kill that woman, and he said, "Yeah, what's it to

you?"

7.

Q    And when was the first time that you came forward
     with this information to the Ayer Police?

A.    About a month ago, maybe five weeks.

Q    1982?

A.    Yeah.

Q    On May 21st, when Mr. Waters came back in, after you
     learned about the murder, did you make any observation
     about his face?

A.    He had a scratch on his face.

Q    Could you point to where on your face the scratch
     was?

A.    Right here (indicating); from here to here.

Q    For the record, you are pointing to the area of
     your cheek from the eye down to the chin?

A.    Yes.

Q    And since you came forward and told the Ayer Police
     of your knowledge of what Mr. Waters had said, have
     you been shown some photographs by the Ayer Police
     and the State Police?

A.    Yes.

Q    And have you also been shown a knife?

A.    Yes.

8.

Q    And have you been able to identify that knife?

A.    Yes.

Q    How can you identify that knife?

A.    Kenny Waters had that knife; he worked with it, used it unpacking packages, boxes.

Q    Was that when he worked at Global Vanlines?

A.    Yes.

Q    So the knife that the State Police showed you is a knife that you can identify as having belonged to Mr. Waters?

A.    Yes.

           MS. FAHEY:  Any questions of this witness?

Q    (By Juror)  Could you describe the knife for us, please?

A.    It's about maybe this long.  It's got a brown handle.  There's only one edge on the knife, sharp edge; it was used to unpack boxes.

Q    (By Ms. Fahey)  Would you say the blade of that knife was less than five inches long?

A.    Yes.

Q    (By Juror)  Was it a folding type?

9.

1

2      A.    No.

3   Q   At that time in May of 1980, did Mr. Waters seem

4       to have extra money?  (By Juror)

5      A.    Yes.

6   Q   (By Ms. Fahey)  What was your financial situation

7       when you lived in Ayer?

8      A.    Neither one of us had much money.

9   Q   Were you working at the time?

10      A.    No, I wasn't.

11   Q   Was he working anyplace other than the diner?

12      A.    No, he wasn't.

13   Q   And at some point after you learned of the murder,

14       do you remember any specific major purchases that

15       Mr. Waters bought?

16      A.    A swimming pool.

17   Q   Do you know where he got the money for that pool?

18      A.    No, I don't.

19   Q   Can you tell us why you waited until now to speak

20       up?

21      A.    Well, I told my boyfriend about it, not knowing

22       he was going to say anything about it, and he called

23       the Ayer Police and told them what I knew and what

24

10.

1

2          I had told him.    I was scared; I didn't want to

3      say nothing.

4                             MS. FAHEY:  Any other questions?

5      (Witness Excused)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

11.

NANCY TAYLOR, Sworn

Q    (By Ms. Fahey)  Would you identify yourself to the Grand Jury, please?

A.    Good morning, my name is Nancy Taylor.  I'm a police officer in Ayer.

Q    And were you so employed in May of 1980?

A.    Yes, I was.

Q    Now, directing your attention specifically to May 21st of 1980, did you have occasion to learn that a woman named Katharina Reitz Brow died in her home?

A.    Yes, I did.

Q    And was she at that time living at 7 1/2 Rosewood Avenue?

A.    Yes, she was.

Q    And where is that home relative to the home of Kenneth Waters on Vernon Street?

A.    The Waters' house on Vernon Street is directly behind Mrs. Brow's separated by a field.

Q    And do you know the cause of death for Mrs. Brow?

A.    Yes, multiple stab wounds.

                    MS. FAHEY:  I would offer the

*JGF Court Reporters*
*Superior Courthouse*
*East Cambridge, Massachusetts 02141*

12.

copy of the death certificate for Katharina Reitz
Brow.

(Whereupon, Certificate
Received and Marked
Exhibit Number 1)

Q   And on May 21st of 1980, in her home, was a murder
weopon found?

A.   Yes, it was.

Q   And what was that murder weapon?

A.   It was a three-inch utility knife.

Q   And when you say a three-inch utility knife, was the
three-inches referring to the blade?

A.   Yes, it is.

Q   And have you had occasion to show Brenda Marsh that
knife?

A.   Yes, I have.

Q   And what, if anything, did she say with regard to
that knife?

A.   She identified it as a knife belonging to
Kenneth Waters.

Q   And have you had a conversation with the family
or family members of Mrs. Brow since her murder?

*JGF Court Reporters*
*Superior Courthouse*
*East Cambridge, Massachusetts 02141*

13.

1

2    A.    Yes, I have.

3    Q    And have you learned from them that Mrs. Brow had

4    been saving -- saving money to take a trip to

5    Germany in September to visit her mother?

6    A.    Yes, I did.

7    Q    And have you learned from the family members where

8    she kept that money?

9    A.    Yes, I did.

10   Q    Where have you learned that she kept that money?

11   A.    She kept her money in an envelope in the

12   linen closet right beside the refrigerator in the

13   kitchen.

14   Q    And on May 21st of 1980, did you go to that home of

15   Mrs. Brow?

16   A.    Yes, I did.

17   Q    The morning of the murder?

18   A.    Not the morning of the murder; later that

19   afternoon, I did.

20   Q    And did you have occasion to view yourself the

21   linen closet area of inside Mrs. Brow's home?

22   A.    Yes, I did.

23   Q    And will you describe what you observed, please?

24

14.

1

2   A.   It was totally ransacked.  All the linens and

3   utensils that were in there were out on the floor,

4   and most of the linens were covered with blood.

5   Q   Is it fair to say that the envelope containing the

6   money was missing?

7   A.   Yes, it was missing.

8   Q   Okay.  Can you describe the appearance there of the

9         entire home when you observed it that morning,

10   or that afternoon?

11   A.   It's a mobil home.  From the kitchen through

12   the hallway, through the back two bedrooms and

13   the bathroom, it was totally soaked in blood.

14   That's the only way to describe it.  From floors

15   to ceilings to walls; everywhere.

16   Q   Did you happen to make any observations of a lamp

17   in the bedroom?

18   A.   Yes, I did.

19   Q   And what were those observations?

20   A.   There was a broken ceramic lamp that probably

21   stood two and-a-half feet tall, the base of it.

22   The base of it was broken.  There was a matching

23   one that was not broken.

24

15.

1

2                           MS. FAHEY:   Any questions?

3    Q    (By Juror)  Was the department able to lift any

4         fingerprints?

5         A.   The State Police did lift some prints.   None

6         of them were anything that they were able to match

7         up.  They were smeared et cetera.

8    Q    (By Ms. Fahey)  So the State Police were unable to

9         match any prints -- lift any prints to be of use

10        in any investigation?

11        A.   That's correct.

12   Q    (By Juror)  And how about on the weapon?

13        A.   They -- there were no prints on the weapon.

14   (Witness Excused)

15

16

17

18

19

20

21

22

23

24

C E R T I F I C A T E                               16.

      I, Susan Hunt, do hereby certify
that the foregoing testimony, consisting of
Pages 2 through 15 inclusive, was recorded by
me, thereafter by me reduced to typewriting,
and is accurate to the best of my knowledge, skill
and ability.

*Susan M Hunt*

Susan M. Hunt