UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BETTY ANN WATERS,

      Plaintiff,

v.                                 Case No.: 04-CV-10521-GAO

TOWN OF AYER, et al.,

      Defendants.

_____/


### PRELIMINARY EXPERT REPORT OF LOU REITER

1.      My name is Lou Reiter.  I have been actively involved in police practices and law enforcement since 1961.  I was an active police officer for 20 years.  Since my retirement in 1981 as an active police officer, I have been involved in police and law enforcement practices as a private police consultant.

2.      Since 1983 I have been providing law enforcement consultation in police training and management.  I provide law enforcement training in the following areas:

- Investigation of critical incidents – officer involved shootings, use of force, and pursuits.
- Managing the Internal Affairs function.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit issues.
- Investigative procedures and supervision.
- Jail intake procedures.
- Personnel practices.
- Supervisory techniques.
- Crowd control procedures.

- Liability management.
- Policy and procedure development.
- Management effectiveness.

I consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization.  My primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.

3.    Since 1983, I have been retained in over 950 police related cases.  This involvement has been on a mix of approximately 2/3 plaintiff and 1/3 defense. Assistance provided includes  case analysis and development and expert witness testimony.  I have been qualified in state and Federal courts, including the District of Columbia and Puerto Rico,  to provide trial testimony in many areas including:

- Field procedures including tactics, arrest techniques and pursuits.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures.
- Jail intake procedures
- Police management and personnel practices.
- Investigation of citizen complaints and discipline.
- Police policy and procedures development.
- Police training.

4.      I am a former Deputy Chief of Police of the Los Angeles Police Department.  I served as a police officer in the Los Angeles Police Department for over twenty years until I retired in 1981.  During that period of time I served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer.  I was involved in police training, investigating allegations of police misconduct, Chairman of the Use of Force Review Board, member of the Unusual Occurrence Command Post Cadre, and researcher and author of the chapters on internal discipline, training and management/employee relations for the <u>Police Task Force Report</u> of the National Advisory Commission on Criminal Justice Standards and Goals.  In 1993 I published the manual/guide <u>Law Enforcement Administrative Investigations</u>; the Second Edition in 1998, and the current Third Edition in 2006.

5.      My experience, training and background is more fully described in the attached resume.  A complete list of my testimony during the past four (4) years is attached.

6.      I have reviewed the following materials to date regarding this case:

- Complaint
- Plaintiff Local Rule 56.1, *Maher v .Town of Ayer*
- Plaintiff Memo of Law, *Maher v. Town of Ayer*
- Ayer Police Department "Police Manual" Policies and Procedures, MPI 1985
- Ayer Police Department "Police Manual" Rules and Regulations, Duties by Rand and Assignment, and Policies and Procedures, MPI
- Ayer Police Department miscellaneous new orders, legislation, and other procedures dated from the early to late 1990s
- Notebook with documents, logs and reports responsive to the Ties Construction vandalism and police misconduct

3

- Depositions:
    - Philip L. Connors (2) with exhibits
    - Arthur Boisseau (3) with exhibits
    - Richard Rizzo
    - Brenda Marsh
    - Stanley Randall
    - John Baliunas
    - Elizabeth Fahey with exhibits
    - Francis P. Callahan with exhibits
    - Betty Anne Waters (2) with exhibits
    - Bruce Taylor
    - Scott Sarsfield
    - Nancy Taylor Harris (2)
    - Marilyn Ann Goss, *Maher v. Town of Ayer*
    - Nancy Harris, *Maher v. Town of Ayer*
- Declarations:
    - Elizabeth J. Lankford
- Investigative materials
    - Crime scene photos
    - Ayer Police Department reports
    - MA. State Police reports and crime lab documents
    - Medical Examiner's reports and autopsy
    - Trial Court documents
    - Search Warrant application
    - Transcribed interview of Edward J. Powers
    - FBI Laboratory reports
    - Latent print receipts and documents
- Ayer Police Department personnel file documents:
    - Walter R. Decot
    - Arthur J. Boisseau
    - Nancy Taylor
    - Philip Connors
    - Stanley Randall
- District Attorney file on Waters matters including criminal trial transcript and post conviction inquiries (3 volumes)
- *State v. Waters* criminal trial transcript and post conviction appeal transcripts
- Affidavits of Roseanna Perry and Brenda Marsh, 2001
- Affidavits of J.W. Carney, Jr., Dennis Maher, and Robert N. Feldman (with attachments), *Maher v. Town of Ayer*
- Transcription of questioning of Roseanna Perry
- Middlesex District Attorney press release regarding DNA 2001

- Tires Construction police reports
- Ayer Police Department daily activity logs 1980-1981
- Various newspaper stories

7.    These opinions are based upon the totality of my specialized knowledge in the field of police practices.  This experience is derived from my personal police experience, knowledge and training.   This expertise has been developed during my 46 years involvement in law enforcement at all various capacities as a practitioner and my continued experience as a trainer, auditor and litigation consultant.  This experience has provided me with extensive personal and specialized training, experience and knowledge of police operations and generally accepted police practices.  The body of knowledge that I have reviewed over the years coupled with my personal and professional experiences, my continued auditing of police agencies (including investigative functions of law enforcement agencies), my constant training of police supervisors, managers and executives, my continuous interaction with other police professionals, organizations and training personnel, all form the foundation for the opinions I am rendering in this matter.

There is a large body of knowledge and literature about the practices and standards which modern, reasonably managed and administered police agencies across the U.S. should follow and apply to its operations.  These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective and legal.  Many of these generally accepted practices have been developed from law

enforcement critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies and employee misconduct.  These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds.  I am familiar with this body of knowledge and through my continuous training and audits assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

My examination of the factors involved in this police practices incident embodies the basic fundamentals which I employ in my professional examination of police agencies during my audits and when working as a consultant with the U.S. Department of Justice.  My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

The terminology I use in my Expert Report is not meant to invade the purview of the court or the final jury determination.  I use these terms in my training of police supervisors, managers and command officers when instructing on administrative investigations and civil liability.  These are products of my continuous review of case law which should guide a reasonable police agency in supervising its employees. These terms have become common terms within law enforcement supervision, management and risk management; just as the terms of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

6

I am aware that the events of this matter occurred between the years of 1980 and 1984. I have taken this into account and my opinions are based upon my understanding of the generally accepted police practices involved in this matter during those years.

8.      It is my understanding from my review of these materials that the following events occurred resulting in this litigation: In May, 1980, Mrs. Brow was brutally murdered in her home. The Ayer Police Department, under Chief Adamson, became the primary investigative agency for this crime supplemented by the Middlesex County District Attorney's Office and members of the Massachusetts State Police. Kenneth Waters, amongst others, was questioned by the Ayer Police Department, but not charged. The case lay relatively dormant until Ms. Nancy Taylor began to re-investigate the case in 1982 under the oversight of Chief Connors. In 1983, Mr. Waters was convicted of this murder. In 2001 that conviction was overturned and Mr. Waters was freed.

9.      This preliminary expert report will address the police investigative practices involved in this matter and the manner in which they departed from generally accepted police practices. This report will also address the on-going systemic deficiencies within the Ayer Police Department that, in my opinion, created an environment where these egregious departures from acceptable police practices and Unconstitutional practices of police investigators could be developed, tolerated and supported.

10.     This expert report will address five (5) major areas: (1) agency

environment, (2) collection and preservation of evidence, (3) use of informants, (4) supervisory deficiencies of Chief Connors, and (5) actions of Ms. Nancy Taylor as primary investigator.

### Agency environment

11.     **The Ayer Police Department, in my opinion, had systemic deficiencies that created an environment conducive to Unconstitutional violations and the support and/or toleration of unprofessional, biased, and prejudicial policing conduct by its members.  The record in the materials discovered in this case indicate an on-going pattern of police employee misconduct and unprofessional conduct.  It would have been obvious to any reasonable police executive and manager that this unprofessional environment would create an obvious high risk of police misconduct and the strong potential for violations of citizens' rights.  This environment of systemic agency and supervisory deficiencies could lead to police employees violating legal safeguards, departing from generally accepted police practices including investigative conduct, and taking shortcuts that any reasonable police officer or police manager would know could lead to erroneous investigative conclusions and could place citizens in harm's way for a wrongful arrest and prosecution.**

**This dysfunctional agency environment with its systemic issues of police misconduct and supervisory failures, in my opinion, allowed the wrongful arrest and prosecution of Kenneth Waters.  This expert report will address all of these**

**investigative failures that lead to the Constitutional failures causing this arrest and prosecution including: (1) the most significant issue involving the fingerprint analysis and hiding of this evidence from the prosecution and defense; (2) the disappearance of the alibi time cards immediately before Mr. Waters trial; (3) the improprieties in dealing with the criminal case informants Ms. Marsh and Perry; (4) the misrepresentations and false testimony of Ms. Taylor, the lead investigator involved in the arrest and prosecution of Mr. Waters; and (5) the systematic failure of the Ayer Police Department to ensure that exculpatory investigative materials were provided to the prosecutor.**

12.     The Ayer Police Department during this period of time numbered under 15 employees and most deposed representatives of the agency put that number at 12. This was typical of most police agencies in the country considering that, at that time, approximately 80 percent of the police agencies numbered less than 25 employees. Even today, 85 percent of the country's police agencies number under 50 employees. While their number may be small, their responsibilities are the same as any police agency. They must operate within the U.S. Constitution, state laws, and acceptable police practices. These laws and practices ensure that policing, even by the smallest of police agencies, protects the rights and privileges of all persons when they encounter police officers and are affected by the individual police officer's authorities granted by the jurisdiction and the State in which the officer is employed.

13.     Police practices in nearly all states are controlled and guided by central

bodies such as the Massachusetts Criminal Justice Training Council.  These bodies,
commonly referred to as Peace or Police Officer Standards and Training groups,
establish entrance requirements, certification of officers, training mandates, and model
policies.  These are supplemented by state-wide bodies such as the Massachusetts
Chiefs of Police Association that also promulgates model policies for its agencies.  This
is similarly true of the International Association of Chiefs of Police (IACP) which
represents nearly all policing groups in America and has consistently been associated
with smaller policing units.  The IACP has consistently provided direction for its
members with model policies and "training keys."  This has been further supported
since 1984 by the Commission on Accreditation for Law Enforcement Agencies.

      14.     These model policies and leading police texts on police practices,
specifically those involving criminal investigations, are consistent in the role, duties and
responsibilities of the police agency when dealing with criminal matters that lead to
potential prosecution.  Even though the prosecution is in the realm of the prosecutor's
office and any investigative support staff that office may have, the principle
responsibility of the initiating police agency is to ensure that all information is passed on
to the prosecutor.  Any censoring of this information simply circumvents the ability of the
prosecutor to reasonably assess a case, determine the appropriateness of prosecution,
and ensure that any exculpatory evidence is turned over to the defense.  Any
circumvention or omissions by the initiating police agency severely restricts the ability
and effectiveness of the prosecutor's role in making these serious determinations and
decisions.

15.     In law enforcement, a homicide such as the Brow murder is considered one of the most significant, major criminal investigations.  These investigations require an allocation of seasoned investigators and normally consume a great deal of time and resources for any police department.  It is surprising that the Ayer Police Department with a complement of only 12 total personnel would not request that the investigation be handled by the State Police.  To conduct a reasonable and acceptable homicide investigation a department the size of Ayer would be severely taxed and this common deficiency often results in inadequate investigations and a high potential for wrongful prosecutions.

