UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————

|  |  |
|---|---|
| BETTY ANNE WATERS, as ) | |
| Administratrix of the Estate of ) | Case No. 04 10521 (GAO) (JGD) |
| KENNETH WATERS, ) | |
| ) | |
| Plaintiff, ) | **PLAINTIFF'S MEMORANDUM** |
| v. ) | **IN OPPOSITION TO DEFENDANTS'** |
| ) | **MOTION TO STRIKE THE** |
| TOWN OF AYER, NANCY TAYLOR- ) | **PLAINTIFF'S DNA EXPERTS** |
| HARRIS, in her individual capacity, ARTHUR ) | **DR. EDWARD T. BLAKE AND** |
| BOISSEAU, in his individual capacity, ) | **DR. SUDHIR K. SINHA** |
| BUDDY DECOT, in his individual capacity, ) | |
| WILLIAM ADAMSON, in his individual ) | |
| capacity, PHILIP L. CONNORS, in his ) | |
| individual capacity, and JOHN DOE and JANE ) | |
| DOES 1–16, in their individual capacities, ) | |
| ) | |
| Defendants. ) | |

—————————————————————

Defendants have moved to strike the reports of Dr. Edward T. Blake of Forensic Science

Associates and Dr. Sudhir K. Sinha of Reliagene, ostensibly because their reports are "legally

irrelevant" and "highly prejudicial."  These reports exclude both Kenneth Waters and his brothers

as the source of blood found at the Brow murder scene.  A close read of the motion reveals that it

is not the reports themselves that Defendants challenge, but rather the factual inferences drawn from

them – namely, that Waters was actually innocent, and that, despite the wholly unsupported new

defense theory, none of his brothers committed the murder either. Waters's actual innocence is

highly relevant, material evidence that pervades both damages and liability; to suggest otherwise in

the context of this wrongful conviction case, as Defendants do, is patently frivolous; they have cited

not a single case in which this argument has prevailed.  Nor would the presentation of this evidence

be too lengthy, particularly if Defendants would accept Plaintiff's outstanding offer of a stipulation as to actual innocence. Finally, Dr. Sinha's report fully complies with Rule 26(a)(2)(C).

## Relevant Facts

There is dispositive evidence that Kenneth Waters did not commit the murder for which he spent 20 years in prison. From the moment police first responded to the scene, it was obvious that there had been a struggle before the victim died. (Cmplt. ¶ 27.)[1] Hairs were found in the victim's hand; Waters was excluded as the source of those hairs. (¶¶ 28, 58.) Blood was discovered that did not match the victim's blood type. (¶ 27.) Police canvassed area hospitals for anyone with a knife wound; at trial, the prosecution theorized that the perpetrator acted alone and was injured in the struggle. (*Id.*) In the pre-DNA era of conventional serology, Mr. Waters (along with the victim's husband and 50% of the population) was found to have the same blood type as the blood found at the scene. (¶¶ 27, 59.) Many years later, however, pursuant to court-ordered DNA testing by two laboratories, Mr. Waters was definitively excluded as the source of that blood,[2] leading the court to order his release, and, ultimately leading the Middlesex County District Attorney's Office to file a *nolle prosequi* withdrawing all charges against him. (¶¶ 66-71.)

The only other forensic evidence at the scene (as we now know but as neither the prosecutor nor the defense knew at trial), was latent fingerprint evidence collected by the state police fingerprint

---

[1] In keeping with this Court's September 25, 2007 order that this briefing would be on issues "sufficiently distinct from any record analysis" to warrant a response prior to summary judgment briefing (Docket No. 110 at 1-2), Plaintiff will cite to the Complaint where possible rather than referring to the record.

[2] *See* Expert report of Edward Blake, found at Docket No. 103-2. Dr. Blake's original findings excluding Mr. Waters as the source of blood from the crime scene were later confirmed by the Massachusetts State Crime Laboratory. (¶¶ 68, 69.)

analyst from critical locations at the scene. (¶ 24.) That evidence was examined contemporaneously by the state police fingerprint analyst (¶¶ 25, 57) and subsequently by Plaintiff's fingerprint expert, Ron Smith, who has definitively excluded Waters as the source of the unknown prints.  (*See* Docket No. 105-13.)  Thus, Waters has now been excluded as the source of all the forensic traces the perpetrator left at the scene.  He was innocent.  (Cmplt. ¶ 65.)

Aside from the vague ABO inclusion, the only evidence offered against Waters at the original trial was the testimony of Brenda Marsh and Roseanna Perry, both ex-girlfriends who claimed Mr. Waters had admitted to them that he had committed the murder.  (¶¶ 41-46, 50-55, 63.)  However, both women subsequently recanted and alleged that their statements were coerced by Ayer police defendants.[3]  There is not a shred of evidence linking Mr. Waters to the crime; in fact, the only credible evidence proves that he was innocent.  To hold a wrongful conviction trial without evidence of innocence, as Defendants propose, would be unprecedented – and unworkable.

