Not Reported in Cal.Rptr.2d                                           Page 1
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

Bravo v. Giblin
Cal.App. 2 Dist.,2002.
Only the Westlaw citation is currently available.
California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.
Court of Appeal, Second District, Division 4, California.
Mark BRAVO, Plaintiff and Respondent,
v.
Howard GIBLIN, Defendant and Appellant.
No. B125242.
(Super.Ct.No. BC105876).

Nov. 18, 2002.
As Modified on Denial of Rehearing Dec. 18, 2002.

Former employee of State mental health hospital who was convicted of raping patient and later exonerated brought § 1983 against sheriff's department personnel, personnel from office of district attorney, former defense counsel, and members of hospital's police force. Following a bench trial, the Superior Court, Los Angeles County, No. BC105876,Florence-Marie Cooper, J., found that hospital investigator had violated employee's civil rights and awarded employee substantial damages. Hospital investigator appealed. The Court of Appeal, Curry, J., held that: (1) substantial evidence supported finding that investigator misled sheriff's department and deputy district attorney about time rape incident occurred; (2) substantial evidence supported finding that hospital police reports were not turned over or mentioned to sheriff's department personnel; (3) investigator was not entitled to qualified immunity; and (4) investigator's act of fabricating evidence that employee had raped patient, and concealing exculpatory evidence regarding such, was proximate cause of employee's violation of civil rights.

Affirmed.
West Headnotes
**[1] Civil Rights 78 ⟲1420**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
In § 1983 action brought by former employee of State mental health hospital against hospital investigator after employee was convicted of raping patient and later exonerated, substantial evidence supported finding that detective did not know that patient was making references to her alleged attacker by a name other than former employee's; while other detective had knowledge that victim identified her attacker by other name, detective had no such knowledge. 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ⟲1420**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
In § 1983 action brought by former employee of State mental health hospital against hospital investigator after employee was convicted of raping patient and later exonerated, substantial evidence supported finding that inconsistencies existed in three interviews of patient in regard to identity of rape perpetrator and that investigator should have been aware of such inconsistencies; patient referred to perpetrator by different name and different description in interviews. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78 ⟲1420**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
In § 1983 action brought by former employee of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d                                                                Page 2
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

State mental health hospital against hospital investigator after employee was convicted of raping patient and later exonerated, substantial evidence supported finding that investigator misled sheriff's department and deputy district attorney about time rape incident occurred; while investigator told department and deputy attorney incident occurred at particular time, investigator was aware of another alleged time of incident conducted during interview with victim. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ☞1420**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
In § 1983 action brought by former employee of State mental health hospital against hospital investigator after employee was convicted of raping patient and later exonerated, substantial evidence supported finding that investigator told detectives reason patient recanted and changed her story was because of intimidation by hospital staff; detective testified that investigator told him that patient was being intimidated by staff, and during employee's criminal trial for rape offense, investigator testified that victim wanted to change her story because of staff intimidation. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ☞1420**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
In § 1983 action brought by former employee of State mental health hospital against hospital investigator after employee was convicted of raping patient and later exonerated, substantial evidence supported finding that investigator changed date of a report complied by hospital employee concerning interview with patient; report was in investigator's possession until it was turned over to hospital administrator, investigator had motive to change date,

and other evidence indicated that investigator consistently undercut evidence that tended to exculpate former employee. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ☞1420**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
In § 1983 action brought by former employee of State mental health hospital against hospital investigator after employee was convicted of raping patient and later exonerated, substantial evidence supported finding that hospital police reports were not turned over or mentioned to sheriff's department personnel; no evidence existed as to when the reports were turned over, and detective specifically testified he did not believe any of the reports were in the possession of the sheriff's department prior to date when criminal charges were filed against employee and the matter turned over to the district attorney. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☞1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Act of investigator of State mental health hospital in fabricating evidence that suggested hospital employee had raped patient, and concealing exculpatory evidence regarding such, demonstrated knowing or intentional behavior designed to violate employee's civil rights, and thus investigator was not entitled to qualified immunity in § 1983 claim brought by employee against investigator after employee was convicted of raping patient and later exonerated. 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ☞1088(1)**

Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)

**(Cite as: Not Reported in Cal.Rptr.2d)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(1) k. In General. Most Cited Cases

**Civil Rights 78 ⚖1088(5)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(5) k. Criminal Prosecutions. Most Cited Cases

State mental health investigator's act of fabricating evidence that hospital employee had raped patient, and concealing exculpatory evidence regarding such, was proximate cause of employee's violation of civil rights under § 1983 after employee was convicted of raping patient and later exonerated, even though investigator claimed sheriff's detectives and deputy district attorney conducted their own investigation of rape claim, and claimed that misrepresentations came from member of facility's police force; evidence indicated investigator was aware of misrepresentations and failed to correct them. 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ⚖1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
            78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

**Criminal Law 110 ⚖627.6(4)**

110 Criminal Law
    110XX Trial
        110XX(A) Preliminary Proceedings
            110k627.5 Discovery Prior to and Incident to Trial
            110k627.6 Information or Things, Disclosure of
            110k627.6(4) k. Reports, Memoranda or Notes. Most Cited Cases

Report of incident involving rape allegation made by state mental health hospital patient was exculpatory evidence that needed to be disclosed to employee of hospital who was accused of raping other patient, and thus hospital investigator's failure to disclose such evidence did not entitle investigator to qualified immunity in § 1983 action brought by employee against investigator after employee was convicted of raping other patient and later exonerated; rape allegation by patient involved many similarities as rape offense alleged to have been committed by former employee. 42 U.S.C.A. § 1983.

**[10] Civil Rights 78 ⚖1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
            78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

In § 1983 action brought by former employee of State mental health hospital against hospital investigator after employee was convicted of raping patient and later exonerated, trial court properly applied a subjective rather than an objective standard in evaluating whether investigator was entitled to qualified immunity; subjective standard was relevant in determining whether investigator acted in a knowing and intentional manner. 42 U.S.C.A. § 1983.

**[11] Appeal and Error 30 ⚖1071.1(5.1)**

30 Appeal and Error
    30XVI Review
        30XVI(J) Harmless Error
        30XVI(J)21 Findings
            30k1071 Findings by Court or Referee
            30k1071.1 In General

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

30k1071.1(5) Particular Cases and Findings

30k1071.1(5.1) k. In General. Most Cited Cases

Even if trial court erred in § 1983 action brought by former employee of State mental health hospital against hospital investigator after employee was convicted of raping patient and later exonerated, by applying subjective rather than an objective standard in evaluating whether investigator was entitled to qualified immunity, such error was harmless; investigator's actions in withholding evidence were not objectively reasonable. 42 U.S.C.A. § 1983.

APPEAL from a judgment of the Superior Court of Los Angeles County, Florence-MarieCooper, Judge. Modified and affirmed.

Bill Lockyer, Attorney General, Margaret A. Rodda, Senior Assistant Attorney General, Richard J. Rojo, Barbara A. Noble and Tania M. Ibanez, Deputy Attorneys General, for Defendant and Appellant.

Law Offices of Hermez Moreno and Hermez Moreno for Plaintiff and Respondent.

CURRY, J.

**\*1** Respondent Mark Bravo was convicted of raping a mental patient at Metropolitan State Hospital (MSH), the state mental health facility where he worked. After three years in prison, he was exonerated by the complaining witness's recantation and DNA testing of a fluid sample used to convict him. Respondent brought suit against sheriff's department personnel, personnel from the office of the district attorney (DA), his former defense counsel, and a number of the members of MSH's hospital police force. Following a nonjury trial, the trial court found that appellant Howard Giblin, senior special investigator for MSH, had violated respondent's civil rights for purposes of 42 United States Code section 1983 (section 1983). The court awarded substantial damages plus costs and attorney fees. Appellant contends that the court's findings of fact were not supported by substantial evidence and that the findings of fact do not support liability under section 1983 either because his actions were objectively reasonable for purposes of the defense of

qualified immunity or because the actions of sheriff's department and DA's office personnel were superseding causes of respondent's injuries. Appellant further contends that the court erroneously failed to offset a settlement between respondent and his criminal attorney. We agree that the settlement should have been taken into account in calculating the amount of the judgment, but otherwise affirm.

We first set forth the basic facts. In February 1990,FN1 respondent was employed at MSH. He worked in unit 208 as the unit supervisor. Unit 208 was a Spanish-speaking unit. Respondent was of Mexican descent.

FN1. All dates set forth herein refer to the year 1990, unless otherwise specified.

Julia DeLeon was a seriously mentally ill patient housed at MSH. She was Guatemalan. Her diagnosis included both bipolar (manic-depressive) disease and schizophrenia. Her mental condition had caused her to be hospitalized at MSH on numerous prior occasions. She had a history of hallucinations and assaultive behavior. She was considered hypersensitive, that is, she had a tendency to feel overly insulted by minor slights. She was known to be flirtatious and to inappropriately touch male peers. One of the doctors at MSH who had examined her testified that she was extremely susceptible to suggestion, such as could arise from being asked leading questions; that if she became upset enough during an interrogation she would not be able to distinguish between fantasy and reality; and that when in a manic phase, she would seek to be the center of attention by any means available.

