Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**

Manning v. Miller
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
Steven MANNING, Plaintiff,
v.
Gary MILLER and Robert Buchan, Defendants.
**No. 02 C 372.**

Nov. 14, 2005.

Leonard Stephen Becker, Law Offices of Leonard S. Becker, Arthur R. Loevy, Jonathan I. Loevy, Jonathan A. Rosenblatt, Kurt Henry Feuer, Loevy & Loevy, Kenneth N. Flaxman, Kenneth N. Flaxman, P.C., Raymond J. Smith, Attorney at Law, Chicago, IL, for Plaintiff.

Jonathan C. Haile, United States Attorney's Office, Penelope Moutoussamy George, Arnold Hyunguk Park, City of Chicago, Department of Law, Mara Stacy Georges, Corporation Counsel, City of Chicago, Thomas R. Weiler, David H. Capizzi, Mark Christopher Egan, Norton, Mancini, Weiler & Deano, Chicago, IL, for Defendants.

KENNELLY, J.

**\*1** Steven Manning sued Gary Miller and Robert Buchan, both agents of the Federal Bureau of Investigation, under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for violating his constitutional rights in connection with two state court criminal prosecutions, one in Missouri and one in Illinois. A jury found in Manning's favor against Buchan, but in favor of Miller, on the claim regarding the Missouri prosecution and awarded Manning $2,555,000 in compensatory damages. On the claim regarding the Illinois prosecution, the jury found in Manning's favor against both Buchan and Miller and awarded just over $3,851,000 in compensatory damages. The jury also assessed punitive damages of $100,000 against Buchan and $75,000 against Miller. Buchan and Miller have moved for entry of judgment as a matter of law or in the alternative for a new trial. For the reasons stated below, the Court denies

the motion.

*Background*

Manning is a former Chicago police officer who was terminated from or left the force in the early 1980's after he was prosecuted and convicted for involvement in an insurance fraud scheme. In 1985, Manning was arrested while participating in the burglary of a jewelry store. He decided to cooperate with the local authorities and eventually became an informant for the FBI. His primary contact was agent John O'Rourke, a member of "Squad 9" in the local FBI office. During this same period, the FBI was investigating Manning for alleged involvement in interstate thefts. Manning's informant relationship ended in the fall of 1986, under circumstances which were the subject of dispute at trial, after Thomas McKillip, one of Manning's alleged associates, was found murdered. Manning maintained that following the termination of his informant relationship with the FBI, O'Rourke's squad, which included Buchan and Miller, resolved to see to it that he was put behind bars and, to that end, Buchan and Miller fabricated evidence to frame him for involvement in a kidnapping and a murder.

In 1990, Manning was charged by local authorities in Missouri with a 1984 kidnapping, following an investigation spearheaded by Buchan and Buffalo Grove, Illinois detective Robert Quid. Manning was arrested in Illinois on a warrant issued by the Missouri authorities. While Manning was incarcerated at the Cook County Jail in August 1990 pending extradition to Missouri, the FBI recruited a jailhouse informant, Tommy Dye, to provide information about Manning and to engage him in conversation while wearing a recording device. This was done ostensibly to gather evidence regarding purported threats by Manning against witnesses and law enforcement investigators. Dye claimed that during their recorded conversations, Manning admitted that he had killed Jimmy Pellegrino, another of his alleged former associates. Cook County authorities ultimately charged Manning with Pellegrino's murder following an investigation largely conducted by the FBI.

Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*2** Manning was convicted of both the Missouri kidnapping and the Illinois murder. He was sentenced to death for the murder and to life imprisonment for the kidnapping. The murder conviction was vacated by the Illinois Supreme Court on appeal due to improper admission of "other crimes" evidence. *People v. Manning,* 182 Ill.2d 193, 230 Ill.Dec. 933, 695 N.E.2d 423 (1998). Cook County authorities declined to retry the case. Manning's Missouri kidnapping conviction was vacated by the United States Court of Appeals for the Eighth Circuit upon consideration of Manning's habeas corpus petition, on the ground that the authorities had violated Manning's right to counsel by using Dye to elicit incriminating information from Manning after he was charged with the kidnapping. *Manning v. Bowersox,* 310 F.3d 571 (8th Cir.2002). Missouri authorities declined to retry the case, and Manning was released from prison in early 2004, after being incarcerated for over thirteen years.

In 2002, following the reversal of his murder conviction but while his kidnapping conviction was still under review, Manning filed this suit, alleging that the defendants had violated his constitutional rights in connection with the Illinois murder prosecution. Following the overturning of his kidnapping conviction, Manning amended the suit to include claims that the defendants had violated his rights in connection with that prosecution as well. In addition to his claims against Miller and Buchan, Manning asserted claims against the United States under the Federal Tort Claims Act.

A combined jury trial on Manning's claims against Miller and Buchan and bench trial on his FTCA claims was held over a period of nineteen days in December 2004-January 2005. After over a week of deliberation, the jury found in favor of Manning and against Buchan, but not Miller, on Manning's claims for violation of his constitutional rights regarding the Missouri prosecution, and in favor of Manning and against both Buchan and Miller on Manning's claims for violation of his rights regarding the Illinois prosecution. The jury found in favor of Buchan and Miller on a parallel claims Manning had asserted against them under the civil suit provisions of the Racketeer Influenced and Corrupt Organizations Act. As noted earlier, the jury awarded Manning compensatory damages of $3,851,100 on the Missouri claim

and $2,555,000 on the Illinois claim, as well as punitive damages of $100,000 against Buchan and $75,000 against Miller. The FTCA claims remain under advisement as the result of the Court's later grant of a motion by the United States seeking to reopen the evidence concerning those claims.

