1    Q.   Is it your memory that you were shown
2  photos of Mrs. Brow at some point while in
3  court?
4         MR. FELDMAN:  Objection.
5    A.   It might have been.  I'm telling you I
6  don't remember where.  I remember seeing them
7  but I don't know where I was.
8    Q.   As you sit here today are you able to
9  testify that at any time Nancy Taylor, Chief
10  Connors or any other Ayer Police officers showed
11  you photographs of Mrs. Brow?
12    A.   No, I can't say it wasn't them.
13    Q.   Can you say it was them?
14    A.   No, because I don't remember who it
15  was or where.  I remember seeing them.
16         (Discussion off the record).
17         (Short recess).
18    Q.   Back to page 2 of your Affidavit
19  please, Miss Marsh.  Sorry.  Actually beginning
20  on paragraph eight on the first page.
21         You state in your Affidavit at the
22  pre-trial hearing and the trial I testified to
23  some things that were not true and were
LEAVITT REPORTING, INC.

1    MR. FELDMAN:  Objection.
2    A.   He asked me questions.  I don't know.
3  I don't exactly remember what they were.
4    Q.   Did he suggest to you what he felt the
5  police had done wrong?
6         MR. FELDMAN:  Objection.
7    A.   No, not at all.
8    Q.   Do you personally have any expectation
9  of financial gain should the plaintiff, the
10  estate of Mr. Waters, prevail in this case?
11    A.   No.
12    Q.   Good enough.
13         MR. TEHAN:  I'm done.  I may have
14  some re-cross but I'm done.  Do you need to take
15  a break?
16         MR. FELDMAN:  No.
17  **Examination by Mr. Feldman:**
18    Q.   **Goo**d afternoon, Miss Marsh.  As you
19  know my name is Rob Feldman and I'm going to ask
20  you a few questions.  And as Attorney Tehan
21  mentioned, if there's any questions you don't
22  understand the way I'm asking, tell me and I
23  will try to rephrase them in a way that's more
LEAVITT REPORTING, INC.

1  suggested to me.  Some of these things are:  And
2  the first is; I called the diner the night of
3  May 20, 1980 after Kenny had left to go to work
4  there and asked to speak with Kenny but I was
5  told he was not there.  That never happened.
6         Did you tell Mr. Scheck that you
7  had never attempted to reach Kenny Waters at
8  work on May 20, 1980?
9    A.   Yes.
10    Q.   But today you don't recall that one
11  way or the other, correct?
12         MR. FELDMAN:  Objection.
13    A.   I don't know.
14    Q.   Do you see at paragraph eight you say
15  some things were not true and were suggested to
16  me.  Do you see that on the first page?
17    A.   Yep.
18    Q.   In your meeting with Mr. Scheck did he
19  suggest any facts that he believed to be true in
20  the case to see if you agreed with him?
21    A.   Did he what?
22    Q.   Suggest any facts to you that he felt
23  were true to see if you agreed with him?
LEAVITT REPORTING, INC.

1  clear.
2         I'm going to ask you some
3  questions about Exhibit Six which I think you
4  have in front of you which is the Affidavit
5  signed on April 18, 2001.
6         Before I do, I just want to ask
7  you a couple of questions about Robert Osborne.
8  Do you recall whether Mr. Osborne ever informed
9  the Ayer Police that what he had told them about
10  your knowledge concerning the Brow murder, did
11  he ever tell you that he had informed the Ayer
12  Police that what he told them wasn't true?
13         MR. TEHAN:  Objection to the form.
14    A.   He did call them.  And I said this
15  this afternoon.  He called them and said that
16  for a thousand dollars he could get me to change
17  my testimony because it wasn't true.
18    Q.   Did he ever tell you who he spoke
19  with?
20    A.   No, he didn't.  He just said he called
21  the Ayer Police.
22    Q.   And he told you that?
23    A.   I don't know how I heard it, but yeah,
LEAVITT REPORTING, INC.

1 I believe it came from him.

2 Q. Do you know whether Mr. Osborne was

3 ever provided anything of value by the Ayer

Police Department?

5 A. No, I don't.

6 Q. He never told you one way or the

7 other?

8 A. No. He knew better.

9 Q. Now, going to Exhibit Six, the

10 Affidavit, at the time you signed this Affidavit

11 to the best of your knowledge and memory were

12 the statements in the Affidavit true?

