**A**

| VOLUME: | I |
|---|---|
| PAGES: | 1 - 334 |
| EXHIBITS: | I - 4 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. # 04-CV-10521-GAO

* * * * * * * * * * * * * *** *

BETTY ANNE WATERS, as Administratrix of the
Estate of KENNETH WATERS
              Plaintiff,


vs.

TOWN OF AYER, NANCY TAYLOR-HARRIS,
In Her Individual Capacity, ARTHUR BOISSEAU,
In his Individual Capacity, BUDDY DECOT, In
His Individual Capacity, WILLIAM ADAMSON, in
His Individual Capacity, PHILIP L. CONNORS,
In His Individual Capacity, and JOHN DOE and
JANE DOES 1-16, in Their Individual Capacities,
              Defendants.

* * * * * * * * * * * * * ***** *

**DEPOSITION OF ROSEANNA BAGGESEN**, a witness

called on behalf of the Defendants, pursuant to

Massachusetts Rules of Civil Procedure, before

Carolyn McGill, a Shorthand Reporter and Notary

Public in and for the Commonwealth of Massachusetts,

for Kopelman & Paige, P.C., 101 Arch Street, Boston,

Massachusetts, held at 340 Main Street, Worcester,

Massachusetts on Monday, July 23, 2007 commencing at

11:35 a.m.

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189
www.leavittreporting.com

Tel. 781-335-6791
Fax: 781-335-7911

 1          Q.    Now, at some point did someone bring

 2     you to a lawyer's office?

 3          A.    Oh, yes.

 4          Q.    Who brought you to a lawyer's office?

 5          A.    I believe it was Betty Anne, Cookie.

 6     This is before the trial though.

 7          Q.    All right.  That's your memory?

 8          A.    Yeah.  It was before the trial.  They

 9     brought me to a -- I don't even remember his

10     name.

11          Q.    Did you go to the office of a lawyer

12     by the name of DeSimone?

13          A.    I believe that's it.

14          Q.    There's an important part I shouldn't

15     forget.  Did you testify at Mr. Waters' criminal

16     trial?

17          A.    Yes, I did.

18          Q.    Did you testify at that trial that he

19     had told you that he had killed that German

20     bitch?

21          A.    Yes, I did.

22          Q.    Was that the truth?

23          A.    Yes, that was.

1          Q.    After the trial was over did you begin

2     calling Ken Waters' mother?

3          A.    Not that I recall.

4          Q.    Did you begin calling her to say you

5     felt so sorry for lying at his trial?

6          A.    Never.  Never.  Never.

7          Q.    Did you lie at his trial?

8          A.    Never.

9          Q.    I wanted to place in front of you if I

10    could for a moment what I'm going to mark as

11    Exhibit One to today's deposition.

12                    (Exhibit No. 1, Affidavit of

13    Roseanna C. Perry; so marked).

14         Q.    I have placed in front of you what

15    I've marked as Exhibit A and you may see that

16    the first sheet is entitled Affidavit of

17    Roseanna C. Perry.  Do you see that?

18         A.    Yes.

19         Q.    Would you go to the next sheet?  And

20    can we agree that it is entitled Questioning of

21    Roseanna Perry by Herbert F. DeSimone, Junior,

22    Esquire?

23         A.    Yes.

```
 1        but does it appear to be your signature on this

 2        first page of Exhibit One?  Can you tell?

 3             A.    Yes.

 4             Q.    Is that your signature?

 5             A.    Sure looks like it.  It looks very

 6        sloppy.

 7             Q.    What were the circumstances under

 8        which you signed the first page of Exhibit One?

 9             A.    This was at his office?

10             Q.    Well, I don't know, Ma'am.  That's

11        what I'm asking you.

12             A.    Because I do remember I signed another

13        paper for some other investigator that used to

14        sit outside my house.

15             Q.    Was that some years later?  How many

16        Affidavits have you signed in connection with

17        this case?

18             A.    Two.

19             Q.    This is one?

20             A.    Yes.

21             Q.    Do you recall what the second one

22        said?

23             A.    No.
```

```
 1          A.    No.

 2          Q.    You don't remember one way or the

 3     other?

 4          A.    No.

 5          Q.    There's mention here of money and

 6     jewelry.  Do you have any current memory of Mr.

 7     Waters discussing those with you, those items

 8     with you?

 9          A.    I remember he said he took jewelry.

10          Q.    The second paragraph up from the

11     bottom on page 1 please I believe states,

12     Roseanna -- it looks like a word is missing --

13     Roseanna absolutely sure Waters told her that he

14     had killed a woman in Ayer, Mass by stabbing

15     her.  Do you see that?

16          A.    Yes.

17          Q.    At the time of giving this statement

18     you were absolutely sure that he had told you

19     that, correct?

20          A.    Yes.

21          Q.    And you remain so today, true?

22          A.    Oh, true.

23          Q.    It says here, Roseanna said Kenny
```

