UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BETTY ANNE WATERS, as | ) | |
| Administratrix of the Estate of | ) | |
| KENNETH WATERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 04-10521-GAO |
| TOWN OF AYER, | ) | |
| NANCY TAYLOR-HARRIS, | ) | |
| ARTHUR BOISSEAU, | ) | |
| BUDDY DECOT, | ) | |
| WILLIAM ADAMSON, | ) | |
| PHILIP L. CONNORS, and | ) | |
| JOHN AND JANE DOES 1-16, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTIONS TO STRIKE
## <u>PLAINTIFF'S POLYGRAPH AND DNA EXPERTS</u>

December 19, 2007

DEIN, U.S.M.J.

## I.  <u>INTRODUCTION</u>

In this action the plaintiff, Betty Anne Waters, as the Administratrix of the Estate of Kenneth Waters, asserts that her brother, Kenneth Waters ("Waters"), was wrongfully arrested and convicted, and served nineteen years of a life sentence, for the 1980 murder and armed robbery of Katherina Brow.  Waters was released from prison following the filing of a nolle prosequi in which the District Attorney acknowledged that new DNA evidence had revealed the blood of an unknown person at the murder scene, but did not

acknowledge Waters' innocence.  Waters subsequently died as the result of an accident. The plaintiff has brought claims against the Town of Ayer, two of its former police chiefs and several of its police officers alleging, in essence, that the defendants violated Waters' rights under 42 U.S.C. § 1983 and state law by arresting and prosecuting him without probable cause and by fabricating incriminating evidence and suppressing exculpatory evidence.

Presently before the court are the "Defendants' Motion to Strike the Plaintiff's Polygraph Expert Charles R. Honts" (Docket No. 104) and the "Defendants' Motion to Strike the Plaintiff's DNA Experts Dr. Edward T. Blake and Dr. Sudhir K. Sinha" (Docket No. 103).[1]  The plaintiff intends to introduce Dr. Honts' testimony at trial in order to challenge the reliability of a 1982 polygraph examination that was given to Brenda Marsh, a key witness for the prosecution in Waters' criminal case.  Specifically, Ms. Marsh "passed" a polygraph exam in 1982 in which she stated that Waters had confessed to the murder.  Defendant Police Officer Nancy Taylor relied on this finding as part of her probable cause-to-arrest analysis, and, therefore, testimony concerning the exam will be introduced by the defendants.  Ms. Marsh has since recanted her testimony, and the plaintiff seeks to introduce Dr. Honts' testimony to discredit the 1982 polygraph examination.  It is undisputed that Officer Taylor had no basis to question the polygraph results in 1982.

---

[1]  Since the case is presently before the District Judge for trial, this decision is being issued as a Report and Recommendation.

For the reasons detailed herein, this court recommends that the motion to strike Dr. Honts' testimony be ALLOWED.  However, this court further recommends that the court issue a limiting instruction, in the form described below, to insure that the jury appropriately limit its consideration of the fact that Ms. Marsh "passed" the polygraph exam in 1982.

With respect to the motion to strike the DNA experts' testimony, it is undisputed that DNA testing was not available at the time of Waters' trial.  The plaintiff intends to introduce testimony from Dr. Blake and Dr. Sinha regarding the results of DNA testing performed many years after Waters' conviction, for the purpose of establishing that neither Waters nor his siblings could have been the source of male blood recovered from the crime scene, and to use that fact to argue to the jury that Waters was innocent.  The defendants will not stipulate to Waters' innocence, but nonetheless object to this testimony.  Specifically, the defendants contend that Waters' actual guilt or innocence is not relevant, and that the issues raised by the plaintiff's constitutional claim are only whether the alleged misconduct of the defendants in the early 1980's violated the United States Constitution, and whether the outcome of the underlying criminal trial would have been different had the alleged misconduct not occurred.  (Mot. to Strike DNA Exp. (Docket No. 103) at 1-2).  Thus, the defendants contend that expert testimony supporting the plaintiff's claim of innocence is unduly prejudicial and irrelevant and should be precluded.

