UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BETTY ANNE WATERS, as Administratrix of the Estate of KENNETH WATERS, Plaintiff, v. TOWN OF AYER, NANCY TAYLOR-HARRIS, in her individual capacity, ARTHUR BOISSEAU, in his individual capacity, WILLIAM ADAMSON, in his individual capacity, and PHILIP L. CONNORS, in his individual capacity, Defendants. | Case No. 04 10521 (GAO)(JGD) **FIRST AMENDED COMPLAINT AND JURY DEMAND** (Leave to File Granted on March 4, 2008) |

## INTRODUCTION

1.    Kenneth Waters was imprisoned for nineteen years of a life sentence for a murder and armed robbery that he did not commit. DNA testing of blood evidence recovered at the scene produced indisputable evidence that fully exonerated Mr. Waters of the crimes. His convictions were vacated and the charges against him were dismissed.

2.    Mr. Waters' wrongful conviction was not an accident, but the result of unconstitutional and tortious efforts by the defendant police officers and their supervisors, and municipal policies, customs and practices deliberately indifferent to civil rights. Despite Mr. Waters' innocence and the utter lack of evidence against him, the defendant officers used unconstitutional techniques to obtain a conviction in a

high-profile murder they had been unable to solve for two-and-a-half years. The defendant officers' actions resulted in Mr. Waters' arrest, unfair trial, conviction and lengthy imprisonment.

3. Acting under color of law, the defendants threatened, coerced and intimidated witnesses into fabricating evidence against Mr. Waters and they withheld and/or destroyed presumptively exculpatory evidence, including alibi and fingerprint evidence.

4. Beyond compensating Mr. Waters for the years stolen from him, this action seeks to redress the unlawful municipal policies and practices pursuant to which the defendants, acting under color of law, violated his clearly established rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION and VENUE

5. Title 28 U.S.C. § 1331 provides federal question jurisdiction, and 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law claims.

6. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Massachusetts, the judicial district in which the claim arose and in which, upon information and belief, all defendants resided and/or conducted business at the time of the events in question.

## PARTIES

7. Plaintiff BETTY ANNE WATERS is the Administratrix of the Estate of KENNETH WATERS, having been duly appointed by the Probate Court of Middletown, Rhode

Island, after he died on September 18, 2001. She is KENNETH WATERS' sister and a resident of Bristol, Rhode Island. She brings this suit in her capacity as the Administratrix of the Estate.

8.    Defendant TOWN OF AYER ("Town"), is an incorporated township within the County of Middlesex. At all times relevant to this action, the Ayer Police Department ("APD") was a department of the TOWN OF AYER. During the investigation and trial of Mr. WATERS, the final policymakers for the Ayer Police Department included, without limitation, Police Chiefs Philip L. Connors and William Adamson, and the Board of Selectmen.

9.    Defendant NANCY TAYLOR-HARRIS was at all time relevant to this complaint employed by the APD and acting under color of law. She is sued in her individual capacity. At the time of the investigation and trial of KENNETH WATERS, she was known as NANCY TAYLOR, and will be referred to as such in this complaint.

10.    Defendant ARTHUR BOISSEAU was at all times relevant to this complaint employed by the APD and acting under color of law. He is sued in his individual capacity.

11.    Defendant former police chief WILLIAM ADAMSON was at all times relevant to this complaint employed by the APD and acting under color of law. He is sued in his individual capacity.

12.    Defendant former police chief PHILIP L. CONNORS was at all times relevant to this complaint employed by the APD and acting under color of law. He is sued in his

3

individual capacity.

## JURY TRIAL DEMAND

13.     BETTY ANNE WATERS hereby demands a trial by jury on all issues so triable.

## FACTS

### The Crime

14.     At 10:45 a.m. on May 21, 1980, Katherina Reitz Brow was found stabbed to death in her Ayer, Massachusetts trailer home by her daughter-in-law.

15.     Mrs. Brow had last been seen alive by her husband, Charles Brow, a few minutes past 7:00 a.m. that morning.

### The Forensic Investigation of the Crime Scene

16.     The first officers to the scene included APD officer Buddy Decot and numerous other officers from neighboring towns, as well as state police officers from the Middlesex District Attorney's Office. APD Lt. ARTHUR BOISSEAU and Chief WILLIAM ADAMSON arrived on the scene a short time later.

