UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-10521-GAO

| | |
|---|---|
| BETTY ANNE WATERS, as Administratrix of the Estate of KENNETH WATERS, <br><br> Plaintiff <br><br> v. <br><br> TOWN OF AYER, NANCY TAYLOR-HARRIS, in Her Individual Capacity, ARTHUR BOISSEAU, In His Individual Capacity, WILLIAM ADAMSON, in His Individual Capacity and PHILIP L. CONNORS, in His Individual Capacity, <br><br> Defendants | MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PHILIP CONNORS' MOTION FOR SUMMARY JUDGMENT |

I.      INTRODUCTION

On May 21, 1980, Katarina Brow ("Brow, Mrs. Brow") was found murdered in her home

at 7 ½ Rosewood Drive, Ayer, MA (Amended Complaint, ¶14).  The investigation of the murder

was conducted pursuant to G.L. c.38, §4 by the Middlesex District Attorney and the State Police

Department with the assistance of the Ayer Police Department (L.R. 56.1 Statement of Facts,

"S.O.F." ¶8).  The District Attorney's case file has been lost or inadvertently destroyed (S.O.F.

¶6).

From the outset, plaintiff's decedent, Kenneth Waters ("Waters") was a person of interest

in the investigation (S.O.F., ¶15).  Waters was arrested by Ayer Police on October 12, 1982,

pursuant to directive of the prosecuting Assistant District Attorney (currently Massachusetts

Superior Court Associate Justice) Elizabeth Fahey (S.O.F. ¶78).

Waters was convicted of Mrs. Brow's murder on May 12, 1983 and incarcerated (S.O.F.

¶102).  His conviction was affirmed on appeal to the Supreme Judicial Court (Commonwealth v.

Waters, 399 Mass. 708 (1987).

In 2001, Waters filed an unopposed motion for a new trial, based solely upon DNA evidence not available at the time of his trial, which established that he was not the source of the non-victim blood found at the crime scene (although his blood type was the same) (S.O.F. ¶2). Thereafter, the Commonwealth filed a nolle prosequi which stated:

> Based upon new DNA evidence of the presence of blood of an unknown person at the scene of the 1980 murder of Katarina Brow, the Commonwealth has agreed that, at a minimum, a new trial of the above indictments is warranted.
>
> At this time, there is insufficient evidence to proceed with a criminal prosecution against the defendant, Kenneth Waters, and as such, the Commonwealth has determined that, at this time, a nolle prosequi is in the interests of justice. The Commonwealth's investigation into the murder of Katarina Brow was and will continue (S.O.F. ¶1).

Waters was released from prison but remained a suspect in the Brow murder up to the point of his own death, as a result of substantial, inculpatory, non-blood evidence developed at trial, as described in detail herein (S.O.F. ¶4). The investigation of the crime for purposes of determining whether to re-try Waters revealed no police misconduct nor was the nolle prosequi predicated upon any evidence of same (S.O.F. ¶5).

This case therefore proceeds not on the basis of any discovery of police misconduct leading to Waters' release. Instead, it reflects post hoc scrutiny of a conviction upheld on appeal by the Supreme Judicial Court in order to unfairly hold the defendants liable for monetary damages.[1]

As set forth hereinafter, the plaintiff has failed to establish actionable individual or municipal misconduct leading to false arrest or an unfair trial, and the defendant has produced herein compelling affirmative evidence negating plaintiff's claims. Specifically, defendant Philip Connors ("Chief Connors") became the Chief of the Ayer Police Department on or about

---

[1]  Waters' prosecutor, Judge Fahey, is entitled to absolute prosecutorial immunity. None of the State Police Officials involved in the Brow prosecution have been sued.

February 1982, almost two years after the murder of Mrs. Brow.  Chief Connors' role in the

Brow murder investigation was limited to his interview of witness Brenda Marsh, along with

defendant Taylor, on October 4, 1982 (S.O.F. ¶44), which interview was not coercive, as

established hereinafter.  In addition, Chief Connors, along with Assistant District Attorney

Fahey, supervised the actions of Officer Taylor.  As will be described in detail herein, the

plaintiff has failed to identify any basis for individual or supervisory liability on the part of Chief

Connors.  Consequently, Chief Connors' Motion for Summary Judgment should be allowed.

II.     FACTS

The facts underlying this case are set forth in the Defendants' Statement of Material Facts

Not in Dispute Pursuant to L.R. 56.1, filed herewith.

III.    ARGUMENT

A.     **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  "In civil

procedure, summary judgment's role is "to pierce the pleadings and to assess the proof in order to

see whether there is a genuine need for trial." Mesnick v. General Elec. Co., 950 F.2d 816,

822 (1st Cir. 1991) (citing, Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir.1990)).

In order to defeat a summary judgment motion, "the non-moving party must demonstrate the

existence of a genuine issue of material fact pertaining to those issues on which it would bear the

burden of proof at trial." Kauffman v. Puerto Rico Telephone Co., 841 F.2d 1169, 1171 (1st Cir.

