UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-10521-GAO

| | |
|---|---|
| BETTY ANNE WATERS, as Administratrix of the Estate of KENNETH WATERS, <br><br> Plaintiff <br><br> v. <br><br> TOWN OF AYER, NANCY TAYLOR-HARRIS, in Her Individual Capacity, ARTHUR BOISSEAU, In His Individual Capacity, BUDDY DECOT, In His Individual Capacity, WILLIAM ADAMSON, in His Individual Capacity and PHILIP L. CONNORS, in His Individual Capacity, <br><br> Defendants | MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WILLIAM ADAMSON'S MOTION FOR SUMMARY JUDGMENT |

I.  INTRODUCTION

On May 21, 1980, Katarina Brow ("Brow, Mrs. Brow") was found murdered in her home at 7 ½ Rosewood Drive, Ayer, MA (Amended Complaint, ¶14). The investigation of the murder was conducted pursuant to G.L. c.38, §4 by the Middlesex District Attorney and the State Police Department with the assistance of the Ayer Police Department (L.R. 56.1 Statement of Facts, "S.O.F." ¶8). The District Attorney's case file has been lost or inadvertently destroyed (S.O.F., ¶6)

From the outset, plaintiff's decedent, Kenneth Waters ("Waters") was a person of interest in the investigation (S.O.F., ¶15). Waters was arrested by Ayer Police on October 12, 1982, pursuant to directive of the prosecuting Assistant District Attorney (currently Massachusetts Superior Court Associate Justice) Elizabeth Fahey (S.O.F., ¶78).

Waters was convicted of Mrs. Brow's murder on May 12, 1983 and incarcerated (S.O.F., ¶102). His conviction was affirmed on appeal to the Supreme Judicial Court (Commonwealth v. Waters, 399 Mass. 708 (1987).

In 2001, Waters filed an unopposed motion for a new trial, based solely upon DNA evidence not available at the time of his trial, which established that he was not the source of the non-victim blood found at the crime scene (although his blood type was the same) (S.O.F., ¶2). Thereafter, the Commonwealth filed a nolle prosequi which stated:

> Based upon new DNA evidence of the presence of blood of an unknown person at the scene of the 1980 murder of Katarina Brow, the Commonwealth has agreed that, at a minimum, a new trial of the above indictments is warranted.
>
> At this time, there is insufficient evidence to proceed with a criminal prosecution against the defendant, Kenneth Waters, and as such, the Commonwealth has determined that, at this time, a nolle prosequi is in the interests of justice. The Commonwealth's investigation into the murder of Katarina Brow was and will continue (S.O.F. ¶1).

Waters was released from prison but remained a suspect in the Brow murder up to the point of his own death, as a result of substantial, inculpatory, non-blood evidence developed at trial, as described in detail herein (S.O.F. ¶4). The investigation of the crime for purposes of determining whether to re-try Waters revealed no police misconduct nor was the nolle prosequi predicated upon any evidence of same (S.O.F. ¶5).

This case therefore proceeds not on the basis of any discovery of police misconduct leading to Waters' release. Instead, it reflects post hoc scrutiny of a conviction upheld on appeal by the Supreme Judicial Court in order to unfairly hold the defendants liable for monetary damages.[1]

As set forth hereinafter, the plaintiff has failed to establish actionable individual or municipal misconduct leading to false arrest or an unfair trial, and defendants have produced herein compelling affirmative evidence negating plaintiff's claims. Consequently, the defendants' motions for summary judgment should be allowed.

---

[1] Waters' prosecutor, Judge Fahey, is entitled to absolute prosecutorial immunity. None of the State Police Officials involved in the Brow prosecution have been sued.

Specifically, the plaintiff has failed to establish actionable individual or supervisory misconduct by Chief William Adamson which led to the false arrest or an unfair trial of Waters, and Chief Adamson has produced herein compelling affirmative evidence negating plaintiff's claims. Of particular significance, Chief Adamson retired from the Ayer Police Department in 1981, a year before Waters' arrest. Thus, he was not an employee of the Ayer Police Department during the interviews of witnesses Brenda Marsh or Rosanna Perry, who testified to Waters' murder admission, the interviews of the Global Van Lines employees, who testified about Waters' connection to the murder weapon, the arrest of Waters, or Waters criminal trial and conviction. Consequently, as Chief Adamson was not directly involved in any injury-causing action, his motion for summary judgment should be allowed.

