UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-10521-GAO

BETTY ANNE WATERS, as Administratrix of the
Estate of KENNETH WATERS,

Plaintiff

v.

TOWN OF AYER, NANCY OFFICER TAYLOR-
OFFICER TAYLOR, in Her Individual Capacity,
ARTHUR BOISSEAU, In His Individual Capacity,
WILLIAM ADAMSON, in His Individual
Capacity and PHILIP L. CONNORS, in His
Individual Capacity,

Defendants

DEFENDANTS' L.R. 56.1
STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE

**The Dismissal of Charges Against Kenneth Waters**

1.    On June 28, 2001, after allowance of an unopposed motion for a new trial, Middlesex

County District Attorney Martha Coakley filed a <u>nolle prosequi</u> of the murder charges

against the late Kenneth Waters for the May 21, 1980 murder of Katarina Brow. (<u>Exhibit</u>

<u>45</u>).  The <u>nolle prosequi</u> provided as follows:

Based upon new DNA evidence of the presence of blood of an unknown person at
the scene of the 1980 murder of Katarina Brow, the Commonwealth has agreed
that, at a minimum, a new trial of the above indictments is warranted.

At this time, there is insufficient evidence to proceed with a criminal prosecution
against the defendant, Kenneth Waters, and as such, the Commonwealth has
determined that, at this time, a <u>nolle prosequi</u> is in the interests of justice.  The
Commonwealth's investigation into the murder of Katarina Brow was and will
continue.  (<u>Exhibit 45</u>)

The discovery of the DNA evidence was the only reason for the District

Attorney's not opposing the motion for a new trial. (<u>Exhibit 4</u>, p. 142, l.14).

2.      The <u>nolle</u> <u>prosequi</u> was not as a result of any determination of police misconduct, but rather, was based solely on DNA testing of non-victim blood found at the murder scene, which testing was unavailable at the time of Waters' criminal trial (<u>Exhibit 45</u>; <u>Exhibit 4</u>, p. 141-143, p.165, l. 12; <u>Exhibit 8</u>, p. 62, l. 21-, p. 63, l. 2).  The blood type of the non-victim blood was the same as Waters' (Amended Complaint, ¶56, <u>Exhibit 40</u>, p. 367; <u>Exhibit 41</u>, p. 546).  This type of blood was found only in small amounts at the crime scene. (<u>Exhibit 39</u>, p. 268).

3.      Prior to the filing of the <u>nolle</u> <u>prosequi</u>, Assistant District Attorney Sheila Calkins was assigned to reinvestigate the Brow murder (<u>Exhibit 4</u>, p. 23, l. 6).

4.      As of 2007, Waters remained a suspect.  (<u>Exhibit 4</u>, p. 50, l. 18)  However, the option of re-trying him ended with his death. (<u>Exhibit 4</u>, p. 79, l. 16).  Waters remained a suspect because he lived near Brow's house, knew Brow kept large sums of money on her person, knew Brow, had been seen with a knife similar to the murder weapon, attempted to sell a ring that had belonged to the decedent, and made purchases after the murder/theft. (<u>Exhibit 4</u>, pp. 152-5).  As noted by District Attorney staff, Waters had the "motive, means and the opportunity" (<u>Exhibit 55</u>, p. 3).

5.      In her re-investigation of the Brow murder, Calkins never concluded that any Ayer police officer destroyed or withheld evidence or coerced witness testimony.  (<u>Exhibit 4</u>, p.157, l. 17, p. 206).

6.      The original file of the District Attorney has been lost or accidentally destroyed.  (<u>Exhibit 4</u>, p. 31, l. 2; <u>Exhibit 18</u>, p. 46, l. 14, p. 63, l. 22).

<u>The Investigation of the Murder of Katarina Brow</u>

A)  <u>District Attorney and State Police Involvement</u>

7.      Katarina Brow was found murdered at her house in Ayer, MA on May 21, 1980.

(Amended Complaint ¶14).  George Katsas, M.D., the Commonwealth's Medical

Examiner, opined at trial that the time of death was approximately 7:00 a.m. on that date

(Exhibit 39, p. 188, l. 9).

8.      Pursuant to G.L. c. 38, §4, the investigation of the murder was the responsibility of the

District Attorney.  (<u>Exhibit 8</u>, p. 19, l 10; <u>Exhibit 1</u>, p. 129, l. 8; <u>Exhibit 10</u>, p. 16, l. 9;

<u>Exhibit 13</u>, p. 36, l. 3).

9.      Ayer police officers understood that the District Attorney was in charge of the

investigation.  (<u>Exhibit 7</u>, p. 72, l. 10; pp. 148-149, l. 16 p. 191, l. 18; <u>Exhibit 2</u>, p. 154, l.

8; p. 234, l. 13; <u>Exhibit 20</u>, p. 84, l. 10).

10.     In Massachusetts, the primary investigators in homicide investigations are State Police

officers.  (<u>Exhibit 4</u>, p. 71, l. 13; <u>Exhibit 8</u>, p. 19, l. 10; p. 23, l. 18; <u>Exhibit 7</u>, p. 149, l.

