UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-10521-GAO

| | |
|---|---|
| BETTY ANNE WATERS, as Administratrix of the Estate of KENNETH WATERS,<br><br>                     Plaintiff<br><br>v.<br><br>TOWN OF AYER, NANCY TAYLOR-HARRIS, in Her Individual Capacity, ARTHUR BOISSEAU, In His Individual Capacity, WILLIAM ADAMSON, in His Individual Capacity and PHILIP L. CONNORS, in His Individual Capacity,<br><br>                     Defendants | MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NANCY TAYLOR-HARRIS' MOTION FOR SUMMARY JUDGMENT |

I.    INTRODUCTION

On May 21, 1980, Katarina Brow ("Brow, Mrs. Brow") was found murdered in her home at 7 ½ Rosewood Drive, Ayer, MA (Amended Complaint, ¶14). The investigation of the murder was conducted pursuant to G.L. c.38, §4 by the Middlesex District Attorney and the State Police Department with the assistance of the Ayer Police Department (L.R. 56.1 Statement of Facts, "S.O.F." ¶8). The District Attorney's case file has been lost or inadvertently destroyed (S.O.F., ¶6)

From the outset, plaintiff's decedent, Kenneth Waters ("Waters") was a person of interest in the investigation (S.O.F., ¶15). Waters was arrested by Ayer Police on October 12, 1982, pursuant to directive of the prosecuting Assistant District Attorney (currently Massachusetts Superior Court Associate Justice) Elizabeth Fahey (S.O.F., ¶78).

Waters was convicted of Mrs. Brow's murder on May 12, 1983 and incarcerated (S.O.F., ¶102). His conviction was affirmed on appeal to the Supreme Judicial Court (Commonwealth v. Waters, 399 Mass. 708 (1987).

In 2001, Waters filed an unopposed motion for a new trial, based solely upon DNA evidence not available at the time of his trial, which established that he was not the source of the non-victim blood found at the crime scene (although his blood type was the same) (S.O.F., ¶2). Thereafter, the Commonwealth filed a nolle prosequi which stated:

> Based upon new DNA evidence of the presence of blood of an unknown person at the scene of the 1980 murder of Katarina Brow, the Commonwealth has agreed that, at a minimum, a new trial of the above indictments is warranted.

> At this time, there is insufficient evidence to proceed with a criminal prosecution against the defendant, Kenneth Waters, and as such, the Commonwealth has determined that, at this time, a nolle prosequi is in the interests of justice. The Commonwealth's investigation into the murder of Katarina Brow was and will continue (S.O.F. ¶1).

Waters was released from prison but remained a suspect in the Brow murder up to the point of his own death, as a result of substantial, inculpatory, non-blood evidence developed at trial, as described in detail herein (S.O.F. ¶4). The investigation of the crime for purposes of determining whether to re-try Waters revealed no police misconduct nor was the nolle prosequi predicated upon any evidence of same (S.O.F. ¶5).

This case therefore proceeds not on the basis of any discovery of police misconduct leading to Waters' release. Instead, it reflects post hoc scrutiny of a conviction upheld on appeal by the Supreme Judicial Court in order to unfairly hold the defendants liable for monetary damages.[1]

---

[1]  Waters' prosecutor, Judge Fahey, is entitled to absolute prosecutorial immunity. None of the State Police Officials involved in the Brow prosecution have been sued.

As set forth hereinafter, the plaintiff has failed to establish actionable individual or municipal misconduct leading to false arrest or an unfair trial, and defendants have produced herein compelling affirmative evidence negating plaintiff's claims. Consequently, the defendants' motions for summary judgment should be allowed.

Specifically, defendant Nancy Taylor-Harris (then known as Nancy Taylor and hereinafter referred to as "Officer Taylor"), was employed as an Ayer Police Officer at the time of the murder and Waters' arrest and prosecution (S.O.F.¶31). Officer Taylor's involvement in this matter began when she received an unsolicited tip two years after the murder. (S.O.F.¶36) From that point, under the direct supervision of Chief Philip Connors and ADA Fahey, Officer Taylor assisted in interviewing two ex-girlfriends of Waters, Brenda Marsh and Roseanne Perry, who testified at trial as to his admissions to having murdered Ms. Brow. At the directive of ADA Fahey, Taylor also procured an arrest warrant for Waters and participated in his arrest (S.O.F. ¶78). Officer Taylor also testified before the grand jury and at Waters' criminal trial. As demonstrated herein, Officer Taylor's investigative work was appropriately supervised at all times by A.D.A. Fahey, the State Police, and/or defendant Chief Connors and did not violate Waters' rights.

## II.    FACTS

The facts underlying this case are set forth in the Defendants' Statement of Material Facts Not in Dispute Pursuant to L.R. 56.1 filed herewith.

## III.    ARGUMENT

### A.    **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In civil

procedure, summary judgment's role is "to pierce the pleadings and to assess the proof in order to

see whether there is a genuine need for trial." Mesnick v. General Elec. Co., 950 F.2d 816,

822 (1st Cir. 1991) (citing, Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir.1990)).

In order to defeat a summary judgment motion, "the non-moving party must demonstrate the

existence of a genuine issue of material fact pertaining to those issues on which it would bear the

burden of proof at trial." Kauffman v. Puerto Rico Telephone Co., 841 F.2d 1169, 1171 (1st Cir.

1988). Under Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1987), summary judgment is

appropriate where the non-moving has the burden of proof and "fails to make a showing

sufficient to establish the existence of an element essential to that party's case."

As the First Circuit has held, "[g]enuine issues of material fact are not the stuff of an

opposing party's dreams. On issues where the nonmovant bears the ultimate burden of proof, he

must present definite, competent evidence to rebut the motion." Mesnick, 950 F.2d at 822. For

summary judgment purposes evidence must be competent and "cannot be conjectural or

problematic; it must have substance in the sense that it limns differing versions of the truth which

a factfinder must resolve at an ensuing trial." Id. (citing, Mack v. Great Atl. & Pac. Tea Co., 871

F.2d 179, 181 (1st Cir.1989)). As the plaintiff can make no such showing in this case, Officer

Taylor is entitled to summary judgment as a matter of law.

### B.    Count I – Due Process – Failure to Disclose – Brady

#### 1.    The *Brady* Standard

In Count I, the plaintiff alleges that Officer Taylor violated Waters' Due Process rights as

defined by the Supreme Court in Brady v. Maryland, 373 U.S. 83 (1963), by failing "to disclose

to the prosecutor and the defense attorney material information that was favorable to Mr.

Waters." [2] (Amended Complaint, ¶77).  Under *Brady*, "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. 83 at 87.  Courts have extended this duty to disclose exculpatory evidence to impeachment evidence. Giglio v. U.S., 405 U.S. 150, 154 (1972).

In the Section 1983 context, "[a] *Brady* violation that resulted in the overturning of the § 1983 plaintiff's conviction is a necessary, but not a sufficient, condition for § 1983 liability on the part of the police. It is a necessary condition because the *Brady* violation establishes the requisite threshold of constitutional injury (a conviction resulting in loss of liberty) below which no § 1983 action can lie. It is not a sufficient condition, however, because the *Brady* duty is a no fault duty and the concept of constitutional deprivation articulated in both *Daniels* and *Youngblood* requires that the officer have <u>intentionally</u> withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial."  Jean v. Collins, 221 F.3d 656, 663 (4th Cir. 2000)(emphasis supplied).  Here, as noted, no *Brady* violation "resulted in the overturning of (Waters') conviction."

