UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BETTY ANNE WATERS, as Administratrix of the Estate of KENNETH WATERS,<br><br>   Plaintiff,<br>v.<br><br>TOWN OF AYER, NANCY TAYLOR-HARRIS, in her individual capacity, ARTHUR BOISSEAU, in his individual capacity, WILLIAM ADAMSON, in his individual capacity, PHILIP L. CONNORS, in his individual capacity,<br><br>   Defendants. | Case No. 04 10521 (GAO) (JGD)<br><br>**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE REPORT OF PLAINTIFF'S POLICE PRACTICES EXPERT LOU REITER** |

## INTRODUCTION

Defendants have moved to strike the police practices report of Lou Reiter on only two grounds, the first of which (the title, "preliminary report") this Court has previously denied. (*See* 11/1/07 Docket entry.) The second ground, that Mr. Reiter's report is "legally irrelevant and lacks a reliable foundation," should likewise be denied because, as set forth below, defendants' motion ignores binding caselaw and flagrantly misconstrues the pertinent issues.[1] Indeed, Mr. Reiter's deposition, which defendants took after filing this motion, supplements the already ample foundation for his opinions.

---

[1] The factual and legal issues raised in this action are set forth more fully in plaintiff's Statement of Disputed Facts ("SDF"), exhibits filed therewith, and memoranda in opposition to the summary judgment motions of defendants Nancy Taylor, Arthur Boisseau, Phil Connors, and Town of Ayer, all of which are hereby incorporated by reference.

1

**BACKGROUND**

Lou Reiter's credentials as a police practices expert are unparalleled. As set forth in an opinion approving his testimony:

> Mr. Reiter is a former Deputy Chief of Police of Los Angeles, California, with over 20 years of experience. He is widely recognized as an authority on police administration and has been a faculty member for national level police management and specialized training programs for law enforcement personnel. In addition, he has published numerous articles in that field. Mr. Reiter spends a considerable amount of time training police officers and auditing police departments, frequently working as a consultant for the United States Justice Department. He is also a researcher and author of the chapters on internal discipline, training and management/employee relations for the *Police Task Force Report* of the National Advisory Commission on Criminal Justice Standards and Goals. Reiter has testified in federal court in a number of cases and his opinions have been almost uniformly admitted.

*Gonzalez-Perez v. Gomez-Aguila*, 296 F. Supp.2d 110, 114 & n.1 (D.P.R. 2003) (collecting cases). Defendants do not challenge Mr. Reiter's credentials or the fit between his expertise and his opinions.

**LEGAL STANDARDS**

Evidence is relevant if it "has any tendency to make the existence of any fact that is of consequence to the determination fo the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "[T]he threshold for relevance is very low under Federal Rule of Evidence 401." *U.S. v. Cotto-Aponte*, 30 F.3d 4, 6 (1st Cir. 1994) (citation and internal quotations omitted).

If helpful to the jury's understanding of the issues in the case, experts qualified on account of their "knowledge, skill, experience, training or education," may testify as to their opinions "if 1) the testimony is based upon sufficient facts or data, 2) the testimony is the product of reliable principles and methods, and 3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In making the admissibility determination, "[t]he inquiry

envisioned by Rule 702 is . . . a flexible one," *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993), and must be "tied to the facts of a particular case," *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 150 (1999). Moreover, "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Fed. R. Evid. 703.

**ARGUMENT**

**I.     Mr. Reiter Has Ample Foundation for His Opinion**

Defendants seek to strike Mr. Reiter's report to the extent it relies on two affidavits – plaintiff's summary judgment exhibits 74 and 75, which they consider to be "inherently unreliable" and "incompetent evidence" relating to the coercion of Roseanna Perry, Waters' ex-girlfriend who testified against him at the criminal trial – while ignoring her deposition testimony. (Doc. 106 at 4-5.) First, Mr. Reiter reviewed Perry's deposition before he was deposed, and it did not change any of his opinions. (Pl. S.J. Ex. 16 at 42-43.) As such, defendants' argument is moot.

