UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____  )
BETTY ANNE WATERS, as                   )
Administratrix of the Estate of         )
KENNETH WATERS,                         )
            Plaintiff,                  )
    v.                                  )
                                        )  Case No. 04 CV 10521 (GAO)(JGD)
TOWN OF AYER, NANCY TAYLOR-             )
HARRIS, in her individual capacity,     )  **PLAINTIFF'S MEMORANDUM**
ARTHUR BOISSEAU, in his individual      )  **IN OPPOSITION TO DEFENDANT**
capacity, WILLIAM ADAMSON, in his       )  **PHILIP CONNORS' MOTION FOR**
individual capacity, and PHILIP L.      )  **SUMMARY JUDGMENT**
CONNORS, in his individual capacity,    )
                                        )
            Defendants.                 )
_____  )

## INTRODUCTION

Kenneth Waters was wrongly convicted of the May 21, 1980 murder and robbery of Katherina Brow based on false evidence coerced and fabricated by defendant Nancy Taylor, the clerk/dispatcher whom defendant Philip Connors, then-Chief of the Ayer Police Department ("APD"), put in charge of the homicide investigation with little or no supervision. Connors now seeks to avoid liability for his complete abdication of his supervisory responsibilities by claiming that he or others did in fact adequately supervise Taylor. However, the record reveals that Connors was well aware of the risks in letting Taylor lead the Brow investigation and, although he had the duty to supervise her, completely abdicated his responsibility to do so. In the absence of any meaningful supervision, Taylor was free to trample on Waters' constitutional rights and ultimately ensure his wrongful conviction. Connors' woefully inadequate supervision of Taylor is the essence

of deliberate indifference, and he must be held liable for it.

## BACKGROUND[1]

### *Nancy Taylor Overstepped Her Limited Duties as the Chief's Secretary, Clerk, Dispatcher and Special Officer for Rape Investigations*

Taylor followed Chief William Adamson to the APD in 1977 from the Pepperell Police Department, where she had worked for two years as a clerk/dispatcher and served as a special officer assigned to interview rape and child abuse victims. (SDF ¶¶13-14.) At Adamson's request, the Ayer Board of Selectmen ("Board") appointed her to fulfill the same role at the APD and limited her duties and pay to clerical work and rape cases. (SDF ¶14.) Adamson, in a letter to the Board supporting a pay increase for Taylor in March of 1980, acknowledged that her job involved "mostly administrative work." (SDF ¶¶129.) Taylor did not attend the police academy until after Waters was convicted in 1983 and only acted as a full-time APD officer for a short time when she left in 1986 to become the "executive secretary" to the Groton Police Chief. (SDF ¶¶15-16, 127) As Connors acknowledged, special officers like Taylor differed from full-time patrolmen because they had not completed the police academy, had less training in follow-up investigations, took only a limited investigative role and certainly not the lead in serious felony investigations, and required very close supervision when undertaking any investigative act. (SDF ¶130.)

When he joined the force as Chief in 1982, Connors had concerns that, under Chief Adamson's tenure, Taylor had exceeded the limited scope of duties the Board had authorized her

---

[1] The facts pertinent to all of defendants' motions are set forth in Plaintiff's Statement of Disputed Facts ("SDF"), which is incorporated herein by reference. Plaintiff respectfully withdraws Count IV, the § 1983 conspiracy claim.

to undertake as a special officer. (SDF ¶126.)[2] By the fall of 1982, matters came to a head. In response to a union complaint that Taylor had been working open shifts that should as a matter of union contract be available first to full-time officers, Connors notified her that her duties and pay would be limited to her appointment. (SDF ¶132.) Taylor fought back, complaining to the Board of Selectmen on September 21, 1982 that Connors had ordered her to stop performing the police duties she had performed from the very first day of her employment, including investigating homicides, and threatened to file a discrimination claim if she did not get her way. (SDF ¶¶133-34.)

