UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____   )
BETTY ANNE WATERS, as                            )
Administratrix of the Estate of                        )
KENNETH WATERS,                                     )
        Plaintiff,                                                  )
        v.                                                             )    Case No. 04 CV 10521 (GAO)(JGD)
                                                                       )
TOWN OF AYER, NANCY TAYLOR-              )    **PLAINTIFF'S MEMORANDUM**
HARRIS, in her individual capacity,                )    **IN OPPOSITION TO DEFENDANT**
ARTHUR BOISSEAU, in his individual          )    **ARTHUR BOISSEAU'S MOTION**
capacity, WILLIAM ADAMSON, in his          )    **FOR SUMMARY JUDGMENT**
individual capacity, and PHILIP L.                 )
CONNORS, in his individual capacity,           )
                                                                       )
        Defendants.                                             )
_____   )

## INTRODUCTION

Kenneth Waters was wrongly convicted of the May 21, 1980 murder and robbery of Katherina Brow on the basis of false and fabricated evidence. Defendant Arthur Boisseau – the Ayer Police Department's ("APD") most senior investigator and primary supervisor at the time – seeks to avoid liability for his misconduct and complete abdication of supervisory duties by claiming that he had little or no involvement in the investigation. However, the record shows Boisseau was involved in the investigation since its inception and had personal knowledge of evidence proving Waters' innocence, yet concealed it from the prosecutor. Given his concerns that defendant Nancy Taylor, who ascended from clerk/dispatcher to become the case's lead investigator, was overstepping her bounds, Boisseau had no excuse not to step in once Taylor targeted Waters based on evidence Boisseau knew to be false. As such, he must be held liable for these suppressions not

only individually, but as Taylor's supervisor as well.

## BACKGROUND[1]

Soon after Mrs. Brow's murder was reported on May 21, 1980, Lt. Boisseau responded to the scene. (SDF ¶¶6, 8, 19, 124.) As the APD's most senior investigator and sole designated follow-up investigation officer, Boisseau was personally involved in the investigation from its inception. (SDF ¶¶8, 19-20, 27, 43-45, 47, 52, 70, 72, 80, 109, 122, 124-25, 240, 245, 253, 340.)

***Boisseau Knew that Waters was Innocent: Not Cut, Not His Fingerprints, No Opportunity***

Boisseau learned the victim had been stabbed to death in a violent struggle wherein the perpetrator was cut and bled; APD officers canvassed local hospitals searching for suspects who had sought treatment for lacerations. (SDF ¶¶25-28, 30, 32-33.) Boisseau interviewed Waters on May 22, the day after the murder, inspected him, and found no cuts or scratches. (SDF ¶¶43-44.)

As the investigation progressed, Boisseau learned that State Police Cpl. John Baliunas had collected latent fingerprints from the scene that were not left by the victim, her family, or Ayer patrolman Walter Decot, the first officer on the scene. (SDF ¶¶125, 240.) Boisseau, a trained fingerprint examiner, appreciated that Baliunas' reports meant that there were prints from the scene that were valuable evidence of the perpetrator's identity. (SDF ¶¶77, 108-09, 247.) During the May 22 interview, Boisseau took Waters' prints. (SDF ¶¶72.) In his deposition, Boisseau acknowledged that where, as here, usable prints are collected at the scene, the obvious next step is to send the fingerprint examiner suspects' prints for comparison. (SDF ¶81.) As the APD's evidence officer, Boisseau kept custody of fingerprints and ensured the chain-of-custody of crime-related evidence.

---

[1] The facts pertinent to all of defendants' motions are set forth in Plaintiff's Statement of Disputed Facts ("SDF"), which is incorporated herein by reference. Plaintiff respectfully withdraws Count IV, the § 1983 conspiracy claim.

(SDF ¶109.) Boisseau acknowledged that he knew Ayer police sent suspects' fingerprints to Baliunas for comparison, and that Baliunas excluded them all. (SDF ¶¶108-09, 247.) Taking the evidence in the light most favorable to plaintiff, a reasonable jury could find that Ayer police sent Waters' prints to Baliunas, who told them Waters was excluded, and Boisseau knew it. Boisseau also knew that Mrs. Brow had been murdered some time between 7:10 a.m., when her husband left for work, and 11 a.m., when she was found, if not within a more narrow window given the pathologist's report at the scene that she had minimal body temperature loss and no rigor mortis. (SDF ¶¶34-39.) At the May 22 interview, Waters gave Boisseau and Adamson his alibi: he had worked an overnight shift at the Park Street Diner until about 8 a.m. the morning of the murder, then went home to change into a suit before meeting his attorney for a 9 a.m. appearance in the Ayer District Court. (SDF ¶¶46-47; *see also id.* ¶¶48-49.) In fact, Boisseau saw Waters in court that morning around 11. (SDF ¶52.) As the court liaison officer, Boisseau was in court regularly and knew that standard procedures required defendants to appear at 9 a.m. and wait for their cases to be called, which meant that Waters had been there since 9 a.m. on the morning of the murder, just as he told the officers. (SDF ¶¶50-52.)

