UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| BETTY ANNE WATERS, as Administratrix of the Estate of KENNETH WATERS, ) ) ) ) | Case No. 04 10521 (GAO) (JGD) |
| Plaintiff, ) | **PLAINTIFF'S MEMORANDUM** |
| v. ) | **IN OPPOSITION TO DEFENDANT** |
| ) | **TOWN OF AYER'S MOTION FOR** |
| TOWN OF AYER, NANCY TAYLOR- ) | **SUMMARY JUDGMENT** |
| HARRIS, in her individual capacity, ARTHUR ) | |
| BOISSEAU, in his individual capacity, ) | |
| WILLIAM ADAMSON, in his individual ) | |
| capacity, PHILIP L. CONNORS, in his ) | |
| individual capacity, ) | |
| ) | |
| Defendants. ) | |

_____

## INTRODUCTION

On May 11, 1983, Kenneth Waters was wrongly convicted of the brutal murder and armed robbery of Katherina Brow in her trailer home in Ayer, Massachusetts. He was sentenced to life imprisonment the next day and spent the next eighteen years in prison until DNA testing of blood found at the crime scene proved beyond any doubt that he was actually innocent of the crime. The Middlesex County District Attorney's Office promptly consented to Waters' release from prison. He was released on March 13, 2001; all charges were dismissed by *nolle prosequi* on June 28, 2001.

This tragedy would have been avoided but for the patently unconstitutional investigative misconduct committed by defendants Lt. Arthur Boisseau and Nancy Taylor, the woefully unqualified police secretary and clerk/dispatcher whom the Town of Ayer (hereinafter, "Ayer"), through its final policymakers including defendant Chief Philip Connors, put in charge of the Brow homicide investigation with no supervision. The 42 U.S.C. § 1983 claim against Ayer alleges in

1

relevant part that, for years prior to and during this investigation, the custom and practice of Ayer's Police Department ("APD") was to abdicate its supervisory responsibility over police personnel in felony investigations, creating a dysfunctional environment defined by pervasive misconduct – including rampant suppression and spoliation of evidence, subornation of perjury and coercing or inducing false testimony, and fabrication of evidence – misconduct which Ayer's final policymakers were on notice of, but never seriously investigated, much less remediated, and which led inexorably to Waters' unconstitutional arrest, prosecution and conviction for a crime he did not commit.[1]

Crediting the evidence presented by plaintiff Betty Anne Waters, Kenneth's sister and the administratrix of his estate, and drawing all reasonable inferences in her favor, as is required here, a reasonable jury could find Ayer liable for its deliberate indifference to the persistence of the foregoing customs, each of which posed an obvious risk of violating criminal suspects' constitutional rights. As set forth below and in plaintiff's memoranda in opposition to the motions filed by individual defendants Taylor, Boisseau and Connors, which are hereby incorporated by reference, these material factual disputes are fatal to Ayer's motion for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate only if the full record discloses "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). Once the moving party has satisfied its burden, the burden shifts to the nonmoving party to set forth specific facts

---

[1] To the extent that it was alleged in Count VI of the Amended Complaint, plaintiff now withdraws the improper hiring claim. All facts pertinent to this memorandum are set forth in plaintiff's Statement of Disputed Facts ("SDF"), incorporated herein by reference.

showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court must "construe the evidence in the light most flattering to the nonmovant[] ... and indulge all reasonable inferences in [her] favor." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006). Simply put, "[t]he nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." *Id.*

Thus, "the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). "[W]hen facts, though undisputed, are capable of supporting conflicting yet plausible inferences – inferences that are capable of leading a rational factfinder to different outcomes in a litigated matter depending on which of them the factfinder draws – then the choice between those inferences is not for the court on summary judgment." *In re Varrasso*, 37 F.3d 760, 764 (1st Cir. 1994).

## ARGUMENT

### I.    Ayer is Liable for the Deprivation of Waters' 4th and 14th Amendment Rights

A municipality may be held liable under § 1983 for constitutional violations committed by its officers where those constitutional deprivations are caused by municipal policy or custom. *See Monell v. N.Y. City Dep't of Soc. Servs.,* 436 U.S. 658, 694, 690-91 (1978). Where, as here, the *Monell* claim is premised on an unwritten custom, "the custom is fairly attributable to the municipality" when it is "'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" *Baron v. Suffolk County Sheriff's Dep't*, 402 F.3d 225, 236 (1st Cir. 2005) (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989)).

3

In other words, municipal liability will exist where a custom is identified that "reflects deliberate indifference to the risk that a violation of a particular constitutional . . . right will follow the decision." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 411 (1997). A town's failure to act, such as the failure to adequately supervise its police, qualifies as deliberate indifference when the omission "reflects a 'deliberate' or 'conscious' choice" to run the risk of constitutional violations. *City of Canton v. Harris*, 489 U.S. 378, 389-90 (1989). Thus, the "continued adherence to an approach that [policymakers] know *or should know* has failed to prevent tortious conduct by employees may establish conscious disregard for the consequences of their action – 'the deliberate indifference' – necessary to trigger municipal liability." *Id.* at 407 (emphasis added).

