UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
BETTY ANNE WATERS, as )
Administratrix of the Estate of )
KENNETH WATERS, )      Case No. 04 CV 10521 (GAO)(JGD)
                    Plaintiff, )
            v. )
)
TOWN OF AYER, NANCY TAYLOR- )      **PLAINTIFF'S MEMORANDUM**
HARRIS, in her individual capacity, )      **IN OPPOSITION TO DEFENDANT**
ARTHUR BOISSEAU, in his individual )      **TAYLOR'S MOTION FOR**
capacity, WILLIAM ADAMSON, in his )      **SUMMARY JUDGMENT**
individual capacity, and PHILIP L. )
CONNORS, in his individual capacity, )
)
                    Defendants. )
_____ )

## INTRODUCTION

Defendant Nancy Taylor was the driving force behind Kenneth Waters' twenty-year ordeal: his arrest, conviction and imprisonment for a murder he did not commit. When Taylor took over the investigation into the May 21, 1980 stabbing death of Katherina Brow, she was the Ayer police chief's secretary, a dispatcher, and a special officer with a limited appointment to take part in rape investigations under close supervision. Taylor was angling for more responsibility and higher pay when she singlehandedly made the case against Waters, despite the fact that he had been ruled out as a suspect years earlier. Taylor browbeat two of Waters' ex-girlfriends – who became the prosecution's star witnesses at trial – into making incriminating statements Taylor knew to be false, including the claim of witness Brenda Marsh that Waters had a "long deep red scratch" on his face, from his eye to his chin, notwithstanding the fact that police had interviewed Waters the day after

1

the murder and saw no scratch or laceration on his body. Taylor also concealed patently exculpatory evidence from the prosecution, including: a bloody fingerprint on a piece of a toaster found at the scene that did not match Waters and time cards verifying Waters' alibi that he had worked at the Park Street Diner until 8 a.m. and appeared at the Ayer District Court less than an hour later, where he remained until after Mrs. Brow's body was found. It does not take a police academy graduate to know that threatening witnesses with baseless criminal charges, lying, and covering up and destroying conclusive proof of innocence violates the most basic tenets of the Constitution. Based on this record, that is what any reasonable jury will find Taylor did.

## BACKGROUND[1]

Taylor followed Chief William Adamson, Sr. from the Pepperell Police Department to the Ayer Police Department ("APD") in 1977. (SDF ¶¶13,14.) The Ayer Board of Selectmen ("Board") appointed her to perform the same limited duties she had in Pepperell, as a clerk, dispatcher, and "special officer" detailed to interview rape and child abuse victims. (SDF ¶13.) Adamson, in a letter to the Board supporting a pay increase for Taylor in March of 1980, just two months before the murder, acknowledged that her job involved "mostly administrative work" such as "handling money, audit sheets for the Registry of Motor Vehicles . . ., typing of letters and other correspondence, the files and record system which if we have everyone handling will be fouled up in less than a week, and many other duties to [sic] numerous to list hereon." (SDF ¶129.) Taylor had ambitions to become a full-time patrol officer but did not attend the police academy until after Waters' conviction

---

[1] Facts for all summary judgment motions are set forth in Plaintiff's Statement of Disputed Facts ("SDF"), incorporated here by reference. Plaintiff withdraws Count IV, the § 1983 conspiracy claim.

in 1983. (SDF ¶15.)[2]

Despite the limitations of her role, Taylor constantly pushed to take on more and more investigative responsibility. She went to the Brow crime scene with Chief Adamson the day of the murder and was involved in the early investigation, even interviewing witnesses on her own in the field. (SDF ¶21,126.) Defendants Lt. Boisseau and Chief Connors, when he joined the force in February of 1982, both had concerns that she had been doing work well beyond the scope of her qualifications and her appointment from the Board. (SDF ¶126.)

By the fall of 1982, matters came to a head. In response to a union complaint that Taylor had been working open shifts that should by union contract be made available first to full-time officers, Connors reined her in. (SDF ¶132.) Taylor fought back, complaining in a September 21, 1981 letter to the Board that under Connors, "I have been ordered to refrain from performing the police duties that I have performed for the past five years. I feel your board has been aware of these duties during this five year period." She threatened to file a discrimination complaint if the matter was not resolved to her satisfaction. (SDF ¶133.) At a Board meeting that night, Taylor claimed to have investigated homicide cases from the very day of her employment (although she now admits that the Brow case was her first (SDF ¶¶15,134)); Board members acknowledged that she had been exceeding the proper scope of her duties for some time and admonished that her duties and pay would remain limited to clerical tasks and rape cases. (SDF ¶¶134-35.)

Nine days later Taylor took a phone call from Robert Osborne, who offered information about the Brow murder, which was still unsolved after 2 ½ years. (SDF ¶¶118, 139.) Taylor saw her chance and took it. She reviewed the Brow investigation file and set up a meeting with Osborne and

---

[2] She left the APD in 1986 to become the Groton Police Chief's executive secretary. (SDF ¶16.)

his girlfriend, Brenda Marsh, whom Osborne claimed had heard a confession from her ex-boyfriend, Kenneth Waters. (SDF ¶¶146,150,151,166,167.) Connors accompanied Taylor to the meeting, but merely watched; as Taylor was aware, he knew hardly anything about the case.  (SDF ¶169-72.) Marsh told them the truth: Waters never confessed to her, and she knew of no link between him and the murder, other than the fact that police had interviewed him soon after the crime, and he told her he felt he was being harassed for something he didn't do. (SDF ¶¶177,180.) But Taylor would not take "no" for an answer: she threatened to charge Marsh as an accessory after-the-fact to murder, and told her she would be imprisoned for ten years and lose her two young children if she did not cooperate. (SDF ¶¶179,181,196.) Marsh was rightly terrified and ultimately gave in to Taylor's pressure and suggestions. (SDF ¶183.) Ultimately, Taylor elicited a statement from Marsh alleging that she called Waters at work the night before the murder and was told he was not there; that he came home the next morning at 10:30 a.m. with a fresh "long deep red scratch" on his face from his eye to his chin, and went to bed; and that, in an argument that later ended their relationship, Marsh asked Waters if he killed Mrs. Brow and he said, "Yeah, what's it to you?" (SDF ¶¶184-88, 224.)

    As set forth below, Marsh's entire statement was false, and any reasonable jury could find that Taylor knew it but withheld from the prosecutor the facts Ayer police had established years earlier that proved it, to secure Waters' arrest. Marsh and Taylor were the only two witnesses who testified before the grand jury that indicted Waters for first-degree murder and armed robbery. (SDF ¶224.) To ensure prosecution, Taylor committed perjury, testifying under oath that there were no usable prints at the scene – when in fact she knew full well that not only were there usable prints believed to have been left by the perpetrator, but also that Waters was among the more than 20 suspects whose prints had been excluded. (SDF ¶¶73-85,88-93,101-117,227,231-33.)

In the months before trial, Taylor tracked down another of Waters' ex-girlfriends, Roseanne Perry, and engaged in the same *modus operandi* of threats and fear-mongering to elicit a second statement claiming that Waters had confessed. (SDF ¶¶259-78, 284-96, 298-99.) In fact, however, Perry had no memory of any such admission, as she was so "plastered" and "zonked out" after a three-hour binge in which she and Waters polished off a six-pack of beer and a quart of Southern Comfort straight from the bottle, that she had blacked out the night of the alleged confession. (SDF ¶¶265, 271-72.) Perry told Taylor the truth, but again, Taylor refused to accept it.

Taylor capitalized on her role as the lead investigator to cover up or destroy any evidence that raised doubts about Waters' guilt. She never told prosecutor Elizabeth Fahey that Marsh and Perry initially denied any knowledge of a link between Waters and the murder, much less that Taylor had threatened both women with baseless criminal charges to wrest incriminating statements from them. (SDF ¶348.) Taylor took advantage of her responsibility to maintain Ayer's casefile, purging it of all APD reports proving the existence of usable prints and suspect exclusions; as set forth below, a reasonable jury could find that Waters' alibi time cards had been there, as well, but that Taylor got rid of them. (SDF ¶¶46,53-117.) Given all the exculpatory evidence Taylor hid from Fahey and the jury, and her role in manufacturing the only incriminating evidence used against Waters in what Fahey termed "a circumstantial case," it was no surprise when the jury convicted. (SDF ¶¶301, 318.)[3]

## LEGAL STANDARD

Summary judgment is appropriate only if the full record discloses "no genuine issue as to any

---

[3] Taylor's pattern of misconduct in other cases – including her suppression of helpful evidence in the *Maher* case, and her trumped up charges against fellow officer Stanley Randall (*see* SDF ¶¶349-51, 360-67 & Pl. Mem. in Opp. to Ayer's Mot. S.J., incorporated herein by reference) – is probative of her investigative *modus operandi* in this case. Fed. R. Evid. 404(b).

material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56. "To succeed, the moving party must show that there is an absence of evidence to support the

nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). Once the moving

party has satisfied its burden, the burden shifts to the nonmoving party to set forth specific facts

showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The court must "construe the evidence in the light most flattering to the nonmovant[] ... and indulge

all reasonable inferences in their favor." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006).

Simply put, "[t]he nonmovant may defeat a summary judgment motion by demonstrating, through

submissions of evidentiary quality, that a trialworthy issue persists." *Id.*

Thus, "the judge's function is not [her]self to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*,

477 U.S. 242, 249 (1986). "[W]hen facts, though undisputed, are capable of supporting conflicting

yet plausible inferences – inferences that are capable of leading a rational factfinder to different

outcomes in a litigated matter depending on which of them the factfinder draws – then the choice

between those inferences is not for the court on summary judgment." *In re Varrasso*, 37 F.3d 760,

764 (1st Cir. 1994). Generally, "state of mind is a factual question that can't be resolved on a motion

for summary judgment." *See Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 485 (1st Cir. 1992). As

intent is so difficult to prove, even circumstantial evidence of it may preclude summary judgment.

*See DeNovellis v. Shalala*, 124 F.3d 298, 308 (1st Cir. 1997).

## ARGUMENT

**I.    Taylor Violated Waters' 14th Amendment Rights by Concealing Evidence from Fahey**

Taylor had a constitutional duty to disclose to the prosecutor any information she knew that

was at all favorable to Waters.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Pyle v. Kansas*, 317 U.S. 213, 216  (1942); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *see also Brady v. Maryland*, 373 U.S. 83 *(1963)*; *Giglio v. U.S.*, 405 U.S. 150, 154 (1972).

Taylor attempts to limit plaintiff's claim solely to the confines of *Brady* and its progeny, but plaintiff's theory rests on the much broader framework, recognized by the Supreme Court as far back as 1935, that Taylor violated Waters' due process rights by knowingly concealing favorable evidence from and presenting false evidence to the prosecutor, the court, and the jury.  *See Limone v. Condon*, 372 F.3d 39, 46-47 (1st Cir. 2004) (citing *Miller v. Pate*, 386 U.S. 1, 7 (1967); *Napue*, 360 U.S. at 269; *Pyle*, 317 U.S. at 216; *Mooney*, 294 U.S. at 112).  Indeed, the 1st Circuit recognizes that a plaintiff's "more sweeping accusation that the appellants actively participated in a plot to secure and sustain unjust convictions against innocent men" may encompass *Brady* violations, but "cannot be shoehorned into the relatively narrow confines of the *Brady* rubric." *Id.*  Thus, "the 'individual allegations of non-disclosure are not meant to be self-sustaining, but, rather, 'are an integral part of the overall story'" sufficient to give rise to a due process claim.  *See id.* at 47.  So too here.

As set forth below, Taylor's deliberate and bad-faith suppression from the prosecutor of favorable evidence – including the APD reports revealing the existence of usable prints from the scene that had been used to eliminate suspects; the exclusion of Waters as the source of the perpetrator's bloody fingerprint on a piece of a toaster on the dining room floor; Waters' time card from work, which cemented his alibi; and the fact that Taylor used coercive and suggestive tactics to manufacture falsely incriminating statements from Brenda Marsh and Roseanna Perry – violated Waters' 14th Amendment rights. Even if analyzed through the "more circumscribed" lens of *Brady*, *Limone*, 372 F.3d at 46, the evidence of each of the foregoing suppressions satisfies that test as well.

### A.  Taylor Deliberately Withheld Favorable Evidence

####   1.  The Exculpatory Bloody Fingerprint and Suspect Exclusions

Perhaps the most glaring distortion of evidence in Taylor's motion is the claim that she satisfied her obligation to disclose helpful evidence when, in the grand jury, she "truthfully and accurately testified that latent prints had been lifted from the scene." (Doc. 159 at 19). In fact, Taylor testified that all prints lifted at the scene "were smeared et cetera," and agreed that a grand juror was "correct" in clarifying, "[s]o the State Police were unable to match any prints – lift any prints to be of use in any investigation." (SDF ¶227). This testimony was not only false, it was a deliberate lie.

