UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
BETTY ANNE WATERS, as                    )
Administratrix of the Estate of          )
KENNETH WATERS,                          )
　　　　Plaintiff,                        )
　　　　v.                                )
                                         )　　Case No. 04 CV 10521 (GAO)(JGD)
TOWN OF AYER, NANCY TAYLOR-              )
HARRIS, in her individual capacity,      )　　**PLAINTIFF'S STATEMENT OF**
ARTHUR BOISSEAU, in his individual       )　　**DISPUTED MATERIAL FACTS**
capacity, WILLIAM ADAMSON, in his        )　　**PURSUANT TO LOCAL RULE 56.1**
individual capacity, and PHILIP L.       )
CONNORS, in his individual capacity,     )
                                         )
　　　　Defendants.                       )
_____ )

**KENNETH WATERS WAS WRONGLY CONVICTED
OF THE MAY 21, 1980 MURDER AND ARMED ROBBERY OF KATHERINA BROW**

1.　　On May 11, 1983, Kenneth Waters was convicted of the May 21, 1980 murder and armed

robbery of Katherina Brow.  He was sentenced to life in prison the next day.  (Ex. 26, *Comm.*

*v. Waters*, Sentencing Transcript at 326; Ex. 27, *Comm. v. Waters*, Commitment Warrants.)

2.　　Waters was innocent.  The prosecution's theory at trial was that Waters, the lone perpetrator,

cut himself and bled in a struggle with the victim. Waters was imprisoned for nearly eighteen

years until DNA testing on the non-victim blood found at the crime scene excluded him as

the man who bled.  As no evidence indicated the presence of a second perpetrator, the DNA

exclusion proved beyond any doubt that Waters was actually innocent of that heinous crime.

(Ex. 90, Expert Report of Dr. Edward T. Blake (7/19/07); Ex. 28, *Comm. v. Waters*, Order

Granting Unopposed Emergency Motion for New Trial (3/16/01); Ex. 92, Middlesex County

1

District Attorney's Office Press Release (3/13/01); Ex. 93, Jerry O'Brien, "After 18 Years, Sweet Freedom for Mass. Man," Providence *Journal-Bulletin* (3/14/01); Sealed Ex. 98, Bode Forensic DNA Case Report (6/8/01); Ex. 29, *Comm. v. Waters*, *Nolle Prosequi* (6/28/01); Ex. 3, Arthur Boisseau 11/16/06 dep. at 222; Ex. 8, Elizabeth Fahey dep. at 133-34; Ex. 24, *Comm. v. Waters*, Trial Transcript Vol. VII at 57-58 (Prosecution Closing Argument); Ex. 91, Expert Report of Dr. Sudhir K. Sinha (5/10/07); Ex. 20, Betty Anne Waters 11/28/06 dep. at 203-14; *see also* exhibits cited *infra* ¶¶30-33, 44 (no scratches); ¶¶34-42, 46-71 (alibi); ¶¶72-117 (print exclusion).)

3.    On March 13, 2001, with the consent of the Middlesex County District Attorney's Office, Kenneth Waters was released from prison after his convictions were vacated and his motion for a new trial was granted based on the undisputed DNA exclusion.  (Ex. 28, Order Granting Unopposed Emergency Motion for New Trial (3/16/01); Ex. 92, Middlesex County District Attorney's Office Press Release (3/13/01).)

4.    The District Attorney's Office subsequently retained an independent laboratory to conduct additional DNA testing of the Brow crime scene evidence.  This testing confirmed that Kenneth Waters was excluded as the source of the non-victim blood found at the crime scene.  (Sealed Ex. 98, Bode Forensic DNA Case Report (6/8/01); Sealed Ex. 97, Correspondence from Calkins to Love (5/23/01).)

5.    In light of the undisputed DNA evidence, on June 28, 2001, the Middlesex District Attorney's Office dropped all charges against Mr. Waters by way of a *nolle prosequi*, thereby favorably terminating the case against him on grounds consistent with innocence.  (Ex. 29, *Nolle Prosequi* (6/28/01).)

## THE CRIME

6.    On Wednesday, May 21, 1980, at approximately 10:44 a.m., Katherina Brow was found

stabbed to death in her Ayer, Massachusetts trailer home by her daughter-in-law Eugenie

Brow, who promptly called the Ayer Police Department ("APD") at 11:01 a.m.  (Ex. 24,

Trial Tr. Vol. 2 (E. Brow) at 83, 85, Vol. 5 at 540 (judicial notice that May 21, 1980 was a

Wednesday); Ex. 31, APD Brow Reports at 1, 3-5; Ex. 33, APD Daily Logs at 5/21/80, 1101

entry); Ex. 58, Autopsy Report.)

## THE AYER POLICE

7.    As of May 21, 1980, William Adamson, Sr. was Ayer's Chief of Police.  He remained in that

position until he was forced to resign amid a corruption scandal in the fall of 1981, in which

Ayer officers were accused of vandalizing the Ties Construction Company (also spelled

"Tye's") after it stopped hiring them for security details.  (Ex. 31, APD Brow Reports at 1,

3-5; Ex. 3, Boisseau 11/16/06 dep. at 19-22; Ex. 7, Philip Connors 11/15/06 dep. at 15-22,

25-36.)

8.    Defendant then-Lt. Arthur Boisseau was the most senior Ayer police officer under the Chief.

Boisseau was the APD's evidence officer, court liaison officer, and designated follow-up

investigations officer.  (Ex. 31, APD Brow Reports at 5, 7; Ex. 3, Boisseau 11/16/06 dep. at

7-21, 26, 29-36, 115, 131-32; Ex. 7, Connors 11/15/06 dep. at 77-79; Ex. 15, Stanley Randall

dep. at 28-29, 68.)

9.    As the Chief's second-in-command, Boisseau was responsibility for "providing the first level

of supervision in the department," being "primarily responsible for the proper performance"

of subordinates, and "ensuring compliance with the department's regulations."  It was

Boisseau's "duty and responsibility" to supervise all subordinate employees, ensure they were aware of departmental policies, and ensure their satisfactory performance. (Ex. 50, Duties by Rank and Assignment (APD Lt-Investigator policy), at 667, 668; *see also* Ex. 3, Boisseau 11/16/06 dep. at 34-36.)

10.    The APD was a small department, including only 12 police officers during the Brow investigation. (Ex. 7, Connors 11/15/06 dep. at 48.)

11.    Lt. Boisseau also served as the interim Chief of Police from late 1981 to February 1982, between the resignation of Adamson and the appointment of defendant Phil Connors as the new Chief. (Ex. 3, Boisseau 11/16/06 dep. at 19-23, 25-26; Ex. 7, Connors 11/15/06 dep. at 41.)

12.    During the Brow investigation, defendant Nancy Taylor was Chief Adamson's secretary and the APD's lone clerical employee. (Ex. 7, Connors 11/15/06 dep. at 50; Ex. 3, Boisseau 11/16/06 dep. at 41; Ex. 35, Excerpts of Nancy Taylor APD personnel file at 43-44.)

13.    Taylor had worked for Chief Adamson at the Pepperell Police Department, where she spent two years as a clerk and dispatcher, and had also served as a special officer detailed to interview rape and child abuse victims. (Ex. 18, Nancy Taylor 11/30/06 dep. at 62, 91-92, 99-100; Ex. 3, Boisseau 11/16/06 dep. at 36-42, 119-21.)

14.    At Adamson's request, in 1977 the Ayer Board of Selectmen appointed her to fulfill the same role at the APD. Her duties and pay were accordingly limited to clerical work and rape cases. (Ex. 35, Taylor personnel file at 65; Ex. 7, Connors 11/15/06 dep. at 64-66, 69-70, 73; Ex. 18, Taylor 11/30/06 dep. at 48, 55-56, 99-100; Ex. 19, Taylor 5/18/07 dep. at 67; Ex. 44, Cathy Johnston, "Ayer Policewoman's Pay Held Back," Ayer *Public Spirit*, Oct. 28,

4

1982.)

15.    Taylor wanted to become a full patrol officer but did not attend the police academy until after Waters was convicted in 1983.  She had no experience in homicide cases before taking part in the Brow murder investigation  (Ex. 35, Taylor personnel file at B257, B263, B272; Ex. 18, Taylor 11/30/06 dep. at 64, 188, 191; Ex. 19, Taylor 5/18/07 dep. at 67; Ex. 7, Connors 11/15/06 dep. at 50; Ex. 3, Boisseau 11/16/06 dep. at 119-20.)

16.    Taylor left the APD in 1986 to take a position as the "executive secretary" to the Groton Police Chief.  (Ex. 45, Norm Hartford, "Nancy Harris - Executive Secretary to Police Chief," 1984.)

17.    Phil Connors replaced Lt. Boisseau as the Ayer Police Chief in February of 1982.  (Ex. 7, Connors 11/15/06 dep. at 15, 41.)

## THE INITIAL INVESTIGATION

### APD Officers Responded to the Scene and Took Command of the Investigation

18.    APD Officer Walter "Buddy" Decot was the first law enforcement officer to arrive at the scene, at approximately 11:03 a.m.  (Ex. 31, APD Brow Reports at 1.)

19.    Lt. Boisseau arrived at 11:17 a.m. and took command of the scene.  (Ex. 31, APD Brow Reports at 7; Ex. 3, Boisseau 11/16/06 dep. at 64-67.)

20.    Boisseau went to the crime scene from the Ayer District Court, only making a brief stop to pick up his camera from the police station.  Boisseau secured and photographed the crime scene.  (Ex. 31, APD Brow Reports at 5, 7-8; Ex. 3, Boisseau 11/16/06 dep. at 64-67.)

21.    It was not until later that day that Massachusetts State Police officers of the CPAC unit at the Middlesex County District Attorney's Office, Trooper Patrick Keane and Detective

Lieutenant John Dwyer, arrived at the scene. They were joined by William Adamson, Sr., then the Chief of the Ayer Police Department, and Nancy Taylor. (Ex. 31, APD Brow Reports at 6, 7; Ex. 18, Taylor 11/30/06 dep. at 120.)

22.    Trooper Keane and Det. Lt. Dwyer worked on the case initially but moved on to other assignments until the fall of 1982 when the case was reactivated. Det. Lt. Dwyer died in 1987. (Ex. 12, Patrick Keane dep. at 10-11, 19-20, 23-24; Ex. 37, State Police Reports at AG150-54, AG148; Ex. 22, *Comm v. Waters*, Excerpts of Probable Cause Hearing Transcript at 13-30 (Dwyer); Ex. 24, Trial Tr. Vol. 5 at 606-08 (Dwyer).)

23.    State Police Chemist Kathleen Higgins arrived at the Brow residence shortly after noon and collected blood and hair samples from the crime scene. (Ex. 31, APD Brow Reports at 10-11.)

24.    Corporal John Baliunas, a trained fingerprint examiner working of the State Police Holden Barracks, arrived at the crime scene a few hours after Brow's body was discovered, and photographed and processed the scene for latent fingerprints. (Ex. 31, APD Brow Reports at 10-11; Ex. 1, John Baliunas dep. at 1-2, 8-35, 110-13, 115; Ex. 52, State Police Fingerprint File at SP5-6; Ex. 54, Excerpts of Baliunas Original File.)

### *The Assailant was Cut and Bled at the Scene In a Struggle with the Victim*

25.    The crime scene was in complete disarray when the APD officers arrived: blood was found all over the house; furniture was toppled; broken glass was on the floor; a toaster had been broken into pieces on the dining room the floor; water was running in the sink; a stove burner remained lit; and towels and sheets from the linen closet were strewn on the floor. (Ex. 31, APD Brow Reports at 4, 7; Ex. 24, Trial Tr. Vol. 2 at 84, 86-95 (E. Brow); Ex. 54,

Baliunas Original File, photographs at BAL41, BAL48; Ex. 38, State Police Crime
Laboratory Report of 7/28/80 at B231-42.)

26.     The victim's body was found in a pool of blood in her bedroom; she was clutching hairs in
her fist when her body was discovered.  The Medical Examiner later concluded that her
death was caused by thirty knife wounds to her body, and she suffered a number of blunt-
force injuries prior to death.  (Ex. 31, APD Brow Reports at 5; Ex. 24, Trial Tr. Vol. 4 at
175-79, 183-87 (Dr. George Katsas), Vol. 3 at 379-80 (Kathleen Higgins); Ex. 58, Autopsy
Report at AG156.)

27.     A bloody knife embossed with the name "Murphy Company," was discovered in the kitchen
wastebasket, and determined to be the murder weapon.  In an interview with Boisseau, the
victim's husband identified the knife as coming from the Brows' own kitchen drawer.  (Ex.
31, APD Brow Reports at 11; Ex. 32, Adamson Brow Reports at B40; Ex. 3, Boisseau
11/16/06 dep. at 102-03; Ex. 24, Trial Tr. Vol. 3 at 195 (Boisseau).

28.     Ayer police also identified a ceramic lamp in the home as the source of the blunt-force
injuries. The press was notified that police had both murder weapons.  (Ex. 40, Cathy
Johnston, *"Brow Family Pleas for Tips to Police,"* "Ayer Murder Investigation," Ayer
*Public Spirit,* June 12, 1980.)

29.     APD officers discovered that the linen closet had been ransacked and two of Mrs. Brow's
handbags, her jewelry, and an envelope full of cash, usually stored in the linen closet, were
missing.  (Ex. 31, APD Brow Reports at 8; Ex. 24, Trial Tr. Vol. 2  at 96-98, 101-03 (E.
Brow).)

30.     Ms. Higgins of the State Police Crime Laboratory in Boston later identified two types of

blood at the scene using pre-DNA technology: type B-positive, consistent with Brow's blood type, and type O, believed to have been left by the perpetrator. Type O blood was identified on the floor of the entrance to the back left bedroom; the fibers of the bathroom rug; the front of the left closet in the middle bedroom; linens recovered from the hallway floor; carpeting in the living room; the curtain from the front door window; and the inside of the front door. (Ex. 39, State Crime Laboratory Report of 4/17/81 at L213-14; Ex. 31, APD Brow Reports at 11; Ex. 37, State Police Reports at AG151; Ex. 24, Trial Tr. Vol. 3 at 28-86 (Abbot).)

31.   Forensic scientist John Cope Abbott testified at the trial that "most people" have Type-O blood. Ayer officers learned that the victim's husband and son shared blood Type O. (Ex. 24, Tr. Vol. 3 at 293 (Abbot); Ex. 32, Adamson Brow Reports at B46, B47).

32.   The disarray of the crime scene, the presence of Type-O blood, and the brutal nature of the victim's injuries led police to believe that the perpetrator was cut and bled in a struggle with the victim. Chief Adamson reported, "[I]nvestigators definately [sic] feel as though assailant(s) sustained some injuries as resuls [sic] of resistance from the victim to the extent that assailant(s) may have sought medical treatment." (Ex. 31, APD Brow Reports at 11; Ex. 37, State Police Reports at AG150-52; Ex. 24, Trial Tr. Vol. 3 at 192-93 (Katsas); Ex. 3, Boisseau 11/16/06 dep. at 221-22.)

33.   APD officers immediately canvassed surrounding hospitals for suspects seeking treatment for injuries sustained with a knife or other sharp objects. (Ex. 31, APD Brow Reports at 3, 12-17; Ex. 32, Adamson Brow Reports at B44-45; *see also* Ex. 37, State Police Reports at AG150-52.)

8

## The Time-of-Death Window Was Established

34.    Mrs. Brow was last seen alive by her husband, Charles Brow, approximately five or ten

minutes past 7:00 a.m. the day of the attack when he left for work.  (Ex. 24, Trial Tr. Vol.

2 at 75 (C. Brow); Ex. 58, Autopsy Report.)

35.    Police concluded that Brow was murdered between 7:10 a.m., when Mr. Brow last saw her,

and 11 a.m., when Eugenie Brow discovered her body, but recognized that the time window

could be narrowed based on the Medical Examiner's findings regarding the victim's body.

(Ex. 3, Boisseau 11/16/06 dep. at 28-29, 90-91; Ex. 33, APD Brow Daily Logs at 5/21/80,

1101 entry; Ex. 31, APD Brow Reports at 1, 3-6.)

36.    Medical Examiner Dr. Bertrand Hopkins examined Brow's body at 11:43 a.m., less than one

hour after it was discovered, and noted that no rigor mortis had set in yet.  Rigor mortis, a

stiffening of the body that sets in over time after death, is a method by which investigators

determine time of death.  (Ex. 31, APD Brow Reports at 8; Ex. 59, Excerpt from Paul C.

Giannelli & Edward J. Imwinkelreid, SCIENTIFIC EVIDENCE Vol. 2, § 19-8 at pp. 125-27

(Michie:1999).)

37.    Dr. Hopkins also noted that the body's rectal temperature when he examined the body at the

scene was 97.8 degrees Farenheit.  (Ex. 31, APD Brow Reports at 8; Ex. 58, Autopsy Report

at B245; Ex. 3, Boisseau 11/16/06 dep. at 89-90.)

38.    The "standard formula" used by pathologists determines time of death based on the average

loss of 1 ½° Farenheit per hour after death.  *Comm. v. Haas*, 398 Mass. 806, 810 n.5 (Mass.

1986).

39.    The local press reported that police believed the murder occurred between 10 a.m. and 11

a.m. (Ex. 40, Cathy Johnston, "Brow Family Pleas for Tips to Police," Ayer *Public Spirit,* June 12, 1980; Ex. 18, Taylor 11/30/06 dep. at 119.)

40.    At trial, prosecutor Elizabeth Fahey argued that the time of death was closer to 7 a.m. than 11 a.m., but no forensic evidence supported that argument. The only time-of-death testimony at trial was from Dr. Katsas, who had conducted the autopsy at 6 p.m. on May 22, more than a day after Dr. Hopkins examined the body. At the autopsy, Dr. Katsas noted the presence of minimal rigor mortis in the victim's extremities. The autopsy report was not introduced at trial. (Ex. 25, Trial Tr. Exhibit Lists; Ex. 24, Trial Tr. Vol. 3 at 173-93 (Katsas), Vol. VII at 40-41 (A.D.A. Fahey Closing).)

41.    The prosecutor asked him: "Assuming, Doctor, the following facts: That Mrs. Brow was last seen alive at approximately 7:00 a.m. on May 21 of 1980; that she was discovered dead at approximately 10:45 a.m. on May 21 of 1980; that body temperature was taken rectally at approximately 11:45 a.m. and determined to be 97.8 degrees, and that she had at that time minimal rigor of the neck and arms and no rigor mortis in her legs, do you have an opinion, Doctor, as to the time that Mrs. Brow died? . . . What is that opinion?" Dr. Katsas testified that "the presence of rigor mortis, slight as it may have been, would indicate that the time of death was most probably closer to the time of her last known to be alive rather than the time she was found dead." (Ex. 24, Trial Tr. Vol. 3 at 187-88 (Katsas).)

42.    Fahey's argument was based on a hypothetical question with an erroneous premise that was inconsistent with Dr. Hopkins' original observation that there was no rigor mortis at 11:40 a.m. on May 21, an hour after the body was discovered. (*See* Ex. 24, Trial Tr. Vol. 3 at 188 (Katsas); *supra* ¶36.)

**Ayer Police Interviewed Waters the Day After the Murder and Soon Excluded Him as a
Suspect Because He Was Not Injured, Had an Alibi, and Was Excluded as the Source of
the Unknown Fingerprint Collected at the Scene**

43.    On May 22, 1980, the day after the murder, Boisseau and State Police Trooper Keane went
to Kenneth Waters' house at 5 Vernon Street and asked him to go with them to the Ayer
police station for questioning about the crime. Waters agreed. (Ex. 31, APD Brow Reports
at 9; Ex. 24, Trial Tr. Vol. 3 at 209 (Boisseau), Vol. 5 at 607 (Dwyer); Ex. 3, Boisseau
11/16/06 dep. at 96-97.)

