UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| BETTY ANNE WATERS, as | ) | |
| Administratrix of the Estate of | ) | |
| KENNETH WATERS, | ) | Case No. 04 CV 10521 (GAO)(JGD) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **PLAINTIFF'S RESPONSE TO** |
| | ) | **DEFENDANTS' L.R. 56.1** |
| | ) | **STATEMENT OF MATERIAL FACTS** |
| TOWN OF AYER, NANCY TAYLOR- | ) | **NOT IN DISPUTE** |
| HARRIS, in her individual capacity, | ) | |
| ARTHUR BOISSEAU, in his individual | ) | |
| capacity, WILLIAM ADAMSON, in his | ) | |
| individual capacity, and PHILIP L. | ) | |
| CONNORS, in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

_____ )

Pursuant to Local Rule 56.1, Plaintiff Betty Anne Waters hereby responds to Defendants'

L.R. 56.1 Statement of Material Facts Not in Dispute, by corresponding numbered paragraphs, as

follows:[1]

## The Dismissal of Charges Against Kenneth Waters

1.     Disputed in part.  The first sentence is undisputed, and it is further undisputed that the

text of the *nolle prosequi* is accurately quoted with the exception that the victim's name

is, and was reflected as, "Katherina Brow," therein.  The third sentence is disputed.

There is no evidence in the record reflecting all the reasons why the Middlesex District

Attorney's Office ("MCDA") elected not to oppose the motion for a new trial. The

deposition testimony defendants cite to support the third sentence is the deposition of

_____

[1] Plaintiff's L.R. 56.1 Counter-Statement of Material Disputed Facts ("SDF"), filed separately,
sets forth the pertinent facts in dispute more comprehensively, and is hereby incorporated by reference.

A.D.A. Sheila Calkins, who testified that she had no role in the decision not to oppose Kenneth Waters' motion for a new trial, and, she said, "I do not know what went into the decision completely, no."  (Def. Ex. 4, Calkins dep. at 141-42; *see also* SDF ¶3.)

2.      Disputed in part.  Undisputed that the non-victim blood was found at the scene from the inside of the front door into the living room, on linens in a hall closet, on the bathroom rug, and at the entrance to the bedroom where the victim was found.  (*See* Pl. Ex. 39). Admitted that police theorized that the perpetrator's, who had been cut and bled in a struggle with the victim, leaving blood of Type O, which was consistent with the victim's husband, Waters, and, the jury heard, "most people" in the population. (SDF ¶¶30-33.) Otherwise disputed.  After learning of the DNA results, the Middlesex District Attorney's Office ("MCDA") conducted a comprehensive investigation into the Brow murder to decide whether to retry Waters. That investigation yielded new evidence of police misconduct and additional evidence of innocence that corroborated the original DNA results, including: 1) additional DNA testing by a lab of the MCDA's choosing confirmed that Waters was not the source of the blood that the perpetrator left at the scene in the struggle with the victim (SDF ¶¶2, 4, 5, 32-33); 2) unbeknownst to the MCDA, the perpetrator had left a print in blood on a piece of a toaster that was collected at the scene, and Waters had been excluded as the source of that fingerprint (SDF ¶¶24, 73-117, 225-43); and 3) one of the key witnesses against Waters, Brenda Marsh, testified before a 2001 grand jury that her testimony at the probable cause hearing and original grand jury, the trial and the postconviction hearing had been false – in fact, Waters did not come home with a "long deep red scratch" on his face from his eye to his chin the morning of the murder, did not arrive home, drunk, at 10:30 that morning, and did not

2

ever tell her he had anything to do with the murder, and each of these facts had been suggested to Marsh by Ayer Police Department ("APD") defendant Nancy Taylor, who pressured and induced Marsh to adopt them by threatening that, if she did not, Marsh would be charged as an accessory after-the-fact to murder, go to prison for ten years, and lose her two young children (SDF ¶¶175–97, 205-11, 222, 224, 258).

3.    Undisputed that Sheila Calkins was assigned to reinvestigate the Brow murder for the MCDA, with the assistance of State Police Sgt. Alan Hunte as lead investigator.  (SDF ¶88.)

4.    Disputed in part.  Admitted that Waters died in 2001.  Disputed for the reasons set forth *supra* at plaintiff's response to SUF ¶2.  Further disputed in that the only evidence that Waters knew Brow kept large sums of money on her person came from Marsh, who has recanted under oath (SDF ¶184), and also in that Waters did not attempt to sell a ring that belonged to the victim; the ring was inspected by Nancy Taylor and given back because it bore no relation to the victim. (SDF ¶¶302-11.)  That Waters knew his neighbor, had been seen with a knife made by the local Murphy Knife Company, and "made purchases," would not lead any reasonable person to consider Waters a suspect, particularly given his exclusion as the source of the perpetrator's blood and fingerprint, the absence of any evidence that more than one perpetrator had committed the crime, and the fact that the victim's husband identified the murder weapon, which had been collected at the scene, as one from the Brow family kitchen.  (SDF ¶¶2, 27.)

5.    Disputed to the extent that the statement relies on an inaccurate premise.  Calkins was assigned to reinvestigate who murdered Brow, not whether "any Ayer police officer destroyed or withheld evidence or coerced testimony."  Whether she made any such

conclusions is irrelevant.  There is evidence that Ayer police officers did destroy or withhold evidence and coerce and manufacture testimony.  (SDF ¶¶53-117, 175-211, 227-33, 235-58, 267-99, 302-11.)

6.    Undisputed that Elizabeth Fahey's original trial file in *Comm. v. Waters* has not been located.

<u>The Investigation of the Murder of Katherina Brow</u>

<u>A) District Attorney and State Police Involvement</u>

7.    Disputed in part.  Undisputed that Katherina Brow was found murdered at her house in Ayer, Mass. on May 21, 1980, and undisputed that at trial, medical examiner George Katsas, M.D., opined at trial as to the time of death based on an erroneous hypothetical question with no factual foundation. Disputed that he testified the time of death was "approximately 7 a.m." or that such testimony was accurate.  (*See* SDF ¶¶34-42 & exhibits cited therein.)

8.    Disputed in part.  Undisputed that M.G.L. c. 38, § 4 applies to homicide cases.  Disputed to the extent that the statement implies the District Attorney was personally involved in investigating or supervising defendants investigating the Brow murder.  As set forth in plaintiff's SDF, Nancy Taylor and the Ayer Police Department were the lead investigators for the Brow murder.  (SDF ¶235; *see also id.* ¶¶18-22, 44, 45, 54, 60-67, 71, 75, 79, 82-84, 97-98, 101-17, 122, 140, 160, 171, 212-13, 224-25, 235, 238.)

9.    Disputed.  Defendant Arthur Boisseau denied that every investigative step Ayer police took was pre-cleared by the MCDA's Office, and no records have been produced corroborating the claim that ADA Fahey was involved in the investigation prior to

September 30, 1982, or that every step taken by Ayer defendants was pre-cleared through her thereafter.  (SDF ¶200; *see also* SDF ¶¶18-22, 235.)

10.  Disputed in part as vague, misleading, and contrary to the record.  As set forth in plaintiff's SDF, Nancy Taylor and the Ayer Police Department were the lead investigators for the Brow murder.  Nancy Taylor was the only law enforcement officer to testify before the grand jury, and ADA Fahey considered Taylor to be the "chief investigator" on the Brow investigation.  (SDF ¶¶235; *see also* SDF ¶¶18-22, 44, 45, 54, 60-67, 71, 75, 79, 82-84, 97-98, 101-17, 122, 140, 160, 171, 212-13, 224-25, 238; *compare* Pl. Ex. 31-33 (APD Brow investigation records) *with* Pl. Ex. 37 (nonforensic State Police Reports).)

11.  Undisputed.

12.  Undisputed.

13.  Disputed.  Trooper Keane and Det. Lt. Dwyer worked on the case initially but then moved on to other assignments until the fall of 1982 when the case was reactivated. ADA Fahey considered Taylor to be the "chief investigator" on the Brow investigation through the trial. (SDF ¶¶18-22, 235; *compare* Pl. Ex. 31-33 (APD Brow investigation records) *with* Pl. Ex. 37 (nonforensic State Police Reports).)

14.  Undisputed.

15.  Disputed in part. Undisputed that State Police Det. Lt. Dwyer and Trooper Keane were present for the May 22, 1980 interview of Waters conducted by defendants Adamson and Boisseau, but disputed that there is any evidence that Dwyer or Keane took part in the interview of Waters or that they interviewed any other "witnesses."  (SDF ¶¶22, 43, 45.)

16.    Disputed in part.  Undisputed that defendant Boisseau and Trpr. Keane went to see
       Waters at his home on May 22, 1980, but disputed that they interviewed him there.
       Waters voluntarily accompanied them to the APD, where Adamson and Boisseau
       interviewed him in the presence of Dwyer and Keane.  (SDF ¶¶43, 45.)