16.     It appears that the Ayer Police Department adopted the model policy manual created by the MPI originally in 1975.  This document has been described alternately as the Municipal Police Institute and Massachusetts Police Institute.  The documents produced by this organization mirrored those adopted by national groups. These model policies have been widely adopted by Massachusetts police agencies, from my personal experience.  They have consistently been acceptable tools to guide officers in reasonable and legal approached to police critical tasks, including felony crime investigations, interviewing witnesses and suspects, use of informants and collection and preservation of evidence.

17.     In her second deposition in this matter, Ms. Nancy Taylor, who had been an employee of Ayer Police Department for nearly 10 years until 1986 and who had been the primary investigator for the Brow murder and Waters' conviction, testified that she had never seen any of the specific manual provisions for interviewing of witnesses,

11

informants and collection and preservation of evidence (64, 78). She acknowledged

that she didn't see these provisions even after she became a police officer in 1983

following the conviction of Mr. Waters (78). She denied seeing any policies or

procedures at Ayer before or during the Brow murder investigation (63) specifically

those concerning interviewing of witnesses, "I have no knowledge of any policies or

procedures." (63)

      18.    Both Chiefs Connors and Boisseau have testified in their depositions that

the Ayer Police Department used the manuals from MPI. Chief Connors indicated that

the original ones were dated 1981; but most were then changed in 1985. But he

acknowledged that the substance of the provisions involving interviewing, informants

and evidence remained the same. The Department did not require officers to sign for

these manuals and there was no documentation that each member had received a

copy of these manuals. This would be indicative of a failure of Ayer Chiefs and police

managers to ensure that all police personnel were aware of these important guidelines

designed to ensure proper policing and the protection of citizen rights.

      19.    During this same period of time involving the Brow murder and arrest and

conviction of Kenneth Waters for this crime, the Ayer Police Department was involved

in internal misconduct incidents. During a period up to 1980, off duty officers from Ayer

Police Department were being used to provide security for the Ties Construction

Company. When that employment opportunity was cancelled by the company, the

facility was vandalized. The focus of the investigation spread to officers with the Ayer

Police Department, including the son of the then current Chief Adamson.

20.    The Ties investigation apparently spanned nearly 3 years culminating in discipline of some officers for refusing to submit to polygraph examinations.  The records of that administrative investigation were indicative of a perfunctory and extremely deficient investigation by the Police Department.  The investigation conducted and its obvious omissions in this administrative investigation, in my opinion, were indicative of an environment of biased and partial policing and administrative decision making.  Actions taken by the Ayer Police Department were consistent with retaliatory responses to employees who brought forth the allegations of improprieties, specifically Officer Stanley Randall.  These actions appeared to be done to support failures in management decisions and to shift the blame for these series of incidents of police misconduct.   While there is no specific reference to the exact reason for Chief Adamson's departure from the Ayer Police Department, several of the command personnel believed the Ties incident and the failures of the administrative investigation played a role in it (Connors and Boisseau).

21.    The Ties Construction incident documents included Ayer Police Department Supplemental Reports by Officers Smith and Kidder dated August 30 and September 1, 1982.  These detail discussions between the officers and former officer McAdams.  These indicated officers taking a female shoplifting suspect to an officer's apartment where they engaged in sex.  These reports also allege that officers would take quantities of narcotics off of suspects they arrested and use this for their own use.  These reports also detailed theft by officers investigating business burglaries.  There is no documentation that any of these allegations of police misconduct and internal

13

knowledge of these acts were investigated by police management.

22.    There apparently was on-going internal turmoil of the Ayer Police Department during the years of the Brow murder investigation and arrest and conviction of Kenneth Waters.  The officers involved in the Ties Construction vandalism sued the Ayer Police Department and the subsequent use of the polygraph on the officers. In Local 346, International Brotherhood of Police Officers v. Labor Relations Commission, et al., *391 Mass. 429, 462 N.E.2d 96,* published in 1984, the document cites to the prevailing environment within the Ayer Police Department, "In addition to creating public distrust, the incident factionalized the department, exacerbating a preexisting schism between the group of officers accused of vandalism and a second group thought to have transmitted the incriminating information to the Attorney General..."  What makes this even more significant is that the entire Police Department consisted of only about 12 officers at the time.

23.    Police officers operate in the field essentially autonomously.  Their daily performance is monitored and controlled by training, policies and procedures and supervisory techniques and systems, including administrative investigations.  These three (3) elements establish the parameters within which field police officers perform. These systems and practices inform officers what they should or should not do particularly when dealing with citizens during enforcement encounters.  The supervisory practices, techniques, systems and administrative investigations are the most critical aspect of controlling, monitoring and guiding field officer performance.

24.    Administrative investigations, commonly referred to as Internal Affairs or

Professional Standards, are vital to maintaining reasonable parameters of field

performance by officers.  These investigations can originate from a myriad of sources.

A common police practice is to investigate allegations of police misconduct which come

to the attention of the police agency from any source if the allegation if later proven true

would amount to misconduct.  This type of system protects the concerns and rights of

the four (4) essential elements to such a system - the aggrieved person, the accused

officer, the involved police agency, and the community served by the police agency.

These systems of administrative investigations establish the environment within the

involved agency for field officers to know that they will be held accountable for their

actions in the field.

     25.    These practices are not new in the police field.  They have been

delineated in frequent national studies on police practices including the 1931

Wickershim Commission, 1967 President Johnson's Commission, 1968 Kerner

Commission Report, 1974 Police Task Force Report of the National Advisory

Commission on Criminal Standards and Goals, and other similar studies since that

time.  These practices are embodied in model policies of nationally recognized police

professional groups such as the International Association of Chiefs of Police and the

Police Executive Research Forum.  They have been continuously referenced in

authoritative texts such as the O.W. Wilson <u>Police Administration</u> and its many

successors, the International City Management Association's texts on municipal police

practices, and <u>Police Administration, Fifth Edition</u>, Swanson, Territo and Taylor.  It is

extensively covered in specific training for administrative investigations by national

15

training entities including the Institute for Police Technology and Management (FL), International Association of Chiefs of Police (VA), Americans for Effective Law Enforcement (IL), and Public Agency Training Council (IN). Since 1997, specific recommendations for this aspect of policing are embodied into the various agreements between police agencies and the Civil Rights Division, U.S. Department of Justice and the "best practices" developed by the U.S. Department of Justice from these investigations.

26.    I regularly train on this subject to police practitioners and use my publication, Law Enforcement Administrative Investigations, as a training tool. I frequently conduct internal audits of police agencies in the practice of administrative investigations. I have personally been an investigator of police misconduct allegations and have adjudicated other cases of police misconduct for 11 years as a police command officer. I am familiar with the effect these practices have within police agencies.

27.    Ms. Nancy Taylor's performance during the investigation of the Brow murder and, specifically, her assumption as the lead investigator in 1982 culminating in the indictment and prosecution of Kenneth Waters was an egregious departure from accepted police practices. Ms. Taylor was employed by the Pepperell Police Department prior to her employment with Ayer. She moved over to Ayer when her boss, Chief Adamson, assumed the position in the Ayer Police Department. Ms. Taylor was hired as a clerk/dispatcher, but apparently functioned also as the Chief's secretary. Her evaluation by Chief Adamson for the period January - April, 1979, identified her as

16

"Policewoman Special Officer." There were numerous commendations in her personnel documents listing her as "Policewoman Taylor." In 1980, Ms. Taylor filed a discrimination complaint with the Town of Ayer principally regarding the issue of pay and her status as a police officer. In September, 1982, the Board of Selectmen of the Town of Ayer directed Ms. Taylor to refrain from performing any police duties and ordered Chief Connors to research any current reserve officer status provisions. Chief Connors upheld Ms. Taylor's position as a clerk and that she should receive police pay only when she was specifically performing as a "rape investigator." Ms. Taylor, however, did not go to the Basic Police Academy until September, 1983, graduating that December. The Board of Selectmen then appointed her as a "Patrolman" after that training and State designation. It is obvious from the documentation in this litigation, the investigative reports, and the depositions in this matter that Ms. Taylor acted as a sworn police officer and represented herself as the same giving sworn testimony in the court proceedings in the Waters' criminal trial designed to mislead the court.

28.    From the beginning of the Brow murder investigation, the documentation is specific and directed that the investigation was the primary responsibility of the Ayer Police Department. This was initially under the lead investigation of former Chief Adamson and, in 1982, by Ms. Taylor. The Ayer Police Department reports and daily logs regularly document this investigative responsibility by the Police Department. The documentation in this matter reflects that the State Police personnel were used as resources, particularly in evidence analysis and latent prints evaluations. This is evident from the minimal number of State Police investigative reports. In a relationship

17

such as this it is incumbent on the originating police agency to maintain an on-going liaison with the State Police support unit and ensure that all necessary follow-up information is supplied to that support element.

## Collection and preservation of evidence

29.    **The Ayer Police Department made reckless and conscious choices to deviate from generally accepted police practices in its collection and preservation of evidence of major crimes, including the murder of Mrs. Brow and arrest/conviction of Kenneth Waters.  Evidence during any investigation is known to have a high degree of potential of being exculpatory.  Systemic failures to adhere to reasonable and generally accepted policies and practices to safeguard this evidence would be known to create the high possibility for wrongful prosecutions and convictions.**

30.    The collection and preservation of evidence during a criminal investigation is a basic essential for any reasonable police agency.  It is a task that any police agency should expect will confront their officers and investigators.  It becomes even more significant in cases of serious crimes and when subjects are arrested and expected to be prosecuted.  The police agency is the foundational element for any successful prosecution that ensures that subjects are brought to justice and that their Constitutional rights are protected during the process.  Since the *Brady v. Maryland* case in 1963, law enforcement has been put on notice that the police agency becomes an essential element in the requirement to provide the prosecutor with materials that

18

might be exculpatory.  Collection of evidence, preservation of that evidence, and the

chain of custody are essential elements that might become exculpatory for a criminal

defendant.  These concepts are exemplified in numerous police texts and model

policies including those embodied in the 1981 and 1985 issues of the MPI manual in

"EVIDENCE - HANDLING, PRESERVATION AND SECURITY 10-1."  These manuals

of the MPI were adopted and used by the Ayer Police Department.  Other examples[1]

are:

"Two basic principles of homicide investigation are documentation and

preservation.  In order to ensure that these principles are accomplished, there must be

an established management policy that gives direction to the investigative unit.

Management is necessary to assure that the preliminary investigation and initial actions

taken at the scene, as well as the total investigative effort, have been properly

documented, and that any evidence recovered has been properly handled and

preserved.  The effective and professional investigation of homicide is the responsibility

of the entire police organization and not just the individual investigator assigned to the

case.  Hence, there is a need for an efficient coordination of activities and procedures

critical to the processing of the case.  Some of these activities are the collection of

evidence, procedural tactics, duties of patrol officers at the scene, preparation of official

forms and required reports, overtime allowance, case-officer responsibility, confidential

---

[1] While these documents were published after the incidents involved in the Brow murder and Waters arrest and prosecution, they represent the on-going contemporary practices within law enforcement at the time.  Publication of documents normally requires a lengthy time line.