## Argument

### I.    Legal Standards

"[R]elevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  This rule  "shall be construed ... to the end that the truth may be ascertained and proceedings justly determined."  Fed. R. Evid. 102.  "The threshold for relevance is very low under Federal Rule of Evidence 401."  *U.S. v. Nason*, 9 F.3d 155, 162 (1st Cir. 1993), *cert. denied*, 510 U.S. 1207 (1994).  Here, innocence is not only relevant; it is "material" insofar as it "could affect the outcome of the case." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

---

[3] Roseanna Perry Baggeson recanted again in her deposition.

248 (1986). This Court may only exclude relevant evidence "if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.

R. Evid. 403.

## II.    The Attack on Innocence Is Not an Attack on the DNA Reports Themselves

This motion has little to do with any alleged deficiencies of the expert reports themselves,

but rather seeks to preclude Plaintiff from drawing inferences from the facts as established by Dr.

Blake and Dr. Sinha – facts that are not disputed by Defendants, who admit as much in their brief:

> ... to the extent that issues related to Waters' actual innocence are relevant background,
> plaintiff needs to show now more than the following facts: DNA evidence suggested that
> Waters was not the source of non-victim blood at the murder scene, on that basis he filed a
> motion for a new trial; the motion was not opposed; and the District Attorney declined
> further prosecution through a *nolle pros*.

(Mtn. at 7.)   In making this argument, Defendants concede the relevance of both DNA reports.

Surely Plaintiff cannot be barred from drawing reasonable inferences from admittedly relevant and

admissible evidence.  The "motion to a strike" is just a smokescreen.

## III.    Kenneth Waters's Actual Innocence is Relevant and Admissible

Our justice system's ultimate goal is that "guilt shall not escape or innocence suffer." *Berger*

*v. United States*, 295 U.S. 78, 88 (1935).  To that end, "[t]he need to develop all relevant facts in the

adversary system is both fundamental and comprehensive." *U.S. v. Nixon*, 418 U.S. 683, 709 (1974).

As the defendant in the underlying criminal case, Mr. Waters was "entitled to a trial that ... enable[d]

jurors to determine where the truth lies." *Buie v. McAdory*, 341 F.3d 623 (7th Cir. 2003).  So too

here.  This 42 U.S.C. § 1983 lawsuit was brought because, despite his conviction, Waters did not

murder Katherina Brow, and the Ayer defendants' unconstitutional acts deprived him of his liberty

4

and the opportunity to bring the truth to light.  A trial that fails to acknowledge his innocence would make a mockery of the Court's truth-seeking function.  *See, e.g., In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.*, 348 F.3d 16, 26 (1st Cir. 2003) (limiting the application of a privilege to "ensure[] that a litigant is not able to present only selected bits of the story and thus distort the truth-seeking process."); *In re Hampers*, 651 F.2d 19, 22 (1st Cir. 1981) (noting "the federal interest in seeking the truth in federal question cases.").

To our knowledge, the only two courts ever to bar evidence of innocence in wrongful conviction cases alleging 14th Amendment violations were reversed on appeal.  In a case Plaintiff's counsel recently litigated, the district court's *in limine* ruling barring evidence of actual innocence was summarily reversed in an extraordinary pre-trial mandamus order.  *See In re Herman Atkins*, No. 06-74094 (9th Cir. Aug. 22, 2006) (Slip op.) (holding that "[e]vidence of actual innocence is both relevant and not subject to exclusion under Rule 403.") (attached as Ex. 1).  In *Moran v. Clarke*, a § 1983 malicious prosecution and due process action, the district court had "excluded significant amounts of evidence on the basis that it ran to the issue of whether [the plaintiff] was actually innocent."  296 F.3d 638, 649 (8th Cir. 2002).  Despite finding that such evidence was irrelevant to the existence of probable cause, the 8th Circuit nonetheless reversed, finding that the "evidence should have been received" insofar as it was "probative both to prove [plaintiff's] innocence and also to establish the very questions at issue in this case."  *Id.* at 650.  Just as in *Moran*, this case presents many legal questions aside from probable cause; innocence is relevant to all of them.

As set forth below, courts uniformly recognize that where, as here, "[t]he fundamental premise of this claim is that Mr. [Waters] is, in fact, innocent of those crimes for which he was convicted," evidence of innocence is relevant to both damages and liability. *Evans v. City of*

5

*Chicago*, 231 F.R.D. 302, 309-10 (N.D. Ill. 2005).[4]  It would be nonsensical to bar evidence of innocence in a wrongful conviction suit.  *See Bravo v. Giblin*, No. B125242, No. 2002 WL 31547001, at *10 (Cal. App. 2 Dist.), *as modified upon denial of reh'g,* (Dec. 18, 2002) (Attached as Ex. 2) (quoting trial court's finding that defendant "abused the power of his position in the worst possible way – by bringing about the conviction of an innocent man.").