In early February, DeLeon was transferred from respondent's unit, 208, to unit 301, the unit for patients considered to be on the mend and used as a transition to discharge. On the morning of February 19, DeLeon had an episode of destructive and aggressive behavior which caused her to be forcibly placed in five-point restraints. Later that day, she repeatedly attempted to visit her old unit after visiting hours and was turned away. Respondent notified staff in her new unit of her misbehavior.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d                                                    Page 5
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

*Flores Interview*

**\*2** On February 20, at around 3:15 p.m., DeLeon was observed banging on a door by hospital police officer (HPO) John Flores and his partner HPO Linda Asher. DeLeon approached the officers. Flores spoke with DeLeon in Spanish, translating for Asher. (The interview with these officers will be referred to hereafter as the "Flores interview.") The officers were certain of the time as their shifts were just about to end and they were preparing to leave for the day. DeLeon appeared upset and agitated but the officers noted no visible injuries. She said in Spanish that someone had violated her. She pantomimed a sexual act with her hands. Flores thought she was indicating sodomy. Asher believed she meant masturbation. DeLeon pointed to a scab on her lip, which did not appear to be a fresh injury.

When asked what happened, DeLeon said her attacker had picked her up in a white, four-door car. She said the person was a supervisor, someone the officers worked with. They also heard her say "208" and "Bravo." At this point, Flores said to Asher, "Mark?" DeLeon said, "Yeah, that's it. Mark Bravo."

DeLeon indicated she had been taken by gunpoint to an outdoor alcove near a vacant building on MSH grounds known as the Old Cider House. The two officers took her to the alcove. There they spotted a blanket, sheet, and used condom. DeLeon had not mentioned these items up to that point. The sheet and blanket appeared to be standard hospital issue. Condoms were distributed to patients because it was known that they would occasionally engage in sexual relations with each other. The alcove of the Old Cider House was popular for this purpose because it offered a modicum of privacy.

HPO Asher prepared a written report of the Flores interview. According to the report, at about 3:20 p.m., DeLeon approached her, upset and crying. DeLeon said she was returning to her own unit after a visit with friends in unit 208 when respondent, driving a white, four door vehicle, offered her a ride. DeLeon got in. Respondent parked the car and

led her to the alcove, where he told her to masturbate him. He said he had a gun. He tried to put a condom on, but was unable to do so. DeLeon denied penetration. She said he hit her in the mouth, pointing to a scab on her lower lip. DeLeon described her attacker as wearing black pants and a checked shirt.

The HPO's took DeLeon back to the office at around 4:05 p.m.; Flores went home. No one spoke to Flores about the incident for the next two days. Asher reported the incident initially to hospital police Chief Brenda Mobley, stating that respondent had been named as the assailant. Chief Mobley contacted appellant who, as special security investigator, was going to be responsible for the investigation, and informed him of what was going on.

*Donnie Brown Interview*

DeLeon was next interviewed by Chief Mobley, hospital police Sergeant Linda Miller, and appellant. Translation services were provided by Donnie Brown, a registered nurse and certified Spanish interpreter. (This interview will be referred to hereafter as the "Donnie Brown interview.") Neither Flores nor Asher was asked to sit in. Chief Mobley told appellant that Asher should be there, but appellant said he wanted Sergeant Miller instead. Brown was the only participant to take notes, which he typed up on March 1. His notes and trial testimony indicated that DeLeon said a man named "Tony" stopped her and asked to see her identification badge. He offered to drive her back to her building. She got in his car because she knew he worked there. He then threatened her with his fist to get her to go with him. She also identified the assailant as "Tony a[C]entral [A]merican" and "Tony who works my building." She said he raped her. She said the incident occurred "maybe half an hour or an hour ago...." She said she had been touched by a different Central American man with a beard or mustache a few days earlier. During the interview, DeLeon started to become anxious and concerned about being thought a liar, so Brown terminated it.

**\*3** The participants to the Donnie Brown interview

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

remembered it slightly differently. Although Brown could not recall hearing DeLeon say anything to implicate respondent, Sergeant Miller testified DeLeon made a reference to "Bravo, Tony" who was from or worked in unit 208. Chief Mobley testified she heard DeLeon say "Tony Bravo" and that appellant told Brown to ask DeLeon if she meant "Mark Bravo." In prior deposition testimony, read into the record, Chief Mobley said she talked to appellant about a week afterward about the fact that DeLeon had not given "Mark's" name. Appellant said something about having further information or corroborating information that confirmed respondent was the guilty party. Appellant could not remember what was said, but he decided to terminate the Donnie Brown interview because he perceived Brown was having trouble understanding DeLeon. He also testified to this at the criminal trial. None of the other witnesses recalled Brown having any trouble translating or understanding DeLeon.

*Olivas Interview*

Immediately after the Donnie Brown interview, appellant and Sergeant Miller interviewed DeLeon a second time, this time utilizing the translation services of Eva Olivas,[FN2] the unit supervisor in charge of unit 301. (This interview will be referred to hereafter as the "Olivas interview.") Olivas prepared two reports. Her initial report was prepared as appellant looked on as soon as the interview concluded. It was brief, identified respondent as the attacker, and said the attack occurred "approx after lunch." The report was given to appellant.

> [FN2.](#) Prior to trial, Eva Olivas married and changed her last name to Palomo. We will refer to her herein by her name at the time of the incident.

The next day Olivas prepared a more detailed report. At some point, the date on the second report was changed from "February 21" to "February 26." The report was in appellant's possession until he turned it over to the hospital administrator, Bill Silva, on March 27. According to the report, DeLe-

on said she had been sexually violated by "Tony Bravo." Olivas asked her to identify her assailant further and she said: "The one from 208, the only Tony Bravo."When Olivas asked her what time the incident occurred, DeLeon said she was not sure, so Olivas asked whether it was before or after lunch. DeLeon replied, "Maybe 2 or 3, I'm not sure. I don't have a watch."DeLeon described seeing "her friend Hermalinda" and "Trini (an employee in 208)" at around the time the attack occurred. She repeated the story about having been offered a ride to her unit. She described the car as white. She said there was a sheet and blanket already in the alcove. She told Olivas that the attacker ejaculated inside of her and threatened to hurt her if she told anyone. Nevertheless, she walked back to unit 208 to confront her assailant. On her way there, she ran into a MSH employee who directed her to Flores and Asher.

In her testimony, Olivas recalled DeLeon saying, "Eva, I have been violated," identifying her attacker as "Tony Bravo," and describing him as the one from 208. DeLeon did not mention a gun. Sergeant Miller could not remember the Olivas interview. Nor could appellant.

*Medical Exam*

**\*4** After these interviews had concluded, appellant and Sergeant Miller transported DeLeon to a medical facility where they were met by Sheriff's Deputy Mary Young.[FN3]DeLeon was examined by a nurse and, at the same time, interviewed through a translator by Deputy Young who was permitted to sit in on the exam. According to the report prepared by the nurse examiner, the assailant's name was "Toney Brown." Note was made of a bump on the back of DeLeon's head and an abrasion on her lower lip. The examiner reported secretions in the genital area, but no sign of injury. The time of the assault was estimated as between "1300 & 1600" or 1:00 and 4:00 p.m.

> [FN3.](#) Deputy Young had married and changed her last name to Newman at the time of trial. As with Eva Olivas, we refer to her by the name she used at the time of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d                                                                                          Page 7
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

the incident.

### Detective Young's Report

After the exam, Deputy Young spoke with appellant and Sergeant Miller. One of them told her that when DeLeon said "Tony" she meant respondent. Sergeant Miller was sure she did not give Young that information. Appellant could not recall such a conversation.

Sergeant Miller accompanied Deputy Young and her partner to the alcove at the Old Cider House where they found a used condom. The deputies took the condom and the sheet and blanket already picked up by Sergeant Miller to a lab for analysis. Deputy Young prepared her written report that night. The time of the incident was said to be "1300 hours" or 1:00 p.m. Respondent was positively identified as the assailant. The report said he was DeLeon's old unit supervisor and had a nickname- "Tony." It described him as wearing a checkered shirt and tan pants. According to Sergeant Miller's report, DeLeon said the assailant asked her to have lunch with him. She agreed, and got into his white car. He parked near the Old Cider House and told DeLeon to walk over there with him. He put a blanket and sheet on the ground and pushed her down on top of it. He hit her in the mouth several times and banged her head on the ground. He had intercourse with her as she continued to struggle. After he left, she went to security offices to report the incident.

Deputy Young put nothing in her report about a gun, because no one told her anything about a gun. The time of the incident came from information received from appellant and Sergeant Miller. Sergeant Miller informed her that respondent was DeLeon's old unit supervisor. DeLeon never said to Deputy Young that the assailant worked in her building. Later that night, Deputy Young attempted to arrest respondent, but she had been given the wrong address.

### Detectives' Investigation

The next day, the case was assigned to sheriff's De-

tectives Barbara Henderson and David Biondi. The detectives reviewed Deputy Young's report indicating that respondent was the only suspect and that the rape occurred around 1:00. They called appellant who told them respondent was about to be placed on administrative leave. They arrested respondent on the morning of February 21.

According to the report prepared later that day by Detective Henderson, the detectives re-interviewed DeLeon. Detective Henderson's report related the following story. DeLeon said she was walking around the grounds after lunch. She saw respondent in a four-door white car. He called her over and invited her to lunch. She got in the car and he drove her to the Old Cider House. They walked to the alcove. There were two blankets lying on the ground. He slapped and hit her, knocking her to the ground. He raped her vaginally. After he was done, he told her not to tell anyone. She immediately went to the housekeeper in unit 208. According to her report, Detective Henderson spoke with housekeeper, Mary Sosa, who said she saw DeLeon at around 2:00 or 2:15. DeLeon said nothing to Sosa about having been raped, although she mentioned she was on her way to talk to police officers.

**\*5** The report further indicated that Detective Henderson had spoken with HPO Asher, who said that DeLeon contacted her at 3:20 p.m. "and stated, she had just been with Mark Bravo and he made her 'jack him off.' " The report said that appellant had been asked to look into whether respondent had checked out a white state car.[FN8] No evidence of that was found.