Defendants' motions

Buchan and Miller argue that the evidence was insufficient to sustain a verdict against them, and that as a result the Court should enter judgment in their favor as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). When considering such a motion, the Court determines whether the evidence presented at trial, with all the reasonable inferences drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the prevailing party. *See, e.g., Gower v. Vercler,* 377 F.3d 661, 666 (7th Cir.2004). The Court may not reweigh the evidence, draw its own inferences, or substitute its own determinations regarding the credibility of witnesses for those made by the jury. *Id.; see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (regarding motion for directed verdict; "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). To prevail on their motion for judgment as a matter of law, Buchan and Miller must establish that " 'no rational jury could have brought in a verdict against [them].' "*Gower,* 377 F.3d at 666 (quoting *EEOC v. G-K-G, Inc.,* 39 F.3d 740, 745 (7th Cir.1994)).

**\*3** Buchan and Miller have also moved, in the alternative, for a new trial under Federal Rule of Civil Procedure 59(a). This request is based on a single contention: that the verdict was against the manifest weight of the evidence. The Court notes that before trial, the parties filed and argued numerous motions *in limine.*Buchan and Miller prevailed on some of these. Among other things, they were permitted to offer at trial a good deal of evidence of Manning's alleged involvement in other crimes, including other murders, on the basis that their awareness of this evidence affected their actions that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

were under challenge in Manning's claims. Buchan and Miller lost on other motions *in limine.*They have not argued that admission of any or all of the evidence that they unsuccessfully sought to exclude, and/or that exclusion of any or all the evidence they unsuccessfully sought to admit, warrants a new trial. Nor have they argued that the Court made errors during the trial or in the jury instructions that require granting a new trial.

The Seventh Circuit has recently stated that a court considering a motion for new trial may not set aside the jury's verdict "if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of the evidence to the jury."*Kapelanski v. Johnson,* 390 F.3d 525, 520 (7th Cir.2004). In their memorandum supporting their motion, Buchan and Miller at times appear to ask the Court to make its own credibility findings and reweigh the evidence. There is some indication of conflict in the Seventh Circuit's precedents about whether a court considering a motion for new trial may reweigh the evidence, and whether it must view the evidence in the light most favorable to the party that prevailed. *Kapelanski,* cited above, and virtually all of the Seventh Circuit's other recent cases say the answer to the first question is no and the answer to the second is yes. *See, e.g., Research Sys. Corp. v. IPSOS Publicite,* 276 F.3d 914, 920 (7th Cir.2002); *Savino v. C.P. Hall Co.,* 199 F.3d 925, 935 (7th Cir.1999) ("In assessing the sufficiency of the evidence we will not reweigh the evidence or judge the credibility of witnesses. If there is a reasonable basis in the record for the jury's verdict, it must stand."). On the other hand, *Thomas v. Stalter,* 20 F.3d 298, 304 (7th Cir.1994), seems to give the opposite answer, stating that in assessing a motion for new trial, the trial court is entitled to weigh the evidence for itself and, in doing so, may make its own assessment of the witnesses' credibility.

It is not entirely clear whether this Court can resolve this apparent inconsistency in the precedents of a superior tribunal. It is possible, however, that the inconsistency is more apparent than real. The unquestioned authority of a court to grant a new trial when a jury's verdict is against the manifest weight of the evidence contemplates that the court will do some weighing of its

own-how else to determine the "manifest weight"? But it seems equally clear that the authority to grant a new trial based on the weight of the evidence is reserved for cases in which it is readily apparent to the trial judge that jury's determination was seriously out of kilter-as the Seventh Circuit has put it, if the verdict "is not rationally connected to the evidence, if it is born out of passion and prejudice, or if it is monstrously excessive."*Slane v. Mariah Boats, Inc.,* 164 F.3d 1065, 1067 (7th Cir.1999).

**\*4** To put it another way, the authority to overturn a verdict that is against the manifest weight of the evidence does not amount to a "chancellor's foot" veto [FN1] that gives the trial judge a roving commission to overturn verdicts that he might disagree with or find distasteful. For example, a court may not set aside a verdict simply because it would have come to a different conclusion had it been the trier of fact. *See, e.g., Ahern v. Scholz,* 85 F.3d 774, 780 (1st Cir.1996); *see generally*11 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2806 at 69 (1995 & Supp.2005) (hereinafter "Wright, Miller & Kane"). Rather, the court must undertake its task with due regard for the role of the jury in our system of justice. As a leading commentator puts it, "A decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter."11 Wright, Miller & Kane, *supra,* § 2806 at 74; *see Ryan v. McDonough Power Equipment, Inc.,* 734 F.2d 385, 387 (8th Cir.1984). For this reason, as the Seventh Circuit has stated, "[a]s long as there is a reasonable basis in the record to support it, we will not overturn a jury's verdict."*Robinson v. Burlington Northern R.R. Co.,* 131 F.3d 648, 656 (7th Cir.1997).

> FN1. A phrase used by the Supreme Court in a different context. *See United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

When measured against this standard, Buchan and Miller's motion falls short; there was, without question, a reasonable basis in the record to support the verdict, and the jury's determination plainly was not against the

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

manifest weight of the evidence. Defendants' memoranda contain viable arguments about what a fact finder should conclude in the first instance. But these arguments do not provide a basis for upsetting the jury's verdict.