13 A. Yes.

14 Q. When you agreed to provide this

15 Affidavit which is Exhibit Six, you didn't agree

16 to provide the Affidavit because you in some way

17 had loyalty to Ken Waters?

18 A. Absolutely not.

19 Q. In fact, at the time you signed this

20 Affidavit in 2001 if anything you still probably

21 felt -- had less than good feelings about

22 Kenneth Waters, correct?

23 A. Right.

LEAVITT REPORTING, INC.

---

1 ability to describe in full detail what happened

2 in connection with your participation in the

3 prosecution of Kenneth Waters, you were happy to

4 be able to tell the complete story?

5 A. Yes.

6 Q. Is the complete story concerning your

7 interactions with Nancy Taylor and the Ayer

8 Police Department described in paragraphs one

9 through nine in this Affidavit, Exhibit Six?

10 MR. TEHAN: Objection.

11 A. Yes.

12 Q. Do you recall in 2001 after providing

13 this Affidavit meeting with a district attorney

14 named Sheila Calkins?

15 A. Yes.

16 Q. Do you recall telling Assistant

17 District Attorney Calkins essentially the same

18 things that were described in the Affidavit?

19 MR. TEHAN: Objection.

20 A. Yes.

21 Q. I'm going to ask you some specific

22 questions about specific paragraphs and then I

23 don't think I have much else to ask you. You

LEAVITT REPORTING, INC.

---

202

1 Q. Did you have an understanding at the

2 time you agreed to sign this Affidavit that it

3 might be used in connection with efforts to help

4 free Mr. Waters?

5 A. Yes.

6 Q. I'm going to ask you a couple of

7 questions. You described a meeting with

8 Attorney Barry Scheck. To the best of your

9 memory you met with him prior to executing this

10 Affidavit?

11 A. Uh-huh.

12 MR. TEHAN: Could I press for an

13 answer. It was ambiguous. She said uh-huh.

14 Q. Would you answer --

15 A. Yes.

16 Q. In connection with that meeting with

17 Attorney Scheck did he in any way pressure

18 you --

19 A. No.

20 Q. -- to submit an Affidavit?

21 A. No.

22 Q. In fact, is it fair to say that by the

23 time you met with Attorney Scheck in 2001 your

LEAVITT REPORTING, INC.

---

204

1 read this carefully enough before you signed it

2 to correct some typographical errors, correct?

3 A. Right.

4 Q. Someone, whoever prepared the

5 document, apparently spelled Ayer AYRE as far as

6 you remember?

7 A. Uh-huh. Yes.

8 Q. Attorney Tehan asked you about a

9 warrant Affidavit, a search warrant Affidavit

10 that's referenced in paragraph one of this

11 document, Exhibit Six. I think you answered you

12 don't recall actually reading it?

13 A. Right.

14 Q. But you have no reason to believe that

15 you didn't review it, right?

16 A. Correct.

17 Q. I mention it because paragraph three

18 picks up. I'm just going to quote from it. It

19 says the Affidavit, and I believe it's referring

20 to the search warrant Affidavit mentioned in

21 paragraph one.

22 It says that I told the male

23 informant that Kenny Waters told me -- then

LEAVITT REPORTING, INC.

205

1  there's a quote within a quote, "that he had
2  killed a woman in Ayer in a breaking and
3  entering and that she (female) had better keep
4  in line or he could do the same to her."  Do you
5  see that?
6      A.   Yes, I do.
7      Q.   The sentence in paragraph three goes
8  on to say that this informant further said that
9  the female remembers washing Waters' blood
10  soaked clothing for him the day of murder but
11  that Waters explained the blood as coming from
12  his duties of meat cutting at his place of
13  employment.  Do you see that?
14     A.   Yes.
15     Q.   Do you recall that Mr. Osborne had
16  apparently told Nancy Taylor and the Ayer Police
17  that you helped Kenny wash his clothes on the
18  morning after the murder?
19     A.   Yes.
20     Q.   That wasn't true, correct?
21     A.   Right.
22     Q.   To the best of your memory you never
23  told Nancy Taylor or the Ayer Police that this

LEAVITT REPORTING, INC.