1       that this man was a police officer?

2           A.   Well, I call them investigators,

3       detectives.

4           Q.   Was the person you said was camped

5       outside your house someone you understood worked

6       for the Waters family?

7           A.   Yes.

8           Q.   What relation did that have to

9       testifying later in court?  Could you explain

10      that please?

11          A.   To me going to court?

12          Q.   I will give you a cleaner question.

13      After you testified at Mr. Waters' criminal

14      trial were there times when a private

15      investigator was camped outside your house?

16          A.   Yes.

17          Q.   And at some point indeed did you come

18      back to Massachusetts to testify in court?

19          A.   Yes.

20          Q.   A second time, that being after the

21      trial?

22          A.   I believe so.

23          Q.   And do you know what role if any a

1       Rhode Island court played in your going to

2       Massachusetts?

3            A.    I was ordered to go.

4            Q.    Do you know why it was required that

5       you be ordered to go?

6            A.    To be a witness.

7            Q.    Had you been asked to go to this

8       hearing voluntarily before being ordered to do

9       so?

10           A.    I believe so.

11           Q.    By whom?

12           A.    By the investigator.

13           Q.    And did you understand at the time

14      that the hearing that you were being asked to

15      attend involved Mr. Waters' attempt to get a new

16      trial?

17           A.    Yes.

18           Q.    Now, between the time that you

19      testified at his trial which I'd suggest was May

20      of 1983 and July of 1985 when I would suggest

21      you testified at his motion for a new trial

22      hearing, please tell me the nature and extent of

23      your contact with the Ayer Police Department.

1          A.      (Nodding).

2          Q.      Despite your fear you did testify to

3     the admission at trial?

4          A.      Yes.

5          Q.      Is that because you wouldn't perjure

6     yourself?

7          A.      I would not perjure myself.

8          Q.      When did you first learn that Ken

9     Waters was getting out of jail?

10         A.      I didn't.

11         Q.      You know today of course?

12         A.      Yes.   I know it today.

13         Q.      Did you have any further contact with

14    the Ayer Police Department after testifying at

15    the motion for a new trial in 1985?

16         A.      I don't believe.

17         Q.      Did you have some contact with the

18    Waters family after 1985?

19         A.      I believe so.

20              MR. TEHAN:  Let me mark as Exhibit

21    Three the following document.

22              (Exhibit No. 3, Affidavit of

23    Roseanna Perry; so marked).

1          Q.     Would you please look over what we

2     have marked as Exhibit Three, Ma'am, and read

3     the entire thing to yourself if you would?  Take

4     your time and then I will ask you some

5     questions.

6          A.     Sure.  This is a lie.

7          Q.     What are you referring to when you say

8     that?

9          A.     Most of it.

10          Q.     We'll get to it then.  Please continue

11     to review it.

12          A.     Oh, come on.  What?  This is just --

13     wow, that makes for a good book.

14          Q.     Fictional?

15          A.     That is incredible.

16          Q.     Let's talk about it.  First of all,

17     prior to today have you ever seen Exhibit Three?

18          A.     No.

19          Q.     When did you first learn that Miss

20     Waters was bringing a civil suit for money

21     damages on behalf of her late brother, Kenny?