As detailed below, this court concludes that while a finding of innocence may not be necessary to establish liability with respect to the plaintiff's constitutional claims, the plaintiff's assertion that Waters was innocent is relevant to those claims.[2]  The plaintiff is alleging that the Ayer police engaged in a conspiracy to have Waters prosecuted and convicted for crimes he did not commit.  The fundamental premise of her claims is that Waters was innocent and that his estate should be compensated for the harm that Waters suffered as a result of his wrongful conviction.  This court finds that the question of Waters' guilt or innocence is directly relevant to any measure of compensatory damages that a jury might award in this case, and that the probative value of expert testimony on the issue of innocence for damages purposes outweighs any risk of possible jury confusion or undue prejudice to the defendants.  Therefore, this court recommends that, unless the parties can reach a stipulation with respect to the substance of the proposed DNA testimony,[3] the motion to  strike such testimony should be DENIED, with an appropriate limiting instruction given.

Finally, the defendants contend that Dr. Sinha's report should be stricken for failure to comply with Fed. R. Civ. P. 26(a)(2)(B).  This court recommends that this motion be DENIED, as the report provides the defendants with sufficient information.

---

[2]  The parties agree that the jury will need to find whether the proceedings against Waters were terminated in his favor in connection with the plaintiff's claim of malicious prosecution.  As detailed herein, the defendants have agreed to a stipulation to address that concern.

[3]  The parties have been attempting to negotiate a stipulation concerning such testimony, but have been unsuccessful to date.

## II.  STANDARD OF REVIEW OF EXPERT TESTIMONY

"Rule 702 of the Federal Rules of Evidence assigns to the trial judge the responsibility for ensuring that an expert's testimony as to scientific, technical, or other specialized knowledge 'both rests on a reliable foundation and is relevant to the task at hand.'"  Hochen v. Bobst Group, Inc., 290 F.3d 446, 452 (1st Cir. 2002) (quoting Daubert v. Merrell Dow Pharm., Inc. 509, U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993)).  The ultimate purpose of this inquiry "is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue."  Id. (quoting Cipollone v. Yale Indus. Prod., Inc., 202 F.3d 376, 380 (1st Cir. 2000)).  "The district court maintains considerable discretion in making this determination."  United States v. Garcia-Morales, 382 F.3d 12, 18 (1st Cir. 2004).

In the instant matter, the defendants are not challenging the plaintiff's experts' qualifications or the reliability of their opinions.  Instead, the defendants contend that the proposed expert testimony is irrelevant and that the admission of such evidence at trial would be highly prejudicial to them and confuse the issues before the jury.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  Daubert, 509 U.S. at 591, 113 S. Ct. at 2795 (quotations and citation omitted).  Moreover, even if admissible under Rule 702, expert testimony still may be excluded under Fed. R. Evid. 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  Id. at 595, 113 S. Ct. at 2798.

Applying these principles, this court recommends that the motion to strike be allowed with respect to the plaintiff's polygraph evidence, although a limiting instruction should be given. With respect to the DNA experts, this court recommends that the motion to strike be denied unless the parties can stipulate to the relevant facts and conclusions.

### III.  MOTION TO STRIKE POLYGRAPH EVIDENCE

#### Overview

The plaintiff's designated polygraph expert, Charles R. Honts, Ph.D., proposes to testify regarding the appropriateness and reliability of a polygraph test that was administered to Brenda Marsh in 1982. As detailed below, Ms. Marsh claimed in 1982 that Waters had confessed to the Brow murder. She took and passed a polygraph test in 1982 to that effect. Ayer Police Officer Nancy Taylor knew the results of the polygraph test when she concluded that there was probable cause to arrest Waters. While the polygraph evidence was not introduced at Waters' trial, the defendants intend to introduce it in the instant case to defend against plaintiff's claim that Waters' arrest was made without probable cause. It is undisputed that "[t]he existence of probable cause is based on the facts and circumstances known at the time of arrest rather than in hindsight." Burke v. Town of Walpole, 405 F.3d 66, 80 (1st Cir. 2005). Thus, "[t]he probable cause analysis entails an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time . . . ." Alexis v. McDonald's Rests. of Mass.,

Inc., 67 F.3d 341, 349 (1st Cir. 1995).  The evidence of the polygraph test, therefore, will be relevant and admissible at trial of this case.

Ms. Marsh testified at Waters' trial that he had confessed.  See Commonwealth v. Waters, 399 Mass. 708, 710, 506 N.E.2d 859, 861 (1987).  However, when Ms. Marsh was deposed in this case, she stated that her testimony against Waters in the criminal action was false and was the result of pressure from Officer Taylor.  (See Marsh Dep. at 211-18).[4]  Accordingly, Ms. Marsh's current testimony, if believed, would support the plaintiff's claim that Waters was wrongfully convicted as a result of the defendants' unconstitutional conduct, including witness coercion.  Therefore, Ms. Marsh's credibility is likely to be of critical importance at trial.