17.     Officers Decot and BOISSEAU, along with other APD officers and state police officers, processed the crime scene and collected evidence.

18.     Mrs. Brow had been stabbed over thirty times and blood was found throughout the house.

19.     The linen closet had been ransacked and the envelope full of Mrs. Brow's excess money and her pocketbook, both of which, according to family members, she kept in the linen closet, were missing.

4

20.   A bloody paring knife embossed with the name of the Murphy Company was discovered in the kitchen wastebasket. The blade was covered with blood and had an unknown hair on it. It was determined to be the murder weapon. Mr. Brow, who worked at Murphy Knife, later informed police that the knife was from the Brow kitchen.

21.   Latent fingerprints were recovered from the crime scene. Corporal John Baliunas of the State Police Department processed the prints.

22.   A print on a Ballantine beer can was identified as belonging to Mrs. Brow. Mrs. Brow and the other members of her family were conclusively excluded as the source of the other prints, which remained unidentified. Unbeknownst to Mr. Waters, police used these prints during the months following the murder to exclude a number of potential suspects.

23.   Kathleen M. Higgins, a Senior Chemist with the Commonwealth of Massachusetts Department of Public Safety, was called to collect and examine the extensive blood evidence at the scene. She identified and collected numerous blood stains for further analysis. Ms. Higgins also identified and collected hair samples that had been left at the scene including hair from the victim's clutched fists and the knife found in the wastebasket.

24.   Testing on the blood evidence was conducted by John C. Abbott of the Commonwealth of Massachusetts Department of Public Safety. Most of the blood was determined to be Type B blood, which was the same blood type as the victim. The

remaining blood was found to be Type O. Most of the Type O blood was on the

towels in the linen closet and by the front door. Thus, the police concluded that the

Type O blood was left by the perpetrator, who must have been cut during the struggle.

25.    Most of the hair at the scene was found to be microscopically similar to Mrs. Brow's

head hair, and was assumed to have come from her. However, three unknown hairs,

including one hair found in Mrs. Brow's left hand and the hair on the murder weapon,

were found to be microscopically dissimilar to Mrs. Brow's hair. Police concluded

that these hairs had been left by the perpetrator.

### Kenny Waters' Alibi

26.    On the date of the Brow murder, Mr. WATERS, his girlfriend, Brenda Marsh, and

two of her children, one of whom was Mr. WATERS', were living with Mr.

WATERS' grandfather in Ayer in a house behind the Brow trailer home.

27.    Mr. WATERS worked at the Park Street Diner. On May 20, 1980, the day before the

murder, Mr. WATERS left his grandfather's house at 3:30 p.m. to work a double shift

at the diner. His shift ended at 8:00 a.m. the next morning, May 21, 1981, the date of

the murder. He did not leave the diner until 8:30 a.m., when a waitress from the diner

gave him a ride home.

28.    Mr. WATERS arrived home at about 8:40 a.m. He changed from his work clothes into

a suit, as he had to appear in the Ayer District Court that morning. Brenda Marsh

drove Mr. WATERS to Ayer District Court with the children. He met his attorney at

the court at about 9:00 a.m. He signed a waiver of a right to initial jury trial, and his

6

attorney put in an appearance for him. He did not leave court until after 11:00 a.m., when Mrs. Brow's body was found, at which time he remembered seeing the officers in court leave upon getting a call to respond to the scene of the murder. After he left the court, Mr. WATERS walked back to the diner, where numerous witnesses saw him, and where he saw police cruisers driving by on their way to the crime scene. He remained at the diner until he was picked up by Brenda Marsh at 12:30 p.m.

### The APD Initial Investigation of Kenny Waters

29.    On May 22, 1980, the day after the murder, APD Officer BOISSEAU, and Jack Dwyer and Pat Keane of the State Police Department went to Mr. WATERS' house and asked him to come to the station to speak with them.

30.    While the officers were at the house, Brenda Marsh confirmed that Mr. WATERS was in court the previous morning, but they ignored this information.