1988).  Under Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1987), summary judgment is

appropriate where the non-moving has the burden of proof and "fails to make a showing sufficient to establish the existence of an element essential to that party's case."

As the First Circuit has held, "[g]enuine issues of material fact are not the stuff of an opposing party's dreams. On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion." Mesnick, 950 F.2d at 822. For summary judgment purposes evidence must be competent and "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Id. (citing, Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir.1989)). As the plaintiff can make no such showing in this case, Chief Connors is entitled to summary judgment as a matter of law.

## B.    Count I – Due Process – Failure to Disclose – *Brady* and Fabrication of Evidence

In Paragraph 77 of the Amended Complaint, the plaintiff sets forth four items of evidence that she claims Chief Connors failed to disclose to the District Attorney[2]: (a) the time cards from the Park Street Diner; (b) witnesses Marsh and Perry's initial denial of having any information about the murder; (c) the fact that inculpatory statements by Marsh, Perry and Global Van Lines were coerced; and (d) facts relating to fingerprints.

At the outset, the First Circuit Court of Appeals recently reaffirmed that only those officials directly responsible for an injury causing action can be held liable under Section 1983. Gagliardi v. Sullivan, 513 F.3d 301 (1st Cir. 2008). In this matter, there is no evidence that Chief Connors ever had possession of time cards or fingerprints (S.O.F. ¶123), or that he had any involvement in the questioning of Rosanna Perry and/or the Global Van Lines employees.

---

[2]  The claims set forth in Counts I and II purportedly arise out of the alleged actions or inactions of Chief Connors in his capacity as a police officer for the Ayer Police Department, as opposed to in his capacity as supervisor. The supervisory claims against Chief Connors are addressed separately in Section D of this Memorandum.

Therefore, Chief Connors' liability cannot be premised on any alleged failure to disclose exculpatory evidence in those instances. <u>Kelly</u> v. <u>Curtis</u>, 21 F.3d 1544, 1551 (11th Cir. 1994) (rejecting plaintiff's theory of "vicarious co-employee liability" and holding that police officer was not subject to liability for failing to disclosure lab report where there was no evidence that he personally knew about the report).

Further, the Ayer Police Department notified the District Attorney of all its activities in advance (S.O.F. ¶¶19, 20) and turned over all relevant materials, including exculpatory evidence, to the District Attorney (S.O.F. ¶26), and in the absence of the District Attorney's file the plaintiff cannot show otherwise. As noted, the only matter in which Chief Connors had direct involvement was with respect to the questioning of Brenda Marsh, and he is entitled to summary judgment as to this claim for the detailed reasons set forth below:

## 1.    Chief Connors did not violate Waters' Due Process Rights as defined in *Brady v. Maryland*

The plaintiff claims that Ms. Marsh initially told Chief Connors and Officer Taylor that "the statements Mr. Osborne had attributed to her were not true, that Mr. Waters had never made such an admission to her and that she did not have any information connecting Mr. Waters to the Brow Murder." (Amended Complaint, ¶39). The plaintiff further alleges that "Chief Connors and Officer Taylor interrogated Ms. Marsh regarding Mr. Osborne's information. Among other things, they told Ms. Marsh that she would be charged as an accessory to the murder and that she would lose her children if she did not corroborate Mr. Osborne's claim." (Amended Complaint, ¶38). The plaintiff then alleges that "Ms. Marsh succumbed to defendants' unrelenting threats and pressure, falsely inculpated Mr. Waters in the Brow murder and agreed to testify against him." (Amended Complaint, ¶40). The plaintiff claims that these allegations amount to

exculpatory evidence that should have been disclosed by Chief Connors (Amended Complaint, ¶77)[3].

Critically, Ms. Marsh would not state at deposition that she had lied at trial, at the probable cause hearing, or even at the hearing on Waters' original motion for new trial in 1985 (S.O.F. ¶121). She also testified at her deposition that no police officer told her to lie in which she testified that she was not coerced (S.O.F. ¶¶65,116, 120).

As to the *Brady* claim, Chief Connors cannot be held liable for failing to disclose the circumstances of the Marsh interview because he could have reasonably relied on Officer Taylor and Brenda Marsh herself to do so. In fact, Taylor apprised Assistant District Attorney Fahey of the interview (S.O.F. ¶67). A police officer has no duty to disclose exculpatory evidence "where [he] has reason to believe that the prosecutor is aware of that evidence." Kelly, 21 F.3d at 1552 (police officer had no duty to disclose report from the state crime lab where the lab generally sent a copy to the District Attorney); Porter v. White, 483 F.3d 1294, 1310 (11th Cir. 2007) (to establish the "affirmative causal connection" between Chief Connors and the alleged constitutional violation in this regard, the plaintiff would have to show both that Chief Connors withheld exculpatory evidence from the prosecution and that the prosecution did not obtain the evidence from anyone else); McMillian v. Johnson, 88 F.3d 1554, 1568 (11th Cir. 1996). Chief Connors testified at deposition that, after the initial interview with Ms. Marsh, Officer Taylor was the primary liaison between the Ayer Police Department and the District Attorney's Office (S.O.F. ¶21). As such, if there were any exculpatory evidence to disclose with respect to the Marsh interview, it was Officer Taylor's responsibility to make the disclosure, and holding Chief Connors liable for a direct violation would be tantamount to a finding of *respondeat superior,*