II.   FACTS

The facts underlying this case are set forth in the Defendants' Statement of Material Facts Not in Dispute Pursuant to L.R. 56.1, filed herewith.

III.   ARGUMENT

    A.   **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In civil procedure, summary judgment's role is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. General Elec. Co., 950 F.2d 816, 822 (C.A.1 (Mass.),1991) (citing, Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir.1990)). In order to defeat a summary judgment motion, "the non-moving party must demonstrate the existence of a genuine issue of material fact pertaining to those issues on which it would bear the burden of proof at trial." Kauffman v. Puerto Rico Telephone Co., 841 F.2d 1169, 1171 (1st Cir.

1988). Under Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1987), summary judgment is appropriate where the non-moving has the burden of proof and "fails to make a showing sufficient to establish the existence of an element essential to that party's case."

As the First Circuit has held, "[g]enuine issues of material fact are not the stuff of an opposing party's dreams. On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion." Mesnick, 950 F.2d at 822. For summary judgment purposes evidence must be competent and "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Id. (citing, Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir.1989)). As the plaintiff can make no such showing in this case, Chief Adamson is entitled to summary judgment as a matter of law.

    **B.**    **Chief Adamson is Entitled to Summary Judgment as to all Claims set forth Against Him Because he was not Employed as an Ayer Police Officer at the Time of Waters' Arrest or Prosecution**

As the First Circuit Court of Appeals recently reaffirmed, only those officials directly responsible for an injury-causing action can be held liable under Section 1983. Gagliardi v. Sullivan, 513 F.3d 301 (1st Cir. 2008). In this matter, it is undisputed that Chief Adamson left the Ayer Police Department in late 1981, approximately one year before Waters' arrest on October 12, 1982. After his departure, Chief Adamson had no obligations or duties with respect to any matter involving the Ayer Police Department. Therefore, as Chief Adamson could not have been directly responsible for any action causing an injury to Waters, he is entitled to summary judgment as to all claims set forth against him, as set forth in detail in the following sections.

### 1. Adamson did not cause any Due Process Violation (Count I)

At the outset, in Count I, the plaintiff claims that Chief Adamson "deliberately fabricated inculpatory evidence by coercing false witness statements and perjured testimony from witnesses including, without limitation, Brenda Marsh, Rosanna Perry and Global Van Lines." (Amended Complaint, ¶78)[2]. This claim is patently frivolous, particularly in light of the fact that the Amended Complaint was filed after the conclusion of discovery in this case. By that point, it was well-established that Chief Adamson was not employed by the Ayer Police Department at the time that Marsh, Perry and Global Van Lines employees were interviewed and that he did not participate in those interviews in any manner. Chief Adamson cannot be held vicariously liable for the conduct of others which he had no ability to control. See, e.g. Kelly v. Curtis, 21 F.3d 1544, 1551 (11th Cir. 1994) (rejecting plaintiff's theory of "vicarious co-employee liability" and holding that police officer was not subject to liability for failing to disclose lab report where there was no evidence that he personally knew about the report). Therefore, Chief Adamson is entitled to summary judgment as a matter of law as to the fabrication of evidence claim.

As to the plaintiff's due process claim for the alleged failure to disclose exculpatory evidence, to trigger the due process protections recognized in *Brady*, there must be an arrest sufficient to invoke an individual's due process rights to a fair trial. Reno v. Flores, 507 U.S. 292, 316 (1993) (citing, DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 200 (1989)). This rule is in recognition of the fact that a due process claim alleging a failure to disclose exculpatory evidence pursuant to *Brady* is based "on the adversarial relationship between the prosecution and the defense; it is inherently unfair for the prosecution, which controls the development of the criminal trial, to have in its possession material, exculpatory

---

[2] The claims set forth in Counts I and II purportedly arise out of the alleged actions or inactions of Chief Adamson in his capacity as a police officer for the Ayer Police Department, as opposed to in his capacity as supervisor. The supervisory claims against Chief Adamson are addressed separately in section III(B)(3) of this Memorandum.

evidence that is unavailable to the defense." U.S. v. Cuthbertson, 651 F.2d 189, 199 (3rd Cir. 1981).