23).  State Police Detective/Lieutenant Dwyer testified and identified exhibits at the

grand jury proceedings (<u>Exhibit 36</u>).  He also testified at Waters' trial that he saw no

scratches on Waters' face on May 22, 1980.  (<u>Exhibit 41</u>, p. 607).

11.     The Assistant District Attorney who prosecuted Kenneth Waters for the Brow murder

was Elizabeth Fahey. (<u>Exhibit 8</u>, p. 16, l. 10; p. 24, l. 22; <u>Exhibit 4</u>, p. 137, l.16).

12.     Fahey has served as a State Superior Court Judge since September 9, 1999.  (<u>Exhibit 8</u>, p.

5, l. 91; Exhibit 4, p. 137, l.19).

13.     State Police investigators were involved in the Brow murder investigation from the

beginning.  (<u>Exhibit 3</u>, p. 234, l. 8).

14.    State Police crime scene investigators, including Lieutenant Detective Dwyer, a chemist, photographer and fingerprint examiner were deployed to the crime scene on the date of the murder.  (Exhibit 1, p. 12, l. 20; Exhibit 38, p. 140).

15.    State Police officers interviewed witnesses and Waters. (Exhibit 10, p. 19, l.11).

16.    State Police Trooper Keane, together with Ayer Police Lieutenant Boisseau, went to interview Waters at his home on May 22, 1980.  (Exhibit 10, p. 66, l. 25).

17.    Waters was interviewed on May 22, 1980 in the presence of State Police Lieutenant Dwyer, Keane, Chief Adamson and Lt. Boisseau of the Ayer Police Department.  (Exhibit 22).

18.    Lt. Dwyer "had a finger in" developing information leading to Waters' arrest.  (Exhibit 10, p. 38, l. 14).

19.    The District Attorney was notified of all Ayer Police Department activity on the Brow case.  (Exhibit 7, p. 152, l. 18).

20.    New Ayer Police Department activity was "run by" the District Attorney in advance.  (Exhibit 7, p. 155, l. 5).

21.    Officer Taylor was the main contact between the Ayer Police Department and the District Attorney after her contact with Robert Osborne on September 30, 1982.  (Exhibit 20, p. 27, l. 15).

22.    Officer Taylor had "pretty constant discussions with [ADA] Fahey about the progress of the [Brow] case.  (Exhibit 20, p. 27, l. 22).

23.    In any case in which Officer Taylor worked with the District Attorney's office, it was given "everything I had."  (Exhibit 20, pp. 105-6).

24.    Assistant District Attorney Fahey was aware that prosecution witness Roseanna Perry stayed in Ayer (Exhibit 20, p. 122, l. 23) and that Perry's expenses were paid while there. (Exhibit 20, pp. 117-118).

25.    Ayer Police knew that all evidence regarding the Brow murder had to be turned over to District Attorney.  (Exhibit 3, p. 44, l. 5).

26.    Everything relevant to the Brow investigation, including exculpatory evidence, was turned over to the District Attorney.  (Exhibit 7, p. 126).

27.    Assistant District Attorney Fahey had access to all police reports.  (Exhibit 8, p. 57, l. 19).

### B.  Ayer Police Involvement and Witness Testimony

28.    William Adamson served as Ayer Police Chief at the time of the Brow murder. (Exhibit 21).

29.    At the time of Adamson's retirement in late 1981, there had been no arrests made, and there were no "live suspects" in the Brow murder.  (Exhibit 3, pp. 23, 110-1, l. 3).

30.    Arthur Boisseau served as an Ayer Police Officer for 32 years.  (Exhibit 3, p. 7, l.15, pp.31, l.24-p. 32, l.1)  At all relevant times, Boisseau served as Ayer Court liaison/prosecutor.  (Exhibit 7, p. 79, l. 1)  Boisseau served as interim Chief between Chief Adamson and Connors. (Exhibit 3, p. 20, l.17)  No significant activity on the investigation took place during Boisseau's tenure as Chief. (Exhibit 3, pp.110, l.21-111).

31.    Defendant Nancy Taylor Harris (then known as Nancy Taylor and hereinafter referred to as "Officer Taylor") served as an Ayer Special Police Officer from 1977 to 1982, and departmental rape/child abuse investigator.  (Exhibit 19, pp.51-52)  In 1983, she became a full-time Ayer Police Officer.  (Exhibit 19, p. 64)  Prior to joining the Ayer Police

Department, Taylor previously worked as a rape investigator for the Pepperell Police Department. (<u>Exhibit 19</u>, p.91-92, l. 1-7).

32. Philip Connors became Ayer Police Chief in February 1982. (<u>Exhibit 7</u>, p. 15, l. 3)  Prior to becoming Ayer Police Chief, Connors served as a sergeant on the Southborough Police Department (<u>Exhibit 7</u>, p. 7) and as Rowley Police Chief (<u>Exhibit 7</u>, p. 11, l. 3).