Significantly, "mere negligence or inadvertence on the part of a law enforcement official in failing to turn over *Brady* material to the prosecution, which in turn causes a defendant to be convicted at a trial that does not meet the fairness requirements imposed by the Due Process Clause, does not amount to a 'deprivation' in the constitutional sense."  Porter v. White  483 F.3d 1294, 1308 (11th Cir. 2007); Reid v. Simmons, 163 F.Supp.2d 81 (D.N.H. 2001); Burke v. Walpole, 2004 WL 507795 (D.Mass. 2004).   "Therefore, where no evidence exists that the investigator acted in bad faith or 'engaged in a conscious effort to suppress exculpatory

---

[2]  Of course, it is well-settled that Officer Taylor had no duty to disclose any evidence directly to the defense attorney.  See, e.g., Reid v. Simmons, 163 F.Supp.2d 81, 93 (D.N.H.,2001).

evidence' the accused's due process rights have not been violated." <u>Clemmons</u> v. <u>Armontrout</u>, 477 F.3d 962, 966 (8th Cir. 2007)(quoting, <u>Villasana</u> v. <u>Wilhoit</u>, 368 F.3d 976, 980 (8th Cir. 2004)).  Indeed, to impose §1983 liability on police officers for *Brady* allegations, there must be specific, concrete examples of bad faith on the part of police which deprived the plaintiff of his due process rights.  <u>Id.</u> at 662 ("[t]he difficulty of trying to sort out such everyday communications between prosecutor and police underscores the need to insist at a minimum that an actual bad faith deprivation of due process rights be alleged").

### 2.    Plaintiff's *Brady* Claims Must be Dismissed for Failure to Establish Intentional Misconduct or Bad Faith

At the outset, the plaintiff has not set forth one scintilla of evidence to suggest that Officer Taylor acted in bad faith or that she engaged in a conscious effort to withhold exculpatory evidence.  Public officials are entitled to a presumption that they have carried-out their official duties in good faith, <u>McCabe</u> v. <u>City of Lynn</u>, 875 F. Supp. 53, 62 (D. Mass. 1995) (citing, <u>Ramos</u> v. <u>Board of Selectmen of Nantucket</u>, 16 Mass.App.Ct. 308, 314, 450 N.E.2d 1125 (1983)), and merely showing that the actor did something wrong is not enough to establish bad faith.  <u>Id</u>.  Rather, the plaintiff has the burden of overcoming this presumption of good faith by producing particularized evidence of bad faith.  <u>Costa</u> v. <u>I.N.S.</u>, 233 F.3d 31, 37 (1st Cir. 2000)(quoting, <u>U.S.</u> v. <u>Gerter</u>, 65 F.3d 963 (1st Cir. 1995)).

In this matter, there is no evidence in the record to suggest that Officer Taylor acted in bad faith, and the plaintiff should not be permitted to infer bad faith simply because she was not satisfied by the result of Waters' criminal proceedings.  Officer Taylor testified at her deposition she believes Waters is guilty (S.O.F. ¶73).  Furthermore, there was no rush to judgment against Waters.  To the contrary, although Waters was a person of interest from the beginning of the investigation, numerous other suspects were investigated.  The investigation of the Brow murder

lasted more than two years, spanning three police chief administrations, before Waters was arrested, in response to compelling and unsolicited evidence of his guilt. The District Attorney was notified of all Ayer police department activity on the Brow case (S.O.F. ¶19), and all new Ayer police activity was "run by" the District Attorney in advance (S.O.F. ¶120). Officer Taylor had "pretty constant discussions with (ADA) Fahey" about the progress of the case. (S.O.F. ¶22). Taylor always disclosed to the District Attorney "everything I had" (S.O.F. ¶23). The Ayer police knew that exculpatory evidence had to be turned over to the District Attorney (S.O.F. ¶25), and everything relevant, including exculpatory evidence, was turned over to the District Attorney (S.O.F. ¶26). ADA Fahey had access to all police reports (S.O.F. ¶27). In the absence of the DA's file, the plaintiff cannot prove otherwise.

Although the plaintiff claims that Officer Taylor acted improperly in continuing to question Brenda Marsh after she initially denied having any information about the murder and in informing her of the consequences of not being truthful, these allegations fall far short of establishing intentional evidence suppression or bad faith, as required, since the basis for Taylor's actions "could just as well be [her] good faith belief that [Waters] was guilty, which could lead to aggressive or manipulative questioning of [Ms. Marsh] in order to get [her] to testify truthfully, if reluctantly, to his guilt." Devereaux, 263 F.3d 1078. Indeed, such a belief was patently reasonable, given that Marsh's boyfriend, Osborne, came forward without solicitation (S.O.F. ¶36) to inform the police that Marsh had information concerning the Brow murder (S.O.F. ¶ 37) and where Marsh, as a victim of domestic abuse, was understandably reluctant to put herself at risk by testifying against her abuser. (S.O.F. ¶¶42, 54, 82).

The facts of this case are in stark contrast to other cases in which courts have found bad faith on the part of a criminal investigator. In Limone v. Condon, 372 F.3d 39 (1st Cir. 2004), the

First Circuit Court of Appeals affirmed the denial of motion to dismiss on qualified immunity grounds where complaint alleged that FBI agents deliberately fabricated evidence to frame someone for a crime that they <u>knew</u> the person did not commit to shield the true perpetrators (FBI informants) from prosecution; and in <u>White</u> v. <u>McKinley</u>, 519 F.3d 806 (8th Cir. 2008), the Eighth Circuit Court of Appeals found that the bad faith element of *Brady* was satisfied where, based on specific facts alleged, a reasonable jury could have found that the police officer deliberately steered the investigation toward the plaintiff to benefit his own love interest.  In each of these cases, there was <u>specific evidence</u> that the investigator had an improper a motive for acting in bad faith towards <u>a particular suspect</u>: in <u>Limone</u> it was to shield the FBI's informant and in <u>White</u> it was to benefit the police officer's love interest.  There is no such evidence in this case.  Therefore, as there is no evidence of bad faith on the part of Officer Taylor, she is entitled to summary judgment as a matter of law.

### 3.    Plaintiff's Specific *Brady* Claims Should be Dismissed on a Substantive Basis

In Paragraph 77 of the Amended Complaint, the plaintiff sets forth four items of evidence that she claims Officer Taylor failed to disclose: (a) Waters' time cards from the Park Street Diner; (b) the fact that Marsh and Perry initially denied having any information about the murder; (c) the fact that inculpatory statements by Marsh, Perry and Global Van Lines were coerced; and (d) facts relating to fingerprints.  As will be set forth in detail below, the plaintiff has failed to establish an actionable *Brady* violation as to any of these issues.

### a.    Time Cards

At the outset, the First Circuit Court of Appeals recently reaffirmed that only those officials directly responsible for an injury-causing action can be held liable under Section 1983. <u>Gagliardi</u> v. <u>Sullivan</u>, 513 F.3d 301 (1st Cir. 2008).  In this matter, there is no evidence that

Officer Taylor ever had possession of the time cards, or that she was aware of the contents of the time cards, and she has specifically denied the same (S.O.F. ¶126).  Indeed, the only evidence linking Officer Taylor to the time cards is her testimony that she heard Officer Decot (now deceased) tell Chief Adamson that he had looked for the time cards at the Park Street Diner and found none. (S.O.F. ¶127).  This is not a sufficient basis for imposing liability under *Brady*. Kelly v. Curtis, 21 F.3d 1544, 1551 (11th Cir. 1994) (rejecting plaintiff's theory of "vicarious co-employee liability" and holding that police officer was not subject to liability for failing to disclose lab report where there was no evidence that he personally knew about the report). Therefore, Officer Taylor is entitled to summary judgment as a matter of law.