Moreover, this motion asks the Court to determine that Perry was truthful when compelled by a contempt order to appear for her deposition in this action, and not truthful when she: 1) gave a sworn statement to Waters' post-conviction investigator just two months after the trial (*see* SDF ¶¶267-72, 284, 287 & Ex. 72); 2) made statements to her daughter Rose over the many years thereafter (SDF ¶¶288, 290 & Ex. 75); 3) made statements to a legal team working on Waters' behalf in 2001 (SDF ¶¶276, 285, 291-94 & Exs. 73, 74); or 4) when she exclaimed upon learning of Waters' exoneration, "Oh my god I'm going to jail for perjury." (SDF ¶299 & Pl. S.J. Ex. 75.) Defendants' argument is wholly without merit not only because it ignores Perry's repeated admissions of false testimony and complaints of coercion but also because, "'[c]redibility

3

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

In any case, there is no question that experts may rely on evidence that would not in and of itself be admissible. *See U.S. v. Corey*, 207 F.3d 84, 91, 89 (1st Cir. 2000) (noting that "Rule 703 . . . specifically permits expert witnesses to rely on otherwise inadmissible hearsay of a type 'reasonably relied' on by experts in the field" because "experts in the field can be presumed to know what evidence is sufficiently trustworthy and probative to merit reliance.") (quoting 29 Charles A. Wright and Victor J. Gold, *Federal Practice and Procedure* § 6273, at 311 (1997)).

Even assuming defendants' premise, they have failed to cite *any* caselaw holding that flaws in the factual foundation of an expert's opinion is remedied by exclusion of the expert's testimony on that issue. This may be because it is crystal clear in the First Circuit that objections to the factual underpinnings of expert testimony go to weight, rather than admissibility, and are best tested in the crucible of cross-examination. *See Currier v. United Technologies Corp.*, 393 F.3d 246, 252 (1st Cir. 2004) (affirming district court's holding that failure of plaintiff's expert to take certain facts into account went to weight rather than admissibility of testimony); *Microfinancial, Inc. v. Premier Holidays Intern., Inc.*, 385 F.3d 72, 81 (1st Cir. 2004) (holding that defendants' attack on plaintiff's expert on grounds that expert only considered part of factual record "goes to the weight, not the admissibility, of his testimony"); *U.S. v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) (alleged "flaws in [expert's] opinion may be exposed through cross-examination or competing expert testimony"); *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 303 (1st Cir. 1998) ("[I]f [the expert's] analysis omitted what defendants argue are important variables, or was deficient

in other respects . . . it was up to defendants to exploit and discredit the analysis during cross examination."); *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l*, 851 F.2d 540, 545 (1st Cir. 1988) ("When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony – a question to be resolved by the jury."); *Payton v. Abbott Labs,* 780 F.2d 147, 156 (1st Cir. 1985) ("If the factual underpinnings of their opinions were in fact weak, that was a matter affecting the weight and credibility of their testimony."); *Fraser and Wise, P.C. v. Primarily Primates, Inc.*, 966 F. Supp. 63, 69 (D. Mass. 1996) (Lindsay, J.) (once expert's qualifications are established, objections to "the factual underpinnings of an expert's opinion . . . go to the weight to be accorded the expert testimony rather than to its admissibility") (citation and internal quotations omitted). In sum, "[t]he burden is on opposing counsel through cross-examination to explore and expose any weaknesses in the underpinnings of the expert's opinion." *International Adhesive Coating Co., Inc. v. Bolton Emerson Intern., Inc.*, 851 F.2d 540, 544 (1st Cir. 1988). Mr. Reiter's report may not be struck on this basis.

**II.    Mr. Reiter's Report Is Highly Relevant to Plaintiff's Claims**

Under the umbrella of Federal Rule of Evidence 702, defendants next attack Mr. Reiter's report by claiming that it 1) is "irrelevant and misleading as it is based on the wrong standard of liability" (Doc. 106 at 6); 2) relies on policy materials that post-date the relevant time period; 3) relies on un-adjudicated complaints to support his opinions about the systemic deficiencies in the Ayer Police Department ("APD"); and, defendants contend, 4) three of the *Monell* incidents Mr. Reiter cites are irrelevant, as they took place "under a prior administration." (Doc. 106 at 14.) None of these arguments is persuasive.

### A. Mr. Reiter Appropriately Opines that Defendants Departed from the Then-Existing Nationally Accepted Police Practices

Defendants challenge Mr. Reiter's invocation of standards embodied in nationally accepted police practices rather than the legal standards governing liability.[2] Yet, "[i]t is black-letter law that it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge . . . Accordingly, expert testimony on such purely legal issues is rarely admissible." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) (citation and internal quotations omitted). That is, if Mr. Reiter had opined as to the legal conclusion that defendants acted with "deliberate indifference," for example, defendants might have a point. "But courts draw a clear line between permissible testimony on issues of fact and testimony that articulates the ultimate principles of law governing the deliberations of the jury." *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 115 (1st Cir. 2003); *see also Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) ("While [expert's] testimony that Defendants deviated from industry standards supported a finding that they acted in bad faith, [expert] never testified that he had reached a legal conclusion that Defendants actually acted in bad faith (i.e., an ultimate issue of law).").