Acknowledging that she had been exceeding the proper scope of her duties for some time and was not qualified to investigate homicides, the Board clarified that those duties fell outside Taylor's authority as a special officer, and her pay would be accordingly limited to wages for clerical duties and rape cases. (SDF ¶¶134-35.) As plaintiff's police practices expert, Lou Reiter, opines, allowing Taylor to continue on with investigative work above and beyond that of a rape investigator, without close supervision, ran a foreseeable and obvious risk that she would violate suspects' constitutional rights. (SDF ¶136.) Even defendants' proffered expert agrees that Taylor needed more supervision than the average officer and that it would raise a concern had she been acting alone or without close supervision in a homicide case. (SDF ¶137.)

### *Connors Allowed Taylor to Take the Lead in the Brow Investigation, While Giving Her Little or No Supervision*

Nine days later, the Brow investigation broke wide open when Taylor answered a call from Robert Osborne on September 30, 1982. (SDF ¶139.) Notwithstanding Connors' claim that Taylor's duties were "much more restricted" under his tenure as compared to Adamson's (SDF

---

[2] Rumors swirled that Taylor and Adamson had more than a professional relationship; Chief Connors candidly admitted that possibility raised concerns about Adamson's objectivity and judgment in allowing her to do work she was not fit for in his capacity as her supervisor. (SDF ¶128.)

¶138), at precisely the same time Connors and the Board were admonishing Taylor for overstepping her authority, Connors let Taylor take charge of this homicide investigation. (SDF ¶140, 143.)

The day after Osborne's call, Taylor swore out an affidavit in support of a search warrant for the vacant home of Waters's deceased grandfather, where Waters had lived two years earlier. (SDF ¶153.) In the application, she misrepresented herself as a "police officer" and referred to Osborne as a "reliable informant" despite the fact that neither she nor Connors had done anything to investigate his credibility or his reliability. (SDF ¶¶154-55.) In fact, based on the limited information known about Osborne as of October 1st – that he called the police for admittedly "financial reasons" – Connors had concerns about Osborne's reliability that would not be allayed without additional corroboration. (SDF ¶¶145, 156-58.)

Connors had no idea Taylor had applied for the warrant, nor was it approved by Boisseau or prosecutor Elizabeth Fahey, in clear violation of APD and basic police practices. (SDF ¶¶159-60.)[3] Even the most cursory supervisory review of the application would have raised red flags about Taylor's representation that Osborne was a reliable informant, and about Taylor's own investigative judgment. There was nothing to be gained in searching the vacant house for evidence of a crime that had occurred more than two years earlier; in fact, nothing was seized. (SDF ¶¶161, 164.)[4]

As of September 29, 1982, the day before Osborne's call, Connors did not consider himself

---

[3] The search warrant was not the first thing Taylor did on her own in this case. The daily logs reveal that as early as 1980, under Chief Adamson's tenure, she interviewed witnesses and pursued leads alone. (SDF ¶126.) Faced with this evidence at his deposition, defendants' proffered expert, John Ford, ultimately retracted his opinion that Taylor was "always closely supervised." (*See* SDF ¶137.)

[4] Taylor's application specified the property was to be searched for any items stolen from Mrs. Brow, or "a spatula, which may have been used in committing the homicide" and a bloody knife, which a local "teenage boy" had allegedly seen in the house when he entered it months earlier. (SDF ¶162.) Despite Taylor's current claim that she "remembered reading" a report about the teenage boy, no such document exists. (*Id.*) Mrs. Brow was stabbed to death with a knife, not a spatula. (SDF ¶163.)

to be at all involved with the Brow investigation. (SDF ¶152.) Thus, when he accompanied Taylor to the October 4, 1982 dinner meeting with Osborne and Brenda Marsh, Connors admittedly knew "very little" about the crime and the investigation. (SDF ¶170.) His only familiarity with the casefile came soon after he took office eight months earlier, when he flipped through it for all of 10-15 minutes after meeting with a Brow family member, and from Boisseau's report to him that there were no leads that had not been followed to a logical conclusion. (SDF ¶¶122, 169.) Connors lacked the most basic understanding of the case: he did not know that suspects had been excluded as the source of the perpetrator's fingerprint, that the perpetrator had bled at the scene, or that Ayer police had interviewed Waters the day after the murder; literally all Connors knew when he walked into that meeting was that Marsh had allegedly told Osborne Waters had admitted murdering Brow. (SDF ¶170.) Thus, Chief Connors allowed his clerk/secretary to run this most critical interview, sitting idly by as Taylor browbeat Marsh, who knew of no evidence linking Waters with the crime, into making false incriminating statements for fear that she would be imprisoned as an accessory after the fact and lose her children. (SDF ¶¶172, 175, 177, 179-88, 196.)