Again, Boisseau acknowledged that the obvious next investigative step was to check Waters' time cards to confirm or disprove the alibi that he had been at work until 8 that morning. (SDF ¶53; *see also id.* ¶54.) In fact, Ayer police officers including Decot were sent to the Park Street Diner and Berry Enterprises in 1980 and again in 1982 to retrieve the cards, and the standard practice at Berry Enterprises was to preserve Park Street Diner employees' time cards as payroll records and to comply with a request from police to disclose them. (SDF ¶253.) But, when the defense subpoenaed them for trial, the time cards for the entire week of the murder were missing. (SDF

¶254.) Given that A.D.A. Elizabeth Fahey testified she would have used the time cards to disprove Waters' alibi defense if she had them, and Taylor's testimony that the time cards would have been important evidence, a reasonable jury could find – particularly given all the other acts of deliberate fabrications and cover-ups – that the cards were exculpatory, but Ayer police got rid of them. (SDF ¶¶67, 257; *see also id.* ¶¶56-59.) Boisseau knew Decot was dispatched to the Park Street Diner for just that task, but testified that he never saw any time cards. (SDF ¶60.) No report exists reflecting that Decot had been dispatched either, although standard practice was to document such an event, whether or not time cards were retrieved, and Boisseau, the ranking Lieutenant, was responsible to ensure that policy was followed. (SDF ¶¶9, 67, 68, 255-56, 307, 339.) This raises a reasonable inference that Boisseau knew or should have known about the time cards, and made sure they were disclosed.

### *Boisseau Had Supervisory Responsibility over Nancy Taylor and other APD Investigators*

During this murder investigation, Boisseau had supervisory responsibilities over all police personnel, both as the Chief's second-in-command, and also as interim chief between Chief William Adamson's forced resignation in late 1981 and defendant Connors' appointment in February, 1982. (SDF ¶¶8-9, 11, 124.) Ayer's policies tasked Boisseau with "providing the first level of supervision in the department," being "primarily responsible for the proper performance" of subordinates, and "ensuring compliance with the department's regulations;" it was his "duty and responsibility" to supervise all employees' performance and ensure they knew APD policies. (SDF ¶¶9, 144.)

### *Boisseau Was Concerned that Taylor Was Overstepping Her Bounds as a Clerk, Dispatcher and Special Rape Investigator*

During the Brow investigation, Taylor was the Chiefs' secretary, a clerk, dispatcher, and a special officer for rape investigations. (SDF ¶¶12-14.) Boisseau acknowledged that special officers

4

like Taylor differed from full-time patrolmen because they had not completed the police academy, had less training in follow-up investigations, took only a limited investigative role and certainly not the lead in serious felony investigations, and required very close supervision when undertaking any investigative act. (SDF ¶130; *see also id.*¶¶127, 129, 131, 136-38.) Given these limitations, Boisseau had concerns that, under Adamson's tenure, Taylor was exceeding the restricted scope of duties she was authorized to undertake as a special officer. (SDF ¶¶126, 142; *see also id.*¶¶128, 132-35.)

Boisseau testified that, pursuant to his duties as second-in-command, he made sure that all subordinate officers were aware of the APD's policies, including those pertaining to chain of custody and evidence handling. (SDF ¶¶9, 144, 307.) But Taylor testified that, in all her years working at the APD, she had no idea there were any written policies governing investigations, handling of evidence, or interactions with witnesses and informants. (SDF ¶308.) As plaintiff's police practices expert Lou Reiter opined, Taylor's ignorance of standard department policies suggests serious supervisory lapses by Boisseau (as well as Connors). (SDF ¶309.)