*Monell* liability involves more than merely employing tortfeasors; to withstand summary judgment, plaintiffs must show the municipal custom was "the moving force of the constitutional violation." *Monell,* 436 U.S. at 694; *see also City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985) ("At the very least there must be an affirmative link between the policy [or custom] and the particular constitutional violation alleged."); *Young v. City of Providence*, 404 F.3d 4, 26, 29 (1st Cir. 2005) (holding that *Monell* causation was established where plaintiff could show that the policies in question were a "cause[] – at least in part" of the constitutional violations).

As set forth below, viewing the record in the light most favorable to plaintiff, a reasonable jury could find that the Board and Connors were on notice of Ayer's custom and practice of failing to adequately supervise and oversee felony investigations such that employees like Taylor and Boisseau were permitted to engage in the pervasive investigative misconduct that defined the environment of the APD, yet did nothing to remedy the inadequate supervision and oversight, nor did they discipline or even bother to meaningfully investigate allegations of misconduct. A

4

reasonable jury could further conclude that if the Board or Connors had corrected these systemic supervisory deficiencies and the specific customs, patterns, and practices of misconduct that emerged from them, Taylor never would have been in a position to trample Waters' constitutional rights by suppressing favorable evidence from the prosecutor, giving false testimony, suborning perjury or by coercing, inducing and manufacturing false evidence against him. These pervasive customs were the moving force behind the deprivations of Waters' constitutional rights.

A.      **The Ayer Board of Selectmen Delegated Final Policymaker Status for Police Supervision and Investigations to Ayer's Police Chiefs**

Contrary to Ayer's claim (Doc. 161 at 6), as set forth below, the Board was on specific and constructive notice of the customs, patterns, and practices of woefully inadequate supervision and specific investigative misconduct before Waters' arrest and prosecution, but did nothing to remedy them despite the obvious risk to citizens' constitutional rights. However, *Monell* liability may also be premised on Chief Connors' deliberate indifference, as the record shows that the Board delegated final policymaker authority to the chief of police pursuant to state law.

Massachusetts law authorizes the Town's Board of Selectmen to establish the police force, appoint the chief, remove officers for cause, and issue regulations pertaining to the department. M.G.L. c. 41, § 97; (SDF ¶319). However, state law also authorizes the Board to delegate policy-making authority to the police chief. *See Woodley v. Town of Nantucket*, 645 F. Supp. 1365, 1376 (D. Mass. 1986) (recognizing police chief's "role is defined not simply by his day-to-day management of the police force but also by his authority under a state statute which authorizes local governments to delegate policymaking authority to chiefs of police") (citing M.G.L. c. 41, § 97A). As the Supreme Court recognizes, "the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level." *Pembaur v. City of Cincinnati*,

5

475 U.S. 469, 480 (1986). Thus, despite Ayer's claim that the Board was the only relevant final policymaker (Doc. 161 at 6), Ayer's police chiefs qualify as final policymakers for the conduct at issue here if the Board "delegated" that authority to them. *Id.* at 483.[2]

In fact, the Board did delegate authority to the chiefs. Francis Callahan, a Board member during the Brow investigation, explicitly acknowledged that the Board delegated all pertinent policymaking law enforcement authority to Ayer's police chiefs. (SDF ¶320.) Specifically, Callahan agreed that the Board delegated or left to the chief's discretion hiring, assignments and oversight of individual police and special officers; law enforcement generally, including the use of informants during investigations; and investigating allegations of police misconduct. (*Id.*)[3]

Mr. Callahan's testimony is consistent with the APD's own written policies, which repeatedly refer to the Board as the "Appointing Authority" and the Chief as the "chief administrative officer of the Department and the final departmental authority in all matters of policy, operations and discipline." (SDF ¶321.) Moreover, APD policy provides:

> Through the Chief of Police the Department is responsible for the enforcement of all laws coming within its legal jurisdiction. The Chief of Police is responsible for planning, directing, coordinating, controlling and staffing all activities of the Department. He is also responsible for ... the enforcement of rules and regulations within the Department, for the completion and forwarding of such reports as may be required by proper authority and for the Departments' relations with local citizens, the local government and other related agencies. The Chief is responsible for training of all members of the department.

(SDF ¶322.) Thus, despite Ayer's claim, as a matter of state law and the Board's practices in the 1980s, Ayer's police chiefs were also final policymakers for the purposes of this action.

_____

[2] In custom cases like this one, the 1st Circuit "has sometimes referred to policymakers in the plural, rather than to a final policymaker," so this Court need not identify a single, final policymaker. *Baron*, 402 F.3d at 241 (citing *Silva v. Worden*, 130 F.3d 26, 32 (1st Cir. 1997)).

[3] The Board had no role with respect to the training of police officers. (SDF ¶320.)

6

**B.    Taylor and Boisseau Violated Waters' 4th and 14th Amendment Rights**

Ayer first claims that there is insufficient evidence of any underlying constitutional violation to support a *Monell* claim. (Doc. 161 at 5.) However, as set forth in plaintiff's memoranda in opposition to Taylor's and Boisseau's summary judgment motions, incorporated herein by reference, there is overwhelming evidence that Taylor and Boisseau suppressed favorable evidence, that Taylor fabricated evidence, and that this wrongdoing instigated Waters' arrest, prosecution, unfair trial and conviction, in violation of Waters' 4th and 14th Amendment rights. (*See* Pl. Opp. to Def. Taylor's Mot. for S.J.; Pl. Opp. to. Def. Boisseau's Mot. For S.J.)