Cpl. John Baliunas, the State Police "photo and fingerprint man," collected several fingerprints from the Brow crime scene, including three on the dining room table, one on a beer can, a partial print on the kitchen faucet, and a bloody print on a piece of toaster found on the dining room floor. (SDF ¶¶24,73-74.) He matched the prints on the beer can and the dining room table to Mrs. Brow, and excluded the victim and her family as the source of the bloody toaster print – making it critical evidence of the perpetrator's identity. (SDF ¶¶75-78.) Ayer police sent numerous fingerprints from suspects to Baliunas for comparison to the latent prints he found at the scene, and Baliunas reported back that all those suspects were excluded. (SDF ¶¶79,83,85,101-17.)

####     a.    The Suppressed APD Fingerprint Reports

APD reports plainly reflect that Adamson was repeatedly eliminating suspects based on Baliunas telling him the suspects did not match usable latent prints collected at the crime scene. (SDF ¶¶108, 110 (citing Ex. 32).) Taylor knew about these reports and hid them from Fahey. (SDF ¶¶110-14, 116, 140, 235.) Taylor's knowledge of these reports has been proven at least three ways. First, a reasonable jury could certainly find that Taylor actually typed these reports for Adamson

given her position as the only clerical staff member and the same misspelling of "definitely" as "definately" in both an Adamson report and one of her daily log entries. (SDF ¶¶12, 32, 111) (citing Ex. 31, APD Brow Reports at 11 & Ex. 33, APD 7/8/80 Daily Log).) Secondly, Baliunas' exclusion of suspects was also reflected in Ayer's daily logs, one of which Taylor typed in 1980 acknowledging, "[t]hus far at least twenty sets of prints as well as elimination prints from family members have been submitted and checked." (SDF ¶116.) None of these logs was in the APD's Brow file.[4]

Third, and most importantly, Taylor admits she reviewed the APD file – where defense investigator DeSimone found these APD reports *after* Waters' conviction (SDF ¶244) – before falsely testifying in the grand jury that there were no usable prints collected at the crime scene. (SDF ¶225.) A.D.A. Fahey relied on Taylor, the "chief investigative investigator," to compile and maintain the prosecution file and to disclose "any information [police] had on the case." (SDF ¶235.) Fahey assumed Taylor provided her "every police report relative to the case" (*id.*), yet Fahey had no idea any usable prints were found, much less that comparisons had been made and suspects ruled out. (SDF ¶¶241-43.) Fahey testified that, "[i]f I learned that there were prints that were usable, I think I would turn that over to the defense and, hopefully, try to use them if they're usable." (SDF ¶242.)

Taylor claims she reasonably believed Fahey learned of the existence of usable prints from some other source (Doc. 159 at 19), but there was no reference at trial to the bloody toaster print. Indeed, in her opening statement, Fahey told the jury "you'll learn that the only full fingerprint that they found when they dusted the house for fingerprints was a fingerprint of Mrs. Brow on a beer can." (SDF ¶243.) It was obvious from this opening that "the prosecution did not obtain [the truth

---

[4] Plaintiff only learned that daily logs existed after Ayer had disclosed its entire Brow investigation file, when Ayer produced some logs pursuant to an order to compel *Monell* evidence; plaintiff then filed another motion to compel production of Brow-related daily logs. (*See* Docs. 77, 93, 101, 102.)

about the existence of usable fingerprints] from anyone else." *Porter v. White*, 483 F.3d 1294, 1310

(11th Cir. 2007). Taylor, who was the primary officer assisting Fahey in trial preparations and

present during the trial, knew this opening statement was false and misleading with respect to the

fingerprint evidence, but said nothing. Based on this evidence alone, summary judgment must be

denied. But there is even more disturbing evidence demonstrating that Waters had been specifically

excluded as the source of the perpetrator's fingerprints by Baliunas, and Taylor knew that too.

### b.    Baliunas Excluded Waters

Eighteen years later, after Waters' conviction was vacated as a result of DNA testing, the

Middlesex County District Attorney's Office reinvestigated the Brow homicide to determine whether

Waters should be retried. (SDF ¶88.) State Police Sgt. Al Hunte, who ran the investigation, found

Baliunas in 2001; he remembered the case. (SDF ¶¶88-91.) Baliunas told Hunte, who later reported

to the D.A.'s office, that Baliunas had excluded the victim as the source of the bloody fingerprint

on the piece of the toaster and had also ruled out Waters. (SDF ¶¶91-92.)[5] A reasonable jury would

find that if the suppressed Ayer fingerprint reports had been disclosed to Fahey prior to the grand

jury presentation or the trial, Baliunas would have offered the same testimony. (SDF ¶93.)[6]

Nor can there be any doubt about the exculpatory value of excluding Waters as the source

---

[5] Baliunas' 2001 statement to Hunte is admissible as non-hearsay offered for the probative fact
that it was said to Hunte during his investigation of Waters should be retried for the Brow murder, and to
show Baliunas' state of mind in 2001. Fed. R. Evid. 801(c). It is also admissible as Hunte's
contemporaneous recording of Baliunas' opinions which Hunte kept in the course of regularly conducted
business activity, Fed. R. Evid. 803(6); a record of matters Baliunas observed and factual findings he
made pursuant to duty imposed by law as to which Baliunas and Hunte had a duty to report, Fed. R. Evid.
803(8); Baliunas' past recollection recorded, Fed. R. Evid. 803(5); and a prior consistent statement to
rebut defendants' claim that the Baliunas 2007 affidavit is a "sham," Fed. R. Evid. 801(d)(1)(b).

[6] Sgt. Hunte interviewed Baliunas about the Waters case again in 2007 and agrees that Baliunas
had a much better memory of the case in 2001. (SDF ¶94.)

of the bloody fingerprint on the toaster part. Given the imprecision of pre-DNA blood typing technology at the time of trial – conventional serology determined that "most people" could have left the Type-O blood at the scene (SDF ¶31) – the bloody fingerprint on the toaster piece was surely the most probative available evidence of the perpetrator's identity. (SDF ¶77.) By any standard, at any time, being excluded as the source of a fingerprint in blood at a crime scene where the perpetrator struggled with the victim and bled, is powerful evidence of innocence.  If Taylor had not concealed the APD reports revealing the existence of that fingerprint from the prosecutor decades earlier, Waters never would have been arrested, much less convicted.

### c.     Ayer Police Sent Baliunas Waters' Prints, and Baliunas Told Them Waters was Eliminated as the Source of the Bloody Toaster Print

Despite Ayer's current claim not to have Waters' fingerprints, Ayer Police took his prints at least twice while he was a suspect in the Brow investigation, and Taylor knew it.  (SDF ¶¶72, 80.) The obvious next step was for Ayer police to send those prints to Baliunas.  (SDF ¶81.)  Baliunas' recently discovered original file confirms they did: Waters' name appears twice on Baliunas' hand-written list of suspects whose prints he compared and excluded – well within the first twenty suspects Taylor wrote had been excluded as early as 1980. (SDF ¶¶101, 103-05, 116, 117.)

Defendant Taylor's reliance on the "sham affidavit rule" to escape the truth about Baliunas' lists is misplaced. That rule exists to bar "an interested witness" from creating a conflict in the record to defeat summary judgment by means of an affidavit "but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).  Here, Baliunas is a disinterested third-party witness, an elderly man who had very good reason to identify the lists as his own once the legible originals – including two new pages of lists

– were located in his own file after he failed to recognize the illegible copies at his deposition. (SDF ¶¶95-101, 104.) *Mahan v. Boston Water and Sewer Comm'n*, cited by defendants for the proposition that the "sham affidavit rule" bars contradictory post-deposition affidavits by non-parties, actually says just the opposite: "the Court is hesitant to extend the sham affidavit rule to this context... [T]he integrity of summary judgment process would be defeated if the Court encroached upon the role of the trier of fact and turned summary judgment into trial on the merits.  A disinterested witness' affidavit signed under the pains and penalties of perjury should be taken as truthful on summary judgment."  179 F.R.D. 49, 56-57 (D. Mass. 1998).

Nor does the "sham affidavit rule" do anything to undermine the trove of other evidence proving – independently of Baliunas' affidavit – that Taylor knew about the fingerprint but covered it up: 1) Ayer police fingerprinted Waters on May 22; 2) Adamson documented Baliunas' oral reports of excluding suspects as the source of the perpetrator's prints in exculpatory police reports that were never produced for trial; 3) Baliunas' original fingerprint file includes Waters' name twice on what is obviously a list of suspects, well within the first twenty Taylor wrote had been excluded in of 1980; and 4) Hunte testified that Baliunas would have testified in 2001 that he had excluded Waters as the source of the perpetrator's prints. (SDF ¶¶72, 79, 80, 88-94, 96-97, 102-04, 110-17.)[7]

      **d.**      **Taylor Had a Duty to Disclose the Exculpatory Fingerprint Evidence and Not Mislead the Prosecutor and Grand Jury By Falsely Testifying There Were No Usable Prints Recovered.**

Taylor's contention that she "had no duty" to disclose this evidence because it was generated by someone else, or because she had reason to believe that someone else turned it over (Doc. No.

---

[7] Plaintiff's fingerprint expert, Ron Smith, examined a photograph of the bloody toastser print and confirms that it does not come from Waters.  (SDF ¶93.)

159 at 19) is based on inapposite 11th Circuit caselaw never adopted by this Circuit, and is simply wrong. Baliunas had retired by the date of Waters' arrest and was not contacted for trial (SDF ¶¶86-87); defendants admit retirees have no ongoing disclosure duty. (Doc. 162 at 5 ("After his departure, Chief Adamson had no obligations or duties with respect to any matter involving the Ayer [PD].").

More importantly, however, an officer's duty to disclose favorable evidence to the prosecutor is not dependent on whether others turned over the same information (SDF ¶239). A due process violation exists any time "any member any member of the prosecution team has information in his possession that is favorable to the defense" and fails to disclose it to the prosecutor. *Mastracchio v. Vose*, 274 F.3d 590, 600 (1st Cir. 2001); *see also Cox v. Hainey*, 391 F.3d 25, 35-36 (1st Cir. 2004) ("Law enforcement officers have an independent duty to exercise their professional judgment and can be brought to book ...[i]f [the officer] knowingly withholds material facts from the prosecutor...."); *cf. U.S. v. Osorio*, 929 F.2d 753, 761-62 (1st Cir. 1991) (prosecutor fails to discharge *Brady* duty "until all those in the government in a position to know have been canvassed" for knowledge of information favorable to the defense).

In any case, Baliunas' standard practice was to report orally his findings back directly to the submitting agency, here the APD; both plaintiff's fingerprint expert and police practices expert agree that such a procedure is consistent with general practice among law enforcement during that era (SDF ¶84). *See* Fed. R. Civ. P. 406 ("Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.").[8] There

---

[8] Taylor's grudging concession that, "at most, the Baliunas Affidavit establishes that he sent Chief Adamson a report indicating that Waters had been excluded as the source of the latent prints found at the scene," distorts the evidence by suggesting Baliunas' report was written. (Doc. 159 at 18.) Baliunas

is no evidence that he diverged from that practice and reported directly to the prosecutor or State Police in this case. *Cf. Kelly v. Curtis*, 21 F.3d 1544, 1552 (11th Cir. 1994) (finding officer had no clearly established duty to disclose exculpatory lab report where "the report itself listed the district attorney's office as a recipient [and] the state lab had a general practice of sending a copy of its results directly to the prosecutor.").[9] This critical exculpatory evidence was in APD files, but Taylor, Fahey's main APD contact and a prosecution witness (SDF ¶¶225, 235), suppressed it from her.

### e.    Due Diligence by the Defense Is a Non-Issue

Nor could defense counsel have discovered the existence of the exculpatory toaster print before Waters was convicted, given that A.D.A. Fahey never knew of it. (SDF ¶¶242-43.) Baliunas' name appeared on the original incident report as the state police fingerprint man who processed the scene, and therefore his name was known to the defense. (SDF ¶24.) But by the time Waters was arrested Baliunas had retired (SDF ¶86) and therefore was not even reachable by the defense given the State Police policy of refusing to disclose personal contact information of former employees, of which the Court can take judicial notice. Fed. R. Evid. 201; *see, e.g.*, Doc. 62 (Motion to Quash Subpoena for contact information on former Massachusetts State Trooper Patrick Keane) (citing various Massachusetts privacy statutes).) Notably, while Baliunas' name appeared on the defense witness list and a subpoena was issued care of the State Police at trial, there is no return on the

---

testified his reports were oral, and oral communications do not get lost in the mail. Taylor knew about Baliunas' results, *see supra*, and her duty to disclose this favorable information was "not ... dependent on whether that evidence has been reduced to written form." *U.S. v. Soto-Beniquez*, 356 F.3d 1, 40 (1st Cir. 2004)*; see Giglio.*, 405 U.S. at 154-55 (finding prosecutor had duty to reveal impeaching oral evidence); *Comm. v. Gilbert*, 337 Mass. 887 (1979) (same).