44.    At the station, Adamson and Boisseau inspected Waters and determined he had no cuts or
scratches on his body. Lt. Boisseau acknowledged that it would have been valuable
incriminating evidence to document any wounds on Waters, given the evidence that the
perpetrator had been cut and bled in the struggle. No report was written documenting
Waters' lack of injuries. (Ex. 3, Boisseau 11/16/06 dep. at 96-100; Ex. 24, Trial Tr. Vol. 3
at 196-97 (Boisseau), Vol. 5 at 607-08 (Dwyer); Ex. 20, Waters 11/28/06 dep. at 179-80,
188; Ex. 18, Taylor 11/30/06 dep. at 254-57, 263-66; *see also* exhibits cited *supra* ¶¶30-33.)

45.    Chief Adamson and Lt. Boisseau interviewed Waters in the presence of Keane and Dwyer.
As per the APD's standard practice, the interview with Waters was tape-recorded. That tape
was not disclosed in discovery in this action and is apparently missing. The only remaining
documentation of the interview is a partial transcript of some of the questioning. (Ex. 3,
Boisseau 11/16/06 dep. at 91-96; Ex. 60, Partial Transcript of May 22, 1980 Interview of
Kenneth Waters.)

46.    During the interview, Waters accounted for his whereabouts on the morning of the murder,
explaining that he had worked an overnight double-shift at the Park Street Diner and left

there after 8:00 a.m., went home and changed into a suit, met with his attorney Carl Black

prior to a 9:00 a.m. appearance in the Ayer District Court, and did not leave court until after

11:00 a.m.  (Ex. 60, Partial Transcript of May 22, 1980 Interview of Kenneth Waters; Ex.

24, Trial Tr. Vol. 5 at 582-85 (Carl Black); Ex. 13, Brenda Marsh dep. at 49; Ex. 63, Ayer

District Court Records; Ex. 3, Boisseau 11/16/06 dep. at 96, 100; *see also* Ex. 20, Waters

11/28/06 dep. at 127-28.)

**Ayer Officers Determine that Waters Was in Court Between 9 and 11 a.m.**

47.  The partial transcript of the interview reflects that Waters specifically informed Adamson,

Boisseau, and the State Police officers that he checked into court at 9:00 a.m. and left at

approximately 11:00 a.m.  (*See* Ex. 60, Partial Transcript of May 22, 1980 Interview of

Kenneth Waters.)

48.  Court records corroborate that Waters had an appearance in the Ayer District Court on the

morning of May 21, 1980 and was the 15th Ayer defendant on the docket for that morning.

(Ex. 63.)

49.  Attorney Carl Black, who represented Waters that morning, had instructed Waters to arrive

at court by 8:45 a.m. that morning, and met him there.  (Ex. 24, Trial Tr. Vol. 5 at 582-85

(Black).)

50.  Lieutenant Boisseau was also at the Ayer District Court at 9 a.m. on May 21, 1980.  (Ex. 33,

APD Daily Logs at May 21, 1980, 0904 entry.)

51.  As the APD's court liaison officer, Boisseau was in court on a daily basis during that time

period and was generally familiar with Ayer District Court procedures requiring defendants

to appear in court at 9 a.m. and then wait through docket call for their cases to be heard.  (Ex.

3, Boisseau 11/16/06 dep. at 14-18.)

52. Boisseau saw Waters in court around 11 a.m. that morning and acknowledges that Waters could have been there as early as 9 a.m., and that he made sure his fellow officers were aware that Waters had been seen in court that morning. (Ex. 24, Trial Tr. Vol. 2 at 121-22 (Boisseau); Ex. 3, Boisseau 11/16/06 dep. at 64, 68-74, 94, 96, 191, 193-94.)

### Ayer Police Collected Waters' Alibi Time Cards, Which Showed He Was at Work Until 8 a.m.

53. It was an obvious investigative step to check Waters' time records at the Park Street Diner to confirm or deny that part of his alibi. The APD's evidence handling policy noted that such evidence is given greater weight than witness testimony, since memories fade. (Ex. 3, Boisseau 11/16/06 dep. at 101-02, 105-06; Ex. 19, Taylor 5/18/07 dep. at 146; Ex. 48 at 2.)

54. For example, on February 26, 1981, Chief Adamson and Taylor confirmed suspect Donald Pina's alibi by obtaining his employment schedule, which showed that he was working at the VA Hospital in Brockton when the murder was committed. (Ex. 61, APD Brow Correspondence from Adamson to Potvin (3/3/81); Ex. 62, Correspondence from VA Hospital to Adamson (2/26/81, enclosing Pina's time records); Ex. 31, APD Brow Reports at 47.)

55. At the beginning and end of their shifts, Park Street Diner employees punched time cards that were forwarded to Berry Enterprises for processing of payroll each week. (Ex. 68, Affidavit of Elizabeth Lankford ¶¶5-7; Ex. 64, Park Street Diner Time Cards.)

56. Waters often worked the graveyard shift (11 p.m. to 8 a.m.) at the Park Street Diner. (Ex. 64, Park Street Diner Time Cards at BAW502-04 (K. Waters cards); Ex. 20, Waters 11/28/06 dep. at 128-30; Sealed Ex. 96, Excerpts of Marsh Grand Jury Transcript (2001) at AG2564;

13

Ex. 20, Waters 11/28/06 dep. at 129-44, 175.)

57.    Brenda Marsh admitted at trial that Waters left home the night before the murder between 10 and 11 p.m. wearing "[h]is clothes to go to work, white shirt and jeans." (Ex. 24, Trial Tr. Vol. 4 at 449 (Marsh).)

58.    Pay stubs located after trial show that Mr. Waters worked more than his typical 48-hour week and actually worked 55.5 hours during the week in question. (Ex. 24, Trial Tr. Vol. 5 at 534 (Tessier); Ex. 65, Stipulation Regarding Waters' Weekly Pay Stub.)

59.    Waters' time card for the week of the murder would have shown that he worked a double shift starting the evening of May 20, 1980 and ending at 8:00 a.m. on the morning of May 21, 1980. *(See* SDF ¶¶53-58, *supra*, ¶¶60-71, *infra*; *see also* Ex. 3, Boisseau 11/16/06 dep. at 100; Ex. 20, Waters 11/28/06 dep. at 129-44, 175; Ex. 100, *Comm v. Waters*, Excerpt of Motion for a New Trial Hearing Tr. at 2-24 (Bradley).)

60.    Nancy Taylor testified in her deposition that APD officer Walter "Buddy" Decot went to the Diner in search of Waters' time cards, and Lt. Boisseau testified that Decot was sent to the diner to "pick up some time cards." Yet, Boisseau testified that he never saw the time cards. (Ex. 18, Taylor 11/30/06 dep. at 129, 132-35, 139-40; Ex. 3, Boisseau 11/16/06 dep. at 231.)

61.    Within days after the murder and after the Ayer police interviewed Waters, two APD officers, including Buddy Decot, appeared at Berry Enterprises and asked for Waters' time card for the week of the murder. (Ex. 68, Lankford Aff. ¶¶9-10; Ex. 3, Boisseau 11/16/06 dep. at 231; Ex. 18, Taylor 11/30/06 dep. at 128-29, 132-35; Ex. 19, Taylor 5/18/07 dep. at 187.)

62.    Elizabeth Lankford, who worked for Berry Enterprises in May of 1980, was present at the

office at the time the APD officers requested the time cards.  (Ex. 68, Lankford Aff. ¶¶2, 9-10.)

63.    It was the standard practice of Berry Enterprises to retain employees' cards on file and to comply with such a request from the police by turning over copies of the time cards.  (Ex. 68, Lankford Aff. ¶11.)

64.    Waters' investigator Joseph Giudetti, interviewed Lankford in connection with Waters' motion for a new trial in 1985.  According to the affidavit he filed in that action, Lankford "remembered turning [the time cards] over to the Ayer police" and "remembered turning them over to Officer Decot, but she could not be certain."  (Ex. 67, Giudetti Aff. ¶5.)

65.    Giudetti followed up directly with Decot, who acknowledged that he may have picked up the cards "and, if he did, he would have merely brought them back to the police station." (Ex. 67, Giudetti Aff. ¶5.)

66.    If Decot did collect the time cards or copies thereof, he would have brought them back to the station and they would have been accessible and known to Adamson, who kept the Brow file in his office in a departure from typical protocol, and by Taylor, who maintained the file. (Ex. 2, Boisseau 8/25/06 dep. at 35-36, 62-64; Ex. 19, Taylor 5/18/07 dep. at 64, 82-86, 124-25, 127, 152-53.)

67.    If there had been no time cards at the Park Street Diner when Decot sought them in 1980, as Nancy Taylor testified, she admitted in her deposition that it would have been important for Ayer police to talk to Waters' coworkers to verify or disprove his alibi.  But as far as Taylor knew there was no further investigation after Decot returned from the Diner. Nevertheless, Taylor made a daily log entry on July 17, 1980 reflecting that at least one APD

15

officer did go to Berry Enterprises specifically in relation to Kenny Waters; Sgt. Harris
returned a $55 check in his name that had been issued to Waters but not delivered, as Waters
had moved away.  (Ex. 19, Taylor 5/18/07 dep. at 162, 187; Ex. 33, APD Brow Daily Logs
at 7/17/80, 1610 entry.)

68.     It was standard APD practice for an officer to write a report about checking a suspect's alibi.
        No report has been disclosed reflecting that Decot or any other Ayer police officer checked
        Waters' alibi at the Park Street Diner.  (Ex. 19, Taylor 5/18/07 dep. at 152-54.)

69.     Taylor's duties as a clerk included filing police reports and maintaining investigative files.
        In a departure from APD's standard practice, Chief Adamson kept the complete APD file
        on the Brow homicide in his own office.  (Ex. 18, Taylor 11/30/06 dep. at 80-83.)

70.     Ayer Police also had numerous opportunities to confirm Waters' alibi as APD officers,
        including Chief Adamson and Lieutenant Boisseau, repeatedly visited the Park Street Diner
        during the first week of the investigation.  Lt. Boisseau was dispatched to the Diner within
        hours of the murder.  (Ex. 31, APD Brow Reports at 2; Ex. 32, APD Adamson Reports at
        B39; Ex. 3, Boisseau 11/16/06 dep. at 87-88, 100.)

71.     Shortly after her brother was arrested in the fall of 1982, plaintiff Betty Anne Waters went
        to Berry Enterprises with Waters' ex-wife.  In response to their inquiry about Waters' time
        cards, a female employee said that she had just looked at Waters' time cards in response to
        a call from the Ayer police, that Waters had in fact worked the morning of the murder, and
        that the police were on their way to pick up the time cards.   After the conviction, Ms.
        Waters returned to Berry Enterprises and again inquired about the time cards.  In response,
        she was informed that the time cards had been turned over to the Ayer Police.  (Ex. 20,

Waters 11/28/06 dep. at 131, 135-42.)

72.     At the conclusion of the interview with Adamson and Boisseau, Waters was asked to provide
his fingerprints and did so.  He also volunteered to take a polygraph examination  (Ex. 60,
Partial Transcript of May 22, 1980 Interview of Kenneth Waters; Ex. 3, Boisseau 11/16/06
dep. at 95-96.)

### Ayer Police Submitted Waters' Prints to Baliunas for Comparison and Learned that He was Excluded

#### *Usable Latent Prints Were Collected at the Scene*

73.     Baliunas found several latent fingerprints at the scene: three on the dining room table; one
on a Ballantine beer can; and a partial print on the kitchen sink's cold water tap, which had
been running when the body was discovered.  In addition, a piece of a toaster was found on
the dining room floor, containing a bloody fingerprint.  (Ex. 52, State Police file at SP5; Ex.
54, Excerpts of Baliunas Original File at BAL4-5, BAL41 (third photo down in both
columns), BAL49; Ex. 1, Baliunas dep. at 13-19; Ex. 11, Sgt. Alan Hunte dep. at 26-28, 45,
46.)

74.     Baliunas photographed each of these items and collected them for examination at the Holden
State Police barracks.  (Ex. 54, Baliunas file at BAL30-32, BAL34, BAL47-50; Ex. 1,
Baliunas dep. at 23-30.)

75.     Baliunas informed Ayer police of the existence of prints collected at the scene.  As per
standard procedure, the APD provided Baliunas with "elimination prints" to rule out the
victim, her family, and APD officer Decot, the first officer on the scene, as the source of
those prints.  (Ex. 1, Baliunas dep. at 72-76, 85-86, 90-91; Ex. 11, Hunte dep. at 103; Ex. 4,
Boisseau 6/13/07 dep. at 6-8; Ex. 54, Baliunas Original File at BAL6, BAL8, BAL10-11.)

76.    Baliunas matched the beer can print to the victim's right index finger and determined that

the prints left on the dining room table belonged to her as well.  (Ex. 54, Baliunas Original

File at BAL30, BAL34, BAL54; Ex. 32, Adamson Brow Reports at B47; Ex. 55, Baliunas

Aff. ¶12; Ex. 11, Hunte dep. at 26-27.)

77.    The remaining toaster print – which Baliunas determined did not come from the victim, her

family, or Officer Decot – was valuable evidence of the perpetrator's identity.  (Ex. 54,

Baliunas Original File at BAL49; Ex. 1, Baliunas dep. at 73; Ex. 11, Hunte dep. at 28, 45-47;

Ex. 4, Boisseau 6/13/07 dep. at 38; Ex. 32, Adamson Brow Reports at B47).)

78.    A fingerprint examiner could not eliminate the victim, her family, police officers, much less

suspects, as the source of a latent fingerprint from a crime scene, and there would be no

purpose served by submitting prints for comparison, if the latent fingerprints lifted at the

scene were smeared or otherwise unusable.  (Ex. 3, Boisseau 11/16/06 dep. at 134-138; Ex.

1, Baliunas dep. at 48-54, 57-58, 91-94, 157-61.)

***Ayer Police Submitted Waters' Prints for Comparison and Baliunas Excluded Him***

79.    APD reports signed by Chief Adamson and Ayer daily logs reflect that Ayer police sent a

number of suspects' fingerprints to Baliunas for comparison with the latents collected at the

scene in hopes of identifying the perpetrator.[1]  (Ex. 32, Adamson Brow Reports at B42, B47-

48, B52; Ex. 31, APD Brow Reports at 21-42, 50; Ex. 53, Adamson correspondence

(7/16/80); Ex. 33, APD Brow Daily Logs at 7/1/80 (Brow Investigation entry before 1503

entry), 7/11/80 (0946 entry), 8/6/80 (two Brow Investigation entries before 1220 entry); Ex.

---

[1] These included Jay Jones, William Jones, Nat Johnson, Larry Williams, Raymond
Williams, Michael Camblin, Ray Jones, Anthony Bean, Michael Hamilton, Jerry Graham, John
Good and Peter Rivera.

54, Baliunas Original File at BAL6, BAL8, BAL10-11; Ex. 55, Baliunas Aff. ¶11; Ex. 1, Baliunas dep. at 40-45, 54-55, 157-61; Ex. 8, Fahey dep. at 212-16, 219-21.)

80.    Chief Adamson, Lt. Boisseau and Nancy Taylor had Waters' fingerprints on multiple occasions and knew they were available for comparison to the crime scene latents. Waters had been fingerprinted by Ayer police in connection with the charge for which he appeared in court on May 21, 1980. Ayer police fingerprinted him again after Adamson and Boisseau interviewed him the next day and a third time on September 2, 1980, when Boisseau arrested him on another charge and questioned him again about the Brow murder. Nancy Taylor typed the daily log entry reflecting that Waters had been "printed" when he was booked on September 2, 1980. Waters was printed a fourth time when Taylor and Ayer Officer Dennis MacDonald ultimately arrested him for the Brow murder on October 13, 1982. (*See* exhibits cited *supra* ¶¶75, 79; Ex. 33, APD Brow Daily Logs at 9/2/80 (1721 entry), 10/13/82 (1306 entry); Ex. 31, APD Brow Reports at 43; Ex. 30, Complaint and Arrest Report at B177.)

81.    The obvious next step was to send Waters' prints to Baliunas for comparison to the usable latent print found at the crime scene. (Ex. 8, Fahey dep. at 229; Ex. 1, Baliunas dep. at 63-64, 66-69, 81-83; Ex. 3, Boisseau 11/16/06 dep. at 29, 95-96, 103-05.)

82.    APD daily logs reflect that Baliunas telephoned Adamson just two hours after Waters provided his prints and left the station on May 22, 1980. (Ex. 33, APD Brow Daily Logs at 5/22/80 (1125 and 1410 entries).)

83.    Baliunas' standard practice was to compare every set of fingerprints provided to him. He no longer remembers every suspect whose prints he compared in the Brow case a quarter-century ago, but at his May 17, 2007 deposition could think of no reason why Ayer police

would not have forwarded Waters' prints to him.  (Ex. 1, Baliunas dep. at 54, 63-64, 68-69, 81, 89-90, 161.)

84.    Baliunas' standard practice was to report the results of fingerprint comparisons to the agency that had submitted prints for comparison, in this case the APD.  That reporting was done orally if there was an exclusion, or in writing if there was a match.  Both plaintiff's police practices expert, Lou Reiter, and fingerprint expert, Ron Smith, opined that this standard practice was consistent with generally accepted law enforcement practices of the time.  (Ex. 1, Baliunas dep. at 45-48, 52-53, 63-66, 79-80, 85-87, 121, 128, 154; Ex. 55, Baliunas Aff. ¶11; *see also* Ex. 57, Smith Expert Aff. (8/21/07) at 5-6; Ex. 18, Taylor 11/30/06 dep. at 290-91; Ex. 16, Reiter dep. at 190.)

85.    Baliunas did not match any suspect's fingerprints to the unknown latents at the Brow crime scene.  (Ex. 55, Baliunas Aff. ¶13; Ex. 1, Baliunas dep. at 65-66.)

86.    Baliunas retired from the State Police on November 12, 1982, taking accumulated vacation time prior to that date.  (Ex. 1, Baliunas dep. at 28, 78-79.)

87.    Baliunas did not testify at Waters' trial.  He was listed on the defense witness list and a subpoena was issued care of the State Police for him to appear at trial in 1983, but there is no record of any return on the subpoena.  Baliunas testified that he was not contacted by anyone in connection with Waters' arrest or trial.  (Ex. 1, Baliunas dep. at 28, 65-66, 78-80; Ex. 55, Baliunas Aff. ¶¶1, 4.)

### Baliunas Told State Police Trooper Al Hunte in 2001 that He Had Excluded Waters as the Source of the Prints

88.    After the DNA exclusion and vacatur of Waters' conviction in March of 2001 (*see supra* ¶¶ 2-3), State Police Trooper Al Hunte was assigned to reinvestigate the case to assist the

Middlesex County District Attorney's Office in determining whether to retry Waters for the Brow murder.  (Ex. 11, Hunte dep. at 5-6, 23-25.)

89.     Hunte had the same poorly copied documents originally produced by the State Police to plaintiff in discovery, including Baliunas' crime scene report, copies of fingerprint enlargements, and the two-page handwritten list of names.  Hunte interpreted the list as a list of suspects Baliunas excluded as the source of the prints he collected at the crime scene.  (Ex. 11, Hunte dep. 62-66, 68-70, 102-03, 106.)

90.     Hunte contacted John Balinuas in his retirement to ask him about the print evidence.  (Ex. 11, Hunte dep. at 20-21, 24-25.)