17.    Disputed in part. Undisputed that State Police Det. Lt. Dwyer and Trooper Keane were
       present for the May 22, 1980 interview of Waters conducted by defendants Adamson
       and Boisseau at the APD.  Disputed to the extent the proffered fact suggests that Dwyer
       or Keane took part in the interview.  (SDF ¶¶22, 43, 45.)

18.    Disputed that Lt. Dwyer developed any evidence or information leading to Waters'
       arrest independent of that which defendants, specifically including Nancy Taylor,
       developed.  Disputed that the purported quotation is accurate, taken in context, or
       supports the proffered fact.  Trooper Keane was asked, "do you have any understanding
       as to how that information that led to his arrest was developed or how it came to be that
       Mr. Waters was arrested?" Keane answered, "No.  I had no working knowledge of the
       exact intricacies of it.  I'm sure back then Lieutenant Dwyer who remained at that office
       had a finger on it."  When specifically asked on the prior page of the deposition whether
       he knew who had developed the evidence leading to Waters' arrest, Keane responded,
       "No idea."  (Def. Ex. 10 at 38; Pl. Ex. 12 at 37; *see also* SDF ¶¶18-22.)

19.    Disputed. Defendant Boisseau denied that all APD investigative acts were precleared by
       the ADA. Taylor applied for and obtained a search warrant for Waters' vacant home two
       years after the crime, without any prior notification to or authorization from Fahey.  Nor
       did Taylor inform Fahey that there were usable prints collected at the scene, or that
       suspects including Waters had been eliminated on that basis, or that Ayer police had

collected Waters' time cards and established his work alibi until 8 a.m. the morning of

the murder, or that Taylor had determined a ring later used against Waters had not come

from the victim, or about impeachment material relating to Taylor's coercion, promises

and inducements of Brenda Marsh and Roseanna Perry, which induced their false

statements. Fahey testified she would have disclosed any such evidence to the defense if

she had known of it. None of it came out at trial. (SDF ¶¶53-117, 175-211, 227-33,

235-58, 267-99, 302-11, 348.)

20.    Disputed. Defendant Boisseau denied that all APD investigative acts were precleared by

the ADA. (SDF ¶200; *see also* SDF ¶¶201-03 & plaintiff's response to SUF ¶19 &

exhibits cited therein, *supra*.)

21.    Undisputed that Nancy Taylor was A.D.A. Fahey's main contact with the APD on the

Brow investigation.

22.    Disputed that the testimony of defendant Taylor is credible evidence of this proffered

"fact." Fahey was not fully informed of Taylor's conduct and there is no documentation

corroborating Taylor's testimony on this point. (*See* plaintiff's response to SUF ¶19,

*supra*.)

23.    Disputed that the testimony of defendant Taylor is credible evidence of this proffered

"fact." ADA Fahey was not informed of everything Taylor knew in connection with the

Brow investigation. (*See* plaintiff's response to SUF ¶19, *supra*.)

24.    Disputed. ADA Fahey was not aware that Perry had been housed in a cell at the APD or

even that the APD had put her up. Fahey testified "If I had learned anything to the effect

of Nancy Taylor badgering, threatening the witness, even putting her up for a week, I

would have, there are all sorts of things in here I would have turned over." (Pl. Ex. 8 at 282.)

25.   Undisputed.

26.   Disputed. (*See* plaintiff's response to SUF ¶19, *supra*.)

27.   Disputed. Prosecutor Fahey relied on Taylor, the "chief investigative investigator" to compile and maintain the prosecution file, as well as to disclose all information known about the crime and investigation, for trial. Fahey expected Taylor to disclose "any information they had on the case," and *assumed* that Taylor provided her "every police report relative to the case." (SDF ¶235; *see also* plaintiff's response to SUF ¶19, *supra* (cataloguing evidence defendants had but of which Fahey was not aware).)

B.  Ayer Police Involvement and Witness Testimony

28.   Undisputed.

29.   Undisputed.

30.   Disputed in part. Undisputed that Boisseau was an APD officer for a total of 32 years, that he was interim Chief between defendants Adamson and Connors, and that he was the APD's court liaison officer. Boisseau was also the APD's designated evidence officer and APD's most senior and experienced investigator between 1980 and 1983. (SDF ¶8.)

31.   Disputed in part. Undisputed that Taylor was appointed as a clerk/dispatcher for the APD with limited authorization to work as a "special officer" on rape cases. Undisputed that Taylor had worked in the same capacity for Chief Adamson at the Pepperell Police Department and that, during the Brow investigation, Taylor was Chief Adamson's secretary and the APD's lone clerical employee. Undisputed that Taylor wanted to

become a full patrol officer but did not attend the police academy until after Waters was convicted in 1983.  It is further averred that Taylor had no experience in homicide cases before taking part in the Brow murder investigation, and that she left the APD in 1986 to take a position as the "executive secretary" to the Groton Police Chief.  (SDF ¶¶12-16.)

32.    Undisputed.

33.    Undisputed that Connors conducted no more than a cursory review in or around February 1980 by flipping through the Brow file for 10-15 minutes.  (SDF ¶¶120-22.)

34.    Undisputed.  (SDF ¶122.)

35.    Undisputed. (SDF ¶122.)

36.    Undisputed except that it cannot be determined whether the call from Osborne was, as alleged, "unsolicited."  There is conflicting testimony as to whether any reward was posted for information regarding the unsolved murder, and Osborne admitted he was calling "for 'financial reasons.'"  Mr. Osborne is deceased and could not be deposed. (SDF ¶¶139, 145.)

37.    Undisputed. (SDF ¶146.)

38.    Undisputed.

39.    Disputed in part. Undisputed that Connors and Taylor contacted A.D.A. Fahey regarding the availability of "informant money," but disputed that Connors and Taylor were "directed" to meet with Marsh and Osborne.  (SDF ¶149.)

40.    Undisputed.  (SDF ¶149.)

41.    Undisputed.  (SDF ¶151.)

42.    Undisputed that Nancy Taylor's report so indicates.  (SDF ¶151.)

43.    Undisputed that Nancy Taylor's report so indicates.  (SDF ¶166.)

44.    Undisputed.  (SDF ¶171.)

45.    Disputed in part.  Undisputed that the purpose of any police interview with informants

should be to gather information, consistently with police department investigative policy

and generally accepted police practices.  Undisputed that APD informant policy directed

that officers should not only gather information but also that officers "are responsible for

evaluating the informant and the truth and accuracy of his information."  (Pl. Ex. 46,

MPI Informant Policy.)  Disputed that Taylor or Connors complied with APD policies

that applied to the interview, that they simply gathered information or that they

evaluated Marsh or the truth and accuracy of the information they elicited from her.  It is

further averred that Taylor refused to accept the information Marsh gave her – a truthful

denial that she knew of any link between Waters and the murder – but instead used

suggestion, coercion, threats of baseless criminal charges and having her children taken

away, to elicit a false statement.  (SDF ¶¶164, 176, 178-99.)

46.    Undisputed that both experts so testified, and that Connors bears ultimate supervisory

responsibility for what took place at the October 4, 1982 interview with Osborne and

Marsh.  (SDF ¶¶46, 375-76.)  Disputed to the extent that the proffered fact implies that

Connors' responsibility detracts at all from Taylor's own duty and responsibility to

follow APD policy and not to engage in conduct geared toward eliciting false evidence.

47.    Disputed in part.  The first sentence is disputed as self-serving, vague and meaningless.

Undisputed that Connors was more than adequately experienced and qualified enough to

attend the October 4th meeting with Marsh, and that plaintiff's police practices expert

Lou Reiter so testified.  Disputed to the extent that Connors admittedly reviewed the

investigative file only once, taking "cursory" glance at it more than six months before

the Marsh interview, and did not know even the most basic facts about the crime or the investigation (SUF ¶33; SDF ¶¶121-22, 152, 168-70, 172), and defendants' proffered expert John Ford testified that, under those circumstances, Connors' mere presence was not enough to ensure proper supervision at the October 4th meeting.  (SDF ¶173).

48.    Disputed in part.  Undisputed that Mr. Reiter to testified, but disputed to the extent that Mr. Reiter opined as to Connors' supervisory lapses in his report, and expert testimony is not necessary to create a dispute of fact as to the adequacy of Connors' supervision of Taylor at the Marsh interview.   For the reasons set forth in plaintiff's statement of disputed facts, there is abundant evidence of Connors' failure to supervise Taylor adequately, both at the Marsh interview and thereafter.  (SDF ¶¶121-22, 124, 126, 130, 132-43, 152-65, 168-73, 175-181, 189-94, 198-201, 209, 216-17, 258, 302-11, 367-70.)