19

informant funds, allocation of police department equipment, supervisor's duties, and notifications. The activities must be properly managed in order to bring the entire organization into play to effect the successful conclusion of the case." [2]

"Maintaining the Chain of Possession. The correct methods employed in collecting, marking, and packaging evidence may be nullified if an account of all the persons who have handled, examined, or stored the evidence cannot be made. This process of accounting for the evidence is called the chain of possession." [3]

The IACP National Law Enforcement Policy Center first issued its paper "Evidence Control" in 1991:

"As part of their routine responsibilities, law enforcement officers come into possession of evidence that varies widely in nature, value, and condition. These items may include anything from priceless jewelry to the bloodstained clothing of a murder victim, and could be as worthless as yesterday's newspaper or as valuable as an art treasure. Such items of evidence are normally held by law enforcement agencies subject to strict legal constraints and normally under the control and safekeeping of an evidence custodian from intake at the agency to their final disposition.

Storing, safekeeping, and managing evidence are major responsibilities not only for the evidence custodian but for the agency in general and all those who come into temporary contact with the material. Failure of agencies to establish effective and efficient systems to manage and secure evidence can and has led to civil and criminal charges against officers and the inability of the criminal justice system to successfully prosecute criminal offenders.

The evidence storage system used by law enforcement agencies must allow evidence custodians to retrieve the proper item of evidence for presentation in a criminal court proceeding or for other purposes, and to document the chain of custody of all evidentiary material from the time of receipt to final disposition. Contraband items no longer required for safekeeping must be destroyed in a manner consistent with law and under strict supervision. The agency's system of evidence custody must conform to local state and federal law as well as to contemporary federal and state regulations governing the disposal of potentially hazardous biological and environmental contaminants.

The evidence control function within law enforcement agencies, therefore, has become a relatively complex management task, particularly within the large number of agencies that have experienced major increases in the volume of evidence on hand. Due to the very nature of the task, evidence

---

[2] <u>Practical Homicide Investigation</u>, Second Edition, Geberth, 1993, p 540

[3] <u>Criminal Investigation</u>, International Association of Chiefs of Police, 1989, p 35

custodians must have a clear knowledge of contemporary practices in this field and be able to deal effectively with law enforcement personnel and the public as well as prosecutors, defense attorneys, criminal and civil courts, other governmental and law enforcement agencies, financial institutions, and business firms, among others. The volume and value of evidence accumulated today require professional management policies and practices that guarantee its integrity in court proceedings and its security within the agency."

31.    In the case of the Brow murder, these principles were consistently violated by members of the Ayer Police Department. These conscious violations resulted in exculpatory evidence not being made available to the prosecutor during the prosecution of Kenneth Waters. These essential pieces of evidence included Waters' time card from the Diner, documentation of the lack of any evidence of injury to his face during his police interview the morning following the murder, the original negatives of crime scene photographs taken by Lt. Boisseau, tape recording of witness and suspect interviews, personal investigative notes, original case files and continuous documentation of investigative efforts.

32.    The Waters' time cards are a typical example. Depositions and declarations, specifically Ms. Lankford, indicate that the Ayer Police Department was given copies of the time cards and later the actual time cards. The testimony in this case indicates that members of the Ayer Police Department were detailed to obtain these time cards. Lt. Boisseau testified that he heard that somebody was sent to the Diner to pickup the cards (231). Nancy Taylor testified that Decot was sent to get these cards. Betty Ann Waters testified (142-143) that an employee of the Diner told her that the police department sent someone to pickup the time cards two years after the murder. The investigative file has no records regarding any such police action. Any

21

record of that evidence was missing at the time of Waters' trial and the time cards were not used during Kenneth Waters' trial.

33.    The issue of comparison of Waters' prints either following his first interview, a subsequent arrest and then following his arrest for the Brow murder is another example of this systemic failure to follow through on available evidence.  The testimony of Ayer Police officers, specifically Lt. Boisseau, acknowledges that Kenneth Waters voluntarily provided his prints during his initial interview the morning following the murder and apparently a few months later following his arrest by the Providence Police Department and transportation back to Ayer by Lt. Boisseau.  He later was fingerprinted when he was arrested for the murder in 1982.

34.    During the fall of 1980 there are numerous daily log entries of the Ayer Police Department reflecting contact with Kenneth Waters, the issuance of a warrant for assault and his eventual arrest by the Providence Police Department.  On September 2, 1980, he was picked up by Lt. Boisseau and Officer Pugh and brought back to Ayer where he was "printed" (B3536).

35.    These daily logs indicate numerous entries regarding subjects being printed in regards to the Brow murder.  These subjects' names are on the documentation disclosed by Trooper Baliunas (Spinola B3285 and Nat and Arthur Johnson B3328).  On July 8, 1980, Ms. Taylor made the entry on the daily log, "Brow Investigation: Cpl. Baliunas S.P. Holden called Chief to advise of prints eliminated and requested original cards on some others.  Prints found on table in house definately (sic) not victims or members of family.  Contacted B.C.I. Plymouth Cty and requested prints

of Donald Pena-Ricardo Pina-Gary Spinolla - Anthony White.  All subjects have several

alias!s (sic)." B3444   Another entry by Ms. Taylor on July 11, 1980, indicated, "Homicide

Investigation: Chief Adamson to Holden State Police Barracks with four sets of

fingerprints for comparison." B3458   On September 6, 1980, Ms. Taylor made the entry,

"Brow investigation:...Thus far at least twenty sets of prints as well as elimination prints

from family members have been submitted and checked...Prints of Jerry Graham who

was arrested yesterday on warrant alleging charge of unarmed burglary will be carried to

S.P. Holden in the am by Bruce Taylor who passes barracks enroute to work." B3502

36.    The latent print investigator, Trooper John Baliunas of the Massachusetts

State Police, testified that he was at the crime scene and lifted five (5) prints sufficient

for comparison and that he compared the prints provided to him by the Ayer Police

Department, specifically Chief Adamson.  These prints were from sources outside the

Ayer Police Department including some from California which had been requested from

these jurisdictions.  Some of these letters requesting the comparison prints to these

outside jurisdictions have Nancy Taylor's initials as the person typing the letter.   Trooper

Baliunas' personal records in this case indicated that he was provided with comparison

prints of the Brow family members and his notes indicate that Kenneth Waters' prints

were recorded twice.  He testified that consistent with his custom and practice he would

have compared these to the prints he lifted at the murder scene.  If any comparison

would have been made he would have noted this and provided the Ayer Police

Department with this information.  Trooper Baliunas testified that his on-going contact

with the Ayer Police Department in this murder investigation was with former Chief

Adamson.  There are memos in the Ayer Police Department's investigation file of this on-going contact between Baliunas and Adamson.  Trooper Baliunas testified that his normal practice was to return any original print cards to the originating agency and the Waters' prints were original cards.

37.    While Trooper Baliunas could not specifically remember comparing Waters' prints, Waters name was on his list of subjects whose prints had been compared and cleared.  He had no recall of any match of any of the provided prints to the prints he lifted from the murder scene.  Trooper Baliunas believed that he had lifted prints sufficient for reasonable comparison from the murder scene.

38.    Ms. Taylor, however, acknowledged in her testimony to the Grand Jury that the investigation only produced "smeared" prints that were unusable. "The State Police did lift some prints.  None of them were anything that they were able to match up.  They were smeared et cetera." (D811)  She acknowledged in her depositions in this matter that her trial testimony was incorrect.

39.    The testimony in this matter, specifically former Chief Boisseau, indicated that the initial interview with Kenneth Waters was tape recorded as a police agency practice.  Other interviews with key witnesses including Brenda Marsh and Roseanna Perry were also tape recorded, as reflected during the depositions of Brenda Marsh, Ms. Perry, Ms. Taylor and Judge Fahey.  Most of these tapes were never found nor produced by the Ayer Police Department.

40.    The manner in which case file documents and evidence was maintained was contrary to reasonable and generally accepted police practices.  Former Chief

24

Boisseau testified that Chief Adamson kept the Brow investigative file and evidence in his office. Boisseau, who acknowledged that he took photographs of the Brow crime scene, testified that he kept the negatives at his home. He also acknowledged that the evidence log book for Ayer Police Department was missing.

41.     "Criminal investigation is a lawful search for people and things useful in reconstructing the circumstances of an illegal act or omission and the mental state accompanying it. It is a probing from the known to the unknown, backward in time, and its goal is to determine truth as far as it can be discovered in any post-factum inquiry. Successful investigations are based on fidelity, accuracy, and sincerity in lawfully searching for the facts of an event under investigation and on an equal faithfulness, exactness, and probity in reporting the results of an investigation. Investigators are persons who stick to the truth and are absolutely clear about the time and place of an event and the measurable aspects of evidence. The work throughout their investigation fully recognizing that even a minor contradiction or error may destroy confidence in their investigation."[4]

42.     These same evidence collection and control deficiencies were evident during the Ties Construction police misconduct investigation. Officer Randall testified that he found a knife at the scene of the construction site vandalism that he believed might be tied to a law enforcement officer. Officer Randall testified (58-67) that he

_____

[4] Criminal Investigation, Weston and Wells, 1988

collected the knife, logged it in the property/evidence log, and gave it to Lt. Boisseau who was the property/evidence at the time.   The materials in this case indicate that this knife was missing.

### Use of informants

**43.    During the period of time Ayer Police Department was conducting the Brow murder and other similar critical criminal investigations, investigators used individuals as informants to develop these cases.  The members of the Police Department failed to use reasonable and generally accepted police practices when utilizing informants.  This conscious choice to deviate from acceptable practices created investigative deficiencies and caused the violation of other persons' Constitutional protections.**

44.     "INFORMANTS...In general, an informant is any person who provides information to the police...2.  Officers who cultivate informants are responsible for evaluating the informant and the truth and accuracy of his information.  To do this effectively, an officer should attempt to determine the informant's motive for aiding the police...Understanding what motivates an informant will aid the officer in the proper evaluation of such an individual and the reliability of the information obtained."[5]

45.     "THE USE OF CONFIDENTIAL INFORMANTS" 6-1..."In general, an informant is any person who furnishes information to the police concerning the commission of a crime...In assessing the credibility of any confidential informant and the

---

[5] MPI, 1981 version

reliability of his information, officer should consider the following factors...c. is there corroboration that supports the informant...Every police officer in dealing with an informant is responsible for evaluating his informant and the accuracy of his informant's information....8. All pertinent information supplied by an informant should be independently investigated. a. this is particularly important in the early stages of a relationship with an informant to assist in evaluating his credibility and reliability...12. If an investigator receives information important to his case from an informant who might possibly be considered incompetent to testify or whose reliability might be questioned, the investigator should make every effort to obtain corroborating evidence from other sources."[6]

46.    "Before considering th proper procedure for interviewing a prospective informant, the specific motives for their involvement should first be identified. This is the first responsibility of the investigator: an informant's motive could weigh heavily against the officer's safety or the credibility of the investigation."[7]

47.    "Each division of the Criminal Investigation Bureau will maintain a separate file of informants. The informant file, which shall contain all documentation, shall be maintained at the regional level." This written policy identified the numbering format, checks to determine that the informant is not being used by other units, and purge provisions."[8]

---

[6] MPI, 1985 version

[7] Practical Drug Enforcement, Lyman, Elsevier, 1989, p 132

[8] Arizona Department of Public Safety Policy 3.12 dated 1983

27

48.    During his November, 2006, deposition in this matter, former Chief
Boisseau testified that he was unaware that any informant was being used during the
Brow investigation, that he had never heard the name Osborne, or that the District
Attorney's Office ever paid an informant for information during this investigation (152).
He was also unaware of any informant file or records regarding use of informants in the
Ayer Police Department (157).