### A.    There is No Damages Case Without Innocence

"A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees...."  *Owen v. City of Independence, Mo.*, 445 U.S. 622, 650 (1980).  Where "the plaintiff was indisputably deprived of his liberty, and the conduct of the defendant responsible for the deprivation was found to be unlawful, ... the plaintiff is entitled to compensatory, not merely nominal, damages."  *Kerman v. City of New York*, 374 F.3d 93, 124 (2d Cir. 2004).  In a case like this one, those damages include not only physical injuries, but also, "consistent with traditional common-law principles governing entitlement to damages for the tort of false imprisonment," damages for both "mental suffering, humiliation, and the like," as well as for the loss of liberty.  *Ibid*. (quoting *Prosser & Keeton* § 11, at 48).

The damages likely to be awarded to the estate of an innocent man incarcerated for a crime he did not commit vastly outweigh the nominal damages, if any, a jury would award a factually guilty plaintiff.  *Cf. Tyree v. Keane*, 400 Mass. 1, 10, 507 N.E.2d 742 (Mass. 1987) (in review of nominal damages award to convicted murderer, noting, "Nor was there any evidence (and here we

---

[4] The case cited by Defendants (Mtn. at 7), *DeToledo v. County of Suffolk*, found that the fact of innocence "is not dispositive," but implicitly found it relevant by considering evidence of innocence before refusing to dismiss the deprivation-of-liberty claim.  379 F. Supp.2d 138, 144 (D. Mass. 2005).

take notice of the plethora of evidence that the plaintiff procured the murder of his wife), that the illegal search resulted in the plaintiff's conviction on the murder charge, or caused him mental suffering . . . .").

Indeed, the emotional distress suffered by an innocent person for being arrested, tried, convicted, imprisoned and branded as a murderer for a crime he did not commit are exponentially higher than any damages suffered by a factually guilty plaintiff whose procedural trial rights were violated. Defendants essentially concede this point in their nonsensical argument that evidence of actual innocence is irrelevant *in light of* the expert report of psychiatrist Dr. Jerome Rogoff:

> This speculation as to the effect of Waters' innocence on his mental state is, in any event, unnecessary in this instance as the plaintiff has proffered the testimony of a Forensic Psychiatric Expert, Dr. Jerome Rogoff, M.D. ("Dr. Rogoff") to testify to the actual psychological state of Waters. Dr. Rogoff's report [Exhibit "C"], which draws on review of prison medical and psychological records as well as interviews with Waters' family members, sets forth his opinion as to the actual impact of incarceration on Waters' mental state. Extensive expert testimony concerning DNA evidence for the purpose of establishing Waters' actual innocence would only serve the purpose of allowing wild jury speculation, in the fact of actual psychological expert testimony, as to the impact of Waters' incarceration on his mental state.

(Mtn. at 8.) Dr. Rogoff's report opines that Mr. Waters suffered immeasurably *as a result of his incarceration for a crime he did not commit*, and notes he suffered from the "Catch-22 dilemma every wrongfully committed inmate runs up against and is the source of profound frustration and rage: the rejection and condemnation of the inmate because he will not own up to or face or show sufficient contrition for the crime." (*See* Rogoff Rpt., Docket No. 103-4 (Mtn. Ex. "C") at 8.) Oddly – but tellingly – Defendants have not moved to strike Dr. Rogoff's report on the basis of relevance or indeed on any other ground. If they concede the relevance of Dr. Rogoff's report, they must acknowledge that innocence is relevant.

As the Hon. Nancy Gertner recently held in *Limone v. U.S.*, a wrongful conviction opinion under the Federal Tort Claims Act that is replete with references to the plaintiffs' actual innocence:

> Framing innocent men for a capital crime, prolonging their suffering for decades while they made futile attempt after attempt to win their freedom, thwarted at every turn – these are acts beyond all bounds of decency... The plaintiffs – who knew themselves to be innocent – were wrongfully convicted. Three were told that they were to be executed, another that he would live the rest of his natural born life behind bars. There is no way to describe that kind of horror than as so severe and of such a nature that no reasonable person could be expected to endure it. [ . . .]

> Losses of this magnitude are almost impossible to catalogue. The loss of liberty. The loss of the enjoyment of their families. The loss of the ability to care for and nurture their children. The loss of intimacy and closeness with their spouses. Indeed, the task of quantifying these losses – which I am obliged to do – is among the most difficult this Court has ever had to undertake... Some injury occurs all in a rush at the start – the shock and horror of arrest and conviction – while other injury only begins to compound after a significant period of time has passed-the setting in of despair, or the withering of relationships.

497 F. Supp.2d 143, 227, 243 (D. Mass. 2007); *id.* at 245 (downwardly adjusting damages for concurrent time some plaintiffs served for actually committing other crimes).