The detectives interviewed respondent and learned he had an alibi for the period between 1:00 and 3:00 p.m., having been in a series of staff meetings. Detective Henderson interviewed a witness who confirmed his presence and the time. Another witness said that respondent left his second job at another hospital at around 12:00 or 12:15. Detective Biondi asked appellant to check into when DeLeon finished lunch. Appellant reported that she would have been finished and out on the grounds by 12:30.

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

*Referral to District Attorney*

The detectives presented the case to the DA's office. Deputy District Attorney (DDA) Linda Chilstrom was assigned. She testified that the detectives told her the rape occurred around noon. It was also possible that she heard that from DeLeon. A report prepared by the DA's office (not by Chilstrom) indicated that the case could not go forward at that time because "victim is very vague with respect to time of incident" and "co-workers cover [respondent's] time at about the period of time victim thinks it took place."It stated that further investigation was required, including "lab test ... to overcome alibi." Subsequent to this preliminary determination, respondent was released from jail.

*DeLeon's Recantations*

While the DA's office awaited the results of the lab testing, DeLeon began a series of recantations and reaffirmations. On February 23, respondent informed Detective Biondi that MSH employee Rachel Potts had information about the case. Detective Biondi interviewed Potts. He prepared a report dated March 1, which said that Potts reported DeLeon frequently talked about sex and getting pregnant. In late 1989, DeLeon said to Potts she liked respondent and would let him "be with" her if she had the chance. After the alleged rape, DeLeon claimed to be pregnant, and described her assailant variously as "Victor," "Tony Bravo," "Mark Bravo," and a patient from 206.

Around February 24, MSH employee Ruben Juarez had a conversation with DeLeon where she said her assailant was not respondent, but another patient from unit 206. On February 24, Juarez prepared a special incident report reflecting the conversation. Appellant sent the report, along with the other reports he received about the incident, to hospital administrator Bill Silva with a note indicating that Juarez's Spanish was poor "so [he] doesn't really know what she was saying or talking about."In testimony at trial, Juarez denied having trouble understanding DeLeon and could not recall ever speaking to appellant about his report. Appellant

also heard from Olivas and MSH employees Veronica James and Noemi Rios that DeLeon had recanted, but he did not include this information in the report to Silva.

**\*6** Around March 13, DeLeon approached appellant. She told him through an interpreter that respondent was not the assailant. In his testimony at trial, appellant could not recall if she identified the attacker as Tony or someone who came from the streets. However, he recalled that he reported the recantation to Detective Biondi and Detective Biondi recalled that appellant told him the attacker was identified as a visitor named Tony. Detective Biondi asked appellant to check into the possible involvement of a visitor named Tony. He also asked appellant to check into the names from the Potts report. Appellant reported back that he could find no information. Detective Biondi testified at trial that he did not investigate DeLeon's story about being attacked by a man from the streets or a "Tony" from the streets because he believed appellant had already investigated.

Neither Detective Biondi nor appellant could remember whether appellant said at the time he reported DeLeon's recantations that DeLeon was being intimidated or pressured by respondent's friends or others on staff. Detective Biondi did recall that appellant talked to him at some point in time about the possibility that DeLeon was being intimidated, and agreed to perform an investigation into possible witness intimidation. In addition, at respondent's criminal trial, appellant testified that he was concerned about DeLeon being intimidated and informed Biondi of his concerns. In a similar vein, appellant testified at the criminal trial to his belief that staff members were making false entries concerning sexual behavior on DeLeon's chart to cover up for respondent, and that he informed Detective Biondi of this.

As a result of being informed about DeLeon's recantations, the detectives re-interviewed DeLeon in mid-March. According to the written report prepared by Detective Biondi, DeLeon told the detectives that "several Mexican people around [the hos-

Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

pital]" were mad at her and that a "fat Mexican wo-
man" had threatened her. Detective Biondi asked
her to confirm that the things she said before were
true. She said she did not know anything and that
she felt sick and heard voices. When pressed, she
said something happened, but the assailant was not
respondent, but a man who came from the streets.
But then she changed her mind again, and said she
was attacked by respondent and that she had made
up a new story because she was scared.

### Nancy G./Merchain Incident

While the investigation into the DeLeon incident
continued, another allegation of sexual assault at
MSH arose. On March 6, HPO Asher stopped a
green car in which a patient named Nancy G. was
riding. It was driven by a man Asher recognized as
a frequent visitor. His name was Anthony Tapia
Merchain. MSH policy forbad patients from riding
in private vehicles. Nancy G. informed Asher that
she had had sex with Merchain, whom she referred
to as "Tony," four or five weeks earlier and that he
had been harassing her since. On the day in ques-
tion, Nancy G. reported that Merchain coaxed her
into his car with an offer of a cigarette. He then
forced her to perform oral sex and forcibly sodom-
ized her, ejaculating into a tissue. Asher prepared a
report that reflected her interview of Nancy G. At
the time, Asher did not know that DeLeon had iden-
tified her attacker as someone with the first name
"Tony."

**\*7** Asher turned the matter over to Sergeant Miller.
Sergeant Miller discovered in talking to Nancy G.
that Merchain had previously taken her to the Old
Cider House alcove for sex. She also discovered
that Merchain had been a patient at MSH many
years earlier.

Asher accompanied Nancy G. to have a rape exam
at the same hospital where DeLeon had been ex-
amined. There they were met by Sheriff's Deputy
Marilyn Vannoy. The tissue allegedly used by Mer-
chain was given to Deputy Vannoy. Nancy G. told
Deputy Vannoy that Merchain had forced her to
have sex with him, and that she was afraid of him.

No one mentioned the DeLeon incident to Deputy
Vannoy. Deputy Vannoy believed that a rape had
occurred and completed a lengthy report. The mat-
ter was turned over to Detective Henderson. She in-
terviewed Nancy G. and talked to Sergeant Miller.
Sergeant Miller testified that she told Detective
Henderson about the two having previously had sex
in the Old Cider House. Detective Henderson testi-
fied that Sergeant Miller did not mention the Old
Cider House or that Merchain had been on MSH
grounds several weeks earlier.

Sergeant Miller and Detective Henderson also dis-
agreed in their testimony about another matter. De-
tective Henderson testified that Sergeant Miller in-
formed her that Nancy G. was afraid of losing her
privileges, which could happen to a patient who
entered a visitor's car voluntarily or had consensual
sex with a visitor. Sergeant Miller denied having
said these things. She claimed that Detective
Henderson told her that Nancy G. admitted to
falsely accusing Merchain of rape because she was
afraid of getting into trouble. In either event, a de-
cision was made to treat the incident as involving
consensual sex and not refer it to the DA's office.

### Nancy B. Incident

On February 21, one day after the DeLeon incident,
a patient named Nancy B. reported that she had
been raped by a janitor. A medical exam was con-
ducted at MSH. Appellant reviewed Nancy B.'s
medical records and reviewed the janitor's attend-
ance reports. He interviewed the employee and his
coworkers. He also interviewed Nancy B., who
bared her breast and offered to have sex with him.
He concluded that there was not sufficient evidence
of rape. The matter was not referred to the sheriff's
department.

### Respondent's Re-arrest and Conviction

In the meantime, on March 20, lab testing of the se-
cretions found on the blanket, sheet, and DeLeon's
underwear was completed. The findings were not
precise under the testing methods utilized.[FN9]The
lab reported that respondent could be excluded as
the source of the secretions found on the blanket,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d                                                                    Page 10
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

but not the secretions found on the sheet or DeLeon's underwear.

Respondent was re-arrested on March 23, and charged with rape, kidnapping, and dissuading a witness. The kidnapping and dissuasion charges were dismissed at the preliminary hearing. After his arrest, Anna Nieto Gomez, his supervisor, wrote a memorandum stating that respondent had arrived early to the 1:00 o'clock meeting with another employee. When she received no response, she called appellant. He told her to mind her own business and not tell him how to do his job.

**\*8** HPO Asher was interviewed by DDA Chilstrom prior to trial. He was firm on the point that the incident must have occurred around 3:00 p .m. Appellant, who was also present, asked him if he was a friend of respondent's.

Respondent was convicted of rape and sentenced to eight years' imprisonment. The conviction was upheld on appeal by Division Seven of this court. DDA Chilstrom sent a letter praising appellant for "provid[ing] more help and thorough information than was provided by the Investigating Officers from the Los Angeles County Sheriff's Department."The letter commended appellant for "providing [her] with witnesses at a moment's notice" and stated: "If I had to rely on just the Sheriff's Department the prosecution would have been in jeopardy."

### PROCEDURAL BACKGROUND

#### *Respondent's Exoneration*

In 1992, DeLeon recanted again. The trial court ordered DNA testing on the tissue samples found on the sheet, blanket, and DeLeon's underwear previously taken into evidence. Both DeLeon and respondent were excluded as the source of the secretions. On January 6, 1994, a petition for habeas corpus was granted, and respondent was ordered released. The habeas petition was not based on the failure to provide information about the Nancy G./Merchain incident, which respondent and his counsel did not learn about until much later, during

the underlying civil trial.

#### *The Complaint Herein*

Respondent brought suit against the State of California, the County of Los Angeles, the DA's office, his criminal defense attorney, and the various officers and sheriff's deputies involved in the investigation of the DeLeon incident. The claims included violation of civil rights under section 1983. Respondent settled with his former attorney for $15,000 and the county defendants, including the sheriff's department and the DA's office, for $875,000. Claims against HPO's Asher and Flores and Chief Mobley were dismissed voluntarily or through summary judgment. By the end of trial, the only defendants remaining were appellant and Sergeant Miller.