Buchan and Miller claim the jury "fell for ... obfuscation and misrepresentation" by Manning's counsel and that it was "confused" by counsel's "tactics and arguments." Dfdt. Reply at 1, 3. The Court takes exception to these contentions. The jury was a highly educated and sophisticated group, FN2 and its verdict-particularly the special verdict form that was given to the jury on defendants' proposal-reflects the careful and discerning job that it did evaluating the evidence and claims during its lengthy deliberations. This was anything but a runaway jury, and there is no basis to believe that it was bamboozled by counsel for either side.

> FN2. The eleven jurors who remained at the close of the case included six jurors with college degrees, including one with two bachelor's degrees, one with a master's degree and a law degree, and another three with master's degrees, as well as five jurors with high school diplomas, including four who had some college education.

The case was, in the Court's view, a close one, in which a jury reasonably could have come out either way; it was not a case in which the evidence clearly favored the losing parties. It is true, as Buchan and Miller argue, that Manning had no *direct* evidence establishing his claims. But the law does not require a jury's verdict to be supported by direct evidence. *See, e.g., Garrett v. Barnes,* 961 F.2d 629, 632 (7th Cir.1992). Circumstantial evidence may serve as the sole support for a guilty finding in a criminal case, *see, e.g., United States v. Reyes,* 270 F.3d 1158, 1168 (7th Cir.2001), and there is no basis to believe the contrary is true for a civil case, in which the burden of proof is lower. Indeed, this jury was instructed, without objection by Buchan or Miller, that it was to consider both direct and circumstantial evidence, and that it was entitled to give equal weight to each. Tr. Vol. 19 at 15.

**\*5** There is, or should be, nothing particularly surpris-

ing about the fact that Manning's case was based largely on circumstantial evidence. To support his claims, Manning was required to adduce evidence largely from government agents, prosecutors, and persons who had testified against him at his criminal trials. In the normal course, one cannot expect such persons to supply direct evidence of a claim that evidence was fabricated and that the falsification was concealed. Were direct evidence required, it would be tantamount to a death-knell for cases of this type. In fact, however, there is no such requirement.

That said, a good deal of the factual underpinning for Manning's claims did, in fact, come from government witnesses who were called by Manning during his case. No such witness made an admission that Manning's claims were true, but as we will discuss, the claims of fabricated evidence were supported inferentially and circumstantially by testimony of government agents and some of the witnesses who allegedly were suborned.

Manning contended that the defendants, and Squad 9 generally, targeted him for retaliation when he terminated his informant status. The evidence supporting this particular contention was meager at best. But this was in no way necessary to support a verdict in Manning's favor. There is no question that the defendants considered Manning to be a dangerous criminal, and as such, he became a focus of investigation. The evidence was sufficient to support the proposition that in their zeal to get Manning off the streets, the defendants-directly and through Buffalo Grove detective Quid-induced witnesses to give false statements implicating Manning, and also produced a false identification of Manning, and concealed all of this from prosecutors and Manning's defense. The evidence was likewise sufficient to support the proposition that the defendants knowingly mischaracterized the purpose of a cash payment to Tommy Dye. To be sure, the evidence was conflicting. But granting a new trial because of such conflicts would invade the jury's province. *See Latino v. Kaizer,* 58 F.3d 310, 315 (7th Cir.1995). It is the function of the jury, not the Court, to choose from conflicting inferences. Though the jury would have been justified in drawing contrary inferences, its verdict was not against the manifest weight of the evidence.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

The Court will briefly discuss the evidence and our reasons for concluding that it supported the jury's findings. Our omission of particular items should be viewed only as reflecting the fact that we are providing a summary of salient points, rather than a complete rendition of the evidence adduced. Our discussion will track the findings that the jury made as reflected on the special verdict form, which we reproduce below.

As indicated earlier, the jury based its verdict with regard to the Missouri kidnapping case on findings that Buchan induced Anthony Mammolito, Carolyn Heldenbrand, and Sharon Dugan to make false statements or fabricate claims about the kidnapping and concealed that information from prosecutors, and that he knew of, and concealed from prosecutors, that a promise had been made to pay money to Mammolito. With regard to the Illinois murder case, the jury based its verdict on findings that Buchan and Miller induced Tommy Dye to make false statements or fabricate claims about the Pellegrino murder and concealed that from prosecutors, and also knowingly mischaracterized to prosecutors the purpose of a $2,000 payment to Dye. The following is a reproduction of the special verdict form as the jury completed it, omitting only the signature lines and the date:

Supplemental verdict form

**\*6** Please answer the questions on this form if, and only if, you find in favor of Mr. Manning on either claim 1 or claim 2 against either Mr. Buchan or Mr. Miller.