206

1  statement was attributed to you by Mr. Osborne,
2  correct?
3      A.   Right.
4      Q.   Do you recall whether Officer Taylor
5  specifically asked you whether you had assisted
6  washing bloody clothes?
7      A.   I don't remember.
8      Q.   But you don't have any memory of ever
9  telling her that, correct?
10     A.   No.
11     Q.   The Affidavit goes on.  In paragraph
12  four it says the statements the male informant
13  attributes to me are false.  Kenny Waters never
14  told me that he killed a woman in Ayer in a
15  breaking and entering and he didn't threaten to
16  quote "keep me in line" or he would do the same
17  to me.  He never came home the day of the murder
18  in clothing soaked in blood and explained the
19  blood as coming from his duties of meat cutting.
20  I never told anything like that to Robert
21  Osborne.  That's true, correct?
22     A.   Yes.
23     Q.   The next paragraph, paragraph five,

LEAVITT REPORTING, INC.

207

1  says Miss Marsh, one day, probably in October of
2  1982 Police Officer Nancy Taylor and Chief
3  Connors showed up at my house asking me about
4  the Brow case.
5          Do you remember if they actually
6  physically came to your house or was that the
7  evening you went to Maxwell Silverman's or do
8  you not recall specifically when they came to
9  your house?
10     A.   I don't remember.
11     Q.   This paragraph goes on to say in
12  paragraph five of the Affidavit, they told me
13  that they knew I had information about Katy
14  Brow's murder, that I would be charged as an
15  accessory after the fact and receive ten years
16  in state prison if I didn't help them and that I
17  could lose my children.
18         You testified earlier today I
19  believe that's something that sticks out in your
20  mind?
21     A.   Yes.
22     Q.   Based on what I understood your
23  testimony this morning, did you have concern in

LEAVITT REPORTING, INC.

208

1  1982 that there was a chance that you might lose
2  custody of your children?
3      A.   Yes.
4      Q.   Of things that were important to you
5  in 1982, would losing your children be among the
6  things that would give you the most concern?
7      A.   Yes.
8      Q.   When they told you, Officer Taylor and
9  Officer Connors, that you if you didn't help
10  them that you might lose your children, did you
11  believe that they meant what they said?
12     A.   Yes, I did.
13     Q.   Did they explain to you how they would
14  cause you to lose custody of your children?
15     A.   Charges of accessory after the fact.
16     Q.   Paragraph six says, I'm reading from
17  the paragraph, on a number of occasions before I
18  testified for the first time on November 5, 1982
19  Nancy Taylor and Chief Connors met with me and
20  repeated these threats if I didn't cooperate
21  with them.  I'm going to ask you, did I read
22  that accurately?
23     A.   Yes, you did.

LEAVITT REPORTING, INC.

209

1   Q.  When it says that they repeated the
2   threats if you didn't cooperate with them, did
3   you understand cooperate with them to mean -- in
4   your use of the term in the Affidavit, do you
5   mean to say that if you didn't give them the
6   information Robert Osborne said you possessed
7   they would make good on the threats?
8       MR. FELDMAN:  Objection.
9   A.  Yes.
10  Q.  Then you go on in the same paragraph,
11  the first meeting was with both of them and
12  Robert Osborne at Maxwell Silverman's
13  restaurant?
14  A.  Yes.
15  Q.  You discussed that a little earlier
16  with Attorney Tehan, correct?
17  A.  Yes.
18  Q.  It says, at that meeting I was
19  confronted with statements Osborne had made to
20  them about what he claimed I said about the Brow
21  case.  I denied that I made the statements
22  Osborne claimed I made and Taylor and Connors
23  kept saying if I didn't cooperate I would be
        LEAVITT REPORTING, INC.

211

1   mean that they did not accept your denial of
2   knowledge of what Osborne said you knew and
3   instead wanted you to agree with what Osborne
4   had said you knew?
5       MR. FELDMAN:  Objection.
6   A.  Yes.
7   Q.  In paragraph seven it says there were
8   a number of meetings where I was picked up and
9   brought to Cambridge for interrogation before I
10  testified.  I do not remember when I first began
11  to go along with what they were suggesting, but
12  I was very frightened and scared.
13      First I'm going to ask you about
14  the second sentence.  The they was Taylor and
15  Connors, the police?
16  A.  Yes.
17  Q.  And I can see from the paragraph that
18  you don't have a specific recollection of a
19  particular moment in time where you decided to
20  go along with what Taylor and Connors were
21  suggesting.  But is it fair to say, Miss Marsh,
22  that at some point in time the pressure and
23  threats resulted in you agreeing to --
        LEAVITT REPORTING, INC.