22          A.     I really didn't learn it until quite

23     recently.

```
1          A.    Okay.

2          Q.    By the way, before we get to that

3    actually, having never seen this Affidavit which

4    is Exhibit Three you have never signed it, have

5    you?

6          A.    No.

7          Q.    You never would, would you?

8          A.    No, I certainty would not.

9          Q.    Within a day or two after learning of

10   DNA tests that led to the release of Kenny

11   Waters I spoke with his lawyers Barry Scheck and

12   Betty Anne Waters who is also Kenny's sister.

13               Was it within a day or two after

14   learning of Kenny's release that you had this

15   meeting?

16         A.    No, I don't believe so.

17         Q.    Was it longer than that?

18         A.    Yes, I believe so.

19         Q.    The next sentence says that Mr. Scheck

20   and I spoke by phone and during the course of

21   the conversation he told me that I should tell

22   the truth no matter what it is and it would be

23   wise to seek the counsel of a lawyer because I
```

```
 1          Q.    Did anyone ever present this Affidavit

 2     to you for signature?

 3          A.    No.

 4          Q.    After the meeting with Mr. Scheck have

 5     you ever spoken with him again?

 6          A.    No.

 7          Q.    After that meeting with Mr. Scheck and

 8     Miss Waters have you ever spoken with Betty Anne

 9     again?

10          A.    I don't recall.

11          Q.    When you had this meeting did either

12     of them tell you what they wanted or hoped you

13     would say?

14                    MR. FELDMAN:   Objection.

15          A.    Should I talk?

16          Q.    Yes, you may.

17          A.    Well, the impression I got was they

18     wanted me to say I lied.

19          Q.    What gave you that impression?

20          A.    Just really by the way they were

21     talking.  You know he's innocent.  You know he's

22     innocent.  And I don't care to this day.  He

23     said that to me.  And in my eyes he will never
```

1    be innocent.  I don't care what the evidence

2    says.  He told me that and I will never ever

3    take that back.

4        Q.    Did you feel pressured by Mr. Scheck

5    and Betty Anne Waters when they met with you?

6              MR. FELDMAN:  Objection.

7        A.    Yes.

8        Q.    What did they do or say that made you

9    feel pressured?

10       A.    Just their presence was a lot of

11   pressure for me.

12       Q.    Did you feel that day you were telling

13   them what they wanted to hear so they would go

14   away?

15       A.    Yes.  But in terms of this, that would

16   not even make for a good book.

17       Q.    Exhibit Three?

18       A.    Exhibit Three.

19       Q.    Because it's so full of falsehoods?

20       A.    I mean, that doesn't even sound like

21   something I would say.  That doesn't even sound

22   like me.

23       Q.    Have you had any contact with Betty

1        Q.    Specifically you understood Rose

2    wanted you to say that at some point members of

3    the Ayer Police Department --

4        A.    Yes, exactly.

5        Q.    -- had said to you that you could be

6    arrested if you didn't cooperate with them --

7        A.    Exactly.

8        Q.    -- in connection with the Brow murder

9    investigation?

10        A.    Yes.

11        Q.    You know who I mean by Brow, the

12    victim of the 1980 murder in Ayer?

13        A.    Yes.

14        Q.    Just to make sure we're on the same

15    page, other than your daughter, Rose --

16        A.    Can I ask you something?  What do you

17    mean in connection?  I didn't even know Kenny

18    back then.

19        Q.    Yes.  Right.  So you didn't know Kenny

20    back at the time that Miss Brow was murdered?

21        A.    Right.  I didn't even know them people

22    until they all moved into the projects.

23        Q.    But other than your daughter, Rose,

1    saying to you that you should testify some day

2    that the Ayer Police Department threatened to

3    arrest you for some crime, other than Rose

4    telling you you should testify to that, you have

5    felt no pressure or any other contact from

6    anyone --

7        A.    No.    Just that one guy.    He would sit

8    outside my house for hours.    That was only a

9    couple years ago.

10        Q.    Did that make you feel -- were you

11    intimidated by that?

12        A.    I was very intimidated.    Then he

13    called me up.    Was it you?

14        Q.    It was not me.

15        A.    He called me up and he says, your

16    daughter was so kind to give me your phone

17    number.

18        Q.    Does the name John Nardizzi ring a

19    bell?

20        A.    That does sound familiar.

21        Q.    Did the person represent himself as a

22    private investigator?

23        A.    Yes.

1        Q.    He told you he had to ask you some

2    questions about what happened?

3        A.    Yeah.  And I could not believe it.  He

4    got my new phone number.  And he called me up

5    and said my daughter, Rosie, was so kind to give

6    him my phone number.

7                    And I told him, I said, let me

8    tell you something right now.  There is not a

9    kind bone in my daughter's body.  And I was very

10   upset.