The plaintiff is seeking to introduce the expert testimony of Dr. Honts to opine that the 1982 polygraph exam was so flawed that an examiner would know that it was not a trustworthy assessment of her credibility.  From the defendants' perspective, such testimony is highly prejudicial because the jury may use it to determine that there was no probable cause to arrest Waters, even though none of the defendants had reason to question the polygraph results at the time.  From the plaintiff's perspective, however, if the fact of the polygraph goes unchallenged, the jury may use it to determine that Ms. Marsh was telling the truth in 1982, and is lying today.  As detailed herein, this court

_____

[4]  Excerpts from the Deposition of Brenda Marsh are attached to "Plaintiff Betty Anne Waters's Opposition to Motion to Strike Expert Report of Charles R. Honts, Ph.D."  (Docket No. 115).

concludes that these concerns can most appropriately be addressed by striking the testimony but giving a limiting instruction.

## **Relevant Facts**

On October 8, 1982, Massachusetts State Police Polygraphist, John P. Nasuti, conducted a polygraph examination of Ms. Marsh pursuant to a request from Detective Lieutenant John Dwyer of the Middlesex District Attorney's Office.  (Mot. to Strike Polygraph Exp., Ex. B).  The examination occurred following a pre-test interview at which Ms. Marsh described a conversation she had with Waters in which Waters had admitted to killing Katherina Brow.  (Id.; see also id., Ex. C at 1515, 1523-24).  The purpose of the polygraph was "[t]o verify Ms. [Marsh's] statement rel[a]tive to the murder of Kat[he]rina Brow of Ayer, mass."  (Id., Ex. B).  In his October 8, 1982 report of the polygraph examination, Mr. Nasuti stated as follows:

> It is the opinion of the undersigned, based on the tests conducted along with a pre-test interview that the subject was truthful in her answers to the following pertinent questions:
>
> 1.    *Did you tell me the real truth about the conversation you had with Kenny [Waters] regarding Mrs Brows death?  ANS: YES.*
>
> 2.    *Are you telling the truth about asking Kenny if he killed that woman?  ANS: YES.*
>
> 3.    *Did Kenny ever mention that he killed a woman prior to your asking?  ANS: NO*

(Id.).

On October 12, 1982, four days after Mr. Nasuti completed his report, and with knowledge of the report, Officer Taylor applied for and received a warrant to arrest Waters on charges of first degree murder and armed robbery.  (Id., Ex. D at 1).  Although a factor in the probable cause analysis, the results of Ms. Marsh's polygraph examination were not used in connection with Waters' probable cause hearing, the Grand Jury proceedings, Waters' criminal trial or any post-trial proceedings.  (Mot. to Strike Polygraph Exp. at 3).

In his report in the instant action, Dr. Honts challenges the reliability of Ms. Marsh's polygraph examination and Mr. Nasuti's report of the examination.  In particular, Dr. Honts opines that "in 1982 no reasonable trained polygraph examiner would have viewed these relevant questions [posed to Ms. Marsh] as providing probative, incriminating evidence against Kenneth Waters."  (Id., Ex. F at 2).  He also concludes as follows:

> In my opinion, based on my training as a polygraph examiner and as a scientist who studies credibility assessment, the Nasuti report is not a reliable indicator of Brenda Marsh's credibility concerning whether or not Ken Waters admitted to the murder of Katherina Brow.  The relevant questions are so poorly formulated that in my opinion any results of this examination are meaningless and without probative value.

(Id., Ex. F at 3).  It is undisputed that the defendants did not have Dr. Honts' opinion at the time Officer Taylor applied for an arrest warrant or at any other time during the criminal proceedings, and there is no evidence that the defendants had any reason to question Mr. Nasuti's results.  Mr. Nasuti was the chief polygraph examiner for the

Massachusetts State Police.  See United States v. Varoudakis, No. 97-10158-RGS, 1998 WL 151238, at *1 (D. Mass. Mar. 27, 1998) (stating that Nasuti served as chief polygraph examiner for the State Police until 1989).  Moreover, there is no evidence suggesting that Officer Taylor had any training or experience regarding polygraph testing. Therefore, even assuming that "no reasonable trained polygraph examiner" should have relied on the test result, this fact has no bearing on any evaluation of Officer Taylor's analysis.