31.    Mr. WATERS voluntarily accompanied the officers to the station for questioning. Mr. WATERS thoroughly accounted for his whereabouts from 7:00 a.m. to 10:45 a.m. on the date of the murder, an accounting that could be corroborated by others. Mr. WATERS informed BOISSEAU and the state police officers that he had been at the diner until 8:30 a.m., had been driven home by a waitress, had changed clothes and immediately left for court with Brenda Marsh for his 9:00 a.m. appearance, and did not leave court until 10:45 a.m.

32.    The APD officers determined that neither Mr. WATERS' clothes nor his shoes had any blood on them. Officer Dwyer examined Mr. WATERS' entire body. He did not

7

find a single cut or scratch on him from which he could have bled. Mr. WATERS was fingerprinted and released.

33. On September 2, 1980, Officer BOISSEAU again picked up Mr. WATERS and took him to the APD. Mr. WATERS voluntarily submitted to a voice-stress examination, which he passed. On September 6, 1980, NANCY TAYLOR was informed that Mr. WATERS had passed the voice stress test.

34. No new evidence was collected and no new leads were established from September 1980 until October 1982. At this point Mrs. Brow's murder had remained unsolved for almost two-and-a-half years.

### The Targeting of Kenneth Waters

35. In October 1982, Robert Osborne, who at that time was living with Mr. WATERS' ex-girlfriend, Brenda Marsh, approached the APD and offered information regarding the Brow murder. Upon information and belief, Mr. Osborne asked for money in exchange for this information.

36. Mr. Osborne told Officer TAYLOR and Chief CONNORS that Ms. Marsh had told him that Mr. WATERS had confessed to killing a woman in Ayer and that she remembered washing blood out of Mr. WATERS' clothes after the murder.

37. Based on this information, which they knew or should have known to be false, the APD officers, including Officers TAYLOR and BOISSEAU, reopened the investigation of the Brow murder, focusing exclusively on Kenneth WATERS as the perpetrator.

38.  Chief CONNORS and Officer TAYLOR interrogated Ms. Marsh regarding Mr. Osborne's information. Among other things, they told Ms. Marsh that she would be charged as an accessory to the murder and that she would lose her children if she did not corroborate Mr. Osborne's claim.

39.  Despite this pressure, Ms. Marsh told the officers that the statements Mr. Osborne had attributed to her were not true, that Mr. WATERS had never made such an admission to her and that she did not have any information connecting Mr. WATERS to the Brow murder.

40.  Ultimately, however, Ms. Marsh succumbed to defendants' unrelenting threats and pressure, falsely inculpated Mr. WATERS in the Brow murder and agreed to testify against him. The APD defendants knew or should have known that her statements and testimony against Mr. WATERS were false and resulted from their coercive psychological pressure.

**The Malicious Prosecution of Kenny Waters**

41.  Based on this false information, Officer TAYLOR swore out a complaint and warrant application against Mr. WATERS for the murder of Katherina Brow on October 12, 1982. Mr. WATERS was arrested the next day.

42.  Based solely on Ms. Marsh's coerced and false testimony at a probable cause hearing in November of 1982, Mr. WATERS was bound over for trial.

43.  Mr. WATERS was indicted on November 8, 1992 based on the same coerced false testimony of Ms. Marsh, and the additional false testimony of APD officer TAYLOR

that all prints recovered from the crime scene were unusable because they were "smeared," and therefore could not be compared to Mr. WATERS' prints.

44.  Once they set the prosecution in motion, APD officers conspired to ensure Mr. WATERS' conviction, in deliberate disregard for Mr. WATERS' factual innocence and his constitutional rights.

45.  In order to obliterate proof of Mr. WATERS' alibi, APD officers confiscated Mr. WATERS' time-cards from Berry Enterprises, which owned and managed the Park Street Diner. Although these records proved that Mr. WATERS had indeed been at work until at least 8:00 a.m. on the morning of the murder, and also would have identified the waitress who drove Mr. WATERS home that morning, the defendants suppressed the time-cards from the prosecution and defense. When defense counsel subpoenaed Mr. WATERS' Park Street Diner time records for trial, all the time cards for the week of the murder were missing.