---

[3]  Both Chief Connors and Officer Taylor deny that the interview of Ms. Marsh occurred as described in the Amended Complaint (S.O.F. ¶61).

which is an insufficient basis for imposing liability under Section 1983.  See, Savino v. City of

New York, 331 F.3d 63, 74 (2nd Cir. 2003) (police officers had no duty to disclose evidence

regarding another officer's observation where that officer was interviewed by the Assistant

District Attorney). Therefore, Chief Connors is entitled to summary judgment as a matter of law

as to the *Brady* claim.

Chief Connors is further entitled to summary judgment as to the *Brady* claim for the

additional substantive argument, set forth in Section III(B) of the Memorandum in Support of

Nancy Taylor-Harris' Motion for Summary Judgment, including but not limited to the argument

that Chief Connors did not act in bad faith, which is supported by the fact that he believes that

Waters was involved in the murder (S.O.F. ¶73).

### 2.     Chief Connors did not fabricate any evidence

In Paragraph 78 of the Amended Complaint, the plaintiff claims that Chief Connors

fabricated inculpatory evidence by coercing false witness statements from Marsh, Perry and two

Global Van Lines employees.  There is absolutely no evidence of coercion with respect to the

Global Van Lines employees, and Ms. Perry expressly denies that she was subjected to any such

coercion (S.O.F. ¶¶98-101).  Therefore, Chief Connors is entitled to summary judgment as to

these claims.  Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 253 (1st Cir.1996)

("speculation and surmise, even when coupled with effervescent optimism that something

definite will materialize further down the line, are impuissant in the face of a properly

documented summary judgment motion").

Brenda Marsh now claims that Chief Connors told her that if she did not cooperate in the

investigation she would be charged as an accessory after-the-fact, and would lose her children.

Significantly, however, as noted, Ms. Marsh would not state at deposition that she committed

perjury by lying under oath during the Waters' criminal proceedings (S.O.F. ¶121), or that any

Ayer Police Officer told her to lie (S.O.F. ¶65).  As such, there was no fabrication of evidence.

  The facts alleged by Ms. Marsh are in any event not sufficient to establish a claim for

fabrication of evidence.  As of 2006, the First Circuit had not recognized a fabrication of

evidence claim of the type alleged here.  Specifically, in <u>United States</u> v. <u>Hall</u>, 434 F.3d 42, 57-

58 (1st Cir. 2006), the First Circuit Court of Appeals addressed the issue as follows:

> We have recognized that a due process violation can occur where the government
> intimidates or harasses potential defense witnesses to discourage them from testifying.
> *See United States* v. A*ngiulo*, 897 F.2d 1169, 1192 (1st Cir.1990).  Hall has cited a series
> of cases in which appellate courts have overturned convictions where the prosecution
> coerced a potential witness not to testify on behalf of the defendant. *See, e.g., United
> States v. Morrison,* 535 F.2d 223, 226 (3d Cir.1976); *United States v. Smith,* 478 F.2d
> 976, 978-79 (D.C.Cir.1973). These case are distinguishable because, here, the challenged
> conduct was intended to *encourage* witnesses to testify.  *Angiulo* and the cases cited by
> Hall recognize a constitutional problem when the defendant is precluded from putting on
> the defense of his choice because the government threatens a person into not testifying.
> *See also Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per
> curiam) (stating that threatening comments by a judge that "effectively drove the witness
> off the stand" violated the defendant's constitutional right to present his defense).  Hall
> does not claim that he was deprived of testimony but rather that Read and Hiscock may
> have testified falsely because of the government's alleged threats. The problem is a
> complicated one because in many cases the government has to press unwilling witnesses,
> out of fear or friendship, to provide testimony that they are reluctant to give. There is no
> blanket rule against inducements by the government to witnesses to produce truthful
> testimony.

In this matter, there are no allegations of any defendant preventing a witness from testifying on

Waters' behalf, and the First Circuit has not recognized a cause of action for fabrication of

evidence based on allegedly threatening a witness to testify against a criminal defendant.  Thus,

not only has the plaintiff failed to state a claim for fabrication of evidence, but since the law in

this regard was not clearly established in 2006, it could not have been clearly established in

1982, and therefore, Chief Connors is entitled to qualified immunity.