"It is clear that a defendant's *Brady* rights do not exist in the abstract, but rather finds expression in connection with a defendant's right to a fair trial." U.S. v. Le, 306 F. Supp.2d. 589, 591-2 (E.D.Va. 2004) (citing, Weatherford v. Bursey, 429 U.S. 545, 559 (1977)). Thus, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf-through incarceration, institutionalization, or other similar restraint of personal liberty-which is the 'deprivation of liberty' triggering the protections of the Due Process Clause ..." DeShaney, 489 U.S. at 200. Indeed, the Supreme Court has even held that the Constitution does not require the disclosure of exculpatory evidence, including impeachment information, prior to a guilty plea. U.S. v. Ruiz, 536 U.S. 622, 628 (2002) ("[t]he constitutional question concerns a federal criminal defendant's waiver of the right to receive from prosecutors exculpatory impeachment material-a right that the Constitution provides as part of its basic "fair trial" guarantee").

Once again, to the extent that the plaintiff's *Brady* claim is based on anything having to do with the interviews of Marsh, Perry and Global Van Lines employees, it is patently frivolous because the plaintiff knew when she filed the Amended Complaint that Chief Adamson was not involved in those interviews and was not even employed by the Ayer Police Department when those interviews occurred. Furthermore, as Waters' right to the disclosure of exculpatory evidence did not arise until his arrest on October 13, 1982, neither Chief Adamson nor anyone else had any duty to disclose any exculpatory evidence prior to that date. As Chief Adamson was not employed by the Ayer Police Department at the time that Waters' rights under *Brady*

6

accrued, he could not have caused any injury to Waters as a matter of law. Therefore, Chief Adamson is entitled to summary judgment as to Count I[3].

### 2. Adamson did not Cause any Violation of the Fourth Amendment (Count II)

In Count II, the plaintiff claims that Chief Adamson violated Waters' Fourth Amendment rights through false arrest and malicious prosecution. Notwithstanding the fact that Chief Adamson did not participate in Waters' arrest and was not even employed as an Ayer Police Officer at that time, the plaintiff's false arrest claim is barred by the applicable statute of limitations. Wallace v. Kato, 127 S.Ct. 1091 (2007); see also Faust v. Coakley, 2008 WL 190769, 1 (D.Mass.2008).

It is undisputed that Chief Adamson did not apply for the arrest warrant, did not file the criminal complaint against Mr. Waters, and did not testify at trial or in any related proceeding. As Chief Adamson did not personally present any information in support of the application for the arrest warrant, he cannot be held liable for the so-called *Franks* violation. Michalik v. Hermann, 422 F.3d 252, 261 (5th Cir. 2005). Moreover, in order to establish liability for malicious prosecution, the plaintiff must show that Chief Adamson took an active part in continuing or procuring the continuation of criminal proceedings initiated by another. Miller v. City of Boston, 297 F.Supp.2d 361, 366 (D.Mass. 2003)(quoting, Mitchell v. City of Boston, 130 F.Supp.2d 201, 215 (D.Mass. 2001). "The giving of the information or the making of the accusation . . . does not constitute a procurement of the proceedings that [a] person initiates if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit." Mitchell, 130 F.Supp.2d at 215 (quoting, Restatement (Second) of Torts, §665, comment d (1977)). In this matter, as Waters was not arrested until after Chief Adamson's retirement, he

---

[3] To the extent plaintiff's *Brady* claims against Adamson arise out of an alleged failure to disclose exculpatory time card and/or fingerprint evidence, such claims must also fail on an evidentiary basis, as noted in Section III(C) hereof.

7

cannot be subject to liability for malicious prosecution. At that point, Chief Adamson took no affirmative action that caused Waters' arrest or the filing of the criminal complaint, and most significantly, he had no ability to control the decisions of the remaining Ayer Police officers or the Middlesex County District Attorney's Office. Thus, Chief Adamson is entitled to summary judgment as to plaintiff's Fourth Amendment malicious prosecution claim.