33. Upon his appointment, at the request of a Brow family member, Connors conducted a "cursory" review of the Brow murder file. (<u>Exhibit 7</u>, p. 164; <u>Exhibit 6</u>, p. 65, l. 11).

34. Connors then requested Lt. Boisseau to review the file for leads that had not been followed to a logical conclusion. (<u>Exhibit 6</u>, p. 63, l. 15).

35. Boisseau advised Connors there were none. (<u>Exhibit 7</u>, p. 168, l. 10).

36. On September 30, 1982, Officer Taylor received an unsolicited telephone call at the Ayer Police Department from one Robert Osborne. (<u>Exhibit 19</u>, p. 143; <u>Exhibit 26</u>).

37. In the call, Osborne stated that he lived with a woman who was Waters' former girlfriend and who had information concerning the Brow murder and who had washed Waters' bloody clothes. (<u>Exhibit 26</u>; <u>Exhibit 19</u>, p. 174, 1.8).

38. Officer Taylor notified Chief Connors of Osborne's call. (<u>Exhibit 19</u>, p. 143, l. 9).

39. Connors, in turn, contacted the District Attorney (<u>Exhibit 19</u>, p. 143, l. 15), and was directed to meet with Marsh and Osborne. (<u>Exhibit 19</u>, p. 162, l. 10; <u>Exhibit 26</u>).

40. Since Osborne had requested money for his information, Connors and Officer Taylor met with Assistant District Attorneys Fahey and Whitehead and State Police Lieutenant Dwyer in Cambridge to secure funding. (<u>Exhibit 7</u>, p. 174, l. 3; <u>Exhibit 26</u>).

41. On October 1, 1982, Officer Taylor received a second call from Osborne, in which he identified Brenda Marsh as Waters' ex-girlfriend. (<u>Exhibit 26</u>).

42. On the same date, Connors, Officer Taylor and Osborne met. At that time, Osborne advised that Marsh was "extremely frightened" of Waters and that "[Waters] had admitted to Marsh that he murdered his neighbor during a breaking and entering." (Exhibit 26).

43. On October 2, 1982, Osborne called Officer Taylor again to advise that Marsh was willing to talk to the police. (Exhibit 26).

44. On October 4, 1982, Connors, Officer Taylor, Osborne and Marsh met at a restaurant, Maxwell Silverman's in Worcester, Massachusetts, for an interview. (Exhibit 7, p. 187, l. 18; p.194, l. 9; Exhibit 27).

45. The purpose of the interview was to get information. (Exhibit 7, p. 204, l. 18).

46. Plaintiff's police practices expert, Lou Reiter testified that in his opinion, Connors was ultimately responsible for the conduct of the Marsh interview, in view of his status as senior officer. (Exhibit 16, p. 91, l. 23; p. 92, l. 18, p. 93, l. 8). Defendants' police practices expert, John Ford ("Ford") concurred in this opinion. (Exhibit 9, p. 156, l. 18).

47. At the interview, Connors served as the "eyes and ears" of the District Attorney. (Exhibit 9, p. 193, l. 13). Reiter does not contend that Connors was unfit or unqualified to participate in the Marsh interview. (Exhibit 16, p. 93, l. 14-19). Chief Connors was eminently qualified and had extensive experience as a police officer and Chief. (Exhibit 49, pp. 10-11).

48. Reiter does not contend that Connors inadequately or improperly supervised Officer Taylor at the Marsh interview (Exhibit 16, p. 94, l. 15-19).

49. Reiter testified that he "did not find this to be from the traditional sense a negligent training issue" (Exhibit 16, p. 31, l. 14-15) and conceded that Officer Taylor was

adequately trained as a rape investigator (Exhibit 16, p.97, l. 19-21) and that her rape investigation training was on point and apt for interviewing Marsh.  (Exhibit 16, p. 99, l. 2-7).  Officer Taylor had more training and expertise than the average full-time officer in the area of investigating victims and witnesses especially women. (Exhibit 49, pp. 8-9).

50.    It was the Ayer Police Department's job to document Marsh's testimony and turn it over to the District Attorney.  (Exhibit 7, pp. 223-4).

51.    Connors and Officer Taylor were "pleasant" at the interview.  (Exhibit 12, p. 134, l. 8-14).

52.    At the interview, Connors and Officer Taylor told Marsh what Osborne had told them.  (Exhibit 12, p. 138, l. 11).

53.    Neither Osborne nor Marsh denied Osborne's statement, as repeated by Connors and Taylor.  (Exhibit 12, pp. 139-140).  Marsh admits that Osborne in fact made the statements attributed to him. (Exhibit 12, p. 221, l. 7).

54.    At the interview, Marsh disclosed that Waters had admitted to her that he had killed Mrs. Brow, and that he had come home on the morning of the murder drunk and with a scratch on his face.  (Exhibit 27)  She also stated she had not come forward sooner due to fear of Waters and his family.  (Exhibit 19, p. 213, l. 13).  She denied washing Waters' bloody clothes.  (Exhibit 27).