Even had Officer Taylor become involved with the time cards, she is nonetheless entitled to summary judgment as a matter of law for the detailed reasons set forth in Section III(c)(2) of the Memorandum in Support of William Adamson's Motion for Summary Judgment, and said arguments are expressly incorporated herein.

### b.    Exculpatory Statements and Coercion of Marsh, Perry and Global Van Lines

The plaintiff claims in the Amended Complaint that Officer Taylor failed to disclose to the District Attorney that Brenda Marsh and Rosanna Perry initially denied any knowledge of Waters' involvement in the Brow murder and that they changed their stories after being threatened by Officer Taylor (Amended Complaint, ¶77).  The plaintiff further claims that Officer Taylor coerced certain Global Van Lines employees to provide inculpatory evidence against Waters (Amended Complaint, ¶77).

### i.    Global Van Lines

As to the Global Van Lines employees, this claim is easily disposed of, as there is absolutely no evidence adduced through discovery in this case which would indicate that the

Global Van Lines employees were coerced in any way.  At this stage of the proceedings, where

the plaintiff has the burden of proof at trial, she cannot defeat the defendant's Motion for

Summary Judgment merely be relying of the conclusory allegations in the complaint.

Roadmaster Industries, Inc. v. Columbia Mfg. Co., Inc., 893 F.Supp. 1162, 1165 (D.Mass.,1995)

(citing, Mack v. Great Atlantic and Pacific Tea Co., 871 F.2d 179, 181 (1st Cir.1989)) ("[t]he

nonmovant may not defeat a properly supported motion for summary judgment by relying on

mere allegations").  In this matter, it appears that the plaintiff would have the court infer that the

Global Van Lines employees were coerced merely because they gave testimony adverse to

Waters.  This is an absurd proposition that cannot serve to create a genuine issue of material fact

for purposes of summary judgment.  Therefore, as there is no evidence of misconduct with

respect to the Global Van Lines employees, Officer Taylor is entitled to summary judgment as a

matter of law as to this claim.

### ii.    **Roseanna Perry**

As to Roseanna Perry, this claim is also easily disposed of.  At her deposition (which was

taken prior to the filing of the Amended Complaint), Ms. Perry denied telling Officer Taylor at

any time that she had no knowledge about the crime (S.O.F. ¶100), and further, she

unequivocally and emphatically denied that her testimony was coerced, threatened or induced by

the Ayer Police in any way (S.O.F. ¶¶98, 99).  Indeed, to this day, Ms. Perry is adamant in her

explicit recollection of Waters' admission (S.O.F. ¶95).

Moreover, ADA Fahey conducted the initial Perry interview (S.O.F. ¶90) and was present

at the second Perry interview conducted at the Providence Police Department (S.O.F. ¶93).

Officer Taylor testified that the initial interview was taped and that the last time she saw the tape

was on ADA Fahey's desk (S.O.F. ¶¶90, 91).  As such, the circumstances of the interviews were

necessarily known to the ADA, thus relieving Officer Taylor of any disclosure obligation under *Brady*.  Reid, 163 F.Supp.2d at 87 ("mere evidence of the *prosecutors'* failure to meet their discrete no-fault *Brady* obligation to turn over exculpatory evidence does not necessarily expose police investigators involved in the case to §1983 liability, absent some culpable and causative action or inaction by them.").  Therefore, as there was nothing for Officer Taylor to disclose about her interviews with Ms. Perry, she is entitled to summary judgment as a matter of law.

### iii.    **Brenda Marsh**

The plaintiff claims that Marsh initially told Chief Connors and Officer Taylor that "the statements Mr. Osborne had attributed to her were not true, that Mr. Waters had never made such an admission to her and that she did not have any information connecting Mr. Waters to the Brow Murder." (Amended Complaint, ¶39).  The plaintiff further alleges that "Chief Connors and Officer Taylor interrogated Ms. Marsh regarding Mr. Osborne's information.  Among other things, they told Ms. Marsh that she would be charged as an accessory to the murder and that she would lose her children if she did not corroborate Mr. Osborne's claim." (Amended Complaint, ¶38).  The District Attorney was aware of the Marsh interview in advance (S.O.F. ¶40).  The purpose of the interview was to get information (S.O.F. ¶45).  Although she has admitted that Connors and Taylor were "pleasant" at her interview (S.O.F. ¶51), plaintiff nonetheless alleges that "Ms. Marsh succumbed to defendants' unrelenting threats and pressure, falsely inculpated Mr. Waters in the Brow murder and agreed to testify against him." (Amended Complaint, ¶40). The plaintiff claims that these allegations amount to exculpatory evidence that should have been disclosed by the Officer Taylor. (Amended Complaint, ¶77)[3], but as will be described in detail below, the plaintiff has failed to establish an actionable *Brady* claim for several reasons.

---

[3]   Both Chief Connors and Officer Taylor deny that the interview of Ms. Marsh occurred as described in the Amended Complaint (S.O.F. ¶61).

First, as observed by the United States District Court for the District of New Hampshire in Reid, 163 F.Supp.2d 81, relying on precedent from the First, Seventh, Eight and Eleventh Circuit Courts of Appeals, "*Brady* does not require the government to turn over information which, with any reasonable diligence, the defendant can obtain himself." Reid, 163 F.Supp.2d at 86. It is well-settled that "[a]s a general proposition, a witness is not the exclusive property of either the government or the defendant." United States v. Scott, 518 F.2d 261, 268 (6th Cir. 1975). As such, any defendant has the right to attempt to interview any witness he desires. Id. In this matter, it was well known, at least as of the date of the Probable Cause Hearing, that Brenda Marsh would be used as a prosecution witness, (S.O.F. ¶80) and there is neither a claim nor any evidence that Officer Taylor or anyone else prevented the District Attorney or Waters' defense counsel from speaking with her to determine what occurred during the initial interview or to question her as to whether any promises, inducements or threats had been made by Ayer Police. In other words, through reasonable diligence everybody could have learned from Marsh herself all of the circumstances of her interview. Under such circumstances, Officer Taylor cannot be held liable for failing to disclose exculpatory evidence. See, e.g. U.S. v. Cheatham, 899 F.2d 747, 753 (8th Cir. 1990) (no *Brady* violation where defense counsel was aware of witness availability and was not prevented from speaking with her at anytime).

In any event, the alleged nondisclosures are immaterial and inactionable. The mere failure to disclose allegedly exculpatory evidence does not automatically support a Section 1983 due process claim against a police officer. "The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Strickler v. Greene, 527 U.S. 263, 280 (1999) (emphasis supplied). Although the term "*Brady* violation"

is often used to describe any failure to disclose exculpatory evidence, "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler, 527 U.S. at 281. There are three components of an actionable Brady claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. Strickler, 527 U.S. at 281-282.