Here, Mr. Reiter carefully does what he has done repeatedly in past police misconduct cases where his testimony has not only been admitted but approved and relied on by the First Circuit: opining as to a departure from the then-accepted standards among law enforcement personnel.

---

[2] While defendants engage in a long dissertation on the legal standards they claim apply to each of plaintiff's claims, those standards are irrelevant to their motion to strike, and the applicable legal standards are set forth in plaintiff's summary judgment memoranda. Nonetheless, it bears noting that the "shocks the conscience" test defendants claim applies to plaintiff's 14th Amendment-based claims (Doc. 106. at 9, 10) applies to *substantive* due process claims, not to the *procedural* due process, fair-trial based-claims alleged here, which require a lesser showing of "deliberate indifference" or intentional conduct. As set forth in plaintiff's legal memoranda, either standard is met here.

Defendants' departure from these generally accepted police practices is not dispositive of a constitutional violation, but it is certainly relevant and probative of the factfinders' determination of whether defendants acted with deliberate indifference, intentionally or inadvertently; whether any reasonable officer in their shoes would have believed their conduct to be lawful; and whether the Town was deliberately indifferent to its officers failure to observe minimally acceptable standards.

Notably, in the five pages devoted to this argument, defendants do not cite a single police practices expert case holding that the standard invoked by Mr. Reiter warrants striking the report. (*See* Doc. 106 at 7-11.) Indeed, invoking nationally accepted police practices and standards is precisely what experts such as Mr. Reiter do in § 1983 actions every day. *See Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 10 (1st Cir. 2005) (In *Monell* failure-to-train action, affirming admission, over defendants' objections, of testimony of "Dr. James Fyfe, an expert on police tactics, who offered expert testimony that both [defendants' actions] were contrary to accepted police standards in a situation like the one at issue . . ."); *id.* at 19, 28-29 (holding that police practices expert's testimony regarding what "*minimally competent* police administrators have long recognized . . . could lead the jury to conclude that it was common knowledge within the police community" that certain procedures were required, and that failure to follow such procedures "support[s] a view that the City *knew* its [procedures were] seriously deficient") (emphasis added); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 564, 565 (1st Cir. 1989) (reviewing evidence supporting plaintiff's verdict at trial and noting with approval that, "[b]ased on a review of the pertinent facts, [expert Lou] Reiter concluded that Alvarez' supervision and discipline of Soto was totally deficient . . . Reiter maintained that there were other glaring inadequacies in the disciplinary system employed by Cartagena").

Thus, testimony from policing experts as to whether defendants acted consistently with then-accepted police practices are routinely admitted in § 1983 police misconduct cases. *See Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (in § 1983 case, "the plaintiff's proffered expert testimony that [the officer's] tactics violated standard police practices, while not dispositive, may also be deemed relevant"); *Young*, 404 F.3d at 10; *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (holding that "testimony of 'an expert on proper police procedures and policies' [is] relevant and admissible" in a § 1983 action); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908-09 (6th Cir. 2004) (in § 1983 cases, "[c]ourts have permitted [police] experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact"); *Billington v. Smith*, 292 F.3d 1177, 1185-86 (9th Cir. 2002) (in § 1983 case, relying on police practices expert's testimony that "the officers' tactics were entirely wrong [and] that no reasonable officer would have used them")*; Larez v. City of Los Angeles*, 946 F.2d 630, 635-36 (9th Cir. 1991) (in § 1983 case, quoting police practices expert's testimony that certain procedures were "totally inappropriate," not "in accord with generally accepted police custom and practice," that he was "offended by" officers' conduct, and that "any reasonable police administrator would be offended by it"); *see also Spina v. Forest Preserve of Cook County*, No. 98 C 1393, 2001 WL 1491524, at *13 (N. D. Ill. Nov. 23, 2001) ("[T]o the extent that Chief Harrington confines her testimony to her opinion that the District's conduct was inappropriate based upon generally accepted police custom and practice, her testimony is not an inappropriate legal conclusion.").