      Almost everything else about that interview violated the APD's written policies.[5] Written procedures called for witnesses to be interviewed separately "to ensure independent statements," yet Taylor interviewed Osborne and Marsh together, which created the risk that Osborne – who had already divulged his financial motive – would unduly influence Marsh's statements. (SDF ¶176.) Moreover, APD policies instructed officers that "notes should be taken," and, "if a statement appears highly informative due to its nature and content, a verbatim account should be recorded," and the witness should "sign or initial [the officer's] notes." (SDF ¶191.) If any notes were taken, Brenda

---

[5] The APD adopted Municipal Policy Institute ("MPI") investigative policies. (SDF ¶174.)

Marsh never signed them. (*Id.*) Nor was the interview tape recorded, despite APD policies calling for officers to audiotape "all conversations with witnesses." (SDF ¶¶190, 192.) It is no surprise that Taylor routinely violated APD policies, as she testified that, in all her years working at the APD, she had no idea there were any written policies governing investigations, handling of evidence, or interactions with witnesses and informants. (SDF ¶308.)

Connors acknowledged that the hallmark of any informant's credibility is corroboration, yet he did nothing to compare the statements Taylor elicited from Marsh to the known facts of the case. (SDF ¶198.)[6] He did not even talk to Boisseau about the case after the meeting with Marsh, although Boisseau was the only other APD officer other than Taylor who had been involved in the Brow investigation from the beginning. (SDF ¶193.) Again, Connors left the follow-up investigation to Taylor, but Taylor made no attempt to corroborate the statement she elicited from Marsh after the interview – perhaps because she knew the statement was false.[7] (SDF ¶202.)

Taylor's failure to audiotape or obtain Marsh's endorsement on Taylor's notes of the interview, or to seek corroboration for the statement, all violated APD policy and generally accepted police practices, and therefore tend to corroborate Marsh's sworn testimony that she told Taylor she

---

[6] In his deposition, Connors fully endorsed the MPI policies calling for police to constantly evaluate the reliability and credibility of witnesses and informants, but later backtracked, claiming those policies did not apply in the homicide investigations because ultimately the prosecutors made credibility determinations. (SDF ¶198.) Boisseau flatly contradicted this position, and indeed, there is no homicide exception to the APD's policies. (SDF ¶199.) Connors' testimony is nothing more than an excuse for his failure to adequately supervise Taylor in connection with, and prepare her for the Marsh interview, as this testimony is patently inconsistent with the policies Connors personally championed.

[7] Taylor now claims she sought Boisseau's assistance to corroborate the statement attributed to Marsh that Waters came home drunk the morning of the murder and went to sleep at 10:30 a.m. by having Boisseau investigate whether Waters was actually in court the morning of the murder. (SDF ¶195.) However, Boisseau denies that he was ever made aware of the Marsh statement by Taylor or anyone else before Waters was arrested and prosecuted. (SDF ¶193.) Thus, whether Taylor did anything to corroborate Marsh's statement is a material issue of fact.

knew nothing about the crime, but that Taylor browbeat her into making false allegations against Waters.  If, as a jury could find, Marsh's sworn testimony – consistently offered on three occasions since 2001 (SDF ¶¶206-210) – is true and Taylor relentlessly threatened Marsh with criminal charges and losing her children while offering incriminating statements for Marsh to adopt, Taylor also violated APD policy by using "overly suggestive" tactics, tactics any reasonable officer knew to avoid due to the obvious risk of generating false evidence (SDF ¶¶178, 211).  If Marsh's testimony is true, Connors sat and watched Taylor violate the law.