### *Boisseau Did Nothing as Nancy Taylor Took Over the Homicide Investigation and Arrested Kenny Waters on the Basis of False Evidence*

As Boisseau knew, there were at least nine more-experienced APD officers, including himself, who should have been assigned to run the Brow investigation before Taylor when it was reactivated in the fall of 1982. (SDF ¶141) In his deposition, Boisseau testified he was no longer involved in the investigation by then, and was not aware of Robert Osborne's call or that Taylor applied for a search warrant before meeting Osborne or Brenda Marsh. (SDF ¶¶148, 165.) Boisseau could think of no reason why Connors allowed Taylor, the clerk/dispatcher and special rape officer, to lead a homicide investigation, and expressed concern about the extent of her role and the substance of her work. (SDF ¶¶126, 142.) For example, when confronted with Taylor's

documentation of these events at his deposition, Boisseau testified that he had serious concerns about Taylor's conduct, including her failure to investigate Osborne's reliability – which was obviously in question – before swearing under oath that he was reliable; her seeking a warrant to search a vacant house for evidence of a murder two years prior, particularly where the victim's husband had identified the murder weapon as a knife from the family's own kitchen; and the fact that no supervisor authorized or even reviewed the warrant application. (SDF ¶165.) Even a cursory supervisory review of the application would have raised serious red flags about Taylor's representation that Osborne was a reliable informant.

Boisseau also testified he had no idea that Taylor and Connors had elicited an incriminating statement from Marsh on October 4, 1982. (SDF ¶193.) He claimed that if he had known, it would have set off alarm bells, and he would have told Taylor that Marsh's statement conflicted with what he knew to be true: Waters did not arrive home drunk at 10:30 a.m. on the morning of the murder and then go to sleep since Boisseau saw him in court that morning and Waters had no long, deep red scratch on his face when Boisseau interviewed him the next day. (SDF ¶193; *see also id.* ¶219.) It was also inconsistent with Boisseau's knowledge that Waters had been excluded as the source of the perpetrator's fingerprints. (SDF ¶¶108-09, 247.) Boisseau admitted in his deposition that, if Waters had been arrested on the basis of Marsh's October 4th statement, he would be concerned that an innocent man was being prosecuted for a crime he did not commit. (SDF ¶194.) Indeed, he admitted that the statement was unreliable based on the facts known to the Ayer police and even taken at face value did not provide probable cause to arrest Waters for the murder. (SDF ¶¶220-21.)

However, there is a factual dispute in the record about the extent of Boisseau's knowledge about Marsh's statement before Waters' arrest. In her deposition, Taylor testified she saw a

discrepancy between the alibi Waters gave in his May 22nd interview and Marsh's statement. Taylor explained that, after the October 4th statement, Boisseau tried to determine whether Waters had been in court on the morning of May 21st and reported back the he could not verify that alibi. (SDF ¶195.) Her testimony on this point, if credited, is evidence that Boisseau knew about Marsh's statement – and that it was false – before Waters was arrested, but lied to other investigators to mask its unreliability and enable Waters' arrest for a crime Boisseau knew he could not have committed.

Boisseau now claims that he was not involved in the second phase of the investigation and had no knowledge of it, but he testified as a prosecution witness at trial (SDF ¶301), from which a reasonable jury could infer that he had not only the duty, but also every opportunity to inform the prosecutor before trial that Marsh's statement lacked reliability and was patently inconsistent with the evidence of innocence of which he had first-hand knowledge, including the fingerprints, Waters' alibi, and the fact that Waters had no cuts or scratches on his body the day after the murder.

## LEGAL STANDARD

Summary judgment is appropriate only if the full record discloses "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). Once the moving party has satisfied its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court must "construe the evidence in the light most flattering to the nonmovant[] ... and indulge all reasonable inferences in their favor." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006). Simply put, "[t]he nonmovant may defeat a summary judgment motion by demonstrating, through

submissions of evidentiary quality, that a trialworthy issue persists." *Id.*

Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). "[W]hen facts, though undisputed, are capable of supporting conflicting yet plausible inferences – inferences that are capable of leading a rational factfinder to different outcomes in a litigated matter depending on which of them the factfinder draws – then the choice between those inferences is not for the court on summary judgment." *In re Varrasso*, 37 F.3d 760, 764 (1st Cir. 1994). Generally, "state of mind is a factual question that can't be resolved on a motion for summary judgment." *See Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 485 (1st Cir. 1992). As intent is so difficult to prove, even circumstantial evidence of intent may be sufficient to preclude summary judgment. *See DeNovellis v. Shalala*, 124 F.3d 298, 308 (1st Cir. 1997).