**C.    Chiefs Adamson, Boisseau and Connors were on Notice of but Deliberately Indifferent to Ayer's Unconstitutional Customs**

Ayer's total abdication of supervisory responsibility, by and through its final policymakers, led to widespread investigative practices that obviously risked violating suspects' constitutional rights. Indeed, plaintiff's police practices expert, former Deputy Chief of the Los Angeles Police Department Lou Reiter, testified that, in his 35 years in law enforcement, he has never seen such a rash of police misconduct incidents in such a small department. (SDF ¶372.) In Ayer, elementary investigatory standards as reflected in the Municipal Policy Institute policies, which the APD formally adopted – policies enacted in large part to protect suspects' constitutional rights (*see* SDF ¶¶309, 371) – were flouted, flagrantly and repeatedly, from Adamson's tenure as Chief through Boisseau's, through Connors.' Officers' "[r]efusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988). Moreover, while each of the Chiefs had notice of these pervasive acts of investigative misconduct, neither Adamson, Boisseau, nor Connors did anything to remedy the situation. Indeed, Mr. Reiter opines that, even when investigations were

7

undertaken, they were "perfunctory and extremely deficient." (SDF ¶347.) As set forth below, these widespread customs were the moving force of Waters' 4th and 14th Amendment deprivations.

### 1.    Custom and Practice of the Suppression and Spoliation of Evidence

As set forth in detail in plaintiff's memorandum in opposition to defendant Taylor's summary judgment motion, during the course of the Brow investigation (and under the tenure of all three Chiefs), Ayer officers knew about but destroyed or failed to document and disclose evidence critical to Waters' defense, including: 1) reports documenting the existence of usable prints from the crime scene and Waters' exclusion as the source of a probative latent print – a fingerprint in blood – as early as 1980; 2) Waters' alibi time cards, which a reasonable jury could find were obtained within days of the crime in 1980 under Adamson and/or in the fall of 1982 under Connors; and 3) the fact that false testimony of the prosecution's two key witnesses had been induced by coercion, threats, promises and rewards in 1982 and 1983 during Connors' tenure as chief. (*See* Pl. Opp. to Def. Taylor's Mot. for S.J. at 7-37.) Taylor was responsible for the spoliation of a ring the prosecution claimed Waters stole from the victim and then sold to her friend Adi Ogden, which could not have belonged to the victim because it was not her size and had an engraving ("WARR") that was not on the victim's ring, and thus had nothing to do with the crime. (*See* SDF ¶¶302-11.) Taylor testified she returned the ring to Ogden at Adamson's direction. (SDF ¶310.)

Ayer's written evidence-handling policy directed officers to preserve items of potential value to the investigation so they would be available to be offered as evidence at trial. (SDF ¶306.) Lt. Boisseau testified that he made sure that all subordinate officers were aware of the policies regarding chain of custody and handling of evidence, specifically that any item of even conceivable relationship to a homicide prosecution should be preserved, logged in, and reported. (SDF ¶307.)

But Taylor testified that, in all her years working at the APD, she had no idea there were any written policies governing investigations, handling of evidence, or interactions with witnesses and informants. (SDF ¶308.)  Indeed, there was no requirement that officers sign to indicate receipt or review of APD manuals, nor was there any other documentation that officers received them.  (*Id.*)  As Mr. Reiter opines, Taylor's testimony is "indicative of a failure of Ayer Chiefs and police managers to ensure that all police personnel were aware of these important guidelines designed to ensure proper policing and the protection of citizen rights."  (SDF ¶309.)  Even if officers knew about the written policies requiring strict adherence to chain-of-custody procedures, as Boisseau claims, in practice, he led by example, taking home his crime-scene negatives from the Brow investigation and finding them only 20 years later during the course of discovery in this action.  (SDF ¶340.)  That the evidence officer conducted himself thusly made it was clear to everyone else that observing the written policy was the exception rather than the rule.

Despite Ayer's attempt to argue otherwise (Doc. 161 at 8), the cumulative evidence of suppression and spoliation of evidence in this case alone in 1982 and 1983 is enough to demonstrate the existence of an unconstitutional custom.  *See, e.g., Baron,* 402 F.3d at 238-39 (finding serial misconduct directed at single victim established custom); *Blair v. City of Pomona*, 223 F.3d 1074, 1079-80 (9th Cir. 2000) (holding that police whistleblower's testimony that he was subjected to ongoing harassment was sufficient evidence of custom to withstand summary judgment).

However, the pattern of suppressing or failing to preserve evidence critical to criminal investigations during the Brow investigation was not isolated; rather, it was consistent with the APD's pre-existing custom under Adamson's tenure as Chief, a custom which, as a matter of daily reality, made a mockery of the APD's written evidence-handling-and-preservation policy requiring

that "[a]ll physical evidence in police department custody . . . be kept securely under lock and key." (SDF ¶338.)  For example, in connection with the vandalism at Ties Construction on February 25, 1980, APD Officer Stanley Randall found a knife, which he collected, bagged as evidence, and personally turned over to Lt. Boisseau, the evidence officer.  (SDF ¶331.)   But before the knife could be examined for fingerprints or other identifying marks that could have incriminated other Ayer officers, "all of a sudden it disappeared." (*Id.*)  Boisseau's only explanation was that the knife "must have gotten tossed out or something" or "got misplaced;" it was never seen again.  (*Id.*)  As expert Lou Reiter opines, this lapse indicated an ongoing pattern of "evidence collection and control deficiencies."  (SDF ¶342.)  Indeed, Ayer's daily logs reflect a pattern of inadequate evidence handling in which, for example, items were left on Boisseau's desk or "placed on the floor" rather than "under lock and key" pursuant to written policy.  (SDF ¶¶332-33.)