[9] That the D.A.'s Office is the titular lead of a homicide investigation by Massachusetts statute does not change the reality that, in practice, Baliunas reported directly to Ayer as the lead investigative agency rather than the State Police or A.D.A. Fahey. (SDF ¶¶75, 79, 82-84, 98, 102-17.)

subpoena and he did not testify for either side. (SDF ¶87.) Indeed, once he retired he was not

contacted about the case by anyone – not the state police, not the prosecutor, not the defense – until

Sergeant Hunte found him in 2001. (*Id.*)

By the time Waters was arrested and tried, the only actively employed officials with

knowledge of the print were Ayer police. But Taylor, Ayer's chief investigative officer for the Brow

homicide (SDF ¶¶140, 235), affirmatively concealed the existence of that print by testifying under

oath in the grand jury that the only prints were unusable and smeared (SDF ¶227).[10] Unlike the

circumstances of *Reid v. Simmons*, where the defendant officer put the defense on notice of the

exculpatory information by testifying in a probable cause hearing that "reports existed, as well as

their substantive content," 163 F. Supp.2d 81, 86 (D.N.H. 2001), in her grand jury testimony, Taylor

affirmatively misrepresented the substance of the print evidence by claiming there was nothing of

use to the case. The prosecutor in this case had no idea any usable prints existed, and was

affirmatively misled as to the very existence of fingerprint reports, much less their substantive

content. As such, the fact that Taylor's grand jury transcript was disclosed to the defense in pretrial

discovery only reinforces the argument that her lies concealed the truth and misled the defense to

believe that the investigating the existence of prints was a dead end. "It was not incumbent on

[Waters] to prove these representations false; rather, [Waters] was entitled to treat [Taylor's]

submissions as truthful." *Banks v. Dretke*, 540 U.S. 668, 696-97 (2004).[11]

---

[10] Based on Fahey's lack of knowledge about prints, a reasonable jury could find that Taylor culled the APD's print-related reports from Ayer's file before delivering it to Fahey.

[11] *See id.* (rejecting due diligence claim since "[o]rdinarily, we presume that public officials have properly discharged their official duties.") (citation and internal quotations omitted); *Strickler v. Greene*, 527 U.S. 263, 286-87 (1999) ("The presumption, well established by tradition and experience, that prosecutors have fully discharged their official duties, is inconsistent with the novel suggestion that conscientious defense

Attorney Herbert F. DeSimone, Jr. only discovered the Ayer reports reflecting the existence of usable prints during his investigation on Waters' behalf after the conviction; trial counsel Bernard Bradley had no knowledge of that evidence at trial. (SDF ¶244.)  Desimone's investigation was stonewalled and it was twenty-five years later – almost twenty of which Ken Waters spent behind bars – before the truth came to light.

## 2. Time cards

In addition to the fingerprint exclusion, a reasonable jury could find that Taylor suppressed Waters' time card for the morning of the murder, which would have cemented his alibi at trial had the jury seen it.  Brow was murdered between 7:10 a.m. when she was last seen alive by her husband and approximately 11 a.m. when her daughter-in-law found her. (SDF ¶¶34-35.)  In his May 22, 1980 interview with defendants and at trial, Waters presented an alibi defense for this entire time-of-death window: he covered for a coworker on the graveyard shift at the Park Street Diner until 8 a.m. on May 21, 1980, then went home to shower, eat breakfast, and change into a suit, before heading to Ayer District Court in time for a 9 a.m. appearance; he stayed in court until after 11 a.m., then stopped by the diner before returning home. (SDF ¶¶43, 46, 47, 312.)[12]  Given the lack of corroboration that he had worked that morning, however, the defense was only able to support the alibi that Waters had been in court between 9 and 11 a.m., thus leaving the erroneous impression that Waters could have committed the crime earlier that morning. (SDF ¶¶48-71, 253-57.)  Had Waters'

---

counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred.") (citation and internal quotation marks omitted).

[12] In fact, the time-of-death window could be narrowed further based on the Medical Examiner's finding of no rigor mortis in the victim's body at 11:43 a.m. the morning of the murder and minimal loss in body temperature, which suggested that Brow died closer to 11 a.m., when Waters had a court appearance where Boisseau saw him wearing a suit. (SDF ¶¶35-42.)

contemporaneous time cards from the diner been produced in response to his trial subpoena rather than collected and covered up by police, *see infra*, he could have rebutted the prosecution's argument that he had the opportunity to murder Mrs. Brow soon after 7 a.m. before going to court.

### a) Boisseau Knew that Waters Was in Court from 9 a.m. to 11 a.m.

Boisseau, the APD's court liaison officer, was at Ayer District Court at 9 a.m. on May 21, 1980. (SDF ¶¶8,50.) Waters had an appearance that morning and was the 15th Ayer defendant on the docket. (SDF ¶48.)  Boisseau saw Waters in court at 11 a.m. and admitted that he could have been there as early as 9 a.m., consistent with the standard court procedure requiring defendants to appear at 9 a.m. and then wait through docket call for their case to be heard.  (SDF ¶¶51, 52.) Attorney Carl Black, who represented Waters in that matter, had instructed Waters to arrive at court by 8:45 that morning, and met him there.  (SDF ¶49.)  A reasonable jury could find Waters was in court from 9 a.m. to 11 a.m., and Boisseau knew it. Boisseau testified that, as any reasonable officer would, he told other investigators, including Taylor, he saw Waters in court that morning. (SDF ¶52.)

### b) Ayer Police Also Discovered that Waters Was Working at the Park Street Diner Earlier that Morning

When Adamson and Boisseau interviewed Waters on May 22, the day after the murder, he told them he had worked the night shift as a short-order-cook at the Park Street Diner from Tuesday evening into Wednesday morning at 8 a.m. before going to court. (SDF ¶46.) Waters' attorney subpoenaed the Park Street Diner employment records for May through July of 1980.  (SDF ¶254.) Alice Tessier, a diner employee, brought time cards to trial but testified that all the cards for the week of the murder were missing.  (*Id.*) Given the evidence of Waters' innocence  (SDF ¶¶2-5, 30, 32, 33, 44, 80-85, 92-93, 103-05), a reasonable jury could conclude Waters told the truth and the

time cards corroborated his alibi statement to police that he was at work until 8 a.m. on May 21.

Taylor claims that the missing time cards are not exculpatory, and in any case would have been outweighed by the testimony of Tessier, who claimed she did not see Waters in the diner until 11 that morning. (*See* Doc. 159 at 9 (citing Doc. 162 at 17-18).) But the time cards that were produced for later weeks corroborate Waters' statement to police that some nights he did work from 11 p.m. to 8 a.m. (SDF ¶¶55, 56.) Those cards are circumstantial evidence tending to support the argument that the missing card exculpated him, as he told police and his sister, plaintiff Betty Anne Waters. (SDF ¶¶46, 53-71.) Moreover, "[m]emories fade," *Stogner v. California*, 539 U.S. 607, 631 (2003), and Ayer's own policies recognized that Tessier's testimony three years after the murder was less reliable than contemporaneously punched time cards would have been – if only they had not mysteriously gone missing. (SDF ¶53.)[13]  As set forth below, the evidence that Ayer police actually collected the cards suggests that the cards did not advance the prosecution's theory because they were not used against Waters at trial.  This is a triable question.

### c)    Ayer Police Collected But Failed to Disclose the Time Cards

It is elementary for police to investigate whether a suspect was at work when the crime was committed; contemporaneous work records are an obvious place to start.  (SDF ¶53.)[14]  Taylor and Boisseau both admitted that Waters' alibi was investigated; in fact, Boisseau went to the Diner

---

[13] Indeed, while Tessier indicated that Waters typically worked a 48-hour week, a pay stub located after trial proved her wrong, showing he actually worked 55.5 hours the week in question.  (SDF ¶58.) Brenda Marsh, despite her hostility to Waters at trial, admitted that he left the night before the murder between 10 and 11 p.m. wearing "[h]is clothes to go to work, white shirt and jeans," and returned the next morning.  (SDF ¶57.)

[14] For example, Donald Pina is no longer a suspect after February 26, 1981, when Adamson and Taylor obtained his time cards and verified his alibi.  (SDF ¶54.)

within hours after the murder on May 21, 1980 and another officer went to Berry Enterprises specifically in reference to Waters in July of 1980.  (SDF ¶¶60, 61, 67, 70, 253.)

Elizabeth Lankford, who worked for Berry Enterprises in May of 1980, recalled in her 2007 affidavit that within days after the murder, two Ayer police officers including patrolman Buddy Decot, appeared to ask for Kenny Waters' time card.  (SDF ¶¶61, 62.)  While she no longer had a specific recollection of the incident some 27 years earlier, she did recall that, unsurprisingly, the normal practice at Berry Enterprises would have been to comply with such a request from police. (SDF ¶¶63, 64.)  That Lankford has no specific memory of giving Ayer police Waters' records 27 years after-the-fact is not surprising, but defendants try to parlay this into proof she refused to comply with a police request, and therefore the police never had custody of Waters' time cards (*see, e.g.*, Doc. 162 at 16).  Yet a post-conviction investigator for Waters, Joseph Giudetti, spoke to Lankford, then under the married name of Elizabeth Tanner, in the mid-1980's.  (SDF ¶64.)  At that time, he swore in an affidavit filed in connection with a motion for a new trial, "she remembered turning them over to the Ayer police."[15]  (*Id.*)  Specifically, she told Giudetti she "thought she remembered turning them over to Officer Decot, but she could not be certain."  (*Id.*)  Giudetti followed up directly with Decot, who "had no memory of picking up the time cards" but acknowledged "that *he may have done so* and, if he did, he would merely have brought them back to the police station."  (SDF ¶65 (emphasis added).)[16]  Standard practice would have been for the

---

[15] Given Lankford's loss of memory since Giudetti interviewed her twenty years ago, this statement is her past recollection recorded, Fed. R. Evid. 803(5).

[16] As Decot was an Ayer police officer, this statement is an admission of a party-opponent's authorized agent, Fed. R. Evid. 801(d)(2)(C), (D), or may be considered as Decot's past recollection recorded, Fed. R. Evid. 803(5). Decot is now deceased.

cards to be placed in the Brow homicide investigation file, which was kept in Adamson's office during his tenure, and maintained by Taylor. (SDF ¶66.)

Moreover, plaintiff Betty Anne Waters personally investigated Waters' time cards in the fall of 1982 soon after her brother was arrested. As she testified in her deposition, when she went to Berry Enterprises with Waters' ex-wife, a female employee reported she had just looked at Waters' time cards in response to a call from Ayer police, that Waters had been working the morning of the murder, and police were on their way to pick them up. (SDF ¶71.) When plaintiff returned after the conviction, she was told that the cards had, in fact, been turned over to Ayer police. (*Id.*) Given Berry Enterprises' practice of retaining these records, as set forth in Lankford's affidavit (SDF ¶63), the fact that the time cards for the week of the murder were missing at trial corroborates the inference that police did, in fact, collect them. Obviously, police had a duty to preserve this evidence. (SDF ¶257.)

Standard procedure was to document the fact that an officer was dispatched to a location on an investigation and to log in any evidence collected. (SDF ¶¶66, 68, 255.) But no Ayer records have been produced documenting that Decot was dispatched to Berry Enterprises to do the fundamental task of checking Waters' time records (SDF ¶256). Why not? Either nobody was sent to check the cards or they were, but that fact was covered up; defendants acknowledge that Decot, at least, was dispatched to the diner, but no report of it has been produced. (SDF ¶¶60, 61, 253, 256.)[17] Again, Taylor's position is undermined by her lies. Her recent testimony – that she just-so-happened to hear Decot, upon his return from the Park Street Diner shortly after the murder,

---

[17] A thorough search of APD daily logs, produced only after plaintiff moved to compel them, reveals one entry – written by Taylor – indicating that APD Sgt. Harris did in fact go to Berry Enterprises in connection with Kenny Waters in July of 1980. (SDF ¶67.)

reporting to Adamson that there were no time cards (SDF ¶67) – is as suspect as it is convenient.