91.     When reached by Hunte in 2001, Baliunas still had a memory of the case and informed Hunte that he remembered collecting three prints from the table and a print on a beer can, all of which he matched to the victim, and a partial print on the faucet and a print on a piece of the toaster that did not match the victim.  (Ex. 11, Hunte dep. at 25-30, 45-47.)

92.     Baliunas told Hunte that Waters had been excluded as the source of the faucet print and that there were no fingerprint matches in the case.  (Ex. 11, Hunte dep. at 9-10, 25-28, 101-02; Sealed Ex. 99, District Attorney post-conviction documents & notes of ADA Sheila Calkins at AG2468, AG2471.)

93.     Hunte believed that Baliunas was truthful and would have testified consistently with what he told Hunte if called for a retrial in 2001.  Plaintiff's fingerprint expert, Ron Smith, confirms that Waters is not the source of the bloody fingerprint on the piece of the toaster.  (Ex. 11, Hunte dep. at 24-25, 46-47, 52-53, 71-72; Ex. 57, Affidavit of Ron (8/21/07), at 5.)

94.     Hunte spoke to Baliunas again in 2007 and agrees that Baliunas' memory of the case was

much better in 2001 than it was in 2007.  (Ex. 11, Hunte dep. at 73-74.)

***Baliunas' Original File Proves He Excluded Waters as the Source of the Perpetrator's Prints***

95.    At his May 17, 2007 deposition, Baliunas testified that it was possible he had some records from his work on the Brow investigation in storage.  (Ex. 1, Baliunas dep. at 36-39, 58-59, 71, 94-98.)

96.    Pursuant to a search of Baliunas' locked storage space in Grafton, Massachusetts on June 10, 2007, what appears to be the original State Police Holden Barracks fingerprint file was located.  (Ex. 55, Baliunas Aff. ¶¶1, 4; Ex. 1, Baliunas dep. at 59-63, 77-78, 86-87, 151-52.)

97.    Baliunas' original file included a copy of his original crime scene report, original latent prints he recovered from the scene, photographic enlargements of those latents, fingerprint cards taken from the victim at the morgue, negatives and prints of photographs of the crime scene and the victim taken at the autopsy, copies of fingerprint cards of some suspects whose prints he compared to latents from the crime scene, and four handwritten pages listing names.  (Ex. 55, Baliunas Aff. ¶7; Ex. 54, Baliunas Original File at BAL7, BAL9, BAL16-20, BAL24; *see also* Ex. 1, Baliunas dep. at 55-56.)

98.    Baliunas' file includes fingerprint records for individuals for whom Ayer has no corresponding record of submitting prints.  For example, Baliunas' file includes a copy of the fingerprint card for Richard Alan Rice – document card generated by the Ayer Police – but there is no reference in Ayer's records to the fact that they submitted it.  Baliunas' standard practice was to keep a copy of the print card in his file if the police sent him a copy, but to return original print cards to the submitting agency.  (Ex. 54, Baliunas Original File at BAL16; Ex. 1, Baliunas dep. at 60-61; Ex. 55, Baliunas Aff. ¶8.)

99.    Prior to discovery of the original Baliunas file, the only evidence the State Police produced from the original fingerprint investigation consisted of several poorly copied pages of latent print enlargements, a copy of Baliunas' two-page original crime scene report, and an almost illegible two-page handwritten list of names.  (Ex. 52, State Police Fingerprint File at SP1, 3-14; Ex. 1, Baliunas dep. at 12-122, 30-32, 35-36, 155-57.)

100.    When shown that list of names at his May 17, 2007 deposition, Baliunas, who is elderly, was first unsure if he had written it and then denied having authored it.  Upon inspection of his original file when it was located two months later, however, Baliunas located this list on the back of two copies of fingerprint cards and identified the list as his own handwriting.  (Ex. 1, Baliunas dep. at 7, 12-22, 30-32, 76-77, 89; Ex. 55, Baliunas Aff.  ¶¶6-7, 9; Ex. 54, Baliunas Original File at BAL6-9.)

101.    Baliunas recognized the original handwritten list of names as the list of suspects he compared and excluded as the source of the latents he found at the crime scene, consistent with standard practice.  (Ex. 55, Baliunas Aff. ¶¶9, 10; Ex. 1, Baliunas dep. at 55-56; *see also* Ex. 57, Smith Expert Aff. (8/21/07) at pp. 5-6.)

102.    Ayer records confirm that the names on Baliunas' list were individuals Ayer police considered suspects.  (Ex. 31, APD Brow Reports at 21-42, 50; Ex. 32, Adamson Brow Reports at B42, B47-48, B52; Ex. 53, Adamson correspondence (7/16/80); Ex. 33, APD Brow Daily Logs at 7/8/80 (entry regarding Pina, Spinola, White, before 1503 entry), 7/11/80 (0946 entry), 8/6/80 (two entries, regarding subjects wanted by Sacramento P.D. and Jerry Graham, before 1220 entry), 8/31/80 (0940 entry); Ex. 54, Baliunas Original File at BAL6, BAL8, BAL10-11; Ex. 55, Baliunas Aff. ¶11; Ex. 1, Baliunas dep. at 40-45; Ex. 8,

Fahey Dep. at 212-16, 219-21.).

103.   The first page of this list, captioned "Sheet #1 Negative:" lists Kenneth Waters as the 11th name.  The second page, "Sheet #2" starts "as of 8-20-80" and includes a second section captioned "con't list of FP cards checked" – that is, a continued list of fingerprint cards Baliunas checked against the crime scene prints.  Kenneth Waters is the last name on that list.  (Ex. 54, Baliunas Original File at BAL6, BAL8; Ex. 55, Baliunas Aff. ¶9.)

104.   Baliunas' original file also included a second list of names not previously produced in discovery: a two-sided, green-lined sheet torn from a spiral-bound pad which Baliunas recognized as a document he had written by hand.  This list included the same suspects' names as appeared on the first two pages, in the same order, plus several more individuals known to the APD.  Kenneth Waters' name is the 12th on the first side of the page, and appears again at the end of the list on the back side of that sheet.  (Ex. 54, Baliunas Original File at BAL10-11; Ex. 55, Baliunas Aff. ¶9.)

105.   Baliunas' file contains evidence that he twice compared Waters' prints to the latent prints found at the scene and excluded him.  (Ex. 55, Baliunas Aff. ¶¶9, 13; Ex. 54, Baliunas Original File at BAL6-9.)

***Baliunas Orally Notified the Ayer Police Defendants of the Exculpatory Print Evidence***

106.   Baliunas testified that his standard practice was to notify the submitting agency of his results orally: "I would call the officer in charge or whoever sent me the prints and tell them [the results], but there was no official report" unless there was a match.  Baliunas considered Chief Adamson to be his main contact with the APD, the agency that submitted prints to him in the Brow case.  (Ex. 1, Baliunas dep. at 45-47, 52-53, 64-65, 79-80; Ex. 55, Baliunas Aff.

¶11; *see also* Ex. 57, Smith Expert Aff. (8/21/07) at 5-6.)

107. There were no suspect matches in this case, and no formal fingerprint comparison reports from Baliunas exist in the recently discovered original Baliunas file, or in the APD, State Police or District Attorney files produced in this action. (Ex. 55, Baliunas Aff. ¶13; Ex. 1, Baliunas dep. at 65-66; Ex. 11, Hunte dep. at 58-59, 61, 70-71.)

108. Pursuant to his standard practice, however, Baliunas orally notified Adamson of the existence of usable prints and his exclusion of suspects, including Waters. (Ex. 31, APD Brow Reports at 21-39, 40-42, 50; Ex. 32, Adamson Brow Reports at B42, B47-48, B52; Ex. 53, Adamson correspondence (7/16/80); Ex. 33, APD Brow Daily Logs at 5/22/80 (1410 entry), 7/8/80 (entry regarding Pina, Spinola, White, before 1503 entry), 7/11/80 (0946 entry), 8/6/80 (two entries, regarding subjects wanted by Sacramento P.D. and Jerry Graham, before 1220 entry), 8/31/80 (0940 entry); Ex. 55, Baliunas Aff. ¶11; Ex. 1, Baliunas dep. at 45-47, 52-53, 64-65, 79-80.)

109. Lt. Boisseau, a trained fingerprint examiner who also kept custody of suspects' fingerprint cards in his capacity as APD's evidence officer, was aware of this fingerprint evidence. (Ex. 3, Boisseau 11/16/06 dep. at 28-29, 32, 33, 66, 85-86, 88, 105-06, 121, 134-43; Ex. 4, Boisseau 6/13/07 dep. at 13-14; 30-31, 33, 36-38, 41-42; Ex. 18, Taylor 11/30/06 dep. at 126, 128, 308-09; Ex. 16, Reiter dep. at 131-34; Ex. 57, Expert Report of Ron Smith dated 8/21/07 at 5-6.)

110. Taylor was also aware of this fingerprint evidence. As Chief Adamson's secretary and the APD's lone clerical employee, Taylor typed daily logs, as well as reports and correspondence for Adamson, acknowledging the existence of usable prints and Baliunas'

exclusion of suspects. Her station as a dispatcher was also central, putting her in a position to hear Chief Adamson and Lt. Boisseau's conversations. (Ex. 7, Connors 11/15/06 dep. at 50; Ex. 33, APD Brow Daily Logs at 7/8/80 (Brow Investigation entry before 1503 entry); Ex. 32, Adamson Brow Reports at B42, B47-48, B52, Ex. 53, Adamson correspondence (7/16/80); Ex. 19, Taylor 5/18/07 dep. at 149-50, 182-83.)

111.    On July 8, 1980, Taylor typed the following APD daily log entry: "Brow investigation: Cpl. Baliunas S.P. Holden called Chief to advise of prints eliminated and requesting original cards on some others. Prints found on table in house definately [sic] not victims [sic] or member of family. Contacted B.C.I. Plymouth Cty and requested prints on Donald Pena-Gary Spinolla-Anthony White." (Ex. 33, APD Brow Daily Logs at 7/8/80 (Brow Investigation entry before 1503 entry).)

112.    A month later, Taylor typed for Adamson's signature a letter to the Sacramento Police Department's Bureau of Criminal Investigation ("BCI") stating, "[l]atent prints were developed at the scene" and asking for fingerprints of two suspects for comparison. (Ex. 53, Adamson correspondence (7/16/80); Ex. 19, Taylor 5/18/07 dep. at 147.)

113.    The Sacramento Bureau of Criminal Investigation (BCI) returned copies of fingerprint cards for Michael Hamilton and Anthony Bean pursuant to Adamson's request. The outside of the envelope bears a note in what appears to be Adamson's handwriting stating "John Baliunas MSP would like these prints." The Adamson report of August 8, 1980 reflects that Baliunas had "called to advise[] negative on Hamilton and Bean prints." (Ex. 31, APD Brow Reports at 21-39, 50; Ex. 32, Adamson Brow Reports at B48).

114.    Taylor wrote in another daily log that: "Prints of Jerry Graham . . . will be carried to S.P.

Holden in the AM by Bruce Taylor who passes barracks en route to work." Bruce Taylor

was, at that time, Nancy Taylor's husband, and not an APD employee. (Ex. 33, APD Brow

Daily Logs at 8/6/80 (two Brow Investigation entries before 1220 entry); Ex. 19, Taylor

5/18/07 dep. at 12-13; Ex. 17, Bruce Taylor dep. at 12-13, 16.)

115.    Adamson sent Baliunas Jerry Graham's fingerprint card along with a short memo. The

APD's copy of the memo bears a handwritten entry at the bottom indicating "neg. John Bal."

An August 8, 1980 entry in Adamson's report about his call with Baliunas indicates, "Also

negative on Graham." (Ex. 31, APD Brow Reports at 40-42; Ex. 32, Adamson Brow

Reports at B48).

116.    As of August 6, 1980, Taylor wrote in a daily log entry, "[t]hus far at least twenty sets of

prints as well as elimination prints from family members have been submitted and checked."

(Ex. 33, APD Brow Daily Logs at 8/6/80 (second Brow Investigation entry on page, before

1220 entry).)

117.    Ken Waters' name was the 11th or 12th name on Baliunas' list of the fingerprint cards he

had checked "as of 8-2-80." (Ex. 55, Baliunas Aff. ¶¶9, 10 & exhibits attached thereto; *see

also* Ex. 54, Excerpts of Baliunas Original File at BAL6, BAL8, BAL10-011.)

118.    There were no arrests in the case for more than two years.

**The Investigation Stalls and Chief Adamson is Replaced by Boisseau and then Connors**

119.    In the fall of 1981, Chief Adamson was forced to resign amid a corruption scandal in which

Ayer officers were accused of vandalizing the Ties Construction Company after it stopped

hiring them for security details. *See* exhibits cited *supra* at ¶7.

120.    Lt. Boisseau became the acting Chief until Phil Connors was appointed as Chief in February

1982.  *See* exhibits cited *supra* at ¶¶8, 11, 17.

121.  Within a couple months after taking office, Connors met with a member of the Brow family about the status of the investigation.  (Ex. 7, Connors 11/15/06 dep. at 163-65.)

122.  Connors reactivated the case.  After the meeting, Connors flipped through the APD's Brow homicide investigation file for 10-15 minutes.  He asked Lt. Boisseau to review the file and notify him whether there were any leads that had not been followed to a logical conclusion. Lt. Boisseau soon reported back that there were no open leads.  (Ex. 7, Connors 11/15/06 dep. at 163-70, 178, 222-23; Ex. 41, Cathy Johnston, "[Brow Case] Reopened in Ayer," Ayer *Public Spirit,* February 1982.)

123.  By the fall of 1982, Brow's murder had remained unsolved for nearly two-and-a-half years. There were still no leads Ayer Police had not followed to a logical conclusion.  (Ex. 3, Boisseau 11/16/06 dep. at 110-11; Ex. 7, Connors 11/15/06 dep. at 164-68, 178; Ex. 18, Taylor 11/30/06 dep. at 114-15.)

**Nancy Taylor Is Admonished by the Ayer Board of Selectmen and Chief Connors to Stop Acting Beyond the Scope of Her Appointment as Clerk, Dispatcher and Special Officer for Rape Investigations**

124.  In 1982, both defendants Boisseau and Connors had supervisory responsibility over Nancy Taylor – Boisseau as the APD's only Lieutenant, the designated follow-up investigative officer and evidence officer, as well as serving briefly as the interim Chief, and Connors as the Chief  starting in or about February 1982 through trial.  (Ex. 3, Boisseau 11/16/06 dep. at 13-16, 18-21, 26, 29-35, 115, 131-32; Ex. 7, Connors 11/15/06 dep. at 15, 46, 48-49, 60, 77-80, 98; Ex. 78, Selected APD Reports and Daily Logs, 11/3/81 Daily log (entry after 2345).)

125.    Boisseau was personally involved in the investigation from its inception, and had knowledge about the circumstances of the crime, the time-of-death window, that Mr. Brow had identified the murder weapon as a knife from the family kitchen, that usable prints at the scene had been used to rule out suspects, and personally interviewed Waters and several other early suspects and witnesses. (Ex. 3, Boisseau 11/16/06 dep. at 64, 78, 87-106, 110-12, 138-42, 177-79; Ex. 33, APD Brow Daily Logs at 5/22/80 (1425 entry); 5/23/80 (0913 entry), 5/27/80 (0954 & 1427 entries), 5/28/80 (0800 entry) 6/28/80 (1712 entry), 7/1/80 (1001 entry), 9/2/80 (1300 & 1721 entries), 9/5/80 (1445 entry), 9/8/80 (1059 entry), 12/26/81 (1520 entry); Ex. 31, APD Brow Reports at 3, 5-9, 18, 43-46, 48, 49; Ex. 60, Partial Transcript of May 22, 1980 Interview of Kenneth Waters.)

126.    Boisseau and Connors both had concerns that, under Chief Adamson's tenure, Nancy Taylor had exceeded the limited scope of duties the Board of Selectmen had authorized her to undertake as a special officer.  She had investigated the Brow homicide but was not always closely supervised; for example, she interviewed witnesses alone. (Ex. 3, Boisseau 11/16/06 dep. at 120-32; Ex. 7, Connors 11/15/06 dep. at 63-71, 73-76, 91-113; Ex. 33, APD Brow Daily Logs at 12/29/80 (1526 entry), 1/19/81 (1347 entry); *see also* Ex. 15, Randall dep. at 143-44.)

127.    Taylor wanted to become a full patrol officer but did not attend the police academy until after Waters was convicted in 1983.  *See* exhibits cited *supra* ¶15.

128.    Rumors swirled that Taylor and Adamson had more than a professional relationship and had been seen kissing; Chief Connors candidly admitted that possibility raised concerns about Adamson's objectivity and judgment in allowing her to do work she was unfit for in his

capacity as her supervisor.  (Ex. 7, Connors 11/15/06 dep. at 113-19; Ex. 3, Boisseau 11/16/06 dep. at 42.)

129.    Adamson, in a letter to the Board of Selectmen supporting a pay increase for Taylor in March of 1980, acknowledged that her job as a clerk, dispatcher and special officer involved "mostly administrative work" such as "handling money, audit sheets for the Registry of Motor Vehicles . . ., typing of letters and other correspondence, the files and record system which if we have everyone handling will be fouled up in less than a week, and many other duties to [sic] numerous to list hereon."  (Ex. 35, Taylor APD personnel documents at 43, 44.)

130.    No written policy or description delineating the special officer's role was produced by Ayer in response to plaintiff's discovery requests but both Chiefs Boisseau and Connors agreed that special officers differed from full-time patrolmen in that they had not completed the police academy, had less training in follow-up investigations, and took only a limited investigative role, certainly not the lead in serious felony investigations.  (Ex. 3, Boisseau 11/16/06 dep. at 36-42, 120-32; Ex. 7, Connors 11/15/06 dep. at 63-70, 73-74, 76, 112.)

131.    Former APD officer Stanley Randall testified that the talk around the police department, on one occasion specifically from then-officer Decot, was that Taylor " wasn't objective enough in the way she conducted [rape investigations], was kind of focused or had tunnel vision and wasn't open to all the different things that could or couldn't be . . . ."  (Ex. 15, Randall dep. at 32-33; *see also id.* at 144-47.)

132.    In response to a union complaint that Taylor had been working open shifts that should as a matter of union contract be available first to full-time officers, Connors notified her that her

police duties and pay were limited to rape cases consistent with her appointment as a special officer.  (Ex. 7, Connors 11/15/06 dep. at 95-104, 112-13.)

133.   Taylor responded with a letter to the Board of Selectmen on September 21, 1982 complaining that under Connors, "I have been ordered to refrain from performing the police duties that I have performed for the past five years. I feel your board has been aware of these duties during this five year period."  She threatened to file a discrimination complaint if the matter was not resolved to her satisfaction.  (Ex. 35, Taylor APD personnel documents at 20.)

134.   At a Board of Selectmen meeting that evening, Taylor claimed she investigated homicide cases from the very first day of her employment; board members acknowledged that she had been exceeding the proper scope of her duties for some time.  (Ex. 5, Fancis Callahan dep. at 97-99; Ex. 42, Cathy Johnston, "Within her Rights - Taylor," Ayer *Public Spirit*, Sept. 30, 1982.)

135.   Recognizing that Taylor was neither appointed nor qualified to perform homicide investigations, the Board of Selectmen clarified that such duties fell outside Taylor's authority as a special officer, and her pay would be accordingly limited to wages for clerical duties and rape cases.  (Ex. 5, Callahan dep. at 97-99; Ex. 35, Excerpts of Nancy Taylor APD personnel file at 24.)