49.    Disputed in part.  Undisputed that Mr. Reiter so testified, and that Taylor had training in interviewing rape victims.  It is disputed, however, that Taylor's training for rape investigations was adequate preparation for her to take charge of a homicide investigation without close supervision.  Reiter opines that allowing Taylor to continue on with investigative work above and beyond that of a rape investigator, without close supervision, ran a foreseeable and obvious risk that she would violate suspects' constitutional rights.  John Ford, offered as defendants' police practices expert, agrees that Taylor needed more supervision than the average officer and that it would raise a concern if, as the daily logs indicated, she had been acting alone or without close supervision in a homicide case.  (SDF ¶¶126, 136-37.)

50.    Disputed in part.  Undisputed that APD officers were responsible for documenting each witness or informant interview, and that APD policy directed them to take notes and

have the witness sign them, or audiotape the interview.  (SDF ¶¶190-92.)  Disputed to

the extent that defendants suggest that the APD did in fact disclose the circumstances

underlying the Marsh statement to A.D.A. Fahey.  (*See* plaintiff's response to SUF ¶19.)

51.    Disputed.  Threatening Marsh with baseless criminal charges, ten years in prison,

showing her gory photographs of the victim, and suggesting her children could be taken

away if she did not make incriminating statements against Waters, was not "pleasant."

(*See* SDF ¶¶175-211, 235-58.)

52.    Undisputed.

53.    Disputed in part.  Undisputed that Osborne told Marsh what he told to the police, but

disputed that Marsh did not deny the truth of Osborne's statement.  In fact, Marsh denied

that she made any statements to Osborne implicating Waters in the Brow murder, and

denying that Waters had confessed to her.  She told Taylor and Connors that Osborne's

statement "was a lie, that I knew nothing."  (SDF ¶180; *see also* SDF ¶¶177, 207-10.)

54.    Disputed in part.  Undisputed that Marsh did not wash bloody clothes and that she told

Taylor and Connors.  Disputed in that Taylor is the only source cited for the remaining

allegations and in fact, Marsh has testified under oath consistently since 2001 that none

of the other statements Taylor attributed to her in her report of the October 4th meeting

ever happened, and she only adopted them as a result of Taylor's unrelenting suggestion,

threats and pressure.  (SDF ¶¶175-211.)

55.    Disputed and noted that Taylor is the only source cited.  Marsh has testified under oath

consistently since 2001 that Waters did not tell her a week before the murder that he

knew Brow had a lot of money and wanted it. While Marsh remembered Kenny leaving

on May 20, 1980, dressed for work on the night shift, she never called him at the diner

that night. Both of those claims were induced by Nancy Taylor's pressure, suggestion

and coercion.  (SDF ¶¶184-85.)

56.    Disputed.  Disputed that the proffered exhibit is reliable or helpful, as it refers to

unreliable hearsay documents for the truth of the matters asserted.  The most important

statements attributed to Marsh in the October 4th interview were **not** corroborated:

> Four experienced investigators including Chief Adamson and Lt. Boisseau looked for
> evidence of recent wounds when they interviewed Waters the next day and didn't find
> any marks on him.  He had no "long, deep red scratch" running down the length of his
> face, as the statement attributed to Marsh claimed.  He was not the person who bled in a
> struggle with the victim. (SDF ¶218.)

> APD officers knew that Waters was seen in court wearing a three-piece suit at 11 a.m.
> the morning of the murder, and at the diner soon thereafter.  He did not arrive home and
> collapse into bed, drunk, between 10 and 10:30 a.m. that morning, as the statement
> attributed to Marsh claimed.  (SDF ¶219.)

> Ayer police picked up Waters' time cards, which showed that he was at work the
> morning of the murder until 8 am.  This evidence, combined with the evidence that he
> was in court by 9, proved he had no opportunity to commit the crime during the time-of-
> death window that had been established.  (SDF ¶¶34-39, 53-71.)

> All of this evidence, combined with Waters' exclusion as the source of the perpetrator's

> bloody fingerprint, weighed against the reliability of the claim that Waters had admitted

> the murder.  (SDF ¶¶72-117.)

57.    Undisputed.  Marsh has so testified, under oath, consistently since 2001.  (SDF ¶222.)

58.    Disputed.  The selected portion of Mr. Reiter's deposition is incomplete.  He went on to

testify that, in order to charge someone as an accessory after the fact, "you would have

to have knowledge that a crime occurred and that actions of the person were in some

way designed to eliminate or change the nature of the evidence."  (Pl. Ex. 16, Reiter dep.

at 185.)  Even if Marsh had washed bloody clothes (which she did not), that in and of

itself is insufficient evidence with which to charge her.  There was no basis for

suggesting that Marsh could legally be charged as an accessory after the fact. That charge applies only to those "who, after the commission of a felony, harbors, conceals, maintains or assists the principal felon ... or gives such offender any other aid, *knowing that he has committed a felony*, ... with intent that he shall avoid or escape detention, arrest, trial or punishment." (SDF ¶179.)

59. Disputed. No expert can testify as to the truth of an underlying fact alleged in a lawsuit; Mr. Reiter has appropriately observed the limits of expert testimony. If, as alleged, Marsh was pressured at the October 4th interview, Mr. Reiter has opined that such conduct would be an egregious departure from generally accepted police practices, would obviously risk generating false evidence, and must be disclosed to the prosecutor. (SDF ¶¶222, 258.)

60. Disputed. Disputed to the extent that term "no other" is undefined. Undisputed that Marsh has testified under oath consistently since 2001 that Nancy Taylor pressured her into making false statements by showing her gory photographs of the victim, by threatening to charge her as an accessory after-the-fact to murder, with going to prison for ten years, and losing her young children. (SDF ¶¶179, 182-83, 188, 196, 206-11.)

61. Undisputed that Taylor and Connors deny the truth of Marsh and plaintiff's allegations that they threatened and pressured and coerced Marsh into making false incriminating statements against Kenny Waters.

62. [No SUF 62 alleged.]

63. Disputed. Marsh could not have legally been charged as an accessory after-the-fact to murder, because Marsh had no knowledge of any link between Waters and the crime, did not wash any bloody clothes, and never heard him make any statement admitting the

crime.  These false allegations were manufactured by Taylor.  (*See* plaintiff's response to

SUF ¶58, *supra*; *see also* SDF ¶¶179, 182-83, 188, 196, 206-11.)

64.    Disputed.  No expert can testify as to the truth of an underlying fact alleged in a lawsuit;

Mr. Reiter has appropriately observed the limits of expert testimony, unlike Mr. Ford,

who opined, relying on Taylor, that there was no pressure.  If, as alleged, Marsh was

pressured at the October 4th interview, both Mr. Reiter and Mr. Ford opined that such

conduct would be an egregious departure from generally accepted police practices,

would obviously risk generating false evidence, and must be disclosed to the prosecutor.

Further, Mr. Ford admitted that the discrepancies between the facts as known to the Ayer

Police and the October 4th statement would lead any reasonable investigator to be highly

skeptical of the statements Taylor attributed to Marsh.  (SDF ¶¶220, 222, 258.)

65.    Disputed.  Marsh has testified under oath consistently since 2001 that she told Taylor the

truth: that Osborne's claim was a lie, that none of the statements attributed to her in the

October 4th meeting report was true.  Marsh has further testified under oath consistently

since 2001 that she only adopted them as a result of Taylor's insistent suggestion,

pressure and coercive threats of baseless criminal prosecution. (SDF ¶177, 179-88, 196,

206-11.)

66.    Disputed in part.  Undisputed that Taylor so testified, but disputed to the extent that APD

policy required all pertinent information obtained to be documented in a report, and

Taylor's report of the October 4th interview includes no reference to Roseanna Perry so

it cannot now be determined whether the proffered fact is true.  (SDF ¶¶190-92.)

67.    Disputed in part. Undisputed that Taylor made Fahey aware of incriminating statements

Taylor ultimately elicited from Marsh at the October 4th meeting, but disputed that

Taylor ever told Fahey that Marsh denied knowledge of any link between Waters and the crime, and was only induced to say otherwise as a result of Taylor's insistent suggestion, pressure and coercive threats. Ms. Fahey testified that she would have disclosed all of this information to the defense had she been aware of it, but she was not. (SDF ¶¶235, 258, 316.)

68. Disputed. The cited exhibit, a police report written by Taylor, is not competent evidence of the truth of the matter therein.

69. Undisputed that State Police trooper Jack Nasuti asked Marsh three questions on October 8th, after she was interviewed at length by Nancy Taylor, and later rendered a one-page polygraph report. (*See* Def. Exs. 34, 35.)

70. Disputed in part. Nancy Taylor, not Jack Dwyer, conducted the lengthy pre-polygraph interview. In her deposition, Taylor claimed she was not even present for that interview or the polygraph. Undisputed that Marsh repeated the incriminating statements Taylor had coerced and manufactured from her, in Taylor's presence, at the October 8th pre-polygraph interview. (*See* Def. Ex. 34.)