49.    Ms. Nancy Taylor, however, used informants during her investigations of
the Brow murder and Goss rape investigations.  There is no documentation in any of the
case investigative files that she used the principles embodied in the MPI or other
recognized sources for reasonable and acceptable use of informants.  In fact, during her
second deposition in this matter, she was unaware of any policy on the subject.  She
further testified that she did nothing to corroborate any of the information provided by the
informants she used including Osborne, Marsh, Perry and Nichols.

50.    Brenda Marsh stated in her affidavit of April 18, 2001, that all of the
information contained in the search warrant application of Ms. Taylor dated October 1,
1982, was not correct.  She specifically denied that she had provided information to
Robert Osborne about Kenneth Waters and his admission of the Brow murder.  Her
affidavit enumerates the continued threats to her by Chief Connors and Ms. Taylor
during the process of the trial.  She acknowledges that she testified to incorrect facts
that were "suggested" to her.

51.    During the investigation conducted by Nancy Taylor leading to the
prosecution of Kenneth Waters, she had extensive dealings with Ms. Perry, a principle

28

informant she used in this criminal matter.  Ms. Taylor acknowledged that she and the

Ayer Police Department kept Ms. Perry in Ayer leading up to the trial and her testimony,

including keeping her at a motel and at times in a cell at the police station (15).  There

are no records and/or receipts for these dealings with this informant.  The deposition of

Bruce Taylor indicated that when Ms. Perry was to Massachusetts from Rhode Island

she was in handcuffs which would belie her being a willing informant or a simple citizen

informant.

52.     Former Chief Connors testified that he was aware of these customary

practices when dealing with informants (as described in above paragraphs 44-47), but

these requirements would not be applicable when dealing with an informant during a

homicide investigation.  He testified that this would be an exception to the customary

practice.  There is no reasonable support for this assertion and it is contrary to all law

enforcement documentation on this police practice.

53.     Both former Chief Connors (238) and Ms. Taylor have testified that they

don't make credibility or reliability determinations of witnesses and informants in

homicide cases.  There is absolutely no reasonable support for this assertion and would

be contrary to reasonable and generally accepted police practices.  Since the

investigators are the initial elements of the criminal justice and prosecution team, they

are the only ones in a position to make this type of face-to-face contact with the subjects

and make these types of vital credibility determinations.

54.     None of the authoritative writings and the identified models supports this

assertion of former Chief Connors.  In fact this would be contrary to any reasonable

29

understanding of the underlying necessities for these practices and how they would be even more significant in a homicide case and prosecution. Any reasonable law enforcement person would know that failure to use these recognized safeguard practices in dealing with police informants would have a high potential of resulting in erroneous information being used during an investigation that could lead to wrongful arrest, prosecution and conviction.

### Supervisory deficiencies of Chief Connors

**55.    Chief Connors failed to exercise reasonable supervisory oversight and control of the Brow murder investigation and arrest/prosecution of Kenneth Waters by Ms. Taylor. Any reasonable police supervisory officer would have known of the significant adverse consequences of failing to maintain constant and vigilant oversight over this type of investigation being conducted by an investigator with no homicide experience.**

56.    Phillip Connors was selected as the Ayer Police Chief in February, 1982, following the resignation of Chief Adamson. When he became the Chief of Police, Nancy Taylor had an on-going complaint against the Town of Ayer for discrimination.

57.    During that same period of time, Chief Connors was persuaded by the Brow family to take a fresh look at the Brow murder investigation. Chief Connors has testified that he retrieved the investigation file and spent "10 to 15 minutes" reviewing the materials. To any reasonable police supervisor and/or manager this would be considered a perfunctory, at best, review and oversight over such a significant investigation. There is no way in this short period of time, considering the type of

30

investigation and the obvious state of the investigative file, that a reasonable police manager could have made the necessary decisions on the status of the investigation, the areas for follow-up, the omissions and directions necessary for additional investigative work.

58.     On September 21, 1982, a letter from the Board of Selectmen ordered Ms. Taylor to refrain from performing any police duties and Chief Connors was directed by the Board to research the police status of "reserve officers."  Chief Connors determined that Ms. Taylor's employee status was that of a "clerk" and that she would receive police pay only when she was performing tasks associated with a "rape investigation."

59.     Chief Connors was aware that Nancy Taylor assumed the lead in the continuation of the Brow murder investigation.  He was on notice that she had an on-going complaint regarding her status working police duties and that the Town Board of Selectmen had ordered her and the Chief to cease her working police related tasks. Any reasonable police manager, particularly the Chief of Police of a 12 person agency, would be aware that Ms. Taylor had not conducted a prior homicide investigation and may not have the necessary investigative experience to conduct one preserving the rights of all persons who might become involved in the investigation or become suspects in this murder.  He further would have known that Ms. Taylor was exceeding her duties, training and position in conducting this investigation and yet he allowed her to continue.

60.     The testimony in this litigation, however, indicates that Chief Connors was actively involved in Ms. Taylor's investigation of the Brow murder.  He was present

during the first meeting between Nancy Taylor and Brenda Marsh when the investigation focused on Kenneth Waters.  Chief Connors' signature is on many of the follow-up and supplemental reports written by Ms. Taylor.

61.    Chief Connors, as the chief law enforcement officer of the Ayer Police Department, had a duty to ensure that all investigative materials including exculpatory materials were turned over to the prosecutor's office.  There is no acceptable reason or rationale for Chief Connors' failure to oversee this aspect of the investigative process and the duty of the Ayer Police Department to ensure the protection of everybody's rights during the subsequent prosecution of Kenneth Waters.

### Actions of Ms. Nancy Taylor as primary investigator

**62.    The actions and conduct of Ms. Nancy Taylor were egregious departures from reasonable and generally accepted police investigative practices. Any reasonable police officer would be aware that these types of conduct would adversely affect any investigation and compromise Constitutional safeguards of all persons involved.  During this period of time it is apparent that Ms. Taylor was allowed to function as the lead investigator for critical investigations without adequate training and direct supervision.  These omissions, in my opinion, were conscious choices made by investigative personnel of the Ayer Police Department and Chiefs Adamson and Connors.**

63.    "Upon receipt of the preliminary investigation report, the investigator should carefully analyze the detail and quality of information supplied.  Once the analysis has been made and a decision reached that the case should be investigated

further, the investigator should develop an investigative plan. After the approaches, strategies, and work format have been outlined, the plan should be discussed with the investigator's supervisor and agreement reached as to the decision to continue, the appropriateness of the plan, and the first review date to further decide on continuation."[9]

64.    In 1982, Ms. Taylor became the lead investigator for the Brow murder case and she was the principal Ayer Police Department person responsible for the subsequent focus on Kenneth Waters, the Grand Jury for his indictment, his arrest, and his eventual prosecution in 1983. Ms. Taylor, at best was a "Special Officer," and did not graduate the Basic Police Academy program under the auspices of the Massachusetts Criminal Justice Training Council until December, 1983. This is documented in the exhibits to various depositions including that of former Chief Connors and Ms. Taylor. During the Waters' trial, Ms. Taylor testified that she was a "police officer" for the Town of Ayer and had been so for the prior five (5) years (564). This was obviously not true and any reasonable police officer would know that this type of testimony would mislead the court.

65.    Homicide investigations, like that of Mrs. Brow's murder, are considered in law enforcement as one of the most complex and significant investigations in which a police agency may become involved. In law enforcement, personnel assigned to conduct homicide investigations are most often the most experienced investigators/detectives available.

_____

[9] Criminal Investigation, International Association of Chiefs of Police, 1989, p 55

33

66.     Former Chief Boisseau, during his November, 2006, deposition, testified that special officers wouldn't become investigators in major cases (38) and he wouldn't have expected Taylor to be the lead investigator (121).

67.     However, Ms. Taylor was actively involved in the Brow murder investigation from the beginning as reflected by the Ayer Police Department daily activity logs.  Information from the daily logs regarding the specific activities of Ms. Taylor which should have resulted in her on-going knowledge of the investigation.  She was present with Chief Adamson and Trooper Keane at the autopsy at the hospital (B3279). Notation that Adi (Park St. Diner) called the station to talk with Ms. Taylor (B3453).  She was detailed to the Park St. Diner by Chief Adamson to check on a former cook named "Bo or Beau" (B3633).  (B3627) indicates that she was detailed by the Chief to interview a female who called the station with some alleged information regarding the Brow murder. There are numerous other daily log entries of her personal involvement or knowledge as reflected in the area of this report regarding the collection of evidence, specifically the on-going collection of fingerprints for comparison by Trooper Baliunas and his verbal responses back to the Ayer Police Department.

68.     The documentation in the Brow murder, from the documentation of both the Ayer Police Department and the State Police, appeared to reflect that the investigation had stalled after the initial series of investigative activities.  Chief Connors (165) consulted with Lt. Boisseau who reported to him that all leads had been followed up on and there was nothing outstanding.  The renewed investigative efforts led by Ms. Taylor resurfaced in 1982 (during the same period of time that Ms. Taylor was involved

in her discrimination complaint with the Town of Ayer) with the information provided by Mr. Osborne. His information was that his current girlfriend, Brenda Marsh, had specific information that Kenneth Waters had admitted to the murder and that she assisted him in covering up his criminal conduct. From the documentation in this matter and the deposition testimony indicated that Mr. Osborne asked for payment for this information. Any reasonable officer would acknowledge that his actions and role in this matter made him a police informant.

69.     Ms. Marsh was contacted, as reflected in her 2001 affidavit several times by Ms. Taylor based upon this uncorroborated information provided by Mr. Osborne. Eventually, Ms. Marsh testified against Mr. Waters with specific information regarding his admission and her involvement in eliminating physical evidence. In her deposition, however, she recanted her assertions and her testimony. She testified in her deposition that she never told Osborne that Waters had admitted the murder (127), and that she had confronted Osborne regarding his lie (132), or that Waters had blood on his clothing the morning of the murder (57). Ms. Marsh testified that she was pressured by Ms. Taylor who accused her of having this information and that she denied it (129). She said she was threatened by Ms. Taylor with having her children taken from her who accused her of being an accessory by washing the bloody clothing and that she could go to prison (138).

70.     Ms. Marsh would have been considered to be a police informant. She has recounted that she was living with Kenneth Waters during the period of time of the murder. She also recounted that she had significant incidents of domestic violence

35

during this relationship. However, the only form of corroboration conducted by Ms. Taylor and the Ayer Police Department was to have Ms. Marsh submit to a polygraph examination.

71.    While polygraph examinations are useful as an investigative resource, any reasonable police investigator would know that there usefulness is limited. No reasonable police investigator would place what appears to be a "blind relevance" on the results of this form of examination. Any reasonable police investigator would not rely on this polygraph result when the investigator knew of materials in the investigation that failed to corroborate these findings, including her assertion that Kenneth Waters had a long scratch and had come home drunk that morning.