Whereas the Defendants in *Limone* did not contest the relevance (or the fact) of Plaintiffs' innocence, this precise question was litigated in *Carter v. City of Philadelphia*, No. Civ.A. 97-4499, 2000 WL 1016653 (E.D. Pa. July 12, 2000), a § 1983 wrongful conviction case where the defendants raised plaintiff's guilt as an affirmative defense. (Attached as Ex. 3.) Plaintiff claimed that his guilt or innocence was irrelevant to his claims. The trial court rejected that reasoning and held:

> There can be little doubt that a person wrongfully incarcerated for any period of time may seek to recover for emotional damages. **The touchstone for such damages, however, is whether or not the plaintiff was, in fact, wrongfully imprisoned. Accordingly, the issue of whether or not a civil plaintiff committed the underlying criminal act is central to the measure of damages for a wrongful imprisonment claim.** There is, of course, an important distinction between whether a person is guilty of the crime, but wrongfully imprisoned due to police misconduct, or whether a person is innocent of the crime and wrongfully imprisoned due to police misconduct. The Court believes that, presented with relevant evidence, a reasonable jury could conclude that an innocent person serving a jail term is likely to feel more emotional

anguish than a guilty person who knows that he, in fact, committed the crime, but may have an avenue of relief available to him because of police misconduct... Certainly, a wrongfully imprisoned person suffers a form of emotional anguish unlike any other... [whereas] a factually guilty individual's distress at his own confinement may be attributable to the "justified deprivation and not the deficient procedures that caused the justified deprivation [and therefore warrants only nominal damages]."

*Id.* at *2-*2 (quoting *Carey v. Piphus,* 435 U.S. 247, 263-64 (1978)) (emphasis added). *See also Lopez v. City of Chicago*, No. 01 C 1823, 2005 WL 563212, at *8 (N.D. Ill. Mar. 8, 2005) (attached as Ex. 4) (rejecting § motion *in limine* to bar evidence of innocence, reasoning, "evidence that shows that another person confessed to the crime and that the charges against Lopez were dropped are relevant to allow an inference that he was innocent and thus suffered the anguish during detention that an innocent person would suffer when wrongfully accused of a crime."). [5]

The reasoning of *Carter* and *Lopez* is equally applicable here. The trial Defendants propose would have Plaintiff proclaiming Mr. Waters's innocence in the face of a parade of law enforcement officials – from Ayer police defendants to prosecutors – pointing the finger at him and branding him a murderer, without any objective evidence against which the jury could assess the reliability of their claims. Such a trial would only recreate and compound the errors in the original criminal trial rather than exposing them and Defendants' unconstitutional misconduct to the light of day, as this civil-rights lawsuit was intended to do. The jury could not possibly assess the extent of Mr. Waters's mental anguish if it did not hear that he is factually innocent of this crime.

Defendants grossly mischaracterize *Newsome v. McCabe*, another § 1983 *Brady* case arising

---

[5] *See also Calderon v. True*, No. 91 C 7765, 1993 WL 413970, n.3 (N.D. Ill. Oct. 15, 1993) (attached as Ex. 5) (in § 1983 prisoner case, noting that "[i]nnocence of the charge presumably would be relevant in determining the appropriate remedies for denial of due process. Even if the required procedures were not followed, Calderone in this civil rights action may not be entitled to more than nominal damages if he was guilty of drug possession.").

out of a post-conviction exoneration.  (Mtn. at 8.)  In denying post-verdict motions, the court held:

> The issue ... was not ... whether Newsome was guilty or innocent of the crime. But that is what it would have become if the fact of Newsome's innocence ... had been kept from the jury. Excluding that evidence would have been highly prejudicial to Newsome. It would have invited the jurors to draw the impermissible inference that he was actually guilty, and, thus, absolve defendants of any misconduct.

*Newsome v. McCabe*, No. 96 C 7680, 2002 WL 548725 at *6 (N.D. Ill. Apr. 4, 2002) (slip op.) (emphasis added), *aff'd after jury verdict*, 319 F.3d 301 (7th Cir.), *cert. denied*, 539 U.S. 943 (2003) (attached as Ex. 6); *see also Lopez*, 2005 WL 563212, at *8. So too with Mr. Waters; to deprive the jury of this damages evidence would be to deprive Plaintiff of a damages case.

## B.    Innocence is Relevant to Liability

Defendants contend that Waters's innocence cannot be relevant because they did not know it when conducting their investigation.  (*See* Docket No. 103 at 6.)  "This *ipse dixit* is simply wrong. Evidence of subsequent events frequently sheds light upon, and thus assumes relevance in relation to, antecedent acts."  *Iacobucci v. Boulter*, 193 F.3d 14, 20 (1st Cir. 1999).

### 1.    The Fourth Amendment and State-Law Malicious Prosecution Claims

Defendants claim that innocence is irrelevant to the 4th Amendment malicious prosecution claim because it does not bear on probable cause; in so doing, they fail to recognize that innocence is relevant to the favorable termination requirement of both the § 1983 and state-law malicious prosecution claims (Counts 2 and 8).