#### *The Statement of Decision*

The court, acting as trier of fact, issued a statement of decision exonerating Sergeant Miller, but finding that appellant was liable for gross abuse of power under section 1983. The court specifically found that appellant was an experienced investigator who knew that female patients could fixate on staff members and further knew the proper protocol for investigating an allegation by a psychiatrically ill patient against an employee, as demonstrated by his investigation of the Nancy B. matter. In contrast to his handling of that matter, in the underlying matter, Giblin failed to review respondent's attendance records, analyze his work hours, accept the time of the rape as reported, interview respondent or his supervisor or co-worker, or review DeLeon's medical charts which would have revealed that DeLeon was "hyper-manic, emotionally unstable, easily excitable, lacking in insight, and likely to confuse fantasies with reality."The court further found that DeLeon had a history of repeatedly touching male peers and engaging in sexually inappropriate behavior with males.

**\*9** The court found that DeLeon identified "Bravo" as her attacker to HPO's Flores and Asher. Although it would have been proper protocol for one of the two to sit in on the followup interview,

Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

"[appellant] said he didn't want Asher involved" and instead included Sergeant Miller. In the Donnie Brown interview, the court found that DeLeon identified her attacker as Tony, a Central American, and someone who works in her unit. She also said the name "Tony Bravo" and appellant told the interpreter to ask if she meant "Mark Bravo." In the Olivas interview, DeLeon continued to say she had been raped by "Tony Bravo." She further said she had seen an employee named Trini right before it happened and an employee named Mary Sosa right after, but neither of these employees were interviewed.

The court found that someone had written in block letters in Olivas's original report that the time of the incident was "Approx After Lunch." The next day, Olivas wrote a second report clarifying that DeLeon had said the incident occurred "after lunch, maybe 2 or 3, I'm not sure. I don't have a watch."The court found it was "unassailable" that the date on the report had been changed from February 21 to February 26, either "to justify not turning it over to the sheriffs, or to create the impression that it was written one week after the interview and [was] thus not reliable...." The court noted that, "By the end of [the Olivas] interview, it was apparent that there were numerous inconsistencies in the three reports DeLeon had made, concerning what had actually happened to her, whether there had been penetration, whether a gun was used, but no effort was made to conduct any investigation before taking steps necessitating the calling in of the sheriffs."The court was "[p]articularly troubl[ed]" by "the complete lack of effort to determine where [respondent] was at 2:00 or 3:00 that afternoon" and the decision to instead report him to the sheriffs "as the assailant identified by DeLeon."

The court specifically found that Deputy Young asked appellant and Sergeant Miller who Tony was, and was told that DeLeon called respondent Tony. Therefore, "Deputy Young ... wrote [in her report to be turned over to the detectives] that the suspect was Mark Bravo, aka Tony, based on what [appellant] and Miller had told her. She knew they had superior knowledge about hospital patients and

personnel and had no reason to doubt the accuracy of their information. She also wrote that the incident occurred at 1:00, because during her questioning of [appellant] and Miller, they told her that was the time.... [¶] From this point on, the events in [respondent's] life were on an ever-increasing downward spiral, where detectives relied on that initial report, the deputy district attorney relied on the detectives, and everyone relied on [appellant]."

The court went on to describe appellant's actions postarrest which "demonstrat [ed] a chilling eagerness to eliminate or explain away all evidence which could tend to exonerate [respondent]." When the detectives determined that respondent had an alibi from 1:00 to 3:30, appellant "told them DeLeon would have been on a grounds pass after lunch by 12:30 and 'available' to the plaintiff."When DeLeon started changing her story and naming others, "[appellant] informed [the detectives] that she was being pressured and intimidated by staff members, and that he was looking into it."When Chief Mobley confronted appellant because she was concerned that respondent was being accused of rape despite the fact that DeLeon had never explicitly named him, "[appellant] said he'd done more investigation and [respondent] was the assailant; he assured her he knew more about the case than she did."When Anna Nieto-Gomez, respondent's supervisor and a potential alibi witness, called appellant wanting to know why she had not been interviewed "[appellant] told her to mind her own business, not tell him how to do his job, and hung up."Appellant's notes indicated that numerous MSH employees had reported that DeLeon had recanted, but his report to the hospital administrator did not contain this information.

**\*10** The court emphasized the fact that "[w]ithin days of the DeLeon incident, [appellant] was in possession of reports of interviews by Asher, Donnie Brown, and Olivas, all of which placed the incident at approximately 3:00. None of these reports was turned over or mentioned to the sheriffs, even when it was apparent that the crime was being investigated as having occurred at 12:30."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The court found that appellant knew about the Nancy G./Merchain incident prior to March 13, including the earlier incident in the alcove at the Old Cider House, yet when DeLeon came to appellant's office on March 13 and told him that her attacker was " 'a man from the streets named Tony,' " appellant reportedly made no connection between the two alleged assaults and did not inform the detectives about a possible connection. The court acknowledged that Detective Henderson was responsible for doing the followup investigation on the Nancy G./ Merchain incident, but concluded that Detective Henderson decided not to pursue the matter based on information she received that the victim was lying to cover up a consensual relationship with Merchain and her lack of knowledge of the repeated references to "Tony" made by DeLeon. When Chief Mobley tried to talk to appellant about a possible connection between the two alleged assaults, he was "dismissive." "On March 15, after Detective Biondi re-interviewed DeLeon, and she reported that the assailant was really 'Tony who comes from the streets,' Biondi asked [appellant] to investigate that. [Appellant] reported back to him that he could find no information on anyone named Tony coming in from the streets."

The court found further evidence of appellant's unseemly eagerness to ensure respondent's conviction by reference to his testimony at the criminal trial. He testified that Donnie Brown and Ruben Juarez had trouble understanding DeLeon. "Although there was no such evidence, he testified that staff members had started making entries in the hospital records 'which showed me they were trying to cover up for Mark.' " All of the foregoing convinced the court "that [appellant] harbored a wilful, deliberate, and malicious mental state" and "that he abused the power of his position in the worst possible way-by bringing about the conviction of an innocent man."

The court awarded respondent $3,925,976, including $221,976 in special damages, $3,537,000 for the time spent in prison, and $1,000,000 for emotional distress, less an $833,000 offset. Judgment was entered. Respondent was awarded attorney fees and costs. Appellant's motion for new trial was denied. This appeal followed.

DISCUSSION

I

Appellant purports to raise eight separate issues on appeal, which can be stated simply as follows: (1) whether the trial court's factual findings are supported by substantial evidence, and (2) if so, whether the findings are legally sufficient to support a claim for violation of civil rights under section 1983.

**\*11** Concerning the first issue, appellant agrees with the court's factual findings on several points. Appellant does not dispute that he was an experienced investigator with knowledge of the fact that female patients could fixate on male staff members and easily make unjustified accusations of inappropriate behavior. Appellant does not dispute that his perfunctory investigation into the underlying matter was conspicuously different from the thorough investigation undertaken when patient Nancy B. accused a janitorial employee of assault.

The statement of decision's summary of what was said by DeLeon in the Flores, Donnie Brown, and Olivas interviews is in accord with the witnesses' testimony. Indeed, in the one area where there was a factual dispute-Donnie Brown testified that DeLeon identified her attacker as "Tony" a Central American who works in her unit, whereas other witnesses recalled that she said "Tony Bravo"-the trial court accepted the version more favorable to appellant, that she said "Tony Bravo." On the separate question of who told Deputy Young that DeLeon meant respondent when she said "Tony" or that the incident occurred at 1:00, the court decided that the evidence was inconclusive as to whether this was said by appellant or Sergeant Miller.

Appellant does not dispute his knowledge of the Nancy G./Merchain incident or that he failed to discuss it with anyone outside MSH or ensure that the materials pertaining to the incident were turned over to respondent, his counsel, or the DA's office. Nor does appellant dispute that he was aware of the connection between Merchain and the Old Cider

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10521-GAO    Document 114-3    Filed 10/15/2007    Page 13 of 25

Not Reported in Cal.Rptr.2d    Page 13
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

House alcove and of Merchain's status as a former MSH patient. He does not deny that he was dismissive when Chief Mobley tried to draw a connection between the two incidents or that he told Detective Biondi that he had no information concerning a Tony who came from the streets.

Appellant stresses that the information concerning Merchain was in the hands of Detective Henderson, who was assigned to investigate both matters. But the court did not disagree with him on this point. The court acknowledged that Detective Henderson was aware of the incident, finding that she failed to followup because she was persuaded that the relationship was consensual and because she lacked knowledge of DeLeon's repeated references to Tony.[FN10]

[1] In connection with the Nancy G./Merchain matter, appellant disputes whether substantial evidence supports that Detective Henderson did not know about the references to Tony, contending that "[b]oth Henderson and Biondi were aware from February 21, 1990, and thereafter that DeLeon was using the names 'Tony,' 'Tony Bravo,' 'Victor,' and a 'Tony who comes from the streets.'" We agree that the evidence demonstrated that *Detective Biondi* was informed in the weeks following the incident that DeLeon had recanted and identified her attacker by numerous names, including Tony. In addition, Detective Biondi was present in mid-March when DeLeon referred to her attacker as "Tony who comes from the streets." But Detective Biondi's knowledge is irrelevant since there was no evidence that he had any knowledge about the Nancy G./Merchain incident. The evidence supports the trial court's implicit finding that Detective Henderson only heard the name "Tony" in connection with Deputy Young's report describing "Tony" as respondent's nickname.[FN7]

*12 The other areas where appellant believes evidence was lacking can be summarized as follows: (1) the finding that there were inconsistencies in the three interviews conducted by MSH personnel, particularly as to the identity of the attacker, and the implicit finding that appellant should have been aware of these inconsistencies; (2) the finding that appellant misled the sheriff's department and DDA Chilstrom about the time of the incident; (3) the finding that appellant told the detectives that the reason DeLeon recanted and changed her story was because of intimidation by staff; (4) the implicit finding that appellant changed the date on the Olivas report; and (5) the finding that MSH police reports were not turned over or mentioned to sheriff's department personnel.[FN8] We discuss each of these areas of dispute in turn.