1. Has Mr. Manning proved that Mr. Buchan or Mr. Miller knowingly induced or caused other law enforcement officers to induce the following witnesses to make false statements and/or to fabricate claims about the Missouri kidnapping and concealed that information from prosecutors?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

|  | Buchan |  | Miller |  |
|---|---|---|---|---|
| Anthony Mammolito | Yes | [] No | [] Yes | No |
| Carolyn Helden-brand | Yes | [] No | [] Yes | No |
| Sharon Dugan | Yes | [] No | [] Yes | No |
| Charles Ford | [] Yes | No | [] Yes | No |
| Harold Ulmstead | [] Yes | No | [] Yes | No |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

2. Has Mr. Manning proved that Mr. Buchan or Mr. Miller knew that a promise had been made to pay money to Anthony Mammolito and concealed that from prosecutors?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

Buchan                    Miller
Yes          [] No       [] Yes          No

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

3. Has Mr. Manning proved that Mr. Buchan or Mr.
Miller knowingly induced or caused other law enforce-
ment officers to induce the following witnesses to make
false statements and/or to fabricate claims about the
Pellegrino murder and concealed that from prosecutors?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

|  | Buchan | | Miller | |
|---|---|---|---|---|
| Tommy Dye | Yes | [] No | Yes | [] No |
| Joyce Pel-legrino | [] Yes | No | [] Yes | No |
| Ronald Tyrakowski | [] Yes | No | [] Yes | No |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

4. Has Mr. Manning proved that Mr. Buchan or Mr. Miller knowingly mischaracterized to prosecutors the purpose of the $2,000 payment to Tommy Dye that was disclosed to the Illinois prosecutors?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 12

Buchan          Miller

Yes        [] No    Yes        [] No

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

5. Has Mr. Manning proved that Mr. Buchan or Mr. Miller knew, and concealed from the Illinois prosecutors, that Tommy Dye had been paid money (not including benefits or money from the witness security program) beyond the $2,000 that had been disclosed to the Illinois prosecutors?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Buchan                Miller

[] Yes        No      [] Yes        No

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

6. Has Mr. Manning proved that Mr. Buchan or Mr. Miller knowingly destroyed material exculpatory portions of the tape recording of the September 24, 1990 conversation between Mr. Manning and Mr. Dye?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Buchan                    Miller

[] Yes        No          [] Yes        No

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

Missouri kidnapping case

The Court begins with the Missouri kidnapping case, and specifically with the evidence regarding Anthony Mammolito. At the Missouri trials, held in 1991 and 1992,[FN3] Mammolito testified that in 1984, Manning and Gary Engel, acting as part of a plan they hatched along with Mammolito and Thomas McKillip, abducted two men in Kansas City, and that Manning and Mammolito later picked up ransom that was paid for the victims' return.

FN3. The jury deadlocked after the first trial, necessitating a retrial.

**\*7** The events that led to Mammolito's testimony began with an interview in 1989 conducted by Buffalo Grove detectives Robert Quid and Gary Del Re at the Louisiana prison where Mammolito was incarcerated. Quid and Del Re went there to try to obtain evidence implicating Manning in McKillip's November 1986 murder, which they were investigating because McKillip's body had been found in Buffalo Grove. Mammolito bore a grudge against Manning because he considered Manning to be responsible for his (Mammolito's) arrest and prosecution. Mammolito could provide no evidence about McKillip's murder, though he suspected Manning of involvement. When asked if he had anything else on Manning, Mammolito allegedly brought up the Kansas City kidnapping. But at this 1989 interview, contrary to his later testimony at trial, Mammolito said he and *McKillip*-not Manning-had picked up the ransom. Manning's claim regarding the Missouri prosecution concerns, in significant part, the path that led Mammolito from point A (his original statement) to point B (his trial testimony).

The evidence amply supported Manning's contention that Buchan worked in concert with Quid to put together a case to support a prosecution of Manning for the Missouri kidnapping. Each had a motive to succeed in this venture. Quid believed Manning had murdered McKillip but lacked evidence to prosecute him for that crime. As noted earlier, Buchan, along with his fellow Squad 9 members, believed Manning to be a dangerous

criminal, responsible for murders and other serious offenses, but likewise had insufficient evidence to prosecute him for any of this. It is virtually undisputed that Quid importuned Mammolito to provide information that would help put Manning behind bars. The evidence supported a finding that Buchan worked with Quid to achieve this goal.

Following Quid's 1989 interview of Mammolito, Quid and Buchan located and interviewed the kidnap victims. They confirmed that an abduction had occurred but reported they had not seen the kidnappers' faces and thus could not identify anyone. The upshot, given Mammolito's identification of the roles of the kidnappers, was that there was no one, other than co-perpetrators, who could identify Manning as involved. Because Mammolito had told Quid he would not testify, the jury properly could infer that Buchan and Quid had reached a significant, and possibly insurmountable, obstacle in their quest to prosecute Manning.

After encountering this apparent hurdle, Buchan and Quid traveled to Minnesota to interview Carolyn Heldenbrand, who had been identified as having dropped off the ransom. It is only fair to say that this was a logical investigative step: the ransom drop was the only interaction (other than the abduction itself) between the kidnappers and non-perpetrators, and the victims had provided some information to Buchan and Quid that could be claimed to cast doubt on Mammolito's identification of the roles of the claimed participants. That said, one would have expected Buchan and Quid to show Heldenbrand photographs of Mammolito and McKillip, the two persons Mammolito had unequivocally identified as having picked up the ransom, even if they also chose to show her photographs of Manning and Engel. One would have expected this, that is, if the goal of Buchan and Quid were simply to learn what information Heldenbrand had. But Buchan did not even bring photographs of Mammolito or McKillip with him on the trip to Minnesota. Rather, he brought only photographs of Manning and Engel, the two alleged perpetrators who remained at large. The jury was entitled to infer, from (among other things) Buchan's actions as well as the motive evidence de-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

scribed earlier, that Buchan had no intention of conducting an honest identification process, but rather traveled to Minnesota intending to do what was necessary to get Heldenbrand to identify Manning-absent an identification, the kidnap investigation likely would have ground to a halt. *See, e.g.,* Tr. Vol. 6 at 63-64. Such an inference was fully supported by the evidence, and was not against its manifest weight.[FN4]

> FN4. In addition, the jury reasonably could have found from the evidence adduced at trial that under normal circumstances, Buchan would have requested that an FBI agent in Minnesota conduct the interview, and that his determination to do it himself supported Manning's theory that Buchan and Quid planned and conducted the interview intending to obtain an identification of Manning, whatever it took.