210

1   charged as an accessory and lose my kids.  Did I
2   read that correctly?
3   A.  Yes.
4   Q.  I'm going to ask you specifically
5   about the last sentence.  It says here in your
6   Affidavit, I denied that I made the statements
7   Osborne claimed I made.
8       Does this help refresh your memory
9   as to whether at the Maxwell Silverman's meeting
10  you at least initially told Officers Taylor and
11  Connors that you didn't make the statement that
12  Osborne said you made?
13      MR. FELDMAN:  Objection.
14  A.  Yes.
15  Q.  Do you remember what reaction they had
16  when you told them other than what is said here
17  in your Affidavit?
18  A.  Not really.
19  Q.  Just that they kept saying, repeating
20  to you if you didn't cooperate you'd be charged
21  as an accessory and lose your kids?
22  A.  Right.
23  Q.  Did you understand their response to
        LEAVITT REPORTING, INC.

212

1   A.  Yes.
2   Q.  -- to give them the information they
3   were looking for?
4       MR. FELDMAN:  Objection.
5   A.  Yes.
6   Q.  That information was the information
7   Osborne said you had?
8   A.  Yes.
9   Q.  It says here at the end of paragraph
10  seven you were frightened and scared.  Was that
11  true?
12  A.  Yes.
13  Q.  Did you remain frightened and scared
14  of the Ayer Police Department and losing your
15  children from your first interaction in person
16  at the night of the dinner at Maxwell
17  Silverman's right through 1985 when you in
18  Exhibit Five had occasion to give testimony once
19  again --
20  A.  Yes.
21  Q.  -- in the Waters' matter?
22  A.  Yes.
23      MR. TEHAN:  I'll object.
        LEAVITT REPORTING, INC.

213

1    Q.   I'm going to turn to paragraph eight
2  which I believe there's actually two paragraph
3  eights, but I will ask you about the first one
4  that starts on page 1 and goes on to page 2.
5         Miss Marsh, it says in paragraph
6  eight that there are certain things that were
7  suggested to you that resulted in your
8  testifying to them at trial and at a pretrial
9  hearing.
10        Paragraph eight A says one of the
11 things that were suggested to you says A) I
12 called the diner the night of May 20, 1980 after
13 Kenny had left to go to work there and asked to
14 speak to Kenny but I was told he was not there.
15 And you go on to say that never happened?
16    A.   Uh-huh.
17    Q.   Do you remember earlier today Attorney
18 Tehan asked you about that and I think I
19 understood you to say you really couldn't say
20 one way or the other whether on the night before
21 the murder you had called the diner?
22    A.   Right.
23    Q.   Now I'm going to ask you a question
             LEAVITT REPORTING, INC.

214

1  that is to the best of your memory.  Do you have
2  any memory of calling the diner on the night
3  before Miss Brow's murder and being told Kenny
4  was not there?
5    A.   No, I don't.
6    Q.   When you answered Attorney Tehan and
7  you said you can't say one way or the other, did
8  you mean to say it's conceivable that you did
9  but you have absolutely no memory of it?
10    MR. FELDMAN:  Objection.
11    A.   No.
12    Q.   So you don't think you called the
13 diner that night?
14    MR. FELDMAN:  Objection.
15    A.   No, I don't think I did.
16    Q.   And do I understand your testimony to
17 be the reason why ultimately you had indicated
18 that you may have called the diner that night
19 and was told Kenny was not there is because that
20 was what was suggested to you by Officer Taylor
21 and Officer Connors?
22    MR. FELDMAN:  Objection.
23    A.   Yes.
             LEAVITT REPORTING, INC.