11       Q.    Miss Baggesen, when was the last time

12   anyone, any member of the Waters family had

13   direct contact with you?

14       A.    Barry Scheck.  With Barry Scheck.

15       Q.    The meeting with Betty Anne Waters and

16   Barry Scheck?

17       A.    Yes, I believe so.

18       Q.    Other than you was there anyone else

19   present during that meeting other than Scheck,

20   Betty Anne Waters and yourself?

21       A.    My daughter, Rosie.  She was in the

22   other room.  Kids everywhere.

23       Q.    Was there anybody else accompanying

```
 1        learned Kenny was released from prison that you

 2        felt threatened or pressured by the Ayer Police

 3        Department?

 4             A.    No.

 5             Q.    Because that would have been untrue,

 6        right?

 7             A.    (No response).

 8             Q.    Did you ever meet with an individual

 9        by the name of Michael Andrews?

10             A.    Not that I know of.

11             Q.    An attorney from Boston, does that

12        ring a bell?

13             A.    No.

14             Q.    You never met with Attorney Michael

15        Andrews and an investigator at your daughter's

16        house at 57 Wisdom Avenue?  That was your

17        daughter's house?

18             A.    Not that I recall.

19             Q.    Do you think it's possible that in

20        fact you had such a meeting, you just don't

21        remember it?

22             A.    No.

23             Q.    When was the last time you talked to
```

1      Nancy Taylor?

2          A.    After the trial.

3          Q.    Immediately after the trial, the

4      dinner that you mentioned?

5          A.    And before I went home.

6          Q.    You haven't talked to her in the last

7      ten years?

8          A.    No.

9          Q.    Have you talked to anyone from the

10     Ayer Police Department?

11         A.    No.  I believe I did call the Ayer

12     Police Department, this is going back some

13     years, when I heard he might be being released

14     or something.

15         Q.    Tell me about that conversation.

16         A.    I can't really recall it.  All I did

17     was call.  I didn't even really talk to anybody.

18         Q.    So you don't remember any specifics of

19     that conversation?

20         A.    No.

21         Q.    Suffice it to say you didn't want

22     Kenny Waters to get out of prison?

23         A.    Suffice it to say very true.

1          Q.    So if I were to tell you that there is

2    a record of an interview with you on March 23,

3    2001, Friday, when Mike Andrews and an

4    investigator met you at your daughter's home at

5    57 Wisdom Avenue where you relayed some

6    information to him --

7          A.    I have no recollection of that.

8          Q.    He is a tall guy, sort of thinning

9    hair, blondish hair?

10         A.    I have no recollection of it.

11         Q.    You don't remember telling this

12   attorney and this investigator that you believe

13   you were dragged into the whole matter because

14   of Kenny's former girlfriend, Brenda?

15         A.    I don't recall it.

16         Q.    Do you remember saying all that I know

17   is the District Attorney's office hunted me down

18   like a dog?

19         A.    I don't recall that.

20         Q.    You don't recall saying that to an

21   attorney from Boston?

22         A.    I don't even recall talking to an

23   attorney from Boston.

1          Q.    You don't remember relaying the

2    information about drinking booze in a funnel to

3    this attorney from Boston?

4          A.    No, I don't remember that.  What was

5    the date?

6          Q.    March 23, 2001.  Do you remember the

7    information in your Affidavit, Miss Baggesen,

8    this information on Exhibit Three?  This is an

9    Affidavit that you didn't sign.  Do you remember

10    you reviewed this with Attorney Tehan?  It has a

11    lot of specific information in it.

12          A.    That we reviewed here today?

13          Q.    Yes.

14          A.    Yeah.

15          Q.    And you were chuckling as you were

16    reading it because you had called it fiction or

17    a good novel?