## Analysis

This court finds that the opinions expressed in Dr. Honts' report would not be helpful to a jury evaluating whether Officer Taylor had an objectively reasonable basis, in 1982, for concluding that Waters had committed murder since there is no evidence that the Officer had reason to challenge Dr. Nasuti's conclusions.  Moreover, as of 1982, there was not a body of law in Massachusetts questioning the usefulness of polygraph evidence in assessing probable cause so no argument can be made that Officer Taylor somehow "should have known" that the test results were not reliable.  In fact, prior to 1989, polygraph evidence was admissible at trial in limited circumstances on the issue of credibility.  See Commonwealth v. Mendes, 406 Mass. 201, 206, 547 N.E.2d 35, 38 (1989), and cases cited.  It was not until 1989 that the highest court in Massachusetts first ruled that polygraphic evidence was inadmissible in criminal trials, either for substantive purposes or for the purpose of corroborating or impeaching testimony.  Id. at 212, 547 N.E.2d at 41.  Even so, it has remained unclear whether, under Massachusetts law, the

results of a polygraph test may be considered to support probable cause under certain circumstances.  See Commonwealth v. Donahue, 430 Mass. 710, 714 n.1, 723 N.E.2d 25, 29 n.1 (2000) (concluding that polygraph results did not render affidavit supporting probable cause invalid where there was no claim that results were intentionally falsified or stated with reckless disregard as to their accuracy).  Therefore, Dr. Honts' proposed testimony would not be helpful to the jury in deciding the issue presented in this case, i.e., whether Officer Taylor had probable cause to seek a warrant for Waters' arrest.

Admission of the fact that Ms. Marsh passed a polygraph exam in 1982, however, may give undue credence to her 1982 testimony.  "[T]he polygraph is imbued in the popular imagination with the aura of a 'lie detector' (which even its most ardent proponents agree it is not)."  United States v. Varoudakis, No. 97-10158-RGS, 1998 WL 151238, at *5 (D. Mass. Mar. 27, 1998).  Something is needed to balance the risk to the plaintiff that a jury faced with evidence of Ms. Marsh's polygraph examination may improperly use it in assessing whether she was truthful at the time she implicated Waters in the Brow murder.  However, this court does not believe that Dr. Honts' expert testimony should be used to balance the scales.  Expert testimony may tip the scale too far.  Moreover, it would place too much emphasis on the 1982 polygraph exam, which should not be considered by the jury at all in assessing Ms. Marsh's credibility.

Federal courts have long recognized the "dubious scientific value" of polygraph evidence.  deVries v. St. Paul Fire & Marine Ins. Co., 716 F. 2d 939, 945 (1st Cir. 1983) (and cases cited).  As noted above, Massachusetts no longer allows the admission of

polygraph evidence for any purpose. This exclusion is due to the court's concerns about

its "uncertain reliability" caused, in large part, by its "subjective nature" and the fact that

the "competence, experience, and education of the test examiner" plays a "crucial role" in

the accuracy of the test. <u>Commonwealth v. Mendes</u>, 406 Mass. at 211, 547 N.E.2d at 40-

41 (internal citations omitted). Therefore, this court recommends that in order to counter

any improper inference that the jury might draw concerning Ms. Marsh's credibility as a

result of the introduction of the 1982 polygraph test for purposes of establishing probable

cause, the court instruct the jury as follows:

> You are instructed that the evidence regarding Ms. Marsh's 1982
> polygraph examination may only be considered for the limited
> purpose of deciding whether or not the defendants had probable
> cause to arrest Mr. Waters. The reliability of polygraph examinations
> has not been established and courts have long considered polygraph
> evidence to be of questionable value in determining the guilt or
> innocence of a defendant or the credibility of a testifying witness. In
> Massachusetts, polygraph evidence is considered by the courts to be
> unreliable and it is inadmissible in criminal trials either for
> substantive purposes or for corroboration or impeachment of
> testimony. Therefore, while you may consider Officer Taylor's
> knowledge of the results of Ms. Marsh's polygraph examination in
> your assessment whether there was probable cause to arrest Mr.
> Waters in 1982, you are not to consider the polygraph evidence for
> the purpose of determining whether Ms. Marsh was truthful in 1982
> or whether she is telling the truth now.