46.  The APD officers also interviewed employees from Global Van Lines, where Mr. WATERS had worked prior to 1980. Defendants coerced and manipulated Global Van Lines employees into falsely stating and later testifying at trial that a knife like the murder weapon was used in their office, that after Mr. WATERS had left the company the knife was missing, and that the missing knife looked just like the murder weapon, all despite Mr. Brow's identification of the knife as being from the Brow kitchen.

47.  The officers, including Defendant TAYLOR, then tracked down Roseanna Perry,

another former girlfriend of Mr. WATERS, and coerced and pressured her into falsely inculpating Mr. WATERS.

48. The officers first went to Ms. Perry's home. She told them that she had no information linking Mr. WATERS to the murder.

49. The officers, including defendant TAYLOR, questioned Ms. Perry again, this time at the Providence Police Department, where they told Ms. Perry that Mr. WATERS and his family were dangerous and were threatening to kill her, and that they would charge her as an accessory in this case if she did not tell them what they wanted to hear. Additionally, during three hours of questioning, the officers repeatedly showed Ms. Perry gruesome pictures of the crime scene and the autopsy.

50. After this three-hour interrogation at the police department, the APD officers, and especially defendant TAYLOR, repeatedly called and came by Ms. Perry's house and told her she was in danger of being killed.

51. Ms. Perry finally yielded to these coercive tactics and, although she had repeatedly told the officers that she knew nothing, she stated that once when she and Mr. WATERS were both drunk, he might have said something about the Brow murder. The officers, particularly defendant TAYLOR, kept pressuring Ms. Perry until she further succumbed and said that Mr. WATERS had said something about killing and stabbing the "old German bitch," stealing her jewelry and money, and getting away with it.

52. The APD officers, and specifically defendant TAYLOR, knew or should have known

that Ms. Perry's coerced testimony was false, but nonetheless presented her fabricated testimony as true.

53. The defendants took these actions despite the fact that none of the physical evidence at the scene pointed to Mr. WATERS.

54. In addition to coercing false witness statements, upon information and belief, the APD defendants, specifically including then-Chief ADAMSON and defendant TAYLOR, sent Mr. WATERS' fingerprints to State Police Trooper Baliunas for comparison to the unidentified prints found at the scene, as they had done to exclude other suspects, and were informed that Mr. WATERS was excluded as the source of those prints, but failed to document or disclose the exculpatory results to the prosecutor.

55. The three unknown hairs found at the scene – including the hair in Mrs. Brow's hand and the hair on the knife – were microscopically dissimilar to Mr. WATERS' hairs and could not have come from him.

56. Mr. WATERS had Type O blood, the same type that was found at the crime scene, but Mr. Brow did as well, along with 48% of the population. This evidence did not in any way inculpate Mr. WATERS, however, since, based on Officer Dwyer's thorough examination of Mr. WATERS the day after the murder, the defendants knew he had absolutely no wounds from which he could have left his blood at the crime scene.

**The Fabrication of Evidence and Violations of <u>Brady v. Maryland</u> and <u>Giglio v. United States</u>**

57.    The APD defendants fabricated evidence to inculpate Mr. WATERS, including without limitation, the false witness statements from Ms. Marsh, Ms. Perry and Global Van Lines employees.

58.    The APD defendants never disclosed to the prosecutor or defense counsel material exculpatory and/or impeachment information, including without limitation:

    a.    that they coerced Ms. Marsh, Ms. Perry and Global Van Lines employees into implicating Mr. WATERS;

    b.    that they had taken prior inconsistent statements from Ms. Perry and Ms. Marsh initially indicating that they had no information linking Mr. WATERS to the murder;

    c.    that fingerprints found at the scene, from which the victim and her family were excluded, were fit for comparison to Mr. WATERS' prints; other suspects had been ruled out after being excluded as the source of those prints; they had submitted WATERS' fingerprint card to the state police for comparison on at least one occasion; the state police reported back to them that Mr. WATERS was excluded, but they deliberately failed to document or disclose this fact to the prosecutor, defendant TAYLOR going so far as to testify falsely before the Grand Jury that the prints were all smeared and therefore, unfit for comparison; and,

    d.    that Mr. WATERS' alibi was corroborated by time records at the Park Street Diner.