Other Courts have recognized that there is no constitutional right to have witnesses interviewed in a particular manner, or to have an investigation carried out in a particular way. Consequently, mere allegations that police officers used interviewing techniques that were in some sense improper, without more, cannot serve as the basis for a claim under Section 1983. Devereaux v. Abbey, 263 F.3d 1070, 1075 (9th Cir. 2001). Rather, to support a claim such as the one advanced here, the plaintiff

> must, *at a minimum*, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [the suspect] despite the fact that they knew or should have known he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

Devereaux, 263 F.3d at 1076 (italics in original).

Allegations that an interviewer disbelieved an initial denial and continued with aggressive questioning of the witness cannot, without more, support a deliberate fabrication of evidence claim. Devereaux, 263 F.3d at 1077; Cunningham v. City of Wenatchee, 345 F.3d 802, 811-12 (9th Cir. 2003). Furthermore, as the Ninth Circuit Court of Appeals has stated, "it is difficult to see, however, how repeated admonitions to be truthful can amount to a constitutional violation for deliberate fabrication of evidence." Devereaux, 263 F.3d at 1077. Mentioning accessory after the fact exposure can be a fact, not a threat. It is not wrong to notify a witness of the consequences of her actions (S.O.F. ¶63).

The 11th Circuit Court of Appeals in Wilcox v. Ford, 813 F.2d 1140 (11th Cir. 1987), found that the following facts did not demonstrate coercive and abusive police tactics:

> Both Marshall and Wrentz, however, initially stated that they did not know anything but eventually signed statements attesting to the hole digging story related above. Wrentz was a very old, illiterate black man with what one police officer described as the "old slave syndrome." The police officer testified that he discovered that Wrentz would agree to anything a white man asked him in a leading question format. The transcripts reflect

that the interrogating officers threatened to charge Wrentz with murder, threatened to lynch him, put words in his mouth, and told him he was headed for eternal damnation.

Marshall received similar treatment. He was in his late sixties at the time of the interrogation and illiterate. Marshall was interrogated for eight and a half hours without being provided with food or water. The officers then threatened to send him to the electric chair along with two other Wilcox employees and also told him that he would die in prison. He repeatedly told the officers that he was in Albany, Georgia, the week that Hanks disappeared and denied digging a hole. Marshall corroborated Wrentz's story only after the police brought Wrentz into the room and Wrentz repeated his story in front of Marshall. Marshall later recanted the statement and explained that he had only made it because he was afraid and wanted to go home.

Wilcox v. Ford, 813 F.2d 1140.

In another case, the Fifth Circuit Court of Appeals in United States v. Fredericks, 586

F.2d 470 (5th Cir. 1978), found that the following facts did not demonstrate coercive and abusive

police tactics:

Robin Ehrlich was led into a separate room and, according to her uncontroverted testimony, subjected to threatening and heavy-handed interrogation concerning the whereabouts of the Quaaludes and whether she used drugs. . . . One of the agents advised her that the best thing she could do under the circumstances was cooperate with the Government. Ehrlich then admitted that the Quaaludes were in the apartment that she shared with Perry . . . . The agents asked Ehrlich to lead them to Perry's apartment, telling her that if she refused to do so she would go to jail. . . . One of the agents warned her: 'You had better not be lying to us, because if we have to get a search warrant, and we have to go through the trouble of that, it is going to be hard on you. You are gong to go to jail for sure.' . . . . Ehrlich was subpoenaed to testify at the suppression hearing and was told that if she failed to testify she would be arrested.

Fredericks, 586 F.2d at 477. In evaluating this conduct, the Court observed that:

In this case, however, the actions of the DEA officers, even if viewed in the worst possible light, were a far cry from the sort of third-degree physical or psychological coercion that might prompt us to disregard altogether the societal interest in law enforcement by excluding the highly probative testimony from the nondefendant. Nor is there the slightest indication in the record that the reliability of Ehrlich's testimony, however involuntarily given, was at all suspect. Indeed, her story was consistent and persuasive throughout from the time of the arrests, through the suppression hearing, up to and including trial.

Fredericks, 586 F.2d at 481.

The allegations about the treatment of Ms. Marsh clearly demonstrate interviewing tactics that were far less coercive than those found insufficient to support fabrication of evidence claims in Wilcox and Fredericks.  Even by her own testimony, Ms. Marsh was not subjected to any sort of third-degree physical or psychological coercion.  The interview of Ms. Marsh was conducted in a public place and in the presence of her then-boyfriend Robert Osborne (S.O.F. ¶44).  Ms. Marsh has testified that Connors and Taylor were "pleasant" at her interview (S.O.F. ¶51), that neither Officer Taylor nor Chief Connors told her to lie (S.O.F. ¶65) and significantly, will not state that she did lie  (S.O.F. ¶121).  Therefore, Chief Connors is entitled to summary judgment as a matter of law.