### 3. There is no viable failure to supervise claim since Adamson was not a supervisor during the relevant time period (Count III)

In the Amended Complaint, plaintiff alleges that Chief Adamson "acquiesced in, condoned or encouraged the unconstitutional misconduct of Taylor, Boisseau and Decot, including the fabrication of evidence, the coercion of witnesses and the suppression of material exculpatory evidence from the prosecutor." (Amended Complaint, ¶89). Plaintiff's failure to train or supervise claim against Chief Adamson fails because, as noted in their separate motion, the plaintiff has failed to establish an underlying constitutional violation by Officer Taylor-Harris, Officer Decot or Lt. Boisseau. Moreover, no constitutional violations occurred during Chief Adamson's tenure since no arrests had been made in the Brow murder at the date of his departure. As such, in the absence of a constitutional violation by a person for whom the supervisor is responsible, Chief Adamson is not subject to supervisory liability.

"To succeed on a supervisory liability claim, a plaintiff not only must show deliberate indifference or its equivalent, but also must affirmatively connect the supervisor's conduct to the subordinate's violative act or omission." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994). There must be a causal link between the subordinate's unconstitutional conduct and the supervisor's knowledge or disregard of such conduct. Id. at 582. In other words, a supervisor may be found liable under 42 U.S.C. § 1983 only on the basis of his own actions or omissions related to the subordinates' unconstitutional conduct. Ayala v. Vivoni, 218

F.Supp.2d 163, 166 (D.P.R. 2002). As such, a supervisor may not be held liable for acts that occur prior or subsequent to his supervision of subordinates. Id.; see also Serna v. Colorado Dept. of Corrections, 455 F.3d 1146, 1154 (10th Cir. 2006) (holding there was no supervisory liability because there was nothing in the record to suggest that the supervisor "was expected to supervise them, either directly or indirectly").

In this matter, as will be described in detail below, Chief Adamson is entitled to summary judgment because there is no evidence that his supervisory actions violated Waters' constitutional rights.

### a. Nancy Taylor

Although Officer Taylor was employed as an Ayer Police Officer during Chief Adamson's tenure as chief, she did not take any material action with respect to the Brow murder investigation until 1982, when she fielded the unsolicited telephone call from Robert Osborne, which lead to Brenda Marsh's testimony. Chief Adamson had already retired at that point. After his retirement, Adamson had no legal authority to supervise Officer Taylor or to exercise any control over her work. As such, no supervisory liability may be imposed against Chief Adamson for the alleged misconduct of Officer Taylor. See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3rd Cir. 1997) (citing Restatement (Second) of Agency §2(1) (1957)("[a] claim against a 'master' based on a tort committed by a 'servant' bears a resemblance to a §1983 claim against a government supervisor based on a constitutional tort committed by a subordinate, but a person cannot be a 'master' unless he or she has the 'right to control the physical conduct' of the servant") (emphasis supplied). Moreover, Chief Adamson cannot be held liable for "acquiescing" to Officer Taylor's behavior because he no longer supervised or had any knowledge of her actions. Robinson, 120 F.3d at 1295 ("[a]ll of our prior cases discussing the issue of supervisory liability for 'acquiescence' involved defendants who had actual authority to

9

control the conduct of the person alleged to have violated the plaintiff's rights") (emphasis supplied); see also Ayala, 218 F. Supp. at 166. Therefore, Chief Adamson is entitled to summary judgment as to this claim.

### b.    Officer Decot

The only allegation involving Officer Decot involves plaintiff's speculative allegation that he picked up Waters' Park Street Diner time cards. With respect to the time cards, however, there is no evidence of any misconduct attributable to Officer Decot, and as previously discussed, there was not duty to disclose any evidence during Adamson's tenure and before Waters' arrest. Indeed, as Officer Taylor testified at her deposition, she heard Officer Decot tell Chief Adamson he had looked for Waters' time cards at the Park St. Diner, but found none. Furthermore, as described in greater detail in Section III(C)(2) of this Memorandum, the plaintiff's claim regarding the time cards fails to establish a substantive *Brady* allegation. Therefore, Chief Adamson is entitled to summary judgment as to this claim.