55.    Marsh also stated that approximately a week prior to the murder, Waters told her that he knew Brow had a lot of money and that he wanted it.  (Exhibit 27)  She also indicated that she had attempted to contact Waters at work on the night of the murder and was told he was not there.  (Exhibit 27).

56.    All of Marsh's interview statements, with the exception of the statement that Waters had a scratch on his face were corroborated.  (Exhibit 50).

57.    Marsh now claims that she initially stated at the interview that she didn't know anything and that the officers "threatened" her with being charged as an accessory after the fact, with resultant incarceration and loss of custody of her children.  (Exhibit 12, pp. 148-9; Exhibit 56).

58.    Reiter agreed that, had Marsh indeed washed Waters bloody clothes with awareness of the Brow murder, said act could render her an accessory after the fact.  (Exhibit 16, p. 95, l. 15-23).

59.    Reiter does not intend to opine at trial that Marsh was pressured at her interview, and admitted that she had multiple opportunities, "in open court" to disclose pressure had it occurred.  (Exhibit 16, p. 96, l. 5-15).

60.    Marsh alleges no other "threats."  (Exhibit 12, p. 150, l. 6).

61.    Connors and Officer Taylor deny "threatening" Marsh (Exhibit 7, p. 250, l. 4; Exhibit 19, p. 197, l. 10, p. 200, l. 4) or exerting "pressure" on her.  (Exhibit 7, p. 263, l. 14).

63.    Fahey views mentioning possible exposure to accessory after the fact charges, as alleged by Marsh, as a possible fact, not a threat.  (Exhibit 8, p. 106, l. 5)  It is not wrong to notify a witness of the consequences of their actions. (Exhibit 7, p. 144, l. 13; Exhibit 9, pp. 55-56).

64.    Reiter testified that he cannot have the opinion that Marsh was pressured during her interview with Connors and Officer Taylor.  (Exhibit 16, p. 96, l.1); Ford concurred in this opinion.  (Exhibit 9, p. 123, l. 15).

65.     Marsh does not contend that Officer Taylor or Connors told her to lie.  (Exhibit 12, p. 180, l. 11).

66.     At the interview, Marsh also identified Roseanna (Perry) Baggessen as another former girlfriend of Waters with whom the police should speak.  (Exhibit 20, p. 16, l. 21, p. 19, l. 22).

67.     Officer Taylor apprised Assistant District Attorney Fahey of the interview of Marsh. (Exhibit 20, p. 26, l. 2-11).

68.     On October 6, 1982, Marsh told Officer Taylor that Waters was a size 9½ shoe, the same size as a footprint at the murder scene.  She also stated that Waters had recently sold a ring. (Exhibit 28).

69.     After the interview, the State Police polygraphed Marsh.  (Exhibit 7, p. 209, l. 24; Exhibit 12, p. 152, l. 11).  The polygraph test took place on October 8, 1982 (Exhibit 19, p. 236, l. 8).

70.     At the pre-polygraph interview conducted by Lt. Dwyer with assistance from Officer Taylor, Marsh repeated Waters' murder admission and added: "he did it."  (Exhibit 34). She also told Lt. Dwyer at the interview that she appeared for polygraph testing "willingly and of [her] free will." (Exhibit 34, p. 25, l. 16-22).

71.     State police polygraphist Nasuti detected no deception in Marsh's account.  (Exhibit 35).

72.     State Police Lt. Dwyer advised Officer Taylor that Marsh had "passed" the polygraph. (Exhibit 19, p. 232, l. 8).

73.     Officer Taylor found Marsh to be "very credible."  (Exhibit 19, p. 234, l. 7).  She believes that Waters is guilty (Exhibit 20, p. 202, l. 19).  Connors also believes Waters was involved in the murder. (Ex. 7, p. 287, l. 7-15)

74.    Assistant District Attorney Fahey has no memory of Marsh's ever complaining about police misconduct.  (Exhibit 8, p. 49, l. 3).

75.    Marsh never told Fahey that the Ayer Police Department told her to lie (Exhibit 8, p. 69, l. 9) or that she intended to lie.  (Exhibit 8, p. 69, l. 1).

76.    Marsh never told Fahey that Waters had not killed Mrs. Brow.  (Exhibit 8, p. 68, l. 19).

77.    Marsh never told the prosecutor, defense counsel or any involved judge that she was pressured by the Ayer Police Department.  (Exhibit 12, pp. 156-7).

78.    After the polygraph, Assistant District Attorney Fahey concluded there was probable cause to arrest Waters and directed Officer Taylor to seek an arrest warrant.  (Exhibit 7, p. 276, l. 10; Exhibit 29)  In Ford's opinion, it was reasonable for Officer Taylor to believe that probable cause existed for Waters' arrest.  (Exhibit 49, p. 13).

79.    In addition to Marsh's statement, corroborated by polygraph, the Ayer Police Department was in possession of additional information contributing to probable cause for Waters' arrest.