To meet the *Brady* materiality standard, the plaintiff must show that "there is a reasonable probability" that the result of the trial would have been different if the suppressed evidence had been disclosed to the defense. Strickler, 527 U.S. at 289-90. A mere "possibility" of a different verdict is not enough. Strickler, 527 U.S. at 291. In other words, the plaintiff must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290 (quoting, Kyles, 514 U.S. at 435). When dealing with impeachment evidence, there is no *Brady* violation where the jury might still have found Waters guilty even if the subject witness had been entirely discredited. Strickler, 527 U.S. at 292. Thus, in Strickler, the Court held that there was no *Brady* violation where the prosecution failed to disclose favorable impeachment evidence where the record provided "strong support for the conclusion that the petitioner would have been convicted of capital murder and sentenced to death, even if [the witness] had been severely impeached." Strickler, 527 U.S. at 294.

Wrongly withheld impeachment evidence is material under *Brady* only when (1) the evidence is highly impeaching or (2) when the witness' testimony is uncorroborated and (3) essential to the conviction." U.S. v. Garcia-Torres, 341 F.3d 61, 70 (1st Cir. 2003) (quoting, U.S.

v. Martinez-Medina, 279 F.3d 105, 126 (1ˢᵗ Cir. 2002)).   In this matter, the alleged impeachment evidence relating to Brenda Marsh does not satisfy any of these three *Brady* materiality criteria.

The alleged impeachment evidence would not have affected Marsh's trial testimony. Critically, when deposed in 2007 Ms. Marsh would not state that she had lied at trial, at the probable cause hearing, or even at the hearing on Waters' original motion for new trial in 1985 (S.O.F. ¶121).  She stated at her pre-polygraph interview that she appeared "willingly and of [her] free will" (S.O.F. ¶70), and she testified two years later at the hearing on Waters' motion for a new trial that she had not been coerced. (S.O.F. ¶ 120).  She also testified at her deposition that no police officer told her to lie (S.O.F. ¶65).  After hearing on Waters' motion for a new trial, the Superior Court (Keady, J.), determined that Marsh's trial testimony had been truthful. (S.O.F. ¶121).  In light of these facts, it is clear that Ms. Marsh's trial testimony would not have changed even if confronted with the alleged impeachment evidence.

In addition, victims of domestic violence are often reluctant to testify against their abusers, and in this matter, it is well-established that Ms. Marsh was the victim of horrific physical and psychological abuses at the hands of Waters, and that she was afraid of him. Therefore, Brenda Marsh's initial reluctance to get involved is not a prior inconsistent statement and would not have been severely impeaching to her credibility since it was attributable to her legitimate fear of Waters (S.O.F. ¶¶ 42, 54, 82).  Likewise, the fact that Marsh cooperated only after allegedly being threatened with being charged as an accessory after the fact would not have severely impeached her credibility since mentioning such charges may be a possible fact, not a threat, and because it is not wrong to notify a witness of the consequences of her actions (S.O.F. ¶63).

Furthermore, "suppressed impeachment evidence has little probative value if additional evidence strongly corroborates the witness's testimony the suppressed evidence might have impeached." Conley v. United States, 415 F.3d 183, 189 (1st Cir. 2005). In this matter, as shown on the comparison chart in paragraph 56 of Defendants' LR 56.1 Statement of Facts, all of Marsh's interview statements concerning Waters, with the exception of his having a scratch on his face after the murder, were corroborated through external sources. Therefore, even if impeached as to the circumstances of the initial interview, she was still a credible witness.

In addition, "[i]mpeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist when that evidence is cumulative or collateral." U.S. v. Sanchez, 917 F.2d 607, 618-19 (1st Cir. 1990) (quoting, U.S. v. Shelton, 588 F.2d 1242, 1248 (9th Cir. 1978)). In this matter, the impeachment of Ms. Marsh with alleged threat at her interview would have been merely cumulative because stronger extrinsic impeachment evidence was introduced at trial and the jury still convicted Waters. Specifically, Marsh twice told Officer Taylor, once in the presence of State Police Trooper Lieutenant, that Waters had a long deep scratch on his face when he came home on the morning of the murder (S.O.F. ¶54, 70). At trial, Ms. Marsh's credibility on this point was impeached by the testimony of both State Police Lieutenant Dwyer and Ayer Police Lt. Arthur Boisseau, who testified that they saw no such scratch when they interviewed Waters the day after the murder (S.O.F. ¶¶10, 102). In addition, Lt. Boisseau further testified at the criminal trial that he saw Waters in court (S.O.F. ¶102), dressed in a suit, at the same time Marsh testified that he was home, drunk, in bed. Thus, any impeachment of Marsh about her interview would be merely cumulative and inactionable in this case.

Further, even had Ms. Marsh been severely impeached, such impeachment would not have affected the outcome of the trial because there was ample evidence to support the verdict. Specifically, Adi Ogden testified that Waters had sold her jewelry belonging to Mrs. Brow after the murder (S.O.F. ¶105) and had admitted to her that he hated Brow (S.O.F. ¶106). Alice Tessier testified that Waters was not at the diner where he worked, as claimed, during the period in which Brow was murdered (S.O.F. ¶¶112, 113). Waters' blood type was the same type as non-victim blood found at the crime scene (S.O.F. ¶2). A former co-worker with Waters at Global Van Lines testified that a knife similar to the murder weapon was missing at the time Waters' employment was terminated. (S.O.F. ¶110). Critically, Roseanna Perry testified at trial that Waters had also admitted to her that he had killed and robbed Mrs. Brow (S.O.F. ¶103).

In this regard, this case is distinguishable from other cases in which courts have found that the failure to disclose impeachment evidence satisfied the *Brady* materiality standard. Compare Conley, 415 F.3d at 183 (finding *Brady* violation where impeachment evidence would have undermined the credibility of a government witness who was the "lynchpin" of the government's case and when the evidence would have "resulted in a markedly weaker case for the prosecution")**; with** Strickler, 527 U.S. at 292-3 (no *Brady* violation based on failure to disclose impeachment evidence where there was other evidence linking the defendant to the crime and where other witnesses gave similar testimony to that of the witness subject to impeachment); and Spence v. Johnson, 80 F.3d 989 (5th Cir. 1996) (evidence that two of seven witnesses recanted trial testimony and stated that they were induced by police promises to lie was not material for purposes of *Brady*). Here, as in Strickler and Spence, and unlike Conley, there was substantial evidence of Waters' guilt that introduced at trial, rendering Marsh wholly unnecessary, particularly in light of the fact that Ms. Perry gave substantially identical testimony

with respect to a Waters admission.  Therefore, as the alleged exculpatory evidence was immaterial, Officer Taylor is entitled to summary judgment as a matter of law.

### c.     Fingerprints

The plaintiff claims that Officer Taylor failed to disclose the fact that Waters' prints were submitted to the State Police for comparison with the latent prints found at the scene, and that Waters was excluded as the source of those latent prints (Amended Complaint, ¶77(d)).  No competent evidence, however, supports this contention.  The State Police conducted the fingerprint comparisons (S.O.F. ¶131).  The State Police Trooper assigned to evaluate the Brow murder scene fingerprint evidence was Corp. Baliunas.  At his deposition, Baliunas testified that he had no recollection of the Ayer Police Department sending him Waters' fingerprints for comparison (S.O.F. ¶132) or of ever comparing or examining Waters' fingerprints (S.O.F. ¶134). Subsequently, Baliunas signed an affidavit which directly contradicts his deposition testimony, except that it still reflects no memory of comparing Waters' prints or excluding him as a suspect (Exhibit 47, ¶11).  In his affidavit, he testified that he sufficiently recalled his actions concerning the Brow investigation to claim that he complied with his usual custom and procedure in testing fingerprints and notifying the Ayer Police Department of the results.