Based on their own admissions, combined with the obvious departures from APD policies and generally accepted practices, Mr. Reiter has ample grounding for his opinion that defendants acted deliberately and in conscious disregard for the rights of Waters and other citizens. Based on

this foundation, Mr. Reiter's opinion is probative of defendants' intent. *See, e.g., DeNovellis v. Shalala*, 124 F.3d 298, 308 (1st Cir. 1997) (recognizing that "direct evidence of discriminatory intent is often hard to come by" and, thus, "circumstantial evidence is often the only means of proving such intent" for a plaintiff to survive summary judgment).

      B.     **Post-Dated Policy Materials**

Like the claim about the evidence relating to Roseanna Perry Baggeson, this argument goes to the nature of the evidence on which Mr. Reiter relies to form the basis of his opinions. In his report, Mr. Reiter noted that the policy materials he cited post-dating the Waters investigation and conviction merely codified investigative practice that had long been generally accepted. (Pl. S.J. Ex. 76 ¶19 n.1.) Again, defendants offer no cases on point. As set forth above, such a challenge to the factual underpinnings of an expert's report is fodder for cross-examination, not an excuse to strike the expert's testimony. *See Mooney*, 315 F.3d at 63; *Int'l Adhesive Coating Co.*, 851 F.2d at 545; *Payton,* 780 F.2d at 156; *Fraser and Wise, P.C.*, 966 F. Supp. at 69. In any case, at his deposition Mr. Reiter clarified that those citations illustrated that the policies and standards in effect during the Brow investigation still represent the current standard, but that the current standard did not in fact provide the basis of his opinions. (Pl. S.J. Ex. 16 at 47-48.) This argument is moot.

      C.     **Evidence of Similar Incidents of Misconduct**

Whether "unadjudicated allegations" are inadmissible (Doc. 106 at 13-14) is irrelevant to a motion to strike Mr. Reiter's report: "Rule 703 . . . specifically permits expert witnesses to rely on otherwise inadmissible hearsay of a type 'reasonably relied' on by experts in the field" because "'experts in the field can be presumed to know what evidence is sufficiently trustworthy and probative to merit reliance.'" *Corey*, 207 F.3d at 91, 89 (quoting 29 Charles A. Wright and Victor

J. Gold, *Federal Practice and Procedure* § 6273, at 311 (1997)). Thus, the relevant question is whether experts typically rely on evidence of prior (or subsequent) similar misconduct incidents when rendering opinions in *Monell* cases. As set forth below, this is precisely the sort of evidence experts rely on, and also which courts look to, as probative evidence of both supervisory lapses and the existence of an unconstitutional custom or practice.

Given that municipal liability under § 1983 must, as a general rule, be premised on evidence of widespread lapses rather than a single incident, *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978),[3] evidence of prior (and subsequent) complaints, allegations and incidents are routinely admitted in *Monell* cases. *See Young*, 404 F.3d at 19 (in failure-to-train claim, noting that "Plaintiff presented numerous reports from police officers of past misidentifications of off-duty personnel in Providence, particularly involving minority officers, and thus, presented evidence that the department was on notice of a misidentification problem"). In the *Monell* context, evidence of other incidents – including even unadjudicated complaints – are relevant and admissible to show that the municipality was on notice of the need for better training or supervision, or that the day-to-day custom in the department was highly likely to lead to the violation of constitutional rights. *See Young*, 404 F.3d at 19; *Bordanaro*, 871 F.2d at 1161 (noting that evidence of unconstitutional custom, as well as training and supervision lapses included fact that policymaker defendants "had received complaints from Everett officers concerning inadequate police training and the dangers that

---

[3] *But see Young*, 404 F.3d at 28 (1st Cir. 2005) ("We have stated that the Supreme Court has left open the possibility that a failure-to-train claim can succeed without showing a pattern of previous constitutional violations [. . . ] where a violation of a federal right is a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.") (citations, internal quotations and brackets omitted); *Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) (same).

this presented to civilians" both prior to and after the incident in question).[4]

Prior complaints, whether adjudicated or not, are also admissible as Rule 404(b) evidence in support of plaintiff's supervisory liability claim. *See Gutierrez-Rodriguez*, 882 F.2d at 572 (affirming trial court's admission, with appropriate limiting instruction, of thirteen casefiles reflecting civilian complaints against police defendant, as "highly probative on the issue of the supervisory liability," although twelve of those cases were "ultimately dismissed.");[5] *Gonzalez-Perez*, 296 F. Supp.2d at 114 & n.1 ("[Reiter's] opinion regarding [defendant's] complaint history is intrinsically connected to one of the main allegations in the complaint: supervisory liability.").