Given that there were at least nine more-experienced APD officers at the APD, Lt. Boisseau could think of no reason why Connors would have chosen Taylor, the clerk/dispatcher and special rape officer, to run the investigation.  (SDF ¶¶141-42.)  Connors rationalized his decision to put Taylor in charge by explaining that the department was "extremely shorthanded" and that Boisseau in particular "was having great difficulty keeping up with his workload already," which had created an investigative "backlog" among his cases.  (SDF ¶143.)  If that were the case, then it fell to Connors to personally supervise Taylor's work on the homicide investigation, as Connors himself admitted. (SDF ¶201.)  But in fact, Connors admitted, he had even "less and less to do with it" after their October 4th meeting with Brenda Marsh and Robert Osborne. (*Id.*)

## LEGAL STANDARD

Summary judgment is appropriate only if the full record discloses "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.  "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).  Once the moving party has satisfied its burden, the burden shifts to the nonmoving party to set forth specific facts

7

showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court must "construe the evidence in the light most flattering to the nonmovant[] . . . and indulge all reasonable inferences in their favor." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006). Simply put, "[t]he nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." *Id.*

Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). "[W]hen facts, though undisputed, are capable of supporting conflicting yet plausible inferences – inferences that are capable of leading a rational factfinder to different outcomes in a litigated matter depending on which of them the factfinder draws – then the choice between those inferences is not for the court on summary judgment." *In re Varrasso*, 37 F.3d 760, 764 (1st Cir. 1994). Generally, "state of mind is a factual question that can't be resolved on a motion for summary judgment." *See Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 485 (1st Cir. 1992). As intent is so difficult to prove, even circumstantial evidence of intent may be sufficient to preclude summary judgment. *See DeNovellis v. Shalala*, 124 F.3d 298, 308 (1st Cir. 1997).

## ARGUMENT

**I.  Connors Is Liable as a Supervisor Due to the Affirmative Link Between His Deliberate Indifference and Taylor's Constitutional Violations**

Connors may be held liable as a supervisor for defendant Taylor's constitutional violations if his own "conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others," as long as there is "an 'affirmative link' between the street-level misconduct and the action, or inaction, of supervisory officials." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989) (citations omitted). Supervisory liability "does not require a showing that the

supervisor had actual knowledge of the offending behavior; he 'may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness.'" *Camilo-Robles v. Toledo-Davila*, 151 F.3d 1, 7 (1st Cir. 1998) (quoting *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994)).

Despite Connors' concerns that Taylor had been exceeding the scope of her duties as a special officer, he installed her as Ayer's lead investigator in the Brow investigation and let her have free rein of the case. Indeed, based on his own admission, Connors had little involvement in or knowledge of the case other than his presence at the October 4th Marsh interview. For example, he had no idea that Taylor applied for a warrant to search Waters' grandfather's house years after the murder, or that Taylor falsely claimed that Osborne was a reliable informant, when in fact Connors had doubts about his reliability and neither he nor Taylor conducted the necessary investigation to corroborate Osborne's story. Moreover, as set forth above, Taylor repeatedly acted in contravention of APD policies and, in fact, testified that she had no idea there were any written policies governing investigations, handling of evidence, or interactions with witnesses and informants. As plaintiff's police practices expert, former L.A.P.D. Deputy Chief Lou Reiter,[8] opines, Taylor's ignorance of standard department policies suggests serious supervisory lapses by Connors. (SDF ¶309.)

Without any meaningful oversight or understanding of the basic guidelines governing criminal investigations, Taylor was in a position to commit multiple acts of misconduct, some in Connors' presence, leading to the conviction of an innocent man. (*See* Pl. Opp. to Def. Taylor Mot. for S.J. at Parts I.A-C, II.A, & III.A-B (incorporated herein by reference).) Taylor's unconstitutional

---

[8] Courts in this circuit have recognized that Mr. Reiter's credentials as a police practices expert are unparalleled. (*See* Doc. 164 at 2.)

fabrications and coverups were eminently foreseeable, absent the close supervision her inexperience warranted. (SDF ¶136.) As Mr. Reiter found, "Chief Connors failed to exercise reasonable supervisory oversight and control of the Brow murder investigation and arrest/prosecution of Kenneth Waters by Ms. Taylor. Any reasonable police supervisory officer would have known of the significant adverse consequences of failing to maintain constant and vigilant oversight over this type of investigation being conducted by an investigator with no homicide experience." (SDF ¶375.)