**ARGUMENT**

I.   **Boisseau Violated Waters' 4th and 14th Amendment Rights by Failing to Disclose and Affirmatively Concealing Favorable Evidence**

Given Boisseau's knowledge of exculpatory facts that not only discredited the statements Taylor elicited from Marsh but affirmatively proved Waters' innocence – including alibi evidence that Boisseau had seen Waters in court and knew about Waters' time card, which collectively proved Waters had no opportunity to commit the crime; that Waters was excluded as the source of the perpetrator's fingerprints; and that Waters could not have been cut and bled at the scene given the lack of any injuries when Boisseau inspected him the very next day – Boisseau is equally as liable as Nancy Taylor for violating Waters' 14th Amendment rights by concealing this favorable evidence from the prosecutor. *See Limone v. Condon*, 372 F.3d 39, 46-47 (1st Cir. 2004) (citing *Miller v. Pate*, 386 U.S. 1, 7 (1967); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Pyle v. Kansas*, 317 U.S.

213, 216 (1942); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)); *see also Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. U.S.*, 405 U.S. 150, 154 (1972). (*See* Pl. Opp. to Def. Taylor's Mot. for S.J. at Parts I.A-D (incorporated herein by reference).)

Likewise, if Taylor's testimony set forth above is credited, the record also shows that Boisseau knew that the Marsh statement was false, and not only concealed the truth but affirmatively lied to make it appear reliable to support a finding of probable cause, thereby taking an affirmative step that led to Waters' wrongful arrest and prosecution. Thus, like Taylor, Boisseau is liable for violating Waters' 4th and 14th Amendment rights to be free from malicious prosecution. (*See* Pl. Opp. to Def. Taylor's Mot. for S.J. at Parts III.A-C (incorporated herein by reference).)

II.  **Boisseau Is Liable as a Supervisor Due to the Affirmative Link Between His Deliberate Indifference and Taylor's Constitutional Violations**

Boisseau may also be held liable as a supervisor for defendant Taylor's constitutional violations if his own "conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others," as long as there is "an 'affirmative link' between the street-level misconduct and the action, or inaction, of supervisory officials." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989) (citations omitted). Supervisory liability "does not require a showing that the supervisor had actual knowledge of the offending behavior; he 'may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness.'" *Camilo-Robles v. Toledo-Davila*, 151 F.3d 1, 7 (1st Cir. 1998) (quoting *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994)).

The expertise of plaintiff's police practices expert, Lou Reiter, has been repeatedly recognized by the First Circuit. *See Gutierrez-Rodriguez*, 882 F.2d at 563-66; *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991); *Bordanaro v. McLeod*, 871 F.2d 1151, 1160 (1st Cir. 1989).

As Mr. Reiter opined, Taylor's conduct involved "egregious departures from reasonable and generally accepted police investigative practices," and these lapses were entirely foreseeable. (SDF ¶374.) Thus, "[a]ny reasonable police supervisory officer would have vigilant oversight over this type of investigation being conducted by an investigator with no homicide experience." (SDF ¶375.)

As set forth above, Boisseau knew Taylor was overstepping the bounds of her qualifications and her authority, but let her have free rein. "With even the minimal amount of proper supervision ... it is unlikely that [Taylor] would have been in" a position to trample Waters' constitutional rights. *Gutierrez-Rodriguez*, 882 F.2d at 564. Boisseau was well aware of the risks in letting her take the lead in this homicide investigation – and had specific knowledge of facts that completely refuted the evidence Taylor obtained – but chose not to step in. Moreover, Boisseau's failure to come forward and inform Taylor and Connors – much less Fahey – of the serious problems with Marsh's statement before it was used as the basis for Waters' arrest is all the more egregious given Boisseau's knowledge that Chief Connors was unfamiliar with the underlying facts of the case (SDF ¶122), coupled with Boisseau's preexisting concerns about Taylor's doing work she was unqualified and unauthorized to do. This is the essence of deliberate indifference, and Boisseau must be held liable for it. *See Camilo-Robles*, 151 F.3d at 7; *Maldonado-Denis*, 23 F.3d at 582.