In the midst of the public outcry that APD officers may have been responsible for the Ties vandalism, and that some of the officers involved had stolen or destroyed evidence, Chief Adamson issued a press release in October 1981, in which he acknowledged that "the Ayer police department facility is not and never has been a secure, totally controlled physically facility," but in fact was regularly accessed by "civilians . . . who had no legitimate reason for being there." (SDF ¶334.) Adamson's admission is probative evidence of serious systemic failures in the department's evidence-handling procedures and also establishes that both he and the Board were on notice of these deficiencies well before Waters' arrest and prosecution.[4]

---

[4] Both Adamson's statement, as well as Connors', *see infra*, were made in their capacities as Ayer's police chiefs, and thus are non-hearsay party admissions.  *See* Fed. R. Evid. 801(d)(2)(C). Moreover, these statements, as well as the content of the press releases and news accounts cited herein, are also admissible to establish Ayer policymakers' actual and constructive notice of pervasive misconduct.  *See Davis v. Carter,* 452 F.3d 686, 693 n.5 (7th Cir. 2006) (out-of-court statements admissible for non hearsay purpose of establishing defendant's notice and knowledge); *Amnesty*

Chief Connors was hired in 1982, in large part to remedy these practices. (*See* SDF ¶¶7, 17.) The circumstances of Adamson's forced resignation due to the Ties scandal put Connors on notice of the department's widespread problems, and he acknowledged specific notice of failures in evidence handling soon after joining the force. (SDF ¶336.) The local newspaper, the Ayer *Public Spirit*, reported on July 15, 1982 that Connors viewed the loss of the knife Randall had collected in the Ties investigation as proving the need for a new APD evidence room. The paper quoted him as saying, "[t]he way evidence is secured here or was prior to my arrival, is different from my opinion of proper security." (*Id.*; *see also* SDF ¶335.)

Yet, while Connors made some efforts to root out criminal elements on the force, there is no evidence that he meaningfully reformed the APD's sub-par evidence-handling practices. In yet another allegation arising out of the Ties investigation, APD Officers Smith and Kidder reported on August 30, 1982 that former officer Jack McAdam told them he, Officer MacDonald, and several officers who had left the APD in connection with the Ties matter, all had practiced seizing marijuana from suspects "for their own personal use." (SDF ¶345.) Although this practice was not only potentially criminal, and also directly implicated the department's evidentiary practices, there is no evidence that Connors ever investigated the allegation, much less disciplined MacDonald, who, along with Taylor, arrested Waters for the Brow murder soon thereafter. (SDF ¶213.)

As Mr. Reiter observes, "[e]vidence during any investigation is known to have a high degree of potential of being exculpatory. Systemic failures to adhere to reasonable and generally accepted

---

*International v. Town of West Hartford*, 361 F.3d 113, 132 n.13 (2d Cir. 2004); *Stevens v. Moore Business Forms, Inc.*, 18 F.3d 1443, 1449 (9th Cir. 1994) (same); *Kunz v. Utah Power & Light Co.*, 913 F.2d 599, 605 (9th Cir. 1990) (same); *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 686 (11th Cir. 1984) (same); *Chapman ex rel. Estate of Chapman v. Bernard's Inc.*, 167 F. Supp. 2d 406, 419-20 (D. Mass. 2001). Adamson's press release and other contemporaneous newspaper articles are also admissible as ancient documents, as they were all published more than twenty years ago. *See* Fed. R. Evid. 803(16).

policies and practices to safeguard this evidence would be known to create the high possibility for wrongful convictions and prosecutions." (SDF ¶344.) Despite this known risk, the failure to document or disclose favorable evidence continued during the Brow investigation on Chief Connors' watch. (*See* Pl. Opp. to Def. Taylor's Mot. for S.J.; SDF ¶¶308, 340-47.)

Thus, Ayer, by and through its final policymaker Connors, was deliberately indifferent to the known and obvious risk that, given the APD's shoddy evidence-handling practices, APD officers, who were confronted on a *regular basis* with the critical task of documenting and disclosing evidence to prosecutors in criminal cases, would perform their investigative tasks in a constitutionally deficient manner. *See City of Canton*, 489 U.S. at 390 & n.10; *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) ("In their investigative capacities, police officers regularly uncover exculpatory materials. The Supreme Court has laid down very specific obligations of police officers on the disclosure of exculpatory materials. Widespread officer ignorance on the proper handling of exculpatory materials would have the highly predictable consequence of due process violations.") (internal quotations and citations omitted).

### 2.    Custom of Fabricating False Evidence and Suborning Perjury by Using Coercion, Promises, or Inducements Against Witnesses

Ayer police repeatedly fabricated evidence and sponsored perjury in the Brow investigation by engaging in coercive and abusive conduct in connection with Brenda Marsh and then Roseanna Perry – not to mention Taylor's own lies before the grand jury in this case. (*See* Pl. Opp. to Def. Taylor's Mot. for S.J. at 8, 23-28, 38-41; SDF ¶¶227-33, 348.) In addition, the criminal trial transcripts reflect that Taylor had promised to, and actually did put in a good word for Roseanna Perry with the Providence police, but Taylor never disclosed this valuable impeachment information to the prosecutor until after the jury convicted. (SDF ¶¶313-18.)