Drawing all reasonable inferences in plaintiff's favor, as is required on summary judgment, this evidence creates a triable issue as to whether Taylor had possession of Waters' time cards and was aware of the contents therein. Given that this would clearly have been critical evidence at trial – indeed, A.D.A. Fahey testified it would have been "helpful" evidence to rebut the alibi defense (SDF ¶257) – the disappearance of the cards supports an inference that they were actually helpful *to the defense* but disposed of in bad faith. *See Nation-Wide Check Corp., Inc. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 217-18 (1st Cir. 1982) ("The failure or refusal to produce a relevant document, or the destruction of it, is evidence *from which alone* its contents may be inferred to be unfavorable to the possessor. . . ."); *see also Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998) (recognizing "the commonsense notion that a party who destroys a document (or permits it to be destroyed) when facing litigation, knowing the document's relevancy to issues in the case, may well do so out of a sense that the document's contents hurt his position).[18]

"It is not for the court on summary judgment to weigh the evidence 'but to determine whether there is a genuine issue for trial.'" *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991) (quoting *Anderson*, 477 U.S. at 249). Here, the standard police practice of checking an alibi; admissions that Ayer police did investigate; evidence from Elizabeth Tanner Lankford, Joseph Giudetti and plaintiff herself that the records existed, were exculpatory, and were

---

[18] The evidence set forth above readily satisfies the foundational requirements necessary to draw an adverse inference from the spoliation of the time card evidence. *See Testa*, 144 F.3d at 177 (spoliation inference appropriate based on evidence that the defendant "knew of (a) the claim (that is, the litigation or the potential for litigation), and (b) the document's potential relevance to that claim"). Both elements are satisfied here since Taylor acknowledged she was aware of the importance of the time cards to the impending criminal trial. (SDF ¶67.)

seized by police; coupled with the fact that the time cards for the week of the murder would have been "helpful" for the prosecution to disprove the alibi but were not presented by the prosecution and mysteriously missing when subpoenaed by the defense at trial (SDF ¶¶53-71, 253-57), considered together in the light most favorable to plaintiff, create a triable question as to whether Taylor suppressed exculpatory time cards that would have cemented Waters' alibi.

### 3. Evidence of Coercion, Fabrication, and the Offer of Promises, Rewards and Inducements in Exchange for False Witness Testimony

At trial, there were no eyewitnesses and no forensic evidence identifying Waters as the perpetrator; the only prosecution evidence directly linking Waters to the murder was the testimony of two of his ex-girlfriends, Brenda Marsh and Roseanna Perry, who both testified that he told them he killed Mrs. Brow. (SDF ¶¶259-60, 301.) But Waters never made any such admissions; as set forth below, this evidence was manufactured by Nancy Taylor, who browbeat Marsh and Perry into falsely implicating Waters in the murder. (SDF ¶¶177, 179-88, 196, 206-11, 218-19, 265, 268-78, 284-99.) A.D.A. Fahey had no idea that both women had initially denied any knowledge linking Waters to the Brow homicide, or that Taylor had induced their testimony by threatening them with unfounded criminal charges. (SDF ¶¶258, 273.)

### a) Taylor Coerced and Fabricated Marsh and Perry's Statements but Did Not Tell the Prosecutor

#### i. Brenda Marsh

On September 30, 1982, Taylor answered a call from Robert Osborne, who admitted he was calling "for 'financial reasons,'" hoping to earn a reward in exchange for information about the unsolved Brow murder. (SDF ¶¶139, 145.) Osborne told Taylor he lived with the killer's ex-girlfriend, and that she had told him she had washed the killer's bloody clothes after the murder.

(SDF ¶146.)  At a meeting the next day with Taylor and Chief Connors, Osborne identified his girlfriend as Brenda Marsh, and claimed she had told him that Kenny Waters had confessed to her that he had killed his neighbor.  (SDF ¶¶150-51.)

When Taylor and Connors first met with Osborne and Marsh on October 4th, however, Marsh told them Osborne had lied: in fact, Waters had never confessed to her, and she had never told Osborne he had, nor had she ever washed bloody clothes.  (SDF ¶¶171, 177, 180; *see also* ¶207.) But Taylor refused to accept the truth.  Although it was widely known among police that asking questions implying or suggesting a particular answer and threatening baseless criminal charges ran the risk of generating false evidence (SDF ¶178, 211), Taylor did not ask questions, but, in Marsh's words, made  what were better characterized as "statements... They told me that I knew who killed Mrs. Brow and that she was murdered and I washed bloody clothes and things like that. And I could be charged as an accessory after the fact, have my children taken away and go to prison for ten years... She was very insistent that I knew everything, no matter what I said." (SDF ¶179.)

Marsh was terrified of losing her children, and of going to prison for a crime that had nothing to do with her.  (SDF ¶183.)  Taylor saw that Marsh was afraid, and capitalized on her fear, repeatedly threatening to file baseless criminal charges against her.  (SDF ¶179, 181-83, 196, 206, 208-10.)  But Taylor offered Marsh an out, feeding her false incriminating statements to adopt in order to avoid baseless criminal charges.  (SDF ¶¶184-88.)  For example, Taylor, who knew the perpetrator had been cut and bled at the scene, suggested to Marsh that Waters came home on the morning of the Brow murder with a "long, deep red scratch" on his face.  (SDF ¶187.)

Ultimately, despite her truthful protestations, Marsh's will was overborne; Taylor's coercive and abusive questioning induced a false statement implicating Waters in the murder.  (SDF ¶183.)

The statement indicated that Waters had come home the morning of the murder between 10 and 10:30 a.m., drunk, with a "long, deep red scratch" on his cheek from his eye to his chin, and collapsed into bed, and that, months later in an argument that ended their relationship, he confessed to Marsh that he had murdered Mrs. Brow. (SDF ¶¶184-88.) Each of these vivid details was false and fabricated by Taylor. (*Id.*, *see also* SDF ¶¶2-5, 44, 48-52, 194, 218, 219.)

Once Taylor manufactured that initial statement, Marsh understandably felt she had no way out. Due to Taylor's relentless pressure and intimidation, Marsh reiterated the false statement under questioning from Taylor in connection with a polygraph examination days later, again before the grand jury, and, finally, at trial and post-conviction proceedings. (SDF ¶¶205, 207-10.) Her testimony was devastating: she described Waters as having a fresh, bloody injury, identified the murder weapon as Waters' own knife, eviscerated his alibi defense, and told the jury he had brazenly confessed to the crime the night they broke up. (Def. Ex. 40.)

But, as she had originally told Taylor, and has testified consistently since 2001, none of it was true. (SDF ¶¶177, 180, 206-10.) Most importantly, Marsh swears, "Kenny never said he killed anyone and no statements like that were made by Kenny the night I left." (SDF ¶206.)

Taylor's report of her October 4th interview of Marsh failed to indicate that Marsh initially denied making the statements attributed to her by Osborne or that Taylor induced her to make incriminating statements by threatening her with baseless criminal charges and the removal of her children. (SDF ¶189.) Taylor never disclosed this information to the prosecutor but, instead, covered it up. Notably, the interview was not tape recorded, nor did Taylor have Marsh sign or endorse any of Taylor's notes of the interview, as APD policy required. (SDF ¶190-92.) Had Fahey learned of this information, she would have disclosed it to the defense as it tended to impeach both Marsh's

statement and Taylor's investigative tactics. (SDF ¶258.) Based on the foregoing facts, a reasonable jury could conclude that Taylor knowingly induced false testimony and sponsored perjury, but withheld this valuable impeachment information from the prosecutor.

### ii.    Roseanna Perry

In April 1983, shortly before Waters' trial began, Taylor tracked Perry down in Providence, Rhode Island, after learning of her criminal history from the Providence Police Department, and had her sign a statement that, among other things, claimed that Waters had admitted to Perry that murdered Katherina Brow. (SDF ¶¶259-63, 273.) This statement, which was repeated at trial, was damning in its own right, and also appeared to corroborate Marsh's testimony about Waters' confession. (SDF ¶266, 273.) But Perry had something else in common with Brenda Marsh in that her testimony, too, was false, induced by Nancy Taylor's coercive tactics; Perry admitted as much in a sworn statement provided to Waters' legal team just months after his conviction. (SDF ¶265, 267-72.) In that statement, Perry described Taylor's conduct in strikingly similar terms as what Brenda Marsh described: Taylor insisted that Waters was Brow's killer, and that Perry knew it (SDF ¶268); Perry repeatedly told Taylor that she knew nothing about it and did not recall Waters' ever making any admission to her (SDF ¶¶265, 268, 271-72).

In fact, Perry told Taylor, the only conversation she ever remembered having with Waters about the murder took place when Perry was so "plastered" and "zonked out" after downing a six-pack of beer and a quart of Southern Comfort straight from the bottle in a three-hour binge with Waters that she blacked out and had no memory of getting home. (SDF ¶265.) Perry only relented to Taylor's intimidation and signed the statement Taylor prepared because she "was under a lot of pressure." (SDF ¶270.)

But Taylor's intimidation did not end with the signing of Perry's statement a month before trial; she kept Perry and her family in a constant state of fear. As reflected in the sworn affidavit of Perry's daughter Rose, Taylor told Rose and Rose's grandmother that Waters was a murderer and that he and his family were out to get them, prompting them to flee their home for two months in fear. (SDF ¶274.) Twice, shortly before trial, Taylor brought Perry back to Ayer and, at one point, placed Perry in a cell at the APD for several days. (SDF ¶¶275-77.) When Perry tried to return to Providence, Taylor sent her husband Bruce Taylor, who was not an APD officer and had never performed police work of any kind, with APD Officer Dennis MacDonald to Providence in Taylor's private car to retrieve her – in handcuffs. (SDF ¶278.) A reasonable jury could infer from these facts that Taylor kept Perry in a state of fear in order to ensure her false testimony at Waters' trial.

Taylor claims that Perry's refusal to recant her trial testimony at her recent deposition is proof that there was no coercion. (Doc. 159 at 10-11.) But Perry's deposition is hardly reliable evidence.[19] Indeed, Perry admitted that her incriminating testimony was false and the product of Taylor's coercive tactics not once, but three times, to three different people in three different contexts over the past twenty-five years. *See* Fed. R. Evid. 613 (evidence of prior inconsistent statements admissible for impeachment purposes). First, Perry gave a sworn statement to Waters' investigator soon after the conviction admitting that her trial testimony had been false, the result of Taylor's unrelenting pressure. (SDF ¶¶267-72, 287.) Over the ensuing years, Perry admitted the same thing to her daughter Rose, explaining that Taylor had threatened that if she did not testify as expected, she would charged with perjury and as an accessory. (SDF ¶¶288, 290.) Finally, Perry again

---

[19] Perry did not appear when defendants subpoenaed her for a deposition, and only did so after being served with an order of contempt prompted by her failure to appear at a show-cause hearing before this Court. (Doc. 81, 92, 99.)

admitted that her testimony was false to attorney Michael Andrews, who was working on Waters' behalf, describing in detail Taylor's threats, pressure, and intimidation tactics. (SDF ¶¶276, 285, 291-94.) An affidavit was prepared for Perry based on her statement to Mr. Andrews, but Perry refused to sign it upon her attorney's advice that she could be charged with perjury if she admitted that her testimony at the criminal proceedings had been false. (SDF ¶¶295-96.) Perry has repeatedly expressed fear of perjury charges if she admitted the truth, even exclaiming upon learning of Waters' release in 2001, "Oh my God I'm going to jail for perjury." (SDF ¶¶298-99.) That statement, spontaneously uttered to her daughter, has the ring of truth and is admissible both as an excited utterance and as a statement against penal interest. *See* Fed. R. Evid. 803(2), 804(b)(3). Such fear of perjury charges gives rise to the reasonable inference that Perry's criminal trial testimony was indeed false. In any case, this Court may not make credibility determinations on summary judgment; that is a quintessential jury question. *In re Varrasso*, 37 F.3d at 764.

Perry's admissions, plus the striking similarities between the threats and intimidation both Marsh and Perry described Taylor using, the fact that Taylor never documented her interview with Perry in any written report and has never produced the tape she claims to have made of it, plus the admissions from Taylor and her husband that Taylor had Perry brought to Ayer in handcuffs and put her in a cell at the APD before trial (SDF ¶¶275-78), creates a material issue of fact with respect to whether Taylor coerced and fabricated Perry's false testimony.

If a jury finds Taylor used these tactics, there is no question that she did not share that information with Fahey, who testified unequivocally she would have disclosed it to the defense if she had known. (SDF ¶258.) Taylor claims it is "undisputed" that Fahey conducted the first Perry interview at her home and was present during the second interview at the police station (Doc. 159

27

at 10), but Fahey testified that she stayed in the car when she and Taylor drove to Providence for the witness interview, and has no recollection of ever interviewing Perry there. (SDF ¶263.) Taylor also claims that she was always with Fahey when speaking to Perry, but Taylor's own notes reflect a host of phone calls with Perry before trial in which Perry exhibited increasingly paranoid and bizarre behavior and made serious allegations against the Waters family which Taylor completely discredited; Fahey did not participated in any of these calls, and Taylor never documented them in any formal report. (SDF ¶¶280-83.)

Not only did Taylor fail to disclose this valuable impeachment information to Fahey, but the record also shows that Taylor failed to timely disclose to Fahey her promise to Perry that she would notify the Providence Police Department about her cooperation in the Waters case. (SDF ¶¶313-17.) Defense counsel raised the issue during jury deliberation, only to be told by Fahey that Perry had "been promised nothing, absolutely nothing." (SDF ¶313.) In response to the judge's instruction that she investigate the matter, Fahey belatedly discovered from Taylor that Taylor had in fact made a promise to Perry in exchange for her testimony. (SDF ¶¶314-15.) But it was too late; by then, the jury had already found Waters guilty (SDF ¶314-16). *See U.S. v. Ingraldi*, 793 F.2d 408, 411-412 (1st Cir. 1986) (recognizing that delayed disclosure depriving the defense of a meaningful opportunity to use the helpful information is unconstitutional).