136.   Plaintiff's police practices expert, Lou Reiter opines that allowing Taylor to continue on with investigative work above and beyond that of a rape investigator, without close supervision, ran a foreseeable and obvious risk that she would violate suspects' constitutional rights.  (Ex. 16, Reiter dep. at 100.)

137. John Ford, offered as defendants' police practices expert, agrees that Taylor needed more supervision than the average officer and that it would raise a concern if, as the daily logs indicated, she had been acting alone or without close supervision in a homicide case. (Ex. 9, John Ford dep. at 136-42, 147-49, 152-60, 205-10, 215-16.)[2]

138. Connors testified that Taylor's duties were "much more restricted" under his tenure as compared to Adamson's. (Ex. 7, Connors 11/15/06 dep. at 113, 96-108.)

**Ayer's Investigation is Reactivated and Nancy Taylor Takes It Over
When Robert Osborne Calls**

139. Nine days after Taylor wrote to the Board complaining that her duties had been limited, the Brow investigation was once again reactivated when, on September 30, 1982, Taylor answered a phone call from Robert Osborne. (Ex. 70, Taylor 10/5/82 Report at B120-21; Ex. 7, Connors 11/15/06 dep. at 170, 178.)

140. As Nancy Taylor later testified at trial, she took over the APD's investigation into the Brow murder from that point on. Chief Connors testified in his deposition that Taylor was Ayer's lead investigator on the case, and Taylor was the only investigator whose name prosecutor Elizabeth Fahey remembered working on the Brow case with her. After the conviction, Fahey wrote a letter of commendation praising Taylor as the "chief investigative officer." (Ex. 24, Trial Tr. Vol. 5 at 573 (Taylor); Ex. 18, Taylor 11/30/06 dep. at 15-18, 23, 26-27; Ex. 7, Connors 11/15/06 dep. at 191-92, 194-96; Ex. 35, Taylor APD Personnel documents at B258; Ex. 8, Fahey dep. at 21-27, 77-78, 82-83, 86-90, 182-83, 189.)

---

[2] Plaintiff reserves the right to move *in limine* to strike the opinions of Mr. Ford on the basis that he lacks the requisite expertise and experience to be of help to the jury, and any other applicable grounds.

141.   There were at least nine more experienced APD officers whom Connors could have assigned to run the Brow investigation.  (Ex. 3, Boisseau 11/16/06 dep. at 125-26; Ex. 7, Connors 11/15/06 dep. at 48-50.)

142.   Lt. Boisseau could think of no reason why Connors would have put Taylor, the clerk/dispatcher and special rape officer, in a position of such responsibility in a homicide investigation, and expressed concern both about the extent of Taylor's role and the substance of her work.  (Ex. 3, Boisseau 11/16/06 dep. at 120-32.)

143.   Connors explained his decision to allow Taylor to run the investigation by explaining that the department was "extremely shorthanded" and that Boisseau while "on paper" the designated follow-up officer,"was having great difficulty keeping up with his workload already," which had created an investigative "backlog" among his cases.  (Ex. 7, Connors 11/15/06 dep. at 77-78, 246, 275.)

144.   As the Chief's second-in-command, APD policy assigned then-Lieutenant Boisseau the responsibility of "providing the first level of supervision in the department," being "primarily responsible for the proper performance" of subordinates, and "ensuring compliance with the department's regulations."  It was Boisseau's "duty and responsibility" to supervise all subordinate employees, to ensure they were aware of departmental policies, and to ensure their satisfactory performance.  In fact, the policy specifically provided that Lieutenants were to be held "accountable for the actions or omissions of officers and civilians under his supervision which are contrary to departmental regulations and which would have been avoided if he had been properly executing his supervisory responsibilities." (Ex. 50, APD Duties by Rank and Assignment (Lieutenant) at 667, 668.)

145.  Robert Osborne contacted the Ayer Police in hopes of earning a reward in exchange for information about the Brow murder.  He admitted he was calling "for 'financial reasons.'" (Ex. 70, Taylor 10/5/82 report at B120; Ex. 18, Taylor 11/30/06 dep. at 140-3, 153-4.)

146.  Osborne did not identify himself but told Taylor that the Ayer police had interviewed the killer twice and released him, that Osborne lived with the killer's ex-girlfriend, and that she told him "she [had] even washed his bloody clothes after the murder."  (Ex. 70, Taylor 10/5/82 report at B120; Ex. 18, Taylor 11/30/06 dep. at 142.)

147.  Taylor informed Osborne that she would check into whether a reward could be provided and then advised Chief Connors of the new lead.  (Ex. 70, Taylor 10/5/82 report at B121; Ex. 18, Taylor 11/30/06 dep. at 143, 146.)

148.  Boisseau testified he was not aware of Osborne's call before Waters was arrested.  (Ex. 3, Boisseau 11/16/06 dep. at 153.)

149.  Later that afternoon, Taylor and Connors met with Assistant District Attorney Elizabeth Fahey, First Assistant Howard Whitehead, and Det. Lt. Dwyer for the sole purpose of discussing whether Osborne may be entitled to a monetary reward.  It was determined that "'informant' money" could be made available to him.  (Ex. 70, Taylor 10/5/82 report at B121; Ex. 18, Taylor 11/30/06 dep. at 149-52, 162.)

150.  The following day, on October 1, 1982, Osborne called Taylor again.  This time, he gave his name and date of birth, identified his girlfriend as Brenda Marsh, and said the suspect he was calling about was Kenneth Waters.  (Ex. 70, Taylor 10/5/82 report at B121; Ex. 18, Taylor 11/30/06 dep. at 153-54, 168, 172-73.)

151.  Taylor and Chief Connors met with Osborne later that afternoon, at which time he told them

34

that Marsh had told him that Waters had confessed that he had killed his neighbor.  (Ex. 70, Taylor 10/5/82 report at B122.)

152.    Until Osborne's call, Connors did not consider himself to be at all involved with the Brow investigation.  (Ex. 7, Connors 11/15/06 dep. at 191.)

## Nancy Taylor Secures a Search Warrant

153.    That same day, October 1, 1982, Taylor swore out an affidavit in support of a search warrant for the vacant home of Waters' deceased grandfather, where Waters had lived two years earlier.  She has no recollection of ever having applied for a search warrant in any case prior to that date.  (Ex. 34, Search Warrant application at B170-71; Ex. 18, Taylor 11/30/06 dep. at 157-60, 163-64.)

154.    In the sworn search warrant application, Taylor referred to herself as a "police officer" and characterized Osborne as a "reliable informant."  (Ex. 34, Search Warrant at B170-71.)

155.    Neither Taylor nor Connors had done anything to investigate Osborne or to corroborate his claims when she swore under oath in the affidavit that he was reliable.  (Ex. 18, Taylor 11/30/06 dep. at 164-68; Ex. 7, Connors 11/15/06 dep. at 188-91, 198-201; Ex.76, Reiter Rpt. ¶78.)

156.    The 1972 Massachusetts Law Enforcement Officers' Handbook, which defense expert John Ford relied upon and testified was used through the 1980s, directs that officers "must . . . [g]ive information to show that your informant is credible . . .  Establishing the credibility of first-time informants can be very difficult . . . Otherwise, your only option is to corroborate as much as possible of the informant's story. (Ex. 9, Ford dep. at 14-15; Ex. 51 (Handbook) at 15.)

157.    Consistent with the Handbook, standard procedure was to investigate the background of an informant like Osborne before declaring him to be reliable. It would have been easy to do so by running his Registry of Motor Vehicles record, checking his criminal history with the Board of Probation, or checking Ayer's files to see if he had a proven track record as an informant. (Ex. 3, Boisseau 11/16/06 dep. at 50-58, 155-60; Ex. 18, Taylor 11/30/06 dep. at 154-56; Ex. 7, Connors 11/15/06 dep. at 136-40.)

158.    The only fact Taylor knew about Osborne when she swore he was reliable was that he had called the police in hopes of obtaining reward money in the Brow case. This fact weighed against his reliability but was not included in the warrant affidavit. (Ex. 34, Search Warrant application at B170-71; Ex. 3, Boisseau 11/16/06 dep. at 167-68; Ex. 7, Connors 11/15/06 dep. at 172-77, 182-83, 201; Ex. 8, Fahey dep. at 301.)

159.    It was also standard APD practice for an officer seeking a warrant to obtain prior authorization from a supervisory police officer or the prosecutor on the case. The Handbook directed: "If you have occasion to need a search warrant, it is strongly recommended that you seek the advice of your legal advisor or the district attorney. If you have never obtained a warrant before, or if you do so only rarely, it is imperative that you contact one of these people or a senior officer who is experienced in obtaining warrants." (Ex. 51 (Handbook) at 11; *see id.* at 13; Ex. 3, Boisseau 11/16/06 dep. at 160-62.)

160.    If obtained, authorization would be documented on the application. Taylor did not seek or obtain any authorization from Chief Connors, Lt. Boisseau or Elizabeth Fahey before obtaining the warrant. When shown Taylor's warrant application at his deposition, Connors admitted he never knew she had filed it. (Ex. 3, Boisseau 11/16/06 dep. at 160-66, 173-74;

Ex. 7, Connors 11/15/06 dep. at 276; Ex. 8, Fahey dep. at 43-44, 299-303; Ex. 18, Taylor 11/30/06 dep. at 160.)

161.   There was nothing to be gained in searching the vacant house for evidence of a crime that had occurred more than two years earlier.  (Ex. 8, Fahey dep. at 303-04; Ex. 76, Reiter Rpt. ¶81.)

162.   Taylor's application specified the property was to be searched for any items stolen from Mrs. Brow, or "a spatula, which may have been used in committing the homicide" and a bloody knife, which, she wrote, a local "teenage boy" had allegedly seen in the house when he entered it months earlier.   Taylor testified in her deposition that she "remembered reading" a report about the teenaged boy, but no such documentation exists.  (Ex. 34, Search warrant application at B170-71; Ex. 18, Taylor 11/30/06 dep. at 182, 178-83.)

163.   Mrs. Brow was not stabbed to death with a spatula, but with a knife from the Brow kitchen which Ayer police recovered at the scene.   (Ex. 3, Boisseau 11/16/06 dep. at 170-72; Ex. 58, Autopsy report.)

164.   No evidence was seized pursuant to the warrant.  (Ex. 18, Taylor 11/30/06 dep. at 186-87.)

165.   In his deposition, Boisseau testified he was no longer personally involved in the investigation when it was reactivated in the fall of 1982, and that he was not aware of it when Robert Osborne called in, or when Nancy Taylor applied for a search warrant before meeting Osborne or Brenda Marsh.  After reviewing Taylor's documentation of those events at his deposition, Boisseau testified that he had serious concerns about Taylor's conduct, including her failure to investigate Osborne's reliability – obviously in question – before swearing under oath that he was reliable; her seeking a warrant to search a vacant house for

evidence of a murder two years prior, particularly where the victim's husband had identified the murder weapon as a knife from the family's own kitchen; and the fact that no supervisor reviewed, much less authorized Taylor to seek the warrant.  (Ex. 3, Boisseau 11/16/06 dep. at 147-74.)

### Taylor, in the Presence of Connors, Elicits a False, Coerced and Manufactured Statement from Brenda Marsh Incriminating Waters

166.    Osborne called Taylor at home on October 2, 1982, and scheduled a dinner meeting with Brenda Marsh and Ayer police for the evening of October 4th.  (Ex. 70, Taylor 10/5/82 report at B122.)

167.    Taylor does not now have a specific recollection of what she did to prepare for the meeting, but it was her custom and practice to refresh her recollection prior to interviewing witnesses by reviewing the case file and then developing a plan to approach and question the witness. She testified that she reviewed the file at some point when the case was reactivated, possibly after Robert Osborne's call.  (Ex. 18, Taylor Dep. 11/30/06 at 110-11, 145, 188, 192-93.)

168.    A review of Ayer's files would have revealed that the perpetrator left a fingerprint that had been used to eliminate suspects; was cut and bled at the scene; and committed the crime between 7:10 am to 11 a.m., and, more likely between 10 and 11 a.m.  Ayer's files also reflected that Waters was interviewed the day after the crime and voluntarily gave his fingerprints to Ayer officers; the report of that interview said nothing about him having any cuts or scratches and that Waters had an alibi, having worked until 8 a.m. at the Park Street Diner and then meeting his attorney before a 9 a.m. appearance in Ayer District Court.  (*See* exhibits cited *supra* at ¶¶24-39, 43-117.)

169.    Connors did not review the file or speak to Lt. Boisseau in preparation for attending the

dinner meeting.  His only familiarity with the case came eight months earlier, when he had flipped through Ayer's casefile and learned from Lt. Boisseau that there were no open leads. (Ex. 7, Connors 11/15/06 dep. at 163-70, 178, 222-23.)

170.    When he accompanied Taylor to the October 4, 1982 dinner meeting with Brenda Marsh and Robert Osborne, Connors admittedly knew "very little" about the crime and the investigation.  He did not know that suspects had been excluded as the source of the perpetrator's fingerprint; that the perpetrator had been cut and bled at the scene or that Ayer police had interviewed Waters the day after the murder, was inspected and had no cuts.  All Connors knew when he walked into that meeting was that Marsh had allegedly told Robert Osborne Waters had admitted murdering Mrs. Brow.  (Ex. 7, Connors 11/15/06 dep. at 219-20, 222, 227-28.)

171.    On the evening of October 4th, Taylor and Connors picked up Marsh and Osborne and took them to Maxwell Silverman's restaurant.  (Ex. 13, Marsh dep. at 131, 133; Ex. 71, Affidavit of Brenda Marsh ¶6; Ex. 18, Taylor 11/30/06 dep. at 195; Ex. 70, Taylor 10/5/82 report at B161.)

172.    Connors relied on Taylor to conduct the interview given her superior knowledge of the case. (Ex. 7, Connors 11/15/06 dep. at 219, 220.)

173.    Given Connors' lack of knowledge about the case, defendants' police practices expert testified that Connors' mere presence was not enough to ensure proper supervision at the October 4 dinner meeting.  (Ex. 9, Ford dep. at 162, 165-66, 173-74, 178-81, 195.)

**Taylor Applies Coercive Pressure, Threats and Suggestion**

174.    During the Brow investigation, the Ayer Police Department had adopted investigative and

39

supervisory policies written by the Municipal Policy Institute ("MPI").  (Ex. 7, Connors 11/15/06 dep. at 11-12, 79-91, 235; Ex 46, MPI Policies and Procedures - Informants; Ex. 47, MPI Policies and Procedures - Interviewing Witnesses; Ex. 48, Excerpts of MPI Policies and Procedures - Evidence - Handling, Preservation and Security.)

175.   As of October 4, 1982, Brenda Marsh was a twenty-five year-old mother of two young children.  She had lived with Ken Waters, the father of her daughter Mandy, for three years. The relationship ended in July 1980.  (Ex. 13, Marsh dep. at 89-90, 94.)

176.   Taylor and Connors' interviewing Marsh in the presence of Osborne violated the APD's written policy requiring witnesses to be interviewed separately "to ensure independent statements."  Osborne had already divulged his financial motive, which raised an additional risk that his presence would unduly influence the interview with Brenda Marsh.  (Ex. 47, MPI Witness Interview policy at B604; Ex. 16, Reiter dep. at 92-93; Ex. 76, Reiter Report at ¶55; Ex. 3, Boisseau 11/16/06 dep. at 167-68, 174-76; Ex. 7, Connors 11/15/06 dep. at 213.)

177.   Waters never made incriminating statements to Marsh about the murder, and she never told Robert Osborne they had.  In Marsh's words,

The statements the "male informant" [Robert Osborne] attributes to me are false. Kenny Waters never told me that he killed a woman in Ayer in a breaking and entering and he didn't threaten to 'keep me in line' or he would do the same to me.  He never came home the day of the murder in clothing soaked with blood and explained the blood as coming from his duties of me[a]t cutting.  I never told anything like that to Robert Osborne.

The only conversations I had with Robert Osborne about this case before he went to the police were general in nature.  I told him that Kenny and I were neighbors of the woman that was murdered and that the police questioned Kenny about it."

(Ex. 71, Marsh Aff. ¶¶4, 9; Ex. 13, Marsh dep. at 89-90, 94, 206.)

178.    APD policies advised officers to "avoid questions that imply or suggest a particular answer" when interviewing witnesses in order to avoid generating false evidence.  (Ex. 47, MPI Interviewing Witnesses Policy at B602-07, ¶7c; Ex. 46, MPI Informant Policy at B605; Ex. 3,  Boisseau 11/16/06 dep. at 44, 58-61, 183-85, 206-07; Ex. 7, Connors 11/15/06 dep. at 140-47, 218, 235, 250-63; 59; Ex. 76, Reiter Rpt. ¶¶11, 49-54, 84.).

179.    Taylor did not ask Marsh questions to ascertain her knowledge but, in Marsh's words,"they were statements . . .  They told me that I knew who killed Mrs. Brow and that she was murdered and I washed bloody clothes and things like that.  And I could be charged as an accessory after the fact, have my children taken away and go to prison for ten years . . .  She was very insistent that I knew everything, no matter what I said."  There was no basis for suggesting that Marsh could legally be charged as an accessory after the fact.  That charge applies only to those "who, after the commission of a felony, harbors, conceals, maintains or assists the principal felon . . . or gives such offender any other aid, *knowing that he has committed a felony*, . . . with intent that he shall avoid or escape detention, arrest, trial or punishment." (Ex. 13, Marsh dep. at 138, 154; Ex. 71, Marsh Aff. ¶¶5-6; Ex. 20, Waters 11/28/06 dep. at 159-61; Ex. 51 (Handbook Police Manual) at 7.)

180.    Marsh denied that she made any statements to Osborne implicating Waters in the Brow murder, and denied that Waters had confessed to her.  She told Taylor and Connors that Osborne's statement "was a lie, that I knew nothing."  (Ex. 13, Marsh dep. at 139-40, 211-12; Ex. 71, Marsh Aff. ¶¶6, 7; Sealed Ex. 96, Excerpts of Marsh 2001 Grand Jury Transcript at AG2570-71; AG2573-74; AG2576-78, AG2581-83, AG2585, AG2587-88, AG2589, AG2611; *see also* Ex. 20, Waters 11/28/06 dep. at 153, 173.)

181.    In response to Marsh's denials, Taylor, in the presence of Chief Connors, threatened Marsh that if she did not adopt Osborne's statements she would be charged as an accessory-after-the-fact, be sent away to prison for ten years, and lose custody of her children.  At her 2006 deposition, Marsh testified that Taylor's threat "sticks out in my mind because that was very traumatic to me." (Ex. 13, Marsh Dep. at 138-39; 148-50, 207-10; Ex. 71, Marsh Aff. ¶¶5-6; Sealed Ex. 96, Excerpts of Marsh 2001 Grand Jury Transcript at AG2583, AG2591-92, AG2603-04, AG2616.)

182.    Taylor also showed Marsh photos of the victim's dead body, which Marsh described as "awful" and which she "couldn't even look at."  (Ex. 71, Marsh Aff. ¶6.)

183.    Marsh felt pressured, in fear of being imprisoned and losing her children, ultimately did as Taylor told her and adopted Taylor's false statements implicating Waters in the Brow murder.  (Ex. 71, Marsh Aff.; Sealed Ex. 96, Excerpts of Marsh 2001 Grand Jury Transcript at AG2583, AG2591-92, AG2603-04, AG2616; Ex. 13, Marsh dep. at 42, 48-49, 89-90, 94, 126-27, 129-30, 138-41, 143-44, 148-50, 154-56, 185-90, 195-99, 201-19.)