71. Disputed. Defense exhibit 35 is not competent evidence of the truth of the matter asserted, and polygraph testing is not, and was not in 1982, a reliable indicator of truth. Elizabeth Fahey testified that she did not often use polygraphs and had no memory of directing that one be conducted in this case, as polygraphs were inadmissible in court because they were unreliable. (SDF ¶223.)

72. Disputed in part. Undisputed that Taylor was told that Marsh "passed" the polygraph, but Defense exhibit 35 is not competent evidence of the truth of the matter asserted, and polygraph testing is not, and was not in 1982, a reliable indicator of truth. Elizabeth

Fahey testified that she did not often use polygraphs and had no memory of directing

that one be conducted in this case, as polygraphs were inadmissible in court because they

were unreliable. (SDF ¶223.) Moreover, it is further disputed that polygraph results

were evidence, or had any bearing on the probable cause determination. The October

4th statement Taylor attributed to Marsh, which was repeated in connection with the

October 8th polygraph, was inconsistent with the known, objective facts. Four

experienced investigators including Chief Adamson and Lt. Boisseau looked for

evidence of recent wounds when they interviewed Waters the next day and didn't find

any marks on him. He had no "long, deep red scratch" running down the length of his

face. APD officers including Taylor knew that Waters was seen in court wearing a three-

piece suit at 11 a.m. the morning of the murder, and at the diner soon thereafter. He did

not arrive home and collapse into bed, drunk, between 10 and 10:30 a.m. that morning.

Ayer officers understood that the reliability of incriminating evidence, as well as the

known exculpatory evidence, must be considered in weighing the existence of probable

cause. Both Lt. Boisseau and defense expert Ford testified that the discrepancies

between the facts as known to the Ayer Police and the October 4th statement (and, by

extension, the October 8th polygraph) would lead any reasonable investigator to be

highly skeptical of the statements Taylor attributed to Marsh. Lt. Boisseau testified that,

taking the statement attributed to Marsh in Taylor's October 5, 1982 report (which was

repeated in connection with the polygraph) at face value, it did not provide probable

cause to arrest Waters. (SDF ¶¶218-22.)

73.    Undisputed that both Taylor and Connors testified to their continued belief in Waters'

guilt, notwithstanding the repeated DNA results demonstrating that he was excluded as

the source of the perpetrator's blood, the fingerprint evidence excluding him as the source of the perpetrator's bloody fingerprint, the lack of any evidence of a second perpetrator, the alibi evidence that he was at work and then in court when the murder was committed, and the fact that Taylor browbeat the only two witnesses to offer any direct link between Waters and the crime at trial. It is averred that these admissions from defendants Connors and Taylor are unreasonable given the undisputed facts, and therefore qualify as evidence of their bias, tunnel vision and bad faith.

74.     Undisputed that ADA Fahey has almost no memory of the case and that Marsh never told Fahey about Taylor's suggestion, pressure and threats because she remained terrified of going to prison for a crime she did not commit, and losing her young children. It was only in 2001 after Waters' release that Marsh felt comfortable coming forward with the truth for the first time, recanting her earlier testimony, consistently over the last seven years. It is further averred that it was Taylor duty and responsibility to disclose to Fahey that Marsh had denied knowing anything and had only made incriminating statements after Taylor's suggestion, pressure and threats of criminal charges and losing her children. (SDF ¶¶208-10, 220, 235, 258.)

75.     Undisputed that Marsh never told Fahey about Taylor's suggestion, pressure and threats because she remained terrified of going to prison for a crime she did not commit, and losing her young children. It was only in 2001 after Waters' release that Marsh felt comfortable coming forward with the truth for the first time, recanting her earlier testimony, consistently over the last seven years. It is further averred that it was Taylor duty and responsibility to disclose to Fahey that Marsh had denied knowing anything

and had only made incriminating statements after Taylor's suggestion, pressure and threats of criminal charges and losing her children. (SDF ¶¶208-10, 220, 235, 258.)

76. *See* plaintiff's response to SUF ¶75, *supra*.

77. Disputed. In 2001 Marsh testified at length under questioning from ADA Sheila Calkins in a reconvened grand jury about the pressure Taylor inflicted on her. (SDF ¶¶206-10; *see also* plaintiff's response to SUF ¶74, *supra*.)

78. Disputed. Elizabeth Fahey testified that she did not often use polygraphs and had no memory of directing that one be conducted in this case, as polygraphs were inadmissible in court because they were unreliable. (SDF ¶¶223.) Nor did Fahey recall authorizing the arrest. Nancy Taylor's application for complaint includes no documentation that Fahey authorized or directed it. (*See* Pl. Ex. 30.) While Ford did opine in his report that it was reasonable for Taylor to believe that probable cause existed, he admitted in his deposition that there was no probable cause prior to the October 4th interview. John Ford testified that none of the previously known circumstantial evidence – including that Waters and the victim lived near each other, had met, that he didn't like her, that he bought an above-ground pool after the murder and moved away soon thereafter – justified his arrest. (SDF ¶214.)

The October 4th statement Taylor attributed to Marsh was inconsistent with the known, objective facts. Four experienced investigators including Chief Adamson and Lt. Boisseau looked for evidence of recent wounds when they interviewed Waters the next day and didn't find any marks on him. He had no "long, deep red scratch" running down the length of his face. (SDF ¶218.) APD officers knew that Waters was seen in court wearing a three-piece suit at 11 a.m. the morning of the murder, and at the diner soon

thereafter.  He did not arrive home and collapse into bed, drunk, between 10 and 10:30 a.m. that morning.  (SDF ¶219.)  Ayer officers understood that the reliability of incriminating evidence, as well as the known exculpatory evidence, must be considered in weighing the existence of probable cause.  Both Lt. Boisseau and Ford testified that the discrepancies between the facts as known to the Ayer Police and the October 4th statement would lead any reasonable investigator to be highly skeptical of the statements Taylor attributed to Marsh.  (SDF ¶220.)  Moreover, defendant Boisseau testified that taking Taylor's report of the October 4th interview at face value, it was so inconsistent with the known facts that it could not provide probable cause.  (SDF ¶221.)  If, as Marsh has consistently testified since 2001, the October 4th statements were the result of pressure and coercion, defendants' expert agrees that the October 4th statement did not provide probable cause to arrest Waters.  (SDF ¶222.)

79.  Disputed.  The polygraph did not corroborate the statement attributed to Brenda Marsh, which conflicted with the known facts which demonstrated the absence of probable cause.  Nor did any of the other items on the following list provide probable cause.  Every   (SDF ¶¶214-15, 218-23.)

    a.  Disputed.  Disputed that defense exhibit 24, an unauthenticated, undated double-hearsay handwritten catalogue of allegations is competent evidence of anything, much less the truth of the matters asserted therein.  It is further averred that its purported author, Officer Gintner, was discharged from the force and convicted of criminal conduct in connection with the vandalism of the Ties Construction Company.  In fact, Adi Ogden brought Taylor a ring she said she had bought from Waters, in the belief it could have been a ring she had given the victim.  Taylor inspected the ring and determined it was not the victim's because it was too small – a size 4 3/4, whereas Mrs. Brow's daughter said she wore a size 7 ring – and had an engraving on it, unlike the ring Ogden had given her.  Pursuant to APD policy, which directed officers to preserve any items of potential use to an investigation, Taylor returned the ring to Ogden, who gave it away.  (SDF ¶¶302-11.)

    b.        Disputed that defense exhibit 24, an unauthenticated, undated double-hearsay handwritten catalogue of allegations is competent evidence of anything, much less the truth of the matters asserted therein.  It is further averred that its purported author, Officer Gintner, was discharged from the force and convicted of criminal conduct in connection with the vandalism of the Ties Construction Company.

    c.        *See* plaintiff's response to SUF 79(b), *supra*.

    d.        *See* plaintiff's response to SUF 79(b), *supra*.  In fact, attorney Carl Black, who had represented Waters on the unrelated matter for which he appeared in court from 9-11 a.m. on May 21, 1980, testified that, as of the date of the criminal trial two years after the murder, he still had not been paid the $500 he was owed.  (Pl. Ex. 24 Vol. 5 at 582-86.)

    e.        *See* plaintiff's response to SUF 79(b), *supra*.  In fact, the swimming pool, a cheap above-ground wading pool, was in Waters' possession before the murder.  (Pl. Ex. 20, Waters 11/28/06 dep. at 178.)

    f.        *See* plaintiff's response to SUF 79(b), *supra*.

    g.        *See* plaintiff's response to SUF 79(b), *supra*.

Finally, 1983 polygraph results from Dr. Raskin are not reliable evidence of anything, nor could they have been used to support probable cause for Waters' arrest on October 13, 1982.