72.    Any reasonable police investigator would also know that it would be imperative to inform the prosecutor of any threats, rewards or promises made to an informant upon whose testimony the prosecutor may rely. There is testimony in this matter that Ms. Perry believed the Ayer Police Department would advise the Providence Police Department that she had assisted them in this case. This type of information would also be considered "Brady" type of materials essential to be made available to the defense. As mentioned prior in this report, it would be consistent with accepted police practices to properly document this type of informant's role in this investigation. These actions were not communicated to the prosecutors' office by Ms. Taylor or any other member of the Ayer Police Department. Ms. Taylor made no attempt to challenge the version of information provided by Ms. Marsh with known evidence collected or known by members of the Police Department.

36

73.     The information provided by Ms. Marsh led Ms. Taylor and other members of the Ayer Police Department to Roseanna Perry.  The affidavits of Roseanna Perry and her daughter represent that she was threatened by Ms. Taylor with being prosecuted as an accessory to the murder of Mrs. Brow and later with the threat of being charged with perjury during subsequent hearings on this matter.

74.     Ms Taylor acknowledged in her second deposition in this matter that Brenda Marsh told her of Roseanna Perry first and that Perry was a former girlfriend of Waters (16).  Chief Connors was with them during this meeting (24).  She located Perry through the Providence Police Department, who knew of her and said she was a "common street walker" (37).  Taylor and Fahey met with Perry in Providence (31). Taylor ran the tape recorder while Fahey interviewed Perry and Taylor gave the tape to Fahey (42).  The last time she observed the tape was in Fahey's office.  A subsequent witness statement was taken of Perry 4/12/83 by Taylor and Det. McDonald (43). During the Fahey interview Perry said Waters admitted the "killing" of Brow (45).  Taylor felt Perry was reliable after her second interview in Providence (55).  This was typed as well as taped by someone from the Providence Police Department (59).  Taylor felt there was no need to make a report of her work on this matter (61).  She testified that she made notes of her calls with Perry who called her repeatedly, but Taylor made no reports of these communications and she had no knowledge where all of her notes might be (102). Ms. Taylor denies she pressured Perry to testify (131), denies Fahey asked her whether any promises had been made to Perry (133) and denies there were or doesn't remember (135).

75.     Again, Ms. Taylor nor any other member of the Ayer Police Department did not document the use of this informant, Roseanna Perry.  This was another key testimonial witness where there was no effort made to corroborate the information provided by this informant.  Any reasonable police officer would know that tactics such as those documented by Ms. Perry and her daughter would be the type to elicit false testimony and the type of conduct that must be disclosed to the prosecutor for an evaluation of any Brady implications.

76.     "A police officer must demonstrate the existence of probable cause at the time he applies for an arrest or search warrant...Search warrants require a demonstration that what is sought probably exists."[10]

77.     On the eve of the trial of Kenneth Waters, Ms. Taylor decided that a search of the Brow residence should be conducted for the possibility of locating additional prints or evidence of the alleged bloody clothing.  This was three (3) years after the crime and after the scene had been processed by both the State and Ayer police agencies.

78.     Ms. Taylor presented an application for this search warrant.  She did so relying information from an untested informant and without any oversight by any supervisor of the Ayer Police Department.  This omission was testified to by Chief Connors (276) that he had not reviewed the search warrant application and was not aware that it was being requested.  Ms. Taylor, on this search warrant application,

---

[10] Introduction to Criminal Evidence and Court Procedures, Hanley, Schmidt and Robbins, 1987

falsely represented herself as a "police officer."  Ms. Fahey, the prosecutor in this matter, testified that she was unaware of this search (42-44).  There is no indication that Ms. Taylor submitted any search warrant return documentation.

79.    A reasonable police investigator knows that it is his/her responsibility to determine elements of probable cause through an analysis of the evidence developed during the investigation.  It is the responsibility of the investigator to organize and present the available evidence to the prosecutor in a manner to facilitate the prosecutor's reasonable decision making in determining whether prosecution is warranted.  The investigator becomes an integral element in the eventual decision to prosecute a subject.  When an investigator puts blinders on his/her search for a suspect and simply focuses on one suspect, the investigator loses his/her objectivity and impartiality and often resulted in wrongful prosecutions.  In this case, Ms Taylor had specific information and evidence that should have been provided to the prosecutor and which was not.  These included the fact that Kenneth Waters had been earlier considered a possible suspect and had been eliminated, had prints taken by the Ayer Police Department and presented to the State Police, had no scratch on his face the morning after the incident, and other relevant exculpatory information and evidence.

80.    Prosecutor Fahey believed that Ms. Taylor was a police officer.  She acknowledged that she relied on her based upon this erroneous belief that she was a police officer and the "chief investigator" for the Brow murder investigation.  Ms. Fahey wrote a letter of commendation to Chief Connors on May 13, 1983, commending "Officer Nancy Taylor...where she was the chief investigative officer..."

81.    No reasonable police investigator would have believed that a search warrant for the purposes stated by Ms. Taylor would have produced the types of evidence she sought.  This conduct by Ms. Taylor is another example of her failure as a homicide investigator and demonstrates her apparent blind zeal to support her investigation that resulted in the indictment, arrest and pending prosecution of Kenneth Waters.  The record and deposition testimony is clear that Ms. Taylor did not clear or apprise either Prosecutor Fahey or Chief Connors of this action.

82.    Normally on a case of this significance particularly when "new" developments appear the entire team or unit involved would gather together to review the case and brainstorm on the possible directions for follow-up investigations.  Either Taylor, Connors or Boisseau have testified nor is there any documentation that this type of planning occurred.  This type of reasonable and common planning activity would more likely than not have produced the investigative file.  This information would have then been necessarily turned over to the prosecutor including the issues of the latent prints and that Kenneth Waters had been obviously excluded as a suspect initially.

83.    Ms. Taylor provided false testimony when she testified that the prints lifted by the State Police at the crime scene were "smeared."  Even more disturbing is that she testified that she examined the lifted prints and could conclude that they were smeared and not sufficient for use in identification.  Without extensive latent prints training and experience, an investigator is not in a position to make this type of determination, in my opinion.  This is even more revealing in that her documentation on the daily logs and

40

other materials acknowledge that she was aware that prints had been compared and subjects were excluded based upon these comparisons.

84.    Ms. Taylor, working with prosecutor Fahey as the "lead investigator," had the legal duty of informing her of all exculpatory materials including the entire case file so Ms. Fahey could perform her prosecutorial duties.  From the deposition testimony, affidavits and police reports this exculpatory material included the fact that Kenneth Waters had provided fingerprints sample that were compared against the prints lifted at the crime scene and excluded him as a suspect, that the police had obtained both copies of and the original time cards for Waters from his place of employment and they were not disclosed, that members of the Ayer Police Department had observed Waters in court the morning after the murder and that when he was interviewed later that morning he had no "deep scratch" on his face, that Marsh and Perry had been threatened and provided inducements, rewards or promises, and that Kenneth Waters had been "cleared or discounted" during the original investigation.  It was the responsibility of Ms. Taylor to have notified Ms. Fahey of these facts as well as ensured that copies of all updated investigative reports be sent to the State Police personnel assigned to assist in this matter.

85.    The deposition testimony of former Chiefs Boisseau and Connors is particularly disturbing from officers who lead a police agency and were so deeply involved in this homicide investigation and prosecution of Kenneth Waters.  Chiefs Boisseau and Connors and Ms. Taylor were unaware of the "Brady" concept; although Chief Connors did testify that he knew the concept of exculpatory evidence.

41

86.     These same egregious, deliberate choices were made by Ms. Taylor during her investigation of the rape of Ms. Goss in August 1983.  The documentation in that subsequent matter of *Maher v. Ayer Police Department, et al.,* disclosed that Mr. Maher's conviction was overturned by the use of DNA examination and other investigative improprieties.  The documentation in that matter indicated that Ms. Taylor used suggestive photo line-up procedures with the victim, Ms. Marilyn Goss and Ms. Taylor participated in having a pending criminal charge against Ms. Goss of battery on a police officer dropped.  None of these factors were disclosed to the District Attorney's Office.  These acts by Ms. Taylor and the Ayer Police Department, in my opinion, were a continued pattern of deceit with either the approval or acquiescence of her supervisors.

87.     This pattern of untruthfulness by Ms. Taylor was also evident in the rape allegation and investigation concerning Ayer Police Officer Randall.  While she has testified in her depositions that she had minimal involvement and immediately turned the matter over to the involved investigative agency, her own reports reflect that she informed the victim of this matter that she "would be with her throughout the entire process."  Officer Randall's charges were dismissed and he filed a lawsuit against Taylor that the charges had been false.

88.     This practice and pattern of egregious investigative conduct by other Ayer Police Department officers was also reported in the Sun during the 1981 trial of Officer Downing for sexual impropriety with a minor charges brought by Ayer Police Officer Pugh.  Former Officer Downing was acquitted when the Court allowed the submission of an apology letter from the victim.  That letter, introduced into the trial, stated that the

victim was picked up by the Ayer Police when he was "stoned" and they threatened him with jail. The victim's letter indicated that the officers made "threats and promises" to him and that "I am scared to death of jails and would have said anything they wanted me to" and that the officers said they were only after Officer Downing.

89.    It is my understanding that additional materials may be in process of being produced or may be requested later. I would request that this report be considered a preliminary report. Should any subsequent information be produced and materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

90.    At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

91.    My fees for this professional service is a flat Case Development Fee of $10,000 and a fee of $2000 for a deposition in Rhode Island or $2500 per day plus expenses for services away from Rhode Island including depositions and trial appearances.


This report is signed under penalty of perjury on this 21st day of August, 2007, in Greenville, RI.

Lou Reiter

43

## LOU REITER...RESUME

**LOU REITER & ASSOCIATES**...58 smith avenue, greenville, rhode island 02828
401.949.6978...401.226.1383(cell)...LREITER583@AOL.COM

## POLICE CONSULTING EXPERIENCE

Lou Reiter has been the principal consultant with Lou Reiter & Associates since its inception in 1983.  In that capacity he has been providing professional consulting to law enforcement agencies in three primary areas: (1) training, (2) agency audits and (3) litigation services.

### TRAINING

Lou Reiter typically conducts 15-20 training seminars and programs each year involving approximately 1000 persons.  These presentations range in time from 3 hours to five (5) days with the majority being a two (2) day seminar.   Normally attended by police supervisors, managers, command personnel and litigation/risk management elements, these seminars involve police practitioners from federal, state, county and municipal law enforcement agencies.

The most common areas of presentation and instruction are:

- Managing the Internal Affairs function, police discipline and the citizen complaint process.
- Investigation of critical incidents - officer involved shootings, use of force, and pursuits/emergency responses.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit/emergency response issues.
- Investigative procedures and supervision.
- Dealing with special populations, including persons with diminished capacities
- Personnel practices.
- Supervisory techniques.
- Liability management.
- Policy and procedure development.
- Jail intake procedures.
- Management effectiveness.