The elements of a § 1983 malicious prosecution claim track those in Massachusetts state law, with the addition of a 4th Amendment violation. *See Albright v. Oliver*, 510 U.S. 266 (1994) (holding that specific Constitutional guarantee, not substantive due process, must provide the hook for § 1983 malicious prosecution action); *Nieves v. McSweeney*, 241 F.3d 46, 53-54 (1st Cir. 2001) ("we will

assume without deciding that malicious prosecution can, under some circumstances, embody a violation of the Fourth Amendment and thus ground a cause of action under section 1983.").

Thus, to prevail on this claim, Waters must show:

(1)    the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant;

(2)    the termination of the proceeding in favor of the accused;

(3)    an absence of probable cause for the charges [in violation of the Fourth Amendment for Count 2];  and

(4)    actual malice.

*Id.* at 53.

Here, as to the second element, the criminal case ultimately terminated with the filing of a *nolle prosequi* by the Middlesex County District Attorney's Office.  In Massachusetts, however, in order to serve as the predicate for a malicious prosecution claim, "the reasons stated for the *nolle prosequi* or dismissal must be consistent with the innocence of the accused."  *Wynne v. Rosen*, 391 Mass. 797, 800-01, 464 N.E.2d 1348, 1351 (Mass. 1984).  Evidence that Waters actually is innocent – including some of the very same DNA evidence on which the D.A.'s Office relied to file the *nolle* – is highly probative of this question.  In *Britton v. Maloney*, another § 1983 malicious prosecution action, the 1st Circuit looked at the underlying evidence of innocence or guilt, as well as the circumstances of the dismissal of charges, before holding that "Britton terminated his criminal case with success and under circumstances that reflect his innocence."  196 F.3d 24, 31 (1st Cir. 1999).

### 2.    The Due Process Claim (Count I)

Just as in *Limone v. Condon*, Plaintiff's broad due process claim "may be distilled into two basic allegations:  first, that the appellants purposefully suborned false testimony from a key witness;

and second, that the appellants suppressed exculpatory evidence." 372 F.3d 39, 44 (1st Cir. 2004).

### a.    Causation and Materiality

As Defendants argue, one question raised by this claim is "whether the underlying criminal trial would have been different had the alleged misconduct not occurred." (Mtn. at 1-2); *see Brady v. Maryland*, 373 U.S. 83 (1963); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942) ("allegations that [the petitioner's] imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him ... sufficiently charge a deprivation of rights guaranteed by the Federal Constitution."); *Limone*, 372 F.3d at 45 (1st Cir. 2004) (collecting cases); *Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999) ("a police officer sometimes may be liable if he fails to apprise the prosecutor or a judicial officer of known exculpatory information.").

Likewise, causation is an element central to the fabrication-of-evidence theory. *See, e.g.*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007) ("A police officer who maliciously or recklessly makes false reports to the prosecutor may be held liable for damages incurred as a proximate result of those reports."); *Washington v. Wilmore*, 407 F.3d 274, 282-83 (4th Cir. 2005) ("We now turn to the causation prong, which requires us to determine whether the facts alleged by Washington demonstrate that the loss of liberty – *i.e.,* Washington's conviction for the murder of Rebecca Williams and subsequent incarceration – resulted from Wilmore's fabrication of evidence.").

Absent evidence of innocence, however, the jury could improperly conclude that the Ayer Defendants' unconstitutional fabrications and omissions had no substantial impact on the outcome of the trial because Mr. Waters's own guilt caused the conviction. *See Lopez*, 2005 WL 563212, at

12

*8 (admitting innocence because without it, "a possible reasonable inference by a trier of fact from the fact that Lopez was detained by police for a crime would be that he was ultimately charged and convicted of the crime or simply released because the police could not collect enough evidence."). The evidence must not be restricted in a manner that allows defense posturing that is patently inconsistent with the facts.[6]  Crediting the argument that innocence is irrelevant – or refusing to allow Plaintiff to offer evidence disproving the defense that Mr. Waters was actually guilty – would instead take us through the looking glass.  There is a compelling need for this evidence.

### b.     Circumstantial Proof of Liability

Innocence is no substitute for independent evidence of misconduct, *see Baker v. McCollan*, 443 U.S. 137, 145 (1979), of which there is plenty.  Nonetheless, Waters's innocence is also a link in the logical chain proving liability on the due process claim alleged in Count 1. "'Circumstantial evidence ... may ... be more certain, satisfying and persuasive than direct evidence,'" but only if Plaintiff is permitted to introduce enough of it for the jury to draw the inferences necessary to prevail.  *Koivunen v. States Line*, 371 F.2d 781, 783 (9th Cir. 1967) (quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960)) (ellipsis in original).