A. *Inconsistencies in Interviews*

[2] Appellant disagrees with the trial court's finding that by the end of the Olivas interview, "it was apparent that there were numerous inconsistencies in the three reports...." Appellant specifically denies that he was aware that DeLeon told HPO's Flores and Asher that the attacker had threatened her with a gun and forced her to masturbate him. Appellant accurately states that, according to the evidence adduced at trial, "neither Flores nor Asher spoke to [appellant] about their findings, both officers left MSH after their interview of DeLeon because they were at the end of their shifts."

Appellant seems to believe that the lack of direct evidence that appellant had knowledge of the substance of the Flores interview means that the trial court's finding is not supported. That is incorrect. A finding may be supported by circumstantial evidence, that is "testimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved."(*People v. Goldstein* (1956) 139 Cal.App.2d 146, 153, 293 P.2d 495 .) The evidence reflects that the hospital police followed an established chain of command: Asher reported to Chief Mobley, and she reported to appellant because the DeLeon incident involved a matter within the sphere of the special security investigator's duties. Asher's report, written a few days after the fact, contained all of the information obtained from DeLeon, including the information about the gun and the type of sexual act involved. The inference

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

could reasonably be drawn from the evidence before the court that Asher informed Chief Mobley of DeLeon's statements and that Chief Mobley accurately relayed the information to appellant.

Concerning the identity of the assailant, appellant denies that there was any evidence of discrepancy, contending that DeLeon "repeatedly" referred to her assailant as "Bravo." This is an inaccurate portrayal of the evidence. The witnesses recalled the use of the name "Bravo" a total of three times, once each in the course of the three different interviews. The name DeLeon repeatedly used was "Tony." Appellant points out that DeLeon described the person involved as a supervisor and referred to his unit either by word or by pointing to unit 208. The evidence is equally clear, however, that she also said that Tony was a Central American who worked in her building (unit 301) and drove a white car. Respondent is of Mexican descent. As a Guatemalan, DeLeon surely knew the difference. Nor did respondent meet the description of working in DeLeon's building or driving a white car. On this record, the court's finding that there were significant discrepancies in the interviews which appellant should have appreciated was not erroneous.

### B. *Time of Incident*

**\*13** **[3]** The court found that Deputy Young wrote in her report that the incident occurred at 1:00 "because during her questioning of [appellant] and Miller, they told her that was the time."Appellant contends that the deputy "was not certain who told her the rape occurred at 1:00 p.m." This is misleading. Deputy Young was sure that the reported time of the incident came from her discussion with appellant and Sergeant Miller at the hospital-she just did not remember which one of them said it.

Appellant states that if the 1:00 p.m. time came from him, it was not a false report because "DeLeon reported in [the Olivas] interview that the rape occurred sometime after lunch."The statement of decision says that when asked if the assault occurred before or after lunch, DeLeon answered, " 'after lunch, maybe 2 or 3, I'm not sure. I don't have

a watch.' " Here we do find a discrepancy between the court's findings and the evidence, but not one that favors appellant. Olivas was the only witness to testify about the precise words used by DeLeon in describing the time of the assault in the Olivas interview. Olivas made clear in her testimony that she was careful to put the words used by DeLeon in quotes when she wrote her final report. Olivas did not put the words "after lunch" in quotes, which means that DeLeon actually said: "Maybe 2 or 3, I'm not sure. I don't have a watch." Since he was a participant in the interview, appellant should have been aware that the words "after lunch" were Olivas's, not DeLeon's.

Moreover, every other MSH witness who participated in the three MSH interviews of DeLeon, including HPO Flores, HPO Asher, Chief Mobley, Donnie Brown, and Sergeant Miller testified that there was no evidence of delay in reporting the assault and that DeLeon was consistent in reporting the time as being between 2:00 and 3:00. The fact that no one else involved in the interview process walked away with the impression that the attack occurred anywhere near 1:00 is evidence that the court could weigh in determining whether appellant gave false information to the deputies.

### C. *Evidence Concerning Intimidation*

**[4]** Appellant contends that the information that DeLeon changed her story and denied respondent's involvement due to pressure and intimidation from staff came from DeLeon and her doctor at the mid-March interview, not from him. Appellant ignores that Detective Biondi specifically testified that "[a]t some point in time" appellant "had told [him] that this patient [DeLeon] was being intimidated by staff...." Detective Biondi had earlier testified that appellant's belief that DeLeon was telling the truth about being raped "added credibility to the case" and that, prior to the mid-March interview, appellant was investigating whether DeLeon was being intimidated. Thus, whether or not Detective Biondi first heard the charge of witness intimidation from DeLeon or her doctor or appellant, appellant's statements added credibility to her story, which other-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

wise might not have been believed.

**\*14** Appellant's testimony from the criminal trial, read into evidence at the civil trial, also supported the court's findings. He testified in the criminal trial that DeLeon indicated she wanted to change her story because "staff members had told her that she would not be able to be placed out of the hospital until she was through testifying in this matter ... in court" and that he "called Detective Biondi and informed him ... of the problem." Appellant also testified at the criminal trial that "staff members started making entries [in DeLeon's chart indicating she had a prior history of sexually inappropriate behavior] which showed [him] that in [his] interpretation of it ... that they [were] trying to cover up for [respondent]" and that he "called Detective Biondi and informed [him] of this problem." He further expressed his belief to the jury in the criminal trial that he did not believe DeLeon when she recanted, "Because of the atmosphere that she was living under at the time. The staff members that work on the unit and control her environment have total control of her life, and it was necessary for her to get along with them to have a reasonable stay at the hospital."

Although he made the above statements concerning intimidation to support the prosecution's case at the criminal trial, at the civil trial he admitted that he "never had any evidence of anybody intimidating this witness [DeLeon] on behalf of [respondent]" and that "there was no evidence that DeLeon was ever threatened, intimidated or coerced by any ... person at the hospital to change her story about [respondent]."

Appellant argues that his trial testimony cannot form the basis of a cause of action because of the principle of judicial immunity. This misses the point. The trial testimony was not used to form the basis for liability, but to bolster the evidence concerning misstatements made to Detective Biondi during the investigation. The criminal trial took place only a few months after the events transpired, so appellant's memory of events was necessarily sharper. His testimony at the criminal trial that DeLeon had been intimidated into recanting and

that he so informed Detective Biondi, gives rise to the implication that he was a key source of information concerning intimidation which ultimately led to respondent's arrest and the filing of charges of dissuasion. Appellant's testimony at the criminal trial tends to shows that he raised the issues of intimidation not just during the trial, but also during the investigation phase.

### D. *The Date Change on the Olivas Report*

[5] Appellant argues that there was no substantial evidence to support a finding that he altered the date on the February 21 Olivas report because "there was no evidence that [he] was the only one who had access to [the] report" and "[t]here was no evidence that the changes were ... in [his] handwriting."

Again, this is a situation where no direct evidence supported the court's implicit finding, so the question becomes whether the circumstantial evidence was sufficient. We believe that it was. As the court pointed out, the evidence was clear that the report was in appellant's possession until it was turned over to Bill Silva on March 27. The court also pointed out a motive appellant had for alteration-to justify not turning it over to the sheriff's department earlier while they were still actively involved in investigating the case or to create the impression that it was written so long after the interview that it was not as reliable as the report written by Olivas on February 20. The evidence of motive and opportunity when added to the other evidence showing that appellant consistently undercut evidence tending to exculpate respondent justified the court's finding.

### E. *The Concealment of MSH Reports*

**\*15** [6] The court specifically stated that "[w]ithin days of the DeLeon incident, [appellant] was in possession of reports of interviews by Asher, Donnie Brown, and Olivas, all of which placed the incident at approximately 3:00. None of these reports was turned over or mentioned to the sheriffs, even when it was apparent that the crime was being investigated as having occurred at 12:30."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10521-GAO   Document 114-3   Filed 10/15/2007   Page 16 of 25

Not Reported in Cal.Rptr.2d                                                    Page 16
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

Appellant contends that the evidence demonstrates he "provided all MSH reports related to DeLeon's initial rape accusation and her subsequent recantation to the LASD detective."The testimony he cites shows that these reports ended up in a sheriff's department file sometime before the civil trial. There was no evidence as to when the reports were turned over. Detective Biondi specifically testified he did not believe any of the MSH reports were in the possession of the sheriff's department prior to March 23, when the criminal charges were filed and the matter turned over to the DA.

Appellant states in his reply brief that "Biondi's report confirms Biondi had these records because he called Officer Flores to clarify issues in [HPO] Asher's report."In the testimony cited by appellant in the reply brief, HPO Flores reported that Detective Biondi called to confirm that DeLeon said something about a gun. Detective Biondi's reference to a gun in a conversation with HPO Flores is not proof that he had the Asher report. The evidence showed that the detectives personally interviewed Asher on February 21. It is just as likely that Detective Biondi heard about the gun from that interview rather than from Asher's written report.

Appellant places significance on the fact that the reports were provided to respondent's criminal lawyer prior to the criminal trial, which took place six months after the event. It was not enough for reports to be collected and eventually turned over to someone, somewhere. By the time the MSH reports materialized, the detectives were convinced that DeLeon reported the attack as having taken place at 1:00 and had repeated the misinformation to DDA Chilstrom. FN9 This gave rise to the prosecutorial theory placing the incident during the half-hour or 15-minute period when respondent did not have a firm alibi. Appellant states he could not have known about respondent's lack of an alibi between 12:30 and shortly before 1:00 because he had not spoken to him or his supervisors. This misses the point. The gravamen of a section 1983 claim is the deliberate giving of misinformation which leads to a person's arrest or conviction. While actual malice may add support to a finding of intent, the test is primarily an objective one, as we discuss in the next section.