**\*8** The jury found that Buchan "knowingly induced ... [Heldenbrand] to make false statements and/or to fabricate claims about the Missouri kidnapping and concealed that information from prosecutors."*See* Special Interrogatory 1. Buchan's use of an identification process that was simply suggestive was not a basis for liability. *See Newsome v. McCabe,* 319 F.3d 301, 305 (7th Cir.2003). Manning could sustain a claim arising from the Heldenbrand episode only upon proof that Buchan had concealed from prosecutors information tending to undercut the identification, in this case, information that Heldenbrand had been induced to make a false identification. *See Newsome v. McCabe,* 256 F.3d 747, 749 (7th Cir.2001). The jury was clearly and unequivocally told this in an instruction given by the Court-an instruction to which defendants interpose no objection in their post-trial motion. The Court can safely conclude, particularly in view of the jury's careful treatment of the special interrogatories, that it understood and followed this instruction. *See, e.g., Jonasson v. Lutheran Child and Family Svcs.,* 115 F.3d 436, 439 (7th Cir.1997); *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.,* 36 F.3d 565, 569 (7th Cir.1994).

If the jury believed Mammolito's original statement identifying himself and McKillip as the ransom-getters was accurate-as it undeniably was entitled to do-then it would have had to conclude that Heldenbrand's identi-

fication of Manning was false. The jury properly could find that it was not merely coincidence, not merely error, and not merely a suggestive procedure, that led Heldenbrand to identify Manning during Buchan and Quid's interview, and ultimately at the Missouri trial. It was entitled to find, based on the circumstantial and other evidence the Court has identified, that Buchan, along with Quid, knowingly and affirmatively prodded Heldenbrand to make a false identification. The evidence was sufficient to permit the jury to infer, without stretching at all, that Buchan went beyond a merely suggestive procedure and knowingly induced Heldenbrand to fabricate an identification of Manning as the ransom-getter, and then withheld this information from the Missouri prosecutors. Such a finding was supported not just by the circumstantial evidence of Buchan's motive, opportunity, and actions, but also by the testimony of plaintiff's expert Gary Wells, which the jury unquestionably was entitled to accept. Wells' testimony supported Manning's contention that investigators had induced Heldenbrand to falsely identify him. *See* Tr. Vol. 6 at 155-68.

The jury was entitled to reject, as lacking in credibility, the testimony of Buchan and Quid regarding (among other things) the Heldenbrand identification. The jury could properly infer from their close work together on a case that was technically outside of their jurisdiction; their common goal of putting Manning behind bars; their readily apparent need to obtain from Heldenbrand information incriminating Manning; and the fact that they traveled to Minnesota without bringing photographs of the two persons who, from Mammolito's statement, likely were the people Heldenbrand had seen, that they entered into an understanding to produce an identification of Manning, whatever it took.

**\*9** The Court also notes that Buchan's demeanor on the witness stand was among the worst this Court has seen in over twenty-four years as a lawyer and a judge. He was combative, belligerent, and unresponsive. One could interpret this as reflecting anger over an unjustified lawsuit. But that certainly was not the only reasonable interpretation. The jury was entitled to infer, as it likely did, that Buchan had harbored, from day one, considerable animus toward Manning; that while testifying he was doing his best to obstruct Manning's

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

presentation of evidence; and that his testimony about the underlying events was not credible. Disbelief of Buchan's denials (or those of Miller and Quid) could not properly form the sole basis for a verdict in Manning's favor. *See* Anderson, 477 U.S. at 256;*see generally,*Wright, Miller & Kane, *supra,* § 2527 at 288. But as the Court has discussed and will discuss, there was much more than this that properly supported the jury's verdict.

It is true, as defendants point out, that Manning and his lawyer were well aware at his Missouri trial of weaknesses in Heldenbrand's identification and the suggestiveness of the photo identification procedure that Buchan used. But they were unaware of purposeful inducement by law enforcement of a false identification. As noted earlier, the jury was unambiguously instructed that to consider the Heldenbrand episode as undisclosed exculpatory evidence, it had to find that "Mr. Buchan did more than simply show Ms. Heldenbrand a suggestive photographic display [but rather that] Mr. Buchan took additional affirmative steps that were not disclosed to the Missouri prosecutors to induce Ms. Heldenbrand to falsely identify Mr. Manning."Tr. Vol. 19 at 24-25. The withholding of this information from prosecutors (and thus from Manning's defense) was a proper basis for imposition of liability, as the jury was instructed.

The evidence permitted the jury reasonably to find that having obtained a false identification of Manning, Buchan and Quid now had what they needed to accomplish their goal of prosecuting Manning. Armed with Heldenbrand's identification, Quid returned to Mammolito and accomplished two things. First, he obtained a new statement from Mammolito in which, contrary to his original statement, he corroborated Heldenbrand by identifying Manning as having picked up the kidnap ransom. Second, he convinced Mammolito to testify against Manning.