215

1    Q.   Paragraph B says, I testified that the
2  morning of May 21, when Kenny came home he had a
3  scratch on the left side of his face.
4         Is it fair to say you have no
5  memory of Kenny Waters coming home on the
6  morning of May 21 with a scratch on his face,
7  correct?
8    A.   Right.
9    Q.   The Affidavit goes on to say, had a
10 scratch on the left side of his face from under
11 the eye to below the mouth several inches that
12 he didn't have before he left for work.
13        Your last sentence in this
14 paragraph says, this is not true.  I know it was
15 being suggested by Nancy Taylor but I don't know
16 where she came up with it.
17        Miss Marsh, is it fair to say that
18 the reason why you had indicated at some point
19 that Waters came home on the morning of the 21st
20 with a scratch on his face is because that's
21 what Nancy Taylor had suggested you should say?
22    MR. FELDMAN:  Objection.
23    A.   Yeah.  Yes.
             LEAVITT REPORTING, INC.

216

1    Q.   I'm going to jump down to paragraph
2  eight D, so we're one more from the last one.
3  It's a long one but I'll read it quickly if the
4  court reporter will allow me to.
5         I testified that in July of 1980
6  Kenny and I had an argument.  He came in drunk,
7  had on new clothes and a new hat and dumped beer
8  over my head and hit me in the back of legs with
9  a plastic bat.  That part is true.  It's also
10 true that I left after this incident and he
11 didn't know I was leaving.  What isn't true and
12 was part of my testimony is that I asked Kenny,
13 "did you kill that woman there?"  And he said,
14 "yeah, what's it to you."  Kenny never said he
15 killed anyone and no statements like that were
16 made by Kenny the night I left.
17        I understood from earlier today
18 you have no memory and you do not believe Kenny
19 Waters ever told you he killed Miss Brow,
20 correct?
21    A.   Correct.
22    Q.   The last sentence in paragraph E, I'm
23 not going to read the whole paragraph, the
             LEAVITT REPORTING, INC.

217

1 reason I testified that it was Kenny's knife is
2 that Nancy Taylor kept telling me it was Kenny's
3 knife and I should so testify. Do you see that?
4     A.  Yes.
5     Q.  Do you remember being encouraged to
6 testify that the photograph of the knife you
7 were shown was Kenny's knife because that's what
8 Nancy Taylor wanted you to say?
9         MR. FELDMAN:  Objection.
10     A.  Yes.
11     Q.  No one in the Waters family has
12 threatened you with any harm or anything over
13 the last twenty years, have they?
14     A.  No.
15     Q.  When you testified at trial and the
16 pretrial hearing, some of the testimony's been
17 marked as Exhibit Three, Four, Four A and Five,
18 you didn't provide that testimony, Miss Marsh,
19 because you were scared of Kenny Waters, did
20 you?
21     A.  No.
22     Q.  In fact, your testimony was the result
23 of your desire to do what the Ayer Police
               LEAVITT REPORTING, INC.

218

1 Department was asking of you?
2     A.  Exactly.
3         MR. TEHAN:  Objection.
4     Q.  If pressure was not applied to you as
5 you described it earlier today by Officer Taylor
6 and the Ayer Police Department, would you have
7 testified the way you testified at Mr. Waters
8 trial?
9         MR. TEHAN:  Objection.
10     A.  No.
11     Q.  At least a large part of your
12 motivation for providing the testimony that you
13 gave was to make sure that you were able to
14 continue to raise your son and daughter,
15 correct?
16     A.  Correct.
17     Q.  Based on things Officer Taylor said to
18 you, did you ever form a belief as to whether
19 she understood that she was pressuring you?
20         MR. FELDMAN:  Objection.
21     A.  Repeat that please.
22     Q.  Did you have a sense as to whether
23 Officer Taylor knew that she was pressuring you?
               LEAVITT REPORTING, INC.

219

1     A.  Yes.
2         MR. TEHAN:  Objection on the basis
3 it's speculative.
4     Q.  Upon what did you base that?
5         MR. TEHAN:  Objection.
6 Speculative.
7     A.  It was the way she was putting things
8 to me.
9     Q.  You were asked certain questions today
10 about your trial testimony and whether or not it
11 was truthful. I'm not going to ask you that
12 question, Miss Marsh. I'm just going to ask
13 you, have you over the last several years since
14 you provided the Affidavit and since Mr. Waters'
15 release, have you ever had any concern for your
16 own welfare with respect to any potential
17 perjury charges?
18     A.  No.
19     Q.  When I say concern, as you sit here
20 today do you have any concern that the Ayer
21 Police Department or the District Attorney's
22 Office might try to mischaracterize what
23 happened in the early 1980's as perjury.
               LEAVITT REPORTING, INC.