18          A.    Yeah, a lot of it.

19          Q.    You never provided the kind of

20    information that was --

21          A.    I don't recall this.

22          Q.    You may have, right?

23                MR. TEHAN:  Objection.

LEAVITT REPORTING, INC.

```
 1            A.    I don't recall.

 2            Q.    You may have in fact told Attorney

 3     Mike Andrews in sum and substance exactly what's

 4     written in this draft Affidavit, right?

 5                  MR. TEHAN:   Objection.

 6            A.    I don't recall.

 7            Q.    Because you didn't tell Barry Scheck

 8     all that detailed information, did you?

 9            A.    I don't recall.  There was so much

10     going on in my life.  I just lost my mother.

11            Q.    So you -- I'm just --

12            A.    I don't recall everything that was

13     said.  I really don't.

14            Q.    Okay.

15            A.    I was distraught that Barry Scheck was

16     even in my house.

17            Q.    Why were you distraught about that?

18            A.    Because why would I want him in my

19     house?  What was I supposed to do, jump up for

20     joy?  How long do you think --  how long -- if

21     he didn't die like he did, God forbid, but I

22     mean, I wouldn't even be sitting here today.

23     And that's the truth.  If he didn't die I
```

1       wouldn't be sitting here.  Not at all.

2            Q.    Why are you telling me that?  Are you

3       telling me that because you may have said the

4       things that are in this Affidavit again to

5       protect your personal safety?

6                      MR. TEHAN:  Objection.

7            A.    In this Affidavit?

8            Q.    Yeah.

9            A.    I don't even -- some of this is --

10                     MR. TEHAN:  That's Exhibit Three

11      by the way.

12                     MR. FELDMAN:  Yes, the draft

13      Affidavit is Exhibit Three.

14           Q.    Let me read paragraph 13, Miss

15      Baggesen, as an example.  I think you may have

16      discussed this with Attorney Tehan.

17                     Paragraph 13 says, after a long

18      time of further questioning I told them that I

19      remembered one night Kenny and I were drinking

20      in a van when the subject of Kenny being

21      questioned in Ayer about the murder came up, but

22      I really didn't remember what he said because we

23      were both plastered, really drunk.  Do you see

1    that?

2         A.    Yes, I see that.

3         Q.    It goes on to say, I believe we

4    finished a whole bottle of Southern Comfort.

5    All that is consistent with what you told

6    Attorney DeSimone, right?

7         A.    Yes.

8         Q.    Then it says, I have never been sure

9    what Kenny said that night because I was so

10   drunk.  I told Nancy Taylor repeatedly I wasn't

11   sure what he said.  I certainly never had a

12   clear memory of him confessing that he committed

13   this murder, but Nancy Taylor kept pushing me to

14   remember what he might have said about

15   confessing to the murder.  She was very

16   overbearing and forceful.  I really thought I

17   was going to be arrested and charged.  Do you

18   see all that?

19        A.    Well, I did not say that.

20        Q.    You're positive you never told this to

21   anyone?

22        A.    Yeah.  I'm -- yeah.

23        Q.    What makes you sure that you never

1    said that to anyone, Miss Baggesen?

2        A.    Because I'm not going to lie.  He said

3    it to me.  He said it to me.  And I will never

4    take it back.  That's what he said.  And I'm not

5    going to lie.  I could have made all of this go

6    away by lying and saying okay, he didn't say it.

7        Q.    In fact you tried to make it go away?

8        A.    I could have saved myself a whole lot

9    of grief, but the fact of the matter is he said

10   he did it.

11       Q.    But in 1983 on July 15 when Herbert

12   DeSimone asked you about it you did lie and try

13   to make it go away, correct?

14              MR. TEHAN:  Objection.

15       A.    I guess so.

16       Q.    In 2001 --

17       A.    I really -- 1985, I can't --

18       Q.    In 2001 when attorneys came to meet

19   with you asking you about what happened you lied

20   again, right?

21              MR. TEHAN:  Objection.

22       A.    No.

23       Q.    No?

1       A.    When Barry Scheck came?

2       Q.    How about when Mike Andrews came to

3   interview you?

4       A.    I have no idea who Mike Andrews is.

5       Q.    How about when Barry Scheck came to

6   your home?

7       A.    I remember Betty Anne and Barry

8   Scheck.  I have no idea who Mike Andrews is.

9       Q.    When Barry Scheck and Betty Anne

10  Waters came to your house did you tell them that

11  Kenny confessed to you?

12      A.    Yes.  Oh, I don't recall if I told

13  them that.

14      Q.    In fact, you didn't tell them that,

15  right?

16      A.    Ah, because Kenny was out in the

17  streets.

18      Q.    So because again you were concerned

19  about your personal safety you told them what

20  they wanted to hear?