## IV.  <u>MOTION TO STRIKE DNA EXPERTS</u>

### <u>Facts Pertaining to Dr. Blake's and Dr. Sinha's Proposed Testimony</u>

The plaintiff's DNA experts, Dr. Blake and Dr. Sinha, propose to testify regarding

DNA testing that eliminated both Waters and his siblings as the source of male blood

found years earlier at the Brow crime scene. Accordingly, the proposed testimony directly supports the plaintiff's allegations that Waters was innocent.

During the murder investigation, Type O blood, which did not match the victim's blood type, was discovered at the crime scene. (Compl. (Docket No. 1) ¶ 27). The police concluded that this blood was left by the perpetrator, who must have been injured in the struggle. (Id.). Waters, like a significant percentage of the general population, had Type O blood. (Id. ¶ 59). At the time of Waters' arrest and criminal trial, DNA testing of evidence was not available. (Pl.'s Submission Pursuant to Court's Oral Instr. (Docket No. 122), Ex. 2).

In 2000, approximately 17 years after Waters' conviction, the plaintiff in the instant action requested that blood samples retrieved from the murder scene be submitted for DNA analysis. (See Compl. ¶¶ 63, 67). Dr. Blake performed the DNA tests, which revealed that Waters was not the source of male blood recovered from the crime scene. (Id. ¶ 68; Mot. to Strike DNA Exp., Ex. A ¶¶ 5-12). These results were replicated by the Massachusetts State Police Crime Lab on March 13, 2001. (Pl.'s Submission Pursuant to Court's Oral Instr., Ex. 2).

On March 14, 2001, Waters filed a motion for a new trial, which was unopposed. (Id.; Compl. ¶ 70). Thereafter, on June 28, 2001, the Middlesex District Attorney filed a nolle prosequi, and on March 16, 2001, Waters' convictions were vacated. (Compl. ¶ 71). The District Attorney's Office dropped all charges against Waters on June 19,

2001.  (Id. ¶ 71).  At no time, however, has the government admitted that Waters was

innocent of the crime charged.  Specifically, the nolle prosequi provides in relevant part:

> Based upon new DNA evidence of the presence of blood of an
> unknown person at the scene of the 1980 murder of Katherina Brow,
> the Commonwealth has agreed that, at a minimum, a new trial of the
> above indictments is warranted.
>
> At this time, there is insufficient evidence to proceed with a criminal
> prosecution against the defendant, Kenneth Waters, and as such, the
> Commonwealth has determined that, at this time, a nolle prosequi is
> in the interests of justice.  The Commonwealth's investigation into
> the murder of Katherina Brow has and will continue.[5]

The plaintiff wants to introduce evidence that none of the blood at the scene came

from Waters or any other biological children of his mother as evidence of his innocence.

The plaintiff retained Drs. Blake and Sinha after various failed attempts to obtain

admissions or a stipulation regarding the results of the DNA testing.  (See generally Pl.'s

Submission Pursuant to Court's Oral Instr.).  As set forth in his expert report, Dr. Blake is

expected to provide testimony regarding his prior DNA testing, which excluded Waters as

the source of the male blood at the crime scene.  (See generally Mot. to Strike DNA Exp.,

Ex. A).  Dr. Sinha is expected to provide testimony regarding DNA testing that excluded

all of the biological sons of Elizabeth O'Connor, Waters' mother, as the source of that

blood.  (See id., Ex. B).  Although the parties are attempting to negotiate a stipulation as

to the substance of the DNA expert testimony, to date no stipulation has been entered.

### Admissibility of Dr. Blake's and Dr. Sinha's Testimony

---

[5] The nolle prosequi is attached as an exhibit to Docket No. 121.

The defendants have moved to strike the expert witness reports and proposed testimony of Dr. Blake and Dr. Sinha on the grounds that DNA evidence obtained many years after Waters' conviction is not relevant to the plaintiff's claims regarding the defendants' conduct at the time of Waters' arrest and prosecution, and that any probative value of that evidence is substantially outweighed by the risk of unfair prejudice to the defendants and jury confusion. They have also moved to strike Dr. Sinha's report on the grounds that it fails to comply with Fed. R. Civ. P. 26(a)(2)(B). As noted above, the parties have informed this court that they are attempting to negotiate a stipulation concerning the substance of the proposed DNA testimony. If they are successful, expert testimony on that issue will be unnecessary. However, in the event the parties are unable to reach a stipulation, this court recommends, for the reasons that follow, that the defendants' motion to strike be denied.