### The Trial and Conviction of Kenny Waters

59.  Mr. WATERS' trial began on May 4, 1983.

60.  On May 11, 1983, the jury found Mr. WATERS guilty of murder and armed robbery, based upon the presentation of the coerced false testimony and without having heard any of the exculpatory evidence withheld by the defendants.

61.  Mr. WATERS was sentenced to life in MCI Walpole-Cedar Junction on the murder charge, and a concurrent sentence of 8 to 10 years on the armed robbery charge.

62.  Kenny WATERS was innocent.

### The Exoneration

63.  After Mr. WATERS' conviction, his sister, BETTY ANNE WATERS began working to prove his innocence. Years after his conviction, after she had gone back to school, put herself through college, and was pursuing a law degree, she was able to find the Type-O blood evidence in this case, which had been preserved in the Middlesex Superior Court Clerk's Office.

64.  In early 2000, the Innocence Project at the Benjamin N. Cardozo Law School and Ms. WATERS were able to persuade the Middlesex District Attorney to agree to testing of the blood evidence found in this case.

65.  The results of DNA testing conducted by Dr. Edward Blake of Forensic Science Associates revealed that Mr. WATERS could not have left the blood at the crime scene, and therefore could not have been the perpetrator.

66.  These dispositive and exculpatory results were replicated by the Massachusetts State

Police Crime Lab on March 13, 2001.

67. On March 14, 2001, Ms. WATERS and the Innocence Project filed an unopposed emergency motion for a new trial based on the discovery of this exculpatory DNA evidence.

68. This motion was granted and on March 15, 2001 Mr. WATERS' convictions were vacated. After 19 years, he was finally released from prison. In light of the DNA evidence, on June 19, 2001, the Middlesex District Attorney's Office dropped all charges against Mr. WATERS by way of a *nolle prosequi*, thereby favorably terminating the case against him on grounds consistent with innocence.

69. On September 19, 2001, having tasted only six months of freedom that these defendants had denied him for nineteen years, Kenny WATERS died in a tragic accident.

70. Plaintiff BETTY ANNE WATERS was appointed as the administratrix of his estate.

**Ongoing Unlawful and Unconstitutional Conduct**

71. In each and every long year of Mr. WATERS' almost two decades of wrongful imprisonment, from October 12, 1982 through March 20, 2001, and indeed in the six months he survived after his release, Defendants TAYLOR, BOISSEAU, ADAMSON, and CONNORS breached their legal and constitutional duties to disclose certain exculpatory facts, including that, at trial, they had withheld material exculpatory and impeachment information from the prosecutor, including the existence of usable unknown prints at the crime scene, the exclusion of WATERS as the source of those

15

fingerprints; the fact that NANCY TAYLOR falsely testified before the Grand Jury that there had been only "smeared" fingerprints found at the scene; the spoliation of time cards that would have established WATERS' alibi; and their improper influence of, and/or promises, inducements and rewards to Brenda Marsh and Roseanna Perry, which led both women to make false statements and present perjured and fabricated testimony against Waters at trial. In so doing, Defendants violated their ongoing legal and constitutional duties and obligations to come forward in every year after Mr. Waters's arrest and conviction, specifically including 1982, 1983, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000 and 2001, which conduct actually and proximately caused Kenneth Waters to suffer and endure false detention and false imprisonment, embarrassment, humiliation, mental and emotional distress, violations of his constitutional rights, personal and physical injuries, and the loss of liberty, in each and every one of those years.

### Supervisory and <u>Monell</u> Facts

72.    Upon information and belief, there was a policy, custom and practice in the TOWN OF AYER, by and through its final policymakers and supervisors, beginning years before the unjust conviction of Mr. WATERS and continuing throughout his incarceration, of failing to adequately investigate serious crimes, deliberately suppressing exculpatory material and coercing witnesses into perjury during criminal investigations.

73.    Upon information and belief, the TOWN OF AYER, through its final policymakers

and supervisors, failed to adequately screen, train, supervise, and/or discipline the

individual defendants concerning proper investigatory techniques, their obligations

to disclose exculpatory and/or impeachment evidence under <u>Brady v. Maryland</u>, 373

U.S. 83 (1963), and <u>Giglio v. U.S.</u>, 405 U.S. 150 (1972), and witness interviewing and

interrogation.