In addition to lacking the requisite level of coerciveness, the plaintiff cannot show that Chief Connors had any reason to believe that Ms. Marsh was lying or that Waters was innocent (S.O.F. ¶56).  She embraced Osborne's story (S.O.F. ¶¶52-3), which was unsolicited by the police (S.O.F. ¶36).  She then passed a polygraph (S.O.F. ¶¶70-72), and her statement accurately led to Rosanna Perry, who gave similar testimony (S.O.F. ¶¶66, 92, 103, 116).  As in Fredericks, her testimony under oath was consistent from the probable cause hearing, to trial, even after trial (S.O.F. ¶¶80, 104, 118).

Moreover, even today, apart from the after-acquired DNA evidence, there is no evidence that Waters was actually innocent.  Indeed, there was ample evidence at the time of trial of his guilt, separate and apart from Ms. Marsh's testimony (S.O.F. ¶¶2, 103, 105, 106, 112, 113).  Therefore, there is no merit to the contention that "Defendants continued their investigation of [the suspect] despite the fact that they knew or should have known he was innocent" Devereaux, 263 F.3d at 1076.

Finally, there is no evidence that this alleged coercion continued. More than two years after trial, at the hearing in support of Waters' original motion for new trial (S.O.F. ¶114), Ms. Marsh testified that she had been truthful in her original testimony and that she was not coerced (S.O.F. ¶¶116, 120). The Court found that Ms. Marsh had testified truthfully at trial (S.O.F. ¶121). She further testified at the hearing that she had no contact with the Ayer Police between the trial and the hearing on the motion for new trial (S.O.F. ¶119). In the two years that passed between the time of trial and the time of the motion for new trial "the psychologically coercive atmosphere of that [initial interview] must surely have dissipated." United States v. Mattison, 437 F.2d 84, 85 (9th Cir. 1970). At that point, long removed from the alleged threats of Chief Connors, Ms. Marsh had another opportunity to reveal in open court any alleged coercion by the Ayer police (S.O.F. ¶59). Connors cannot be held liable under Section 1983 if Brenda Marsh continued to give the same testimony long after the allegedly coercive act ended. Therefore, Chief Connors is entitled to summary judgment as a matter of law.

**C.    Count II – Fourth Amendment – False Arrest, Malicious Prosecution, _Franks v. Delaware_**

**1.    The false arrest claim is barred by the statute of limitations**

By this point and even when the Amended Complaint was filed, it is clear that the plaintiff's false arrest claim is barred by the applicable statute of limitations. Wallace v. Kato, 127 S.Ct. 1091 (2007); see also Faust v. Coakley, 2008 WL 190769, 1 (D.Mass.2008).

**2.    Malicious Prosecution and _Franks v. Delaware_**

At the outset, Chief Connors is entitled to summary judgment as to this claim for the detailed reasons set forth in Section III(D) of the Memorandum in Support of Nancy Taylor-Harris' Motion for Summary Judgment, and said arguments are expressly incorporated herein.

It is further undisputed that Chief Connors did not apply for the arrest warrant, did not file the criminal complaint against Mr. Waters, and did not testify at trial or in any related proceeding.  As Chief Connors did not personally present any information in support of the application for the arrest warrant, he cannot be held liable for the so-called *Franks* violation. Michalik v. Hermann, 422 F.3d 252, 261 (5th Cir. 2005).  Moreover, in order to establish liability for malicious prosecution, the plaintiff must show that Chief Connors took an active part in continuing or procuring the continuation of criminal proceedings initiated by another.  Miller v. City of Boston, 297 F.Supp.2d 361, 366 (D.Mass. 2003)(quoting, Mitchell v. City of Boston, 130 F.Supp.2d 201, 215 (D.Mass. 2001).  "The giving of the information or the making of the accusation . . . does not constitute a procurement of the proceedings that [a] person initiates if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit."  Mitchell, 130 F.Supp.2d at 215 (quoting, Restatement (Second) of Torts, §665, comment d (1977)).

In this matter, although the application for arrest warrant and criminal complaint were filed by Officer Taylor, the determination as to the existence of probable cause was made by Assistant District Attorney Fahey (S.O.F. ¶78).  At all times, both in practice and as a matter of state law, the decision to prosecute Kenneth Waters lay exclusively with the District Attorney who could bring the proceedings or not as she saw fit (S.O.F. ¶81, 83).  There is no evidence that Chief Connors interfered with the District Attorney's assessment of the case in any way.   Chief Connors' role in the prosecution of Kenneth Waters was limited to attending the initial interview with Brenda Marsh, signing-off on police reports authored by Officer Taylor and supervising Officer Taylor's activities.  This is not a sufficient basis for imposing liability on Chief Connors for malicious prosecution, and doing so would be tantamount to subjecting him to *respondeat*

*superior* liability for the alleged misconduct of Officer Taylor.  As will be described in detail below, the plaintiff has failed to identify a sufficient basis for supervisory liability under Section 1983.  Therefore, Chief Connors is entitled to summary judgment as a matter of law.