### c.    Lt. Boisseau

There is also no viable claim that Lt. Boisseau violated Waters' constitutional rights to impose supervisory liability on Chief Adamson. Indeed, the only allegations against Lt. Boisseau relate to his knowledge regarding the lack of scratch on Waters' face the day after the murder. This allegation, however, did not lead to a false arrest of Waters or deprive Waters of a constitutionally fair trial. In fact, Lt. Boisseau's trial testimony that he saw Waters in court the morning of the murder, he did not notice a scratch on Waters' face the day after the murder[4] and that Mr. Brow had identified the knife located at the murder scene as his, were all *exculpatory* disclosures by Lt. Boisseau. Therefore, as there is no underlying constitutional violation by Lt.

---

[4] State Police Lt. Det. Dwyer also testified at trial that he did not see a scratch on Waters' face during the May 22, 1980 interview.

Boisseau, there is no viable claim for supervisory liability against Chief Adamson on this basis either.

### 4. There Is No Viable Failure to Train Claim Against Chief Adamson (Count III)

In paragraph 89 of the Amended Complaint, plaintiff also alleges that Chief Adamson failed to train Officer Taylor, Officer Decot and Lt. Boisseau. There is no evidence, however, that any of these Ayer Police Officers were deficiently trained. Indeed, the plaintiff's own police practices expert "did not find this to be from the traditional sense a negligent training issue." (S.O.F. ¶49).

There is supervisory liability for failure to train only where "the supervisor's action or inaction was 'affirmatively linked' to the constitutional violation caused by the subordinate." Aponte Matos v. Toledo Davila, 135 F.3d 182, 192 (1st Cir. 1998)(quoting, Seekamp v. Michaud, 109 F.3d 802, 888 (1st Cir. 1997)). In this matter, as previously noted, Waters' constitutional rights did not accrue until he was arrested about a year after Chief Adamson's retirement. Thus, any causal link between acts which occurred during Chief Adamson's tenure and the subsequent arrest of Waters in 1982 was broken when Chief Connors took office in February 1982. See Rodriguez-Vazquez, 160 F.Supp.2d at 212. Chief Connors made all the decisions related to staffing and training officers who worked on the Brow murder investigation after Robert Osborne came forward in September 1982, and significantly, Chief Adamson had no right or authority to direct otherwise. It is undisputed that it was Chief Connors' duty to ensure that officers involved in Waters' arrest and prosecution in 1982 and 1983, respectively, were properly trained and to ensure that the investigation of the murder from that point forward complied with constitutional standards. Consequently, there is no viable causal connection between Adamson's alleged failure to train Officers Decot and Taylor or Lt. Boisseau and actions taken by these

11

officers against Waters during Chief Connors' tenure.  Therefore, Chief Adamson is entitled to summary judgment as a matter of law as to this claim.

The plaintiff's failure to train claim against Chief Adamson fails for the additional reasons set forth in the Memorandum in Support of Chief Connors' Motion for Summary Judgment.

### 5. Adamson could not have been part of a Conspiracy (Count IV)

Plaintiff claims that the Ayer defendants, including Chief Adamson, "reached a mutual understanding and acted in concert to violate Mr. Waters' civil rights." (Amended Complaint, ¶92).  At the essence of plaintiff's allegations is that the Ayer Police officers conspired to suppress exculpatory evidence, fabricate inculpatory evidence, withhold fingerprint evidence and abdicate their supervisory responsibilities" which resulted in Waters' false arrest and malicious prosecution.  (Amended Complaint, ¶¶93-94).  It is absurd to suggest that Chief Adamson could agree to violate Waters' rights over a year prior to Waters' arrest and before anyone knew about the evidence that would be volunteered by Robert Osborne in September 1982.

"A civil rights conspiracy as commonly defined as 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.' " Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (citing, Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir.1979), rev'd in part on other grounds, 446 U.S. 754 (1980) (quoting, Rotermund v. United States Steel Corp., 474 F.2d 1139 (8th Cir.1973)).  "Purely conclusory allegations of conspiracy are not adequate to state a claim, and [plaintiff] must establish the existence of an agreement, express or tacit, between the individual Defendants to deprive him of a specific federal right. Ousley, 313 F.Supp.2d at 85.