Specifically:

    a.    Waters sold jewelry belonging to Mrs. Brow to Adi Ogden, who recognized it as gifts she had previously given to Mrs. Brow (Exhibit 24; Exhibit 25);

    b.    Waters made statements to co-workers that he had previously broken into Brow's house and stolen things; (Exhibit 24)

    c.    Waters had purchased a firearm to kill anyone going onto his land, including the police; (Exhibit 24)

    d.    Waters paid $500 in cash to a criminal defense attorney in an unrelated matter; (Exhibit 24)

    e.    Waters purchased a swimming pool and paid for repairs to his motor vehicle after the murder; (Exhibit 24)

f.    Waters made statements as to how easy it was to get from his home to Brow's without being seen; and (Exhibit 24)

g.    Waters had previously pled guilty to a charge of attempted murder. (Exhibit 24)

Further, prior to trial, David C. Raskin, Ph.D. also polygraphed Waters on March 11, 1983 at the request of Assistant District Attorney Fahey. He concluded that Waters ". . . is not credible when he denies having stabbed and murdered Katarina Brow on May 21, 1980." (Exhibit 53).

80.    Marsh testified on October 8, 1982 at a probable cause hearing that Waters had admitted to murdering Mrs. Brow. (Exhibit 37, p. 49, l. 15; pp. 75-76; Exhibit 20, p. 29, l. 12).

81.    Marsh also testified that Waters had stated prior to the murder that Brow had a lot of money and he'd like to get that money. (Exhibit 37, pp. 47-48).

82.    Marsh testified that she had delayed in coming forward because she wanted nothing to do with Waters. (Exhibit 37, 83).

83.    On October 12, 1982, Officer Taylor secured an arrest warrant for Waters and he was arrested on that date. (Exhibit 29). Reiter agreed that the ultimate evaluation of the sufficiency of the evidence, of the credibility of witnesses and the decision whether to prosecute lay with the District Attorney. (Exhibit 16, p.107, l. 1-10).

84.    Ayer police officer Dennis MacDonald arrested Waters. (Exhibit 11, p. 16, l. 22).

85.    At the time of his arrest, Waters told MacDonald: "I knew you guys were going to find me." (Exhibit 11, p. 116, l. 9). MacDonald's post-arrest notes reflect that Waters stated that he was drunk and not at work on the night of the murder. (Exhibit 31).

86.    On October 13, 1982, Waters was interviewed at the Ayer Police Department and stated that Marsh "was a very truthful person." (Exhibit 32).

87.    On October 15, 1982, Officer Taylor interviewed the owners of Global Van Lines, where Waters had worked. They told Officer Taylor that Waters had been fired based upon

suspicions that he had committed a breaking and entering into the warehouse and that a knife similar to the murder weapon had "disappeared around the time that Waters' employment was terminated." (Exhibit 33).

88.   After Waters' arrest, Fahey and Officer Taylor made arrangements to meet Perry in Providence, R.I. (Exhibit 20, p. 27, l. 15).

89.   They met with Perry at her mother's house. (Exhibit 20, p. 40, l. 7; Exhibit 14, p. 80, l. 19).

90.   Fahey conducted the interview; Officer Taylor ran the tape recorder. (Exhibit 20, p. 42, l. 6, p. 44; Exhibit 14, p. 80, l. 10). Their demeanor was "professional." (Exhibit 14, p. 83, l. 12) Officer Taylor was "very nice." (Exhibit 14, p. 159, l. 11) Perry was not reluctant to be interviewed, but was nervous. (Exhibit 20, p. 128, l. 11).

91.   Officer Taylor last saw the interview tape in Fahey's office. (Exhibit 20, p. 42, l. 10; p. 44, l. 13).

92.   At the interview, Perry stated that Waters had admitted killing Mrs. Brow to her. (Exhibit 20, 5/18, p. 45, l. 1-17; Exhibit 14, p. 256, l. 5).

93.   There was a second interview of Perry conducted at Providence police headquarters on April 12, 1983. (Exhibit 20, p. 55, l. 16). Assistant District Attorney Fahey was present at this interview, as were Officer Taylor and Providence Detective McGaherty. (Exhibit 40, pp. 402-3). At the interview, Perry stated that she was "absolutely sure Waters told her he had killed a woman in Ayer, Massachusetts" and that Waters "had threatened her a few times" (Exhibit 54).

94.   Perry "came across as reliable." (Exhibit 20, p. 55, l. 7).

95.     Perry remains "absolutely certain" of Waters' admission.  (Exhibit 14, p. 99, l. 20)  She
        remembers exactly what Waters said. (Exhibit 14, p. 245, l. 12)  His admission was
        "shocking" and "unforgettable." (Exhibit 14, pp. 227-8).

96.     Plaintiff offered Perry $10,000 not to testify at trial.  (Exhibit 14, p. 11, l. 4).

97.     Plaintiff also offered Perry $10,000 to change her testimony.  (Exhibit 14, p. 73, l. 9).
        Plaintiff brought Perry to an Attorney DeSimone's office to give a statement. (Exhibit 14,
        p. 67, l. 11)  Perry did not tell DeSimone the truth.  (Exhibit 14, p. 77, l. 21)  Perry did
        not view her statement to DeSimone as under oath. (Exhibit 14, p. 77, l. 7).