Pursuant to the "sham affidavit" rule, when a witness has given clear deposition testimony, he cannot create a conflict with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.  Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994).  This Court and others have extended the sham affidavit rule as prohibiting the admission of a post-deposition affidavit of a non-party to contradict unambiguous deposition testimony of the same previously deposed non-party.  Mahan v. Boston Water and Sewer Commission, 179 F.R.D. 49, 56, n. 6 (D.Mass. 1998) (citations

omitted).  Baliunas' Affidavit, due to its lack of corroboration, is also incompetent under F.R.E. 406 to establish a routine practice of the State Police Fingerprint Division.  In any, event, neither Baliunas' deposition nor Affidavit provides evidence that Waters was ever excluded as the source of the latent prints found at the murder scene, much less that any such exclusion was disclosed to the Ayer Police, which thereafter withheld it.  Therefore, there was no exculpatory fingerprint evidence to disclose.

Even if the Baliunas affidavit is accepted for purposes of summary judgment, it does not establish that Officer Taylor knew that Waters had been excluded.  Nothing in the testimony of Baliunas suggests that he communicated the results of his fingerprint comparison to Officer Taylor.  At most, the Baliunas Affidavit establishes that he sent Chief Adamson a report indicating that Waters had been excluded as the source of the latent prints found at the scene. There is no evidence that Chief Adamson received such a report or that any evidence of such an exclusion was communicated to Officer Taylor.  Indeed, after a diligent search, Ayer Police Department records establish that it never received a report from Baliunas concerning Waters' fingerprints (S.O.F. ¶133).  See, F.R.E. 803(8) and (10).

The only link between Officer Taylor and the fingerprints was her Grand Jury testimony (S.O.F. ¶¶128, 129).  To the extent that the plaintiff claims that Officer Taylor testified falsely before the Grand Jury, such testimony cannot serve as a basis for liability for Officer Taylor because she is entitled to absolute immunity for testifying before the Grand Jury.  Briscoe v. LaHue, 460 U.S. 325 (1983); Kelly, 21 F.3d 1544 at 1153.  Moreover, nothing about her testimony suggests that she knew that Waters had been excluded or that she was concealing any evidence.  Therefore, Officer Taylor's grand jury testimony is insufficient to link her to a failure to disclose fingerprint evidence.

Furthermore, even if Officer Taylor had been aware that Baliunas issued a report excluding Waters as the source of the latent prints, she had no duty to disclose it to the District Attorney.  A police officer has no duty to disclose exculpatory evidence "where she has reason to believe that the prosecutor is aware of that evidence."  Kelly, 21 F.3d at 1552 (police officer had no duty to disclose report from the state crime lab where the lab generally sent a copy to the District Attorney); Porter v. White, 483 F.3d 1294, 1310 (11th Cir. 2007) (to establish the "affirmative causal connection" between Officer Taylor and the alleged constitutional violation in this regard, the plaintiff would have to show both that Officer Taylor withheld exculpatory evidence from the prosecution and that the prosecution did not obtain the evidence from anyone else); McMillian v. Johnson, 88 F.3d 1554, 1568 (11th Cir. 1996).  At his deposition, Baliunas testified that he would have issued a report of any exclusion to the District Attorney's Office. (S.O.F. ¶132)  Moreover, it would be reasonable for Officer Taylor to assume that the District Attorney would have knowledge of the work done by her own investigators, the State Police. Indeed, this was the case, as Corp. Baliunas was identified as a witness by both the defense and the prosecution. (S.O.F. ¶¶136, 7).

In any event, at the moment Officer Taylor truthfully and accurately testified that latent prints had been lifted from the scene, her obligation to disclose exculpatory evidence was satisfied.  Reid, 163 F.Supp.2d at 86.  As observed by the United States District Court for the District of New Hampshire in Reid, relying on precedent from the First, Seventh, Eight and Eleventh Circuit Courts of Appeals, "*Brady* does not require the government to turn over information which, with any reasonable diligence, the defendant can obtain himself."  Reid, 163 F.Supp.2d at 86.  Thus, in Reid, the Court found that a police officer satisfied his *Brady*

obligation when he testified at a probable cause hearing about the existence of investigative

reports which the plaintiff claimed were exculpatory.  In so holding, the Court found that

> Accepting the fact that Simmons testified about those reports at the probable cause
> hearing, as the state court did, that testimony not only placed the prosecution on notice of
> the existence of the other investigative reports, it necessarily also informed Reid and his
> counsel (both of whom were present at the probable cause hearing) that those reports
> existed, as well as their substantive content . . . Consequently, Reid (or his counsel) likely
> should have, in the exercise of reasonable diligence, recognized the exculpatory value of
> those reports and could have obtained copies of them simply by asking the prosecutor or
> the Manchester Police Department.

Here, as in <u>Reid,</u> Officer Taylor's testimony placed both the district attorney and Waters'

defense counsel on notice of the fact that latent prints had been lifted from the scene[4].  At that

juncture, any defense attorney exercising "reasonable diligence" would have recognized the

exculpatory value of comparing his client's prints to those found at the scene.  Indeed, Baliunas

testified that he would have compared Waters' prints for the defense if he received such a

request, but that no such request was received.  (S.O.F., ¶135).  It does appear that this did occur

to defense Attorney Bradley, as evidenced by the fact that State Police Fingerprint examiners

were identified on Waters' trial witness list, and that he subpoenaed the results of a State Police

fingerprint comparison of Kenneth Waters' prints that was conducted shortly before trial. (S.O.F.

¶¶136, 137). Moreover, the value of this evidence was certainly recognized by Waters' appellate

counsel, as evidenced by his correspondence to Attorney Bradley and the District Attorney

(S.O.F. ¶137).  Therefore, as Waters' defense counsel was aware of the State Police Fingerprint

evidence, and this evidence was neither suppressed nor unavailable, there was no *Brady* violation

with respect to the fingerprint evidence.

---

[4]  Although neither Waters nor his defense counsel were present at the grand jury proceedings, the pretrial
conference report (S.O.F. ¶136) indicates that Attorney Bradley was provided with a transcript, thereby putting him
on notice of Officer Taylor's testimony.

C.     **Count I – Due Process – Fabrication of Evidence**

In Paragraph 78 of the Amended Complaint, the plaintiff claims that Officer Taylor fabricated inculpatory evidence by coercing false witness statements from Marsh, Perry and the two Global Van Lines employees.

As previously discussed, there is absolutely no evidence of coercion with respect to the interview of the Global Van Lines employees who stated and later testified that a knife similar to the murder weapon had "disappeared" around the time that Waters' employment was terminated (S.O.F. ¶¶87, 110), and Roseanna Perry specifically denies that she was coerced (S.O.F. ¶¶98-100) or that she testified falsely (S.O.F. ¶116).  Therefore, Officer Taylor is entitled to summary judgment as to these claims.

Brenda Marsh, as noted, would not state at deposition that she lied under oath during Waters' criminal proceedings, (S.O.F. ¶121) or that any Ayer Police Officer told her to lie (S.O.F. ¶65).  Therefore, regardless of the tactics used, there can be no fabrication of evidence claim if Brenda Marsh told the truth.  Also of significance is the fact that the interview of Ms. Marsh was conducted in the presence and with the participation of Chief Connors. (S.O.F. ¶44). Connors was a former Southborough Police Department sergeant and Hadley Police Chief (S.O.F. ¶32), who served as the District Attorney's "eyes and ears" (S.O.F. ¶47).  Plaintiff's police practices expert, Lou Reiter, has conceded that both Connors and Taylor were qualified to conduct the Marsh interview (S.O.F. ¶¶47, 49), and that Connors adequately supervised Taylor at the interview. (S.O.F. ¶48).