None of the three cases defendants cite supports their contention that unadjudicated complaints are "inadmissible." (Doc. 106 at 13.)  As set forth *infra*, *Kinan v. City of Brockton*, 876 F.2d 1029, 1034-35 (1st Cir. 1989), dealt with the admissibility of a *post-hoc* internal affairs report about the incident in question, not evidence pertaining to other similar incidents of misconduct. In *Strauss v. City of Chicago*, the plaintiff offered statistical summaries of complaints in opposing a motion to dismiss; the court there was not addressing the admissibility of evidence on summary judgment or at trial.  760 F.2d 765, 768-69 (7th Cir. 1985).  Nonetheless, the Seventh Circuit noted that "the type of information plaintiff provided us could furnish the necessary foundation to allege a 'pattern of conduct or a series of acts' in support of *Monell* liability, if more context were provided

---

[4] *See generally* Plaintiff's Memorandum in Opposition to Ayer's Motion for Summary Judgment.

[5] Notably, as in *Bordanaro*, 871 F.2d at 1161, *Gutierrez-Rodriguez* is a case in which the First Circuit credited Lou Reiter's reliance on evidence of prior complaints against the police defendants – "*regardless of whether the complaints were true or false*" –  as support for his finding that the defendants were on notice of a problem of constitutional proportions.  *See Gutierrez-Rodriguez*, 882 F.2d at 565-66, 575 (emphasis added).

about the nature of the conduct underlying the complaints." *Id.*   Finally, the issue in *Bryant v. Whelan,* 759 F. Supp. 410 (N.D. Ill. 1991), was whether statistical evidence was dispositive proof of municipal liability, not whether evidence of unadjudicated complaints was admissible; indeed, the Court implicitly found that it was admissible. 759 F. Supp. at 424 ("the fact that a low percentage of cases are ultimately sustained cannot in and of itself be read to establish a policy of indifference").

> D. **Defendants' Claim that the Ties, Randall and Downing Incidents Are Irrelevant Because They Arose under a "Prior Administration" Misapprehends the Doctrine of *Monell* Liability**

Finally, defendants argue that prior incidents that took place under the tenure of Chief William Adamson, Sr. cannot support municipal liability given that Mr. Waters' arrest and conviction took place after defendant Philip Connors had replaced Adamson as Chief, and because those incidents "did not involve the individual defendants." (Doc. 106 at 14.)[6] This claim fundamentally misapprehends the nature of plaintiff's *Monell* claims.

Count V of the Complaint alleges that Waters' arrest, prosecution and conviction were the result of unconstitutional Town customs and practices.

> "Unlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." *Britton v. Maloney*, 901 F. Supp. 444, 450 (D. Mass.1995), *aff'd in part and rev'd in part on other grounds,* 196 F.3d 24 (1st Cir. 1999). In a § 1983 suit premised on custom, then, we must first determine whether the custom is fairly attributable to the municipality. *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989). This standard is met when a custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Id.*; *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality

---

[6] The parties have executed a stipulation dismissing Adamson as an individual defendant. Evidence that he was on notice of a pattern of unconstitutional conduct by his officers is nonetheless relevant and admissible to the claim against Ayer, as Adamson was Ayer's final policymaker for law enforcement issues during his tenure as Chief. (*See* Plaintiff's Memorandum in Opposition to Ayer's Motion for Summary Judgment.)

opinion).

*Baron v. Suffolk County Sheriff's Dept.*, 402 F.3d 225, 236-37 (1st Cir. 2005). By definition, evidence of prior similar incidents in the years leading up to Mr. Waters' 1982 arrest and 1983 conviction are admissible in order to prove the existence of a custom that was so "well settled and widespread" that municipal policymakers must have been on notice of it.[7]

Hiring a new police chief in and of itself does not absolve a municipality of *Monell* liability. *See Monell*, 436 U.S. at 690-91 (holding that § 1983 enables suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels"); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) ("If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose."). The focus is on whether the custom or practice persists despite the municipality's actual or constructive notice, not the identity of the policymaker. *See Young*, 404 F.3d at 28 ("A finding of deliberate indifference requires also that the City have disregarded a known or obvious risk of serious harm from its failure to develop a training program . . . Such knowledge can be imputed to a municipality through a pattern of prior constitutional violations."); *Baron*, 402 F.3d at 241 ("The requirement in the affirmative policy cases that the district court identify a final policymaker may therefore not apply in those cases based on custom."); *Bordanaro*, 871 F.2d at 1156 (affirming *Monell* verdict upon finding that "the Everett Police Department had a longstanding, wide-spread, and facially unconstitutional practice of breaking down doors without

---

[7] Plaintiff also alleges in Count VI that the Town violated Mr. Waters' constitutional rights by means of its inadequate supervision of its police officers. *See Young*, 404 F.3d at 26 (citing *City of Canton v. Harris,* 489 U.S. 378 (1989)).

a warrant when arresting a felon" that continued throughout witness' "24-year tenure as a police officer").