Connors claims that, if he did not supervise Taylor, it was because A.D.A. Fahey or the State Police did. (Doc. 160 at 18.) Yet Fahey testified in her deposition that she assumed Taylor was supervised by the State Police, and there is no evidence that the State Police gave Taylor the kind of "close supervision" defendants' expert John Ford agreed she needed; indeed, the documentation reflects that the State Police were hardly involved in the investigation between the early days after the crime and the days just before Waters' arrest. (SDF ¶¶22 & exhibits cited therein, 137, 203.) Despite Connors' attempt to shift responsibility to Fahey or the State Police, the responsibility to supervise Taylor rested with him. Most importantly, it was uniquely the APD's responsibility, delegated to Taylor and supervised by Connors, to provide Fahey with all APD reports on prior investigative activities conducted by APD (SDF ¶235), which included, a reasonable jury could find, fingerprint reports excluding Waters and copies of time cards that corroborated his alibi (SDF ¶¶53-117, 168, 241, 253-55.) Yet Connors missed this crucial exculpatory evidence because he looked at APD's Brow file for only 10-15 minutes, an admission of perfunctory performance that, by itself, demonstrates he was deliberately indifferent to his supervisory responsibilities. Perhaps even worse, Connors was present when Taylor coerced Marsh into giving patently false statements, such as the claim that Waters had a long, deep red scratch on his cheek the morning of the murder. Despite

Connors' attempt to shift responsibility to Fahey or the State Police (Doc. 160 at 18), the most egregious constitutional violations literally took place under his nose, and the responsibility to supervise Taylor rested directly with him. As Mr. Reiter opined, "There is no acceptable rationale for Chief Connors' failure to oversee this aspect of the investigative process and the duty of the Ayer Police Department to ensure the protection of everybody's rights during the subsequent prosecution of Kenneth Waters." (SDF ¶376.) Connors abdicated his duty.

Even during the interview with Marsh, Connors failed to exercise any meaningful oversight over Taylor. Given that Connors was completely unfamiliar with the underlying facts of the crime and the investigation that had been conducted in the two years before he joined the force, even defendants' proffered expert admits that Connors' mere presence was not enough to ensure proper supervision at the October 4th meeting with Brenda Marsh. (SDF ¶173.) Indeed, watching a subordinate browbeat a witness and manufacture evidence does not qualify as adequate supervision by any stretch of the imagination. As Mr. Reiter opined, Taylor's conduct involved "egregious departures from reasonable and generally accepted police investigative practices," and these lapses were entirely foreseeable. (SDF ¶374.) Connors knew Taylor was overstepping her qualifications and her authority – and he even watched as she did it, flouting APD policy left and right – but did nothing to stop her. He sat and watched as Taylor induced Marsh into making a statement both women knew was false, by threatening Marsh with criminal prosecution as an accessory after the fact to murder, and losing her children. By silently watching Taylor pressure Marsh this way, Connors acquiesced in that misconduct.[9]

---

[9] There is some evidence in the record suggesting that Connors personally engaged in coercive and abusive questioning of Brenda Marsh (SDF ¶209), and violated his acknowledged duty to disclose the impeaching nature of this questioning to the prosecutor in connection with the probable cause determination and trial (SDF ¶258), but the sole claim plaintiff alleges against Connors arises out of his

"With even the minimal amount of proper supervision ... it is unlikely that [Taylor] would have been in" a position to trample Waters' constitutional rights. *Gutierrez-Rodriguez*, 882 F.2d at 564. Connors was aware of the risks in putting her Taylor in charge of this homicide investigation but did nothing to adequately supervise her. This is the essence of deliberate indifference, and he must be held liable for it. *See Camilo-Robles*, 151 F.3d at 7; *Maldonado-Denis*, 23 F.3d at 582.