**III.    Boisseau Is Not Entitled to Qualifed Immunity as He Violated Clearly Established Law and Could Not Have Reasonably Believed It Was Lawful to Allow a Subordinate to Use False Evidence to Arrest and Prosecute an Innocent Man Without Disclosing the Truth**

As set forth above, under Boisseau's nose, Taylor violated Waters' clearly established constitutional rights when she suppressed fingerprint exclusions, alibi time cards and evidence of her own misconduct; when she manufacturing incriminating statements by browbeating two key witnesses; and when she misled the prosecutor and the grand jury in order to arrest and prosecute

Waters without even arguable probable cause. *See, e.g.*, *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004) ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction).") (citation omitted); *id.* at 47-48 (citing *Smith v. Florida*, 410 F.2d 1349, 1350-51 (5th Cir.1969) (police violate the right described in *Mooney* if they suborn perjury even though they do so without the prosecutor's knowledge).

It is "well settled that a deliberately indifferent police supervisor may be held liable for the constitutional violations of his subordinates." *Camilo-Robles* 151 F.3d at 6; *see also Diaz v. Martinez,* 112 F.3d 1, 4 (1st Cir. 1997). Ultimately then, whether Boisseau is entitled to qualified immunity as a supervisor boils down to "the test of objective legal reasonableness," which "necessarily depends upon the relationship between [Boisseau's] acts and omissions and [Taylor's] conduct." *Camilo-Robles*, 151 F.3d at 6. Qualified immunity must be denied if Boisseau "should reasonably have understood that his conduct jeopardized [Waters'] rights." *Id.* at 7.

Where, as here, there is a strong affirmative link between Boisseau's inaction and Taylor's unconstitutional acts, Boisseau cannot plausibly claim he was objectively reasonable in believing he was acting lawfully. *See id.* at 14. This is particularly true given how closely APD policy tracked supervisory liability, specifying that Lieutenants were to be held "accountable for the actions or omissions of officers and civilians under his supervision which are contrary to departmental regulations and which would have been avoided if he had been properly executing his supervisory responsibilities." (SDF ¶144.) Thus, Boisseau was on notice that he could be held accountable for

Taylor's misconduct, yet by his own admission did nothing to adequately supervise her.

Just as in *Limone v. U.S.*, "it is inaccurate to characterize what happened here as an exercise of supervisory judgment at all." 497 F. Supp.2d 143, 232 (D. Mass. 2007). That is,

> In the face of blatant, ongoing, horrific misconduct that crossed the line into illegality, [Boisseau] did not merely take insufficient or incompetent action; [Boisseau] did not take delayed or selective action; [Boisseau] did not overlook particular instances of misconduct; [he] simply walked away from [his] responsibilities altogether. No stretch of supervisory discretion allows the complete abandonment of the supervisory role.

*Id.* at 232-33. It was clearly established that supervisors would be held liable for their deliberate indifference to and personal participation in each of these constitutional violations because they were aware of the risks but failed to do anything about it. *See Rizzo v. Goode*, 423 U.S. 362 (1976); *Camilo-Robles*, 151 F.3d at 11 (rejecting supervisors' qualified immunity defense where evidence showed that supervisors had the authority to reassign the subordinate and knew the subordinate posed a risk of harm but "failed to take readily apparent steps to alleviate that risk" in "reckless disregard for the rights of others...."). Boisseau's claim to qualified immunity must be rejected.

### IV. Boisseau Is Also Liable Under State Law

Boisseau was involved in the Brow investigation from the beginning and, if Taylor's testimony is credited, not only concealed his knowledge that the Marsh statement was false, but affirmatively lied to bolster its reliability to support Waters' wrongful arrest and prosecution. For the reasons set forth in plaintiff's opposition to Taylor's summary judgment motion (*see* Part IV), Boisseau's motion should be denied as to the state-law claims as well.

### CONCLUSION

For the foregoing reasons, defendant Boisseau's motion for summary judgment must be denied.

Dated: May 27, 2008  Respectfully submitted,
New York, NY

/s/ Deborah L. Cornwall
Barry C. Scheck (BS 4612)
Deborah L. Cornwall (DC 2186)
Monica Shah (MS 9846)
COCHRAN NEUFELD & SCHECK, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Tel. (212) 965-9081 / Fax (212) 965-9084

Robert N. Feldman (BBO # 630734)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210-1108
Tel. (617) 307-6130 / Fax (617) 307-6101

***Attorneys for Plaintiff Betty Anne Waters***

**CERTIFICATE OF SERVICE**

   I, Monica R. Shah, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via overnight delivery to those indicated as non-registered participants on May 27, 2008 as well as:

Joseph L. Tehan, Jr.
Gregg J. Corbo
Jeffrey T. Blake
Kopelman & Paige, PC
101 Arch Street, 12th Floor
Boston, MA 02110

              /s/ Monica R. Shah
              Monica R. Shah