The multiple instances of coercing or otherwise inducing false testimony from witnesses in this case alone is sufficient to establish an unconstitutional custom. *See, e.g., Baron,* 402 F.3d at 238-39; *Blair,* 223 F.3d at 1079-80. Indeed, when Chief Connors himself took part in such misconduct, as he did with Marsh (either by actively participating in the coercion or, as a supervisor, watching it happen), he not only subjected himself to personal supervisory liability but also, as the Town's final policymaker for law enforcement matters, exhibited deliberate indifference that rendered the Town liable, even for a single act. *See Pembaur,* 475 U.S. at 480 ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."); *Roma Construction Co. v. Russo,* 96 F.3d 566, 576 (1st Cir. 1996) ("An unconstitutional policy or custom may be inferred from a single decision or act ... [but] the isolated action must be taken by a municipal official with 'final policy-making authority' in the relevant area of the city's business." (citation and quotation marks omitted)); *Kinkus v. Village of Yorkville,* 476 F. Supp. 2d 829, 844 (S.D. Oh. 2007) (finding that single decision by chief to make or ratify a charging decision, which the court had previously held violated the plaintiff's constitutional rights, was sufficient to establish city policy).

Again, however, there is evidence above and beyond the Brow investigation that pressuring witnesses and suborning perjury was simply "the way things are done and have been done" at the APD. *Russo,* 96 F.3d at 576 (quoting *Kibbe v. Springfield,* 777 F.2d 801, 806 (1st Cir. 1985)). Mr. Reiter opines that the following "egregious, deliberate choices" reflect a "practice and pattern of egregious investigative conduct" in Ayer (SDF ¶369):

###### a.        **Coercion of the Juvenile Complainant Against Officer Downing**

In the early 1980s, then-Ayer officer Ernest Downing was charged by another Ayer officer,

Dominic Pugh, with committing unnatural and lascivious acts with a minor.  At the jury trial in 1981, the alleged victim, who had been jailed by the Ayer Police on pending criminal charges, testified for the prosecution and was impeached with a letter he had written admitting that he had lied because Ayer cops "scared me with questions and said if I didn't answer them, they would put me away," and a Christmas card he sent to Downing in which he apologized for "lying."  (SDF ¶352.)  From this evidence and Downing's acquittal (SDF ¶354), a reasonable jury could infer that the charges were false from their inception, the result of coercive and abusive police practices.

The Board issued a press release soon after Downing's acquittal, stating that the Board met with Chief Adamson and concluded that they would "begin immediately dealing with the cause of disharmony in the Ayer Police Department," and warning that "[a]ny and all officers whose conduct, actions or comments are contrary to what we expect of an Ayer police officer will be dealt with ...." (SDF ¶355.)  The press release proves that the Board and its delegated final policymaker, Adamson, were on notice of the allegations that APD officers had coerced a witness and suborned false testimony.  Yet, rather than rooting out these corrupt investigative practices, or even investigating them, as described below, Adamson targeted APD Officer Randall, who had testified on Downing's behalf and corroborated the defense theory that Downing was being punished by a rival camp within the department for exposing corruption in connection with Ties. (SDF ¶353; *see also* ¶356.)

### b.    Fabricated Charges Against Officer Randall

Rather than addressing the allegations of investigative misconduct within the department, Adamson charged Randall with violating APD policy, in part, for his testimony at Downing's trial. (SDF ¶356.)  As the Ayer *Public Spirit* reported, Randall claimed the charges were baseless and brought solely to retaliate for exposing the role of Ayer police officers and Chief Adamson's son,

William Adamson, Jr., in the Ties vandalism. (*Id.*) At the October 13, 1981 hearing on the charges, the Board credited Randall's statement that his Downing testimony was truthful, dropping charges for lack of evidence. (SDF ¶358.)

Within two weeks of the Board hearing, Randall was conveniently charged with rape arising out of an incident alleged to have taken place two months earlier, on August 31st. (SDF ¶360.) Although the incident had allegedly occurred in Acton, not Ayer, the complainant reported it to Taylor at her home on October 21, 1981. (SDF ¶361.) Taylor now claims that she immediately realized that this charge presented a conflict of interest for Adamson and herself because Randall was making corruption charges against Adamson's son and other Ayer officers with respect to Ties. At her deposition, Taylor took great pains to explain that she cautioned Adamson that the two of them perhaps should not interview the rape complainant, L. Frawley. Taylor then emphasized that, although she interviewed Frawley, she ended the interview upon learning the incident was alleged to have taken place in a neighboring town, where Taylor directed Frawley to go because Taylor could have nothing more to do with the case, and "never saw [her] again, nor talked to [her]." (SDF ¶362.) However, Taylor's report of these events[5] shows that her current account of them is false. Taylor's report reveals that, days later, she had a three-hour meeting with Frawley, and promised to accompany her through criminal proceedings if she filed charges against Randall. (SDF ¶363.) Again, Taylor lied to conceal her intimate involvement with the filing of baseless charges.