### b)  Taylor Had a Duty to Disclose Her Coercion, Fabrication, and Promises, Inducements and Rewards to Marsh and Perry

Marsh and Perry were the prosecution's star witnesses – the only ones purporting to offer any direct link between Waters and the murder – and Taylor knew she had a duty to disclose any evidence undermining their credibility (SDF ¶¶237, 317). *See Giglio v. U.S.*, 405 U.S. 150, 154

(1972) (holding that where "the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" violates the constitution) (quoting *Napue*, 360 U.S. at 269);  *Pyle*, 317 U.S. at 216 (finding due process violation in deliberate suppression of deception by prosecution witnesses); *Ferrara v. U.S.*, 456 F.3d 278, 291 (1st Cir. 2006) ("the government manipulated the witness ... into reverting back to his original version of events, then effectively represented to the court and the defense that the witness was going to confirm the story (now known by the prosecution to be a manipulated tale) that the petitioner was responsible for killing [the victim]...  The government's obligation to disclose the evidence can hardly be doubted.").[20]

With respect to Marsh, Taylor argues that the nondisclosure of her misconduct, however egregious, does not implicate *Brady* because Waters' defense counsel could have learned of the coercive conduct by interviewing Marsh prior to trial. Yet, there is nothing in the record suggesting that reasonable diligence would have uncovered defendants' misconduct, and Taylor's assertion to the contrary is belied by Fahey's own testimony that *she* was unaware of Taylor's coercive conduct toward Marsh.  (SDF ¶258.)  Indeed, Marsh has testified that she was fearful of what Taylor and the Ayer Police might do to her in the event she did not cooperate and provide the testimony Taylor told her was required.  (SDF ¶209.)  If Fahey did not learn of these facts in her dealings with Marsh, there is no reason to suspect that defense counsel would have secured this information. In any case, Marsh was hostile to Waters even aside from Taylor's threats, and therefore hardly likely to cooperate with

---

[20] Even aside from the evidence of coercion, Taylor's motion fails to acknowledge that Perry was brought to Ayer in handcuffs and jailed in an APD cell before her testimony – and that Fahey never learned of it.  (*See* Doc. 159 at 10-11.) Thus, Taylor has waived any argument with respect to whether the failure to disclose this evidence constitutes *Brady* evidence.

the defense. Due diligence is not an issue.

Moreover, evidence of Taylor's tactics would also have undermined her own credibility and offered the defense material with which to challenge the integrity of the investigation as a whole, given Taylor's admission at trial that she had taken it over after Adamson's resignation (SDF ¶140). *See Atkins v. County of Riverside*, No. 03-55844 (9th Cir. Sept. 14, 2005) (slip op. at 4), attached hereto as Exhibit 1 (evidence that lead investigator fabricated evidence or engaged in other misconduct "while attempting to build the case against the defendant undermines the credibility of the investigator as well as the evidence compiled in that investigation."). Officers must disclose any ammunition that would support a criminal defendant's "attack on the integrity of the investigation and on the reliability of [its lead investigator]." *Kyles v. Whitley*, 514 U.S. 419, 449 (1995).

### B. The Suppressed Evidence Was Material

Again, plaintiff's 14th Amendment theory is not limited to the confines of *Brady*, although the evidence easily meets that test. Taylor claims that "there was ample evidence to support the verdict" even if the suppressed information had been disclosed (Doc. 159 at 16), but "materiality ... is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434. To prove that the suppressed evidence was material, a plaintiff "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict," but may do so "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 434-35; *see also Bagley v. U.S.*, 473 U.S. 667, 678 (1985); *Conley v. U.S.*, 415 F.3d 183, 189 (1st Cir. 2005).

The bloody toaster print was the best evidence of the perpetrator's identity and therefore the most powerful evidence Taylor deprived Waters of at his criminal trial. (SDF ¶77.) As Taylor

implicitly acknowledges by failing to argue otherwise, the exclusion of Waters – or indeed the existence of a usable print that authorities did not match to him – was, apart from any other suppressed evidence, quite obviously material to the outcome of the trial.

Yet again there is more. As set forth above, drawing all reasonable inferences in plaintiff's favor, the missing time card corroborated Waters' alibi and was collected by Ayer police but never disclosed to the prosecutor by Taylor. A jury that finds these underlying facts would also find the suppression of the time cards material: given Dr. Katsas' (erroneous hypothetical) testimony that the time of death was closer to 7 a.m. than 11 a.m. (SDF ¶¶41-42), a jury could find the time card would have demonstrated that Waters was at work when the crime was committed.[21] Even aside from the time of death, if armed with the cards, Waters would have had a compelling argument that he had no opportunity to slip into Brow's home, struggle with her in the kitchen to the dining room to the bedroom, ultimately stabbing her 30 times, wash his wounds and change his bloody clothes between the time he got off work as a short-order cook at 8 a.m. and the time he arrived in court, unscathed and in a spotless three-piece suit 45 minutes later.

To suggest, as Taylor does, that "Marsh [was] wholly unnecessary" to the prosecution (Doc. 159 at 16), is to engage in pure fantasy. It was the statements Taylor elicited from Marsh that jumpstarted the case against Waters, more than two years after he had been ruled out. At trial she was one of only two prosecution witnesses who offered any direct link between Waters and the crime. Just as in *Giglio* itself, "the Government's case depended almost entirely on [Marsh's]

---

[21] Defendants' citation to *California v. Trombetta*, 467 U.S. 479, 488 (1984) (Doc. 162), conflates the question of exculpatory value with the question of materiality. Here, unlike *Trombetta*, there is evidence from which a jury could find the time cards were actually exculpatory, and that police knew it. *See supra*.

testimony; without it there could have been no indictment and no evidence to carry the case to the jury. [Marsh's] credibility as a witness was therefore an important issue in the case...." 405 U.S. at 154-55. Marsh and Perry were both key witnesses in what the prosecutor admitted "was a circumstantial case." (SDF ¶301.) Additional ammunition to impeach either of them "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Conley*, 415 F.3d at 191 (quoting *Kyles*, 514 U.S. at 441).[22]

Finally, the evidence of Taylor's lies and deceptions about her dealings with Brenda Marsh and Roseanna Perry was material, as it not only undermines the credibility of those critical prosecution witnesses, it also "paint[s] a picture of an investigator willing to compromise his professional obligations out of a desire to pin a crime on a particular defendant. Disclosing the alleged [misconduct] to the defense – and the jury – would have cast a shadow across the entire police investigation." *Atkins*, slip op. at 5 (attached hereto as Ex. 1).[23]

---

[22] Taylor's attempts to distinguish other cases where the court found no materiality (Doc. 159 at16) fail. In *Strickler v. Greene*, "there was considerable forensic and other physical evidence linking petitioner to the crime," 527 U.S. 263, 292 (1999), whereas the only forensic evidence including Waters in this case was not highly probative, since the jury heard that the victim's husband and "most people" were also potential donors (SDF ¶30). In *Spence v. Johnson*, the suppressed impeachment evidence was held immaterial in part because the witness' "testimony was supported by other evidence presented at [the] trial." 80 F.3d 989 (5th Cir. 1996). In contrast, as set forth above, Marsh's statement conflicted with the evidence at trial in critical respects (most notably that Waters was in court that morning and had no scratch the next day), but the jury still convicted. Evidence that Marsh was coerced into falsely claiming Waters had admitted the killing was hardly cumulative; it would have eviscerated her credibility and that of Taylor as the lead investigator.

[23] In addition, a reasonable jury could find that Taylor was responsible for the spoliation of a ring the prosecution claimed Waters stole from the victim and then sold to her friend Adi Ogden, which in fact bore no relation to the crime. In 1980, Taylor inspected a ring Ogden had bought from Waters and determined that it could not have been the victim's ring, because it was too small – a size 4 3/4, whereas Mrs. Brow wore a size 7 – and had an engraving on it, unlike the ring Ogden said she had given her. Having determined the ring was not the victim's, Taylor gave it back; Ogden in turn gave it to her sister in Germany. (SDF ¶¶304-06, 310-11.) Nonetheless, Taylor said nothing to Fahey at trial as Ogden testified that she was "shocked" when, soon after the murder, Waters offered to sell her *the very same ring* Ogden had given Brow.

Ultimately, materiality is a mixed question of fact and law for the jury to determine, *see Gregory v. City of Louisville, et al.,* 444 F.3d 725, 744 (6th Cir.), *pet'n for reh'g & reh'g en banc denied* (2006), that must be assessed cumulatively, not item by item, *Kyles*, 514 U.S. at 420.[24] If the jury finds the suppressed evidence was exculpatory, then, when it is all considered cumulatively, materiality is overwhelming: if this evidence had been disclosed, Waters never would have been charged, much less convicted. *See id.*, 514 U.S. at 449 n.19 (noting that suppressed items "would not have functioned as mere isolated bits of good luck for Kyles. Their combined force in attacking the process by which the police gathered evidence and assembled the case would have complemented, and have been complemented by, the testimony actually offered by [defense witnesses] to show that [the police] had framed Kyles.").

Had this evidence been disclosed and the case against Waters still gone to trial, it would have looked completely different; Waters likely would have been acquitted. *Cf. Comm. v. Waters*, 399 Mass. 708, 711 (in affirming Waters' conviction, noting that "the defendant introduced testimony *attempting to impeach* the credibility of the Commonwealth's witnesses") (emphasis added).  Any reasonable jury, if allowed to do so, will find for the plaintiff on this claim.

### C.  Taylor Acted Deliberately, or in Bad Faith, to Conceal the Truth

---

(SDF ¶302.)  Fahey emphasized Ogden's testimony about the ring in her closing argument, characterizing it for the jury as "important evidence for your consideration. (SDF ¶303.)

[24] In light of *Kyles*, Taylor's contention that "the materiality of exculpatory evidence can-not be judged with the benefit of hindsight, knowing exactly what was presented at trial," but only "from the perspective of the police officers, who did not have the benefit of knowing exactly how the evidence at trial would play out," (Doc. 159 at 30) is perplexing. The *ex ante* materiality standard outlined by the 11th Circuit in *McMillian,* as cited by Taylor, has not been adopted in any other circuit court, and certainly not by this one.  In any case, the exculpatory value of all the evidence Taylor suppressed – the prints, the time card, the conflicts between Marsh's statement and the known facts, as well as the suggestive and coercive tactics used against the only witnesses directly linking Waters to the crime – would have been patently obvious to any sentient person.

Taylor claims that a civil suppression-of-favorable evidence claim requires evidence of bad faith, but merely proving the suppression was deliberate or done with deliberate indifference is sufficient. *See Pyle*, 317 U.S. at 216 (finding due process violation in deliberate suppression of fact of deception by prosecution witnesses); *Limone v. Condon*, 372 F.3d 39, 45 (1st Cir. 2004) (using "deliberate" as operative intent element in suppression-of-evidence claim with no reference to "bad faith"); *Reid v. Simmons*, 163 F. Supp.2d 81, 90 (D.N.H. 2001) (plaintiff must show that defendant either "acted in bad faith, or with intent to violate the plaintiff's constitutional rights, or with deliberate indifference to those rights."), aff'd, 47 Fed. Appx. 5, 2002 WL 31182838, at *1 (1st Cir. Sept. 25, 2002) (affirming that "the evidence was insufficient as a matter of law to prove that Simmons failed to disclose the evidence in issue either deliberately or with reckless indifference to Reid's constitutional rights.").

Taylor admitted in her deposition that she knew she had the responsibility to inform the prosecutor of everything known about the case, which includes anything helpful to the defense. (SDF ¶237.) Plaintiff easily clears any intent hurdle because any reasonable juror could easily find that Taylor was well aware of the helpful print evidence, *see supra*, but "intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial. This is what is meant by 'bad faith.'" *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (en banc). Taylor's grand jury testimony is admissible as the best evidence of the fact that she concealed the existence of exculpatory print evidence from the prosecutor in bad faith.[25]

---

[25] Absolute immunity is a bar to liability for perjurious testimony, *Briscoe v. Lahue*, 460 U.S. 325 (1983), not a bar on its use as probative evidence of other issues for which Taylor may be held liable, *Limone v. U.S.*, 271 F. Supp. 2d 345, 357 (D. Mass. 2003) (holding even where perjury was not itself an actionable tort, "the fact of perjury is a significant piece of evidence, part of the 'story' underlying claims based on the tort of malicious prosecution"), *aff'd sub nom Limone v. Condon*, 372 F.3d 39 (1st Cir.