184.    Taylor suggested and falsely attributed to Marsh the statement that Kenny talked about a woman that went into the diner a lot, had a lot of money in her house, and was returning to Germany, and that he wanted her money.  This statement was false:  Waters never said any of these things to Marsh.  (*See* Ex. 70, Taylor 10/5/82 report at B161; Ex. 71, Marsh Aff. ¶ 8(c); Sealed Ex. 96, Excerpts of Marsh 2001 Grand Jury Transcript at AG2573-74, 2579-80.)

185.    Taylor suggested and falsely attributed to Marsh the statement that Marsh called the diner the night of May 20, 1980, after Kenny had left to go to work there, and asked to speak to Kenny, but was told he was not there.  This statement was false:  While Marsh remembered

Kenny leaving on May 20, 1980, dressed for work on the night shift, she never called him at the diner that night.  (Ex. 13, Marsh dep. at 214; Ex. 70, Taylor 10/5/82 Report at B161; Ex. 71, Marsh Aff. ¶8(A).)

186.    Taylor attributed to Marsh the statement that Waters came home "late, between 10 & 10:30 a.m., in a drunken condition" the morning of the murder.  This statement was false: Waters was in Ayer District Court wearing a suit at 11 a.m.  (*See* exhibits cited *supra* ¶52; *see also* Ex. 70, Taylor 10/5/82 Report at B161-62; Sealed Ex. 96, Excerpts of Marsh 2001 Grand Jury Transcript at AG2581; Ex. 3, Boisseau 11/16/06 dep. at 189-91.)

187.    Taylor suggested and falsely attributed to Marsh the statement that Kenny came home the morning of May 21, 1980 with a "long, deep, red scratch on Waters [sic] left cheek running from beneath the eye to the chin" that was not there when he left for work the night before. This statement was false:  Marsh did not observe Waters with any such scratch; he had none. (Ex. 70, Taylor 10/5/82 Report at B162; Ex. 71, Marsh Aff. ¶8(B);  Sealed Ex. 96, Excerpts of Marsh 2001 Grand Jury Transcript at AG2581-83, AG2587-88; Ex. 13, Marsh dep. at 215; Ex. 3, Boisseau 11/16/06 dep. at 96-100, 176-80, 226-27; Ex. 18, Taylor 11/30/06 dep. at 222-26; Ex. 24, Trial Tr. Vol. 3 at 196-97 (Boisseau), Vol. 5 at 607-08 (Dwyer); *see also* exhibits cited *supra* ¶¶43-44.)

188.    Taylor suggested and falsely attributed to Marsh the statement that Kenny admitted to the Brow murder.  That statement was false: Waters was innocent.  He never told Marsh that he killed anyone, nor did he make any statements to Marsh implicating himself in the Brow murder.  Waters told Marsh after being questioned by Ayer police that he was being blamed for something he did not do.  Marsh only adopted this statement as a result of threats and

pressure from Nancy Taylor.  (Ex. 71, Marsh Aff. ¶¶4, 6, 7, 8(D); Sealed Ex. 96, Excerpts of Marsh 2001 Grand Jury Transcript at AG2570-71, AG2585, AG2589; Ex. 13, Marsh Dep. at 211-12, 216; *see also* exhibits cited *supra* at ¶2.)

189.   Taylor's report of her October 4th interrogation of Marsh, which was approved by Chief Connors, did not reflect any discussion of charging Marsh as an accessory after the fact, that she could lose her children, or that the statements attributed to Marsh were elicited by means of these threats and suggestions about what to say.  (Ex. 70, Taylor Oct. 5, 1982 Report.)

190.   APD policy called for important interviews to be tape-recorded, but the October 4 meeting was not taped although a tape-recorder was available.  (Ex. 47, MPI Witness Interview Policy at B606; Ex. 7, Connors 11/15/06 dep. at 161-63; Ex. 19, Taylor 5/18/07 dep. at 82.)

191.   APD policies instructed officers that "notes should be taken," and, "if a statement appears highly informative due to its nature and content, a verbatim account should be recorded," and the witness should "sign or initial [the officer's] notes."  Brenda Marsh did not review or sign off on any notes of the October 4 dinner meeting.  Aside from Taylor's handwritten report dated October 5, 1982, no notes or reports documenting the meeting have been produced.  (Ex. 46, MPI Informant policy at B599; Ex. 47, MPI Witness Interview Policy at B606; Ex. 76, Reiter Rpt. at ¶¶ 70, 75; Ex. 16, Reiter dep. at 105-06, 199-200; Ex. 51, Handbook at pp. 53, 57.)

192.   Nor was any tape recording of the interview produced, although APD policy called for officers to audiotape "all conversations with witnesses."  (Ex. 47, MPI Witness Interview Policy at B607.)

193.   Boisseau testified in his deposition that he was not aware of the Marsh statement and if he

had been, it would have set off alarm bells that would have prompted him to tell Taylor and Connors that it conflicted with what he knew to be true: that Waters had no cuts and was in court when Marsh claimed he was home asleep in bed. He testified that neither Taylor nor Connors told him about Marsh's statement after it was elicited. Based on his knowledge of the underlying facts and his review of Taylor's report of her contacts with Osborne and Marsh at his deposition, he had serious concerns about the reliability of both witnesses. (Ex. 3, Boisseau 11/16/06 dep. at 176-84, 186-91, 226-27.)

194.    Boisseau testified in his deposition that, given the discrepancies between the statement attributed to Marsh in Taylor's report of the October 4 meeting and what he knew to be true, he would have wanted a great deal more corroboration before taking action against Waters, and, if that statement was the basis of Waters' arrest, would have a serious concern that an innocent man was being prosecuted for a crime he did not commit on the basis of false evidence. (Ex. 3, Boisseau 11/16/06 dep. at 187-91, 226-27.)

195.    Nancy Taylor testified in her deposition that she recognized a discrepancy between Waters' earlier statement that he had been in court the morning of the murder and Marsh's statement that he arrived home drunk and went to sleep at 10:30 am. She said that, after she elicited Marsh's statement on October 4, Boisseau attempted to determine whether Waters had been in court on the morning of the murder and reported back the he could not verify that alibi. (Ex. 18, Taylor 11/30/06 dep. at 176, 271, 277-83; Ex. 19, Taylor 5/18/07 dep. at 187-89.)

196.    Following the October 4 dinner meeting, Taylor and Connors brought Marsh in for questioning several more times. During each of these meetings, Taylor repeated her threats to imprison Marsh and take away her children. (Ex. 71, Marsh Aff. ¶¶6-7; Ex. 13, Marsh

dep. at 155-56, 208-09, 211; Sealed Ex. 96, Excerpts of Marsh 2001 Grand Jury Transcript at AG2583, AG2591-92, AG2603-04, AG2616.)

197.   Marsh later identified a photograph of the bloody knife collected at the crime scene as Waters' knife.  This statement was false: the victim's husband had identified the knife as coming from the Brow kitchen early on in the investigation during an interview with Lt. Boisseau. (Def. Ex. 34, Marsh Prepolygraph interview at 21; Ex. 32, APD Adamson Reports at B40.)

198.   Connors and Taylor both testified that, consistent with APD written policies, the hallmark of any informant's credibility is corroboration.  Connors did nothing to compare the statements Taylor elicited from Marsh to the known facts of the case and did not speak to Boisseau after meeting with Marsh.  Although he fully endorsed the MPI policies calling for police to constantly evaluate the reliability and credibility of witnesses and informants, Connors testified in his deposition that the APD's policies did not apply in the context of homicide investigations because only the prosecutors made the credibility determinations; the police only collected facts.  (Ex. 7, Connors 11/15/06 dep. at 135-40, 146-47, 153-56, 217, 220-21, 223-28, 233, 235-48; Ex. 19, Taylor 5/18/07 dep. at 199; Ex. 3, Boisseau 11/16/06 dep. at 111.)

199.   Boisseau testified there is no homicide exception to the APD's policies on testing an informant's credibility.  The APD's written policies themselves include no such exception.  Plaintiff's expert Lou Reiter opines, "there is no reasonable support for [Connors'] assertion and it is contrary to all law enforcement documentation on this police practice."  (Ex. 3, Boisseau 11/16/06 dep. at 50-61, 148-50, 155-60, 167-76, 182-83, 186-88; Ex. 46, MPI

Informant Policy at B595-B607; Ex. 48, MPI Evidence Policy; *see also* Ex. 76, Reiter Rpt. ¶¶44-47, 52-54.)

200. Defendant Connors testified that the Ayer police took no investigative action before clearing it with the District Attorney's Office. Lt. Boisseau, who was active in the investigation early on, denied that every investigative step was pre-cleared through the District Attorney's Office. (Ex. 7, Connors dep. at 153-56; Ex. 3, Boisseau 11/16/06 dep. at 114-15.)

201. Connors acknowledged he had the responsibility to personally supervise Taylor's work on the homicide investigation but testified that he had even "less and less to do with it" after October 4. (Ex. 7, Connors 11/15/06 dep. at 246, 276.)

202. Connors testified he authorized Taylor to "follow up whatever the District Attorney's Office said she could follow up on" under the prosecutor's supervision. (Ex. 7, Connors 11/15/06 dep. at 195, 275-78.)

203. Former Assistant District Attorney Fahey testified that she assumed Taylor was supervised by state police officers. (Ex. 8, Fahey dep. at 202-04.)

204. On October 8, 1982, Nancy Taylor interviewed Marsh again in the presence of Lt. Det. Dwyer and State Police polygrapher Jack Nasuti. In her deposition, Taylor testified that she specifically recalled that she played no part in the pre-polygraph interview, was sure she left before it began because she "didn't feel it was my place" to remain, and was as certain of that as she was of any of her testimony. Trooper Nasuti asked Marsh three questions based on Taylor's interview and reported that Marsh passed the polygraph. (Def. Ex. 34, Marsh prepolygraph interview at 1, 3-14, 18-19, 20; Ex. 18, Taylor 11/30/06 dep. at 227-31, 239-48; Def. Ex. 35 (Nasuti report).)

205.   Marsh testified consistently with the false October 4 statement at the preliminary hearing and in the grand jury in 1982, at trial in 1983 and in post-conviction criminal proceedings in 1985. (Ex. 71, Marsh Aff. ¶7; Ex. 13, Marsh dep. at 211-12, 217-18.)

206.   After Waters was released on bail in 2001 but before charges were dismissed, Marsh admitted in a sworn affidavit that her prior statements and testimony had been false, and that they were induced by her fear of threats from Nancy Taylor and Chief Connors that she would be charged as an accessory after the fact, and have her young children taken away from her if she did not make incriminating statements about Waters. In that sworn affidavit, Marsh stated, "Kenny never said he killed anyone and no statements like that were made the night I left." (Ex. 71, Marsh Aff.)

207.   On June 21, 2001, Marsh was subpoenaed to testify before a grand jury investigating whether or not to retry Waters for the murder. Under questioning from Middlesex County Assistant District Attorney Sheila Calkins, Marsh testified consistently with her 2001 affidavit. Marsh denied that Waters had made any of the incriminating statements she had testified to in the criminal proceedings, or that she had told Robert Osborne he had. (Sealed Ex. 96, Excerpts of Marsh Grand Jury Transcript (2001) at AG2564, AG2570-71, AG2573-74, AG2576-78, AG2581-83, 2585, AG2587-88, AG2589, AG2611.)

208.   Marsh testified under oath before the grand jury that she ultimately made those incriminating statements from the October 4 meeting through during the criminal proceedings because:

A:     Well, I had two young children. I was threatened to have my children taken away from me, put in prison for 10 years for accessory to a murder.
Q:     By Robert Osborne?
A:     No, by Nancy Taylor.

(Sealed Ex. 96, Excerpts of Marsh Grand Jury Transcript (2001) at AG2583.)

48

209.    Marsh testified that she still felt pressured by those threats when she testified against Waters

in his motion for a new trial in 1985:

Q:    And you had the opportunity at that time to tell the judge and every body else, including Kenneth Waters, that what you had testified at his trial about his admission of killing the woman back in Ayer was not true; you had that opportunity at that point, didn't you?

A:    I didn't think I did.

Q:    You didn't think you did?

A:    Exactly.

Q:    Now, at that time Kenneth Waters had already been in jail for almost two years; isn't that true?

A:    And I still had two small children.

Q:    You had stated before that the reason you did it was because you thought that someone was going to take your children away.

A:    No, not what I thought. I was told.

Q:    Who were you told that by?

A:    Nancy Taylor.

[. . .]

Q:    Was there anybody else present when Nancy Taylor told you this?

A:    Chief Connors.

[. . .]

Q:    . . . You indicated that you were threatened with your children being taken away from you by Nancy Taylor from the Ayer police department; is that correct?

A:    Yes.

Q:    And also the chief, Chief O'Connor [sic]?

A:    Yes.

Q:    Was there anything else that they threatened you with?

A:    No.

Q:    Would you tell the grand jury what it is that they said to you that made you feel that they were threatening you with your children?

A:    They told me that I would be charged with accessory after the fact of murder and my children would be taken away from me and I would never see them again.

[. . .]

A:    . . . I was threatened numerous times.

(Sealed Ex. 96, Excerpts of Marsh Grand Jury Transcript (2001) at AG2591-92, AG2603-04,

AG2616.)

210. At her 2006 deposition in this case, Marsh testified a third time under oath that those incriminating statements against Waters were not true, and she only made them under threat of being charged as an accessory and losing her children. (Ex. 13 Marsh dep. at 42, 48-49, 89-90, 94, 126-27, 129-30, 138-41, 143-44, 148-50, 138-41, 154-56, 185-90, 195-99, 201-19.)

211. Lt. Boisseau testified there was no legitimate reason to threaten a witness in Brenda Marsh's position with criminal charges, and that such threats ran the risk of generating false evidence. (Ex. 3, Boisseau 11/16/06 dep. at 184-85, 206-07.)

### There Was No Probable Cause to Arrest or Indict Waters

212. Based on the information attributed to Marsh on October 4, 1982, Taylor swore out felony complaint and warrant application for Waters' arrest on October 12, 1982. (Ex. 30, Complaint at B175, B177.)

213. Taylor and Officer MacDonald arrested Waters in Providence, Rhode Island, pursuant to that warrant the next day. (Ex. 30, Complaint and Arrest Report at B177; Ex. 43, Ayer *Public Spirit,* Photograph of Nancy Taylor leading Kenneth Waters into the Ayer police station, Oct. 14, 1982.)

214. Up to September 29, 1982, the day before Osborne called the APD, there was no probable cause to arrest or prosecute Waters. Prior to that date, there were no leads that had not been followed to a logical conclusion, and defense expert John Ford testified that none of the previously known circumstantial evidence – including that Waters and the victim lived near each other, had met, that he didn't like her, that he bought an above-ground pool after the

murder and moved away soon thereafter – justified his arrest.  (Ex. 7, Connors 11/15/06 dep. at 164-68; Ex. 3, Boisseau 11/16/06 dep. at 110-11; Ex. 9, Ford dep. at 127-31, 272, 275-83.)

215.    Waters had been ruled out as a suspect: he had no abrasions when questioned by police the day after the murder, and he was excluded as the source of the perpetrator's bloody prints at the scene, and his time card and court appearance alibis left him little to no opportunity to commit the crime during the time-of-death window.  (*See* exhibits cited *supra* ¶¶44, 46-118.)

216.    APD policy provided: "An officer should constantly test his informant's information for consistency and truth by checking against information received from other sources" and directed that "[a]ll leads supplied by the informant should be investigated or followed up.  This is especially true when the relationship is in its earliest stages and will aid in determining reliability. "  (Ex. 46, MPI Informant policy at 599, ¶¶7, 9).)

217.    Brenda Marsh was an informant within the meaning of the MPI policy that the APD had adopted.  (Ex. 7, Connors 11/15/06 dep. at 133-36, 240-46; Ex. 76, Reiter Rpt. ¶70; Ex. 9, Ford dep. at 101-07; Ex. 46, MPI Informant policy.)

218.    The October 4th statement Taylor attributed to Marsh was inconsistent with the known, objective facts.  Four experienced investigators including Chief Adamson and Lt. Boisseau looked for evidence of recent wounds when they interviewed Waters the next day and didn't find any marks on him.  He had no "long, deep red scratch" running down the length of his face.  (Ex. 70, Taylor 10/5/82 Report at B162; Ex. 24, Trial Tr. Vol. 3 at 196-97 (Boisseau), Vol. 4 at 448 (Marsh), Vol. 5 at 607-08 (Dwyer); Ex. 3, Boisseau 11/16/06 dep. at 97-99, 191-200; *see also* exhibits cited *supra*, ¶44.)

219.   APD officers knew that Waters was seen in court wearing a three-piece suit at 11 a.m. the morning of the murder, and at the diner soon thereafter.  He did not arrive home and collapse into bed, drunk, between 10 and 10:30 a.m. that morning.  (Ex. 70, Taylor 10/5/82 Report at B161-62; Ex. 24, Trial Tr. Vol. 2 at 121-22 (Boisseau); Vol. 3 at 305 (Ogden), Vol. 5 at 582-86 (Black); Ex. 63, Ayer District Court Records; Ex. 3, Boisseau 11/16/06 dep. at 96, 100, 191-200.)

220.   Ayer officers understood that the reliability of incriminating evidence, as well as the known exculpatory evidence, must be considered in weighing the existence of probable cause.  Both Lt. Boisseau and defense expert Ford testified that the discrepancies between the facts as known to the Ayer Police and the October 4 statement would lead any reasonable investigator to be highly skeptical of the statements Taylor attributed to Marsh.  (Ex. 3, Boisseau 11/16/06 dep. at 57-58, 177-83, 186-94, 196, 198-205; Ex. 9, Ford dep. at 291-93, 296-98, 300-04, 308-09.)

221.   Lt. Boisseau testified that, taking the statement attributed to Marsh in Taylor's October 5, 1982 report at face value, it did not provide probable cause to arrest Waters.  (Ex. 9, Ford dep. at 274-75; Ex. 3, Boisseau 11/16/06 dep. at 201-05, 226-30.)

222.   If, as Marsh has consistently testified since 2001, the October 4 statements were the result of pressure and coercion, defendants' expert agrees that the October 4 statement did not provide probable cause to arrest Waters.  (Ex. 9, Ford dep. at 280-83, 301-04,  311-16, referring to Def. Ex. 49, Ford Rpt., numbered paragraphs at pp. 12-13; Ex. 16, Reiter dep. at 57-58, 77-85.)

223.   Elizabeth Fahey testified that she did not often use polygraphs and had no memory of

directing that one be conducted in this case, as polygraphs were inadmissible in court because they were unreliable.  (Ex. 8, Fahey dep. at 269-71.)

### Grand Jury

224.  The grand jury met on November 12, 1982.  Only two witnesses testified before it indicted Waters for the first-degree murder and armed robbery of Katherina Brow: Brenda Marsh and Nancy Taylor.  Marsh reiterated her prior incriminating statements against Waters, including that Waters had a scratch on his cheek from his eye to his chin when he got home around 10:30 am the morning of the murder and that when she asked him if he had anything to do with the murder, he told her, "Yeah, what's it to you."  Taylor testified that Mrs. Brow died from multiple stab wounds, that an envelope full of money was missing from Mrs. Brow's closet, and that a bloody knife had been recovered at the scene.  (Ex. 23, *Comm. v. Waters*, Excerpts of Grand Jury Transcript; Ex. 21, Indictments.)

225.  Prosecutor Elizabeth Fahey relied on Taylor to be familiar with the evidence and to testify accurately before the grand jury.  Taylor reviewed the evidence before she testified.  (Ex. 8, Fahey dep. at 239-41; Ex. 18, Taylor 11/30/06 dep. at 234, 236-38, 284-86, 289; Ex. 19, Taylor 5/18/07 dep. at 148.)