80.    Undisputed that, at the probable cause hearing, Marsh repeated the false statement Taylor induced from her by means of insistent suggestion, pressure and coercion.  It is further averred that Taylor knew the statement was false and did not disclose to Fahey evidence that would have given rise to serious doubts about its reliability, including the discrepancies between the statement and the known facts, as well as the coercive tactics Taylor had used to elicit it. (SDF ¶205; *see also* SDF ¶¶175-211.)

81.    *See* plaintiff's response to SUF ¶80, *supra*.

82.    *See* plaintiff's response to SUF ¶80, *supra*.  Undisputed that Marsh wanted nothing to do with Waters.

83. Disputed in part.  Undisputed that Taylor secured an arrest warrant for Waters on October 12, 1982, pursuant to which he was arrested the next day.  (SDF ¶¶212-13.) Undisputed that ultimate probable cause determinations rest with the prosecutor, but disputed that Taylor or Boisseau provided Fahey with all the evidence tending to show Waters' innocence as well as the low integrity of the investigation and evidence that led to his arrest.  (SDF ¶¶212-22, 235, 242, 253-58.)

84. Disputed in part.  Undisputed that Officer MacDonald arrested Waters, but he did so with Nancy Taylor.  (SDF ¶¶212-13.)

85. Disputed.  Disputed that the exhibits cited in support of the proffered fact are reliable, and further noted that Dennis MacDonald was not called as a witness at the criminal trial, nor was any evidence of the statements he claims Waters to have made, admitted at trial.

86. Disputed in part.  Undisputed that Waters was interviewed at the APD on October 13, 1982 but the substance of that interview and the competence of the exhibit cited to establish it, are disputed.  APD policy called for such interviews to be tape recorded (*see* SDF ¶¶190-92), but no tape of this interview was made or produced.

87. Disputed.  Disputed that the unauthenticated hearsay document cited is competent evidence of the proffered fact.  Further disputed that whether Waters had ever been seen with a knife that looked similar to the murder weapon was at all relevant or incriminating, as murder weapon, a bloody knife embossed with the name "Murphy Company," was discovered in the kitchen wastebasket, and later identified by the victim's husband as a knife as coming from the Brows' own kitchen drawer.  (SDF ¶27.)

88.    Disputed in part.  Undisputed that Taylor did not meet Perry until after Waters' arrest, and that the two did meet.  Disputed that Fahey was present and involved at that interview.  (SDF ¶261-63.)

89.    Disputed in part.  Fahey testified that she remembered driving to Providence with Taylor but that she, Fahey, stayed in the car when Taylor tried to interview a female witness at her home.  *See* plaintiff's response to SUF ¶88, *supra*.

90.    Disputed in part.  *See* plaintiff's response to SUF ¶89, *supra*.  Disputed that the testimony cited from Roseanna Perry is reliable, and it is averred that Perry has made repeated inconsistent statements over the years in circumstances suggesting that her testimony in the criminal proceedings and at her compelled deposition in this case, was false.  (SDF ¶¶265-99.)

91.    Undisputed that Taylor so testified, but the truth of the testimony is disputed.  No tape was ever produced.

92.    Disputed.  *See* plaintiff's response to SUF ¶90, *supra*.

93.    Disputed in part.  Undisputed that a statement was taken from Perry at the Providence Police Department on April 12, 1983, by Nancy Taylor in the presence of Providence Det. McGaherty.  Disputed that Fahey was present; she has no memory of being there and there is no documentation that she was.  The statement itself does not reflect her presence.  Disputed that Perry stated that she was absolutely sure Waters told her he had killed a woman in Ayer, Massachusetts.  Unlike other entries in the statement, this statement is not in quotations, but written in the third person.  Perry has made repeated inconsistent statements over the years in circumstances suggesting that her statement,

her testimony in the criminal proceedings and at her compelled deposition in this case, was false. (SDF ¶¶265-99.)

94.    Disputed. Taylor learned from the Providence Police Department that Perry was a "common street walker" and had a criminal history. Taylor and Perry had numerous telephone calls in the month before trial, none of which Fahey was a part of, and none of which Taylor reduced to a formal report. Taylor's handwritten notes of one call with Perry reflect that Perry told her she was "going to bury them all," a reference to the Waters family. Perry frequently called Taylor while "very upset," and "rambled" in a way that made it difficult to understand her. Taylor testified that Perry told her she was receiving threats from the Waters family, but Taylor never did anything to investigate those alleged threats, and was not concerned to learn that the Providence Police Department had ignored Perry's complaints. Taylor testified her lack of concern stemmed in part from her sense that Perry's claims could have been "an exaggeration," and because Taylor did not consider it her job to make that credibility determination. This evidence weighs strongly against Perry's apparent reliability. (SDF ¶¶262, 282-81.)

95.    Disputed in part. Undisputed that Perry so testified but disputed that her statements are reliable for the reasons set forth *supra* in response to SUF ¶¶90 & 94. The only conversation Perry ever had with Waters about the Brow murder, she told Taylor, was at the end of a three-hour binge in which the two of them drank a six-pack of beer and "wiped out" a quart of Southern Comfort straight from the bottle. Perry was, in her words, "plastered," so "zonked out" that she blacked out and did not remember getting home. Perry has repeatedly expressed fear of being charged with perjury if she admitted

her testimony in 1983 and 1985 was false.  Upon learning of Waters' release on bail in
2001, Roseanna Perry exclaimed, "Oh my God I'm going to jail for perjury."  (SDF
¶¶265, 298-99.)

96.     Disputed.  Disputed that any testimony cited from Roseanna Perry is reliable. Perry has
        made repeated inconsistent statements over the years in circumstances suggesting that
        her testimony in the criminal proceedings and at her compelled deposition in this case,
        was false. Perry has repeatedly expressed fear of being charged with perjury if she
        admitted her testimony in 1983 and 1985 was false.  Upon learning of Waters' release on
        bail in 2001, Roseanna Perry exclaimed, "Oh my God I'm going to jail for perjury."
        (SDF ¶¶265-99.)

97.     Disputed in part.  Undisputed that Perry gave a statement to plaintiff's investigator,
        Herbert F. DeSimone, Jr., which she swore was truthful in an affidavit.  (SDF ¶¶267-68,
        272.)  Otherwise, disputed. *See* plaintiff's response to SUF ¶96, *supra*.

98.     Disputed.  *See* plaintiff's response to SUF ¶96, *supra*.

99.     Disputed.  *See* plaintiff's response to SUF ¶96, *supra*.

100.    Disputed.  *See* plaintiff's response to SUF ¶96, *supra*.

101.    Disputed.  Perry was brought to Ayer in handcuffs and placed in a cell at the APD.
        (SDF ¶¶277-78; *see also* plaintiff's response to SUF ¶96, *supra*.)

### THE TRIAL OF KENNETH WATERS

102.    Undisputed.

103.    Disputed in part.  Undisputed that Perry testified but disputed that her testimony was
        truthful. The only conversation Perry ever had with Waters about the Brow murder, she
        told Taylor, was at the end of a three-hour binge in which the two of them drank a six-

pack of beer and "wiped out" a quart of Southern Comfort straight from the bottle.  Perry was, in her words, "plastered," so "zonked out" that she blacked out and did not remember getting home.  Perry has repeatedly expressed fear of being charged with perjury if she admitted her testimony in 1983 and 1985 was false.  Upon learning of Waters' release on bail in 2001, Roseanna Perry exclaimed, "Oh my God I'm going to jail for perjury."  (SDF ¶¶265, 298-99.)

104.    Disputed in part. It is undisputed that Marsh so testified at the criminal trial but disputed that the testimony was true.  As Marsh has testified under oath consistently since 2001, Nancy Taylor pressured her into making this false statement by showing her gory photographs of the victim, by threatening to charge her as an accessory after-the-fact to murder, with going to prison for ten years, and losing her young children.  (SDF ¶¶179, 182-83, 188, 196, 206-11.)

105.    Disputed in part. It is undisputed that Ogden so testified, but disputed that her testimony was accurate.  In fact, Adi Ogden brought Taylor a ring she said Waters sold her, in the belief it could have been a ring she had given the victim.  Taylor inspected the ring and determined it was not the victim's because it was too small – a size 4 3/4, whereas Mrs. Brow's daughter said she wore a size 7 ring – and had an engraving on it, unlike the ring Ogden had given her.  Pursuant to APD policy, which directed officers to preserve any items of potential use to an investigation, Taylor returned the ring to Ogden, who gave it away.  (SDF ¶¶302-11.)

106.    Disputed in part. It is undisputed that Ogden so testified, but disputed that her testimony was accurate or truthful.

107.    *See* plaintiff's response to SUF ¶104, *supra*.