These training programs have been presented in the following states for police training academies, private training groups, public agencies, governmental entities and academic facilities:

| | | | |
|---|---|---|---|
| California | Ohio | Oregon | Alaska |
| Florida | Indiana | Washington | New Jersey |
| Georgia | Wisconsin | Hawaii | Connecticut |
| New York | United Kingdom | Vermont | District of Columbia |
| Texas | Minnesota | North Carolina | New Mexico |
| South Carolina | Missouri | Illinois | Michigan |
| Massachusetts | Arizona | Oklahoma | North Dakota |
| Rhode Island | Nevada | Louisiana | Arkansas |
| Pennsylvania | Utah | Mississippi | Kentucky |
| Virginia | Colorado | Tennessee | Kansas |
| Maryland | | | |

## LAW ENFORCEMENT AGENCY AUDITS

These types of agency audits take on many different forms. Some are designed to identify the strengths and weaknesses of the agency, make recommendations and present specific timetables for implementation. Others are specifically designed to evaluate the agency's liability potential, make recommendations and suggest implementation strategies. Some involve budgetary concerns and consideration of consolidation of police jurisdictions. Occasionally the purpose is to conduct an administrative investigation using external investigators due to sensitive or political potential conflicts of interest. Some are accreditation and re-accreditation on-site assessments for the Commission on Accreditation for Law Enforcement Agencies, Inc.

These audits are conducted either as a one-person unit or as a member of a larger team of police professionals, although not more than six (6) total. Most of these are through contracts with the affected governmental body. Some are through a litigation or risk management unit.

In 2001, Lou Reiter was appointed as the Federal Court Monitor for the consent decree in *Colin, et al., v. County of Ventura, et al.,* CV 97-8352, 98-3051 and 98-6092 LGB (Cwx), United States District Court, Central District of California.

Since 1996, Lou Reiter has acted as a consultant for the Special Litigation Section, Civil Rights Division, U.S. Department of Justice, in six (6) pattern and practices investigations concerning the cities of New York, New Orleans, Pittsburgh, Buffalo, Columbus, OH., and Charleston, WV. He has also worked with the cities of Cincinnati and Schenectady which were being investigated by this governmental agency.

Lou Reiter since 1983 has audited law enforcement agencies as small as three (3) persons to as large as 39,000 personnel. They have represented municipal, county and state entities. Normally, he conducts 3-5 of these audits each year. During these forms of audits, he rides with line officers and first level supervisors for nearly 100 or more hours for interviews and direct observation of field implementation.

The primary areas of focus during these audits are:

- ■    Citizen complaint procedures.
- ■    Discipline, internal affairs and early warning systems.
- ■    Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- ■    Specialized operations including traffic, investigations, narcotics, vice, intelligence,

emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.
- Training and training documentation
- Use of police resources
- Support functions including communications, records and detention and holding facilities.

These types of agency audits have been conducted in the following states:

| | | | |
|---|---|---|---|
| Florida | Pennsylvania | California | Texas |
| Georgia | North Carolina | Illinois | New York |
| Arizona | South Carolina | Wisconsin | Rhode Island |
| Colorado | Virginia | West Virginia | Washington |
| Ohio | New Mexico | Louisiana | Montana |
| Delaware | Wyoming | Tennessee | |

## LITIGATION SERVICES

Lou Reiter, since 1983, has been involved in over 950 law enforcement civil litigation cases and a few criminal matters. He has acted both as a consultant and testimonial expert witness. These have been in Federal and local courts. He has worked with plaintiff attorneys approximately 60 percent of the time and the remainder with defense units. He has also been employed in this area by insurance entities, risk management pools, local prosecutorial offices and the United States Department of Justice.

While there has been a wide range of specific law enforcement practices and procedures which have been involved in these cases, some of the more common issues addressed in case development and subsequent testimony have been:

- Field procedures including tactics, arrest techniques and pursuits/emergency response driving.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures, including warrant applications, informant control and use, and search warrant processes.
- Jail intake procedures.
- Police management.
- Personnel practices, including hiring, retention, remediation, background investigations, use of professional counseling services and promotion/assignment.
- Investigation of citizen complaints.
- Employee discipline.
- Police policy and procedures development.
- Police training.

These litigation services have been in the following states and jurisdictions:

| | | | |
|---|---|---|---|
| Florida | Oregon | Tennessee | Connecticut |
| Georgia | New Mexico | Minnesota | Maine |
| Alabama | Arizona | Ohio | New Hampshire |
| Mississippi | Alaska | South Carolina | Puerto Rico |
| Louisiana | Hawaii | North Carolina | Rhode Island |
| California | Montana | Virginia | Washington |
| Texas | Wyoming | District of Columbia | Wisconsin |
| Missouri | Colorado | Maryland | Massachusetts |
| Illinois | Kansas | Pennsylvania | Idaho |
| Indiana | Oklahoma | New York | West Virginia |
| Michigan | Texas | New Jersey | Nevada |
| Iowa | Kentucky | Delaware | |

## PRIOR ACTIVE POLICE EXPERIENCE

Lou Reiter was a sworn member of the Los Angeles Police Department for 20 years between 1961-1981. He began as a police officer and retired as a Deputy Chief of Police. During that tenure he served in over 20 assignments. Some of those assignments included:

**Promotion schedule.**

- 1980   Deputy Chief of Police
- 1976   Commander
- 1974   Captain
- 1970   Lieutenant
- 1966   Sergeant
- 1961   Police Officer

**Personnel and Training Bureau, Commanding Officer.** As a Deputy Chief directed the operations of three (3) divisions and two (2) major sections, involving over 300 employees.

- Responsible for all training, personnel management, recruitment and selection, employee-management relations and behavioral science services
- Responsible for the successful implementation of the 1980 Consent Decree requiring increased hiring of females and minorities
- Chairman of the Use of Force Review Board which adjudicated all officer-involved firearm discharges, serious injuries resulting from police action and in-custody deaths
- Caused the initiation of a unique peer counseling program for employees and a transfer system for "burned out" employees from high activity areas and assignments.

**Operations West Bureau Commanding Officer.** Directed all police operations (patrol, traffic, investigations and vice/street narcotics) in the Western quadrant of the City with four (4) geographic stations and one (1) traffic division involving over 1400 employees.

**Planning and Fiscal Bureau Commanding Officer.** Directed the operations of five (5) divisions, involving over 400 employees.

- Responsible for the $310 million Police budget preparation and management

- ▸ Automated systems
- ▸ Planning and research
- ▸ Communications
- ▸ Guided the development of the Emergency Command Control Communications System, a multi-faceted computer based system financed by a $40 million tax override
- ▸ Provided on-going liaison with the City Council and directed efforts to develop local and state legislation

**Uniformed Coordinator for Operations Central and Valley Bureaus.** Each Bureau consisted of five (5) geographic stations, a traffic division, gang enforcement unit, and over 1600 employees. In addition to the overall coordination of patrol and uniformed operations, monitored and approved personnel complaint investigations, adjudications and discipline during this four (4) year assignment.

- ▸ Coordinated the successful police efforts in the San Fernando Valley during the 1978 school desegregation
- ▸ Directed the City-wide 500 person police reserve officer program
- ▸ Department liaison to community alcoholism programs
- ▸ Participant in the Physical Altercation and Tactics Committee
- ▸ Regular member of the Fleet Safety Review Board and Shooting Review Panel.

**Central Area Commanding Officer.** For two (2) years commanded over 250 uniformed officers and detectives in the Los Angeles Central City (downtown) area.

**Team policing.** Selected to make preliminary preparations and then command a unique team policing experiment in Foothill Division in July, 1973 (this was similar to the current Community Oriented Policing concept). This consisted of a command of 57 employees including detectives and traffic officers to maintain 24-hour police service for this area. Crime went down in this area while it rose in adjacent areas.

**Traffic assignments.** Served as a uniformed traffic accident investigator throughout the City. Investigated 1200-1500 traffic accidents and arrested nearly 400 drunk drivers. Provided specialized enforcement and accident investigation on the City's freeway systems in specially equipped pursuit vehicles.

**Patrol assignments.** Was a uniformed patrol officer in three (3) geographic stations. Functioned as a plainclothes member of an anti-crime unit. As a sergeant was a field supervisor and later, as a lieutenant, was a uniformed watch commander.

**Employee misconduct administration.** Investigated cases alleging employee misconduct both as a field supervisor and member of Internal Affairs Division. As the Department Advocate, presented the agency case against employees during internal administrative hearings (Boards of Rights). Later, as a Lieutenant, acted as a defense representative for accused employees during these same hearings. Adjudicated investigations of police misconduct and served as a member of Boards of Rights on many occasions.

**Other personnel related activities.** Participant in the Physical Altercation and Tactics Committee, Fleet Safety Review Board and Shooting Review Board. In 1981, chaired the Police Productivity Workshop which presented recommendations for massive changes in operations to respond to budgetary restrictions imposed by the passage of Proposition 13.

**Training commands and assignments.** Commanded (1980-1981) the Personnel and Training Bureau which included the Police Academy and video training production unit. Implemented programs (1980-81) to assist in the achievement of court consent decree hiring of females/minorities and their successful performance during the training aspect of their employment. Was the Assistant Commanding Officer of the

Police Academy.  Was the Officer-in-charge of the Human Relations Training Unit which covered such topics as community and cultural diversity, officer-partner relations, inter-personal communications, and handling the emotionally disturbed and mentally ill.

**Staff researcher and author for the 1973** *Police Task Force Report* **of the National Advisory Commission on Criminal Justice Standards and Goals.**  The report assisted agencies nationwide to update their operations and develop plans for future growth and strategies.  The three (3) specific chapters researched authored by Lou Reiter were "Internal Discipline, Training and Management-Employee Relations."

**Managing Unusual Occurrences.**  Member of the Department Field Command Post Cadre since its inception following the 1965 Watts Riots.  Developed procedures for police operations during such incidents principally as a member of the Operations Section and later incident command functions.  Participated in numerous actual unusual occurrence control operations as well as training exercises responding to natural and man-made incidents.

**Volunteer police.**  Managed the LAPD 500 person Reserve Officer Corps.  Developed revised training programs and an in-service training element.  Created a unique expert advisory group within this volunteer corps specializing on the expertise of lawyers, doctors, statisticians, educators and other specialists.  Implemented a 54 person Reserve Chaplain program.  Lobbied for and supported State laws mandating strengthened training and selection requirements for volunteer elements of police agencies.

**Community Relations and Crime Prevention.**  Community Relations lieutenant and Assistant Commanding Officer of Hollywood Division, directing the community mobilization and crime prevention efforts.  Was the Officer in Charge of the Public Service and Crime Prevention Section, Public Affairs Division.

**New Careers and Concentrated Employment Program.**  In 1967, initiated, implemented and administered this U.S. Department of Labor funded program which employed, trained and assigned disadvantaged, underemployed persons to police community relations and crime prevention programs.  Ninety (90) percent were ex-convicts or former narcotics users.

**Planning and Research.**  Researched and authored policy and procedure changes for the Department and incorporated them into the Department Manual.

## ADDITIONAL INSTRUCTIONAL EXPERIENCE

During the years since 1971, Lou Reiter has been involved in continuous and varied aspects of training both within and outside the law enforcement field.  Some of those not covered in the preceding sections are:

- Faculty member for national level police management and specialized programs for organizations such as the Public Agency Training Council (Indianapolis), Americans for Effective Law Enforcement (Chicago), Institute for Police Technology and Management (Jacksonville, FL.), Police Foundation Executive Institute, Commission on Accreditation for Law Enforcement Agencies, National League of Cities, Law Enforcement Assistance Administration, academic institutions, local police academies, state police organizations and risk management/insurance pool groups.
- Senior Consultant, Institute for Liability Management.
- Faculty member, Criminal Justice Management Program, Florida Center for Public Management, Florida State University.
- Certified Instructor, Law Enforcement Supervision/Management, Florida Department of Law

Enforcement.
- Lifetime Vocational Training Certificate, Law Enforcement, California.
- Developed and presented "Frontline Supervision," a police supervision program.