For example, as Plaintiff will show on summary judgment, when Ayer police Defendants interviewed Mr. Waters the day after the crime, he offered an alibi – that he had been at work at the Park Street Diner until after 8am, drove home to shower and put on a suit, and then appeared in court

---

[6] Indeed, Defendants appear poised to raise this defense, given that they refused to admit Mr. Waters's innocence in their answers to the Complaint (*Compare* Docket No. 1 (Complaint) at ¶ 65 *with* Docket Nos. 10, 13 (Answers) at ¶65), and Plaintiff's Rule 36 demands, despite the lack of any competent evidence calling the DNA results into question.

13

on another matter by 8:45am.[7]  Defendants obtained his time-stamped punch card from the Park

Street Diner, proving he had been at work that morning, but never disclosed it to the prosecutor.[8]

Evidence that Mr. Waters did not commit the crime corroborates the *Brady* theory by making it more

probable than not that Mr. Waters was telling the truth when he gave the alibi, and therefore that the

missing punch card was exculpatory.  *See* Fed. R. Evid. 401; *Calderon-Ortiz v. Laboy-Alvarado*, 300

F.3d 60, (1st Cir. 2002) ("question[s] of fact [are] subject to demonstration in the usual ways,

including inference from circumstantial evidence....") (citation and internal quotations omitted).

Likewise, Plaintiff will present evidence that, *unbeknownst to the defense at trial*, the state

police fingerprint analyst had collected usable latent fingerprints from the crime scene that were

determined not to have come from the victim, her family, or police.  Believing that these prints were

left by the perpetrator, Ayer police had sent Cpl. Baliunas a number of suspects' prints, *including

Mr. Waters's*, for comparison, but Baliunas reported back only negative results.  His innocence of

the crime corroborates the theory that the fingerprint evidence was exculpatory; he was not there.[9]

Plaintiff will prove that the only evidence originally presented against Mr. Waters – the

testimony of two ex-girlfriends claiming that he made admissions about the murder – was coerced

and induced by promises, threats and rewards made by Defendants, who withheld this fact from the

prosecutor at trial.  Here, innocence makes it is less likely that Waters made any admissions, which

---

[7] Police believed the murder took place between 7am and 11am, if not between the narrower window of 10am and 11am on May 21, 1980.

[8] Defendant Boisseau admitted at trial that he saw Mr. Waters in court that morning and that pursuant to the standard court procedures, Waters would have had to be there before 9am.

[9] So too, the exclusion of Mr. Waters as the source of the latent prints lifted from the scene is additional evidence of his innocence.  To deprive Mr. Waters of this evidence would gut his *Brady* fingerprint theory, to be addressed in later briefing as per this Court's order.

14

in turn circumstantially corroborates the claim that police coerced both Brenda Marsh and Roseanna Perry into falsely implicating him.

Just as in the case of Steven Manning, another exoneree who recently prevailed in a wrongful conviction § 1983 case in the Seventh Circuit,

> There is, or should be, nothing particularly surprising about the fact that [Waters's] case [is] based largely on circumstantial evidence. To support his claims, [Waters] was required to adduce evidence largely from government agents, prosecutors, and persons who had testified against him at his criminal trials. In the normal course, one cannot expect such persons to supply direct evidence of a claim that evidence was fabricated and that the falsification was concealed. Were direct evidence required, it would be tantamount to a death-knell for cases of this type. In fact, however, there is no such requirement.

*Manning v. Miller*, No. 02 C 372, 2005 WL 3078048, at *5 (N.D. Ill. Nov. 14, 2005) (attached as Ex. 7). Depriving Waters of this evidence at trial would be "a death-knell" for his case.

## IV.    Defendants Cannot Show that Evidence of Waters's Innocence Creates Any Unfair Prejudice, or that Any Unfair Prejudice Substantially Outweighs the Highly Probative Value of Innocence Under Rule 403; No Waste of Time

Ultimately, Defendants claim that evidence of innocence should be barred as "unfairly prejudicial, misleading... and a waste of time." (Docket No. 103 at 9.) Such an argument, premised on Federal Rule of Evidence 403, is, in counsel's experience, unprecedented at this phase of litigation and, once the relevance of innocence is established, is no reason to further delay the disclosure of defense expert reports, if any. Defendants have failed to articulate how they will be prejudiced at all, much less "unfairly" prejudiced by the admission of evidence of innocence, or that any unfair prejudice "substantially outweighs" the probative value of the evidence at issue. In fact, a trial without innocence would unfairly prejudice Plaintiff, and, on a practical level, be unworkable.