II

"The elements necessary to constitute a claim under Section 1983... require[ ] the plaintiff to allege facts which show: (1) That the defendants have acted under color of state law or authority; [and] (2) that the defendants have deprived the plaintiff of a right, privilege, or immunity secured by the Constitution and laws of the United States [citation]." (*Sykes v. State of California (Dept. of Motor Vehicles) (9th Cir.1974) 497 F.2d 197, 199-200,* fn. omitted, disapproved on other grounds in *Dennis v. Sparks (1980) 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185,* citing *Cohen v. Norris (9th Cir.1962) 300 F.2d 24, 30.*) This broad definition is limited by the principle of qualified immunity. "Qualified immunity protects government officials performing discretionary functions from civil liability under federal law unless their conduct violates a 'clearly established [federal] statutory or constitutional right[ ] of which a reasonable person would have known.' " (*Kelly v. Curtis (11th Cir.1994) 21 F.3d 1544, 1550,* quoting *Harlow v. Fitzgerald (1982) 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396.*) To overcome this defense, "[a] plaintiff cannot rely on ' 'general, conclusory allegations" or "broad legal truisms" ' to show that a right is clearly established." (*Kelly v. Curtis, supra,* 21 F.3d at p. 1550, quoting *Post v. City of Fort Lauderdale (11th Cir.1993) 7 F.3d 1552, 1557.*) "Instead, the plaintiff must show that, 'when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful. [Citation.] 'If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.' " (*Kelly v. Curtis, supra,* 21 F.3d at p. 1550, quoting *Anderson v. Creighton (1987) 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523.*)

*16 Respondent states that the evidence shows that appellant fabricated, falsified, and concealed evidence with the intent to bring about his wrongful arrest, prosecution, conviction and imprisonment. Re-

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

spondent maintains that a reasonable law enforcement officer would have understood that such acts were unlawful, and that case law clearly establishes that such actions on the part of a law enforcement officer violate a criminal defendant's constitutional rights. Appellant contends that the trial court wrongly based liability on his failure to investigate. To the extent the court based liability on fabrication, falsification, and concealment of evidence, appellant asserts that the information he reported was truthful as far as he knew or the truth was revealed through someone else prior to respondent's arrest, prosecution, and conviction, and the sheriff's department and DA's office exercised independent judgment on the evidence as accurately revealed. Finally, appellant contends that the court wrongly applied a subjective, rather than an objective standard to the question of whether a reasonable police officer would have understood that the actions undertaken were unlawful.

### A. *Failure to Investigate*

Looking first at whether a failure to investigate can form the basis of a section 1983 claim, numerous cases hold that once a police officer has the statement of the alleged victim of and/or eyewitnesses to a crime identifying the alleged perpetrator, no further investigation need take place. (See, e.g., *Gerald M. v. Conneely* (7th Cir.1988) 858 F.2d 378, 381; *Gramenos v. Jewel Companies, Inc.* (7th Cir.1986) 797 F.2d 432, 439; *United States v. Mahler* (9th Cir.1971) 442 F.2d 1172, 1174-1175; *Daniels v. United States* (D.C.Cir.1968) 393 F.2d 359, 361.) In the case of *Romero v. Fay* (10th Cir.1995) 45 F.3d 1472, for example, the plaintiff brought a section 1983 action, arguing that the police did not have probable cause to arrest him based on the statements of two witnesses. The plaintiff argued that a reasonable police officer would have investigated his alibi witnesses before arresting him, and that the information possessed by the alibi witnesses would have negated the probable cause to arrest. The court rejected this argument, stating that the Fourth Amendment requires officers "to reasonably interview witnesses readily available at the scene, investigate basic evidence, or

otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."(*Id.* at 1476-1477, fn. omitted.) The court concluded that once the police have enough evidence to constitute probable cause, they have no continuing obligation to further investigate in an attempt to uncover exculpatory evidence: "Once [the police officer] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff ..., his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause."(*Id.* at p. 1478, fn. omitted.)

**\*17** Appellant contends that DeLeon's statements were sufficient, in and of themselves, to establish probable cause to arrest and prosecute respondent. In this regard, he particularly relies on *Ahlers v. Schebil* (6th Cir.1999) 188 F.3d 365. There, a corrections officer had been accused by a female prostitute and drug addict of engaging in sexual acts with her while she was under arrest and being detained in a holding cell. The sheriff's department investigated the matter briefly, but then, as was its policy, turned the matter over to the state police for an independent review. The officer was subsequently arrested and charged, but the charges were later dropped when the witness failed to appear at a hearing and later changed her story. On appeal, plaintiffs (the officer and his wife) based a section 1983 claim on the allegations that defendants failed to gather evidence, failed to interview witnesses at the scene, failed to view the scene, and failed to reconstruct the alleged event.(*Id.* at p. 373.)The court concluded that these inadequacies did not negate probable cause or preclude the defendants from claiming qualified immunity. "An eyewitness identification will constitute sufficient probable cause 'unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness "was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation."' [Citation.] This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity. [Citation.] [¶] Thus, [the alleged victim's] accusa-

Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

tion that she had been sexually assaulted by [the officer], standing alone, was sufficient to establish probable cause, especially when bolstered by Sheriff's Department's records which confirm that there was a window of time within which the alleged sexual assault could have occurred."(*Id.* at p. 370.)

The court went on to state, however, that there may be situations where reliance on the accusation of a purported victim is not sufficient to negate the need for further investigation. In this regard, the court said: "It appears ... that in order to sustain their claim that there are genuine issues of fact regarding the existence of probable cause, Plaintiffs would have to allege that the Defendants had reason to think that [the alleged victim's] eyewitness identification was in some way untruthful or unreliable. Plaintiffs, however, put forth no such allegations. In fact, prior to [the officer's] arrest and up until immediately before the preliminary examination, [the alleged victim] had relayed her allegations to both the [sheriff's department] and to [the state investigator] in a consistent manner. Although Plaintiffs wish to make much of the fact that [the alleged victim] was a prostitute and had a substance abuse problem, ..., her status and occupation provide no reason to automatically assume she was dishonest."(*Ahlers v. Schebil, supra,* 188 F.3d at p. 371.)

***18** [7] These statements by the court in *Ahlers* highlight the difficulty of appellant's position. Unlike the typical case where the statement of the victim or a single eyewitness was held to be sufficient to justify an arrest and/or a prosecution, in the case before us, there *was* cause to believe that DeLeon's statement was unreliable: DeLeon was a hospitalized mental patient with a history of delusions, fantasies involving sex and pregnancy, and, during manic phases, a desire to be the center of attention. The evidence indicated that MSH had its own in-house police force for the purpose of ascertaining whether patients' accusations should be taken seriously and reported to authorities or dealt with as a further symptom of their illness. It would be reasonable to expect hospital police to be conscious of the possibility that a mental patient relating a plausible sounding accusation of sexual assault was in a

delusional state and incapable of distinguishing fantasy from reality.

The necessity for in-house investigation of patient charges was illustrated by the Nancy B. incident where a patient accused a janitor of rape. Appellant reviewed the relevant files and learned that the patient had a fixation on sexual matters and that the employee was not at work during the time of the alleged attack. Contrary to appellant's assertion that all sexual assault claims were taken seriously and reported to authorities, this accusation was resolved entirely in-house.

Appellant contends that the Nancy B. incident was distinguishable because she acted irrationally when being interviewed, baring her breast and offering to have sex then and there. We do not see why this justifies the decision to take DeLeon's accusations at face value without reviewing her medical records or speaking with her doctor. For all appellant knew, DeLeon was equally delusional and fixated on sex, but better able to feign rationality during the interview process.

What we find most troubling about the actions of the hospital police is how persons supposedly experienced in handling the accusations of the mentally ill managed to impair the investigation. HPO Flores admitted that he brought up the name "Mark" before hearing DeLeon identify her alleged attacker by that name, although he knew that mental patients are highly suggestible. Taking her back to the scene of the crime before she had been thoroughly interviewed was also a serious mistake. Because she said nothing about a blanket, sheet, or condom prior to spying those items in the alcove, there was no way of knowing whether the physical evidence fit her story or if her story was immediately altered to fit the physical evidence.[FN10] Failing to have either Flores or Asher present at the Donnie Brown and Olivas interviews to determine whether DeLeon's story remained consistent over time was certainly bad procedure, as was having Donnie Brown ask her if she meant to say "Mark Bravo."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Another factor that would have helped to determine whether DeLeon was relating a credible story would have been to ascertain the whereabouts of the alleged assailant during the relevant time period and determine whether she could accurately describe him. Although there were five members of the hospital police force involved by 4:00, no one thought to check respondent's whereabouts or find out what clothes he was wearing or which car he was driving. Similarly, nobody checked with the MSH employees DeLeon supposedly saw immediately before and after the incident, so that timing could be firmly set while events were still fresh in everyone's mind.

**\*19** Despite these investigatory errors, we conclude that we need not resolve whether the failure to investigate alone would justify the finding of section 1983 liability. Although the court discussed appellant's failure to thoroughly investigate DeLeon's story in its statement of decision, its subsequent order denying the motion for new trial said that its decision was not "based on [appellant's] failure to conduct an investigation."We agree with respondent and the trial court that the evidence demonstrated fabrication of inculpatory evidence and concealment of exculpatory evidence from both the sheriff's department and the DA's office. These actions on the part of appellant were clearly violative of respondent's constitutional rights and support the judgment entered.