The jury properly could find that Mammolito's new statement was false. Among other things, the jury reasonably could find that there was no reason to think Mammolito was mistaken in, or that he had a motive or reason to falsify, his original statement identifying himself and McKillip-not Manning-as the ransom-getters. The circumstantial evidence was sufficient to permit the

jury to infer that Quid was able to procure both Mammolito's belated corroboration of Heldenbrand and his newly found willingness to testify by using Heldenbrand's false identification and by promising to pay Mammolito in return for identifying Manning. Quid denied making any such arrangement, but the jury was not required to believe his denial; there was circumstantial and other evidence that reasonably supported a finding that he and Mammolito reached an understanding for Mammolito to be paid in return for testifying at Manning's trial. The Missouri prosecutors denied any knowledge of such an arrangement. The jury was entitled to believe them.[FN5]

> FN5. Defendants point out that the prosecutors received before trial a letter from Mammolito claiming a right to payment. But what was significant was whether a deal had been made. The prosecutors said they had no knowledge of that, and no such deal was disclosed to Manning's defense counsel.

**\*10** It is true, as defendants have consistently pointed out, that Manning was fully aware at his two Missouri trials of the change in Mammolito's version of the events. Manning was completely in the dark, however, about any deal to pay Mammolito money. He likewise was unaware of the circumstances that led to Mammolito's changed version regarding Manning's alleged role in the kidnapping; Quid's report of his post-Heldenbrand meeting with Mammolito, at which Mammolito evidently changed his story, was inexplicably missing from the Buffalo Grove police department's files. The jury was entitled to find that Quid convinced Mammolito to change his story and falsely implicate Manning, and that this was concealed from the prosecutors, and thus from Manning's defense.

Defendants contend there was no basis in the evidence that would permit the jury to conclude that Buchan was aware of a deal between Quid and Mammolito. The Court disagrees. The evidence showed that Quid worked hand in hand with Buchan in the Missouri kidnapping investigation. And, as Manning points out in his response to defendants' motion, "the reality is that [the Missouri investigation] was Buchan's case, not Quid's."Pl. Resp. at 14. The jury properly could infer,

Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

based on these factors, that Quid would not have made a deal with Mammolito without letting Buchan in on it and would not have importuned Mammolito to change his story without Buchan's knowledge. The jury was not required to accept Quid's and Buchan's contrary testimony.

Buchan was the primary law enforcement liaison with the Missouri prosecutors. The jury's finding that he knew of but failed to disclose to them an arrangement with Mammolito to be paid for testifying, together with its findings regarding the inducement of Mammolito and Heldenbrand to testify falsely, were sufficient for the jury to find Buchan liable on Manning's claim regarding the Kansas City kidnapping. For the same reasons, that finding, though certainly subject to reasonable debate, was not against the manifest weight of the evidence.

Sharon Dugan testified at Manning's Missouri trial that she took Gary Engel (who was then her husband) to the airport in Chicago so he could catch a flight to Kansas City, Missouri on some date prior to the kidnapping, and that Manning met Engel at the airport. Dugan also identified a ring that she said Engel had given her, which one of the kidnap victims testified looked like a ring the kidnappers had taken from him. Manning claimed that Dugan was fed information and was induced to testify falsely against him.

The evidence supporting the jury's finding that Buchan induced Dugan to provide false information implicating Manning was, to be sure, thinner than the evidence regarding Mammolito and Heldenbrand. But even here, the Court cannot say that the finding was against the manifest weight of the evidence. There was evidence that supported a reasonable inference that Buchan exploited, and perhaps created, a motive for Dugan to falsely implicate Manning. In addition, Dugan admitted that she had no recollection of mentioning Manning when first questioned by the authorities, and that she brought up Manning's name only after Buchan became involved. The jury was not required to accept Dugan's explanation of this; it was entitled to believe that Buchan fed her information to enable, and to corroborate, her statement implicating Manning, and withheld that significant fact from the Missouri prosecutors.[FN6]

[FN6.] Though Manning's defense was aware of this and other inconsistencies in witnesses' accounts, there is a difference between an inconsistency and a made-up lie. What the jury found had not been disclosed was law enforcement's deliberate fabrication of deceptive accounts by witnesses.

**\*11** Even were the Court to determine that the evidence did not support, or was manifestly contrary to, the jury's finding about Dugan, that would not require entry of judgment for Buchan or granting him a new trial on the Missouri claim. The jury's amply-supported findings regarding Heldenbrand and Mammolito were more than sufficient to sustain its verdict in Manning's favor on the Missouri kidnapping claim, even without the Dugan evidence. Indeed, the jury's finding regarding Heldenbrand alone was sufficient to support its verdict in Manning's favor against Buchan on the Missouri claim. In short, even were the Court to conclude that the jury's finding regarding Sharon Dugan was against the manifest weight of the evidence, the error would not require a new trial.

### Illinois murder case

The jury's findings that Buchan and Miller knowingly induced Tommy Dye to provide false evidence and withheld this information from prosecutors, and that they knowingly mischaracterized to Illinois prosecutors the purpose of a $2,000 payment to Dye, likewise were supported by the evidence and were not against its manifest weight.

Dye was a jailhouse informant who the FBI arranged to be placed near Manning while he was incarcerated at the Cook County Jail awaiting extradition to Missouri. Dye befriended Manning and engaged him in a number of conversations. During some of these conversations, Dye was wearing a recording device supplied by the FBI.

Manning was prosecuted for James Pellegrino's murder largely on the strength of Dye's claim that while in jail, Manning told him he had killed Pellegrino. Manning was convicted and sentenced to death. Though the Illinois prosecutors also presented other evidence, there was evidence supporting a finding that Dye's testimony

was crucial to obtaining a conviction.