220

1         MR. TEHAN:  Objection.
2     A.  No.
3         MR. FELDMAN:  I don't believe I
4 have anything else at the moment for this
5 witness.
6         MR. TEHAN:  I have a couple more.
7 **Examination by Mr. Tehan:**
8     Q.  Miss Marsh, you knew that when you
9 testified under oath at criminal proceedings
10 involving Mr. Waters that your testimony was
11 subject to the pains and penalties of perjury,
12 correct?
13     A.  I guess so.
14     Q.  Well, you knew that, right?
15     A.  Yeah.
16     Q.  And also you knew that perjury was a
17 crime, correct?
18     A.  Yes.
19     Q.  And you knew that if convicted of
20 perjury at the Waters trial you might go to
21 jail, correct?
22     A.  Yes.
23     Q.  And you knew you might lose your kids
               LEAVITT REPORTING, INC.

221

1   in that event, true?

2       A.   Yes.

3       Q.   Do you have any reason to believe that
Mr. Osborne did not make the statements to the
Ayer Police which they attributed to him in
6   their discussions with you?

7       A.   He made those statements to them.

8       Q.   You mentioned that you met with
9   Assistant District Attorney Calkins at some
10  point, Sheila Calkins?

11      A.   Uh-huh.

12      Q.   When did that take place?

13      A.   May or June of '01, maybe even April.
14  I don't know.

15      Q.   Was that before or after Mr. Waters
16  was released from jail?

17      A.   I don't know if he was out then.  I
18  have no clue.

19      Q.   Who else was present at that meeting?

20      A.   Attorney Salsberg.

21      Q.   That was your attorney?

22      A.   Yes.

23      Q.   Why did you engage a private attorney

LEAVITT REPORTING, INC.

223

1       Q.   What was your understanding?

2       A.   That Kenny was -- for the wrongful
3   imprisonment of Kenneth Waters.

4           MR. TEHAN:  Give me a quick
5   second.

6           (Short recess).

7       Q.   I have two more questions.  Miss
8   Marsh, when you testified earlier that you
9   learned from some source that Mr. Osborne had
10  said that you would change your testimony in
11  exchange for money, would it refresh your
12  recollection if I were to suggest that he made
13  that statement not to the Ayer Police but to Mr.
14  Waters' defense attorney, Mr. Peters?

15      A.   Yes, he did.  Thank you.

16          MR. TEHAN:  You may have some
17  more, Counsel.  I don't.

18      A.   I couldn't remember who he said that
19  to.

20          MR. TEHAN:  For the record, there
21  are a couple of outstanding events.  We learned
22  from Miss Conwell that there may be a revision
23  to the response of request for production to

LEAVITT REPORTING, INC.

222

1   at that point?

2       A.   I can't tell you why.  I just thought
3   I needed one.

4       Q.   Why did you think you needed one?

5       A.   I don't know.

6       Q.   Did you ever attend a meeting with
7   Chief Rizzo of the Ayer Police Department?

8       A.   Not that I can remember.

9       Q.   How many times did you meet with
10  Sheila Calkins?

11      A.   I don't think I met with her
12  personally.  I had to sit in front of her and
13  she had to ask questions.

14      Q.   That was in person, correct?

15      A.   Yes.

16      Q.   How many times did you do that?

17      A.   I don't know.

18      Q.   Did Miss Calkins tell you why she was
19  asking you the questions?

20      A.   I don't know.

21      Q.   Did you have an understanding at that
22  point as to why you were meeting with her?

23      A.   Yeah.

LEAVITT REPORTING, INC.

224

1   include some new documents.  And also I think we
2   are waiting for some documents from the Attorney
3   General.

4           On that basis, and I'm going to
5   hope and trust it would not happen, I'm going to
6   technically reserve the right to reconvene if
7   anything materializes in that regard.

8           MR. FELDMAN:  And I will reserve
9   my rights regarding any outstanding discovery
10  from any source.

11          I think we all need to
12  collectively say thank you to Miss Marsh for
13  appearing today.

14          (The deposition was suspended at
15  4:40 p.m.)

16

17

18

19

20

21

22

23

LEAVITT REPORTING, INC.