21      A.    Kind of, yes.

22      Q.    And in essence you told them what was

23  in this draft Affidavit --

1          A.    What's in this, this is garbage.

2                    MR. TEHAN:   What is this please,

3      Ma'am, for the record?  What's the blue sticker

4      say?

5          A.    Exhibit Three.

6                    MR. TEHAN:   Thank you.

7          A.    This is garbage.

8          Q.    That's what you told them, you told

9      them garbage.

10         A.    I mean, this is garbage.

11         Q.    Miss Baggesen, the information in the

12     Affidavit that you're reviewing now, Exhibit

13     Three, it's garbage.  Is that what you're

14     telling us?

15         A.    A lot of it, yes.

16         Q.    Do you know where this was created,

17     this draft Affidavit, who created it?

18         A.    No.

19         Q.    Do you know where the person who

20     created this draft Affidavit for your signature

21     would have learned information about you and

22     Kenny doing funnel drinks?

23         A.    Everybody was doing it.  Betty Anne

1    was there, all the sisters, all the brothers,

2    the neighbors.

3        Q.    So you never told Barry Scheck that

4    you guys used to do funnel drinks?

5        A.    We didn't always do it.  I did it that

6    one time.  Why would I even say that?

7        Q.    You didn't tell Attorney Mike Andrews

8    that either?

9        A.    Why would I say that?

10       Q.    I'm just asking if you did or did not.

11       A.    I don't know who that Attorney Andrews

12    is.

13       Q.    Okay.  How about the information

14    regarding the dinner you went on with Nancy

15    Taylor and the person you believed to be her

16    husband, where did that information come from?

17                MR. TEHAN:  Objection.

18       A.    Probably from me.  I probably said we

19    went for dinner.  I certainly didn't say a fancy

20    restaurant or Nancy's husband argued with Nancy.

21       Q.    Miss Baggesen, I'm trying to

22    understand whether you believe someone made up

23    the information --

```
 1    statement that my mother gave me to read, did

 2    you ever give that to Rose to read?

 3         A.    No.

 4         Q.    Are you sure?

 5         A.    I believe I've never seen this until

 6    today.

 7         Q.    Well Rose says, I read the statement

 8    and said okay.  That was all the truth.  Why

 9    don't you sign it and get it over with?  Did

10    Rose say that to you?

11         A.    No.

12         Q.    She said, meaning you said, she said

13    she was afraid to sign it because she was sure

14    she would go to jail for perjury.

15         A.    My daughter is a bold-faced liar.

16         Q.    She goes on to say, she said why would

17    Kenny's lawyers tell her to get a lawyer unless

18    she could get into trouble?  Did Mr. Scheck or

19    Mike Andrews or anyone tell you to get a lawyer?

20         A.    No.

21         Q.    She also said this to other people in

22    my presence including my friend, Pam Sivo.

23         A.    How convenient.  How did I know Pammy
```

1    time.  It's a little bit longer paragraph.

2         A.   No.

3         Q.   So is there a particular sentence in

4    paragraph 6 that you believe --

5         A.   She and the male officer began telling

6    me that he hung his former girlfriend out a

7    window.  I forgot how I found out about that.

8              At one time that while in jail he

9    had slashed the throat of another prisoner

10   killing him.  Is that really true?

11        Q.   For now I want to focus on whether or

12   not you might have been the source of the

13   information.

14        A.   No.

15        Q.   Do you know what I mean by source of

16   the information, the reason why someone wrote

17   this Affidavit for you to review and sign is

18   because you told them this information.

19        A.   I did not tell them that.

20        Q.   You don't believe you told anyone this

21   information?

22        A.   No.

23        Q.   You didn't tell Mike Andrews this

```
 1      information?

 2          A.    No.  I don't even know who Mike

 3      Andrews is.

 4          Q.    You didn't tell any attorney who came

 5      down to speak with you from Boston this

 6      information, right?

 7          A.    I don't believe.

 8          Q.    Or might you have?

 9                MR. TEHAN:  Objection.  That's

10      speculation.

11          A.    No.

12          Q.    Well, I want to make sure particularly

13      in light of the objection we're making a

14      distinction between what you're sure and what

15      you're not.

16                You're sure that the information

17      in paragraph 6 was not provided by you to any

18      attorney who you discussed the Waters matter

19      with?

20          A.    I'm sure.

21          Q.    You are sure?

22          A.    I never.

23          Q.    Is there anything in particular about
```