### 1.    Compliance with Fed. R. Civ. P. 26(a)(2)(B)

The defendants argue that Dr. Sinha's expert report fails to comply with Fed. R. Civ. P. 26(a)(2)(B) because "it presents three conclusory statements without providing the basis or reasons therefor." (Mot. to Strike DNA Exp. at 3). Fed. R. Civ. P. 26(a)(2)(B) requires in relevant part that expert reports contain the following information:

> a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions ....

This court finds that Dr. Sinha's report is sufficient to meet these requirements.

-15-

In his report, Dr. Sinha states that on April 13, 2007, he received a sample consisting of buccal swabs from Waters' mother, Elizabeth O'Connor.  He also indicates that he performed genetic testing on this sample and compared his results to the results set forth in the May 14, 2001 report of DNA testing by Dr. Blake's firm, Forensic Science Associates.  (Mot. to Strike DNA Exp., Ex. B at 1).  As described in Dr. Blake's report, Forensic Science Associates conducted the DNA testing on blood samples from the crime scene.  (See generally id., Ex. A).  Charts depicting the results of Dr. Sinha's DNA testing on Ms. O'Connor and the DNA results obtained by Forensic Science Associates, as well as inconsistencies between the two sets of results, are included as part of Dr. Sinha's report.  (Id., Ex. B at 2-3).  Dr. Sinha further expressed the following opinions based on his tests of Ms. O'Connor's sample and his comparison of those results with the data from Forensic Science Associates:

1.   The buccal swabs of Elizabeth O'Connor, identified as ReliaGene Sample #07-03128, produced a distinct female genetic profile.

2.   Based on the genetic test results, Elizabeth O'Connor is excluded as the biological mother of the DNA donor in the blood from bathroom rug #3 (Item #1A) profile taken from Appendix 1 of Forensic Science Associates report dated May 14, 2001, case #00-628. Elizabeth O'Connor is also excluded as the biological mother of the DNA donor in FSA items 4A, 5A, 6A, 7A, 8 and 9.

3.   Our opinion of NON-MATERNITY is based on the below noted inconsistencies.  The term "inconsistency" means that the band sizes of the tested woman do not match the obligate maternal alleles in the child profile.  Based on the absence of these DNA markers (as determined by DNA analysis) the blood samples from FSA items #1A, 4A, 5A, 6A, 7A, 8, and 9 could not have originated from a biological offspring of the tested woman, Elizabeth O'Connor.

-16-

Thus, Dr. Sinha's report contains a complete statement of the expert's proposed opinions, indicates what testing was performed and what data was considered to support the opinions, and explains, with reference to charts of the testing results, the reasons for Dr. Sinha's conclusion that Ms. O'Connor is not the biological mother of the person whose DNA samples were obtained from the crime scene. This is enough to comply with the Federal Rules and to enable the defendants to prepare a defense. See Pena-Crespo v. Puerto Rico, 408 F.3d 10, 13 (1st Cir. 2005) (requirements of Rule 26(a)(2)(B) enable opposing counsel to better prepare for trial). The fact that Dr. Sinha did not attach the May 14, 2001 report from Forensic Science Associates as an exhibit to his own report does not render his report inadequate. It is clear from Dr. Singha's report what data he considered, and the defendants received the May 14, 2001 report as an attachment to Dr. Blake's expert report. (See Mot. to Strike DNA Exp., Ex. A ¶ 18). Furthermore, there is nothing improper about the fact that Dr. Sinha's report is brief or that Dr. Sinha included the reasons for his conclusions as part of his description of his conclusions. Fed. R. Civ. P. 26(a)(2)(B) does not mandate that information be set forth in a particular format. Accordingly, this court recommends that the motion to strike Dr. Sinha's report on the grounds that it fails to comply with Fed. R. Civ. P. 26(a)(2)(B) be denied.