74.     Upon information and belief, the TOWN OF AYER, through its final policymakers

and supervisors, failed to adequately screen, hire, supervise and discipline officers in

order to avoid hiring individuals with a propensity for abusing their police authority.

**Damages**

75.     As a direct result of the defendants' unconstitutional actions, Mr. WATERS sustained

the following injuries and damages in every year from 1982 through his death in

2001: personal physical injuries and sickness; pain and suffering; severe mental

anguish; emotional distress; loss of income; infliction of physical illness; inadequate

medical care; humiliation, indignities and embarrassment; degradation; permanent

loss of natural psychological development; and restrictions on all forms of personal

freedom, such as diet, sleep, personal contact, educational opportunity, vocational

opportunity, athletic opportunity, personal fulfillment, sexual activity, family

relations, reading, television, movies, travel, enjoyment, and expression.

## CAUSES OF ACTION

### COUNT I:
**42 U.S.C. § 1983 Fourteenth Amendment Due Process Claims for Failure to Disclose Material Exculpatory Evidence and Impeachment Evidence, and Fabrication of**

17

**Inculpatory Evidence**

76.    Plaintiff hereby incorporates all of the foregoing as if set forth herein and further

alleges as follows:

77.    Defendants TAYLOR, BOISSEAU, ADAMSON, and CONNORS failed to disclose

to the prosecutor and the defense attorney material information that was favorable to

Mr. WATERS. This undisclosed information included, but was not limited to:

a.    the time records they had seized from the Park Street Diner;

b.    the exculpatory statements made by Ms. Perry and Ms. Marsh before they

succumbed to the coercive interrogation tactics used by the police;

c.    the fact that the inculpatory statements of Ms. Perry, Ms. Marsh and the Global

Van Line employees were the result of coercive interrogation tactics used by

the police; and

d.    the fact that usable prints left by someone other than the victim and her family

were lifted at the scene, and that state police had successfully compared and

excluded other suspects as the source of those prints, and that they had

submitted Mr. WATERS' prints for comparison on at least one occasion and

learned that he too had been excluded, NANCY TAYLOR instead going so far

as to testify falsely before the Grand Jury that all the prints were smeared and

therefore, unfit for comparison.

78.    Defendants TAYLOR, BOISSEAU, ADAMSON, and CONNORS, deliberately

fabricated inculpatory evidence by coercing false witness statements and perjured

testimony from witnesses including, without limitation, Brenda Marsh, Roseanna Perry, and Global Van Lines employees.

79.    Acting with deliberate indifference by fabricating inculpatory evidence and withholding material exculpatory and impeachment evidence prior to trial, the individual named defendants violated Mr. WATERS' clearly established Fourteenth Amendment right to due process of law as interpreted by the United States Supreme Court cases including Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. U.S., 405 U.S. 150 (1972), and their progeny. No reasonable officer would have believed this conduct was lawful.

80.    Defendants' deliberate fabrication of inculpatory evidence and suppression of favorable evidence directly and proximately caused Mr. WATERS to be wrongfully convicted and to suffer the injuries and damages described above in every year from his arrest in 1982 through his death in 2001.

## COUNT II:
### 42 U.S.C. § 1983 Fourth Amendment Violations for False Arrest, Malicious Prosecution and Franks v. Delaware Claim

81.    Plaintiff hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

82.    The officers in this case, including Officer TAYLOR, deliberately, with malice and reckless disregard for the truth, caused an arrest warrant to issue by filing an affidavit containing fabricated evidence that they knew or should have known was false, and omitting material information that would have vitiated probable cause.

83. When Mr. WATERS was arrested, the only evidence against him consisted of the fabricated, false and coerced statements of witnesses, which were the result of police pressure, and which the police knew or should have known were false. These statements did not provide even arguable probable cause to arrest him, particularly in light of the exculpatory alibi evidence the defendants deliberately ignored.

84. Defendants TAYLOR, BOISSEAU, ADAMSON and CONNORS, all state actors acting under color of law, commenced or caused to be commenced a criminal prosecution, instituted with malice and without probable cause, against Mr. WATERS. They initiated a prosecution against Mr. WATERS by coercing false statements from witnesses implicating him in the murder and by falsely arresting him. They continued the prosecution by presenting false testimony against him to the grand jury and at the trial, in their capacity as complaining witnesses.