### D.    Count III – Section 1983 Supervisory Liability

In Count III, the plaintiff claims that Chief Connors failed to train and adequately supervise defendants Taylor and Boisseau, as well as Buddy Decot (Amended Complaint, ¶89).  Supervisory liability can be grounded on either the supervisor's direct participation in the unconstitutional conduct, or through conduct that amounts to condonation or tacit authorization.  Whitfield v. Melendez-Rivera,  431 F.3d 1 (1st Cir. 2005)(citing, Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir.1999)). Absent direct participation, a supervisor may only be held liable where "(1) the behavior of [his] subordinates results in a constitutional violation and (2) the [supervisor's] action or inaction was ' affirmatively link [ed] ' to the behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence ... amounting to deliberate indifference.' " Hegarty v. Somerset County, 53 F.3d 1367, 1379-80 (1st Cir.1995) (quoting Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 902-03 (1st Cir.1988)).

It is well settled that "a supervisor cannot be liable for merely negligent acts.  Rather, a supervisor's acts or omissions must amount to a reckless or callous indifference to the constitutional rights of others."  Febus-Rodriguez, 14 F.3d at 92.  "An official displays such reckless or callous indifference when it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights."  Id.  Moreover, there must be an 'affirmative link' between the supervisory official's acts or omissions and his subordinate's violation of the plaintiff's constitutional rights."  Id.

**1.      Chief Connors was not involved in any direct violation of Waters'
rights**

Chief Connors' only direct involvement in this matter was with respect to the interview

of Brenda Marsh, and as previously discussed, nothing that occurred during that interview

violated Waters' constitutional rights.  Therefore, as Chief Connors is not subject to supervisory

liability based on his direct participation in any misconduct, the plaintiff has the burden of

proving that Chief Connors' condoned or tacitly authorized misconduct by subordinate officers.

As noted hereafter, the plaintiff cannot meet this burden.

**2.      Chief Connors did not supervise Officer Decot or Lt. Boisseau**

There is no evidence that Officer Decot performed any service in connection with the

Brow murder investigation during the period of time that Connors was Chief.  The only evidence

regarding Officer Decot's involvement in the Brow murder investigation is from the deposition

of Officer Taylor, in which she testified that she heard Officer Decot (now deceased) tell Chief

Adamson that he had looked for the time cards at the Park Street Diner and found none (S.O.F.

¶127).  As with individual liability, a supervisor can only be subject to liability based on their

own actions or inactions.  Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91-2 (1st Cir.

1994).  Thus, Chief Connors cannot be held liable for actions or inactions that occurred prior to

his becoming chief.  Ayala v. Vivoni, 218 F.Supp.2d 163, 166 (D.P.R. 2002) (a supervisor may

not be held liable for acts that occur prior to his supervision of subordinates).  As the issue of

Officer Decot's involvement with Waters' time cards clearly occurred prior to Chief Connors'

tenure as Chief, he cannot be held liable for failing to train and/or supervise Officer Decot.

Connors himself has never seen the time cards (S.O.F. ¶123).

There is likewise, no evidence that Lt. Boisseau had knowledge of the time cards (S.O.F.

¶124) or otherwise participated in the Brow murder investigation subsequent to Connors'

becoming Chief.  Lt. Boiusseau's primary role in the Ayer police department was that of police

prosecutor/liaison (S.O.F. ¶30).  He also interviewed Waters on May 22, 1980 (S.O.F. ¶17).

Thus, his only investigative actions did not cause or contribute to Waters' arrest or trial.  There is

no evidence that Lt. Boisseau participated in the interviews of Brenda Marsh, Rosanna Perry or

the Global Van Lines employees, or that he participated in the procurement of the arrest warrant

or criminal complaint.  Indeed, Lt. Boisseau's only relevant involvement in this matter during

Chief Connors' tenure was his testimony at the criminal trial.  In this regard, Lt. Boisseau

provided significant exculpatory testimony which impeached Brenda Marsh (S.O.F. ¶102).  As

there is no evidence of a constitutional violation by Lt. Boisseau, there can be no supervisory

liability on the part of Chief Connors.

### 3.    Connors properly supervised Officer Taylor

Plaintiff is expected to emphasize that Officer Taylor was a special officer who had not

attended the full-time police academy at the time of her involvement in the Brow murder

investigation and Waters prosecution.  The plaintiff, however, cannot support a failure to train

and/or supervise claim with such broad generalizations.  Rather, the plaintiff bears the burden of

linking specific failures on the part of Chief Connors to specific constitutional violations

committed by Officer Taylor.  In any event, Officer Taylor was adequately trained to interview

Ms. Marsh (S.O.F. ¶49).  Further, in light of his rank, Chief Connors was ultimately responsible

for the conduct of the interview (S.O.F. ¶46).