12

In this instance, the only link between the alleged co-conspirators is that they were Ayer police officers, except of course for Adamson who retired long before Waters was arrested. No evidence of agreement to deprive Waters of his rights has been shown to exist (indeed, there is no evidence that Connors and Adamson ever even met) and Boisseau's exculpatory trial testimony (S.O.F. ¶102) belies any conspiracy to convict Waters. There is no evidence of an overt act by Adamson in support of the alleged conspiracy. Indeed, Adamson was powerless to take any affirmative action at that point given that he was no longer employed by the police department. Most significantly, the plaintiff has identified absolutely no motive for any of the defendants to conspire against Waters. Therefore, Chief Adamson is entitled to summary judgment as to the conspiracy claim.

### 6. Adamson is entitled to Summary Judgment as to the State Law Claims

In addition to the foregoing arguments about lack of involvement and causation, Chief Adamson is entitled to summary judgment as to the state law claims for malicious prosecution and violations of the Massachusetts Civil Rights Act for the detailed reasons set forth in Section III(G) of the Memorandum in Support of Nancy Taylor-Harris' Motion for Summary Judgment, and said arguments are expressly incorporated herein.

### C. Adamson did not Violate Waters' Rights with respect to the Fingerprint Evidence or the Time Cards

The only allegations in the Amended Complaint that arose during Adamson's tenure as Chief relate to the alleged withholding of exculpatory fingerprint and time card evidence. Although Chief Adamson could not have caused any constitutional violation with respect to these issues at that time because Waters had not been arrested, he also is entitled to summary judgment as to these claims on an evidentiary basis as well.

1. **Fingerprints**

The plaintiff claims that Chief Connors failed to disclose the fact that Waters' prints were submitted to the State Police for comparison with the latent prints found at the scene, and that Waters was excluded as the source of those latent prints (Amended Complaint, ¶77(d)). No competent evidence, however, supports this contention. The State Police conducted fingerprint comparisons (S.O.F. ¶131). The State Police Trooper assigned to evaluate the Brow murder scene fingerprint evidence was Corp. Baliunas. At his deposition, Baliunas testified that he had no recollection of the Ayer Police Department sending him Waters' fingerprints for comparison (S.O.F. ¶132) or of ever comparing or examining Waters' fingerprints (S.O.F. ¶134). Subsequently, Baliunas signed an affidavit which directly contradicts his deposition testimony, except that it still reflects no memory of comparing Waters' prints or excluding him as a suspect (Exhibit 47, ¶11). In his affidavit, he testified that he sufficiently recalled his actions concerning the Brow investigation to claim that he complied with his usual custom and procedure in testing Waters' fingerprints and notifying the Ayer Police Department of the results.

Pursuant to the "sham affidavit" rule, when a witness has given clear deposition testimony, he cannot create a conflict with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed. Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994). This Court and others have extended the sham affidavit rule as prohibiting the admission of a post-deposition affidavit of a non-party to contradict unambiguous deposition testimony of the same previously deposed non-party. Mahan v. Boston Water and Sewer Commission, 179 F.R.D. 49, 56, n. 6 (D.Mass. 1998) (citations omitted). Baliunas' Affidavit, due to its lack of corroboration, is also incompetent under F.R.E. 406 to establish a routine practice of the State Police Fingerprint Division. In any, event, neither Baliunas' deposition nor Affidavit provides evidence that Waters was ever excluded as the

source of the latent prints found at the murder scene, much less that any such exclusion was disclosed to the Ayer Police, which thereafter withheld it. Therefore, there was no exculpatory fingerprint evidence to disclose.

Even if the Baliunas affidavit is accepted for purposes of summary judgment, it does not establish that Chief Adamson knew that Waters had been excluded. At most, the Baliunas Affidavit establishes that he sent Chief Adamson a report indicating that Waters had been excluded as the source of the latent prints found at the scene. There is no evidence, however, that Chief Adamson received such a report or that any evidence of such an exclusion was communicated to the other Ayer police officers. Indeed, Ayer Police Department records indicate that Corp. Baliunas communicated with Chief Adamson as to the specific exclusion of other individuals as the source of the latent prints. After a diligent search by Chief Rizzo, however, no such Ayer Police Department records establish that Chief Adamson ever received such a report from Baliunas concerning Waters' fingerprints (S.O.F. ¶133). See; F.R.E. 803(8) and (10). Therefore, the absence of the public record supports the contention that no such communication was ever received by the Ayer Police Department.