98.     Perry was not afraid of the police.  (Exhibit 14, p. 139, l. 10)  She did not feel "pushed
        around" by the police. (Exhibit 14, p. 152, l. 9)  She did not feel threatened at her
        interview. Exhibit 14, p. 88-89, l. 1).

99.     No pressure was applied to Perry by the Ayer Police Department to get her to lie.
        (Exhibit 14, p. 84, l. 18-23; p. 87, l. 21-88).

100.    Perry never told Officer Taylor she had no memory or that she did not want to talk to her.
        (Exhibit 14, p. 95, l. 10).

101.    Before Waters' trial, the Ayer Police Department took Perry to Ayer, at her request,
        because she was in fear of her life from the Waters family.  (Exhibit 14, p. 102-7).

### THE TRIAL OF KENNETH WATERS

102.    The Criminal Trial of Kenneth Waters took place on May 4, 1983, May 5, 1983, May 6,
        1983, May 9, 1983, May 10, 1983, sentencing occurred on May 12, 1983. (Trial
        Transcript generally).  Boisseau testified at trial that he saw Waters in Ayer District Court
        at 11:00 a.m. on the morning of the Brow murder dressed in a suit. (Exhibit 38, pp. 121-
        2).  He also testified that he saw no scratches on Waters the date after the murder.

(Exhibit 39, p.196, l. 24-25) and that Mr. Brow had identified the murder weapon as his.

(Exhibit 39, p.195, l. 16-21).

103.  Perry testified truthfully at Waters' criminal trial that Waters admitted to her that "I killed

that German bitch and to stealing Mrs. Brow's money and jewelry."  (Exhibit 14, p. 41,

pp. 65-66; p. 118, l. 22; Exhibit 40, p. 344).

104.  Marsh also testified at Waters' criminal trial that he had admitted to murdering Mrs.

Brow.  (Exhibit 40, p. 457, l. 20).

105.  Adi Ogden testified at trial that, after the Brow murder, Waters sold her a necklace and

ring which she had given to Mrs. Brow.  (Exhibit 39, p.p.303, 306-71; Exhibit 40, p.339).

106.  Ogden also testified that Waters told her that he hated Mrs. Brow and that when he wants

to kill, he kills. (Exhibit 40, p.344).

107.  Brenda Marsh testified at trial that when she called looking for Waters at the Park Street

Diner on May 20, 1980, she was told he was not there.  (Exhibit 40, p. 450).

108.  Marsh testified at trial that Waters knew Mrs. Brow kept money in her trailer and that he

wanted to get it.  (Exhibit 40, p.451).

109.  Marsh testified at trial that, after the Brow murder, she and Waters left Ayer to live in a

van in Providence, R.I. (Exhibit 40, pp.455-6).

110.  Marsh testified at trial that the murder weapon belonged to Waters.  (Exhibit 40, pp.459-

60).  A co-employee of Waters' at Global Van Lines testified that a knife similar to the

murder weapon had disappeared when Waters stopped working there. (Exhibit 41,

pp.522-3).

111.   Marsh testified at trial that Waters went home to sleep on the morning of the Brow

murder.  (Exhibit 40, p.480, l. 5-6) and that he had a scratch on his face at that time.  (Id.,

l. 22).

112.   Alice Tessier testified at trial that she managed the Park Street Diner.  (Exhibit 41, p.533,

l.14-17).

113.   Although she worked from 5:30 a.m. to 3:00 p.m. on the day of the Brow murder,

(Exhibit 41, p.535, l.14-25).  Tessier did not see Waters until 11:00 a.m. on that day.

(Exhibit 41, p.536, l. 10).

## THE HEARING ON WATERS' MOTION FOR A NEW TRIAL

114.   An evidentiary hearing was conducted on Waters' motion for a new trial in Middlesex

Superior Court, which began on July 22, 1985.  (Exhibit 42; Exhibit 43).

115.   Perry had no contact with the Ayer Police Department between the time of Waters' trial

and his motion for a new trial hearing.  (Exhibit 14, p. 122, l. 1; p. 125, l. 9).

116.   At the new trial hearing, Perry testified again to Waters' admission.  (Exhibit 14, p. 123,

l. 23).

117.   Perry denied any coercion at the hearing.  (Exhibit 43, p. 16, l. 19).

118.   Marsh testified that Waters had admitted to killing Mrs. Brow.  (Exhibit 42, p. 17, l. 6)

119.   Marsh had no contact with the Ayer Police Department between Waters' trial and the

motion for new trial hearing. (Exhibit 12, p. 182, l. 19).

120.   Marsh denied any coercion at the hearing.  (Exhibit 42, p. 12, l. 23- p.13 1.11).

121.   After the hearing on Waters' motion for a new trial the Superior Court (Keady, J.)

determined that the trial testimony of Marsh and Perry had been truthful.  (Exhibit 44).