As the superior officer on the scene, Chief Connors, not Officer Taylor, was responsible for conducting the interview and any consequences flowing therefrom.  Indeed, both plaintiff's experts Reiter and defense expert John Ford agreed that it was Connors, not Taylor, who was

ultimately responsible for the interview. (S.O.F. ¶46). Therefore, as the interview was the responsibility of Chief Connors, Officer Taylor is not subject to liability for the interviewing tactics used therein. See Rose v. Town of Concord, 971 F.Supp. 47, 50 (D.Mass. 1997) ("It is presumptively reasonable for a police officer to follow the order of a superior so long as that order does not violate a clearly established constitutional or statutory right.").

Officer Taylor is further entitled to summary judgment for the detailed reasons set forth in Section III(B)(2) of the Memorandum in Support of Philip Connors' Motion for Summary Judgment, and said arguments are expressly incorporated herein.

### D.    Count II – Fourth Amendment – False Arrest, Malicious Prosecution, *Franks v. Delaware*

#### 1.    False Arrest

By this point and even when the Amended Complaint was filed, it is clear that the plaintiff's false arrest claim is barred by the applicable statute of limitations. Wallace v. Kato, 127 S.Ct. 1091 (2007); see also Faust v. Coakley, 2008 WL 190769, 1 (D.Mass.2008).

#### 2.    Malicious Prosecution

##### a.    There is no cause of action for Malicious Prosecution

Although the Supreme Court and the First Circuit Court of Appeals have firmly slammed the door on the possibility of maintaining a malicious prosecution claim based on alleged violations of due process, neither Court has decided whether such a claim can proceed based on alleged violations of the Fourth Amendment. See, e.g., Neives, 241 F.3d at 54; Albright, 510 U.S. at 271-75. Because the contours of the Fourth Amendment are more narrow than the contours of the Due Process Clause, this Court should not recognize a cause of action for malicious prosecution based on alleged violations of the Fourth Amendment.

To assess the plaintiff's malicious prosecution claim, it is essential to establish the time frame for which the Fourth Amendment provides protection.  Based on the allegations in the Complaint, it is expected that the plaintiff will claim that Waters was seized for purposes of the Fourth Amendment from the time of his arrest through his release after entry of the *nolle pros* in 2001.   Such a contention, however, is not supported by Fourth Amendment jurisprudence.  The United States Supreme Court has held that "[a]lthough it is frequently invoked in criminal trials, the Fourth Amendment is not a trial right; . . . The gravamen of a Fourth Amendment claim is that the complainant's legitimate expectation of privacy has been violated by an illegal search or seizure."  Kimmelman v. Morrison, 477 U.S. 365, 374 (1986).  Thus, "[a]t some point after a person is arrested, the question of whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause (and after conviction to the Eight Amendment's cruel and unusual punishment clause . . .)."  Ringuette v. City of Fall River, 888 F.Supp. 258, 264 (D.Mass. 1995) (quoting Jones v. Chicago, 856 F.2d 985, 994 (7th Cir. 1988)).

In Neives v. McSweeney, 241 F.3d 46 (1st Cir. 2001), the First Circuit expressly rejected the argument that a person is "seized" within the meaning of the Fourth Amendment from the time of their arrest through the end of their criminal trial.  Neives, 241 F.3d at 54.  In so holding, the Court recognized that

> a seizure under Fourth Amendment jurisprudence is generally a discrete event, quintessentially an arrest . . . Thus, seizure jurisprudence traditionally has centered on the initial deprivation of liberty that a seizure of the person entails . . . [A] seizure is a single act, and not a continuous fact . . . ."

Neives, 241 F.3d at 55 (internal quotes and citations omitted).

Applying the foregoing analysis to the case at bar, it is clear that plaintiff's arrest constitutes the dividing line between the Fourth Amendment and the Due Process Clause.  Thus,

the Fourth Amendment protects a far more narrow subset of rights than the Due Process Clause.

If the Supreme Court and the First Circuit Court of Appeals have rejected claims based on

alleged violations of Due Process, which covers misconduct alleged to have taken place

subsequent to plaintiff's arrest and causing his incarceration, it would be illogical to recognize

such a cause of action based only on alleged pre-arrest misconduct, which only resulted in a

relatively short period of incarceration and the plaintiff's trial.  Therefore, the Court should not

recognize a cause of action for malicious prosecution based on alleged violations of the Fourth

Amendment.

        As was the case in <u>Meehan</u> v. <u>Town of Plymouth</u>, 167 F.3d 85 (1st Cir. 1999), however,

there is no need for the Court to address this issue because the plaintiff cannot in any event

establish a violation of Waters' Fourth Amendment rights.  As previously discussed, because the

Fourth Amendment protections expire after the plaintiff's arrest, the sole issue for decision by

the Court is whether the arrest was based on probable cause.  As any alleged misconduct

occurring after that date should be excluded from the Court's assessment, and for the reasons

stated below, Officer Taylor is entitled to summary judgment as a matter of law.

### b.      <u>The arrest was based on probable cause</u>

        A §1983 malicious prosecution action based upon a deprivation of Fourth Amendment

rights, if recognized by this Court, would require a showing of the absence of probable cause to

initiate proceedings.  <u>Meehan</u>, <u>supra</u>, at 89.  Likewise, a claim based on a direct deprivation of

the Fourth Amendment requires a showing that the plaintiff's arrest was without probable cause.

<u>Acosta</u> v. <u>Ames Department Stores, Inc.</u>, 386 F.3d 5, 9 (1st Cir. 2004).  "Probable cause is

established with evidence demonstrating that 'at the time of the arrest, the facts and

circumstances known to the arresting officers were sufficient to warrant a prudent person in

believing that the [arrestee] had committed or was committing an offense.'" Grant v. John Hancock Mutual Life Ins. Co., 183 F.Supp.2d 344, 357 (D.Mass. 2002) (quoting, U.S. v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997)). Where, as here, the facts concerning Officer Taylor's knowledge at the time of arrest are not in dispute, the existence of probable cause is an issue of law that may be determined by the Court on a Motion for Summary Judgment. See, e.g. Forest v. Pawtucket Police Department, 290 F.Supp.2d 215, 226 (D.R.I. 2003); aff'd 377 F.3d 52.

In this instance, ample probable cause existed for Waters' arrest. Apart from Marsh's statement as to his admission (S.O.F. ¶54), she also stated that Waters was aware that Brow had money and wanted it for himself (S.O.F. ¶55), and that she had called him at work on the night of the murder and was told he was not there. Id. Marsh's statements were verified by State Police polygraph (S.O.F. ¶¶69-74).

The Ayer Police Department was further aware that Waters had sold Mrs. Brow's jewelry to Adi Ogden, that Waters had made statement to co-workers that he had previously broken into Mrs. Brow's house and stolen things, that it was easy for him to reach Brow's house from his house undetected, that he had purchased a firearm, made purchases after the murder and theft, had previously pled guilty to attempted murder (S.O.F. ¶79) and had fled the area to live in a van in Providence, R.I. shortly after being questioned by police (S.O.F. ¶109). It was also aware that Waters' shoe size was the same size as a footprint found at the crime scene (S.O.F. ¶68). In any event, the determination of probable cause was made by ADA Fahey, who directed Taylor to secure the arrest warrant. It was therefore reasonable for Taylor to believe that probable cause existed for Waters' arrest (S.O.F. ¶78). See, e.g. U.S. v. Capozzi, 91 F.Supp.2d 423, 433 (D.Mass. 2000) (police officer's actions in seeking search warrant were objectively reasonable where he relied on "the go-ahead of an experienced assistant district attorney.").