In her memorandum in opposition to the Town's motion for summary judgment, plaintiff has offered proof – in part through evidence relating to the Ties, Randall and Downing incidents – that the APD had a widespread and longstanding custom of suppression and spoliation of exculpatory evidence; use of threats, promises, inducements and rewards to generate false witness statements; outright fabrication of evidence and subornation of perjury, all in an environment devoid of any meaningful supervisory oversight. (*See generally* SDF ¶¶323-77.) Moreover, the evidence demonstrates that final policymakers including Ayer's Board of Selectmen, Chief Adamson, defendant interim Chief Arthur Boisseau, and, as of 1982, defendant Chief Connors, were on actual and constructive notice of these pervasive problems, especially an abject failure to supervise defendant Taylor, who played a major role in encouraging a false, retaliatory rape charge against whistleblowing officer Stanley Randall and notoriously pursued felony and homicide cases far beyond her training and experience for her personal aggrandizement. (*Id.*) Despite the fact that Connors was hired as a direct response to pervasive misconduct among APD officers, these unconstitutional customs continued unabated even after Chief Connors took over, although he was on specific notice of the problem. (*See, e.g.*, SDF ¶¶336, 345-51, 365-77.) Indeed, these customs were the moving force behind Mr. Waters' unlawful arrest, prosecution, conviction and twenty-year imprisonment.

Defendants grossly distort *Kinan*, 876 F.2d 1029, by citing it for the proposition that municipalities can never be held liable for the acts of prior administrations. If credited, this proposition would eviscerate *Monell* and always preclude municipal liability. In any case, *Kinan*

dealt with a very different set of circumstances, and has no bearing here. In *Kinan*, the plaintiff sought to introduce the report of an Internal Affairs investigation initiated by the new police chief two years after the incident in question, after the filing of plaintiff's notice of claim, in support of the theory that the municipality was liable for the earlier misconduct based on the theory of after-the-fact "ratification." The First Circuit, noting the lack of evidence of a pattern or custom of similar misconduct – i.e. precisely the sort of evidence defendants challenge here – rejected this theory. *Id.* Instead, the Court affirmed the trial court's exclusion of the internal affairs report, finding that "[w]e fail to see how an investigation ordered by [the new chief] two years after the incident concluding that there was no police misconduct would be evidence of [his] liability as a policymaker." *Id.* at 1035.

Here, in contrast, there is no *post-hoc* ratification theory; indeed, other than the Ties incident, there was no internal affairs investigation of any of the police misconduct alleged in connection with these other incidents. Rather, plaintiff alleges that the Town of Ayer police had a custom, practice and pattern of using threats, promises, inducements and rewards to generate false witness statements, of suborning perjury, of withholding helpful information from the defense, and of engaging in outright fabrications, and that these customs went hand in hand with a systemic lapse in supervision, particularly for the less qualified officers, despite the fact that the Town was on actual and constructive knowledge of the problem, from defendant Chief Adamson's tenure through that of Chief Connors.

## CONCLUSION

For the foregoing reasons, the remainder of defendants' motion to strike the report of police practices expert Lou Reiter, should be denied.

Dated: May 27, 2008                    Respectfully submitted,
      New York, NY

/s/ Deborah L. Cornwall
Barry C. Scheck (BS 4612)
Deborah L. Cornwall (DC 2186)
Monica Shah (MS 9846)
COCHRAN NEUFELD & SCHECK, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Tel. (212) 965-9081 / Fax (212) 965-9084

Robert N. Feldman (BBO # 630734)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210-1108
Tel. (617) 307-6130 / Fax (617) 307-6101

***Attorneys for Plaintiff Betty Anne Waters***

## CERTIFICATE OF SERVICE

      I, Monica R. Shah, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via overnight delivery to those indicated as non-registered participants on May 27, 2008 as well as:

Joseph L. Tehan, Jr.
Gregg J. Corbo
Jeffrey T. Blake
Kopelman & Paige, PC
101 Arch Street, 12th Floor
Boston, MA 02110

                                      /s/ Monica R. Shah
                                      Monica R. Shah