II. **Connors Is Not Entitled to Qualified Immunity as He Violated Clearly Established Law By Failing to Supervise Nancy Taylor and Could Not Have Reasonably Believed His Conduct was Lawful**

As set forth above, under Connors' nose, Taylor violated Waters' clearly established constitutional rights when she manufactured incriminating statements by browbeating two key witnesses and when she misled the prosecutor and the grand jury in order to arrest and prosecute Waters without even arguable probable cause. *See, e.g.*, *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004) ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction).") (citation omitted); *id.* at 47-48 (citing *Smith v. Florida*, 410 F.2d 1349, 1350-51 (5th Cir.1969) (explaining that police violate the right described in *Mooney* if they suborn perjury even without the prosecutor's knowledge).

It is "well settled that a deliberately indifferent police supervisor may be held liable for the constitutional violations of his subordinates." *Camilo-Robles* 151 F.3d at 6; *see also Diaz v. Martinez,* 112 F.3d 1, 4 (1st Cir. 1997). Thus, whether Connors has qualified immunity boils down

---

failure to adequately supervise Taylor. Thus, plaintiff withdraws Counts I, II, VII, and VIII against him.

to "the test of objective legal reasonableness," which "necessarily depends upon the relationship between [Connors'] acts and omissions and [Taylor's] conduct." *Camilo-Robles*, 151 F.3d at 6. In other words, qualified immunity must be denied if Connors "should reasonably have understood that his conduct jeopardized [Waters'] rights." *Id.* at 7. Defendants' expert admits that the buck stopped with Connors for anything that happened at the Marsh interview, regardless of who did the questioning. (Doc. 155 ¶46.) Given the strong affirmative link between Connors' inaction and Taylor's unconstitutional acts, Connors cannot plausibly claim he was objectively reasonable in believing he was acting lawfully. *See id.* at 14.

Just as in *Limone v. U.S.*, "it is inaccurate to characterize what happened here as an exercise of supervisory judgment at all." 497 F. Supp.2d 143, 232 (D. Mass. 2007). That is,

> In the face of blatant, ongoing, horrific misconduct that crossed the line into illegality, [Connors] did not merely take insufficient or incompetent action; [Connors] did not take delayed or selective action; [Connors] did not overlook particular instances of misconduct; [he] simply walked away from [his] responsibilities altogether. No stretch of supervisory discretion allows the complete abandonment of the supervisory role.

*Id.* at 232-33. It was clearly established that supervisors would be held liable for their deliberate indifference to and participation in each of these constitutional violations because they were aware of the risks but failed to do anything about it. *See Rizzo v. Goode*, 423 U.S. 362 (1976); *Camilo-Robles*, 151 F.3d at 11 (rejecting qualified immunity defense where supervisors had authority to reassign subordinate they knew posed risk of harm but "failed to take readily apparent steps to alleviate that risk" in "reckless disregard for the rights of others . . . .").

## CONCLUSION

For the foregoing reasons, defendant Connors' motion for summary judgment must be denied.

Dated: May 27, 2008  Respectfully submitted,
      New York, NY

/s/ Deborah L. Cornwall
Barry C. Scheck (BS 4612)
Deborah L. Cornwall (DC 2186)
Monica Shah (MS 9846)
COCHRAN NEUFELD & SCHECK, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Tel. (212) 965-9081 / Fax (212) 965-9084

Robert N. Feldman (BBO # 630734)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210-1108
Tel. (617) 307-6130 / Fax (617) 307-6101

***Attorneys for Plaintiff Betty Anne Waters***

**CERTIFICATE OF SERVICE**

      I, Monica R. Shah, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via overnight delivery to those indicated as non-registered participants on May 27, 2008 as well as:

Joseph L. Tehan, Jr.
Gregg J. Corbo
Jeffrey T. Blake
Kopelman & Paige, PC
101 Arch Street, 12th Floor
Boston, MA 02110

                                            /s/ Monica R. Shah
                                            Monica R. Shah