Randall was arrested by the Acton Police Department and charged with the rape, but the charges were dismissed "at the complainant's request" soon thereafter. (SDF ¶364.) Considering

---

[5] Taylor's deposition was completed on May 18, 2007 (SDF Ex. 19); the Court granted plaintiff's motion to compel *Monell* evidence including this report on May 23, 2007 (Doc. 93).

the historical context in which the criminal charges were filed, their immediate withdrawal, and Taylor's attempt to distance herself from the case, a reasonable jury could find that Taylor took part in encouraging a witness to file charges she knew were baseless.

Ayer attempts to distance itself from the damaging evidence related to the Downing and Randall investigations by claiming that the filing of complaints or lawsuits is insufficient to establish a custom because that evidence is inadmissible (Doc. 161 at 9), but this misstates the law.[6] Evidence of prior (and subsequent) complaints, allegations and incidents are routinely admitted in *Monell* cases. *See, e.g., Young*, 404 F.3d at 19. Specifically, evidence of other incidents – including even unadjudicated complaints – are relevant and admissible to show that the municipality was on notice of the need for better training or supervision, or that the day-to-day custom in the department was highly likely to lead to the violation of constitutional rights. *See id.*, 404 F.3d at 19 (in failure-to-train claim, noting that "Plaintiff presented numerous reports from police officers of past misidentifications of off-duty personnel in Providence, particularly involving minority officers, and thus, presented evidence that the department was on notice of a misidentification problem"); *Bordanaro*, 871 F.2d at 1161 (evidence of unconstitutional custom, and training and supervisory

---

[6] None of the three cases Ayer cites supports its claim that evidence of unadjudicated complaints is "inadmissible." (Doc. 161 at 9.) *Kinan v. City of Brockton*, 876 F.2d 1029, 1034-35 (1st Cir. 1989), dealt with the admissibility of a *post-hoc* internal affairs report about the incident in question, not evidence pertaining to other similar incidents of misconduct. In *Strauss v. City of Chicago*, the plaintiff offered statistical summaries of complaints in opposing a motion to dismiss; the court there was not addressing the admissibility of evidence on summary judgment or at trial. 760 F.2d 765, 768-69 (7th Cir. 1985). Nonetheless, the Seventh Circuit noted that "the type of information plaintiff provided us could furnish the necessary foundation to allege a 'pattern of conduct or a series of acts' in support of *Monell* liability, if more context were provided about the nature of the conduct underlying the complaints." *Id.* Finally, the issue in *Bryant v. Whelan,* 759 F. Supp. 410 (N.D. Ill. 1991), was whether statistical evidence was dispositive proof of municipal liability, not whether evidence of unadjudicated complaints was admissible; indeed, the Court implicitly found that it was admissible. 759 F. Supp. at 424 ("the fact that a low percentage of cases are ultimately sustained cannot in and of itself be read to establish a policy of indifference.").

lapses included fact that policymakers "had received complaints from Everett officers concerning inadequate police training and the dangers that this presented to civilians" both prior to and after the incident in question).[7]  Thus, the Downing and Randall proof is relevant and admissible here to prove both notice and Ayer's custom of coercing or inducing witnesses to make false statements.[8]

### c.    Undisclosed Inducement to the Complainant Against Dennis Maher

In a second case Taylor investigated that led to a wrongful conviction, Taylor arranged to have criminal assault charges against a rape victim dismissed in exchange for her continued cooperation as the complaining witness against Dennis Maher, who was later exonerated on the basis of DNA evidence.  (SDF ¶349.)  This is precisely the sort of "promise, inducement or reward" police have a duty to disclose, and which A.D.A. Elizabeth Fahey pledged she would have disclosed as impeachment material regarding a witness or investigator had she known of it in the Brow case. (SDF ¶350.)  The prosecutor in *Maher*, Attorney J.W. Carney, has sworn in an affidavit that he had no knowledge of Taylor's deal with the victim, but that it should have been disclosed.  (SDF ¶351.)

The *Maher* case reveals strikingly similar misconduct post-dating Waters' conviction, and is admissible as "reliable insight into the policy in force at the time of the incident" relating to Waters.  *See Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991); *see also Bordanaro*, 871 F.2d at 1167 ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional rights."); *Henry v. County of Shasta,* 132 F.3d 512, 519

---

[7] In the supervisory liability context, the First Circuit has held that evidence of prior complaints – "*regardless of whether the complaints were true or false*" – are admissible and sufficient to establish that defendants were on notice of a problem of constitutional proportions.  *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 575 (1st Cir. 1989) (emphasis added).

[8] Defendants have moved to strike Mr. Reiter's expert report on the same grounds.  (Doc. 106.) Plaintiff adopts herein the arguments set forth in her memorandum opposing that motion.  (Doc. 164.)