However, there is additional evidence of Taylor's bad faith. First, Taylor repeatedly set out on her own, evading supervisory review and flouting APD policies.[26] Baliunas flatly denies Taylor's claim that he told her the prints were smeared, since they were not smeared and such a statement would have been false. (SDF ¶¶229-30.) When confronted in her second deposition with the correspondence she drafted proving she knew the prints were usable, Taylor manufactured a spectacular lie: she claimed that she remembered for the first time when reading the transcript of her first deposition that she and Fahey were so concerned that the prints were smeared that they took the unprecedented step of sending Lt. Boisseau back to the crime scene on the eve of trial, three years after the murder, to dust again for prints. (SDF ¶245.) There is absolutely no evidence that this ever happened. Not only is it contrary to standard protocol – and, frankly common sense – to return to the crime scene, which has been thoroughly cleaned and lived in during the interim, three years after the fact to lift prints (SDF ¶¶248-52), but Boisseau also admitted that he had no memory of ever returning to the scene to dust for prints *in this case or ever in any other case*, and there is no record or report indicating that he did so in this case (SDF ¶¶246, 248).[27] Moreover, if he had been asked

_____

2004). Taylor's grand jury testimony is relevant to her intent, state of mind, pretrial communications with Fahey, and her suppression of the exculpatory print evidence.

[26] For example, without bothering to investigate Osborne, Taylor swore he was a "reliable informant" in a warrant application to search Waters' vacant former home. She had never obtained a search warrant before, but did so in this case alone, behind the backs of Boisseau, Connors and Fahey, in a gross violation of APD policies. (SDF ¶¶153-65.) If the warrant had yielded incriminating evidence, Taylor could take the credit – at least until the suppression motion that would inevitably have followed based on Taylor's false claim to Osborne's reliability.

[27] Boisseau and Taylor share the same counsel although there may be a conflict between their positions. In addition to Taylor's absurd claim that Boisseau dusted for prints three years after the murder, which Boisseau carefully parried in his third deposition by testifying he had no memory of doing so, Taylor also claims that, after she elicited the Marsh statement, Boisseau told her he could not confirm that Waters had been in court, leading Taylor to believe Marsh's statement was reliable, when in fact, Boisseau did see him there, says he told Taylor, and ultimately testified to that effect at trial. (SDF ¶¶ 186, 193-95.)

to do so, Boisseau testified, he would have told Taylor and Fahey it was not necessary, because he knew usable prints had been collected. (SDF ¶247.) Taylor's testimony is a sham, and her continued coverup is still more evidence of her bad faith. Finally, her coercive conduct toward Brenda Marsh and Roseanna Perry was calculated to overbear their wills and induce incriminating evidence against Waters that Taylor knew to be false.  Taylor's bad faith is manifest.

### D.  Taylor Has No Qualified Immunity for Her Deliberate Suppression of Evidence

As the First Circuit recognized in *Limone v. Condon*, "[t]here is no requirement that the facts of previous cases be materially similar to the facts sub judice in order to trump a qualified immunity defense.  General statements of the law are capable of conveying fair warning.  It follows logically that, in some situations, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'  So it is here."  372 F.3d 39, 48 (1st Cir. 2004) (citation omitted). The constitutional bar on police engaging in lies and deceptions in order to win a conviction is longstanding and unambiguous.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Pyle v. Kansas*, 317 U.S. 213, 216  (1942) (finding due process violation in deliberate suppression of fact of deception by prosecution witnesses); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *see also Brady*, 373 U.S. 83; *Giglio*, 405 U.S. at 154.

Taylor seeks to invoke the protection of qualified immunity upon the preposterous claim that the exculpatory value of the evidence she suppressed was "so subtle that no reasonable non-lawyer would have thought it to be exculpatory."  (Doc. 159 at 29.)  But no reasonable officer could have believed that it was lawful to do what Taylor did: lying about and covering up the existence of usable fingerprints, much less the patently exculpatory fact that Waters had been specifically excluded as the source of a bloody fingerprint found at the crime scene; hiding time cards that proved Waters had

no opportunity to commit the murder; or concealing the fact that the two key witnesses denied any

knowledge of a link between Waters and the crime and only said otherwise after Taylor threatened

them with baseless criminal charges and brought Perry to a cell at the APD in handcuffs, much less

that Taylor notified Providence Police that Perry, who had extensive run-ins with them, of Perry's

cooperation.  *See Limone,* 372 F.3d at 50 (rejecting qualified immunity defense for suborning of

perjury and suppression of exculpatory evidence on the grounds that, as early as 1967, "[no]

reasonable law enforcement officer would have thought it permissible to frame somebody for a crime

he or she did not commit"); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("was it clearly

established in 1979 and 1980 that police could not withhold from prosecutors exculpatory

information about fingerprints and [other evidence]? The answer is yes.").

## II.    Taylor's Fabrication of Marsh and Perry's Statements Violated Waters' Clearly Established 14th Amendment Rights

An official who fabricates evidence for use in a criminal proceeding violates the 14th

Amendment. *Miller v. Pate*, 386 U.S. 1, 7 (1967).  Taylor does not dispute that this right has been

firmly established since 1983, nor can she. The First Circuit has recognized that this concept is "self-

evident," explaining that "if any concept is fundamental to our American system of justice, it is that

those charged with upholding the law are prohibited from deliberately fabricating evidence and

framing individuals for crimes they did not commit." *Limone*, 372 F.3d at 45; *see also Washington

v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005); *Castellano v. Fragozo*, 311 F.3d 689, 704–05 (5th

Cir. 2002); *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001); *Zahrey v. Coffey*, 221 F.3d

342, 355 (2d Cir. 2000); *Clanton v. Cooper*, 129 F.3d 1147, 1152 (10th Cir. 1997); *Stemler v. City

of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).  Decades before Taylor's fabrications, the Supreme

Court had characterized the constitutional bar on the "knowing use of false evidence" as "implicit in any concept of ordered liberty." *Napue*, 360 U.S. at 269; *see also Miller*, 386 U.S. at 7; *Pyle v. Kansas*, 317 U.S. at 216.

**A. Taylor Fabricated the Marsh and Perry Statements**

A 14th Amendment fabrication-of-evidence claim simply requires proof that the official deliberately "fabricated evidence and that the fabrication resulted in a deprivation of [the defendant's] liberty." *Washington*, 407 F.3d at 282 (citing *Zahrey*, 221 F.3d at 349). *Washington* was a false confession case in which a state police trooper was found to have fabricated evidence by suggesting incriminating facts to a mentally retarded suspect, and then misrepresenting to the prosecutor that those facts had originated with the suspect, providing proof of his guilty knowledge. *See id.*, *on remand, Washington v. Wilmore*, No. Civ.A. 3:02CV00106, 2006 WL 2471611 (W.D. Va. Aug. 23, 2006) (denying defendant's post-trial motion for judgment as a matter of law).

Thus, the constitutional bar on fabricating evidence is the same whether the false evidence is tangible or takes the form of a statement that is knowingly elicited from a suspect or witness by means of threats, pressure or promises. Indeed, in *Spurlock v. Satterfield*, the 6th Circuit recognized the viability of a 14th Amendment fabrication claim where the defendant police officer was alleged to have engaged in precisely the same misconduct Taylor committed here: inducing false testimony from an informant who, "when initially confronted, ... denied any knowledge of the crime," but who ultimately testified against the plaintiffs as a result of the officer's "pressure, threats of prosecution, and ... promises to help [the informant] and his family." 167 F.3d 995, 998 (6th Cir. 2001); *see also Spurlock v. Satterfield*, 330 F.3d 791, 798, 799 (6th Cir. 2003) (holding that official fabricated evidence by "threatening [informant] to 'st[i]ck to his trial story' or be prosecuted for perjury," and

by trying "to coerce [informant] into maintaining the false testimony he gave during [plaintiffs'] ...
criminal trials ... even in light of significant evidence that [informant's] testimony had been false.").

Nonetheless, Taylor relies on *Devereaux* – a distinguishable 9th Circuit case in which
defendant officers were alleged to have used suggestive questioning to induce impressionable
children into false claims of sexual abuse, 263 F.3d 1070 – for the proposition that there is a higher
burden to make out a fabrication claim based on statements elicited from adult witnesses like Brenda
Marsh and Roseanna Perry.  In that very different factual context, *Devereaux* required the plaintiff
who was alleging a fabrication of witness statements to show that the defendant (1) knew or should
have known that the suspect was innocent or (2) knew or should have known that the investigative
techniques used would yield false information.  263 F.3d at 1076.[28]

Under either standard, Taylor's conduct was manifestly unconstitutional. First, Taylor
deliberately elicited statements she knew to be false.  She refused to accept Marsh's truthful denial,
and instead induced her to claim that Waters had a fresh "long deep red scratch" on his cheek from
his eye to his chin  (incriminating evidence given that police knew the perpetrator had been cut and
bled in the struggle with the victim), when he arrived home, drunk, at 10:30 on the morning of the
murder, after not going to work the night before  (also incriminating because it eviscerated his work
alibi and suggested that Waters had an opportunity to commit the crime). (SDF ¶¶177-94, 205.)
Taylor, who had maintained and reviewed the file (SDF ¶¶129, 167, 168), knew that Waters had no

---

[28] Defendants also cite the 1st Circuit's decision in *United States v. Hall*, 434 F.3d 42, 57-58
(1st Cir. 2006), to suggest that Taylor's conduct was not obviously a fabrication of evidence.  (Doc. 160
at 8.) But in *Hall*, the coercion allegations were known to defense counsel, who cross-examined the
witnesses on it at trial, *id.* at 58, whereas here, Taylor deliberately concealed the evidence of witness
coercion and suggestion.  Thus, while the *Hall* jury could "evaluate witness credibility in light of the
evidence concerning the alleged threats," *id.* at 58, Waters did not learn of the misconduct until after he
was convicted, so his jury never had the chance to consider it.

"long deep red scratch" on his face because Adamson, Boisseau, Det. Lt. Dwyer and Trooper Keane all saw him the very next day and found not a mark on him (SDF ¶¶44). Taylor also knew that Waters did not arrive home drunk and go to sleep at 10:30 that morning, because Lt. Boisseau saw him in court wearing a suit at 11 a..m. and told his APD colleagues (SDF ¶52). A reasonable jury could also find she knew that Waters had indeed been at work that morning, as reflected by the time cards recovered by Decot. (SDF ¶¶53-71.) Taylor's deliberate fabrication violated Waters' clearly established 14th Amendment rights as described in *Washington,* 407 F.3d at 282.

Taylor's conduct also makes out either standard of liability under *Devereaux*: 1) based on the fingerprint exclusion, his lack of injury and alibi, Waters knew or should have known Waters was innocent; and 2) her threats to imprison Marsh and Perry on baseless charges as accessories after-the-fact to murder, to take away Marsh's children and her stoking Perry's fear of Waters, were such "coercive and abusive" tactics that any reasonable officer would know they risked generating false evidence. 263 F.3d at 1076. Unlike the officers in *Devereaux*, Nancy Taylor was not operating in a gray area; she saw a bright line and leapt across it in a deliberate attempt to elicit incriminating statements she knew to be false. That is unconstitutional. *See Com. v. Raymond*, 450 Mass. 729, 734-35 (Mass. 2008) (prosecution's informing witness of the possibility of facing perjury charges would constitute "improper threats or coercive behavior"); *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) ("acquiring known false statements from a witness for use in a prosecution is ... fabricating evidence"); *Moore v. Valder,* 65 F.3d 189, 194-95 (D.C. Cir.1995) ("intimidating and coercing witnesses into changing their testimony" is "a misuse of investigative techniques

legitimately directed at exploring whether witness testimony is truthful and complete.").[29]

### B.  Taylor Has No Qualified Immunity for Her Deliberate Fabrications

Simply put, the evidence shows that Taylor deliberately suborned perjury and framed an innocent man. No reasonable officer could believe this blatant manipulation of the truth to be lawful. *See id.*; *see also Limone*, 372 F.3d at 45 (recognizing violation of due process rights when officer deliberately fabricates evidence to frame individual for crime he did not commit); *LaFrance v. Bohlinger*, 499 F.2d 29, 34-35 (1st Cir. 1974) ("[T]here is a substantial claim by the defendant that the impeaching statement offered by the government was obtained by police threats and other blatant forms of physical and mental duress"); *Mitchell v. City of Boston*, 130 F. Supp.2d 201, 213 (D. Mass. 2001), 130 F. Supp.2d at 213 ("'When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983'") (quoting *Ricciuti v. N.Y.C Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).[30]

---

[29] Connors cites two inapposite, out-of-circuit cases to support the claim that Taylor's conduct was not coercive and abusive under a *Devereaux* standard (Doc. 159 at p. 22, citing Doc. 162.) *Wilcox v. Ford*, 813 F.2d 1140, 1149 (11th Cir. 1987) and *U.S. v. Fredericks*, 586 F.2d 470, 478-80 (5th Cir. 1978), arose on habeas corpus and direct appeal, and involved guilty prisoners who sought new trials on the theory that officers had engaged in "improper interrogation of witnesses," 813 F.2d at 1148 – not § 1983 wrongful conviction cases applying *Devereaux* to decide whether officers deliberately fabricated evidence against suspects they knew or should have known were innocent.  Plus, the Supreme Court recognizes that telling a witness she risks perjury charges for changing her story falls into the category of "threatening remarks" that "could well ... exert[] such duress on the witness' mind as to preclude [her] from making a free and voluntary choice whether or not to testify." *Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curiam).