226.  The 1972 Massachusetts Law Enforcement Officers' Handbook advises police, "You should begin preparing yourself for testifying in court during the investigation of the case.  All facts should be properly checked and preserved in notes and reports.  Don't rely on memory alone."  (Ex. 51, Handbook, at 53.)

227.  When Fahey asked if any grand jurors had questions for Taylor, this exchange followed:

Q     (By Juror) Was the department able to lift any fingerprints?
A.     The State Police did  lift some prints.  None of them were anything that they were

53

able to match up.  They were smeared et cetera.

Q    (By Ms. Fahey) So the State Police were unable to match any prints -- lift any prints
to be of use in any investigation?

A.    That's correct.

(Ex. 23, Grand Jury Tr. at 15.)

228.    This testimony was false. Unsmeared prints were collected at the scene that were of use in
the investigation.  (Ex. 18, Taylor 11/30/06 dep. at 293-98, 302-05; *see supra* at ¶¶73, 76-
78.)

229.    In her deposition, Taylor testified that someone had told her the prints were smeared.  (Ex.
18, Taylor 11/30/06 dep. at 307-08, *id.* at 297, 289; Ex. 19, Taylor 5/18/07 dep. at 168-69.)

230.    Baliunas did not tell anyone the prints were smeared, as that would have been false.  (Ex. 1,
Baliunas dep. at 93-94, 142-43.)

231.    Taylor testified in her deposition that Chief Adamson's reports regarding Baliunas'
exclusion of suspects as the source of latent fingerprints were not available to her prior to
the grand jury, so she was not aware of the existence of usable fingerprints.  (Ex. 18, Taylor
11/30/06 dep. at 297, 304-08.)

232.    Taylor had personally typed correspondence for Chief Adamson asking for suspect
fingerprints to compare to the latent fingerprints collected at the crime scene.  Taylor
personally typed a daily log entry on August 6, 1980 reflecting that "[t]hus far at least twenty
sets of prints as well as elimination prints from family members have been submitted and
checked."  (Ex. 53, Adamson correspondence (7/16/80); Ex. 19, Taylor 5/18/07 dep. at 147;
Ex. 33, APD Brow Daily Logs at 8/6/80 (second Brow Investigation on page, before 1220
entry); *see* exhibits cited *supra* ¶¶110-14, 116.)

233.    Taylor knew her testimony about fingerprints was false.  (*See* exhibits cited *supra* ¶¶72-87,

91-93, 102-08, 110-18, 225-32.)

234.  The grand jury indicted and Waters was bound over for trial.  (Ex. 23, Grand Jury Tr.; Ex.

21, Indictments.)

### TAYLOR, BOISSEAU AND CONNORS DELIBERATELY, OR IN BAD FAITH, WITHHELD INFORMATION FROM FAHEY THAT WOULD HAVE BEEN HELPFUL TO WATERS' DEFENSE AT TRIAL

235.  Prosecutor Fahey relied on Taylor, the "chief investigative investigator" to compile and

maintain the prosecution file, as well as to disclose all information known about the crime

and investigation, for trial.  Fahey expected Taylor to disclose "any information they had on

the case," and assumed that Taylor provided her "every police report relative to the case."

(Ex. Ex. 35, Taylor APD Personnel documents at B258; Ex. 8, Fahey dep. at 57, 67, 77-78,

89, 182-85, 189, 242-44; Ex. 19, Taylor 5/18/07 dep. at 27, 64, 127, 243-44, 255-56.)

#### *Fahey Did Not Know There Were Usable Fingerprints*

236.  John Baliunas had retired prior to Waters' arrest in 1982 and had taken the state police

fingerprint file with him.  He was not contacted by anyone in connection with Waters' trial

and did not testify.  (Ex. 1, Baliunas dep. at 28, 65-66, 78-80; Ex. 55, Baliunas Aff. ¶¶1, 4;

*see* exhibits cites *supra* ¶¶86-87.)

237.  Taylor, Connors, and Boisseau each acknowledged in deposition their responsibility to

disclose any helpful or exculpatory evidence to the prosecutor.  (Ex. 18, Taylor 5/18/07 dep.

at 105; Ex. 7, Connors 11/15/06 dep. at 126-32, 240, 248, 268-71; Ex. 3, Boisseau 11/16/06

dep. at 43-44, 58-61, 217-19; *see also* Ex. 76, Reiter Rpt. ¶72).

238.  Sgt. Kenny Martin, a State Police Rule 30(b)(6) designee, testified that state police

fingerprint casefiles would not necessarily be forwarded to the prosecutors, as "it's been my

experience dealing with all the DAs, they're all a little different in how they want to handle an investigation . . ." (Ex. 14, Lt. Martin dep. at 30-31.)

239. Plaintiff's police practices expert, Lou Reiter, opined that Ayer police officers' duty to disclose favorable fingerprint evidence to the prosecutor was not negated simply by virtue of the fact that, before his retirement, Baliunas had an obligation to report as well. (Ex. 16, Lou Reiter dep. at 128-34.)

240. Nancy Taylor and Arthur Boisseau both knew that usable prints were collected at the scene and that Ayer reports documented that suspects had been eliminated based on their exclusion as the source of the prints Baliunas collected at the scene. (*See* exhibits cited *supra* ¶¶75, 77-85, 106-17.)

241. Chief Adamson's reports and correspondence relating to the Brow investigation made clear references to the existence of usable prints, but Fahey did not know there were any usable prints found at the scene, or that comparisons had been made and suspects ruled out. (Ex. 8, Fahey dep. at 36, 67, 190-92, 198-99, 233-36; Ex. 31, APD Brow Reports at 21-42, 50; Ex. 32, Adamson Brow Reports; Ex. 53, Adamson correspondence to Potvin.)

242. Fahey testified that "If I learned that there were prints that were usable, I think I would turn that over to the defense and, hopefully, try to use them if they're usable." (Ex. 8, Fahey dep. at 199-200, 204-05, 219-20, 241-44.)

243. There was no reference at Waters' trial to the bloody toaster print. In her opening statement, Fahey told the jury "you'll learn that the only full fingerprint they found when they dusted the house for fingerprints was the fingerprint of Mrs. Brow on a beer can." (Ex. 24, Trial Tr. Vol. 2 at 59 (Prosecution Opening Statement).)

244.    Nor was Waters' defense counsel Bernard Bradley of the Committee for Public Counsel
        Services ("CPCS") aware any of the reports reflecting the existence of usable prints. Only
        after Waters' conviction did his new investigator, Attorney Herbert F. DeSimone, Jr.,
        discover Adamson's reports about suspects being excluded as the source of fingerprints
        collected at the scene.  (Ex. 56, Herbert F. DeSimone, Jr. Aff.)

245.    When, at her second deposition, Taylor was shown the correspondence she typed referring
        to the existence of usable prints from the scene, Taylor testified that she suddenly
        remembered while reviewing the transcript of her first deposition that she and Elizabeth
        Fahey were so concerned the prints were smeared that they sent Lt. Boisseau back to the
        crime scene on the eve of trial, three years after the murder, to dust again for prints.  (Ex. 19,
        Taylor 5/18/07 dep. at 171-77.)

246.    Boisseau admitted that he has no memory of Nancy Taylor giving him keys to the crime
        scene, of going back to dust for prints, or indeed ever going to a crime scene years later to
        dust for prints in any case.  (Ex. 4, Boisseau 6/13/07 dep. at 34-38, 49.)

247.    If asked to do so on the premise that there were no usable prints, Boisseau testified that he
        would have told Taylor and Fahey it was not necessary because he knew usable prints had
        been collected and that Baliunas was excluding suspects based on them.  (Ex. 4, Boisseau
        6/13/07 dep. at 34-38, 41-42.)

248.    There is no documentation of Boisseau being dispatched to the Brow residence to dust for
        prints before trial, although there are APD daily logs reflecting the fact that Boisseau did so
        in other cases.  (Ex. 78, APD Daily Logs at 7/25/80 (1412 entry); Ex. 4, Boisseau 6/13/07
        dep. at 33-34.)

249. Returning to scene three years after the crime to dust for prints was inconsistent with APD policy:

> [I]t is the duty of the first police officer to arrive to preserve the crime scene in the same physical condition as it was left by the perpetrator. The prompt arrival of the police to the crime scene is essential because . . . evidence can be destroyed or altered, deliberately or unintentionally, before the police arrive by the victim or by witnesses. Often the person in charge of the premises may unthinkingly destroy evidence by cleaning up the place after a crime has been committed . . . The first police officer who arrives upon or is called to the scene of the crime should take the following steps until additional assistance of investigating officers arrive: . . . (h) protect any surfaces that may contain fingerprints . . . Officer assigned to conduct a crime scene search should begin by making a systemic, methodical and thorough examination of the area in and around the scene.

> (Ex. 48, MPI Evidence Policy at p.1.)

250. Lt. Boisseau testified that standard protocol is to dust for fingerprints as soon as possible after the crime is discovered to increase the chances of finding a print left by the perpetrator. (Ex. 4, Boisseau 6/13/07 dep. at 34, 47-50; Ex. 48, MPI Evidence Policy at B5602-03.)

251. Taylor claimed that she collected the keys from Charles Brow, Jr., because the house was vacant, but in fact Mrs. Brow's husband Charles lived there continuously through his testimony at the 1983 trial. (Ex. 19, Taylor 5/18/07 dep. at 171-72, 175; Ex. 24, Trial Tr. Vol. 2 at 69 (C. Brow).)

252. The Brow murder left blood throughout the trailer; it was cleaned after it was processed by the authorities, a process that would have obliterated the print evidence. (Ex. 4, Boisseau 6/13/07 dep. at 26-27.)

### *Ayer Police Did Not Document or Disclose the Alibi Time Cards*

253. Defendants Taylor, Boisseau and Connors testified that Ayer officer Decot was dispatched to Berry Enterprises to collect Waters' time cards to confirm or deny Waters' alibi. There

is evidence that Ayer officers including Decot checked those records soon after Waters was interviewed on May 22, 1980, and collected them soon after Waters was arrested in 1982. (*See* exhibits cited *supra* ¶¶53-71.)

254.    Waters' defense attorney subpoenaed his employment records for trial but the custodian of those records, Alice Tessier, testified that the employment records for the week of the murder, including Waters' time card, were missing.  (Ex. 66, Subpoena for Time Cards; Ex. 24, Trial Tr. Vol. 5 at 533-35 (Tessier).)

255.    APD policy and standard procedure was to document the fact that an officer was dispatched to a location on an investigation and to log in any evidence collected.  (Ex. 2, Boisseau 8/25/06 dep. at 33-36, 38-39; Ex. 3, Boisseau 11/16/06 dep. at 106-10; Ex. 6, Connors 8/25/06 dep. at 58-60; Ex. 7, Connors 11/15/06 dep. at 156; Ex. 48, MPI Evidence Policy at 8, 10-12.)

256.    No Ayer records have been produced documenting that officers were dispatched to Berry Enterprises, either in 1980 or shortly after Waters' arrest in 1982, to do the fundamental task of checking Waters' time records.

257.    Prosecutor Elizabeth Fahey testified at her deposition that Waters' time cards would have been "helpful," and, if the Ayer police had collected them, they had a duty to preserve and disclose them.  (Ex. 8, Fahey dep. at 37-38, 253, 255-56.)

### *Taylor and Connors Did Not Disclose to Fahey the Threats, Pressure or Suggestion They Used to Elicit Marsh's Statements*

258.    Neither Taylor nor Connors told Prosecutor Fahey that Marsh's statement was elicited by threats that she would be charged as an accessory after the fact to murder and lose her parental rights if she did not cooperate.  If Fahey had learned this information, she would

have disclosed it to the defense. (*See* exhibits cited *supra* ¶¶179-189, 196, 201-11; *see also* Ex. 18, Taylor dep. 11/30/06 at 204-05; Ex. 8, Fahey dep. at 47-48, 66, 93-95, 98-99, 104, 106-16, 124-28, 148, 151-52, 261-62, 272, 282-83, 289-96, 312; Ex. 3, Boisseau 11/16/06 dep. at 217-19; Ex. 7, Connors 11/15/06 dep. at 240; Ex. 76, Reiter Rpt. ¶72.)

### *Roseanna Perry*

259. Roseanna Perry, a second former girlfriend of Waters', also testified as a prosecution witness. She testified that one night in 1981, Waters told her he had killed Mrs. Brow. (Ex. 24, Trial Tr. Vol. 4 at 399.)

260. Perry and Brenda Marsh were the only prosecution witnesses to offer a direct link between Waters and the murder. (*See, e.g.*, Ex. 8, Fahey dep. at 36, 61; Ex. 19, Taylor 5/18/07 dep. at 47.)

261. Nancy Taylor had located Perry in Providence, Rhode Island shortly before trial in 1983. (Ex. 19, Taylor dep. 5/18/07 at 31.)

262. Taylor learned from the Providence Police Department that Perry was a "common street walker" and had a criminal history. (Ex. 19, Taylor 5/18/07 dep. at 35-38.)

263. Taylor first interviewed Perry at her home in Providence, Rhode Island, in April 1983. Taylor testified in her deposition that Fahey accompanied her for the interview. Fahey testified that she remembered driving to Providence with Taylor but that she, Fahey, stayed in the car when Taylor tried to interview a female witness at her home. (Ex. 19, Taylor 5/18/07 dep. at 40-42; Ex. 8, Fahey dep. at 30-31, 71-72.)

264. APD policy directs officers to document every witness interview in a report. Taylor did not document her first interview of Roseanna Perry in any written report. (Ex. 47, MPI Witness

Interviewing Policy at 5; Ex. 7, Connors 11/15/06 dep. at 268-69; Ex. 19, Taylor 5/18/07 dep. at 60-61, 83-84.)

265.    The only conversation Perry ever had with Waters about the Brow murder, she told Taylor, was at the end of a three-hour binge in which the two of them drank a six-pack of beer and "wiped out" a quart of Southern Comfort straight from the bottle.  Perry was, in her words, "plastered," so "zonked out" that she blacked out and did not remember getting home.  (Ex. 72, Perry Affidavit & Statement to DeSimone at CPCS44-47, CPCS49.)

266.    At trial, Perry testified that Waters had confessed to the murder, but she did not volunteer the fact that she and Waters had been drinking the night she claimed to have heard his confession.  On cross examination she admitted that they were both "drunk."  (Ex. 24, Trial Tr. Vol. 4 at 398-99, 408, 422-23 (Perry).)

267.    On July 15, 1983, two months after the conviction, Perry made a statement to Waters' investigator, Herb F. DeSimone, Jr.  Perry swore under penalty of perjury that all of the facts in the statement were true and accurate.  (Ex. 72, Perry Affidavit & Statement to DeSimone.)

268.    In that statement, Perry said that, at the beginning of the interview with Taylor and Fahey, she repeatedly told them, "I don't really remember, I don't really remember . . . [w]hat he said," but, "it was mostly Nancy you know, 'Rosanna we know you know something,' she told me she said, 'I know you know something that your [sic] not telling us', like I felt like I was being, you know . . ."  (Ex. 72, Perry Affidavit & Statement to DeSimone at CPCS51-52.)

269.    At a second meeting, this time at the Providence Police Department on April 12, 1983, Taylor showed Perry photographs of the victim's dead body.  Perry became "completely

hysterical," she told DeSimone, because "they were so gross, I'd never seen nothing like it in my life." Taylor then asked Perry, "do you want him out on the streets?"  (Ex. 72, Perry Affidavit & Statement to DeSimone at CPCS49-52, CPCS54; Ex. 19, Taylor 5/18/07 dep. at 53.)

270.    Perry felt "under a lot of pressure" from Taylor and ultimately told her Waters had confessed to her.  (Ex. 72, Perry Affidavit & Statement to DeSimone at CPCS54.)

271.    Perry later told DeSimone:

. . . one thing I wanted to say at the trial but I couldn't – we were absolutely plastered. .. we were so zonked I don't even know ... the more I think about it, you know I was thinking about it after the trial and everything, and I mean he could have said just about anything.

[. . .]

I wanted to say in court how plastered we really were.

> Q:    And why weren't you able to say that?
> A:    They said drink – say that you were drinking – it doesn't sound right.
> Q:    Who said that?
> A:    Um, well Nancy Taylor.
> Q:    Who is Nancy Taylor?
> A:    The policewoman, from Ayer, Mass.

(Ex. 72, Perry Affidavit & Statement to DeSimone at CPCS41, CPCS46, CPCS47, CPCS650; *see also* Ex. 19, Taylor 5/18/07 dep. at 92.)

272.    When DeSimone asked her if she was sure what Waters had said to her that night, Perry answered:

Well I thought that's what he did say, but the more I thought about it – I think he might have said something else... Maybe he was just proudly talking about getting picked up ... Well if I'm not sure about what he said, because we were really plastered – both of us.

[. . .]

the more I thought about it, you know, I'm saying – God – did he really say that to me,

cause, like I had a black out, you know what I'm talking about, when you drink so much you can be talking, you know... I thought he said that, but, I don't know, he could have been talking about getting picked up for it... That's what he could have said.

[. . .]

I honestly believe that he said he got picked up for killing, that's what I really believe... I mean, we was just so absolutely plastered, I mean, I don't even remember going into my own house, like I said, I probably crawled in...

Like I said I blacked out, I mean I – when you black out, you could be walking, you could be talking, but have completely no memory whatsoever.

(Ex. 72, Perry Affidavit & Statement to DeSimone at CPCS43, CPCS49, CPCS56, CPCS57.)

273.    Taylor prepared and had Perry sign a "Witness Statement" reporting that "Roseanna was absolutely sure that Waters told her that he had killed a woman in Ayer, Ma. by stabbing her." (Def. Ex. 54.)  Taylor never disclosed to Fahey that Perry denied having any memory of such an admission, or that she pressured Perry into making the statement.

274.    Before the trial, Nancy Taylor told Roseanna Perry's daughter Rose and Rose's grandmother that Kenny was a murderer and that he and his family were going to get us next. As a result, Rose and her grandmother moved out of their house for two months.  (Ex. 75, Rose Perry Aff. ¶ 2.)

275.    Roseanna Perry was brought back to Ayer by Ayer police at least twice before trial.  (Ex. 19, Taylor 5/18/07 dep. at 15, 123-24.)

276.    Perry later told an attorney working on Mr. Waters' behalf:

Then one day Nancy Taylor and another police officer showed up at my house [in Rhode Island].  She was all upset and told me that people were coming to kill me and that I had to go with them for my own safety.  By now she already had me so terrified that I believed her and she ordered me to send my kids with my mother (who is now deceased) and told my mother that she had to go somewhere to hide. My mother and my kids went to my mothers sisters (also deceased) house to stay.

Then they took me in a marked cruiser.  They drove at high rates of speed, zig zagging in and out of traffic.  Nancy was saying things like 'are they still following us?' and 'did we lose them?'  I was terrified to be in a speeding car, and they knew it.  Nancy told me that people were following us, trying to kill me.  I didn't know what to think.  Nancy was so overbearing and so demanding that I just went along with them.  I mean they were the police and I thought that it was true that someone was trying to kill me.  Nancy Taylor told me I had to do this and that I would stay there until the trial so that Kenny would not have me killed.

(Ex. 73, Memo to Andrews of Perry Interview.)

277.    Taylor placed Perry in a cell at the APD for several days.  (Ex. 19, Taylor 5/18/07 dep. at 15, 123-24.)

278.    Perry left and returned to Providence.  Bruce Taylor, Nancy Taylor's husband at the time, and APD Officer Dennis MacDonald drove to Providence in Nancy Taylor's private car to retrieve her.  Bruce Taylor and MacDonald drove her back to Ayer in handcuffs.  (Ex. 75, Rose Perry Aff. ¶ 1; Ex. 17, Bruce Taylor dep. at 54-60, 65, 67, 84-85; Ex. 19, Taylor 5/18/07 dep. at 12.)