108.    *See* plaintiff's response to SUF ¶104, *supra.*

109.    Disputed in part. It is undisputed that Marsh so testified at the criminal trial, and undisputed that Waters and Marsh were homeless for a period and had to live in a van, but disputed that they moved out of Ayer "to live in a van."

110.    *See* plaintiff's response to SUF ¶104, *supra.* Disputed that this testimony was truthful or relevant, as the victim's husband had identified the murder weapon as a knife from the Brows' own kitchen. (SDF ¶27.)

111.    *See* plaintiff's response to SUF ¶104, *supra.* Waters was in court when Marsh testified he came home, and he had no long, deep red scratch on his face. (SDF ¶¶2, 30-39, 43-52.)

112.    Undisputed.

113.    Disputed in part. Undisputed that Tessier so testified, but disputed that her testimony, in May of 1983, to events that took place three years earlier, was accurate. Independent evidence discovered after the trial raise doubts about Ms. Tessier's memory. She testified that Waters typically worked enough shifts to make out a 48-hour week. However, pay stubs located after trial show that Mr. Waters worked more than his typical 48-hour week and actually worked 55.5 hours during the week in question. Ayer police checked his alibi and "picked up" the time cards and did not disclose them to the prosecutor, who testified she would have found them "helpful" in rebutting Waters' alibi defense. The missing cards showed that Waters was at work until 8 a.m. the morning of the murder. (SDF ¶¶53-71.)

## THE HEARING ON WATERS' MOTION FOR A NEW TRIAL

114.    Undisputed.

115.  Disputed in part.  The testimony cited in support of this fact, the deposition of Roseanna Perry, is unreliable, for the reasons set forth *supra* at plaintiff's response to SUF ¶96.

116.  Disputed in part.  Undisputed that Perry so testified but disputed that her testimony was true.  *See* plaintiff's response to SUF ¶96, *supra*.

117.  Disputed in part.  Undisputed that Perry so testified but disputed that her testimony was true.  *See* plaintiff's response to SUF ¶96, *supra*.

118.  Disputed in part. It is undisputed that Marsh so testified at the hearing on Waters' motion for a new trial but disputed that the testimony was true. As Marsh has testified under oath consistently since 2001, Nancy Taylor pressured her into making this false statement by showing her gory photographs of the victim, by threatening to charge her as an accessory after-the-fact to murder, with going to prison for ten years, and losing her young children.  (SDF ¶¶179, 182-83, 188, 196, 206-11.)

119.  *See* plaintiff's response to SUF ¶118, *supra*.

120.  *See* plaintiff's response to SUF ¶118, *supra*.

121.  Disputed in part. Undisputed that the Superior Court made factual findings based on the evidence presented, but disputed that the Superior Court had sufficient facts with which to assess the crediblity of Perry and Marsh or the reliability of their testimony.  Further disputed as irrelevant to this action.

## **BRADY FACTS**

### A. Time Cards

122.  Disputed in part.  Undisputed that Waters' criminal defense attorney Bradley testified that without seeing the time cards, he did not specifically know whether they would have helped the case.  (Def. Ex. 42 at 2-26.)  However, Bradley also testified that Waters told

him he was working the morning of the murder and that the time cards would have

helped him cross-examine Park Street diner employee Alice Tessier regarding his

client's work schedule on the morning of the murder.  (Pl. Ex. 100 at 2-24.)

123.    Disputed.  A jury could find that Connors had seen the time cards.  (SDF ¶¶53-71, 215,

253-57, 312, 343.)

124.    Disputed. A jury could find that Boisseau saw the time cards or even that he personally

collected them.  Boisseau went to the Park Street diner the day of the murder and was

the evidence officer with responsibility to take custody of the cards when they were

brought in.  (SDF ¶¶53-71, 215, 253-57, 312, 343.)

125.    Undisputed.

126.    Disputed. A jury could find that Taylor had seen the cards in the file that she maintained,

but destroyed them prior to the trial.  (SDF ¶¶53-71, 215, 253-57, 312, 343.)

127.    Disputed in part.  Undisputed that Decot was dispatched to the Diner to check Waters'

alibi.  Disputed that the time cards were not there.  Elizabeth Lankford, who worked for

Berry Enterprises in May of 1980, was present at the office at the time the APD officers

requested the time cards. It was the standard practice of Berry Enterprises to retain

employees' cards on file and to comply with such a request from the police by turning

over copies of the time cards.  Waters' investigator Joseph Giudetti, interviewed

Lankford in connection with Waters' motion for a new trial in 1985.  According to the

affidavit he filed in that action, Lankford "remembered turning [the time cards] over to

the Ayer police" and stated that she "remembered turning them over to Officer Decot,

but she could not be certain." Giudetti followed up directly with Decot, who

acknowledged that he may have picked up the cards "and, if he did, he would have

merely brought them back to the police station." If Decot did collect the time cards or copies thereof, he would have brought them back to the station and they would have been accessible and known to Adamson, who kept the Brow file in his office in a departure from typical protocol, and by Taylor, who maintained the file. If there had been no time cards at the Park Street Diner when Decot sought them in 1980, as Nancy Taylor testified, she admitted in her deposition that it would have been important for Ayer police to talk to Waters' coworkers to verify or disprove his alibi. But as far as Taylor knew there was no further investigation after Decot returned from the Diner, although a daily log entry Taylor made on July 17, 1980 reflects that at least one APD officer did go to Berry Enterprises specifically in relation to Kenny Waters; the entry reflects that Sgt. Harris returned a $55 check in his name. It was standard APD practice for an officer to write a report about checking a suspect's alibi. No report has been disclosed reflecting that Decot or any other Ayer police officer checked Waters' alibi at the Park Street Diner. Taylor's duties as a clerk included filing police reports and maintaining investigative files. In a departure from APD's standard practice, Chief Adamson kept the complete APD file on the Brow homicide in his own office. Ayer Police also had numerous opportunities to confirm Waters' alibi as APD officers, including Chief Adamson and Lieutenant Boisseau, repeatedly visited the Park Street Diner during the first week of the investigation. Lt. Boisseau was dispatched to the Diner within hours of the murder. Shortly after her brother was arrested in the fall of 1982, Plaintiff's Betty Anne Waters went to Berry Enterprises with Waters' ex-wife. In response to their inquiry about Waters' time cards, a female employee told her that she had just looked at Waters' time cards in response to a call from the Ayer police, that

Waters had in fact been working the morning of the murder, and that the police were on their way to pick up the time cards. After the conviction, Ms. Waters returned to Berry Enterprises and again inquired about the time cards. In response, she was informed that the time cards had been turned over to the Ayer Police. (SDF ¶¶53-71.)

### B. Fingerprint Evidence

128.  Disputed. Taylor did not testify before the grand jury that "some" fingerprints had been smeared. She told the jury that there were no usable prints collected at the scene:

> Q    (By Juror) Was the department able to lift any fingerprints?
> A.   The State Police did lift some prints. None of them were anything that they were able to match up. They were smeared et cetera.
> Q    (By Ms. Fahey) So the State Police were unable to match any prints -- lift any prints to be of use in any investigation?
> A.   That's correct.

(SDF ¶227.)

129.  Disputed. Taylor knew there were usable prints and that the APD had eliminated at least twenty suspects in the summer of 1980 once State Police Cpl. John Baliunas reported to the APD that those suspects were excluded as the source of the latent fingerprints collected at the scene. Numerous other documents she authored demonstrate her knowledge that usable prints were lifted at the scene. (SDF ¶¶72-117, 227-33, 235-58.)

130.  Disputed. Lankford told an investigator in the mid-1980's that she had indeed given the cards to the APD, likely officer Walter Decot. By the time she was reached in connection with this litigation in 2007, her memory had faded but she was still confident that Ayer police asked for the cards, and that she complied. (SDF ¶¶61-65.)

131.  Disputed. State Police Cpl. John Baliunas collected latent fingerprints at the crime scene, examined them, and compared them to fingerprints of suspects the APD provided to him. He considered the APD his main contact in the case, received fingerprints from

them on a regular basis for comparison purposes, and orally reported back to them as the submitting agency that all those suspects were exluded.  (SDF ¶¶72-117.)

132.    Disputed.  Baliunas told State Police Sgt. Alan Hunte in 2001 that he had excluded Waters, and Baliunas' original file, located after his 2007 deposition, corroborates that statement insofar as it lists Waters' name twice on lists of suspects whose fingerprint cards Baliunas checked and excluded.  Waters gave his prints to Adamson and Boisseau on May 22, 1980, and Adamson spoke with Baliunas later that day.  There is no reason why Waters' prints would not have been provided to Baliunas.  Baliunas may have provided the District Attorney's Office with written reports if he had prepared any, but his practice was only to prepare written reports documenting fingerprint matches.  And, in this case, other than identifying a fingerprint on a Ballantine beer can as the victim's right index finger, there were no matches, so he reported his exclusions of Ayer suspects back to the Ayer Police orally.  (SDF ¶¶72-117.)  ADA Fahey had no idea there were any usable prints collected at the scene.  (SDF ¶242.)