Elected to the Santa Clarita Community College Board of Trustees in 1975 and reelected in 1979. Served as Board President and acted on many local and State committees on education.

Past member:

- Police Science Advisory Boards for Junior Colleges of Rio Hondo, El Segundo and Harbor City in the Los Angeles area.
- Faculty member for graduate and undergraduate level courses at various universities and colleges.
- Principal faculty member for the Management Development Program for the City of Los Angeles.
- Trainer for Florida American Cancer Society's Volunteer Leadership Development Program.
- California State University, Northridge, Advisory Committee on Teacher Education.
- Advisory Committee on Clinical Rehabilitative Services Credential, Department of Communicative Disorders.

## LAW ENFORCEMENT PROFESSIONAL ACTIVITIES

Since 1973, Lou Reiter has been involved in law enforcement professional activities and programs. Many of these were during his tenure with the LAPD. Other have been as a concerned public member and police consultant. Some of those include:

- Assessor, Commission on Accreditation for Law Enforcement Agencies, Inc., (1985- ), and has been assigned to both on-site audits for accreditation and re-accreditation. Re-certified as an assessor in 1999 at Montreal Conference and in 2002 at Cleveland.
- Advisory Board Member, Legal and Liability Risk Management Institute, Indianapolis, IN.
- American Society for Law Enforcement Trainers, member.
- National Internal Affairs Investigator's Association, member and conference presenter.
- National Center for Women and Policing, member.
- Founding Member, Tallahassee Committee of Ninety-Nine and former member of Board of Directors (1982-1988) and Secretary (1984-1987). This organization was formed in 1981 and provided support to local law enforcement agencies for greater professionalization, underwriting local police training programs, purchasing police equipment and ensuring benefits to families of police officers.
- Presenter and participant, 1982 and 1983 Florida Governor's Challenge Conference on Crime.
- Chair, Public Safety Committee, 21st Century Council, City of Tallahassee (1990-1993). This citizen group was organized to create an annual assessment guide to evaluate the effectiveness of our community's public safety performance.
- Past member, California Peace Officers Association
  - Chairman (1979-81) Standards and Ethics Committee.
    - Initiated and moderated the First Joint Symposium on Professional Issues.
    - Developed and received State approval and distribution of the *Code of Professional Conduct and Responsibilities for Peace Officers.*

- ‣ Member, Law and Legislation Committee.
- ‣ Member, Small Agency Committee.
- ‣ Member, Reserve Officers Committee.
- ‣ Recipient of the 1981 'Professionalism Award' from the California Peace Officers Association.
- ■ Member or past member:
  - ‣ Florida Sheriffs' Association, Lifetime Member.
  - ‣ Florida Council on Crime and Delinquency.
  - ‣ American Society for Training and Development, local and National.
  - ‣ Public Safety Committee, League of California Cities.
  - ‣ Los Angeles County Peace Officers Association.
  - ‣ Southern California Police Community Relations Officers Association.

## PUBLICATIONS

Lou Reiter has published many law enforcement articles. With the exception of his Internal Affairs manual mentioned below, most of his current publications are integral parts of training he provides and are tailored to the specific subject matter and audience of the presentation. The below represent many of his published works:

- ■ *Law Enforcement Administrative Investigations, a manual/guide.* This comprehensive 120 page manual was first published by Lou Reiter & Associates in 1993. The 2nd edition was published in 1998 and is an expanded version with several guest author chapters and contains over 300 pages in a 'nuts and bolts' method of presentation for practitioners. The Third Edition was published by the Public Agency Training Council in November, 2006
- ■ "Conduct Unbecoming: Sex, videotapes, the Internet and police misconduct," Public Agency Training Council Information, April, 2007
- ■ "Procedural Time Limits in Administrative Investigations – Absolutes," The Local Government Liability Beat, Georgia Risk Management, March, 2007
- ■ "Sex, Videotapes, the Internet, and Police Misconduct," Law Enforcement Executive Forum, Illinois Law Enforcement Training and Standards Board of Executive Institute, Western Illinois University, 2007
- ■ "Are you providing reasonable training and policy direction on handling of the mentally ill and emotionally disturbed persons?" Law Enforcement Risk Management Legal Update, Fall 2006
- ■ "Common Questions About Law Enforcement Administrative Investigations," Public Agency Training Council Information, September, 2006
- ■ "Preparing a Defense in Law Enforcement Litigation: A Formula for Law Enforcement," Public Agency Training Council Information, August, 2006
- ■ "Administrative Insight: A Key to Defending Your Decisions for Administrative Investigations," Law Enforcement Risk Management Legal Update, Summer, 2006, LLRMI/PATC
- ■ "Past time to reform police bill of rights," OpEd article, <u>Providence Journal</u>, July 25, 2005
- ■ "Witnesses: A critical element in administrative investigations," Legal and Liability Risk Management Institute web site, 2005
- ■ "Be Prepared," <u>Public Risk</u>, August 2005, co-authored with Jack Ryan
- ■ "The need for IA/OPS audit," Legal and Liability Risk Management Institute web site, 2004
- ■ "Internal Affairs: The new Achilles tendon for police agencies," Legal and Liability Risk Management Institute web site, 2004
- ■ "Consent Decrees: Why they're important for your agency," Legal and Liability Risk

Management Institute web site, 2004
- "So you want to be an expert witness," Legal and Liability Risk Management Institute web site, 2003
- "Creating Reasonable and Defensible Discipline," Commission on Accreditation for Law Enforcement Agencies, Inc., Newsletter, November, 1996.
- "Timesharing With Your Subordinates," Florida Police Chief, April, 1984.
- "Police Agencies Need Shooting Policy," Tallahassee Democrat, September 27, 1982.
- "Truth About Miami Is Down in the Streets," Tallahassee Democrat, December 27, 1982.
- "Police Recruitment in the 80's – Crisis or Opportunity?" Western City, May, 1981.
- "Civil Detoxification in Los Angeles," Police Chief, August, 1981
- "Professional Police," California Peace Officer, 1980.
- "The Elected Public Official Views Police Professionalism," California Peace Officer, 1980.
- "A Footbeat Officer's View of Police Work," Journal of California Law Enforcement, October, 1979.
- "A Day With Sergeant Maynard Jones," Police Chief, April, 1979.
- "Field Sergeants' Administrative Time Utilization," Journal of California Law Enforcement, unknown date.
- "Make Your Meetings Successful," Journal of California Law Enforcement, April, 1979.
- "Ways To Get That Paper Out Now, Faster and Better," Journal of California Law Enforcement, October, 1978.
- "Internal Discipline," "Training," and " Management-Employee Relations," Police Task Force Report, National Advisory Commission on Criminal Justice Standards and Goals, United States Department of Justice, U.S. Printing Office, 1973.

## URBAN ECONOMIC DEVELOPMENT AND COMMUNITY ACTION GROUPS

During his residence in both Southern California and Florida, Lou Reiter has been active in various programs designed to improve and enhance community and economic development. Some of those activities have included:

- Tallahassee Area Chamber of Commerce and committees on County and City Governments.
- Local committee for district member voting in Leon County.
- Forward Tallahassee.
- Board of Directors, Skid Row Development Corporation. A non-profit organization formed to stimulate redevelopment of the skid row area in Los Angeles, attract funding sources, funnel monies to redevelopment projects and oversee the general plan for this designated area. During the first year originated over $6 million of projects impacting business stimulation and residential housing.
- Board of Governors, Alcohol Detoxification and Rehabilitation Center. In 1976 conducted an extensive management study of this program. The results were implemented and produced an increased intake of public inebriates and reduction in walkout rates.
- Central Business District Redevelopment Project, Skid Row Task Force.
- Greater Van Nuys Chamber of Commerce and member of the Business Improvement Committee and Vitalize Van Nuys, Inc. ( a specific economic action project).

## COMMUNITY ACTIVITIES

Community activities have been a personal commitment for Lou Reiter. Many of these were in connection with his duties as a police practitioner. Others were from his personal orientation to the communities in which he has lived. Some of those not previously mentioned have included:

- American Cancer Society
  - Board of Directors and Executive Board, Florida Division.
  - State Crusade Committee, Vice Chair.
  - Chairperson, State Direct Mail and Marketing Subcommittee.
  - President (1986-87) and Board of Directors, Leon County Unit.
  - Trainer, State Volunteer Leadership Development Program.
  - Crusade Chairperson (1982-84) Leon County Unit which increased donations 60% to a record high of $111,000 annually.
- President, Consolidation NOW, a citizens' group advocating the consolidation of governments of Leon County and the City of Tallahassee.
- President (1985) and member Board of Directors (1983-88), Tallahassee Junior Museum. During the year as President the museum received accreditation from the American Association of Museums.
- Chairperson, Airshow '86, Tallahassee's first major airshow. Co-chair, Airshow '87.
- Rotary International
  - Providence Rotary (2004– )
  - Smithfield, RI, Rotary (2002-2004 )
  - Tallahassee Capital Rotary (1981-1999 )
  - Paul Harris Fellow (1976)
  - Service Above Self/Member of the Year recipient (1986-7)
  - Presenter at district and zone conferences
  - Past member, Newhall, CA., Rotary
  - Creator of the Newhall Rotary Community Service Fund
- Memberships, current and previous:
  - Forward Tallahassee, Public Safety Committee
  - Florida Economics Club
  - Tallahassee Tiger Bay Club
  - WFSU-TV committees
  - Partners in Excellence, a school/business support program
  - 1987 Leon County School District "Citizens For Better Schools" Bond Steering Committee
  - Florida State University Artists Series, benefactor
  - Public Inebriate Task Force, Alcoholism Council of Greater Los Angeles
  - Canyon County, CA., Formation Committee
  - Vice President and Board of Directors, Santa Clarita Valley Boys and Girls Club
  - Board of Directors, Tallahassee Informed Parents
  - Boy Scout Troop 23 Committee
  - Swannee Area Scout Council Fund-raising Committee
  - Board of Directors, LeMoyne Art Foundation
  - Member and Director, United Way of Leon County

## FORMAL EDUCATION

University of Southern California - Graduate of the Managerial Policy Institute (1980) and graduate study in the Master of Public Administration program.

Pepperdine University - Bachelor of Science in Public Management/Criminal Justice Program .

University of California at Los Angeles - undergraduate study in Political Science.

## PERSONAL

Born March 31, 1939, in Minneapolis, Minnesota.

Resident of Rhode Island since 1999 and Tallahassee, Florida, between 1981-1999.  Lou Reiter lived in the Los Angeles area for nearly 30 years.

Lou's wife is Marilyn McFadden who is an attorney and was a certified Florida police officer.  She currently specializes as a consultant in law enforcement and prosecution issues of Domestic Violence and is considered one of the leading experts in police employee-related domestic misconduct.  They have six (6) grown children one of whom was a police officer with the City of Tallahassee.