### A.    No Unfair Prejudice in Admitting Evidence of Actual Innocence

Defendants' claim that evidence of innocence is "highly prejudicial," "is unadulterated

sophistry.... [, as] egregiousness is a hallmark of probative value." *Foley v. City of Lowell, Mass.*, 948 F.2d 10 (1st Cir. 1991). Indeed, "[t]he rule does not aspire to eliminate prejudice-after all, most evidence is offered precisely because the proponent believes it will prejudice the factfinder in his favor-but only to eliminate *unfair* prejudice." *Iacobucci v. Boulter*, 193 F.3d 14, 21 (1st Cir. 1999). Other than simply acknowledging the emotional impact of innocence, Defendants fail to explain how they would be prejudiced, much less how such prejudice would be "unfair." Rule 403 does not bar the admission of all evidence simply because it may have some emotional content or give rise to feelings on the part of jurors. *See Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 575 (1st Cir. 1989) ("Our past decisions have authorized the exclusion of evidence only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence.") (citations and internal quotations omitted); *Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1135 (4th Cir. 1988) (same holding with regard to "emotional content" of racially inflammatory language). The reality is that, as set forth above, it is Plaintiff who would be unduly prejudiced by the exclusion of this evidence.

**B.    The Highly Probative Value of Innocence to Liability and Damages is Not Substantially Outweighed by Unfair Prejudice to Defendants**

The Rule 403 calculus swings in favor of admissibility for damages evidence, though inherently prejudicial to Defendants. For example, in *Furtado v. Bishop*, a 42 U.S.C. § 1983 prisoner case, the defense appealed the trial court's admission of damages evidence relating to the conditions of segregated confinement. The First Circuit summarily rejected the Rule 403 argument:

> Defendants first challenge as unfairly prejudicial the introduction of evidence concerning the conditions in segregated confinement, particularly as to [plaintiff's] concededly "grotesque,

horrifying and dramatic" testimony that he was locked up at DSU Bridgewater for virtually twenty-four hours a day for six months, in a cell that was located under a ward for violent, uncontrollable mental patients, that were saturated with excrement and urine, and that had no plumbing and almost no furnishings. This evidence was highly relevant to the theory of recovery already discussed and central to plaintiffs' proof of damages. The probative value of this evidence was substantially outweighed by the danger of unfair prejudice in admitting it. Fed. R. Evid. 403.

604 F.2d 80, 89-90 (1st Cir. 1979).

Thus, where, as here, the "probative value of such [damages] evidence is so great [] it could not properly be excluded under Rule 403." *Herber v. Johns-Manville Corp.*, 785 F.2d 79, 83 (3d Cir. 1986) (in asbestos litigation, affirming admission of damages evidence and noting that "while we acknowledge that there may be some danger that a jury will overreact to evidence of increased risk of cancer, we have more confidence than did the trial judge in the ability of juries to deal appropriately with such evidence under the guidance of the court."); *see also Haley v. Gross*, 86 F.3d 630, 645-46 (7th Cir. 1996) (in inmate failure-to-protect action, affirming admission of photograph of plaintiff's charred legs after cell fire because, while "[t]he photograph is certainly chilling" and "certainly disturbing, its contents were highly relevant; and [had] very significant probative value [that] was not substantially outweighed by any danger of unfair prejudice."). The evidence admitted in *Furtado* and *Haley* was much more graphic and likely to inflame the jury than the simple truth of Kenny Waters's innocence. Sometimes the truth is prejudicial. That does not make it inadmissible.

## C.    No Waste of Time

Plaintiff will seek to introduce DNA evidence and other evidence of Waters's innocence at trial only because Defendants have refused repeated offers to stipulate to and/or formally admit this evidence and Mr. Waters's innocence under Rule 36. That offer still stands. Once the Court rules that this evidence is relevant, and if there is no agreement, then Plaintiff will be sure to offer this

evidence in the simplest, most efficient manner possible, but it is fully within Defendants' power to

minimize the time spent on offering the fact of innocence in evidence, if only they opt to stipulate.[10]

## V.    Dr. Sinha's Report Complies with Rule 26(a)(2)(C)

Finally, Defendants move to strike Dr. Sudhir Sinha's DNA report on the sole grounds that

it allegedly "presents three conclusory statements without providing the basis or reasons therefor."

(Docket No. 103 at 3.)[11] However, Dr. Sinha's report includes everything the Rules require and

adequately puts Defendants on notice that ReliaGene excluded not only Kenneth Waters but also his

brother Leroy and all of their mother's other sons as possible donors of the unknown blood collected

at the crime scene. The report is intended as rebuttal evidence in light of the deposition testimony

of certain defendants – based on sheer biased speculation – that the DNA exclusion of Kenny Waters

as the source of the blood was not dispositive, and that he was probably present when his brother

committed the murder.

Dr. Sinha offers the following opinions:

1.    The buccal swabs of Elizabeth O'Connor,[12] identified as ReliaGene Sample #07-03128, produced a distinct female genetic profile.

2.    Elizabeth O'Connor is excluded as the biological mother of the DNA donor in the blood from bathroom rug #3 (Item #1A) profile taken from Appendix 1 of Forensic Science Associates report dated May 14, 2001, case #00-628. Elizabeth O'Connor

---

[10] Notably, Rule 37(c)(2) authorizes plaintiff to apply for reasonable expenses incurred in proving innocence where, as here, Defendants have denied it without any investigation or good-faith basis to do so.