### B. *Provision of False Evidence*

There is no dispute that a law enforcement officer who provides false or fabricated evidence that leads to a suspect's arrest and prosecution has violated the suspect's constitutional rights for purposes of a section 1983 action. (See, e.g., *Spurlock v. Satterfield* (6th Cir.1999) 167 F.3d 995, 1005 ["[Defendant] cannot seriously contend that a reasonable police officer would not know that such actions [fabricating evidence and manufacturing probable cause] were inappropriate and performed in violation of an individual's constitutional and/or statutory rights"]; *Ricciuti v.. N.Y.C. Transit Authority* (2d Cir.1997) 124 F.3d 123, 130 [where evidence

indicated that police officers fabricated a confession from the suspect, court held: "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983"]; *Riley v. City of Montgomery, Ala.* (11th Cir .1997) 104 F.3d 1247, 1253 ["If the jury were to find that [the defendant police officer] planted the cocaine [in plaintiff's car], this planting of false evidence could constitute a violation of Plaintiff's rights under the Federal Constitution and, accordingly", could give rise to liability under Section 1983"]; *Hervey v. Estes* (9th Cir.1995) 65 F.3d 784, 789 ["It is ... objectively unreasonable for a law enforcement officer to deliberately or recklessly misstate facts material to the probable cause determination"].)

Appellant also contends that he should be free of blame because the sheriff's detectives and DDA Chilstrom conducted their own independent investigation which supported respondent's arrest and the decision to prosecute. Appellant argues, in effect, that these investigations constituted a superseding cause and that his actions were not, therefore, the proximate cause of respondent's injuries. The Ninth Circuit recognized in *Smiddy v. Varney* (9th Cir.1981) 665 F.2d 261, 266, that, generally speaking, "[f]iling of a criminal complaint immunizes investigating officers ... from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time."The court went on to state that the presumption may be rebutted by "a showing that the district attorney was pressured or caused by the investigating officers to act contrary to his independent judgment" or evidence of "the presentation by the officers to the district attorney of information known by them to be false...."(*Ibid.;* accord, *Borunda v. Richmond* (9th Cir.1989) 885 F.2d 1384, 1390;*Jones v. City of Chicago* (7th Cir .1988) 856 F.2d 985, 993 [court recognized that since "elementary principles of legal causation ... are as applicable to constitutional torts as to com-

mon law torts," if the evidence showed plaintiff would have been prosecuted even if the defendant officers had behaved properly, "then they did not cause his injury and are not liable," but held that because "the jury could find that the defendants systematically concealed from the prosecutors, and misrepresented to them, facts likely material to [and] likely to influence ... the decision whether to prosecute," the jury was entitled to find that "had it not been for the misconduct of the defendants, [plaintiff] would neither have been arrested nor charged"].)

**\*20** [8] We have already discussed the evidence which established that appellant either falsely informed Deputy Young that DeLeon meant respondent when she said "Tony" and that the incident occurred at 1:00 p.m., or stood by while Sergeant Miller made these misrepresentations. Appellant appears to believe that if the words came out of Sergeant Miller's mouth, he cannot be liable. That is not so. The evidence showed that both he and Sergeant Miller spoke with Deputy Young at the hospital after the medical exam. If appellant did not inform the deputy that, from all indications, the incident occurred at 3:00 p.m., and that they had no real idea who DeLeon meant when she referred to her assailant as "Tony," then he is guilty of withholding exculpatory evidence. As we discuss in part C below, from the standpoint of a section 1983 violation involving a peace officer, there is no significant difference between the two. (See *O'Neill v. Krzeminski* (2d Cir.1988) 839 F.2d 9, 11 ["A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers"].)

Appellant points out that the detectives independently interviewed DeLeon, respondent, and respondent's alibi witnesses. They also interviewed Mary Sosa, the woman DeLeon claimed to have seen immediately after the attack, who reported seeing DeLeon at around 2:00 or 2:15 p.m., and HPO Asher who reported her understanding that the attack occurred around 3:00 p.m. DDA Chilstrom also independently interviewed DeLeon and both

Asher and Flores.

Rather than supporting appellant's position, we believe this evidence shows how a misrepresentation from a supposedly reliable source can infect a criminal investigation, and justifies the court's decision to hold appellant culpable for the injuries inflicted on respondent. The detectives and DDA Chilstrom did not "independently conclude[ ]" that the attack could have occurred between 12:45 and 1:00. They reached that erroneous conclusion because they had been informed by appellant and Sergeant Miller-who purportedly received their information from the source-that the victim reported the attack occurred close to lunch time. Because appellant and Sergeant Miller misrepresented the time, reporting that the attack occurred "after lunch" or around 1:00 p.m., the detectives and DDA Chilstrom did not believe Sosa, Flores, and Asher when they told the truth.[FN11]

The same problem arises with regard to appellant's contention that the detectives' or DDA Chilstrom's independent investigations led them to conclude that respondent, through his friends at MSH, was improperly intimidating DeLeon or pressuring her to recant. Appellant alleges that the detectives heard about this from their mid-March interview of DeLeon, and that DDA Chilstrom independently decided to prosecute based on their investigation. We find it difficult to believe that DeLeon's bizarre report of being threatened by "several Mexican people around [the hospital]" and a "fat Mexican woman" would have caused DDA Chilstrom to file a formal dissuasion of witness charge against respondent. The evidence demonstrated that appellant agreed to investigate intimidation. He testified at trial that DeLeon was being intimidated, that people were falsifying her records, and that he so informed the detectives. In addition, he let no opportunity slip to denigrate those who came forward with possible exculpatory evidence, particularly evidence that DeLeon had identified a different suspect. When the Donnie Brown interview failed to elicit information implicating respondent, appellant accused Brown of having difficulty interpreting. When Ruben Juarez reported that DeLeon had re-

Case 1:04-cv-10521-GAO    Document 114-3    Filed 10/15/2007    Page 21 of 25

Not Reported in Cal.Rptr.2d                                                                                    Page 21
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

canted and tried to name someone else, appellant passed that information along with a notation that "[Juarez] doesn't really know what she was saying or talking about."When Anna Nieto-Gomez called to complain about not being interviewed and tried to inform appellant that she could extend respondent's alibi to sometime before 1:00 p.m., he told her not to tell him how to do his job and hung up on her. On these facts, the court could reasonably find that appellant was an important source, if not the sole source, of misinformation concerning witness intimidation.

*21 Appellant cites *Arnold v. Intern. Business Machines* (9th Cir .1981) 637 F.2d 1350, for the proposition that where an independent investigation leads to a decision to arrest and prosecute, the person or entity that instigated the investigation cannot be held liable. Plaintiff in *Arnold* had been arrested for theft of corporate documents and trade secrets. The investigation into the theft of proprietary information had been commenced by the company, IBM, and then turned over to a task force in the Attorney General's office. Suspicion focused on plaintiff, who was arrested and held for a short period of time. Ultimately, charges were dismissed. Plaintiff brought suit against IBM for violation of civil rights under section 1983. The Ninth Circuit held that despite IBM's involvement in the investigation, which included providing funds, an employee to serve on the task force, and information concerning the identification of trade secrets and proprietary documents, the company could not be held liable because: "There is nothing in the record ... to indicate that defendants exerted any control over the decision making of the Task Force."(*Arnold,* at p. 1357.)Although the task force "used the information supplied by IBM to determine which companies might be in possession of IBM documents, ... the Task Force conducted a full and independent investigation[,]" and the task force was in no sense "a mere conduit for carrying out IBM's will."(*Ibid.*)

Appellant ignores the significant differences between *Arnold* and the present case. First, IBM was a private company, not a governmental entity. Thus, the primary issue before the court was wheth-

er IBM could be liable under section 1983, which, as we have seen, must be based on actions undertaken under color of state law or authority. This required evidence of either a conspiracy with or control of the state's task force, and the court could find evidence of neither. (*Arnold v. Intern. Business Machines, supra,* 637 F.2d at pp. 1356-1358.) Second, in stark contrast to the present situation, there was "no evidence that [the company] ever considered [plaintiff] a suspect before it went to the authorities."(*Id.* at p. 1367.)The task force developed all of the evidence pointing to the plaintiff. Third, although plaintiff argued that the company failed to provide the task force with exculpatory evidence, the court concluded that even if the company had provided the information identified by plaintiff, "[he] still would have been arrested, indicted, and had his house searched" and that "defendants' action in withholding this information does not even rise to the level of causation in fact, let alone proximate cause."(*Id.* at p. 1358.)Here, the court found that the exculpatory evidence withheld, particularly the evidence concerning the Nancy G./Merchain incident, would have had an impact on the decision to arrest and prosecute. Appellant disputes the trial court's finding in this regard. We now turn to that issue.

C. *Concealment of Exculpatory Evidence*

*22 The parties agree that withholding exculpatory evidence from the prosecutor's office by a law enforcement officer can lead to section 1983 liability where the officer has no reason to believe the prosecutor has knowledge of the evidence. (See, e.g., *McMillian v.. Johnson* (11th Cir.1996) 88 F.3d 1554, 1569["[P]re-existing law in this circuit clearly established that withholding [exculpatory] material from the prosecutor, and thus preventing its disclosure to the defense, violates an accused's due process rights"]; *Sanders v. English* (5th Cir.1992) 950 F.2d 1152, 1162,disapproved on other grounds in *Albright v. Oliver* (1994) 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 ["Lt. McCoy's deliberate failure to disclose ... undeniably credible and patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10521-GAO    Document 114-3    Filed 10/15/2007    Page 22 of 25
Not Reported in Cal.Rptr.2d                                                                   Page 22
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

under § 1983"].)