Dye's credibility as a witness against Manning was subject to serious question due to his background and the fact that he was getting a significant break on his sentence in return for testifying. Critically, however, Dye testified at Manning's trial that his claim about Manning was corroborated by one of the tape recordings he had made. The recording itself provided only equivocal support for Dye's claim-and Manning's defense counsel were obviously aware of this. But Dye's contention was made believable, at least in part, by his testimony that the key portion of the recording was somewhat garbled because the microphone had been "capped off," preventing proper recording, because he was bent over at the time.

At trial in the present case, Manning denied involvement in Pellegrino's murder and also denied making any admissions to Dye. The jury was entitled to credit his testimony and thus to conclude that Dye fabricated the purported admission. The jury's belief of Manning's denial of involvement in Pellegrino's murder and its determination that Dye made up Manning's purported admission would not, without more, support a verdict against Buchan or Miller on the Illinois murder claim. For that, as the jury was instructed, there had to be evidence sufficient for the jury reasonably to find that Buchan and Miller induced Dye to make false statements and/or fabricate claims about the Pellegrino murder and concealed this from prosecutors. *See generally Manning v. Miller, 355 F.3d 1028, 1033 (7th Cir.2004).*

*12 There was a sufficient basis in the evidence for the jury to find not only that Buchan and Miller had both the motive and the opportunity to induce Dye to make up a story, but that they actually did so. The evidence that they importuned Dye to make up out of whole cloth that Manning had made statements about the Pellegrino murder certainly was not overwhelming. But there were enough irregularities in the FBI's investigative steps that the jury, if it concluded (as it was entitled to do) that the defendants had a motive to make a case against Manning, properly could find that they importuned Dye to fabricate a story that Manning had admitted killing Jimmy Pellegrino. We summarize certain of the import-

ant irregularities, not as a necessarily exhaustive list, but to illustrate the point.

- The jury properly could find, as Manning argued, that the original rationale for placing an informant with Manning at the Cook County Jail was fabricated by Buchan. Buchan's supervisor Michael Taylor testified that he approved recruiting an informant based on Buchan's report that an informant Buchan had used in another case, Curtis Stover, claimed that Manning had made an imminent threat to harm witnesses. But Buchan prepared no memorandum documenting the purported tip, and a later interview of Stover (after Dye had already been recruited) not only produced no reference to any threat, but also established that Stover had no interaction with Manning that could have given a basis for the claim of an imminent threat. *See* Tr. Vol. 12 at 158-59.

- One of the early debriefing memoranda regarding Dye's interactions with Manning reflected a claim that Manning told Dye he had killed a man named Chuckie English. It was later shown that Manning could not have committed the murder. The jury reasonably could find no admission had been made, that Dye had to get the information from someone, and that the most likely source was law enforcement.

- The report prepared upon debriefing Dye after the conversation in which he later testified that Manning made the admission contained no reference to it.[FN7]

> [FN7.] Defendants' contention that if they were actually manufacturing false evidence, they would have done a better job of it, *see* Def. Mem. at 22, is certainly a viable argument to present to a fact finder, but it is not a basis to overturn the verdict.

- There were arguable irregularities in the timing of the preparation of certain FBI reports by Miller regarding debriefing sessions with Dye.
- There was evidence supporting a reasonable inference that Buchan and Miller spent time with Dye far beyond what was arguably needed to prepare the transcripts of the recorded conversations-meetings which were not documented by debriefing memoranda. This supported a finding that Dye's dramatically improved rendition of details about the Pellegrino murder had come from the

agents.

- The evidence supported Manning's claim (discussed below) that Miller had knowingly mischaracterized to Illinois prosecutors the basis for a $2,000 payment to Dye. FN8

> FN8. We have not addressed, because it is immaterial to the sufficiency of the evidence to support the jury's findings, Dye's claim that he was provided with conjugal visits at FBI offices. But we reject as unsupported defendants' contention that the jury "very likely [rejected Dye's] conjugal visits claim." Def. Mem. at 21. Their contention that "no reasonable jury could find Dye's story about conjugal visits credible," *id.,* is likewise without basis. The only evidence the jury heard was Dye's claim and denials offered by the defense, and it would not have been inherently unreasonable for the jury to accept the former and reject the latter.

The proposition that no admission actually appeared on the Dye-Manning tape recording was, without question, known and available to Manning's attorneys at his criminal trial and thus cannot be said to have been concealed. But the jury properly could conclude that Dye fabricated the claim of a tape recorded admission at the insistence of Miller and Buchan (during their numerous sessions together), that corroboration was needed, and that they planted the story that Dye used to explain the absence of clear evidence on the recording. Neither of these points, which the jury reasonably could find to be not only material but critical to the case against Manning, had been disclosed to the Illinois prosecutors or were known to Manning's defense counsel.

**\*13** At Manning's Illinois trial, Dye testified that the portion of the tape recording containing the purported admission was less than clear because Dye had been bent over, causing the microphone to be capped off. At the trial in the present case, Miller testified under oath that he had come up with the idea that the microphone had been interfered with, Tr. Vol. 4 at 110-11, a significant fact never disclosed to the Illinois prosecutors and thus unknown to Manning at his Illinois trial. The

jury reasonably could find that Miller had importuned Dye to fabricate evidence and concealed that from prosecutors, and that Buchan was aware of this given their close working relationship. There was a reasonable basis to find that this story was a material element in establishing and corroborating Dye's credibility as a prosecution witness.