## 2.    Relevance of Expert DNA Testimony and Risk of Prejudice

The defendants also contend that the proposed testimony regarding DNA testing is irrelevant because DNA analysis was unavailable at the time of the conduct giving rise to this action and because the question of Waters' guilt or innocence is unrelated to the

plaintiff's claims.  They further argue that they would be unduly prejudiced by the admission of such evidence and that expert testimony concerning DNA testing would muddle the issues to be decided and lead to jury confusion.  This court finds that while an extensive examination of the DNA experts is unnecessary and it would seem that the facts could be stipulated to in order to avoid undue emphasis on the experts' testimony, the proposed testimony is highly probative on the issue of damages and should not be stricken.[6]

It is undisputed that the plaintiff does not need to prove Waters' innocence to establish the defendants' liability for constitutional violations.[7]  The plaintiff contends that the defendants lacked probable cause to arrest and prosecute Waters, and that the defendants fabricated incriminating evidence and withheld exculpatory evidence in order to convict Waters.  Since DNA testing was not available at the time of Waters' trial, it could not have played a role in the defendants' assessment of probable cause.  Moreover, as a matter of law the constitutionality of the defendants' conduct does not rise or fall on Waters' guilt or innocence.  See Baker v. McCollan, 443 U.S. 137, 145, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 443 (1979) (arrestee's innocence of the charge contained in warrant is

---

[6]  The defendants do not challenge the witnesses' credentials, methodologies or conclusions.  Therefore, it would seem that a stipulation would be appropriate.  These witnesses would not be qualified to testify as to the significance of their DNA testing results (i.e., that Waters must be innocent if his blood was not found at the scene) and the plaintiff does not intend to proffer their testimony for that purpose.

[7]  The relevance of innocence to the plaintiff's malicious prosecution claim will be discussed infra.

"largely irrelevant" to claim of deprivation of liberty without due process of law since the constitution "does not guarantee that only the guilty will be arrested"); <u>DeToledo v. County of Suffolk</u>, 379 F. Supp. 2d 138, 144 (D. Mass. 2005) (same). Nevertheless,the evidence of innocence may be admissible for other purposes. <u>See</u>, <u>e.g.</u>, <u>Moran v. Clarke</u>, 296 F.3d 638, 649-50 (8th Cir. 2002) (while evidence probative of innocence was "irrelevant" to question of probable cause for arrest in § 1983 action, it could be admitted for another purpose). In the instant case, the evidence is highly relevant to the issue of damages and it should be admitted.

The question of Waters' innocence underlies the plaintiff's theory of the case as a whole. As stated in the opening paragraphs of her complaint and alluded to throughout her pleading, the plaintiff is alleging that "Kenneth Waters was imprisoned for nineteen years of a life sentence for a murder and armed robbery that he did not commit" and that "[d]espite Mr. Waters' innocence and the utter lack of evidence against him, the defendant officers used unconstitutional techniques to obtain a conviction in a high-profile murder they had been unable to solve for two-and-a-half years." (Compl. ¶¶ 1-2). Thus, a fundamental premise of the plaintiff's claims is that Waters was innocent, and the measure of damages that she is seeking in this case is that which will compensate Waters' estate for emotional distress arising out of the conviction of an innocent man.

There can be little dispute that the release of a person who was innocent is qualitatively different in the eyes of the public from the release of a guilty person on a "technicality." <u>See Lopez v. City of Chicago</u>, No. 01 C 1823, 2005 WL 563212, at *8

(N.D. Ill. Mar. 8, 2005) (unpub. op.) (evidence that another person confessed was "relevant to allow an inference that [the plaintiff] was innocent and thus suffered the anguish during detention that an innocent person would suffer when wrongfully accused of a crime" as opposed to the inference that the plaintiff was "simply released because the police could not collect enough evidence.").  As the court stated in <u>Carter v. City of Philadelphia</u>, No. Civ. A. 97-4499, 2000 WL 1016653 (E.D. Pa. July 12, 2000), a civil rights action in which the plaintiff was seeking damages for wrongful arrest, prosecution and imprisonment:

> There can be little doubt that a person wrongfully incarcerated for any period of time may seek to recover for emotional damages.  The touchstone for such damages, however, is whether or not the plaintiff was, in fact, wrongfully imprisoned.  Accordingly, the issue of whether or not a civil plaintiff committed the underlying criminal act is central to the measure of damages for a wrongful imprisonment claim .... The Court believes that, presented with relevant evidence, a reasonable jury could conclude that an innocent person serving a jail term is likely to feel more emotional anguish than a guilty person who knows that he, in fact, committed the crime, but may have an avenue of relief available to him because of police misconduct.

<u>Id.</u> at *2.  <u>See also</u> <u>Limone v. United States</u>, 497 F. Supp.2d 143, 243 (D. Mass. 2007) (wrongful incarceration resulting from malicious prosecution, negligence, and conspiracies engaged in by the government causes losses of such a "magnitude" that they "are almost impossible to catalogue.").  Thus, in the instant case, the plaintiff should be able to seek to establish Waters' innocence, and the DNA evidence is critical to that endeavor.