85. Defendants' intentional misconduct violated Mr. WATERS' clearly established Fourth Amendment rights. No reasonable police officer would have believed these acts were lawful.

86. The criminal action ultimately terminated in Mr. WATERS' favor on June 20, 2001, when all criminal charges against him were dropped by way of *nolle prosequi* in light of the DNA exclusion, under circumstances consistent with his innocence.

87. As a direct and proximate result of defendants' unconstitutional acts, Mr. WATERS was falsely arrested, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction and wrongly imprisoned for almost two decades, resulting in his

suffering the damages set forth above in every year from his arrest in 1982 through his death in 2001.

## COUNT III:
### 42 U.S.C. § 1983 Supervisory Liability of All Individual Supervisor Defendants

88.    Plaintiff hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

89.    Defendants ADAMSON, CONNORS, and other supervisors of the AYER Police Department, acting under color of law with deliberate indifference to the rights of criminal suspects, failed to train and adequately supervise defendants TAYLOR, BOISSEAU, as well as Buddy Decot. In so doing, these defendants tacitly acquiesced in, condoned or encouraged the unconstitutional misconduct of TAYLOR, BOISSEAU and Decot including the fabrication of evidence, the coercion of witnesses and the suppression of material exculpatory evidence from the prosecutor.

90.    The failure of these defendants to train and adequately supervise defendants TAYLOR and BOISSEAU, as well as Decot, amounted to deliberate indifference, or intentional misconduct, which proximately and directly caused Mr. WATERS to suffer all of the injuries and damages set forth above in every year from his arrest in 1982 through his death in 2001.

## COUNT IV:
### 42 U.S.C. § 1983 Conspiracy

91.    Plaintiff hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

21

92.    Upon information and belief, defendants TAYLOR, BOISSEAU, ADAMSON and

CONNORS conspired, reached a mutual understanding and acted in concert to violate

Mr. WATERS' civil rights.

93.    In furtherance of the conspiracy, defendants undertook overt acts, including without

limitation, the following:

a.    suppressing exculpatory evidence in favor of Mr. WATERS;

b.    fabricating inculpatory evidence against Mr. WATERS;

c.    deliberately failing to document or disclose to the prosecutor the fact that they

had submitted Mr. WATERS' fingerprints to the state police for comparison

with usable unknown prints found at the crime scene, and that he had been

excluded; and

d.    with respect to the supervisor defendants, authorized, encouraged or condoned

this conduct by, inter alia, abdicating their responsibilities to ensure proper and

adequate investigations.

94.    Defendants' conspiracy directly caused the constitutional deprivations suffered by Mr.

WATERS, including his false arrest, malicious prosecution, unfair trial, wrongful

conviction and unlawful confinement, and all the other grievous permanent damages

and injuries set forth above in every year from his arrest in 1982 through his death in

2001.

**COUNT V:**
**42 U.S.C. § 1983 <u>Monell</u> Claim against the Town of Ayer for Unconstitutional**
**Customs, Policies and/or Practices**

95.    Plaintiff hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

96.    The TOWN OF AYER, by and through its final policymakers, including without limitation, Police Chiefs ADAMSON and CONNORS, created and maintained the following unconstitutional customs, policies and/or practices:

    a.    APD officers systemically failed to disclose to prosecutors information that was favorable to criminal defendants;

    b.    APD officers systemically committed and permitted witnesses to commit perjury against suspects;

    c.    APD officers routinely coerced, pressured and threatened witnesses into offering inculpatory evidence against their primary suspects and to testify against them; and

    d.    APD officers systemically failed to investigate leads pointing away from their primary suspects.

97.    The TOWN's unconstitutional customs, practices and policies directly and proximately caused Mr. WATERS' constitutional deprivations, including his false arrest, malicious prosecution, unfair trial, wrongful conviction, and the other grievous permanent injuries and damages set forth above.