As with the plaintiff's claim against the Town, the plaintiff's failure to supervise claim

against Chief Connors fails because the plaintiff has failed to establish an underlying

constitutional violation by Officer Taylor.  Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576,

582 (1st Cir. 1994). Therefore, for this reason, Chief Connors is entitled to summary judgment as to Count III.

The plaintiff cannot show that Chief Connors failed to adequately supervise Officer Taylor with respect to any of the wrongdoing alleged in the complaint. First, Officer Taylor has never seen the time cards (S.O.F. ¶126). Further, there is no evidence that she was aware that Waters had been excluded as the source of the latent prints, or that she engaged in any misconduct with respect to the interviews of Rosanna Perry or the Global Van Lines employees. Therefore, Chief Connors cannot be subjected to supervisory liability on these issues. Second, as noted, it is clear that Chief Connors could not have more closely supervised Officer Taylor with respect to the Marsh interview; he was there. Indeed, even the plaintiff's own police practices expert acknowledged that Officer Taylor was appropriately supervised in this regard with the following testimony:

> Q:    Now, is it your contention, sir, that Chief Connors inadequately or
>        improperly supervised Nancy Taylor-Harris in connection with the
>        interview of Ms. Marsh?
>
> A:    The one interview?
>
> Q:    Yes, sir.
>
> A:    I can't say that.
>
> (S.O.F. ¶48).

Chief Connors may only be held liable if his acts or omissions as a supervisor showed a deliberate indifference to Waters' constitutional rights. Bisbal-Ramos v. City of Mayaguez, 467 F.3d 16, 24 (1st Cir. 2006) ("[d]eliberate indifference will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights. The affirmative link requirement contemplates proof that the supervisor's conduct led

inexorably to the constitutional violation").   In this matter, there was no need for Chief Connors to supervise Officer Taylor with respect to the second interview with Brenda Marsh, which took place in the presence of State Police Lt. Dwyer (S.O.F. ¶70), or her interviews with Rosanna Perry, which took place in the presence of Assistant District Attorney Fahey (S.O.F. ¶90. 93). There is no evidence in the record to suggest that either Dwyer or Fahey were not qualified to supervise Officer Taylor in these tasks, and given their stature and authority over the investigation, it was eminently reasonable for Chief Connors to rely on them to provide the appropriate level of supervision.  c.f. Fernandez v. Leonard, 963 F.2d 459, 468 (1st Cir. 1992)(no liability where "at all times relevant to the plaintiffs' suit, [the officers] were acting under the supervision of FBI Agent Leonard, a trained and experienced expert in hostage situations.").

### 4.    Officer Taylor was properly trained

The plaintiff cannot show that Chief Connors failed to adequately train Officer Taylor. Although Taylor had not attended the full-time police academy, her training as a rape investigator was in excess of that possessed by full-time officers in the area of interviewing abuse victims such as Ms. Marsh.  (S.O.F. ¶49)  As plaintiff's expert Reiter concluded:

> Q:    You would agree with me then, would you not, Mr. Reiter, that the specific training that Nancy Taylor-Harris took in order to become a rape investigator was on point and apt for the task she undertook in interviewing Ms. Marsh?
>
> A:    Correct.
>
> (Id.)

Officer Taylor had sufficient training for the supervised work she performed with the Ayer Police Department during the Brow murder investigation (S.O.F ¶49).  In fact, Officer Taylor had more training and expertise than the average full-time officer in the area of investigating victims and witnesses especially women.  (Id.)  At the time Osborne came forward,

Officer Taylor had worked as a special police officer for more than six years and attended 188 hours of police training.  (Id.)  As part of her police training, Officer Taylor attended several specialized seminars including on topics such as domestic violence, interviews and interrogation techniques, report writing.  (Id.)  Officer Taylor also scored a 98.5/100 on the Massachusetts Criminal Justice Training Council examination for special officers.  (Id.)  Indeed, despite plaintiff's allegations that Officer Taylor was not properly trained because she did not attend the full-time police academy until 1983, such a blanket accusation does not support plaintiff's failure to train claim.  See Rodriguez-Vazquez v. Cintron-Rodriguez, 160 F.Supp.2d 204, 212 (D.P.R.2001) ("[h]is allegations against [the supervisor] do not provide even a thin thread of facts causally relating [the supervisor's] alleged negligence to the acts of the co-defendants).  As a trained rape investigator, Officer Taylor had significant training and experience in working with women and victims of domestic violence (such as Ms. Marsh and Ms. Perry), interviewing witnesses (such as Mr. Osborne) and report writing (S.O.F, ¶49).  Such assignments were the specific tasks Chief Connors and Assistant District Attorney Fahey asked Officer Taylor to perform under their direct supervision  (S.O.F. ¶¶46, 47, 49, 50,142).  Therefore, Chief Connors is entitled to summary judgment on plaintiff's failure to train claim.