Moreover, Chief Admason did not violate Waters' *Brady* rights with respect to the fingerprint evidence for the additional reasons set forth in Section III(B)(3)(c) of the Memorandum in Support of Nancy Taylor-Harris' Motion for Summary Judgment, and said arguments are expressly incorporated herein.

    **2.**    **Timecards**

        **a.**    **There Is No Evidence that Chief Adamson or Anyone Else Ever Had the Time Cards**

As noted, only an official directly responsible for an injury-causing action can be held liable under Section 1983. Gagliardi, 513 F.3d 301 (1st Cir. 2008). In this matter, there is no

15

evidence that Chief Adamson ever had possession of the time cards.  Indeed, the only competent evidence in this case regarding the time cards is Officer Taylor's deposition testimony where she stated that Officer Decot told Chief Adamson he had looked for Waters' time cards at the Park Street Diner, but found none.  Moreover, the Declaration of Elizabeth Lankford (S.O.F., ¶46) does not support plaintiff's claim that Officer Decot, or any member of the Ayer Police Department, including Chief Adamson, ever had possession of the time cards.  In her Declaration, Ms. Lankford states that Ayer police officers, including Officer Decot "*asked* for Mr. Waters' time card" for the day of the murder (S.O.F., ¶127; Exhibit 46, ¶10) (emphasis supplied).  She further states that "Berry Enterprises retained original time cards from the Park Street Diner on file." (Id., ¶7).  Significantly, the Declaration does not provide that Officer Decot received the time cards, just that they were requested.  (Id., ¶¶9-10).  Further, Lankford states that Berry Enterprises "would comply with a police request by turning over a copy rather than the original," which, if available, would have been fully available to Waters and his defense counsel during trial.

Although the Lankford Declaration fails to establish sufficient grounds for the admission of custom evidence pursuant to F.R.E. 406 insofar as it does not establish the existence of a fixed and invariable custom and practice, the only proposition that can be reasonably gleaned from that declaration is that Berry Enterprises would have retained the original time cards if it had given copies to the police.  Therefore, if they existed, the original time cards would have been equally available to Waters and/or the District Attorneys' Office.  Therefore, as there is no evidence that Chief Adamson or any other Ayer Police Officer ever had possession of the time cards, or that they prevented Waters or anyone else from obtaining the time cards themselves, Chief Adamson is entitled to summary judgment as to the *Brady* claim.

16

### b. The Time Cards Have Not Been Shown to be Exculpatory

The plaintiff also cannot prove that the time cards were exculpatory. It is well-settled that "mere speculation that materials may contain exculpatory evidence is not sufficient . . . to sustain a *Brady* claim." United States v. Brown, 360 F.3d 828, 833 (8th Cir. 2004) (quoting, United States v. Wadlington, 233 F.3d 1067, 1076 (8th Cir. 1997)); United States v. Crowell, 586 F.2d 1020, 1029 (4th Cir. 1978). It is undisputed that the time cards were missing at the time of Waters' criminal trial and they remain missing to this date. Thus, absent rank speculation, conjecture and surmise, the plaintiff cannot establish that the time cards were exculpatory. Therefore, as the plaintiff cannot establish a disputed issue of fact based on anything more than unreasonable inferences built on "the gossamer threads of whimsy, speculation and conjecture." Raskiewicz v. Town of New Boston, 754 F.2d 38, 45, n. 7 (1st Cir. 1985), Chief Adamson is entitled to summary judgment on the time card issue as a matter of law.

Moreover, it is undisputed that the time cards were missing at the time of Waters' original trial and remain missing to this date. While plaintiff unilaterally characterizes the time cards as "exculpatory," no one will ever know what the time cards reflect. Materiality is the rock upon which any due process claim based on the alleged failure to exculpatory evidence must be anchored. United States v. Kincaid, 712 F.2d 1, 3 (1st Cir. 1983); California v. Trombetta, 467 U.S. 479, 488 (1984). In Trombetta, the respondents claimed that the breath samples used to determine blood alcohol content, which were destroyed by the police department, could have been used by them to impeach the Intoxilyzer results. In finding that there was no due process violation, the Court found that although the breath samples "might conceivably have contributed to respondents' defenses, a dispassionate review of the Intoxilyzer and the California testing procedures can only lead one to conclude that the chances are extremely low that the preserved samples would have been exculpatory." Trombetta, 467 U.S. at 489.