At her deposition in 2007, Marsh would not state that her prior testimony was false.

(Exhibit 12, p. 173, l. 2; pp. 174-5, 178).

## BRADY FACTS

### A. Time Cards

122.    Waters' criminal defense attorney has admitted he did not know if the time cards would have been helpful to the defense (Exhibit 42, p. 26).

123.    Chief Connors has never seen Waters' time cards from the Park St. Diner for the time period encompassing the Brow murder.  (Exhibit 6, p. 60, l. 10-24; p. 66, l. 21; p. 67, l. 4; Exhibit 7, p. 265, l. 3).

124.    Lt. Boisseau has never seen Waters' time cards.  (Exhibit 3, p. 231, l. 4).

125.    Assistant District Attorney Fahey has never seen Waters' time cards.  (Exhibit 8, p. 38, l. 22).

126.    Officer Taylor has never seen Waters' time cards.  (Exhibit 19, p. 133, l. 9).

127.    Officer Taylor heard Officer Decot (deceased) tell Chief Adamson he had looked for Waters' time cards at the Park St. Diner, but found none.  (Exhibit 19, pp. 128-9; Exhibit 20, p. 150, l. 7; p. 157, l. 14).

### B. Fingerprint Evidence

128.    Officer Taylor testified at grand jury that some fingerprints lifted from the crime scene had been "smeared." (Exhibit 19, pp. 284-7).

129.    Officer Taylor was unaware at that time that any usable prints had been lifted from the scene.  (Exhibit 19, p.289, l. 1).

130.   Elizabeth Lankford, who maintained time records at the Park St. Diner, has never stated that the Ayer Police Department was ever provided with Waters' time cards.  (<u>Exhibit 46</u>).

131.   The State Police, not the Ayer Police Department, conducted fingerprint investigations. (<u>Exhibit 11</u>, p. 38, l. 17).

132.   State police fingerprint examiner Baliunas has no actual recollection that the Ayer police department ever sent him Waters' fingerprints for comparison.  (<u>Exhibit 1</u>, p. 83, l. 2). Baliunas would have provided the District Attorney's Office with copies of his reports. (Exhibit 1, p.35, l. 12, p.36, l. 2)

133.   Chief Richard Rizzo conducted a diligent search of Ayer Police Department records upon filing of this suit. (Exhibit 17, pp.17-18, 51)  Ayer Police records do not reflect either its sending Waters' fingerprints for comparison, or receiving any comparison results. (<u>Exhibit 23</u>).

134.   Baliunas has no recollection of ever comparing or examining Waters' prints.  (<u>Exhibit 1</u>, p. 144-5, l. 16).

135.   Baliunas would have compared Waters' fingerprints had defense counsel requested him to do so.  (<u>Exhibit 1</u>, pp. 148-9).

136.   Officer Taylor testified regarding fingerprints from the crime scene at grand jury proceedings, and Waters' criminal defense counsel was provided with a transcript. (<u>Exhibit 57; Exhibit 59</u>).  Waters' criminal defense counsel was aware that the State Police were in possession of Waters' fingerprints and therefore subpoenaed Baliunas to trial.  (<u>Exhibit 48</u>).

137.    Waters' defense counsel listed "Massachusetts State Police Fingerprint Section" as a
        criminal trial witness.  (Exhibit 52).  Waters' appellate counsel was also made aware of
        fingerprint evidence from the murder.  (Exhibit 58).

## SUPERVISORY FACTS

138.    Chief Adamson retired prior to Waters' arrest (Exhibit 3, p. 23, l. 13).

139.    Chief Connors was present with Officer Taylor at the Marsh interview. (Exhibit 7, p. 187,
        l. 18).

140.    Connors authorized Officer Taylor to do what the District Attorney asked her to do.
        (Exhibit 7, p. 195, l. 10).

141.    Assistant District Attorney Fahey conducted the interview of Roseanna Perry, with
        Officer Taylor present.  (Exhibit 20, p. 42, l. 6, p. 44; Exhibit 14, p. 80, l. 10).

142.    Connors allowed Officer Taylor to work on the Brow case under his supervision because
        the department was shorthanded and Lt. Boisseau had a case backlog.  (Exhibit 7, p. 275,
        l. 10-14).

143.    Officer Taylor was qualified to participate in the interviews of Marsh and Perry in light
        of her specialized training as a rape investigator.  (Exhibit 9, pp. 8-10; Exhibit 16, p.97,
        l.19-21, p.99, l. 2-7).

144.    Fahey was not concerned with Officer Taylor' level of experience because the State
        Police was in charge of the investigation.  (Exhibit 8, pp. 201-2, 204).

## MONELL FACTS

### A.  The Board of Selectmen Is the Policymaker

145.    Connors, as Police Chief, reported to the Ayer Board of Selectmen, which had ultimate authority over the Ayer Police Department.  He could not implement policies without Board of Selectmen approval. (Exhibit 7, pp. 58-9).