Moreover, as previously discussed with respect to the plaintiff's *Brady* claim, the circumstances of Brenda Marsh's initial interview would not have negated probable cause because Officer Taylor could have reasonably believed that Marsh was reluctant to get involved solely out of her fear of Waters. See United States v. Hall, 434 F.3d 42, 57-58 (1st Cir. 2006) (recognizing that "in many cases the government has to press unwilling witnesses, out of fear or friendship, to provide testimony that they are reluctant to give."). As previously discussed, there was no reason not to believe Brenda Marsh, and the reasonableness of Officer Taylor's belief that Brenda Marsh knew something is supported by the fact that Robert Osborne came forward without solicitation and, to that point, his story was corroborated. Indeed, Osborne delivered exactly what he said he would, an ex-girlfriend that was living with Kenneth Waters at the time of the murder. When pressed, Marsh went along with Osborne's story and subsequently passed a polygraph examination. Most significantly, although there was ample evidence in addition to the statements of Brenda Marsh to support probable cause, there was absolutely no evidence to suggest that Waters was innocent. Therefore, as Waters' arrest was based on probable cause, Officer Taylor is entitled to summary judgment as a matter of law.

### 3.    *Franks v. Delaware* **Claim**

The Fourth Amendment is not violated unless a police officer procures a warrant by intentionally or recklessly making material false statements in a supporting affidavit. Franks v. Delaware, 438 U.S. 154 (1978). A so-called *Franks* Violation may also be established by showing "the intentional or reckless omission of material exculpatory facts from information presented to a magistrate. Burke v. Walpole, 405 F.3d 66, 82 (1st Cir. 2005). "An officer makes an assertion with reckless disregard when, viewing all the evidence, the officer must have entertained serious doubts regarding the truth of his statements or had obvious reasons to doubt

the accuracy of the information reported." Forrest, 290 F.Supp.2d at 229 (citing, Menebhi v.

Mattos, 183 F.Supp.2d 490, 502 (D.R.I. 2002)). "The reckless disregard standard requires an

officer to have a 'high degree of awareness of the statement's probable falsity.'" Id. Allegations

of negligence are insufficient to establish a Franks Violation, and this rule precludes challenges

to warrants based merely upon the claim that law enforcement officers failed to disclose all

potentially exculpatory information or failed to conduct the most exhaustive investigation

possible. Moreta-Ramirez v. Lemert, 233 F.Supp.2d 286, 291-292 (D.P.R. 2002).

In this matter, the plaintiff cannot show that Officer Taylor sought the warrant for the

plaintiff's arrest with reckless disregard for the truth. At the outset, the Ayer District Court file

in not in the summary judgment record. Therefore, there is no way to determine what

information was submitted by Officer Taylor in support of the warrant application, and therefore,

no evidence that she recklessly disregarded the truth in applying for it. Roche v. John Hancock

Mutual Life Ins. Co., 81 F.3d 249, 253 (1st Cir.1996) ("speculation and surmise, even when

coupled with effervescent optimism that something definite will materialize further down the

line, are impuissant in the face of a properly documented summary judgment motion").

Moreover, ADA Fahey determined the existence of probable cause, made the decision to seek

the warrant, and no reasonable officer would have doubted that decision, based on the probable

cause facts set forth above. (S.O.F. ¶78).

### E.    Count IV – Conspiracy

Plaintiff claims that the Ayer defendants, including Officer Taylor, "reached a mutual

understanding and acted in concert to violate Mr. Waters' civil rights." (Amended Complaint,

¶92). At the outset, Count IV should be dismissed as a matter of law because, as described in

detail above, the individual defendant did not violate the plaintiff's constitutional rights. Nieves,

241 F.3d at 50 (1st Cir. 2001) (claim of conspiracy cannot survive absent proof of an underlying constitutional violation by the officer involved in the incident).

"A civil rights conspiracy as commonly defined is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.' " Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (citing, Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir.1979), rev'd in part on other grounds, 446 U.S. 754 (1980) (quoting, Rotermund v. United States Steel Corp., 474 F.2d 1139 (8th Cir.1973)). "Purely conclusory allegations of conspiracy are not adequate to state a claim, and [plaintiff] must establish the existence of an agreement, express or tacit, between the individual Defendants to deprive him of a specific federal right. Ousley, 313 F.Supp.2d at 85. In this instance, the only link between the alleged co-conspirators is that they were Ayer police officers (except of course for Adamson who retired long before Waters was arrested). No evidence of agreement to deprive Waters of his rights has been shown to exist, and Boisseau's exculpatory trial testimony (S.O.F. ¶102) belies any conspiracy to convict Waters. Most significantly, the plaintiff has identified absolutely no motive for any of the defendants to conspire against Waters. Therefore, Officer Taylor is entitled to summary judgment as to the conspiracy claim.

### F.    Officer Taylor is entitled to Qualified Immunity

#### 1.    The qualified immunity standard

The federal courts apply a tripartite analysis to determine whether qualified immunity shields a public official from liability. See Valdizan v. Rivera-Hernandez, 445 F.3d 63, 64 (1st Cir. 2006). The first step is to determine whether the defendant's conduct amounted to a

constitutional violation.  <u>Whitfield</u> v. <u>Melendez-Rivera</u>, 431 F.3d 1, 7 (1st Cir. 2005) (citations

omitted).  If a constitutional violation is found to have taken place, the second prong is to

determine whether the constitutional right was clearly established at the time of the alleged

violation.  The third prong is whether a reasonable officer, similarly situated, would understand

that his conduct violated that clearly established right.  <u>Id.</u>

At the outset, where, as here, the first component of the qualified immunity analysis is

dispositive, the second two factors do not have to be assessed.  <u>Valdizan</u>, 445 F.3d at 64, n. 1.

As previously discussed, the plaintiff cannot establish any constitutional violation by Officer

Taylor in connection with the arrest and/or prosecution of Waters.  Therefore, she is entitled to

qualified immunity.

### 2.    Officer Taylor is entitled to qualified immunity on the Due Process claims

Even if the plaintiff can establish the Officer Taylor violated Waters' due process rights

by failing to disclose the circumstances of the Marsh interview, she is entitled to qualified

immunity.  To overcome a police officer's assertion of qualified immunity in the *Brady* context,

the plaintiff must show that "a reasonable officer in [Officer Taylor's] position would know,

when [she] acted, that the evidence withheld from the prosecutor was material, that is,

withholding the evidence would undermine confidence in the outcome of [Waters'] trial."

<u>McMillian</u>, 88 F.3d at 1569.  Where "the exculpatory character of the evidence in question is so

subtle, particularly from the perspective of a non-lawyer, one cannot reasonably infer bad faith

on [the officer's] part merely because" it was not disclosed to the prosecutor.  <u>Reid</u>, 163

F.Supp.2d at 91.  Here, the claimed exculpatory component of the Marsh interview was so subtle

that no reasonable non-lawyer would have thought it to be exculpatory.  Furthermore, it was

reasonable for Officer Taylor to assume that the District Attorney would independently interview

Ms. Marsh to determine whether she possessed any bias. Therefore, the materiality of exculpatory evidence cannot be judged with the benefit of hindsight, knowing exactly what was presented at trial; it must be assessed from the perspective of the police officers, who did not have the benefit of knowing exactly how the evidence at trial would play out. McMillian, 88 F.3d at 1570.