(9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry."); *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1985) (holding that based on evidence that the policymaker's failure to reprimand or discharge the defendant officers, admit error, or otherwise change policy, "the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City").[9]

### 3.    Systemic Failure to Supervise and Oversee Criminal Investigations

Ayer claims that Chief Connors cleaned house after Chief Adamson was forced to retire amidst the Ties scandal, and therefore Ayer may not be held liable for any unconstitutional customs predating Connors' tenure since those customs had been eradicated before Waters' wrongful conviction.[10] (Doc. 161 at 2-3, 6.) In fact, however, Connors did nothing to remedy the systemic failure to supervise and oversee criminal investigations, which – as a consequence of this supervisory vacuum – were led by officers acting well beyond their qualifications and flouting policy and law with impunity.  Indeed, plaintiff's expert Lou Reiter opines that:

> The Ayer Police Department, in my opinion, had systemic deficiencies that created an environment conducive to Unconstitutional violations and the support and/or toleration of unprofessional, biased, and prejudicial policing conduct by its members.  The record in the materials discovered in this case indicate an on-going pattern of police employee misconduct and unprofessional conduct.  It would have been obvious to any reasonable police executive and manager that this unprofessional environment would create an obvious high risk of

---

[9] Likewise, while the allegations that Taylor and Sgt. Dennis MacDonald fabricated a false police report and falsely testified against Bruce Holdorff in January of 1984 post-dates Waters' conviction, APD officers' continued misconduct, as well as Connors' failure to adequately investigate or discipline them, is also relevant proof of Ayer's custom and practice of fabricating evidence, as well as the systemic supervision deficiencies, at the time of Waters' conviction. (*See* Defs. Ex. 51; Pl. Resp. to Defs. Stmt. of Material Undisputed Facts ¶¶158-60.)

[10] To the extent that Ayer argues that hiring a new chief, in and of itself, absolves it of *Monell* liability (*see* Doc. 106), plaintiff adopts herein her arguments in opposition.  (*See* Doc. 164 at 12-15.)

police misconduct and the strong potential for violations of citizens' rights. This environment of systemic agency and supervisory deficiencies could lead to police employees violating legal safeguards, departing from generally accepted police practices including investigative conduct, and taking shortcuts that any reasonable police officer or police manager would know could lead to erroneous investigative conclusions and could place citizens in harm's way for a wrongful arrest and prosecution.

(SDF ¶371.) These systemic supervisory deficiencies were neither remedied nor even investigated by Chief Connors once Adamson resigned, but were only exacerbated under his tenure. (SDF ¶346.)

Soon after Connors took over as chief in early 1982, Randall told him that he believed Nancy Taylor had attempted to frame him for a rape he did not commit, in retaliation for his role in exposing the corruption of other officers relating to the Ties incident. (SDF ¶367.) Thus, Connors was on specific notice that Nancy Taylor was alleged to have fabricated evidence in a criminal case to frame a fellow officer for a crime he did not commit – but Connors did nothing about it. (SDF ¶¶368, 370.)[11] In fact, Connors admitted, he never instituted any administrative investigation into those serious charges, and never disciplined Taylor for her role in the case. (SDF ¶368.)

Instead, despite his concerns that Taylor had been exceeding the scope of her duties as a special officer (SDF ¶¶126, 135-37), and notwithstanding the gravity of Randall's allegations, Connors went on to install Taylor as Ayer's lead investigator in the Brow investigation (SDF ¶¶140, 143). In that capacity, Taylor was in a position to commit multiple acts of misconduct, some in Connors' presence, which led to the conviction of an innocent man. (*See* Pl. Opp. to Def. Taylor Mot. for S.J. at 7-37, 38-41, 43-53; Pl. Opp. to Def. Connors Mot. for S.J. at 2-8; *see also* SDF ¶¶373-76.)

Ayer claims that, if Connors did not supervise Taylor, it was because A.D.A. Fahey or State

---

[11] Randall filed and ultimately settled a suit against Taylor, Ayer and others. (SDF ¶366.)

Police Lt. Dwyer did.  (Doc. 161 at 16.) Yet in her deposition, Fahey made it clear that she did not supervise Taylor's work, testifying that she assumed Taylor was supervised by the State Police; and there is no evidence that the State Police gave Taylor the kind of "close supervision" defendants' expert John Ford agreed she needed. (SDF ¶¶137, 203.)  Indeed, the documentation reflects that the State Police were hardly involved in the investigation between the early days after the crime and the days just before Waters' arrest.  (SDF ¶22.)  Most importantly, Fahey was explicitly depending on Taylor to provide her with information about all investigative activities conducted by Ayer officers, and all APD reports. (SDF ¶¶225, 235.)  The APD was directly communicating with Baliunas about the fingerprint evidence and excluding suspects.  (SDF ¶¶75, 79, 84, 102-17.)  The APD was the agency that prepared the exculpatory police reports regarding fingerprint exclusions that were suppressed in this case. (SDF ¶110, 113, 115.) The APD was the agency that collected the exculpatory time cards that inexplicably disappeared.  (SDF ¶¶53-71.)  Connors himself was present when Taylor coerced Marsh into giving patently false statements, such as the claim that Waters had a "long, deep, red scratch" on his cheek from his eye to his chin on the morning of the murder.  (SDF ¶¶170, 187.)  Thus, despite Ayer's attempt to shift responsibility to Fahey or the State Police, the most egregious constitutional violations were plainly Ayer's responsibility, and the responsibility to supervise Taylor rested with Connors. As Reiter opines, "There is no acceptable rationale for Chief Connors' failure to oversee this aspect of the investigative process and the duty of the Ayer Police Department to ensure the protection of everybody's rights during the subsequent prosecution of Kenneth Waters."  (SDF ¶376.)  Connors simply abdicated his duty.  Lacking any meaningful oversight, Taylor was free to suppress evidence critical to Waters' defense, browbeat witnesses into falsely testifying against Waters, and lie on the witness stand.