[30] Taylor's misplaced reliance on other out-of-circuit case law does not alter this result. *Cunningham v. Wenatchee*, 345 F.3d 802 (9th Cir. 2003), is distinguishable because the only allegation of witness coercion there was the claim that the defendant officer merely continued questioning witnesses after they initially denied being sexually abused.  *Id.* at 812.  The witnesses in *Cunningham* – unlike Marsh and Perry – were not threatened with baseless prosecution; they were not told they would be separated from their

Indeed, in *Spurlock*, the wrongful conviction case where the officer deliberately manufactured an informant's incriminating statement, the 6th Circuit rejected the officer's qualified immunity argument, holding that he "cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights." *Id.* at 1006 -07 (citing *Brady*, 373 U.S. at 83; *Pyle*, 317 U.S. at 216; *Mooney*, 294 U.S. at 112-13; *Albright v. Oliver*, 510 U.S. at 274); *see also Limone,* 372 F.3d at 50 (rejecting qualified immunity defense for suborning of perjury and suppression of exculpatory evidence on the grounds that, as early as 1967, "[no] reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit" (citation omitted)). Nor can Taylor.

### III.  Taylor Violated Waters' Clearly Established Constitutional Right Not to be Seized and Prosecuted Without Probable Cause

#### A.  Legal Standards

##### 1.  The 4th Amendment Malicious Prosecution Claim is Viable

Taylor next claims that the 4th Amendment did not protect Waters. She is mistaken. The 4th Amendment guarantees that no person shall be seized without probable cause. U.S. Const. Amd. IV. Probable cause exists "[i]f the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed [by the suspect]...." *Carroll v. U.S.*, 267 U.S. 132, 161 (1925) (citation and internal quotations omitted). In this case,

---

loved ones; they were not fed false information; they were not kept in a constant state of fear; they were not taken to the police station and required to sleep in a jail cell; they were not told that the suspect and his family were out to harm them; they simply were not subject to the kind of coercion at issue here. More importantly, unlike Taylor, there was no evidence that the officer in *Cunningham* knew the defendant was innocent.

Waters was seized on October 13, 1982, when Taylor arrested him, and not released until March 15, 2001. (SDF ¶¶ 3, 212.) No "prudent, reasonable, [and] cautious police officer" would have believed Waters murdered Brow based on the evidence known to the Ayer police defendants when he was arrested, or as of November 10, 1982, when he was indicted and bound over for trial. *U.S. v. Jodoin*, 672 F.2d 232 (1st Cir. 1982) (citation and internal quotations omitted).

Notwithstanding Taylor's argument (Doc. 159 at 22-24), the Court need not determine when exactly the 4th Amendment protection yields to that of the 14th, since the § 1983 4th Amendment malicious prosecution theory alleged here is broader than a false-arrest theory, governing Taylor's conduct and Waters' ongoing detention *after* the moment of his arrest. In contrast to the straw-man false-arrest theory Taylor has constructed, this 4th Amendment claim relates to Waters' "unlawful detention[, which] forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process." *Wallace v. Cato*, 127 S. Ct. 1091, 1096 (2007) (emphasis in original);[31] *Albright*, 510 U.S. at 272 ("We hold that it is the Fourth Amendment, and not substantive due process, under which petitioner Albright's [§ 1983 malicious prosecution] claim must be judged.").

Taylor mischaracterizes binding 1st Circuit authority on this question, *Nieves v. McSweeney*, 241 F.3d at 46, by claiming that it rejected the possibility of a 4th Amendment-based § 1983 claim for malicious prosecution governing any period of time other than the arrest itself, and therefore, she claims, this Court should not even recognize plaintiff's claim as a legally viable cause of action. (Doc. 159 at 23, 24.) In fact, the *Nieves* court acknowledged the viability of this claim, finding that,

---

[31] *Wallace* forecloses a § 1983 false arrest theory, but not the § 1983 malicious prosecution theory advanced here.

"[f]or a public official to transgress the Fourth Amendment through the initiation and pursuit of criminal charges, the prosecution of those charges must at a bare minimum have occasioned a deprivation of liberty consistent with the concept of a seizure." *Id.* at 54.; *see also Luthy v. Proulx*, 464 F. Supp.2d 69, 73 (D. Mass. 2006) ("A malicious prosecution may be actionable under section 1983 if it results in the deprivation of the constitutional right against unreasonable seizure.").[32]

More egregiously, however, Taylor misrepresents *Nieves* by omitting a description of its factual context,[33] and by conveniently excising the most relevant portions of quoted sections of the case. The actual quote from *Nieves* follows, with the passages Taylor deleted in bold:

> a seizure under Fourth Amendment jurisprudence is generally a discrete event, quintessentially an arrest, **or at least a physical detention**. Thus, seizure jurisprudence traditionally has centered on the initial deprivation of liberty that a seizure of the person entails. Since "[a] seizure is a single act, and not a continuous fact," **run-of-the-mill conditions of pretrial release do not fit comfortably within the recognized parameters of the term**.

241 F.3d at 55.

At issue in *Nieves* was that the plaintiffs, unlike Waters, were not detained after arraignment. *Id.* at 49. Thus, in order to convince the court that their 4th Amendment claim was not time-barred, as it would be if their seizure ended upon arrest, they had to "show[] some post-arraignment deprivation of liberty, caused by the application of legal process, that approximates a Fourth Amendment seizure." *Id.* at 54. Ultimately, the plaintiffs could merely show "they suffered the stress

---

[32] Likewise, the damages foreseeably flowing from the malicious prosecution – *i.e.* Waters' conviction and two decades of suffering in prison – are compensable under the 4th Amendment as well as the 14th. *See Monroe v. Pape*, 365 U.S. 167 (1961) (in § 1983 action, adopting common law tort principle that "man is responsible for the foreseeable result of his actions").

[33] Defendants Town of Ayer and Boisseau, in his capacity as the then-Chief of Police, were defendants in *Nieves*.

and anxiety" of facing charges and public stigma, and had to appear for pretrial court proceedings and trial. *Id.* at 54-55. Under those circumstances, the plaintiffs "did not suffer a post-arraignment seizure within the meaning of the Fourth Amendment." *Id.* at 57. Obviously, Waters suffered a post-arraignment seizure within the meaning of the 4th Amendment, since he was physically detained continuously between his arrest and his conviction, and, indeed, his exoneration.

### 2. Elements

To survive summary judgment, Waters bears the burden of demonstrating the existence of a triable fact question on the common-law elements of malicious prosecution, plus a Fourth Amendment violation. The elements are:

> 1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; 2) the termination of the proceeding in favor of the accused; 3) an absence of probable cause for the charges; and 4) actual malice.

*Nieves*, 241 F.3d at 53. As *Nieves* described at length, the only additional element needed to transform the claim from a common-law tort into a constitutional violation is to demonstrate that the plaintiff was seized within the meaning of the Fourth Amendment, *i.e.*, detained.

The first two elements are easily met. Nancy Taylor personally swore out the felony complaint and warrant application for Waters' arrest, arrested him, and testified before the grand jury that indicted him. (SDF ¶¶212-13, 224, 227, 234.) The proceedings terminated in Waters' favor upon the District Attorney's filing of the *nolle prosequi* on June 28, 2001. (SDF ¶5.)

In *Beecy v. Pucciarelli*, 387 Mass. 589, 594 n. 9 (Mass. 1982), the court held that malice:

> is not necessarily revenge or other base and malignant passion. What ever is done *wilfully and purposely,* if it be at the same time *wrong and unlawful,* and that known to the party, is in legal contemplation malicious. That which is done contrary to one's own conviction of duty, or with a wilful disregard of the rights of others, *whether it be to compass some unlawful end, or some lawful end by unlawful means,* or ... *to do a wrong and unlawful act*

*knowing it to be such,* constitutes legal malice.

*Id.* at 594 n.9 (quoting *Wills v. Noyes*, 12 Pick. 324, 328 (1832)) (emphasis in original). In other words, malice may be inferred from the lack of probable cause or the misrepresentation of material facts in applying for a warrant. *See id.*, 387 Mass. at 594. The evidence of Taylor's deliberate lies and deceptions easily clears that hurdle.

Thus, the 4th Amendment claim boils down to probable cause. The pertinent inquiry is two-fold: first, determining "the events which occurred," and second, making "the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer," give rise to probable cause. *Ornelas v. U.S.*, 517 U.S. 690, 696-97 (1996). Probable cause is ultimately a mixed question of law and fact that the Court can decide on summary judgment only if the material facts are not in dispute. *See id.*; *cf. Acosta v. Ames Department Stores, Inc.*, 386 F.3d 5, 9-10 (1st Cir. 2004) (holding that court can determine probable cause as a matter of law where material underlying facts are undisputed).

In addition, under a *Franks v. Delaware*[34] theory, police violate the Fourth Amendment by acting "in reckless disregard, with a 'high degree of awareness of [the] probable falsity'" of statements contained in an arrest warrant application, or by intentionally or recklessly omitting material exculpatory facts from it. *Burke v. Town of Walpole*, 405 F.3d 66 (1st Cir. 2005) (citations omitted). Reckless disregard exists where "circumstances evince obvious reasons to doubt the veracity of the allegations in the application," and "may be inferred where the omitted information was critical to the probable cause determination." *Id.* Taylor is liable under either theory.

### B. There Was No Probable Cause to Arrest or Indict Waters

---

[34] 438 U.S. 154 (1978).

### 1.   October 13, 1982 Arrest

It is undisputed that up to September 29, 1982, the day before Robert Osborne made his fateful call, there was no probable cause to arrest or prosecute Waters.  (SDF ¶¶212, 214-15, 218-22.)  Connors and Boisseau both agreed that prior to that date, there were no leads that had not been followed to a logical conclusion, and defendants' proffered expert agrees that none of the previously known circumstantial evidence – including that Waters and the victim lived near each other, had met, that he didn't like her, that he bought an above-ground pool after the murder and moved away soon thereafter – justified his arrest. (SDF ¶214.) In other words, Waters had been ruled out as a suspect. The statement Taylor and Connors elicited from Brenda Marsh at their October 4, 1982 meeting was the only new piece of evidence collected against him – other than the unreliable polygraph, which was not evidence – before Taylor swore out a warrant for Waters' arrest on October 12, 1982. (SDF ¶¶204, 212-13, 223.) Neither Marsh's false and obviously unreliable statement nor the polygraph gave rise to probable cause. (SDF ¶221-23.)

### a)   The Statement Attributed to Marsh Was Obviously Unreliable

Marsh's statement was inconsistent with the known, objective facts.  She alleged Waters had a "long, deep red scratch" down the length of his face when he arrived home the morning of the murder, but four seasoned investigators including Chief Adamson and Lt. Boisseau inspected him the next day and found not a mark on him.  (SDF ¶187.) Marsh claimed Waters arrived home and collapsed into bed, drunk, between 10 and 10:30 am, but, as Taylor knew, Boisseau saw Waters in court wearing a three-piece suit at 11 a.m. (SDF ¶¶186, 219.) As Lt. Boisseau and defendants' own proffered expert concede, these glaring discrepancies with the facts as known to Ayer police would lead any reasonable investigator to be highly skeptical of anything else Marsh said.  (SDF ¶¶193-94,

220.) Indeed, APD policy cautioned that "[a]n officer should constantly test his informant's information for consistency and truth by checking against information received from other sources" and directed that "[a]ll leads supplied by the informant should be investigated or followed up. This is especially true when the relationship is in its earliest stages and will aid in determining reliability." (SDF ¶216.)

Officers must weigh known exculpatory evidence in the probable cause calculus (SDF ¶220). *See Burke*, 405 F.3d 66. Lt. Boisseau candidly testified that due to these glaring discrepancies with the known exculpatory evidence, Marsh's statement, as recorded in Nancy Taylor's October 5, 1982 report, on its face, did not provide probable cause. (SDF ¶221.)

Twice In 2001 and again in 2006, while under oath, Marsh unequivocally recanted the statement and her testimony at the criminal proceedings, explaining that she told Taylor and Connors repeatedly and truthfully that Waters never told her he committed the crime, but that she felt pressured and coerced by Taylor's persistent and aggressive interview tactics. (SDF ¶¶177, 179-88, 206-10.) Assuming Marsh testified truthfully in her affidavit and deposition, as the Court must here, even defendants' proffered expert admits that, before the polygraph, Marsh's statement alone did not provide probable cause to arrest Waters. (SDF ¶222.) As set forth below, any reasonable officer would have known that engaging in the type of overbearing and suggestive conduct Marsh describes ran the risk of generating falsely incriminating statements; APD policies specifically advised officers to "avoid questions that imply or suggest a particular answer" when interviewing witnesses. (SDF ¶178.)[35] As such, without independent corroboration, no reasonable officer could rely on the result

---

[35] Moreover, there was no basis for even suggesting that Marsh or Perry could legally be charged as accessories after the fact. That charge applies only to those "who, after the commission of a felony, harbors, conceals, maintains or assists the principal felon ... or gives such offender any other aid,

of such an interview as reliable evidence. There is a triable question as to the underlying facts; taken in plaintiff's favor, as they must be, there was not even arguable probable cause.