279.    Bruce Taylor was not an Ayer Police officer, nor had he ever worked for the Ayer Police in any capacity.  This was the first time he had ever performed or assisted in police work of any kind.  (Ex. 19, Taylor 5/18/07 dep. at 12-14; Ex. 17, Bruce Taylor dep. at 61.)

280.    Taylor testified that she was always with Fahey when speaking to Perry, and that Fahey, not Taylor, "took the notes."  (Ex. 19, Taylor 5/18/07 dep. at 84, 86.)

281.    Taylor and Perry had numerous telephone calls in the month before trial, none of which Fahey was a part of, and none of which Taylor reduced to a formal report.  (*See, e.g.*, Ex. 36, Taylor handwritten notes; Ex. 19, Taylor 5/18/07 dep. at 86-7, 89-93, 99-107.)

282.    Taylor's handwritten notes of one call with Perry reflect that Perry told her she was "going to bury them all," a reference to the Waters family.  (Ex. 36, Taylor handwritten notes at

B88, Ex. 24, Trial Tr. Vol. 4 at 432-33 (Perry); Ex. 20, Waters 11/28/06 dep. at 158.)

283.    Perry frequently called Taylor while "very upset," and "rambled" in a way that made it

difficult to understand her. Taylor testified that Perry told her she was receiving threats from

the Waters family, but Taylor never did anything to investigate those alleged threats, and

was not concerned to learn that the Providence Police Department had ignored Perry's

complaints. Taylor testified her lack of concern stemmed in part from her sense that Perry's

claims could have been "an exaggeration," and because Taylor did not consider it her job to

make that credibility determination. (Ex. 19, Taylor 5/18/07 dep. at 55, 87, 89-93, 103-04,

108-10, 112.)

284.    Perry did not want to testify against Waters and was uncertain of what, if anything, he said

to her regarding the Brow homicide. (Ex. 72, Perry Affidavit & Statement to DeSimone at

CPCS47-49, CPCS51, CPCS56.)

285.    Once Ayer police returned her to Ayer, Perry told Andrews:

I stayed at the police station for about a week and then they moved me to a Holiday
Inn located in Ayer. I stayed there for another week while they prepared me for the
trial. Nancy Taylor continued to tell me all kinds of bad things about Kenny, and
told me that I better go through with testifying or else I would be in trouble. . . . The
night before the trial a whole group of police barged into my room and told me that
people were coming to kill me. They said that these people had cut the telephone
lines to the Hotel. . . .

I have to say that Nancy Taylor was relentless in keeping me terrified, she never let
up. Throughout this whole time she made me scared to death that I would be killed
and scared that I would end up being arrested for the murder.

The next day I went to court and testified. After the trial ended, Nancy and her
husband took me out for a lobster dinner at a fancy restaurant.

(Ex. 73, Memo to Andrews of Perry Interview.)

286.    At trial, Perry repeated the same statement attributed to her by Taylor at her April 12, 1983

interview.  (Ex. 24, Trial Tr. Vol. 3 at 398-99 (Perry); Def. Ex. 54.)

287. Three months later Perry recanted her testimony in the sworn statement to DeSimone and in conversations with plaintiff Betty Ann Waters.  (Ex. 72, Perry Aff. & Statement to Desimone at BAW367, CPCS34-68; Ex. 20, Waters 11/28/06 dep. at 75-84, 92-93.)

288. Since 1983, Perry has told her daughter Rose that Kenneth Waters was an innocent man whom she helped to convict based on false testimony due to Nancy Taylor's threat that if she did not testify, she would be charged as an accessory after the fact.  She told her daughter she felt she had no choice but to go into court and lie.  (Ex. 75, Rose Perry Aff. ¶¶1, 3.)

289. Taylor testified in her deposition that Perry "was as afraid as Brenda Marsh was that she could be charged as an accessory."  (Ex. 19, Taylor 5/18/07 dep. at 128.)

290. Roseanna Perry testified at Waters' motion for a new trial in 1985.  She later told her daughter Rose that before that proceeding, Nancy Taylor told her she would be charged with perjury and accessory if she recanted her trial testimony.  Her testimony in 1985 was consistent with her trial testimony.  (See Ex. 75, Rose Perry Aff.)

291. Soon after Waters' release in 2001, attorney Michael Andrews and an investigator working on Mr. Waters' behalf contacted Roseanna Perry.  She invited them into her house and told them she was pressured by Nancy Taylor at a meeting at the Providence Police station: Taylor told her to look at autopsy photographs and asked her if she "wanted to end up like this woman."  Perry told Andrews that she told Taylor she knew nothing about any connection between Waters and the murder, but Taylor "began asking me why I was covering for Kenny" and told her she would be "in trouble" and "charged with accessory to the murder" if she did not give them information.  Perry told Andrews that "Nancy Taylor

was not letting up, she just wouldn't accept what I was telling them;" she was "relentless." (Ex. 75, Rose Perry Aff. ¶7; Ex. 73, Memo to Andrews of Perry Interview.)

292.    Perry told Andrews that, at that point, she said, "MAYBE, and I mean MAYBE, Kenny had said something one night when we were drinking together," but "I could have just imagined him saying that." Perry told him "I know I told her that I wasn't sure because I was so drunk." (Ex. 73, Memo to Andrews of Perry Interview.)

293.    Perry told Andrews that at this point in their interview, "Nancy Taylor was so overbearing, and so forceful, she scared me. I really thought that I was going to be arrested and charged. They told me they would arrest me and I believed them . . . She told me that I had to get sure." (Ex. 73, Memo to Andrews of Perry Interview.)

294.    Perry told Andrews that, after the session at the Providence police station, "Taylor never left me alone. She was always calling me and coming by the house. . . . She told me that Kenny was going to get me and that I was in danger of being killed. She had me so scared that I used to hide in the closet in my house." (Ex. 73, Memo to Andrews of Perry Interview.)

295.    An affidavit was prepared for Perry to sign based on the statements she had made to Andrews. (Ex. 73, Memo to Andrews of Perry Interview; Ex. 74, Unsigned Perry Draft Affidavit.)

296.    Attorney David Levy told Perry if she signed the affidavit she could be charged with perjury for admitting her testimony in the criminal proceedings was false, because her move to Rhode Island tolled the statute of limitations for perjury in Massachusetts. She did not sign it. (Sealed Ex. 99, District Attorney post-conviction documents at AG2428-29, AG2523; Ex. 75, Rose Perry Aff. ¶7.)

297. In her 2006 deposition, Perry reiterated her incriminating testimony from the criminal proceedings. (*See generally* Def. Ex. 14.)

298. Perry has repeatedly expressed fear of being charged with perjury if she admitted her testimony in 1983 and 1985 was false. (Ex. 75, Rose Perry Aff. ¶¶4-7.)

299. Upon learning of Waters' release on bail in 2001, Roseanna Perry exclaimed, "Oh my God I'm going to jail for perjury." (Ex. 75, Rose Perry Aff. ¶6.)

### TRIAL

300. A jury trial was held from May 3 to May 11, 1983. (Ex. 24, Trial Tr.)

301. Former Assistant District Attorney Fahey testified that "it was a circumstantial case." Nancy Taylor and Arthur Boisseau were witnesses for the prosecution. Brenda Marsh and Roseanna Perry offered the only direct link between Waters and the crime. (Ex. 8, Fahey dep. at 36, 61; Ex. 19, Taylor 5/18/07 dep. at 47.)

### *Taylor Inspected and Gave Up Custody of a Ring which Had no Connection to the Victim, But Was Used Against Waters at Trial*

302. At trial, a friend of the victim, Adi Ogden, testified that she was "shocked" when Waters offered to sell her a ring soon after the murder, the same ring Ogden claimed she had given to Brow as a gift. (Ex. 24, Trial Tr. Vol. 3 at 294-96, 303-08, 327-28, Vol. 4 at 342, 361 (Ogden).)

303. Fahey emphasized this testimony in her closing argument, characterizing it for the jury as "important evidence for your consideration. (Ex. 24, Trial Tr. Vol. VII at 41-42 (Prosecution closing).)

304. Nancy Taylor had inspected the ring when taking Ogden's statement on July 1, 1980. She determined that it could not have been the victim's ring, because it was too small – a size 4

3/4, whereas Mrs. Brow's daughter said she wore a size 7 ring – and had an engraving on it, unlike the ring Ogden had given her.  (Ex. 31, APD Brow reports at 19, 20; Ex. 24, Trial tr. Vol. 2 at 109-10 (E. Brow), Vol. 3 at 327-28 (Ogden).)

305.    Taylor gave the ring back to Ogden two weeks later, and Ogden gave it away to her sister in Germany.  (Ex. 24, Trial Tr. Vol. 3 at 308 (Ogden), Vol. 5 at 565 (Taylor).)

306.    Ayer's written evidence handling policy directed officers to preserve items of potential value to the investigation so they would be available to be offered as evidence at trial. The policy stated, "It is a fundamental principal of law enforcement that the success or failure of any criminal investigation and subsequent prosecution often depends on the availability and the admissibility of physical evidence . . . which can be collected by the police and carefully protected and preserved for presentation in court."  (Ex. 48, MPI Evidence Policy at 1, 2, 10-12.)

307.    Boisseau testified that he made sure that all subordinate officers were aware of the policies regarding chain of custody and handling of evidence, specifically that any item of even conceivable relationship to a homicide prosecution should be preserved, logged in, and reported.  He did not know a ring had been brought to the station in connection with the Brow investigation.   (Ex. 3, Boisseau 11/16/06 dep. at 103, 106-10.)

308.    Nancy Taylor testified that, in all her years working at the APD, she had no idea there were any written policies governing investigations, handling of evidence, or interactions with witnesses and informants. There was no requirement that officers sign to indicate receipt or review of APD manuals, nor was there any other documentation that officers received them. (Ex. 18, Taylor 11/30/06 dep. at 276; Ex. 19, Taylor 5/18/07 dep. at 61-66, 77-79; Ex. 76,

Reiter Rpt. ¶18 .)

309.    As Plaintiff's expert Lou Reiter opined, Taylor's testimony is "indicative of a failure of Ayer

Chiefs and police managers to ensure that all police personnel were aware of these important

guidelines designed to ensure proper policing and the protection of citizen rights."  (Ex. 76,

Reiter rpt. ¶18; *see also* Ex. 51 (Handbook and Police Manual) at 83.)

310.     Taylor testified at trial that she gave the ring back to Ogden "because I was told to return

it . . . [b]y my chief" – that is, Chief Adamson.  (Ex. 24, Trial Tr. Vol. 5 at 567.)

311.    Both Boisseau and Connors agreed in their depositions that only items that bore no possible

evidentiary value could be returned to their owner.  (Ex. 3, Boisseau 11/16/06 dep. at 107-

08; Ex. 7, Connors 11/15/06 dep. at 291-94.)

312.    Waters raised an alibi defense and subpoenaed his time cards from the Park Street Diner, but

they were "missing."  (Ex. 24, Trial Tr. Vol. 7 at 24-25, 32, 34, 35 (Defense closing); Ex.

24, Trial tr. Vol. 5 at 533, 535, 538 (Tessier).)

### Taylor Suppresses Evidence of an Inducement to Perry

313.    While the jury was deliberating on the morning of May 11, 1983, Waters' defense attorney

raised a concern about whether Nancy Taylor made promises to Perry that had never been

disclosed.  Fahey told the judge that, other than the fact that Perry had been put up in the

Motel Linda at the APD's expense, "she's been promised nothing, absolutely nothing . . . I

know of no other promises whatsoever."  The judge instructed Fahey to "investigate the

business of any promises being made to Roseanna Perry, and report back" to him.  (Ex. 24,

Trial tr. Vol. 7 at 636-37, 639.)

314.    After a break, Fahey reported that Perry told her she had never been promised anything by

Ayer police or Fahey herself.  The judge directed Fahey to ask the police.  At 4:47 that

afternoon, the jury convicted on all charges.  (Ex. 24, Trial tr. Vol. 7 at 641, 645-47.)

315.    At Waters' sentencing hearing the next day, Fahey reported that Nancy Taylor had told Perry

that "the Providence Police Department would be notified and has been notified that

Roseanna Perry did testify for the Commonwealth in a first degree murder case."  (Ex. 26,

*Comm. v. Waters*, Sentencing tr. at 4-5.)

316.    Fahey had argued that neither Brenda Marsh nor Roseanna Perry had a motive to lie:

. . . Do they have a motive to lie? They are scared to death of him . . .  When you are
evaluating the testimony of Roseanna Perry and Brenda Marsh you can consider that they
didn't come forward on their own, that the State contacted them . . . They told you the truth,
ladies and gentlemen, and you know they told you the truth because they are scared to death,
they are too scared to lie.

(Ex. 24, Trial tr. Vol. VII at 50-51.)

317.    Both Fahey and Boisseau testified that any promise or inducement such as the one Taylor

provided to Perry should have been disclosed to the prosecutor.  (Ex. 8, Fahey dep. at 312;

Ex. 3, Boisseau 11/16/06 dep. at 215-18.)

318.    Waters was convicted and sentenced to life in prison.  (Ex. 26, Sentencing Tr.; Ex. 27,

Commitment Orders.)

**Ayer's Pattern of Deliberate Indifference to Constitutional Rights**

*Ayer's Board of Selectmen Delegated Final Policymaking Authority to Ayer's Police Chiefs*

319.    Pursuant to Massachusetts law, the Ayer Board of Selectmen ("Board") established the

police force, appoints the chief, may remove officers for cause, and issues regulations

pertaining to the department.  M.G.L. c. 41, § 97; (Ex. 5, Callahan dep. at 23, 27, 33).

320.    Francis Callahan, a Board member during the Brow investigation, explicitly acknowledged

that the Board delegated all pertinent policymaking authority in the law enforcement arena

to Ayer's police chiefs.  Specifically, Callahan agreed that the Board delegated or left to the

chief's discretion hiring, assignments and oversight of individual police and special officers;

law enforcement generally, including the use of informants during investigations; and

investigating allegations of police misconduct.  The Board had no role whatsoever with

respect to the training of police officers.  (Ex. 5, Callahan dep. at 7-8, 23, 27, 31-32, 33, 39,

43-44, 46, 62, 73-75, 79, 82-83, 87-88, 100-01, 103, 105-06, 134-36, 138-39; *see also* Ex.

7, Connors 11/15/06 dep. at 57-60.)

321.    The APD's own written policies, which repeatedly refer to the Board as the "Appointing

Authority" and the Chief as the "chief administrative officer of the Department and the final

departmental authority in all matters of policy, operations and discipline."  (Ex. 50, APD

Duties by Rank and Assignment, at B576, 659, 216.)

322.    Specifically, APD policy provides:

Through the Chief of Police the Department is responsible for the enforcement of all laws
coming within its legal jurisdiction.  The Chief of Police is responsible for planning,
directing, coordinating, controlling and staffing all activities of the Department.  He is also
responsible for . . . the enforcement of rules and regulations within the Department, for the
completion and forwarding of such reports as may be required by proper authority and for
the Departments' relations with local citizens, the local government and other related
agencies.  The Chief is responsible for training of all members of the department.

(Ex. 50, APD Duties by Rank and Assignment at 659.)

### Ties Vandalism

323.    In a 1984 opinion, the Supreme Judicial Court of Massachusetts set forth the undisputed

facts underlying a 1980 incident commonly referred to as the Ties scandal in connection with

a review of a Labor Relations Commission's decision relating to the dismissal of Ayer police

officers. (Ex. 77, *Local 346, Intern. Broth. of Police Officers v. Labor Relations Com'n & Town of Ayer*, 462 N.E.2d 96 (Mass. 1984).)

324. The SJC set forth the underlying facts of the scandal, which the Town did not dispute, as follows:

For approximately eight months during 1979, a construction company in Ayer hired off-duty police officers to guard a manufacturing site. In February, 1980, after the company had terminated its employment of police officers, the manufacturing site was broken into and extensively ransacked. Damage estimates ranged from $25,000 to $45,000. The Ayer police department began an extensive investigation of the crime but for some time was unable to identify any suspects.

(Ex. 77, 462 N.E.2d at 98)

325. Ayer officer Stanley Randall responded to the report of vandalism at Ties and found extensive damage. Lt. Boisseau arrived to collect prints and take photographs. (Ex. 78, Selected APD Ties Reporting at 2/25/80 Randall Report, 2/25/80 APD Daily Log (0501, 0601, 0814 entries); Ex. 15, Randall dep. at 47-49, 53-61; Ex. 3, Boisseau 11/16/06 dep. at 45-46; Ex. 18, Taylor 11/30/06 dep. at 320.)

326. The SJC found:

In April, 1981, in the course of casual conversation with a fellow officer, an Ayer police officer stated that he and three fellow officers, identified by name, had perpetrated the vandalism as retaliation for the company's termination of their employment as private guards. Eventually, this information was relayed to the Attorney General, who began his own investigation of the incident in July, 1981.

(Ex. 77, 462 N.E.2d at 98 (footnotes omitted).)

327. Ayer officer Leon Smith told Stanley Randall that he had been involved in the vandalism at Ties along with other officers. (Ex. 15, Randall dep. at 64, 69-73.)

328. The SJC found that,

By the late summer of 1981, the possible involvement of the four police officers in the crime,

73

as well as the Attorney General's decision to investigate, had become public knowledge, and spawned public distrust of the police department. [FN5]

FN 5: There was evidence that townspeople would call the police department only when specific police officers were on duty, and that, although it was common practice for Ayer residents to notify the police when leaving a house unattended, they were reluctant to do so after this investigation became public.

(Ex. 77, 462 N.E.2d at 98.)

329.    Chief Adamson brought all four suspected officers in to the station, including Officer

Gintner, Officer Pugh, Sgt. Lenney, and Adamson's son, William Adamson, Jr., who had

resigned.  His daily log entry for August 3, 1981 reflects that Chief Adamson contacted the

State Police detective in charge of the Attorney General's investigation and "[a]dvised him

I know that isn't true." Adamson "further advised him all four officers who are allegedly

involved have come to me twice and now are in for the third time denying any involvement

in this incident of vandalism [sic]."  (Ex. 78, Selected APD Ties Reporting at B618-19 (Aug.

3, 1981).)

330.    The SJC found that:

In addition to creating public distrust, the [Ties] incident factionalized the department, exacerbating a preexisting schism between the group of officers accused of the vandalism and a second group thought to have transmitted the incriminating information to the Attorney General. Members of the second group voluntarily submitted to polygraph examinations. The record does not reveal the nature of the questioning of those officers, but, according to the commission's findings, the officers "passed" the examinations.

(Ex. 77, 462 N.E.2d at 98 n.6; *see also* Ex. 15, Randall dep. at 78-81.)

**Custom of Suppressing or Spoliating Favorable Evidence**

331.    When he responded to Ties Construction on February 25, 1980 (*see supra* ¶¶323-25), Officer

Stanley Randall found a buck knife he believed may have been used in connection with the

vandalism he found there.  He collected the knife, bagged it as evidence and personally

turned it over to then-Lt. Boisseau, the evidence officer.  Before the knife could be examined

any further for fingerprints or other identifying marks, Randall testified in deposition, "all

of a sudden it disappeared."  Boisseau explained to him that the knife "must have gotten

tossed out or something" and in any event, "got misplaced."  It was never seen again.  (Ex.

15, Randall dep. at 55-66.)