133.    Disputed in part. Ayer reports, correspondence and daily logs all reflect that suspects' fingerprints were sent to Baliunas, and that he orally reported back his results.  (SDF ¶¶72-117.)  The only reasonable inference from the existence of Waters' name on Baliunas' list of fingerprint cards checked is that the APD sent him Waters' fingerprints to compare.  A reasonable jury could find that Ayer once had that documentation, but that Taylor destroyed it.

134.    Disputed.  Baliunas told State Police Sgt. Alan Hunte in 2001 that he had excluded Waters, and Baliunas' original file, located after his 2007 deposition, corroborates that statement insofar as it lists Waters' name twice on lists of suspects whose fingerprint

cards Baliunas checked and excluded.  Baliunas' standard practice was to compare all

prints sent to him, and to report back all his results to the submitting agency.  (SDF ¶¶83,

88-94, 97, 101-05. )

135.  Undisputed, but averred that Taylor's perjurious grand jury testimony – that the only

prints had been "smeared" – coupled with her spoliation and suppression of APD reports

documentin the existence of usable prints, mislead the defense into believing there was

no fingerprint evidence to which to compare Waters' prints.  (SDF ¶¶227-33, 236-44.)

136.  Disputed.  When Fahey asked if any grand jurors had questions for Taylor, this exchange

followed:

> Q     (By Juror) Was the department able to lift any fingerprints?
> A.    The State Police did  lift some prints.  None of them were anything that they were
>       able to match up.  They were smeared et cetera.
> Q     (By Ms.  Fahey) So the State Police were unable to match any prints -- lift any
>       prints to be of use in any investigation?
> A.    That's correct.

(SDF ¶227.)  Undisputed that Waters' attorney was provided with this transcript.

Disputed that defense counsel was aware that the State Police were in possession of

Waters' fingerprints and therefore subpoenaed Baliunas to trial.  Baliunas' name was

known to the defense as he was listed on the APD's initial crime scene report as a "photo

and fingerprint man."  He had retired prior to Waters' arrest in 1982.  He was listed on

the defense witness list and a subpoena was issued care of the State Police for him to

appear at trial in 1983, but there is no record of any return on the subpoena.  Baliunas

testified that he was not contacted by anyone in connection with Waters' arrest or trial.

(SDF ¶¶87, 236.)  Defense counsel was not aware of any usable fingerprints; it was only

after the conviction that an investigator for Mr. Waters first unearthed APD reports

documenting the existence of usable prints.  (SDF ¶244.)  Indeed, ADA Fahey had no

idea there were usable prints.  (SDF ¶¶242-43.)

137.    Disputed in part.  Undisputed that the Massachusetts State Police Fingerprint Section

was listed on the defense witness list, and a subpoena was issued care of the State Police

for him to appear at trial in 1983, but there is no record of any return on the subpoena.

Baliunas testified that he was not contacted by anyone in connection with Waters' arrest

or trial.  (SDF ¶¶87, 236.)  Defense counsel was not aware of any usable fingerprints; it

was only after the conviction that an investigator for Mr. Waters first unearthed APD

reports documenting the existence of usable prints.  (SDF ¶244.)

### SUPERVISORY FACTS

138.    Undisputed.

139.    Undisputed.

140.    Undisputed that Connors so testified (SDF ¶202), but disputed that this direction was

authorized under Taylor's limited appointment as a special officer, or that Connors

adequately supervised her thereafter.

141.    Disputed.  *See* plaintiff's response to SUF ¶¶89-93, *supra*.

142.    Disputed in part.  Undisputed that Connors allowed Taylor to take charge of the Brow

investigation and explained his decision by noting that the department was "extremely

shorthanded" and that Boisseau while "on paper" the designated follow-up officer, "was

having great difficulty keeping up with his workload already," which had created an

investigative "backlog" among his cases.  (SDF ¶143.)  Disputed that his mere presence

at the October 4th interview qualified as supervision, or that he supervised Taylor

subsequently given his admission that he had "less and less to do with it" thereafter. (SDF ¶¶173, 201.)

143. Disputed. Taylor was neither authorized nor qualified to question either Marsh or Perry as the key informant witnesses in an unsolved homicide. By her own admission she had no knowledge of any APD policies, including those directing the process for conducting informants and witness interviews. (SDF ¶¶308-09.)

144. Disputed in part. Undisputed that Fahey was not made aware of Taylor's suppression of evidence, perjury, coercion, manufacturing of evidence, or sponsoring of perjury, or that Taylor was not a full-time officer or a Police Academy graduate. Undisputed that Fahey assumed that Taylor was operating under the direct supervision of the state police, but disputed that she in fact had any supervision by state police or adequate supervision by her own superiors at the APD. (SDF ¶¶203, 235, 258.)

## MONELL FACTS

145. Disputed in part. Unisputed that Connors reported to the Board, but averred that the Board delegated final policymaking authority to him for law enforcement matters. Pursuant to Massachusetts law, the Ayer Board of Selectmen ("Board") established the police force, appoints the chief, may remove officers for cause, and issues regulations pertaining to the department. (SDF ¶319.) Francis Callahan, a Board member during the Brow investigation, explicitly acknowledged that the Board delegated all pertinent policymaking authority in the law enforcement arena to Ayer's police chiefs. Specifically, Callahan agreed that the Board delegated or left to the chief's discretion hiring, assignments and oversight of individual police and special officers; law enforcement generally, including the use of informants during investigations; and

investigating allegations of police misconduct. The Board had no role whatsoever with respect to the training of police officers. (SDF ¶320.) The APD's own written policies, which repeatedly refer to the Board as the "Appointing Authority" and the Chief as the "chief administrative officer of the Department and the final departmental authority in all matters of policy, operations and discipline." (SDF ¶321.) Specifically, APD policy provides:

Through the Chief of Police the Department is responsible for the enforcement of all laws coming within its legal jurisdiction. The Chief of Police is responsible for planning, directing, coordinating, controlling and staffing all activities of the Department. He is also responsible for ... the enforcement of rules and regulations within the Department, for the completion and forwarding of such reports as may be required by proper authority and for the Departments' relations with local citizens, the local government and other related agencies. The Chief is responsible for training of all members of the department.

(SDF ¶322.)

146.   Disputed in part. *See* plaintiff's response to SUF ¶145, *supra*.

147.   Undisputed.

148.   Disputed. Ernest Downing complained to the board that APD officers had coerced a young man into making false allegations of criminal conduct against him. Stanley Randall reiterated those allegations in a Board meeting after Downing was acquitted. Via those complaints and reporting in the local paper, the Board was on specific notice of a pattern of conduct among APD officers including improper evidence handling, the filing of false charges, and improper pressuring and coercion of witnesses. (SDF ¶¶323-30, 334, 336, 343-44, 352-77.)

### B. Specific Incidents Alleged to Support Monell Claim

### TIES CONSTRUCTION

149.    Disputed in part.  Undisputed that Connors instituted an internal investigation into the possible involvement of APD officers in the vandalism at Ties Construction.  However, it is disputed that the investigation was anything more than perfunctory.  (SDF ¶¶345-47.)

150.    Disputed in part.  Undisputed that Connors demanded the suspect officers take polygraphs, but disputed that this action was anything more than perfunctory as an investigation.  (SDF ¶¶345-47.)

151.    Disputed in part.  Undisputed that Connors brought administrative charges against the suspect officers for refusing to take polygraph exams, but disputed that this action was anything more than perfunctory as an investigation.  (SDF ¶¶345-47.)

152.    Disputed in part.  Undisputed that the suspect officers were eventually fired by Connors for refusing to take polygraphs, but disputed that this action was anything more than perfunctory as means of changing entrenched investigative customs and practices in the department. (SDF ¶¶345-47.)

153.    Undisputed.

154.    Disputed in part.  Undisputed that Ford so testified, but disputed that firing officers for refusing to take polygraph exams, as opposed to seeking independent corroboration of their alleged involvement in the case, or exploring whether this was an isolated incident or part of a broader more widespread pattern of misconduct by APD officers, was appropriate or aggressive.  Ford also acknowledged that Connors' failure to investigate allegations of misconduct by other officers who were not fired, was neither appropriate, aggressive, nor calculated to send a message that misconduct would not be tolerated. In addition, Connors did not start any internal investigation into officer Stanley Randall's

allegation that Nancy Taylor had framed him for rape, in criminal charges that were

quickly dismissed.  Instead, Connors assigned Taylor to lead the reactivated Brow

investigation soon thereafter.  That lapse was not appropriate, aggressive, nor calculated

to send a message that misconduct would not be tolerated.  (SDF ¶¶345-47, 362-70.)