## LOU REITER TESTIMONY

**January, 2003**

Mark Jarmie/Jason Bowles (P), Albuquerque, *Tanberg v. Sholtis*,          D

**February, 2003**

Andy DeBevoise (D), Orlando, *Cleningden v. County of Brevard, FL.,*      T

**March, 2003**

Mary Han/Paul Kennedy (P), Albuquerque, *Louren Oliveros v. County of Bernalillo,* CIV-02-0732 RLP
     LFG, D
Joe Fine (P), Albuquerque, *L'Esperance v. John Mings,* CIV 02-0258 CJA/DJS, D
Timothy Touhy (P), *Russ v. City of Chicago*,                   , D

**April, 2003**

Elizabeth Hodgsen (P), Des Monies, IA., *Seibold v. Frisbie*,    , D
Timothy Wheeler (P), Santa Monica, *Reid v. City of Redlands, CA.,*      D

**May, 2003**

Judith Berkan/Peter Berkowitz (P), San Juan, Puerto Rico, *Gonzalez v. Cartenega,* Civil No. 00-2502(HL),
     D

**June, 2003**

William Hulsy (P), Santa Ana, *Bailey v. County of Riverside, CA.,* EDCV 01-403 VAP(SGLx), D/T
Gary White (P), Columbia, SC, *Huggins v. Lexington County Sheriff's,* 3:02-2361-17, D
Mark Jarmie/Jason Bowles (P), Albuquerque, *Tanberg v. Sholtis*,        T
Phil Hohenlohe (P), Helena, MT., *Olsen/Montana Advocacy Program v. City of Bozeman,* Human Rights
     Commission Hearing, T

**July, 2003**

Jerry Marconi (P), Chicago, *Saponaro v. City of Bellwood, IL.,* No.98 L 4985, D

**September, 2003**

David Golub (P), Stamford, CT., *Peters v. Greenwich, CT.,* CV 950147192 S, D
Rob Jarchi (P), Santa Monica, *Gousse v. Los Angeles Police Department,* BCS252804, D
David Cerda (P), Chicago, *Duran v. Cicero,* 01 C 6858, D

**October, 2003**

Tyler Weaver (P), Seattle, *Hickey v. City of Seattle,* C00-1672 R, D
Rob Jarchi (P), Santa Monica, *Gousse v. Los Angeles Police Department,* BCS252804, T

**December, 2003**

Judith Berkan/Peter Berkowitz (P), San Juan, Puerto Rico, *Gonzalez v. Cartenega,* Civil No. 00-2502(HL),

T

David Switalski/Steven Andrews (P), Tallahassee, FL., *Rominger v. Florida Dept. of Law Enforcement*, T
Scott Carr (P), Santa Monica, CA., *Grill v. Los Angeles World Airport Police Department*, D
Michael Meehan (P), Tucson, AZ., *Wertheim v. City of Tucson/Pima County SO*,  D

### January, 2004

Teresa Parrish (P), Albuquerque, NM., *Paloni v. City of Albuquerque*,     D
Steve Roach (P), Boston, *Ruggerio v. City of Boston*, 00-CV-1232ORCL, D

### March, 2004

Thomas Marszsewski (P), Chicago, *Collins v. City of Chicago*,      D
David Golub (P), Stamford, CT., *Peters v. Greenwich, CT.*, CV 950147192 S, T

### April, 2004

James Crabtree (P), Lenaxa, KS., *Klein v. State of Kansas*,      D
Michael Meehan (P), Tucson, AZ., *Wertheim v. City of Tucson/Pima County SO*,  T

### May, 2004

Jon Meyer (P), Manchester, NH., *Recupero v. Town of Deering*,     D
Samuel Paz (P), Santa Monica, CA., *Martinez v. California Highway Patrol*, GIN025209, D
Beatrice Brickhouse (D), Albuquerque, NM., *Bain v. City of Albuquerque*, CIV-03-033CWPJKBM, T

### June, 2004

Jaffe/Spinella (P), New Britain, CT., *Andrus/Celetano v. Grasso*, CV 96-0392407-S, T

### July, 2004

Bill Kurnik/Vince Cipolla (D), Des Plaines, IL., *Adams v. Town of Steger, IL.*, 01-L-00477, D

### August, 2004

Roman Okrei/Gordon Ring (P), Rockford IL., *DeLuna v. City of Rockford*,     D

### September, 2004

Bruce Bogan (D), Orlando, FL., *Ingram v. Daytona Beach*, 2003-31253 CICI, D

### October, 2004

Kathy Barnard (P), Seattle, WA., *SEIU/Marsh v. Redmond*, Arbitration hearing, T
Bradley Marshall (P), Seattle, WA., *Thomas v. Miller*, CV03-0796Z, D
Bradley Marshall (P), Seattle, WA., *Thames v. City of Pensacola, FL.*,     D

### November, 2004

Jude Basile (P), San Luis Obsipo, CA., *Vestal v. County of San Luis Obsipo*, CV 04-0064 JFW (Shx), D

**December, 2004**

Michael Withey (P), Seattle, *Johnson v. City of Seattle*,    D

**January, 2005**

Edward T. Moore (P), Dallas, TX., *Martinez v. City of Dallas*, 03-1054-C, D

**February, 2005**

Ed Plato (D), Farmington Hills, MI., *Bobb v. City of Inkster,* 03-70223, D
Kevin Martinez (P), Albuquerque, NM., *DeYapp v. Tracy*, 02-0452 MV/RLP(ACE), D
Cameron Stewart (P), Los Angeles, *Torres v. City of Madera, CA.,* CV-F-02-6385 AWI-LJO, D
Paul Spinella (P), Hartford, CT., *Hogsfeld v. Town of Old Saybrook, CT.,* 3:01CV1979(WWE), D
Hebert Santos/Sandra Snaden (P), Hartford, CT., *Florence v. Town of Plainfield, CT.,*    D

**March, 2005**

Truman Chafin (P), Williamson, WV., *Pruitt v. West Virginia State Police*, 03-C-137, D

**April, 2005**

Tim Touhy (P), Chicago, *Zagar v. City of Chicago*, 01 L 5176, D
Mel Brooks (P), Chicago, *Goodall v. City of Dolton,*    D
David Cerda (P), Chicago, *Brown v. City of Chicago,*    D

**May, 2005**

Andrew DeBoivse (D), Winter Park, FL., *Porter v. White*, 8:04-CV-367-R-17MSS, D
Keith Tischler/Gayle Swedmark (D), Tallahassee, FL., *Ault v. Putnam Co. S.O.*, 99-1095-CIV-J-219, T

**July, 2005**

Stephanie Griffin (D), Albuquerque, *Best v. City of Albuquerque,* CIV 04-0357 BB/WDS, T

**October, 2005**

Timothy Warner (D), Panama City, FL., *McCloud v. Anderson*, 04-80984, D
John Culver/Mark Silverstein, Denver (P), *Nash v. City/County of Denver,* 05 CV 4500, T

**November, 2005**

Joe Marguiles (P), St. Paul, MN., *Yang v. City of St. Paul,* 03-5306 (PAM/RLE), D

**December, 2005**

Larry Sherwin (P), Seattle, _____ *v. Washington State Patrol,*    Arbitration T
Cammie Nichols, Albuquerque, *Buck v. City of Albuquerque*, CV 04-1000 JP/DJS, D

**January, 2006**

Terrence Roberts (P), Riverdale, MD., *Prince Jones v. Prince George's County,* CAL 01-03974, T
Robert Bennett (P), Minneapolis, *Ngo v. Minneapolis Police Department,* 03-3376 (RHK/AJB), D

**February, 2006**

Kathy Levy (D), Albuquerque, *Boyer v. Albuquerque*, CIV 03-997 JB/WDS, T
Michael Haddad (P), Oakland, CA., *Wilkins v. City of Oakland*, C01-1402MMC, D

**March, 2006**

Christina Norris (P), Louisville, *Hughes v. Louisville Police*, 3:02CV-60-S, D
Thomas Beko/Mary Margaret Madden (D), Reno/Carson City, *Brown v. Edding*, CV-04-0109-LRH-VPC, T

**April, 2006**

Jerry Marconi (P), Chicago, *Saponaro v. City of Bellwood,* 98 L 4985, T

**May, 2006**

Mary Baker (D), Houston, *James v. Harris County Sheriff's Department,* 04TRL0131, D

**June, 2006**

Scott Santos/Paul Bross (P), Melbourne, FL., *Kimbrough v. City of Cocoa, FL.,* 6:05-CV-471-Orl-31KRS, D
Joel Robbins (P), Phoenix, *Walen v. Vanderpool*, CV05-3036-PHX-EHC, D
Will Smart (P), Seattle, *Howe v. City of Kent and Federal Way*,        D

**July, 2006**

John Alpizar (P), Palm Bay Fl., *Fournier v. Williams*, 05-2033-CA-046089-XXXX-XX, D
James Floyd (D), Tallahassee, FL., *Reddings v. City of Tallahassee,* 05-CA-002099, D
Josh Alex (P), Seattle, *Tubar v. Clift,*        D

**August, 2006**

James Sanford (P), Chicago, *Reynolds v. City of Chicago,*        D
Dawn McDonald (P), Springfield, MA., *St. Peter/Bogacz v. Town of Agawam,* 04-30054-MAP, D

**September, 2006**

Christopher DeLara (P), Albuquerque, *Romero v. City of Gallup*, CIV 05-1240 JP/WDS, D

**October, 2006**

James Floyd (D), Tallahassee, FL., *Reddings v. City of Tallahassee*, 05-CA-002099, T
Sally Saltzberg (P), Chicago, *Klipfel/Casali v. City of Chicago,*        , D
Mary Baker/Frank Sanders (D), Houston, *James v. Harris County Sheriff's Department,* 04TRL0131, D

**November, 2006**

Kathy Levy (D), Albuquerque, *Hall v. City of Albuquerque*, Fed. Ct. 04-0873 JH/RLP, T
Cohen/Guerrin (P), Philadelphia, *Buhalo v. City of Philadelphia*, Fed. Ct. 03-CV-4727, D
Mark Thomsen (P), Milwaukee, *Fields v. City of Milwaukee*, Fed. Ct. 03-C-1450, D

**February, 2007**

Elliott Weinreb (P), Santa Fe, NM., *Lucero v. Valdez*, CIV-05-0601-JP/WPL, D

**March, 2007**

Tim Touhy (P), Chicago, *Zagar v. City of Chicago*, 01 L 5176, T

**April, 2007**

David Robinson (P), Detroit, *Miller v. City of Columbus, OH.,* 2:05-cv-0425, D

**May, 2007**

Amanda Antholt (P), Chicago, *Arias/Sorokosz v. City of Chicago*, 05 C 5940, D
Lucy France (D), Missoula, MT., *Crawford v. Ravalli County,* DV 01-340, T

**June, 2007**

Jose Olmo (P), San Juan Puerto Rico, *Colon-Ortiz v. San Juan*, 03-1989 (DRD), T
Jonathan Moore (P), New York City, *Haus v. NYPD,* 03 Civ. 4915, D
Melvin Brooks (P), Chicago, *Davis v. City of Chicago*, 03 L 15299, D

**July, 2007**

Fred Diamondstone (P), Seattle, *Alley-Barnes v. City of Sackman,* CV 06-0882 TSZ, D
Chuck Geerhart (P), San Francisco, *Crosley v. City of Pittsburg, CA.*, Case No. C05-04051 JSW, D