[11] While the brief does invoke Rule 702, the only other basis on which Defendants seek to preclude Dr. Sinha's testimony is based on the relevance of DNA evidence and claimed prejudice if it were admitted. Having chosen to present only these arguments, Defendants have waived all other grounds for attacking this report.  So too with Dr. Blake's report.

[12] Elizabeth O'Connor is the biological mother of both Plaintiff Betty Anne Waters, her brother, decedent Kenneth Waters, and their deceased bother Leroy Waters, who Defendants now apparently allege may have committed the crime.

is also excluded as the biological mother of the DNA donor in FSA items 4A, 6A, 7A, 8, and 9.

3. Our opinion of NON-MATERNITY is based on the below noted inconsistencies. The term "inconsistency" means that the band sizes of the tested woman do not match the obligate maternal alleles in the child profile. Based on the absence of DNA markers (as determined by DNA analysis) the blood samples from FSA items #1A, 4A, 5A, 6A, 7A, 8 and 9 could not have originated from a biological offspring of the tested woman, Elizabeth O'Connor.

(Sinha Report, Docket No. 103-3 at 1.)

The report includes a "complete statement of all opinions to be expressed and the basis and reasons therefor, the data or other information considered by the witness in forming the opinions; any exhibits to be used" Fed. R. Civ. P. 26(a)(2)(B). The attached charts detail what Ms. O'Connor's DNA profile is and how, and at which alleles, it differs from the blood at the crime scene. (Docket No. 103-3 at 2-3.) Dr. Sinha's report also includes information about results of controls tested alongside the O'Connor DNA that demonstrate the reliability of the results. (Docket No. 103-3 at 3.) The report explains, albeit in technical language, how it is possible to determine whether any offspring of Elizabeth O'Connor left that blood by noting differences between her DNA profile and that from the crime scene evidence; it notes precisely in which Forensic Science Associates report the original DNA profile of the crime scene evidence was reported, and indeed cites every item of evidence at issue. (Docket No. 103-3 at 1 ¶ 3.) The FSA report Dr. Sinha cites was itself generated by and produced as an attachment to the expert report of Dr. Blake and submitted in the same Rule 26(a)(2) package served on the Defendants on August 23, 2007. (*See* Docket No. 103-2 at 8 ¶ 18) (Blake report, noting that his May 14, 2001 report was attached thereto as Exhibit 8).[13]  Finally, the

---

[13] Plaintiff disclosed Dr. Blake's earlier report as an attachment to his expert report, but did not attach it again to Dr. Sinha's report. In the First Circuit, the exhibits need not actually be attached to the report as long as defendants are on notice of it. *See Pena-Crespo v. Puerto Rico*, 408 F.3d 10, 13 (1st Cir. 2005)

Sinha report attaches his CV, which includes a list of cases in which he has testified as an expert in the last four years.  (Docket No. 103-3 at 12.)  In sum, the report amply satisfies Rule 26.

Defendants have failed to explain precisely how they are prejudiced in preparing to depose Dr. Sinha.  Notably, his report was originally disclosed to the Defendants months ago, on May 17, 2007, along with a declaration from Elizabeth O'Connor identifying all her sons, as well as Kenny's and Leroy's birth certificates.  Defendants failed to raise any question, concern or objection to this production until their motion to strike was filed, some four months later.

**Conclusion**

For the foregoing reasons, the frivolous motion to strike the expert reports of Dr. Blake and Dr. Sinha should be rejected in full.  This Court should affirmatively hold that Mr. Waters's actual innocence is relevant, that its probative value to liability and damages greatly outweighs any prejudice to the defense, and that Dr. Sinha's report meets the requirements of Rule 26.

Dated: October 15, 2007          Respectfully submitted,
       New York, NY

                                   __/s/ Deborah L. Cornwall_____
                                   Barry C. Scheck (BS 4612)
                                   Deborah L. Cornwall (DC 2186)
                                   Monica R. Shah
                                   COCHRAN NEUFELD & SCHECK, LLP
                                   99 Hudson Street, 8th Floor
                                   New York, NY 10013

---

(finding that expert report failed to satisfy Rule 26(a)(2)(B) in relevant part because it "did not ... describe any exhibits Dr. Alonso planned on using.").

Tel. (212) 965-9081 / Fax (212) 965-9084

Robert N. Feldman (BBO # 630734)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210-1108
Tel. (617) 307-6130 / Fax (617) 307-6101

**_Attorneys for Plaintiff Betty Anne Waters_**

## CERTIFICATE OF SERVICE

I, Emily Gordon, hereby certify that the foregoing document filed through the ECF
system will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered
participants on October 15, 2007.


_____/s/ Emily Gordon_____
Emily Gordon