[9] Appellant makes a vain attempt to convince us that the report of the Nancy G./Merchain incident was not exculpatory, *Brady*[FN12] evidence which needed to be disclosed to the defense because there was no direct or circumstantial evidence linking Anthony Tapia Merchain to the DeLeon attack. DeLeon repeatedly identified her attacker as "Tony" a Central American; she said he offered her a ride in his car and offered to take her to lunch; she occasionally identified her attacker as a fellow patient; the attack took place in the alcove of the Old Cider House. Merchain went by the name "Tony"; he was Hispanic; he was a former patient at MSH; he had had consensual sex with Nancy G. in the Old Cider House alcove at around the time DeLeon was allegedly attacked and had been returning to the grounds regularly thereafter looking for sex; he offered his victim a ride in his car and induced her to come along with an offer of treats. DDA Chilstrom testified that she would have considered the report *Brady* evidence. We see no reason to disagree with her professional judgment or that of the trial court.

Appellant contends that he was "not responsible" for informing DDA Chilstrom about the Nancy G./Merchain incident because Detective Henderson had knowledge of the incident. Appellant misperceives his burden in establishing a qualified immunity defense where the charge is concealment of exculpatory evidence. A law enforcement officer does not establish the defense by demonstrating that a fellow officer was aware of the exculpatory evidence-he or she must show that there were reasonable grounds to believe that *the DA's office* had the evidence.

This is illustrated by *McMillian v. Johnson, supra,* 88 F.3d 1554, a case cited by appellant. There, a detective sued for failing to turn over exculpatory witness statements to the prosecutor argued that he had reason to believe the prosecutor knew about the evidence because one of his codefendants, who also knew about the evidence, was the prosecutor's investigator. The court "agreed that a prosecutor's investigator's awareness of exculpatory or impeachment evidence *usually* will give other investigators reason to believe that the prosecutor is aware of the evidence. But [the defendant] cannot avail himself of that argument, for he allegedly conspired with [the prosecutor's investigator] to withhold the evidence from the prosecutor. *Thus, far from having reason to believe that the prosecutor was aware of the evidence, [the defendant] allegedly knew that the prosecutor was not aware of the evidence.*" (*Id. at p. 1568,* italics added.) The court contrasted the situation before it with the situation in the case of *Kelly v. Curtis, supra,* 21 F.3d 1544, where the defendant had been sent a report from the lab showing that a substance found in an accused drug offender's possession was not cocaine, but also received a mailing list which (erroneously) indicated that the same report had been sent to the DA.

**\*23** We do not see how, on the facts of the present case, appellant could have reasonably believed that DDA Chilstrom had any information about the Nancy G./Merchain incident. Initially we note that Detective Henderson was a sheriff's department detective, not an investigator for the DA's office. Once the decision was made to close the matter as consensual, there was no reason for her to report the incident to DDA Chilstrom. More significant is the fact that Detective Biondi called to ask appellant whether he had any information about a "Tony who came from the streets." This should have alerted him to the fact that Detective Henderson had not even told her partner about the Nancy G./ Merchain incident. Rather than forthrightly bringing up the incident, which must have been on his mind in view of his discussion with Chief Mobley, appellant's answer ensured that Detective Biondi was kept in the dark.

Moreover, because the issue is the officer's reasonable belief concerning the DA's knowledge, the fact that appellant worked more closely with DDA Chilstrom than either of the detectives is further proof of his culpability. The evidence showed that appellant brought witnesses from MSH to her office to be interviewed. He assisted at trial by bringing in witnesses and giving lengthy testimony himself.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Yet during all of his dealings with DDA Chilstrom, they never discussed the Nancy G./Merchain incident. This should have been the final tip off that the incident was unknown to her.

Put another way, appellant bore the burden of proof of establishing the qualified immunity defense, including proof that it was reasonable for him to assume that exculpatory evidence known to him had been passed on to the DA's office. Proving that another law enforcement officer had the information did not establish the defense. The fact that a fellow officer is also withholding information in derogation of the accused's constitutional rights is not a defense to a section 1983 claim.

### D. *Subjective v. Objective Standard*

[10] Appellant complains that the trial court erroneously applied a subjective rather than an objective standard in evaluating the qualified immunity defense. Appellant points to the court's reference to *Scheuer v. Rhodes* (1974) 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, which the court cited in support of the proposition that, "As an officer of the State, [appellant] has only qualified immunity, and that immunity provides no protection in the face of evidence of conduct which grossly abuses the lawful power of office."

Appellant correctly asserts that the test for qualified immunity set forth in *Scheuer v. Rhodes* comprised both objective and subjective (good faith) components. As the Supreme Court explained in *Davis v. Scherer* (1984) 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139, subsequent authorities disapproved the *Scheuer v. Rhodes* test: "[T]he 'totality of the circumstances' test [of *Scheuer v. Rhodes* ] comprised two separate inquiries: an inquiry into the objective reasonableness of the defendant official's conduct in light of the governing law, and an inquiry into the official's subjective state of mind.*Harlow v. Fitzgerald, supra,* [457 U.S. 800,] rejected the inquiry into state of mind in favor of a wholly objective standard. Under *Harlow,* officials 'are shielded from liability for civil damages insofar as their conduct does not violate clearly estab-

lished statutory or constitutional rights of which a reasonable person would have known.'457 U.S., at 818. Whether an official may prevail in his qualified immunity defense depends upon the 'objective reasonableness of [his] conduct as measured by reference to clearly established law.'*Ibid.* (footnote deleted). No other 'circumstances' are relevant to the issue of qualified immunity."(*Davis v. Scherer, supra,* 468 U.S. at p. 191.)

***24** [11] The court cited *Scheuer v. Rhodes* as support for the proposition that qualified immunity provides no protection in the face of evidence of conduct which grossly abuses the lawful power of office. We do not believe that meant the court incorrectly applied a subjective test in evaluating whether qualified immunity existed.FN13 But assuming arguendo that the court applied the wrong standard, it would not be grounds for reversal. As appellant also correctly points out, "[t]he qualified immunity defense ... presents a question of law that must be resolved de novo on appeal."(See, e.g., *Elder v. Holloway* (1994) 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 .) As the above discussion indicates, our independent review convinces us that appellant's actions were not objectively reasonable.

The court determined that respondent was entitled to damages in the amount of $221,976 for his economic losses, $3,537,000 to compensate him for 1,179 days of incarceration at the rate of $3,000 per day, and $1 million to compensate him for emotional distress suffered between the date of the incident and the date of his sentencing. To determine the final amount awardable to respondent, the court took into account the $875,000 settlement with the County of Los Angeles and concluded that appellant was "entitled to an offset for that portion of the settlement which represents economic damages."The court calculated that the ratio of economic damages to noneconomic damages was 95.2 percent, and reduced the damages by $833,000 (95.2 percent of $875,000). Neither party took issue with respect to the court's method of calculating the offset due appellant, but appellant called our attention

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

to the fact that the court neglected to similarly off-set the $15,000 settlement with respondent's former criminal attorney. Respondent pointed out that the court made a mathematical error in its original statement of decision, which has since been corrected nunc pro tunc, in that the ratio of economic damages to noneconomic damages was, in fact, 4.8 percent. Accordingly, damages should be offset by an additional $720 (4.8 percent of $15,000).

DISPOSITION

The judgment is modified to reflect a reduction in the amount awarded in the amount of $720. As modified, the judgment is affirmed. The parties are to bear their own costs on appeal.

We concur: EPSTEIN, Acting P.J., and HASTINGS, J.

FN4. Respondent apparently drove a red Datsun.

FN5. The secretion samples were not DNA tested, but merely blood-typed.

FN6. The legal significance of Detective Henderson's knowledge is discussed in part II, C, *infra.*

FN7. Detective Henderson testified she was at the March 15 interview, but did not recall DeLeon identifying her attacker as "Tony".

FN8. Appellant also disputes that he concealed DeLeon's medical condition. The court's finding was that appellant did not *review* DeLeon's medical report at the appropriate time.

FN9. At oral argument, counsel for appellant conceded that DDA Chilstrom did not have the MSH reports.

FN10. Although the trial court did not include this in its findings, we note the medical records would have shown that DeLeon had been forcibly placed in restraints

the day before, which could have explained the minor abrasions and contusions found on her body by the medical examiner.

FN11. In making this argument, appellant overlooks the evidence that when HPO Flores got into a disagreement with DDA Chilstrom about the time of the incident, appellant intimated that he was saying this because he was a friend of respondent.

FN12. *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

FN13. We note that in its order denying the motion for new trial, the court explained: "This Court's reference in its statement of decision to evidence of defendant's malice should not be read to reflect an application of the 'wrong' standard. Proof of subjective malice is no longer required in order to overcome immunity, but it is not irrelevant. In this case, in addition to the personal animus of [appellant] for [respondent], the evidence was clear and convincing that [appellant] deprived [respondent] of 'basic, unquestioned constitutional rights' (*Harlow at p. 815* ), demonstrating objectively that he was not entitled to immunity from suit. The defense argues that [respondent] did not prove that 'the right which [appellant] allegedly violated was clearly established at the time [respondent] was arrested.'[Appellant] is obviously wearing the same blinders he wore throughout the trial of this case. As [respondent] succinctly argues in his Opposition, few rights could be more established, basic, and unquestioned than the right to be free from wrongful arrest, conviction, and incarceration."

Cal.App. 2 Dist.,2002.
Bravo v. Giblin
Not Reported in Cal.Rptr.2d, 2002 WL 31547001
(Cal.App. 2 Dist.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2002 WL 31547001 (Cal.App. 2 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.