The evidence also supported a finding that Buchan and Miller fed Dye significant details regarding the Pellegrino murder that Dye in turn incorporated into his claims regarding Manning's purported admissions-another fact (if found by the jury) that was not disclosed to Illinois prosecutors or Manning's defense. Dye's testimony included significant details about the murder that were never referenced in the interview memoranda of the debriefings of Dye, or for that matter in any memoranda that Buchan or Miller prepared. The interview memoranda were summaries, and Dye had been with Manning at the jail on occasions other than those when he was wearing a recording device. But the jury was entitled to believe Manning's testimony that he had never talked to Dye about Pellegrino-leaving defendants as the most likely alternative source of information (as the details Dye provided were evidently correct). Indeed, though Dye contended at trial that his testimony about Manning's admissions was true, *see* Tr. Vol. 9 at 130, 155, he also admitted that he was "coached" by Buchan and Miller and was fed information by both. Tr. Vol. 9 at 124-25, 155.

The evidence was also amply sufficient to support the jury's finding that the defendants misrepresented to Illinois prosecutors the basis for a $2,000 payment to Dye. Miller wrote the prosecutors a letter in which he stated that "the FBI paid $2,000 to Thomas Dye as reimbursement for expenses that he incurred while acting at the Government's request for the period from August, 1990 to January, 1992. He was paid no monies prior to this and has been paid no monies since that time nor has he received any other form of compensation from the FBI." PX 4. Based on the evidence presented at trial, the jury was entitled to find that Dye in fact had no "expenses," that Miller knew it, and that he likewise knew full well that the payment was, quite simply, a *quid pro quo* for Dye's testimony against Manning. The jury was likewise entitled to find that the misrepresenta-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

tion was material, due to the different connotation of a payment for testimony as compared with a reimbursement of out of pocket expenses, and based on the testimony-largely undisputed-that a straight payment for testimony is viewed as improper. The jury was also entitled to infer from the close working relationship that Buchan and Miller had with each other, and with Dye, that Buchan was likewise aware of the misrepresentation and that he decided to go along with it. Though the Court agrees with defendants that this alleged misrepresentation by itself likely would not be considered material with respect to Manning's Illinois conviction, it was a factor that the jury reasonably could have found was an important element in misleading the Illinois prosecutors and Manning's defense.

**\*14** Defendants point out that the Ronald Tyrakowski and Joyce Pellegrino provided testimony at Manning's Illinois trial that supported a finding of guilt and that the jury did not find had been fabricated. But the jury was entitled to find, indeed the evidence was quite persuasive, that the believability of Dye's testimony at the Illinois trial-a factor buttressed by the allegedly fabricated explanation of the tape recording's vagueness and Dye's rendition of details about the Pellegrino murder-was the key factor in securing Manning's conviction.

Finally, we address defendants' argument that Manning's testimony was not believable and that the jury's acceptance of it was unreasonable. The Court disagrees. It is the jury's province to decide which witnesses to believe. *See Kasper v. St. Mary of Nazareth Hosp.,* 135 F.3d 1170, 1173 (7th Cir.1998). Though a court may enter judgment for the opposing party (or grant a new trial) when "objective evidence shows it would be unreasonable to believe a critical witness for one side," *id.,* this is not such a case. To be sure, defendants offered plenty of evidence to impeach Manning's credibility. This included his prior convictions (of which one was for fraud) and his attempt to manufacture a false alibi for the Missouri kidnapping in 1989 while incarcerated with Dye at the Cook County Jail. But this impeachment and the other factors cited by defendants are not enough to put this case into the narrow category of those in which acceptance of a witness's testimony is unreasonable as a matter of law. Juries are often asked to rely on critical testimony from convicted felons, wit-

nesses who have committed prior frauds, and witnesses that stand to gain from acceptance of their testimony-and sometimes on critical testimony from witnesses who fall into each of these categories (the most common occasions are in criminal cases). There is no rule of law that a jury may not reasonably believe the testimony of such a witness, or that the verdict of a jury that believes such a witness is against the manifest weight of the evidence. *See, e.g., United States v. Beverly,* 913 F.2d 337, 358 (7th Cir.1990). Moreover, as the Court has discussed, Manning's testimony was far from being the only evidence that supported his claims in this case.

Finally, if the defendants are suggesting-as they have at various junctures-that it is inherently implausible that law enforcement agents like the defendants would risk their careers by fabricating evidence, the Court rejects the suggestion. There are, sadly, more than a few documented instances of such behavior. In addition, the evidence revealed a sufficient basis for the jury to find the defendants were not credible in their testimony. We have already discussed defendant Buchan. With regard to defendant Miller, the evidence permitted the jury reasonably to find that he had suggested to Dye a phony explanation for the absence of a clear admission by Manning on tape; that he knowingly gave prosecutors a false description of the basis for paying Dye $2,000; and that in his past he had perpetrated a fraud on a fellow FBI agent who was not perceived as a team player. In sum, the jury's acceptance of Manning's testimony did not render its verdict legally infirm or against the manifest weight of the evidence.

### Conclusion

**\*15** For the reasons stated above, the Court denies defendants' motion for judgment as a matter of law or alternatively for a new trial [docket # 228-1 & 2, 227-1].

N.D.Ill.,2005.
Manning v. Miller
Not Reported in F.Supp.2d, 2005 WL 3078048 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.