Any risk of prejudice to the defendants can be addressed by way of a limiting instruction to the effect that the DNA evidence may not be considered in evaluating the defendants' conduct in connection with Waters' arrest and conviction, since it was not available at the time, but that it may be considered in connection with the plaintiff's claim that Waters' was innocent of the crime charged. Excluding the DNA evidence, on the other hand, would be "highly prejudicial" to the plaintiff as it would "invite[] the jurors to draw the impermissible inference that he was actually guilty, and, thus, absolve defendants of any misconduct." Newsome v. McCabe, No. 96C 7680, 2002 WL 548725, *6 (N.D. Ill. April 4, 2002) (unpub. op.). Consequently, absent a stipulation, this court recommends that Drs. Blake and Sinha be permitted to testify with an appropriate limiting instruction.

### 3.     Malicious Prosecution Claim

The plaintiff has also brought a malicious prosecution claim. The parties agree that, in connection with that claim, Waters' innocence is relevant. In order to prevail on this claim, the plaintiff must demonstrate that "criminal proceedings were initiated against [Waters] without probable cause and for an improper purpose and were terminated in his favor." Meehan v. Town of Plymouth, 167 F.3d 85, 89 (1st Cir. 1999) (quoting Landrigan v. City of Warwick, 628 F.2d 736, 745 n.6 (1st Cir. 1980)). Under Massachusetts law, "a criminal prosecution is terminated in favor of the plaintiff when the district attorney formally abandons the criminal proceedings by a nolle prosequi" and "the reasons stated for the nolle prosequi . . . [are] consistent with the innocence of the accused." Wynne v.

<u>Rosen</u>, 391 Mass. 797, 800-01, 464 N.E.2d 1348, 1351 (1984).  However, in this case, given the ambiguous language used, evidence of the nolle prosequi alone may not be sufficient to satisfy the plaintiff's burden of proving that the reasons stated for it are consistent with Waters' innocence.

The defendants' have agreed to stipulate that the nolle prosequi in the instant case satisfies the plaintiff's burden of proving that criminal proceedings were terminated in Waters' favor.  A jury instruction to that effect is appropriate in the instant case.  Thus, the DNA evidence does not need to be admitted in connection with the malicious prosecution claim.

## V.  <u>CONCLUSION</u>

For all of the reasons set forth above, this court recommends that the defendants' motion to strike the plaintiff's polygraph expert (Docket No. 104) be ALLOWED, but that the court give the following jury instruction:

> You are instructed that the evidence regarding Ms. Marsh's 1982 polygraph examination may only be considered for the limited purpose of deciding whether or not the defendants had probable cause to arrest Mr. Waters. The reliability of polygraph examinations has not been established and courts have long considered polygraph evidence to be of questionable value in determining the guilt or innocence of a defendant or the credibility of a testifying witness.  In Massachusetts, polygraph evidence is considered by the courts to be unreliable and it is inadmissible in criminal trials either for substantive purposes or for corroboration or impeachment of testimony. Therefore, while you may consider Officer Taylor's knowledge of the results of Ms. Marsh's polygraph examination in your assessment whether there was probable cause to arrest Mr. Waters in 1982, you are not to consider the polygraph evidence for the purpose of determining whether Ms. Marsh was truthful in 1982 or whether she is telling the truth now.

This court also recommends that, absent a stipulation of facts, the defendants' motion to strike the plaintiff's DNA experts (Docket No. 103) be DENIED, but that the court give an appropriate limiting instruction to the effect that the DNA evidence may not be considered in evaluating the defendants' conduct in connection with Waters' arrest and conviction, since it was not available at the time, but that it may be considered in connection with the plaintiff's claim that Waters' was innocent of the crime charged.  In addition, the court should give a jury instruction reflecting the parties' agreement that the nolle prosequi satisfies the plaintiff's burden of proving as part of her malicious prosecution claim that the underlying criminal proceedings were terminated in Waters' favor.[8]

　　　　　　　　　　　　　　　　　　 / s / Judith Gail Dein
　　　　　　　　　　　　　　　　　Judith Gail Dein
　　　　　　　　　　　　　　　　　United States Magistrate Judge

---

[8] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).