### COUNT VI:
### 42 U.S.C. § 1983 <u>Monell</u> Claim against Town of Ayer for Unconstitutional and Inadequate Screening, Hiring, Training and Supervision

98.  Plaintiff hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

99.  The TOWN OF AYER, by and through its final policymakers, including without limitation Police Chiefs ADAMSON and CONNORS, created unconstitutional customs, policies and/or practices of failing to screen; of improperly hiring; and of failing to train and/or supervise APD officers to ensure that they disclosed favorable information to prosecutors, that they did not fabricate falsely inculpatory evidence against suspects, and that they did not coerce or improperly pressure witnesses or encourage witnesses to commit perjury.

100. The TOWN's unconstitutional policies, practices and customs with regard to screening, hiring, training and supervising APD officers adequately in these areas directly and proximately caused Mr. WATERS' constitutional deprivations, including his false arrest, malicious prosecution, unfair trial, wrongful conviction, and the other grievous permanent injuries and damages set forth above.

## STATE CAUSES OF ACTION

### COUNT VII:
### MGL C. 12 § 11I Claim

101. Plaintiff hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

102. Defendants TAYLOR, BOISSEAU, ADAMSON and CONNORS interfered with the Mr. WATERS' exercise and enjoyment of rights guaranteed to him by the United

States Constitution, and the constitution and laws of the Commonwealth of Massachusetts by coercing witnesses into fabricating evidence against him.

103.  Defendants' misconduct deprived plaintiff of his rights under federal and state law by threats, intimidation and coercion, thereby violating the Massachusetts Civil Rights Act.

104.  As a direct and proximate result of this conduct, plaintiff suffered the injuries as described above in every year from his arrest in 1982 through his death in 2001.

<u>COUNT VIII:</u>
**Malicious Prosecution Claim**

105.  Plaintiff hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

106.  Defendants TAYLOR, BOISSEAU, ADAMSON and CONNORS, acting with malice and without probable cause, initiated the criminal proceedings against Mr. WATERS by fabricating evidence against him, by arresting him, and/or by testifying before the grand jury and at trial.

107.  The criminal proceedings terminated in Mr. WATERS' favor on or about June 20, 2001, when all criminal charges against him were dismissed.

108.  Defendants' conduct caused Mr. WATERS' unfair trial, wrongful conviction and imprisonment, all of which events and circumstances caused Mr. WATERS to suffer the physical, emotional and pecuniary damages set forth above in every year from his arrest in 1982 through his death in 2001.

## CLAIMS FOR DAMAGES

109. Defendants' actions deprived Mr. WATERS of his civil rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and the laws of the Commonwealth of Massachusetts.

110. The defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds and omissions caused Mr. WATERS to be falsely arrested, maliciously prosecuted, unfairly tried, wrongfully convicted, and to suffer almost two decades of wrongful imprisonment.

111. All the alleged acts, misdeeds and omissions committed by the defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual defendants meets all of the standards for imposition of punitive damages.

WHEREFORE, Plaintiff BETTY ANNE WATERS prays as follows:

A. That the Court enter judgment in favor of the Estate of Mr. WATERS and against defendants on all Counts of the Complaint;

B. That the Court award compensatory damages to the Estate of Mr. WATERS and against the defendants, jointly and severally, in an amount to be determined at trial;

C. That the Court award punitive damages to the Estate of Mr. WATERS and against all individual defendants, jointly and severally, in an amount to be

26

determined at trial, in order that such award will deter similar proscribed conduct by defendants in the future;

D.    That the Court award to the Estate of Mr. WATERS and against defendants pre-judgment and post-judgment interest on all sums awarded him in this action and that it further award to the Estate of Mr. WATERS recovery of his costs concerning this action, including reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §1988; and

E.    That the Court grant the Estate of Mr. WATERS any such other relief to which he may be entitled.

Dated: March 5, 2008                          Respectfully submitted,
                                              By counsel for the plaintiff,


                                              Barry C. Scheck
                                              Deborah L. Cornwall
                                              Monica R. Shah
                                              Cochran Neufeld & Scheck LLP
                                              99 Hudson St., 8th Floor
                                              New York, NY 10013
                                              Tel: (212) 965-9081
                                              Fax: (212) 965-9084


                                              Robert N. Feldman
                                              Birnbaum & Godkin, LLP
                                              280 Summer Street
                                              Boston, MA 02210-1108
                                              Tel: (617) 307-6100
                                              Fax: (617) 307-6101


27