### E.    Qualified Immunity

Chief Connors is entitled to qualified immunity on all claims, including plaintiff's supervisory liability claim.  Qualified immunity is an affirmative defense shielding public officials sued in their individual capacity from civil damages so long as their conduct does not violate any clearly-established statutory or constitutional right of which a reasonable person would be aware." Rodriguez-Esteras v. Solivan-Diaz, 266 F.Supp.2d 270, 281 (D.P.R. 2003). Courts apply a trifurcated inquiry to determine whether an official is entitled to qualified immunity.  Hatch v. Department for Children, Youth and Their Families, 274 F.3d 12, 20 (1st

Cir. 2001).  First, courts will evaluate "whether the plaintiff has alleged the violation of a

constitutional right.  If so, we then ask whether the contours of the right were sufficiently

established at the time of the alleged violation."  Only if the first two prongs are established, it is

necessary to inquire whether an objectively reasonable official would have believed that the

action taken or omitted violated that right.  Id. (citing, Starlight Sugar, Inc. v. Soto, 253 F.3d 137,

141 (1st Cir.2001)).

In this matter, Chief Connors took no actions which an objectively reasonable police

chief would have thought to violate Waters' rights.  As to the due process claims, the nature of

the exculpatory evidence was so subtle, that no reasonable officer would have believed it to be

exculpatory.  See, Reid, 163 F.Supp.2d at 91.  Likewise, as previously noted, even in 2006, the

plaintiff's theory of fabrication of evidence was not clearly established in the First Circuit. Hall,

434 F.3d at 57-58.  Moreover, no reasonable officer in Chief Connors' position would have

believed that the manner of Ms. Marsh's interview (even assuming it occurred as she alleges)

would have led to her committing perjury on three separate occasions (which she does not now

claim that she did).  Given Officer Taylor's significant experience with interviewing victims of

domestic violence, it was certainly reasonable for Chief Connors to allow her leeway in

questioning Ms. Marsh.  Ford v. Moore, 237 F.3d 156, 164 (2nd Cir. 2001).  Moreover, as

previously discussed, there was no "third degree physical or psychological coercion applied" and

it was certainly reasonable for the officers to remind Ms. Marsh of the consequences of not being

truthful, particularly where she was understandably reluctant to testify against her abuser.

The plaintiff's Fourth Amendment claim fares no better.  As previously discussed, no

reasonable officer with such minimal involvement in a prosecution would expect to be held

liable under the circumstances of this case, where probable cause was far more than "arguable."

<u>Mutter</u> v. <u>Town of Salem</u>, 945 F.Supp. 402, 408 (D.N.H.,1996) ("[t]he individual defendants are entitled to qualified immunity in that probable cause for the arrest was at <u>least arguable</u>") (emphasis supplied).

Finally, it was not clearly established at the time that a supervisor would be held liable for the acts of subordinates <u>before</u> his service as Police Chief.  As the First Circuit has held, "[w]hen a supervisor seeks qualified immunity in a section 1983 action, the "clearly established" prong of the qualified immunity inquiry is satisfied when (1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." <u>Camilo-Robles</u> v. <u>Hoyos</u>, 151 F.3d 1, 6 (1st Cir. 1998).  As previously discussed, no reasonable supervisor would have believed that they could be held liable for misconduct that occurred prior to becoming Chief, as in the case of Decot.  <u>Ayala</u>, 218 F.Supp.2d at 166, or for allowing Boisseau to testify as to exculpatory evidence at trial.  Additionally, as previously discussed, there is no evidence that Officer Taylor's actions violated Waters' constitutional rights so as to hold Chief Connors liable.  Indeed, it was not clearly established that Chief Connors would be held liable for appropriately supervising the interview of Ms. Marsh with the approval of the District Attorney's Office (S.O.F. ¶¶46-49).  Thus, Chief Connors is entitled to qualified immunity on plaintiff's supervisory liability claim.

**F.** **Count IV – Conspiracy**

Chief Connors is entitled to summary judgment as to this claim for the detailed reasons set forth in Section III(E) of the Memorandum in Support of Nancy Taylor-Harris' Motion for Summary Judgment, and said arguments are expressly incorporated herein.

G.    **Count VII – MCRA and Count VIII – State Law Malicious Prosecution**

Chief Connors is entitled to summary judgment as to these claims for the detailed reasons set forth in Section III(G) of the Memorandum in Support of Nancy Taylor-Harris' Motion for Summary Judgment, and said arguments are expressly incorporated herein.

IV.    CONCLUSION

For the foregoing reasons, Chief Connors is entitled to summary judgment as a matter of law as to Counts I, II, III, IV, VII and VIII.

DEFENDANT PHILIP CONNORS,
By his attorneys,


/s/ Joseph L. Tehan, Jr.
Joseph L. Tehan, Jr. (BBO # 494020)
Gregg J. Corbo (BBO # 641459)
Kopelman and Paige, P.C.
101 Arch Street, 12th Floor
Boston, MA  02110
(617) 556-000

342666/01907/0053