17

The same can be said of the time cards in this case. The time cards were missing at the time of Waters' original trial and they remain missing to this date. As such, no one will ever know what the time cards said. Although the time cards might conceivably have been favorable to Waters, the chances are extremely low that they would have been exculpatory. In this regard, it is highly significant that Alice Tessier testified at trial that she was at work from 5:00 a.m. on the morning of the murder and that she did not see Waters there until after 11:00 a.m. The testimony of a person who was actually at the Diner during the relevant time period is far more valuable than any information that would have been contained on a time card, and it is highly unlikely that the jury would have believed the time card over Ms. Tessier if there were a conflict. Therefore, as the time cards would not have played a significant role in Waters' defense, regardless of what they said, there can be no liability for failing to preserve that evidence.

   **D.**  **Chief Adamson is entitled to qualified immunity**

Chief Adamson is entitled to qualified immunity because there were no actions prior to his departure from the Ayer Police Department in 1981 which resulted in Waters' arrest or prosecution by the District Attorney's Office in 1983. "Qualified immunity is an affirmative defense shielding public officials sued in their individual capacity from civil damages so long as their conduct does not violate any clearly-established statutory or constitutional right of which a reasonable person would be aware." Rodriguez-Esteras v. Solivan-Diaz, 266 F.Supp.2d 270, 281 (D.P.R. 2003). Courts apply a trifurcated inquiry to determine whether an official is entitled to qualified immunity. Hatch v. Department for Children, Youth and Their Families, 274 F.3d 12, 20 (1st Cir. 2001). First, courts will evaluate "whether the plaintiff has alleged the violation of a constitutional right. If so, we then ask whether the contours of the right were sufficiently established at the time of the alleged violation." Only if the first two prongs are established, it is necessary to inquire whether an objectively reasonable official would have believed that the

action taken or omitted violated that right. Id. (citing Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir.2001)).

Here, as noted, the plaintiff cannot establish any constitutional violation attributable to Chief Adamson in connection with the Brow murder investigation, including the disclosure of exculpatory evidence or the alleged fabrication of evidence. Most notably, there is no competent evidence to conclude that Chief Adamson received a fingerprint comparison report from Trooper Baliunas which excluded Waters' prints from those found at the murder scene. Additionally, it would not be reasonable for Chief Adamson to believe that actions taken after his tenure as police chief would violate Waters' constitutional rights. At the time Chief Adamson resigned, Waters was not arrested nor had Mr. Osborne or Ms. Marsh come forward with information regarding the murder investigation. Further, even assuming that fingerprint evidence was available regarding Waters, it was certainly reasonable for Chief Adamson to conclude that the reports were being maintained by State Police (which conducted all the comparisons) and would be sent to State Police Detectives and the Middlesex District Attorney's Office in conjunction with their statutory authority to conduct the murder investigation. See G.L. c.38, §4.

Moreover, Chief Adamson is entitled to qualified immunity as to plaintiff's supervisory liability claim. Indeed, it was not clearly established at the time that a supervisor would be held liable for the acts of subordinates after his service as Police Chief. As the First Circuit has held, "[w]hen a supervisor seeks qualified immunity in a section 1983 action, the "clearly established" prong of the qualified immunity inquiry is satisfied when (1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998). Chief Adamson had no control over the actions of Officer Taylor-Harris, Officer Decot or Lt. Boisseau after his tenure as police chief, nor is

there any evidence that these officers violated Waters' constitutional rights.  Thus, Chief Adamson is entitled to qualified immunity on plaintiff's supervisory liability claim.

## IV.    CONCLUSION

For the foregoing reasons, Chief Adamson is entitled to summary judgment as a matter of law as to Counts I, II, III, IV, VII and VIII.

>                                DEFENDANT,
>
>                                WILLIAM ADAMSON,
>
>                                By his attorneys,
>
>                                /s/ Joseph L. Tehan, Jr.
>                                Joseph L. Tehan, Jr. (BBO # 494020)
>                                Gregg J. Corbo (BBO # 641459)
>                                Kopelman and Paige, P.C.
>                                101 Arch Street, 12th Floor
>                                Boston, MA  02110
>                                (617) 556-0007

336396.5/AYER-WATERS/0053