146.    The Board of Selectmen had oversight over the Police Department.  (Exhibit 5, p. 26-7, l. 1).

147.    The Board of Selectmen appointed the Police Chief and approved his appointment of subordinate officers.  (Exhibit 5, p. 33, l. 5).

148.    No one complained to the Board of Selectmen regarding police intimidation or coercion.  (Exhibit 5, p. 117).

### B.  Specific Incidents Alleged To Support Monell Claim

### TIES CONSTRUCTION

149.    During Chief Connors' tenure, he started an internal investigation into alleged police vandalism at Ties Construction Co. (Exhibit 7, p. 20, l. 20).

150.    Connors demanded that the suspect police officers take polygraphs.  (Exhibit 15, p.84).

151.    Connors brought administrative charges against the suspect officers when they refused to take polygraph exams.  (Exhibit 7, p. 26, l. 20).

152.    The suspect officers were eventually fired by Connors for refusing to take polygraphs.  (Exhibit 15, p. 84, l. 9).

153.    The firings were sustained by the Ayer Board of Selectmen.  (Exhibit 7, p.31, l. 7).

154.  In Ford's opinion, "Chief Connors' response to allegations of wrongdoing by his Police Officers was appropriate, aggressive and calculated to send a message that misconduct would not be tolerated."  (Exhibit 9, p. 17).

155.  Ayer police officer Randall felt Connors "did a super job cleaning it up.  I really did." (Exhibit 15, p. 84, l. 20-23).

156.  Reiter acknowledged that Connors' termination of the suspect officers sent "a positive reinforcing message to the remainder of the troops…"  (Exhibit 16, p. 169, l. 3-8).

## THE COMPLAINT OF BRUCE HOLDORFF

157.  On January 5, 1984, Bruce Holdorff filed an "Internal Affairs Complaint Report" stating that "Police report of an incident involving Holdorff and Sgt. MacDonald and Officer Taylor contained false information."  (Exhibit 51).

158.  MacDonald joined the Ayer Police Department in 1980 (Exhibit 11, p. 13, l. 11).

159.  At Chief Connors' request, Holdorff, Taylor and MacDonald all took polygraphs, which they all passed.  (Exhibit 11, pp. 105-9).

160.  Holdorff's charge was therefore deemed "unsubstantiated."

## LISA FRAWLEY'S ALLEGED RAPE
## BY STANLY RANDALL

161.  Stanley Randall ("Randall") was employed as an Ayer Police Officer from 1971-1987 (Exhibit 15, p. 6, l. 4-7).

162.  Randall was dispatched to Ties Construction to investigate vandalism which had occurred there.  (Exhibit 15, p. 55, l. 6 – 56, l. 17)

163.  Randall believed that Ayer Police Officers were responsible for the vandalism. (Exhibit 19, p. 320, l. 12).

164.    Randall's investigation caused factions in the Ayer Police Department.  (Exhibit 19, p. 323, l. 6).

165.    Officer Taylor, as departmental rape investigator, was notified of an allegation by one Lisa Frawley that Randall had raped her.  (Exhibit 19, p. 326, l. 4).  The alleged rape took place on October, 1981 (Exhibit 15, p.89, l. 8).

166.    Taylor feared that Frawley's claim might comprise some type of retaliation against Randall.  (Exhibit 19, p. 334, l. 12).

167.    Accordingly, Taylor and Chief Adamson agreed to refer the case to the State Police if the alleged rape took place in Ayer.  (Exhibit 19, p. 329, l. 8).

168.    When they learned the rape had allegedly taken place in Acton, Massachusetts, they referred Frawley to the Acton Police Department.  (Exhibit 19, p. 339, l. 9)

169.    The criminal complainant against Randall was the Acton Police Department. (Exhibit 15, p. 93, l. 4 -10).

170.    The charges were dropped the day after Randall's arraignment.  (Exhibit 15, p.94, l. 17-23).

171.    Randall brought a civil lawsuit out of the incident, which was settled.  (Exhibit 15, p. 102, l. 22, p. 103, l. 3).

172.    Reiter does not intend to opine that the Ayer Police Department improperly induced or influenced the Acton Police Department to bring charges against Randall.  Reiter agreed that Officer Taylor's telling the alleged rape with victim that she would be there to help if needed was "very appropriate." (Exhibit 16, p. 176, l. 5 – p. 177, l. 18).

173.    Reiter testified that he will not offer opinion testimony that any member of the Ayer

Police Department harbored any bias against Waters leading to the charges against him.

(Exhibit 16, p. 22, l. 5-8).

174.    Reiter does not intend to opine that the "environment within" which the Ayer Police

Department resulted in an unfair criminal trial.  (Exhibit 16, p. 180, l. 8-15).

                                        DEFENDANTS,

                                        By their attorneys,


                                        /s/ Joseph L. Tehan, Jr.
                                        Joseph L. Tehan, Jr. (BBO # 494020)
                                        Gregg J. Corbo (BBO # 641459)
                                        Kopelman and Paige, P.C.
                                        101 Arch Street, 12th Floor
                                        Boston, MA  02110
                                        (617) 556-000


343613.2/01907/0053