Officer Taylor is likewise entitled to qualified immunity with respect to the fabrication of evidence claim. First, as of 2006, the First Circuit had not yet recognized a fabrication of evidence claim based on the alleged coercion of a third party witness. See United States v. Hall, 434 F.3d 42, 57-58 (1st Cir. 2006). Since the law in this regard was not clearly established in 2006, it could not have been clearly established in 1982, and therefore, Officer Taylor is entitled to qualified immunity for this reason. Furthermore, as previously discussed, there was ample evidence of Waters' guilt aside from his admission to Ms. Marsh, and there was corroboration of nearly everything Marsh testified to. Given that Osborne came forward voluntarily, combined with Marsh's understandable reluctance to implicate her abuser, no reasonable officer would have believed that Marsh was lying, particularly where the entire interview was supervised by the Chief of Police. Indeed, even today, Marsh does not contend that she lied at trial. Therefore, as no reasonable police officer would have believed that the actions with respect to the Marsh interview would give rise to the fabrication of evidence, Officer Taylor is entitled to qualified immunity.

### 3.    Officer Taylor is entitled to qualified immunity on the Fourth Amendment claims

In the context of the Fourth Amendment, Officer Taylor is entitled to qualified immunity unless her actions were "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." St. Hilaire v. City of Laconia, 71 F.3d 20, 28 (1st Cir. 1995); quoting

Malley v. Briggs, 475 U.S. 335, 344-345, 106 S.Ct. 1092, 1098 (1986).  Thus, "the question the

court must ask is whether another officer, standing in [the defendant's] shoes and having the

same information [the defendant] had, might reasonably have come to the conclusion that he had

probable cause to [arrest the plaintiff]."  Hoffman, 973 F.2d at 986.

     Even though both inquiries focus on the objective reasonableness of the officer's actions,

the Supreme Court has made it clear that the inquiry into whether an officer had probable cause

to arrest for purposes of establishing a substantive violation of Fourth Amendment, and the

inquiry into whether an officer reasonably believed that there was probable cause for purposes of

qualified immunity, involve different standards of proof.  Saucier v. Katz, 121 S.Ct. 2151, 2152,

533 U.S. 194, 194-195 (2001); Atwater v. City of Lago Vista, 121 S.Ct. 1536, 1564, 532 U.S.

318, 367 (2001); both citing Anderson v. Creighton, 107 S.Ct. 3034, 3040-3041, 483 U.S. 635,

640-641 (1987).  Thus, the Supreme Court has held that where an officer correctly perceives all

of the relevant facts, but has a mistaken understanding as to whether those facts establish

probable cause, the officer will be entitled to qualified immunity.  See Saucier, 121 S.Ct. at 2153,

533 U.S. at 195 (discussing application in context of excessive force case).  It seems clear from

these decisions that an officer is entitled to more latitude in evaluating reasonableness for

purposes of qualified immunity than for purposes of substantive probable cause determination.

     As previously discussed, the facts in the record establish that probable cause was more

than merely arguable.  Therefore, Officer Taylor is entitled to qualified immunity.

### G.    Counts VII and VIII – State Law Tort and Civil Rights Claims

     For the reasons stated in Mitchell v. City of Boston, 130 F.Supp.2d 201, 214-215, 216

(D.Mass. 2001), the plaintiff's state law tort and civil rights claims under the Massachusetts Civil

Rights Act accrued at the moment of his arrest in 1982, and as such, the statute of limitations for

bringing such claims expired long before the plaintiff filed the Complaint in this case.

Therefore, Officer Taylor is entitled to summary judgment as a matter of law as to Counts VII

and VIII.

### 1.    Officer Taylor is entitled to summary judgment on plaintiff's MCRA Claim- Count VII

Count VII purports to state a claim pursuant to G.L. c. 12, §11 (H)(I), the Massachusetts

Civil Rights Act ("MCRA").  In order to recover under MCRA, plaintiff must show that Waters'

exercise of constitutional rights has been violated through "threats, intimidation or coercion."

Sietins v. Joseph, 238 F.Supp. 2d 366, 377-78, (D.Mass. 2003).  To be actionable, the "threats,

intimidation or coercion" must be "directed toward a particular individual or class of persons."

Detoledo v. County of Suffolk, 379 F.Supp. 2d 138, 146 (D.Mass 2005) (citing, Bally v.

Northeastern University, 403 Mass. 713, 718-19, 532 N.E.2d 49 (1989)).  In Bally, the Supreme

Judicial Court recognized as meritorious those cases where the "threats, intimidation or

coercion" were directed at the plaintiff.  Bally v. Northeastern University, 403 Mass. at 718-19,

532 N.E.2d 49.  In this instance, there is no evidence that any threats were made to Waters

himself, and the alleged threats against Marsh or Perry are insufficient to maintain a MCRA

claim.

### 2.    Officer Taylor is entitled to summary judgment on plaintiff's State Law Tort Claims- Count VIII

Officer Taylor is also entitled to summary judgment as to the state law malicious

prosecution claim.  As previously discussed, Officer Taylor had probable cause to arrest Waters.

Although the inquiry into the plaintiff's federal malicious prosecution claim should end at the

plaintiff's arrest due to the limitations of the Fourth Amendment, under Massachusetts law,

"probable cause to arrest may not be conclusive where evidence later surfaces that eliminates

probable cause, and the police are involved in pursuing the action despite the discovery of this evidence." Gutierrez v. MBTA, 437 Mass. 396, 406, 772 N.E.2d 552, 562 (2002). The plaintiff's state law malicious prosecution claim fails because Probable Cause never dissipated, and in fact, became stronger as the case progressed. Specifically, after Waters' arrest, Marsh testified to his murder admission at probable cause hearing (S.O.F. ¶80) trial (S.O.F. ¶104) and motion for new trial hearing (S.O.F. ¶118). Perry testified to a second murder admission by Waters at trial (S.O.F. ¶103) and motion for new trial hearing (S.O.F. 116). Alice Tessier testified at trial that Waters was not at work at the time of the murder (S.O.F. ¶113). Global Van Lines employees stated that a knife similar to the murder weapon had disappeared after Waters was fired (S.O.F. ¶¶87, 110). Waters stated at the point of his arrest that "I knew you guys were going to find me," and that he was not at work at the time of the murder (S.O.F. ¶85) and that Marsh "was a very truthful person." (S.O.F. ¶86). A polygraph of Waters conducted on March 11, 1983 resulted in a determination that Waters ". . . is not credible when he denies having stabbed and murdered Katarina Brow (S.O.F. ¶79). Consequently, there was no derogation of probable cause supporting a malicious prosecution claim.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, Officer Nancy Taylor-Harris is entitled to summary judgment

as a matter of law as to Counts I, II, IV, VII and VIII.

DEFENDANT,

NANCY TAYLOR HARRIS,

By her attorneys,

/s/ Joseph L. Tehan, Jr.
Joseph L. Tehan, Jr. (BBO # 494020)
Gregg J. Corbo (BBO # 641459)
Kopelman and Paige, P.C.
101 Arch Street, 12th Floor
Boston, MA  02110
(617) 556-000

336252/01907/0053

34