Taylor's unconstitutional fabrications and coverups were eminently foreseeable, absent the close supervision her inexperience warranted. (SDF ¶¶367, 371-76.) As Mr. Reiter found more generally, "Chief Connors failed to exercise reasonable supervisory oversight and control of the Brow murder investigation and arrest/prosecution of Kenneth Waters by Ms. Taylor. Any reasonable police supervisory officer would have known of the significant adverse consequences of failing to maintain constant and vigilant oversight over this type of investigation being conducted by an investigator with no homicide experience." (SDF ¶375.) Under these circumstances, the failure to supervise her is the essence of deliberate indifference.

### D. Ayer's Unconstitutional Customs Were the Moving Force Behind the Deprivation of Waters' Constitutional Rights

Ayer's systemic supervisory lapses were the moving force behind Taylor's misconduct, as none of it could have occurred if the APD followed its own stated policies for investigating felonies and supervising police personnel. (SDF ¶¶9, 124-26, 130, -31, 136-37, 141-44, 159-65, 168-69, 173, 174, 176, 178-79, 190-94, 198-99, 201, 216-22, 255, 264, 281-83, 302-17.) Taylor testified she had no idea that there were any written policies governing her conduct during all her years at the APD (SDF ¶308), an admission that demonstrates the utter failure of all three Ayer Chiefs – Adamson, Boisseau and Connors – to take the most minimal steps to protect the rights of criminal suspects who had the misfortune to cross paths with Ayer police. (SDF ¶309.)

"With even a minimal amount of proper supervision and discipline," *Gutierrez-Rodriguez*, 882 F.2d at 564, Taylor would not have been in a position to engage in the rampant misconduct that deprived Waters of his constitutional rights and his liberty. A reasonable jury could find that Connor's decision to allow Taylor to lead the Brow investigation, despite his specific knowledge that she was unqualified and unauthorized by the Board to do so – in and of itself – is sufficient to

establish Ayer's liability under *Monell*. *See Pembaur*, 475 U.S. at 480; *Roma Construction Co.,* 96 F.3d at 576; *Kinkus,* 476 F. Supp. 2d at 844.

Indeed, a "violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.... The high degree of predictability may also support an inference of causation – that the municipality's indifference led directly to the very consequence that was so predictable." *Bd. of County Comm'rs v. Brown*, 520 U.S. at 410. Thus, the substantial evidence of Ayer's deliberate indifference, by and through its final policymakers, to the obvious risk that its customs and practices would inevitably lead APD officers to violate suspects' constitutional rights also supports a finding that Ayer's practices were the "moving force" behind the constitutional violations committed by his officers. *See Monell*, 436 U.S. at 694; *Young*, 404 F.3d at 26, 29. Here, Ayer utterly failed – under Adamson, Boisseau and Connors – to ensure minimally adequate supervision in serious felony cases; proper evidence preservation or documentation or disclosure of favorable evidence; or appropriate non-coercive and non-suggestive questioning of witnesses. The failure to ensure that the APD's written polices were known and carried out in practice would obviously run the risk of violating criminal suspects' constitutional rights in precisely the ways Waters' rights were violated here. In short, Ayer's "dysfunctional agency environment with its systemic issues of police misconduct and supervisory failures . . . allowed the wrongful arrest and prosecution of Kenneth Waters." (SDF ¶377.)[12] The tragedy was foreseeable, and Ayer's Board and its Chiefs watched it happen without

---

[12] "Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion," *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1270 (9th Cir. 1994), and courts routinely rely on expert testimony to establish causation in *Monell* and supervisory liability cases, *see, e.g., Gutierrez-Rodriguez,* 882 F.2d at 566; *Allen v. Muskogee*, 119 F.3d 837, 843-44 (10th Cir. 1997); *Vineyard v. County of Murray*, 990 F.2d 1207, 1213 (11th Cir. 1993); *Russo v. City of Cincinnati,* 953 F.2d 1036, 1047 (6th Cir. 1992).

lifting a finger to stop it.

## CONCLUSION

For the foregoing reasons, defendant Ayer's summary judgment motion should be denied.

Dated: May 27, 2008  
      New York, NY

Respectfully submitted,

/s/ Deborah L. Cornwall  
Barry C. Scheck (BS 4612)  
Deborah L. Cornwall (DC 2186)  
Monica Shah (MS 9846)  
COCHRAN NEUFELD & SCHECK, LLP  
99 Hudson Street, 8th Floor  
New York, NY 10013  
Tel. (212) 965-9081 / Fax (212) 965-9084

Robert N. Feldman (BBO # 630734)  
BIRNBAUM & GODKIN, LLP  
280 Summer Street  
Boston, MA 02210-1108  
Tel. (617) 307-6130 / Fax (617) 307-6101

***Attorneys for Plaintiff Betty Anne Waters***

<u>**CERTIFICATE OF SERVICE**</u>

       I, Monica R. Shah, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via overnight delivery to those indicated as non-registered participants on May 27, 2008 as well as:

Joseph L. Tehan, Jr.
Gregg J. Corbo
Jeffrey T. Blake
Kopelman & Paige, PC
101 Arch Street, 12th Floor
Boston, MA 02110


                     /s/ Monica R. Shah
                     Monica R. Shah