### b) The Unreliable Polygraph Did Not Give Rise to Probable Cause

Defendants contend that "Marsh's statements were verified by State Police polygraph." (Doc. 159 at 25.)  As prosecutor Fahey testified, she did not rely on polygraphs because such evidence is inadmissible in Massachusetts courts for any purpose due to its unreliability. (SDF ¶223.) *See Comm. v. Mendes*, 406 Mass. 201, 547 N.E.2d 35 (1989); *see also U.S. v. Scheffer*, 523 U.S. 303, 313 (1998) (noting that "there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams.").

Of course, "[u]nreliable evidence is unreliable evidence in any forum." *deVries v. St. Paul Fire and Marine Ins. Co.*, 716 F.2d 939 (1st Cir. 1983) (citation and internal quotations omitted). Thus, polygraph evidence is no more reliable an indicator of probable cause as it is evidence of guilt. *See Comm. v. Donahue*, 430 Mass. 710, 714 n.1 (Mass. 2000) (refusing to consider polygraph presented in affidavit as evidence supporting probable cause); *Comm. v. Scanlan*, 9 Mass. App.Ct. 173, 400 N.E.2d 1265 (Mass. App. 1980) (same).

Taylor need not have been a trained polygraph examiner to grasp just how unreliable this polygraph result was.  Anyone trained in (or even attuned to) the art of questioning would see that the questions Marsh answered were so vague and ambiguous as to be meaningless.  Nowhere does

---

*knowing that he has committed a felony*, ... with intent that he shall avoid or escape detention, arrest, trial or punishment."  (SDF ¶179.)  Marsh consistently denied ever having washed Waters' bloody clothing; even taking Taylor's report of her conversations with Osborne and Marsh as true, there was no evidence that Marsh did anything to assist him in the belief that he had committed the murder.

the polygraphist ask the direct question, "Did Ken Waters tell you he murdered Mrs. Brow?" (Def. Ex. 35.) Instead, he asks, referring to a 47-page pre-polygraph interview conducted in large part by Nancy Taylor, if Marsh told "the real truth about the conversation you had with Waters about Mrs. Brow's death." Which conversation about Brow's death was Marsh talking about when she answered "Yes"? During the interview, Marsh told Taylor that Marsh had asked him why police wanted to talk to him, and he told her "[b]ecause he was being blamed for something he didn't do." (Def. Ex. 34 at p. 9.) A truthful "Yes" answer to that question does not corroborate – but actually contradicts – the original statement Taylor attributed to Marsh.

More importantly, Taylor knew that critical elements of Marsh's statement conflicted with the known facts as set forth above, and therefore could not consider the polygraph to be a reliable indicator of Marsh's truth so as to tip the scales in favor of probable cause. "There is nothing sacrosanct or magical about a polygraph," *Tittle v. Raines*, 231 F. Supp.2d 537, 552 (N.D. Tex. 2002), *aff'd*, 69 Fed. Appx. 658 (5th Cir. 2003). A man cannot both have a bloody facial wound and appear unscathed, and he cannot be in two places at once; polygraph results cannot make it so. Any reasonably prudent officer would have understood that additional corroboration of Marsh's statement was necessary before a warrant could lawfully be obtained. (SDF ¶¶216-22.)[36]

### c) The District Attorney's Uninformed Authorization to Arrest Waters Did Not Create Probable Cause

---

[36] Taylor nonsensically argues that, because Taylor's probable cause affidavit in support of the arrest warrant is "not in the summary judgment record," (Doc. 159 at 27) we cannot know what she proffered in support of probable cause, and therefore there can be no claim based on material omissions or misrepresentations in the warrant. We do know the evidence that had been gathered against Waters as of October 12, 1982, when she obtained the warrant, and the panoply of evidence the APD was aware of that exculpated him and which raised serious doubts about the reliability of the statement Taylor elicited from Marsh. There is no way a neutral magistrate would have issued the warrant had all the pertinent information been presented. (SDF ¶193-94, 221.)

Taylor concedes, as she must, that prosecutors rely on police to disclose all pertinent evidence they are aware of, whether incriminating or exculpatory, so that the prosecutor can make a reliable determination of probable cause. (SDF ¶237.) "One standard police function is to provide information to the prosecutor and the courts. Thus, a police officer sometimes may be liable if he fails to apprise the prosecutor or a judicial officer of known exculpatory information," *Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999). If only Taylor had carried out her standard function and made Fahey aware that Waters was excluded as the source of the suspect's bloody fingerprint, that Waters' time cards proved his alibi, or that Taylor and Connors had pressured and induced Marsh into making her incriminating statement, Fahey never would have instructed Taylor to seek the warrant.

Thus, that A.D.A. Fahey authorized Taylor to seek an arrest warrant does not absolve Taylor given that Taylor withheld critical facts from her. (SDF ¶220.) "Law enforcement officers have an independent duty to exercise their professional judgment and can be brought to book for objectively unreasonable mistakes regardless of whether another government official (say, a prosecutor or a magistrate) happens to compound the error. The officer's own role is also pertinent. If he knowingly withholds material facts from the prosecutor, his reliance on the latter's opinion would not be reasonable." *Cox v. Hainey*, 391 F.3d 25, 35-36 (1st Cir. 2004).

### 2. November 10, 1982 Grand Jury

Nor did the grand jury proceedings that gave rise to the indictment generate any new evidence that would have given rise to probable cause. The only witnesses were Marsh, who repeated the false and incriminating statements Taylor had induced her to make, and Taylor herself, who lied about the

existence of usable prints.[37] (SDF ¶¶227-28, 232-33.) Her fingerprint lie alone creates a triable question on the malicious prosecution claim. *See Albright*, 510 U.S. at 79 (Ginsberg, J., concurring) ("If Oliver gave misleading testimony at the preliminary hearing, that testimony served to maintain and reinforce the unlawful haling of Albright into court, and so perpetuated the Fourth Amendment violation...  Albright remained effectively 'seized' for trial so long as the prosecution against him remained pending, and ... Oliver's testimony at the preliminary hearing, if deliberately misleading, violated the Fourth Amendment by perpetuating the seizure...."); *id.* at 307 (Stevens, J., dissenting) ("I agree with [Justice Ginsberg's] explanation of . . . why the seizure was constitutionally unreasonable.").

### C.  Taylor Has No Qualified Immunity

Qualified immunity is no defense to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335 (1986). Here, Taylor deliberately withheld material exculpatory facts while fraudulently proffering the statement she induced from Marsh as reliable evidence supporting probable cause. Any reasonable officer in Taylor's position would have realized the statement was false and unreliable, and would have sought to find evidence corroborating the statement before relying on it. Thus, because "it is obvious that no reasonably competent officer would have concluded that a warrant should issue" based on the facts known to Taylor, *id.*, 475 U.S. at 341, she has no qualified immunity for instigating the malicious prosecution against Waters.

### IV.    Taylor Is Also Liable Under State Law

### A.  Massachusetts Civil Rights Claim (M.G.L c. 12 §11-I)

Taylor next seeks summary judgment on Waters' claim under the Massachusetts Civil Rights

---

[37] Taylor admits that her practice was to review the file before testifying. (SDF ¶225-26.)

Act ("MCRA"), arguing that it is time-barred. That argument must be rejected. The MCRA confers

a private right that parallels § 1983, and carries it a 3-year statute of limitation. M.G.L. c. 12, § 11I;

M.G.L. c. 260 § 5B; *see* Mitchell, 130 F. Supp.2d at 214 (citing *Flynn v. Associated Press*, 401

Mass. 776 (1988)). Taylor argues that Waters' MCRA claim accrued at "the moment of his arrest

in 1982," instead of upon his exoneration. However, only during the DNA litigation in 2001 did

Waters discover the extent to which Marsh was coerced by Taylor (or the existence of a bloody

fingerprint at the scene from which he had been excluded decades earlier, a fact that, despite Waters'

best efforts, was only elicited several years into this civil rights litigation). Thus, Waters' MCRA

claim was tolled until he discovered the basis for it in 2001, within three years of its timely filing in

2004. *See Sampson v. Town of Salisbury*, 441 F. Supp.2d 271, 275-76 (D. Mass. 2006) (recognizing

that the MCRA statute of limitations period may be tolled under the "discovery rule" where basis

for claim was inherently unknowable); *Franklin v. Albert*, 381 Mass. 611, 618-619 (1980) (where

claim is based on an inherently unknowable wrong, discovery rule tolls accrual of claim where until

injured party knew, or in the exercise of reasonable diligence, should have known of the factual basis

for a cause of action); *Friedman v. Jablonski*, 371 Mass. 482, 486-487 (1976); *Hendrickson v. Sears*,

365 Mass. 83, 88-91 (1974).

Taylor's next contention, that the MCRA claim just be dismissed because no "threats,

intimidation or coercion" was directed at Waters, is equally unavailing. A plaintiff may indeed

pursue a viable MCRA claim even "though the confrontation may involve third persons and the

threat of harm [was] not directed at the plaintiff." *Sarvis v. Boston Safe Deposit and Trust Co.*, 47

Mass. App. Ct. 86, 92 (1999) (citing *Redgrave v. Boston Symphony Orchestra*, 399 Mass. 93,

100-101 (1987)). By way of example, in *Planned Parenthood League of Massachusetts, Inc. v.*

*Blake*, 417 Mass. 467, 474 n. 8 (1994), the Supreme Judicial Court concluded that clinic patients would be threatened or coerced by the defendants who protested outside of the clinic. 417 Mass. at 474-75. In so holding, the court stated that threats or coercion which may cause potential "confrontation between two people (*i.e.*, clinic staff and the defendants) that has the effect of depriving a third person (*i.e.*, patients) of protected rights can sufficiently prove a violation of the MCRA." *Id.* at 474 n. 8 (citing *Redgrave*, 399 Mass. at 100).[38] Here, Taylor can be held liable under the MCRA because she directed threats and abusive and coercive investigative techniques, toward Marsh and Perry with the specific intent of depriving Waters of his rights. Summary judgment must be denied as to this claim.

### B. Malicious Prosecution

Taylor challenges Waters' state-law malicious prosecution claim on the same grounds. Yet this claim did not accrue until the criminal proceedings terminated favorably with the June 28, 2001 *nolle prosequi*, less than three years before this action was filed. *See Nieves*, 241 F.3d at 53 (citing state law). As set forth above, there is a material dispute of fact as to the existence of probable cause to arrest or prosecute Waters (or the Court could find as a matter of law that the Marsh statement conflicts so obviously with the undisputed facts that there was no probable cause). *See Gutierrez v. MBTA*, 437 Mass. 396 (2002)). In sum, the motion must be denied.

---

[38] Taylor cites *Bally v. Northeastern University*, 403 Mass. 713 (1989), in which the plaintiff alleged that Northeastern's drug testing policy, which applied to all student athletes, violated the MCRA. The Supreme Judicial Court confirmed the viability of a MCRA claim where threats, intimidation or coercion were directed at one person or at a group, but, on the facts presented, held Northeastern's actual policy did not violate the plaintiff's civil rights. In other words, *Bally* is completely inapposite to this case.

## CONCLUSION

For the foregoing reasons, Taylor's summary judgment motion should be denied in full, and plaintiff given the opportunity for a fair trial to try to remediate the one Taylor sabotaged in 1983.

Dated: May 27, 2008          Respectfully submitted,
      New York, NY

                     /s/ Deborah L. Cornwall
                     Barry C. Scheck (BS 4612)
                     Deborah L. Cornwall (DC 2186)
                     Monica Shah (MS 9846)
                     COCHRAN NEUFELD & SCHECK, LLP
                     99 Hudson Street, 8th Floor
                     New York, NY 10013
                     Tel. (212) 965-9081 / Fax (212) 965-9084

                     Robert N. Feldman (BBO # 630734)
                     BIRNBAUM & GODKIN, LLP
                     280 Summer Street
                     Boston, MA 02210-1108
                     Tel. (617) 307-6130 / Fax (617) 307-6101

                     ***Attorneys for Plaintiff Betty Anne Waters***

**CERTIFICATE OF SERVICE**

I, Monica R. Shah, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via overnight delivery to those indicated as non-registered participants on May 27, 2008 as well as:

Joseph L. Tehan, Jr.
Gregg J. Corbo
Jeffrey T. Blake
Kopelman & Paige, PC
101 Arch Street, 12th Floor
Boston, MA 02110


/s/ Monica R. Shah
Monica R. Shah

56