332.    A daily log entry from June of 1980 indicates that another knife confiscated by Officer

Kidder was placed out in the open on Lt. Boisseau's desk, not "under lock and key" pursuant

to the policy.  Another daily log entry from September of 1980 chastised an officer for

failing to file a report or application for complaint in connection with a stolen car, and the

next entry directs that the "Officer in charge should follow up and give a little direction with

regards to tagging the evidence . . . ."  (Ex. 78, Selected APD Reports and Daily Logs at

6/21/80 (1830 entry), 9/8/80 (two entries after 0805); Ex. 48, MPI Evidence Policy at p. 12.)

333.    An October 3, 1981 log entry indicates that officers Smith and Decot recovered a purse from

the Park Street Diner, then brought to the police station and "placed on the floor."  (Ex. 78,

APD Daily Logs, at 10/3/81 (0412 entry).)

334.    During the midst of the public outcry regarding the possibility that APD officers were

responsible for the vandalism at Ties, and that some of the officers involved had stolen or

destroyed investigating officers' property, Chief Adamson issued a press release in October

1981.  As quoted by the local paper, Adamson acknowledged that "the Ayer police

department facility is not and never has been a secure, totally controlled physically facility,"

but in fact was regularly accessed by "civilians . . . who had no legitimate reason for being

there."  (Ex. 81, 10/6/81 Lowell *Sun,* "Chief Adamson responds to Ayer police dispute," at

2.)

335.  Stanley Randall described the evidence room as a holding cell which was accessible by officers in addition to Lt. Boisseau.  (Ex. 15, Randall dep. at 129-30.)

336.  The Ayer *Public Spirit* reported on July 15, 1982 that Chief Connors viewed the loss of the knife as evidence in the Ties case (*see supra* ¶¶323-31) demonstrated the need for a new evidence room.  The paper quoted him as saying, "[t]he way evidence is secured here or was prior to my arrival, is different from my opinion of proper security."  (Ex. 87, Cathy Johnston, "Ties grand jury excused – but investigation continues," Ayer *Public Spirit*, July 15, 1982.)

337.  Taylor, Connors, and Boisseau each acknowledged in deposition their responsibility to disclose any helpful or exculpatory evidence to the prosecutor.  (*See* exhibits cited *supra* ¶237.)

338.  The APD's written evidence handling and preservation policy required that "[a]ll physical evidence in police department custody should be kept securely under lock and key."  (Ex. 48, MPI Evidence Policy at p. 12)

339.  Boisseau testified that he made all police personnel aware of their duty to preserve evidence and follow strict chain-of -custody policies.  (Ex. 3, Boisseau 11/16/06 dep. at 106-10.)

340.  Boisseau took home his crime-scene negatives from the Brow case and found them 20 years later during the course of discovery in this action.  His son had taken them to school with him during the Brow investigation to show his friends.  (Ex. 3, Boisseau 11/16/06 dep. at 74-86; Ex. 15, Randall dep. at 137-40.)

341.  Stanley Randall testified that "[t]here was always evidence for cases missing," but to his

knowledge, no officer was ever disciplined for it.  (Ex. 15, Randall dep. at 118, 131-37.)

342.    As Plaintiff's police practices expert Lou Reiter opined, these lapses was indicative of an

ongoing pattern of "evidence collection and control deficiencies." (Ex. 76, Reiter rpt. ¶¶29-

42.)

343.    During the course of the Brow investigation and under the tenure of all three Chiefs, Ayer

officers knew about but destroyed or failed to document and disclose helpful evidence,

including: 1) the existence of usable prints from the crime scene and the fact that Waters had

been excluded as the source of the unknown print as early as 1980; 2) Waters' alibi time

cards; 3) the fact that the testimony of the prosecution's two key witnesses was perjurious,

and had been induced by coercion, threats, promises and rewards in 1982 and 1983, and 4)

a ring a witness bought from Waters that did not match the witness' description of a ring she

had given to the victim.   (*See* exhibits cited *supra* at ¶¶46-117, 240-43, 253–57, 258, 302-

17.)

344.    Plaintiff's expert Reiter concluded that,

The Ayer Police Department made reckless and conscious choices to deviate from generally
accepted police practices in its collection and preservation of evidence of major crimes,
including the murder of Mrs. Brow and the arrest/conviction of Kenneth Waters.  Evidence
during any investigation is known to have a high degree of potential of being exculpatory.
Systemic failures to reasonable and generally accepted policies and practices to safeguard
this evidence would be known to create the high possibility for wrongful convictions and
prosecutions.

(Ex. 76, Reiter rpt. ¶29.)

345.    The Ties investigation, which continued late into 1982, yielded additional allegations of

criminal misconduct by officers who were still on the force.  In an August 30, 1982 report,

APD Officer Leon Smith reported that, at a meeting with himself and Patrolman Kidder,

former officer Jack McAdam told them he and Officer MacDonald, along with three officers who had left the APD in connection with the Ties matter (Lenney, Adamson, Jr., and Pugh) all had a practice of seizing marijuana from suspects "for their own personal use." Patrolman Kidder's report of their interview with Jack MacAdams recounted the same allegations against Officer MacDonald. There is no evidence that Connors ever investigated or disciplined officer MacDonald in connection with that allegation. (Ex. 78, Selected APD Ties Reporting at B648-57.)

346. Lt. Boisseau testified that, other than the administrative investigation Connors conducted into the Ties matter which resulted in three officers being fired for refusing polygraph tests, he was not aware of any other administrative investigation ever being conducted into police misconduct during his tenure at the APD, which ended in 1996. (Ex. 3, Boisseau 11/16/06 dep. at 46.)

347. Plaintiff's police practices expert, Lou Reiter concluded that the records of the internal investigation of the Ties vandalism "were indicative of a perfunctory and extremely deficient investigation by the Police Department." (Ex. 76, Reiter rpt. ¶20.)

**Custom of Using Undisclosed Promises, Inducements, and Pressure Against Witnesses and Sponsoring Perjury**

348. Nancy Taylor and Chief Connors repeatedly engaged in coercive and abusive conduct toward Brenda Marsh. Taylor then used the same tactics against Roseanna Perry and herself lied to the grand jury about the existence of usable fingerprints in this case. Fahey never heard about any of this conduct. (*See* exhibits cited *supra* ¶¶227-33, 259-99, 313-17.)

### *Undisclosed Inducements to the Complainant against Dennis Maher*

349. In a subsequent case, Taylor arranged to have criminal assault charges against a rape victim

dismissed in 1983 in exchange for her continued cooperation as a witness against Dennis

Maher, who was later exonerated on the basis of DNA evidence. (Ex. 3, Boisseau 11/16/06

dep. at 207-15; Ex. 89, Carney Affidavit & M.G. Assault Complaint; Ex. 10, *Maher v. Ayer,*

*et al.,* Goss dep. at 44; Ex. 88, *Comm. v. Maher*, 4/3/03 *Nolle prosequi*.)

350. Prosecutor Elizabeth Fahey testified, and Boisseau agreed, that there is a duty to disclose

impeachment information about witnesses including promises, inducements and rewards.

(Ex. 8, Fahey dep. at 106-16; Ex. 3, Boisseau 11/16/06 dep. at 207-19; Ex. 7, Connors

11/15/06 dep. at 121-32.)

351. The prosecutor in the *Maher* case, Attorney J.W. Carney, has sworn in an affidavit that he

had no knowledge of the deal with the victim in that case, but that, it should have been

disclosed. (Ex. 89.)

### Coercion of the Juvenile Complainant Against Officer Downing, and Fabricated Charges and Undisclosed Inducement to the Complainant Against Officer Randall

352. In the early 1980's, then-Ayer officer Ernest Downing was charged by another Ayer officer,

Dominic Pugh, with committing unnatural and lascivious acts with a child under the age of

16. At a 1981 jury trial, both the alleged victim and an alleged eyewitness, both of whom

were then jailed on pending criminal charges, testified for the prosecution. The defense

impeached the alleged victim with two letters he had written and signed. A local paper

quoted the first letter, to a local attorney, at length:

The true story is I got picked up by the Ayer cops and they scared me with questions and
said if I didn't answer them, they would put me away . . .  At the time I was stoned and I
was freaking out because I was very confused, mixed up, and didn't know what the hell was
going on since they had brought me to another police station and used a tape recorder and
threats and promises.  They told me they wanted Ernie Downing off the police force no
matter what it took.  To save my own skin I said what they wanted to hear even when it was

all a lie and even when it wasn't true. They promised me I wouldn't go to jail and it was only Downing they were after. Mr. Downing was really good to me and was not like they said he was. I'm truly sorry for what I said that wasn't true but I was too scared of jail for what I have already been there a few times for minor stuff and I will tell you the truth I am scared to the death of jails and would have said anything they wanted me to. . . . P.S. Please tell Mr. Downing that I am truly sorry for lieing [sic] about him.

Downing's attorney also introduced a Christmas card the alleged victim had sent Downing later that year, in which he apologized for "lying." The defense theory was that Downing was being punished by a rival camp within the department for exposing corruption. (Ex. 79, Patricia Montminy and Lisa Berthiaume, "Ex-Officer Found innocent of morals charges," Lowell *Sun*; *see also* Ex. 15, Randall dep. at 122-23, 177-78.)

353.    Stanley Randall testified at the trial that Downing was being targeted for reporting corruption among a faction of Ayer officers. Randall was quoted in the Lowell *Sun* as testifying that "I know I'll be in for it when I go back to work. I'll have to walk a thin line." (Ex. 80, Patricia Montminy, "Testimony shows Ayer police department a divided camp," Lowell *Sun*; Ex. 15, Randall dep. at 19-23.)

354.    Downing was acquitted. (*See* Ex. 79, Patricia Montminy and Lisa Berthiaume, "Ex-Officer Found innocent of morals charges," Lowell *Sun*; Ex. 15, Randall dep. at 20.)

355.    The Board of Selectmen issued a press release soon after Downing's acquittal, stating:

the board of selectmen have met with Chief William Adamson and assessed present conditions in the Ayer Police Department. We are not pleased with the morale problem or divisiveness apparent within this department . . . . While reaffirming support for Chief Adamson, we intend to begin immediately dealing with the cause of disharmony in the Ayer Police Department based on reports and recommendations from Chief Adamson. Any and all officers whose conduct, actions or comments are contrary to what we expect of an Ayer police officer will be dealt with according to existing rules and regulations of the Ayer Police Department."

(Ex. 82, Patricia Montminy, "Selectmen enter fray on Ayer police morale," Lowell *Sun*,

10/7/81.)

356.   The same day, Adamson gave notice of a hearing before the Board regarding seven allegations that Randall had violated APD policy, including three charges arising from his testimony at Downing's trial.  Randall alleged that the charges were in retaliation for exposing the role of Ayer police officers and Chief Adamson's son, William Adamson, Jr., in the vandalism at Ties Construction in February 1980.  (Ex. 83, 10/7/81 Adamson letter to Randall; Ex. 84, "Ayer investigator charges efforts to silence him," "Press conference," Ayer *Public Spirit*, 10/15/81.)

357.   Downing wrote a letter to the editor of Ayer's newspaper, the *Public Spirit*, noting:

"Ayer police officers testified [at his trial] that a certain group of officers has engaged in serious misconduct, including beating prisoners.  My concern is that there will be reprisals against the officers who were courageous enough to expose this misconduct. . . . The truth is that the misconduct of a group of officers has been common knowledge among the police department and the citizens of Ayer for a long time.  Moreover, police officers and citizens have knowledge of specific incidents of misconduct by these officers.  I am puzzled by the way the selectmen have handled this situation...."

(Ex. 84, "Downing urges public to demand an open meeting," Ayer *Public Spirit*, 10/15/81.)

358.   At the October 13, 1981 Board meeting, members of the public were "very vocal" in their support of Randall, to the point where, as Frank Callahan testified, "a riot broke out."  Randall told the board his statements at Downing's trial had been truthful, stating, "believe it or not, we have two police departments in Ayer."  The charges against Randall were dropped due to lack of evidence.  The Lowell *Sun* reported, "[t]o the continuous roar of almost 600 people who mobbed town hall, the selectmen last night dropped all seven charges of violating departmental rules and regulations lodged against Patrolman Stanley Randall."

(Ex. 5, Callahan dep. at 126; Ex. 85, Karen E. Guregian, "All charges against Ayer officer

dropped by board of selectmen," Lowell *Sun*, Oct. 14, 1981; Ex. 15, Randall dep. at 39-43, 163-67.)

359.  The Board raised concerns with Chief Adamson that evening.  (Ex. 5, Callahan dep. at 125.)

360.  Two weeks later, Randall was charged with rape arising out of an incident alleged to have taken place two months earlier, on August 31.  (*See* Ex. 86, Kevin B. Blackstone, "Ayer patrolman accused of rape, his attorney charges a 'frameup'," Boston *Globe*, 10/29/81; Ex. 15, Randall dep. at 85-96,)

361.  The complainant first contacted Nancy Taylor at home on October 21, 1981 to report the alleged incident, which was alleged to have taken place in the town of Acton.  (Sealed Ex. 94, APD Report regarding Randall allegations.)

362.  Taylor testified in her deposition that she wanted nothing to do with investigating criminal allegations against a fellow officer, and that once she determined the alleged incident had taken place in Acton, not Ayer, she led the complainant and her boyfriend to the Acton police department and "I never saw either one of them again, nor talked to them."  (Ex. 18, Taylor 11/30/06 dep. at 341, *see id.* at 325-41, 348-50.)

363.  Taylor's October 26, 1981 police report states that Taylor met with the complainant three days after the initial phone call, for a three-hour meeting in which Taylor promised to accompany her throughout the criminal proceedings.  (Sealed Ex. 94, APD Report regarding Randall allegations.)

364.  On October 28, 1981, Randall was arrested and charged with rape in Acton.  The charges were dismissed "at the complainant's request" soon thereafter.  (Sealed Ex. 94, Acton arrest report; Ex. 15, Randall dep. at 94-96, 100, 167-77.)

365.  Adamson resigned on November 3, 1981, and Lt. Boisseau was appointed interim Chief. (Ex. 78, Selected APD Reports and Daily Logs, 11/3/81 Daily log (entry after 2345); Ex. 3, Boisseau 11/16/06 dep. at 19-21, 26.)

366.  Randall filed a civil lawsuit against the Town of Ayer and some of its police officers, including Chief Adamson and Nancy Taylor.  The case was settled.  (Ex. 15, Randall dep. at 102-05, 149-60.)

367.  Once Chief Connors took over, Stanley Randall told him that he believed Nancy Taylor had been involved in an attempt to frame him for a rape he did not commit, in retaliation for his role in exposing the corruption of other officers relating to the Ties incident.  (Ex. 7, Connors 11/15/06 dep. at 36-39, 45-46.)

368.  Chief Connors testified he conducted no administrative investigation of Randall's allegation against Taylor.  (Ex. 7, Connors 11/15/06 dep. at 37-39.)

369.  Taken together, expert Lou Reiter opined that these "egregious, deliberate choices" reflect a "practice and pattern of egregious investigative conduct" among Ayer police officers.  (Ex. 76, Reiter Rpt. ¶¶86, 88.)

370.  There is no record that the APD ever investigated Nancy Taylor for potential misconduct in connection with any of the four cases she investigated in which defendants – including Stanley Randall, Ken Waters, Dennis Maher and a homosexual Ft. Devens soldier arrested for raping a woman – were arrested or convicted but later exonerated.  (Ex. 7, Connors 11/15/06 dep. at 37-39; Ex. 15, Randall dep. at 144-47, 176-77.)

### *Additional Opinions of Plaintiff's Police Practices Expert Lou Reiter*

371.  Plaintiff's police practices expert, Lou Reiter, opined:

The Ayer Police Department, in my opinion, had systemic deficiencies that created an environment conducive to Unconstitutional violations and the support and/or toleration of unprofessional, biased, and prejudicial policing conduct by its members.  The record in the materials discovered in this case indicate an on-going pattern of police employee misconduct and unprofessional conduct.  It would have been obvious to any reasonable police executive and manager that this unprofessional environment would create an obvious high risk of police misconduct and the strong potential for violations of citizens' rights.  This environment of systemic agency and supervisory deficiencies could lead to police employees violating legal safeguards, departing from generally accepted police practices including investigative conduct, and taking shortcuts that any reasonable police officer or police manager would know could lead to erroneous investigative conclusions and could place citizens in harm's way for a wrongful arrest and prosecution.

(Ex. 76, Reiter rpt. ¶11.)

372.    In fact, Reiter testified that, in his 35 years in law enforcement, the number of police misconduct incidents the APD had during the early 1980's is staggering for such a small department.  (Ex. 16, Reiter dep. at 178.)

373.    Reiter opined that Taylor's "performance during the investigation of the Brow murder and, specifically, her assumption as the lead investigator in 1982 culminating in the indictment and prosecution of Kenneth Waters was an egregious departure from accepted police practices."  (Ex. 76, Reiter rpt. ¶27.)

374.    Reiter further opined,

The actions and conduct of Ms. Nancy Taylor were egregious departures from reasonable and generally accepted police investigative practices.  Any reasonable police officer would be aware that these types of conduct would adversely affect any investigation and compromise Constitutional safeguards of all persons involved.  During this period of time it is apparent that Ms. Taylor was allowed to function as lead investigator for critical investigations without adequate training or supervision.  These omissions, in my opinion, were conscious choices made by investigative personnel of the Ayer Police Department and Chiefs Adamson and Connors.

(Ex. 76, Reiter rpt. ¶62.)

375.    Reiter found that "Chief Connors failed to exercise reasonable supervisory oversight and

control of the Brow murder investigation and arrest/prosecution of Kenneth Waters by Ms. Taylor.  Any reasonable police supervisory officer would have known of the significant adverse consequences of failing to maintain constant and vigilant oversight over this type of investigation being conducted by an investigator with no homicide experience." (Ex. 76, Reiter rpt. ¶55; *see also* Ex. 16, Reiter dep. at 100.)

376.    As Reiter opined, "[t]here is no acceptable rationale for Chief Connors' failure to oversee this aspect of the investigative process and the duty of the Ayer Police Department to ensure the protection of everybody's rights during the subsequent prosecution of Kenneth Waters." (Ex. 76, Reiter rpt. ¶61; *see also id.* ¶¶55, 59-60.)

377.    In sum, Mr. Reiter's review of this record reveals that Ayer's "dysfunctional agency environment with its systemic issues of police misconduct and supervisory failures ... allowed the wrongful arrest and prosecution of Kenneth Waters."  (Ex. 76 at 8-9.)


Dated: May 27, 2007                              Respectfully submitted,
       New York, NY

                                                 /s/ Deborah L. Cornwall
                                                 Barry C. Scheck (BS 4612)
                                                 Deborah L. Cornwall (DC 2186)
                                                 Monica R. Shah (MS 9846)
                                                 COCHRAN NEUFELD & SCHECK, LLP
                                                 99 Hudson Street, 8th Floor
                                                 New York, NY 10013
                                                 Tel. (212) 965-9081 / Fax (212) 965-9084

                                                 Robert N. Feldman
                                                 BIRNBAUM & GODKIN, LLP
                                                 280 Summer Street
                                                 Boston, MA 02210-1108
                                                 Tel. (617) 307-6130 / Fax (617) 307-6101

                                                 ***Attorneys for Plaintiff Betty Anne Waters***

## <u>CERTIFICATE OF SERVICE</u>

I, Monica R. Shah, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via overnight delivery to those indicated as non-registered participants on May 27, 2008 as well as:

Joseph L. Tehan, Jr.
Gregg J. Corbo
Jeffrey T. Blake
Kopelman & Paige, PC
101 Arch Street, 12th Floor
Boston, MA 02110

/s/ Monica R. Shah
Monica R. Shah