155.    Undisputed that Randall so testified in reference to the Ties matter.

156.    Undisputed but incomplete.  Reiter also opined that Connors' actions "were indicative of

a perfunctory and extremely deficient investigation by the Police Department."  (SDF

¶347.)  Mr. Reiter went on to opine that:

> The Ayer Police Department, in my opinion, had systemic deficiencies that created an
> environment conducive to Unconstitutional violations and the support and/or toleration
> of unprofessional, biased, and prejudicial policing conduct by its members.  The record
> in the materials discovered in this case indicate an on-going pattern of police employee
> misconduct and unprofessional conduct.  It would have been obvious to any reasonable
> police executive and manager that this unprofessional environment would create an
> obvious high risk of police misconduct and the strong potential for violations of citizens'
> rights.  This environment of systemic agency and supervisory deficiencies could lead to
> police employees violating legal safeguards, departing from generally accepted police
> practices including investigative conduct, and taking shortcuts that any reasonable police
> officer or police manager would know could lead to erroneous investigative conclusions
> and could place citizens in harm's way for a wrongful arrest and prosecution.

(SDF ¶371.)

## THE COMPLAINT OF BRUCE HOLDORFF

157.    Undisputed.

158.    Undisputed. It is further averred that MacDonald arrested Waters for the Brow homicide,

along with defendant Taylor, and that APD officers investigating the Ties matter in the

fall of 1982 implicated MacDonald in criminal conduct – stealing marijuana seized from

suspects – that Connors never investigated.  (SDF ¶¶213, 345.)

159.    Disputed in part.  Undisputed that all three took polygraphs at Connors' request, but

disputed that they all "passed," or the implication that such an order, in and of itself,

constituted a meaningful investigation into wrongdoing. There is no evidence of any follow up investigation after those polygraph results, although the results were obviously unreliable, as they could not all have been telling the truth.

160. Undisputed that Connors deemed Holdorff's complaint unsubstantiated solely as a result of polygraph results.

### LISA FRAWLEY'S ALLEGED RAPE BY STANLEY RANDALL

161. Undisputed.

162. Undisputed. Randall collected a knife from the scene and gave it to Boisseau, but it "went missing" before it could be examined for any evidence such as fingerprints that could have linked it to an APD officer or other suspect. (SDF ¶¶331-42.)

163. Undisputed. Randall believed APD officers were involved because an APD officer admitted his and other officers' involvement directly to him. (SDF ¶¶323-28.)

164. Undisputed. (SDF ¶¶323-30.)

165. Disputed in part. Randall was charged with rape arising out of an incident alleged to have taken place two months earlier, on August 31. The complainant first contacted Nancy Taylor at home on October 21, 1981 to report the alleged incident, which was alleged to have taken place in the town of Acton. Taylor testified in her deposition that she wanted nothing to do with investigating criminal allegations against a fellow officer, and that once she determined the alleged incident had taken place in Acton, not Ayer, she led the complainant and her boyfriend to the Acton police department and "I never saw either one of them again, nor talked to them." Taylor's October 26, 1981 police report states that Taylor met with the complainant three days after the initial phone call,

for a three-hour meeting in which Taylor promised to accompany her throughout the criminal proceedings.  (SDF ¶¶360-63; *see also* SDF ¶¶352-59.)

166.    Disputed that Taylor had any fears for Randall. Taylor testified in her deposition that she wanted nothing to do with investigating criminal allegations against a fellow officer, and that once she determined the alleged incident had taken place in Acton, not Ayer, she led the complainant and her boyfriend to the Acton police department and "I never saw either one of them again, nor talked to them."  Taylor's October 26, 1981 police report states that Taylor met with the complainant three days after the initial phone call, for a three-hour meeting in which Taylor promised to accompany her throughout the criminal proceedings.  (SDF ¶¶360-63.)

167.    Disputed.  *See* plaintiff's response to SUF ¶166, *supra*.

168.    Disputed.  *See* plaintiff's response to SUF ¶166, *supra*.

169.    Disputed.  Frawley was the complainant.  *See* Pl. Ex. 95.

170.    Undisputed.

171.    Undisputed.

172.    Disputed and irrelevant. Once Chief Connors took over, Stanley Randall told him that he believed Nancy Taylor had been involved in an attempt to frame him for a rape he did not commit, in retaliation for his role in exposing the corruption of other officers relating to the Ties incident, but Connors testified he conducted no administrative investigation of Randall's allegation against Taylor.  (SDF ¶¶367-68.)  There is no record that the APD ever investigated Nancy Taylor for potential misconduct  in connection with any of the four cases she investigated in which defendants – including Stanley Randall, Ken Waters, Dennis Maher and a homosexual Ft. Devens soldier arrested for raping a woman

– were arrested or convicted but later exonerated.  (SDF ¶370.)  Taken together, expert

Lou Reiter opined that these "egregious, deliberate choices" reflect a "practice and

pattern of egregious investigative conduct" among Ayer police officers.  (SDF ¶369.)

173.  Undisputed that plaintiff has not offered Mr. Reiter as an expert in bias.

174.  Disputed.  Mr. Reiter opines:

> The Ayer Police Department, in my opinion, had systemic deficiencies that created an
> environment conducive to Unconstitutional violations and the support and/or toleration
> of unprofessional, biased, and prejudicial policing conduct by its members.   The record
> in the materials discovered in this case indicate an on-going pattern of police employee
> misconduct and unprofessional conduct.  It would have been obvious to any reasonable
> police executive and manager that this unprofessional environment would create an
> obvious high risk of police misconduct and the strong potential for violations of citizens'
> rights.  This environment of systemic agency and supervisory deficiencies could lead to
> police employees violating legal safeguards, departing from generally accepted police
> practices including investigative conduct, and taking shortcuts that any reasonable police
> officer or police manager would know could lead to erroneous investigative conclusions
> and could place citizens in harm's way for a wrongful arrest and prosecution.

(SDF ¶371.)  In fact, Reiter testified that, in his 35 years in law enforcement, the number

of police misconduct incidents the APD had during the early 1980's is staggering for

such a small department.  (SDF ¶372.)  Reiter opined that Taylor's "performance during

the investigation of the Brow murder and, specifically, her assumption as the lead

investigator in 1982 culminating in the indictment and prosecution of Kenneth Waters

was an egregious departure from accepted police practices."  (SDF ¶373.)  Reiter further

 opined that,

> The actions and conduct of Ms. Nancy Taylor were egregious departures from reasonable
> and generally accepted police investigative practices.  Any reasonable police officer
> would be aware that these types of conduct would adversely affect any investigation and
> compromise Constitutional safeguards of all persons involved.  During this period of
> time it is apparent that Ms. Taylor was allowed to function as lead investigator for critical
> investigations without adequate training or supervision.  These omissions, in my opinion,
> were conscious choices made by investigative personnel of the Ayer Police Department
> and Chiefs Adamson and Connors.

(SDF ¶374.)  Ultimately, Reiter found that "Chief Connors failed to exercise reasonable supervisory oversight and control of the Brow murder investigation and arrest/prosecution of Kenneth Waters by Ms. Taylor.  Any reasonable police supervisory officer would have vigilant oversight over this type of investigation being conducted by an investigator with no homicide experience."  (SDF ¶375.) "There is no acceptable rationale for Chief Connors' failure to oversee this aspect of the investigative process and the duty of the Ayer Police Department to ensure the protection of everybody's rights during the subsequent prosecution of Kenneth Waters."  (SDF ¶376.)  In sum, Mr. Reiter's review of this record reveals that Ayer's "dysfunctional agency environment with its systemic issues of police misconduct and supervisory failures ... allowed the wrongful arrest and prosecution of Kenneth Waters."  (SDF ¶¶377, 371-76.)


Dated:  May 27, 2007            Respectfully submitted,
        New York, NY
                                /s/ Deborah L. Cornwall
                                Barry C. Scheck (BS 4612)
                                Deborah L. Cornwall (DC 2186)
                                Monica R. Shah (MS 9846)
                                COCHRAN NEUFELD & SCHECK, LLP
                                99 Hudson Street, 8th Floor
                                New York, NY 10013
                                Tel. (212) 965-9081 / Fax (212) 965-9084

                                Robert N. Feldman
                                BIRNBAUM & GODKIN, LLP
                                280 Summer Street
                                Boston, MA 02210-1108
                                Tel. (617) 307-6130 / Fax (617) 307-6101

                                ***Attorneys for Plaintiff Betty Anne Waters***

## <u>CERTIFICATE OF SERVICE</u>

I, Monica R. Shah, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via overnight delivery to those indicated as non-registered participants on May 27, 2008 as well as:

Joseph L. Tehan, Jr.
Gregg J. Corbo
Jeffrey T. Blake
Kopelman & Paige, PC
101 Arch Street, 12th Floor
Boston, MA 02110

/s/ Monica R. Shah
Monica R. Shah