UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-10521-GAO

BETTY ANNE WATERS, as Administratrix of the Estate of KENNETH WATERS,

Plaintiff

v.

TOWN OF AYER, NANCY TAYLOR-HARRIS, in Her Individual Capacity, ARTHUR BOISSEAU, In His Individual Capacity and PHILIP L. CONNORS, in His Individual Capacity,

Defendants

DEFENDANT NANCY TAYLOR-HARRIS' REPLY TO PLAINTIFF'S SUMMARY JUDGMENT OPPOSITION

I. INTRODUCTION

This case highlights the importance of the "gatekeeper" role of the trial judge at the summary judgment stage of the proceedings. Well aware that so-called "wrongful conviction" cases present highly sympathetic claims for jury consideration, plaintiff seeks to avoid summary judgment by presenting a bloated and obfuscatory record in opposition to defendants' motions, with the hope of inundating the court with so many "facts" that at least one is found to be in dispute and material. However, many of the "facts" put forward by plaintiff are either unsupported in the record or are immaterial. The issue is compounded by plaintiff's use of these "facts" in support of arguments predicated upon manifestly unjustified inferences. Finally, plaintiff's massive oppositions fail to satisfy, or even address, her required threshold proof that any defendant violated Mr. Waters' constitutional rights with malice or had any motive to "frame" her decedent.

For these reasons, and as set forth below and in defendants' original submissions, Officer Taylor's motion for summary judgment should be allowed.

II.     ARGUMENT

    1. The Plaintiff is asking the Court to apply the wrong legal standard

The materiality of the "facts" that the plaintiff claims are in dispute must be evaluated in light of the claims set forth in the Amended Complaint. Although the plaintiff dwells extensively on the overall quality of the Ayer Police Department's ("APD") investigation by highlighting claimed discrepancies between the actual investigation and its policies and procedures, this is a nonissue since it is only conduct that runs afoul of the Constitution that is actionable. Smith v. Freeland, 954 F.2d 343, 347-48 (6th Cir. 1992) (in section 1983 action, testimony from police practices expert that defendant officers violated police department polices was irrelevant because the issue was whether the defendant violated the Constitution, not whether he should be disciplined by the department). In other words, there is no Section 1983 cause of action for negligent investigation. Baker v. McCollan, 443 U.S. 137, 146 (1979)("Section 1983 imposed liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law"); Reid v. Simmons, 163 F.Supp.2d 81, 89-91 (D.N.H. 2001). Rather, in order to impose liability upon the defendants in this case, the plaintiff must point to specific instances in which the conduct of the defendants deliberately and maliciously ran afoul of the Constitution in a manner that harmed Waters. Reid, 163 F.Supp.2d at 90.

The vast majority of the "facts" and opinions set forth by the plaintiff are wholly irrelevant to the case at hand, and are insufficient to establish a triable issue as to any claim set forth in the Amended Complaint, as they merely allege minor deviations from policy and things that the defendants could have or should have done differently in their investigation. For example, plaintiff asserts that Officer Taylor "improperly" returned Adi Ogden's ring, incorrectly applied for a search warrant during the Brow murder investigation and uses expert and lay opinion to scrutinize the various steps of the Brow murder investigation.

Such "facts" and opinions, however, are inconsequential to the adjudication of this case. For example, plaintiff's allegations regarding the alleged "spoliation" of the ring are irrelevant because the ring and its evidentiary value were fully disclosed at trial. Although the ring itself was not available, the record demonstrates that Adi Ogden testified regarding the ring and its size at trial, and Eugenie Brow testified as to the victim's ring finger size. (Pl. Ex. 24, Vol. 2 at 109-10 (Brow), Vol. 3 at 327-28). Information regarding the ring was also fully documented in APD reports, which were available to ADA Fahey as well as defense counsel. (Def. Ex. 25). There was no dispute regarding the ring itself and an examination of the ring would have had no impact on the trial. Indeed, no issue of this fact was made at trial, in the motion for new trial or on appeal. Therefore, the plaintiff's "facts" regarding the ring are immaterial to the allegations raised in the Amended Complaint.

Plaintiff also attempts to impose liability on the basis of Officer Taylor's search warrant application for the vacant home of Waters' grandfather in October 1982. (See, Pl. SDF, ¶¶153-65). Contrary to plaintiff's insinuations, however, Officer Taylor's actions regarding the search warrant had no bearing on the constitutional issues to be decided in this case, because it is undisputed that the search of the home yielded no evidence and had no impact on Waters' arrest, or his trial. (Pl. SDF, ¶164). Once again, no issues regarding the search warrant were raised at trial, in the motion for new trial or on appeal.

Plaintiff also uses expert and lay opinion testimony to assess the adequacy of Ayer's role in the Brow murder investigation (See, e.g., Pl. SDF, ¶¶137, 156, 173, 220 (Ford); ¶¶155, 161, 176, 199, 375 (Reiter)). At most, these alleged failures amount to nothing more than mere negligence, and have no impact on the alleged violations of Waters' constitutional rights as alleged in the Amended Complaint. Therefore, for the detailed reasons set forth herein, the plaintiff has failed to adduce sufficient evidence to justify denial of Officer Taylor's motion for summary judgment.

2. <u>The plaintiff has adduced no evidence of deliberate misconduct or malice</u>

The plaintiff's attempt to compare this case to <u>Limone</u> v. <u>Condon</u> is unavailing. This case is not comparable to the <u>Limone</u> case in any relevant respect, and that decision does not compel a decision in favor of this plaintiff. In <u>Limone</u>, the Court found that the plaintiff could survive a Rule 12 Motion to Dismiss based on allegations that the defendants actively participated in framing the plaintiff for crimes that the defendants <u>actually knew</u> the plaintiff did not commit. See <u>Limone</u>, 372 F.3d at 43 (the central theme of plaintiffs' claims is that the defendants violated the Constitution by developing a witness for the prosecution <u>in spite of their knowledge</u> that the witness would perjure himself and falsely implicate three innocent men). Indeed, the defendants in <u>Limone</u> were alleged to have <u>intentionally</u> framed the plaintiff for the improper purpose of shielding the true perpetrator of the crime. Although these allegations were sufficient to survive a motion to dismiss in <u>Limone</u>, the First Circuit acknowledged that the plaintiffs would have to adduce more than bare allegations of knowledge to survive a motion for summary judgment. <u>Limone</u>, 372 F.3d at 47. Here, no such evidence has been adduced.

Cases cited by the plaintiff with respect to her fabrication of evidence claims support this reading of law. In <u>Spurlock</u> v. <u>Spatterfield</u>, 167 F.3d 995 (6th Cir. 1999) (Pl. Opp., p. 38[1]), the Court denied the defendant's Motion to Dismiss based on factual allegations that the defendant police officer had an improper motive for charging the defendant (the police detective devised a scheme to frame a known criminal so that he could collect the reward money), and knowledge of the falsity of the informant's testimony (the detective admitted that he knew the informant was lying). Likewise, in <u>Washington</u> v. <u>Wilmore</u>, 407 F.3d 274 (4th Cir. 2005) (Pl. Opp., p.38), the Court found that there was a question of fact regarding the fabrication of evidence claim where the police officer fabricated

---

[1] References to "Pl. Opp." herein refer to Plaintiff's Opposition to Defendant Nancy Taylor-Harris' Motion for Summary Judgment.

4

evidence that the criminal defendant's admission included details that were not known to anyone else, even though those details were supplied by the police officer. Significantly, the concurring opinion filed with the Washington decision cites Limone for the proposition that the Due Process Claims prohibits the police from "deliberately fabricating evidence and framing individuals for crimes that they did not commit." Washington, 407 F.3d at 285. The concurrence then goes on to state that "the issue in this litigation is not simply whether the justice system failed Washington, but instead whether any such failure is the result of deliberate or reckless misconduct by law enforcement." Washington, 407 F.3d at 285, n. 2.

In this matter, while the plaintiff baldly asserts that Officer Taylor "should have known" that Waters was innocent, this allegation falls far short of the actual knowledge possessed by the defendants in Limone and Spurlock as required to establish liability; see, also Milsein v. Cooley, 257 F.3d 1004 (9th Cir. 2001) (Pl. Opp., p. 40) (reversing district court's granting of Motion to Dismiss based on absolute prosecutorial immunity where two district attorneys approached a witness and induced him to give false testimony against a defense attorney who had successfully defended a criminal case). Plaintiff has not alleged, nor offered in her Opposition, any evidence of Officer Taylor's improper motive to impose liability; she has not offered one fact demonstrating Officer Taylor's actual malice or improper motive towards Waters. At most, plaintiff attempts to deduce, through sheer speculation and surmise, not fact, that Officer Taylor had aspirations during her employment with the APD, including for additional pay, which in turn constituted an improper motive for Waters' arrest and prosecution. (See, e.g., Pl. SDF, ¶¶14, 15, 127; Pl. Opp., pp. 2-3)[2]. There is no evidence to support this position, and Officer Taylor expressly rejected such insinuations

---

[2] In her Opposition, plaintiff attempts to paint a picture of Officer Taylor as a power hungry officer to create a possible improper motive: "Taylor had ambitions to become a full-time patrol officer…"; "[d]espite the limitations of her role, Taylor constantly pushed to take on more and more investigative responsibility"; "Nine days later Taylor took a phone call from Robert Osborne, who offered information about the Brow murder, which was still unsolved after 2 ½ years. Taylor saw her chance and took it." (Plaintiff's Opposition, pp. 2-3) (emphasis supplied).

at her deposition.[3]  Moreover, there is no evidence that Officer Taylor received more money for obtaining a conviction in the Brow case or that she was promised any advancement if such a conviction were obtained.

As the First Circuit observed in Depoutot v. Raffaelly, 424 F.3d 112, 121 (1st Cir. 2005), the plaintiff's unsubstantiated speculation that an officer intended to falsify evidence is insufficient to survive a motion for summary judgment.  As the plaintiff's case is based entirely upon such unsubstantiated speculation, Officer Taylor is entitled to summary judgment.

    3. The Plaintiff has Failed to Establish a Triable Issue on the *Brady* Claim

The central premise to Officer Taylor's motion for summary judgment is that an individual defendant can only be held liable on the basis of his or her own involvement in the underlying dispute.  Gagliardi v. Sullivan, 513 F.3d 301 (1st Cir. 2008).  This premise is not rebutted by the plaintiff; indeed, it is completely ignored in her oppositions. This premise is of particular significance in this case as there is simply no evidence of a conspiracy between the defendants.  Indeed, based on the utter lack of support for her conspiracy claim, the plaintiff withdrew Count IV (Pl. Opp., p. 2).  Rather, relying on Limone, the plaintiff claims that there is some overarching claim of wrongful conviction that extends beyond her Brady claim and merges all of the claims and defendants together (Pl. Opp., p. 7).  Limone does not support this view.

The plaintiff seeks to avoid individualized scrutiny of her constitutional claims, because her case is built on a house of cards that cannot withstand even the slightest breeze.  Moreover, the plaintiff cannot at this late juncture rewrite her complaint.  In her lengthy 111 paragraph complaint, which was amended after the close of discovery, the plaintiff eschewed a general statement of

---

[3] See Pl. Ex. 19, p. 67, "Question: And you would get paid more money for the activities you did as a special officer than you did for your clerk and dispatching duties? Answer: Yes, only—but only on an overtime basis.  If it were during my 40 hours, I was paid at my 40 hours rate"; see also Pl. Ex. 18, pp.55-56, "Question: So, it was in your financial interest, certainly, to do more activity that was involved in the work of a special patrol person?"  Answer: I didn't look at it that way."

6

claims in favor of specific allegations of wrongdoing. Having made such allegations, at this stage of the proceedings, it is incumbent upon the plaintiff to back them up with specific, competent, evidence in the record. The plaintiff has not done so.

Analyzing this case by looking at each alleged Constitutional violation by each defendant, it is clear that Officer Taylor cannot be held liable for failing to disclose exculpatory evidence, and the whimsical inferences created by the plaintiff are insufficient to establish a triable issue on the *Brady* claim.

          a.      <u>The fingerprint evidence</u>

The most distorted issue in plaintiff's Opposition involves the fingerprint evidence. Based on a number of fanciful assumptions and manipulations of the evidence in the record, the plaintiff claims: (1) that the APD, through Chief Adamson, sent Waters' prints to State Police Corp. Baliunas for comparison to latent prints found at the murder scene; (2) that Baliunas compared the prints and (3) excluded Waters as the source of those prints; (4) that Baliunas communicated his findings to Chief Adamson; and (5) that Officer Taylor was aware of this communication and concealed it from ADA Fahey. One problem for the plaintiff is that the evidence supports none of the "facts" in this chain. The bigger problem for the plaintiff is that this entire line of argument is irrelevant based on what was known by ADA Fahey and Waters' defense attorney. Therefore, despite the plaintiff's creative work of fiction, she has failed to identify a triable issue of fact with respect to the fingerprint evidence.

The duty imposed upon the defendant police officers is to disclose exculpatory evidence to the <u>district attorney</u>, and there can be no liability if the district attorney knew of the evidence at issue. <u>Kelly</u> v. <u>Curtis</u>, 21 F.3d 1544, 1552 (11th Cir. 1994). Here, it is clear that ADA Fahey had sufficient knowledge of the fingerprint evidence to absolve Officer Taylor of liability for failing to disclose additional fingerprint evidence. As previously discussed in her original summary judgment

7

memorandum, Officer Taylor satisfied her *Brady* obligations the moment that she testified truthfully before the Grand Jury that latent prints had been lifted from the scene. While the plaintiff claims that she testified falsely that the prints were smeared and unusable, the accuracy of her testimony in this regard is irrelevant for several reasons.

First, contrary to plaintiff's assertion, ADA Fahey did not rely solely upon Officer Taylor's Grand Jury testimony regarding the fingerprints, as is clear from the portions of her Opening Statement cited by the plaintiff. Specifically, in her Opening Statement, ADA Fahey states that "you'll learn that the only full fingerprint that they found when they dusted the house for fingerprints was a fingerprint of Mrs. Brow on a beer can." (Pl. Opp., p. 9). This statement is inconsistent with Officer Taylor's Grand Jury testimony in which she stated that no useable prints were found. Clearly, the District Attorney had received contrary information from another source, and Officer Taylor cannot be held liable if the District Attorney failed to disclose it to the defense.

Not only did the District Attorney have sufficient knowledge of the fingerprint evidence, it is clear that Waters' defense attorney did as well. The plaintiff disingenuously states that, although Waters' defense counsel knew that Baliunas was in charge of the fingerprint evidence, Baliunas was unavailable as a witness because he retired shortly before trial. Of course, Baliunas was still retired when he was deposed in 2007, yet the plaintiff had no trouble securing his testimony. Furthermore, the plaintiff's argument in this regard is rebutted by the evidence that Waters' defense counsel subpoenaed a fingerprint comparison by Baliunas' successor in the fingerprint division, State Police Trooper Amaral. (Def. Ex. 48). This subpoena was served prior to trial and specifically references a 1983 comparison of Waters' prints to the latent prints found at the scene. (Def. Ex. 48). That Waters' defense counsel chose not to call this witness or introduce evidence of the comparison at trial suggests that the evidence was not favorable to Waters.

The evidence of knowledge of the fingerprint evidence by ADA Fahey and Waters' defense attorney renders the fingerprint issue wholly irrelevant to the plaintiff's *Brady* claim. In fact, despite plaintiff's best efforts to mischaracterize the record regarding the "fingerprint evidence" and draw speculative inferences from incompetent evidence, the fingerprint issue is simply a "red herring." There is simply no evidence to demonstrate that Baliunas actually excluded Waters as the source of the latent prints, nor is there evidence that any such exclusion was communicated to the Ayer Police Department. Most significantly, there is not one scintilla of evidence to prove that Officer Taylor knew that Waters was excluded as the source of those prints. In the absence of direct evidence of Officer Taylor's knowledge in this regard, she is entitled to summary judgment.

Even more troubling is plaintiff's reliance on the newly discovered "bloody toaster fingerprint" to create a triable issue as to a "material fact." For example, plaintiff asserts that "[t]he bloody toaster print was the best evidence of the perpetrator's identity and therefore the most powerful evidence Taylor deprived Waters of at his criminal trial." (Pl. Opp., p. 30). Such "fact" is misleading and patently frivolous. The record conclusively proves that neither Officer Taylor (nor the APD) knew of the so-called "bloody toaster fingerprint" during the original criminal investigation, nor was it even disclosed to Ayer Police until 2007 during discovery in <u>this</u> case. In fact, the record shows that Trooper Baliunas had possession and custody of the toaster fingerprint, which was secretly stored in a private storage facility from his retirement in November 1982 until July 2007. (Pl. Ex. 55 at ¶¶4, 6-7[4]; Ex. 54 at BAL000049). As the Massachusetts State Police Fingerprint Report indicates, only five latent fingerprints were noted by Trooper Baliunas, which did not include the bloody toaster print.[5] Therefore, given the fact that the Ayer defendants,

---

[4] As Trooper Baliunas did not testify to this issue at his deposition, which preceded his affidavit, defendants do not assert that ¶¶4, 6 and 7 contain the elements of a "sham affidavit."

[5] The State Police Holden Lab Report Form authored by Trooper Baliunas lists five latent fingerprints: three fingerprints were lifted from the dining room table, one fingerprint was lifted off the kitchen faucet, one fingerprint was lifted off a Ballentine beer can. (See Plaintiff's Exhibit 52 at SP000005).

including Officer Taylor only became aware of the existence of this fingerprint in 2007, it is undisputed that the issue of the "bloody toaster fingerprint" is wholly irrelevant and immaterial to the claims set forth in the Amended Complaint.

b. The Time Cards

As with the fingerprints, the plaintiff's allegations concerning the time cards are based on an imaginary chain of "facts" that are not supported by the evidence. Specifically, the plaintiff claims: (1) that the APD collected Waters' time cards; (2) the time cards showed that Waters was working at the time of the murder; and (3) that Officer Taylor destroyed the time cards. These contentions are a blatant falsehood that are not supported by any fact in the record, but rather based upon wild misrepresentations of the evidence.

First, the plaintiff states that "the time card for the week of the murder would have shown that he worked a double shift starting the evening of May 20, 1980 and ending at 8:00 am on the morning of May 21, 1980." This statement is obviously false and unsupported because the time card is not in evidence and no one knows what it actually would have said, and the plaintiff's inferences from the number of hours worked were already rejected by the Supreme Judicial Court. Commonwealth v. Kenneth Waters, 399 Mass. 708, 718, 506 N.E.2d 859, 866 (1987).

Neither the Declaration of Elizabeth Lankford, nor the Affidavit of Joseph Guidetti establish that the Ayer Police ever collected Waters' time cards.[6] In her 2007 declaration, Ms. Lankford merely states that "[w]ithin days after the murder, two Ayer police officers appeared at the office of Berry Enterprises asking for Kenny Waters' time card for the date of the murder." (Pl. Ex. 68, ¶9). The Declaration does not say whether or not she turned anything over, or even that she had

---

[6] Defendants also note that plaintiff's "fact" and the inferences made from such fact, as provided in Plaintiff's Opposition to Officer Taylor's Motion for Summary Judgment, p. 20., n.2 are patently false. The daily log cited by the plaintiff only indicates that Ayer Police Sergeant Harris went to APD to return a $55 check in Waters' name that had been issued but not delivered to Waters, as he had already moved out of Ayer. Therefore, plaintiff's improper inference, as contained on p. 20, n.2, that "Sgt. Harris did in fact go to Berry Enterprises in connection with Kenny Waters in July of 1980" clearly does not support that the time cards were acquired.

possession of the time cards at that time. A subsequent paragraph of the Declaration simply states "[i]n normal practice at Berry Enterprises, we would comply with a police request by turning over a copy rather than the original." (Pl. Ex. 68, ¶11). This statement is not sufficient to establish a disputed issue of fact for purposes of summary judgment.

The statement in and of itself does not establish that any employee of Berry Enterprises gave the APD Waters' time card, or even a copy thereof, and the affidavit fails to establish sufficient foundation to justify treating this as habit evidence under Rule 406. U.S. v. Newman, 982 F.2d 665, 668-9 (1st Cir. 1992) (habit evidence inadmissible where proponent of the evidence failed to establish foundation for assessing the adequacy of the sample so as to determine whether the regularity of the conduct alleged to be habitual rested on analysis of instances numerous enough to support an inference of systematic conduct). Here, there is no foundation laid that Berry Enterprise routinely, habitually or systemically reviewed and responded to police requests for time cards.

The Guidetti Affidavit is inadmissible for any purpose and, again, does not establish that the Ayer Police collected the time cards. First, the plaintiff attempts to use the Guidetti Affidavit to fill in a blank in the Declaration of Elizabeth Lankford (Pl. Ex. 68). According to the Guidetti Affidavit, he spoke with a different Berry Enterprises employee[7], Elizabeth Tanner, in 1985. According to Guidetti, Ms. Tanner told him "that she remembered turning [the time cards] over to the Ayer police." (Pl. Ex. 67, ¶5). This statement constitutes inadmissible hearsay, and therefore does not establish this as a fact for purposes of summary judgment.

To avoid application of the hearsay rule, the plaintiff characterizes this statement as a "past recollection recorded" admissible under Fed.R.Evid. 803(5). This is not, however, a proper application of the rule. Rule 803(5) addresses "a memorandum or record concerning a matter about

---

[7] The plaintiff claims that Tanner is the married name of Elizabeth Lankford (Pl.Opp, p. 19). There is no evidence in the record to support this proposition, and in her Declaration, Ms. Lankford stated that her maiden name was Tessier (Plaintiff's Exhibit 68, ¶1).

11

which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, <u>shown to have made or adopted by the witness</u> when the matter was fresh in the witness' memory and to reflect that knowledge correctly" (emphasis added)." When the memorandum or record is written by someone other than the witness, it must be shown that the witness: (1) checked the memorandum when the matter was fresh in their memory and (2) that the witness knew it to be correct. <u>U.S</u>. v. <u>Mornan</u>, 413 F.3d (3rd Cir. 2005). When the record is written by someone other than the witness and the record is not reported verbatim, unsigned and unsworn, the hearsay exception does not apply. <u>U.S</u>. v. <u>Benson</u>, 961 F.2d 707 (8th Cir. 1992). However, assertions made in a record written by someone other than the witness will be admissible if both the witness and the one transcribing testify to the accuracy of the report. <u>U.S</u>. v. <u>Green</u>, 258 F.3d 683 (7th Cir. 2001).

  Here, the record that the plaintiff is trying to introduce as a past recollection was not created by the witness, Lankford. Indeed, it is not even clear that it is Lankford's statement that was recorded by Guidetti. Even if it were, there is no evidence that Lankford does not remember whether or not she gave the time cards to the Ayer Police. Her declaration is simply silent on this issue, and there is no evidence that she adopted the statement in the Guidetti affidavit as her own. Therefore, the exception will not apply and the hearsay statement in the Guidetti Affidavit may not be considered as part of the summary judgment record.

  The statement that Guidetti attributes to Officer Decot is also insufficient to establish that the APD collected the time cards. Guidetti states that Officer Decot "had no memory of picking up the time cards, but he may have done so and, if he did, he would have merely brought them back to the police station." (Pl. Ex. 68, ¶5). A statement that "he may have" collected the time cards does not establish a fact for purposes of summary judgment. Moreover, while Officer Decot was an agent of the APD, there is no evidence that he was authorized to talk to private investigators on its

behalf. Therefore, the hearsay statements attributed to Officer Decot do not establish that the APD had the time cards.

Finally, even if the evidence establishes that the APD collected the time cards at some point, there is no one scintilla of evidence that Officer Taylor actually saw those time cards, and it is an outrageously attenuated inference to suggest that there is evidence that Officer Taylor destroyed them. Once again, in the absence of evidence that Officer Taylor had possession of the time cards or knew what they said, the plaintiff has failed to establish a dispute as to a material fact on this issue.

      c. <u>Roseanna Perry Coercion</u>

Throughout her summary judgment oppositions, the plaintiff adheres to the delusional notion that Roseanna Perry was coerced by Officer Taylor and that she lied at Kenneth Waters' trial. To the contrary, Roseanna Perry testified consistently under oath on numerous occasions, most recently at her 2007 deposition, that she was <u>not</u> coerced by Officer Taylor and that she told the truth at trial. As her final word on this topic, Ms. Perry's deposition testimony represents the evidence that will be put forth at trial and the plaintiff cannot defeat the defendants' motions for summary judgment on the "mere hope" of discrediting Roseanna Perry on cross-examination at trial. <u>Frito-Lay of Puerto Rico, Inc.</u> v. <u>Canas</u>, 92 F.R.D. 384, 392 (D.P.R. 1981).

Without citation to any legal authority, the plaintiff claims that the deposition testimony of Ms. Perry is incompetent evidence to establish that she was not coerced by Officer Taylor and that she told the truth at trial because she only appeared for deposition after being served with an order of contempt (Pl. Opp., p. 26). This is an absurd proposition that has no bearing on the issues before the Court. Rather than relying on the sworn deposition testimony of Ms. Perry, who is in the best position to know whether or not she was coerced, the plaintiff asks the Court to rely on several out-

of-court statements attributed to her. For the following reasons, none of these sources provide competent evidence for purposes of creating a genuinely disputed fact on this issue.

1. The 1985 Statement does not Reflect her Present Testimony

First, the plaintiff claims that "Perry gave a sworn statement to Waters' investigator DeSimone soon after the conviction admitting that her trial testimony had been false, the result of Taylor's unrelenting pressure."[8] (Pl. Opp., p. 26). In making this assertion, the plaintiff completely ignores the fact that Ms. Perry disavowed that statement in subsequent sworn testimony before the Superior Court and in her 2007 deposition. Under circumstances similar to the case at bar, the Second Circuit Court of Appeals held that such a disavowed affidavit was insufficient to create a genuine issue of material fact for purposes of defeating a Motion for Summary Judgment. See Santos v. Murdock, 243 F.3d 681 (2001).

In this matter, Ms. Perry has testified consistently under oath since 1985 that she was not coerced by Officer Taylor and that she told the truth at trial. Ms. Perry reaffirmed this testimony at her recent deposition and there is no evidence to suggest that she will testify differently at trial. Therefore, the earlier statement that has been disavowed by Ms. Perry is insufficient to create a triable dispute on this issue.

2. The Affidavit of Rose Perry

The plaintiff next attempts to rely on the affidavit of Roseanna Perry's daughter, Rose Perry, to establish that a disputed issue of fact exists based on prior inconsistent statements. The Affidavit of Rose A Perry (Pl. Ex. 75), however, is not admissible for any purpose, as it is entirely a hearsay account of what Roseanna Perry allegedly told her daughter at various times. It is "black letter law" that hearsay is not admissible to create a disputed issue of fact at summary judgment. Davila v.

---

[8] Perry's deposition testimony and Pl. Ex. 72 establish that her statement was not sworn at the time it was made. Perry testified that she did not appreciate the import of her later authenticating affidavit when she executed it. (Def. S.O.F., ¶97).

14

Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007). In an effort to avoid application of this well-established rule, the plaintiff attempts to pigeon hole the affidavit into several exceptions to the hearsay rule. These attempts are unavailing for several reasons.

First, the plaintiff claims that the hearsay statements contained in Rose Perry's affidavit are being offered, pursuant to Fed.R.Evid. 613, to impeach Roseanna Perry's deposition testimony. Evidence admitted for impeachment purposes pursuant to Rule 613, however, is not admitted for substantive purposes and cannot be used to support the plaintiff's case at the summary judgment stage. Santos, 243 F.2d at 684; Jacobsen v. Towers Perrin Forster & Crosby, Inc., 2008 WL 782477 (D.Md. 2008). Once again, the plaintiff cannot defeat the defendants' motions for summary judgment on the "mere hope" that she can discredit Ms. Perry on cross-examination at trial.

Second, the plaintiff claims that the statement in paragraph 6 of the affidavit, that Ms. Perry allegedly stated "Oh my God I'm going to jail for perjury" was an excited utterance, admissible pursuant to Rule 803(2) and a statement against interest, admissible pursuant to Rule 804(b)(3). The second contention is easily disposed of, as the exceptions in Rule 804(b) only apply if the declarant is unavailable as a witness. Ms. Perry is clearly available to testify in this matter, as demonstrated by her appearance at deposition. Therefore, Rule 804(b)(3) does not apply. The plaintiff has, likewise, failed to establish that the statement qualifies as an excited utterance. Rule 803(2) "allows the admission of a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." U.S. v. Taveras, 380 F.3d 532, 537 (1st Cir. 2004). A statement cannot qualify as an excited utterance where "the time interval between the event and the statement is long enough to permit reflective thought." U.S. v. Bailey, 834 F.2d 218, 228 (1st Cir. 1987)(quoting, McCormick on Evidence §297, at 856 (E.Cleary 3d ed. 1984)).

In this matter, the affidavit of Rose Perry does not set forth sufficient foundational facts to establish admissibility under Rule 803(2). The full paragraph states "On March 14, 2001, when the story about Kenny's release was in the paper, I called my mother and she went to get the paper. I called her again after she read the article and she said "Oh my god I'm going to jail for perjury." The quoted portion of the affidavit does not set forth the time interval between when Roseanna Perry read the newspaper article and when she made the alleged statement to Rose Perry. It could have been hours, days, even weeks later. Furthermore, this could hardly have been shocking news to Roseanna Perry or a reflexive reaction to a startling event, since in the preceding paragraph of the same affidavit, Rose Perry states that she informed her mother of Waters' pending release about a year prior to her signing the affidavit in June 2001. Thus, by the time she made the supposedly excited utterance in March 2001, Roseanna Perry had ten months to figure out how she would react to news of Waters' release. As such, her statement cannot qualify as an excited utterance as a matter of law, and the entirety of the Rose Perry affidavit constitutes nothing more than rank hearsay and no portion of it is admissible under any recognized hearsay exception.

  3. <u>The Investigator's Notes</u>

Finally, the plaintiff attempts to rely on the unsworn notes of an unidentified investigator (Pl. Ex. 73) to establish that a disputed issue of fact exists based on prior inconsistent statements. This memorandum is, likewise, inadmissible. It is well-settled that unsworn statements do not meet the requirements of Fed.R.Civ.P. 56(e) and may not be considered by a District Court in ruling on a Motion for Summary Judgment. <u>Bennett</u> v. <u>Saint-Gobain Corp.</u>, 453 F.Supp.2d 314, 324-5 (D.Mass. 2006) (unsworn statement detailing statements of third parties are not admissible in opposition to motion for summary judgment). In this matter, not only is the memorandum unsworn, the author is identified only as "this investigator". In addition, the entire substance of the memorandum contains inadmissible hearsay that cannot be considered in opposition to a motion for

summary judgment. As the plaintiff has produced no admissible evidence to rebut Roseanna Perry's deposition testimony that she was <u>not</u> coerced by Officer Taylor and that she told the truth at trial, the plaintiff has failed to establish a dispute as to a material fact on this issue.

        d.      <u>Roseanna Perry Promises</u>

The plaintiff has also failed to demonstrate that the alleged promises made to Roseanna Perry during Waters' criminal trial are material to this case and constitute an issue of triable fact on her *Brady* claim. The record establishes that defense counsel Bradley raised the issue of an inducement to Perry in the form of a new identity during jury deliberations. (Pl. Ex. 24, Vol 7, p. 636). In response, ADA Fahey advised the Court that Perry had received no such inducement. (Pl. Ex. 24, Vol 7, pp. 636-37). At sentencing, ADA Fahey further disclosed that that the Providence Police Department had been notified that Ms. Perry had testified for the Commonwealth in the first degree murder case. (See, Pl. Exhibit 26 at 000328).

The trial transcript reflects that neither the criminal trial judge nor Waters' defense counsel was concerned about the effect of this alleged promise on Waters' rights. Indeed, the trial judge merely responded "Fine. Thank you." and Mr. Bradley made no objection. This issue was not raised in the Motion for New Trial, nor was it raised on appeal. Therefore, plaintiff has failed to establish that this issue would have contributed to a significant impeachment of Perry that would have affected the trial outcome. Most significantly, Perry maintains to this day that she testified truthfully at trial and that her testimony was not affected by Officer Taylor. (Def., S.O.F., ¶95).

    4.  <u>The Plaintiff Failed to Establish a Triable Issue on the Fabrication of Evidence Claim</u>

The plaintiff has failed to adduce sufficient evidence to create a triable issue as to the fabrication of evidence claim against Officer Taylor. At the outset, the plaintiff has utterly failed to rebut the defense argument that the First Circuit Court of Appeals has rejected a theory of fabrication of evidence based on allegations that a third party witness was coerced into giving

17

unfavorable testimony to a criminal defendant. United States v. Hall, 434 F.3d 42 (1st Cir. 2006). Despite the plaintiff's reliance on cases from other circuits, Hall represents the applicable law of this jurisdiction and should be followed in this instance. The Supreme Court case relied upon by the plaintiff, Webb v. Texas, 409 U.S. 95, 98 (1972), is inapplicable as it addresses the prohibition against threatening a witness into not testifying on behalf of the accused, a situation that is distinguishable from the case at bar, as explained by the First Circuit in Hall.

Moreover, the plaintiff has failed to demonstrate that Officer Taylor acted with the requisite level of culpability to support a fabrication of evidence claim. As explained in her original summary judgment memorandum, jurisdictions that have recognized a cause of action for fabrication of evidence of the type alleged here require that "(1) Defendants continued their investigation of [the suspect] despite the fact that they knew or should have known he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." Devereaux v. Abbey, 263 F.3d 1070, 1075 (9th Cir. 2001).

The plaintiff cites no comparable case law to support the claim that the tactics used by Officer Taylor fell into the second category of conduct that is egregiously abusive or coercive, because it was not. Rather, the plaintiff, pointing to "facts" that are not support by the record, argues that Officer Taylor should have known that Marsh[9] was lying (Pl. Opp., p. 39). As previously discussed, there is no evidence that Officer Taylor saw any time card demonstrating that Waters was at work at the time of the murder, or that she was aware that he was allegedly excluded as the source of the latent prints. Nor is there any evidence that she was aware prior to trial, if at all, that Waters was seen in Court at 11:00 am that day by Lt. Boisseau, or that Boisseau did not see a

---

[9] Although the plaintiff claims that Perry's testimony was also fabricated, she offers absolutely no evidence or even argument to suggest that Officer Taylor should have known that Perry was lying.

18

scratch on his face. Indeed, police reports of the Waters interview are silent on that point, and State Police Lt. Dwyer, who was present at the initial Waters interview, was also present when Brenda Marsh stated in the pre-polygraph interview that Waters had a scratch on his face when he came home the morning of the murder. If this statement were false, Trooper Dwyer could have told Officer Taylor right then and there. There is no evidence that he did.

The plaintiff cannot claim that Officer Taylor should have known that Marsh was lying without demonstrating that Officer Taylor was aware of these alleged discrepancies in her story, and the alleged knowledge of others cannot be imputed to Officer Taylor for purposes of Section 1983 liability. Savino v. New York, 331 F.3d 63, 73-4 (2d Cir. 2003).

5. The Plaintiff Failed to Establish a Triable Issue on the Malicious Prosecution Claim

Only evidence known to the officer at the time she sought the warrant can be considered in determining whether it detracted from the probable cause analysis. Savino, 331 F.3d at 73-4. As previously discussed, there is no evidence that Officer Taylor was aware that Waters was seen in Court on the morning of the murder or that Boisseau did not see a scratch on his face. There is, likewise, no evidence that she was aware of the content of the time cards or that Waters was excluded as the source of the latent prints. As such, these facts cannot be used to derogate from her probable cause determination, and for the reasons discussed in her original summary judgment memorandum, there was ample evidence to establish probable case. Moreover, as previously discussed, there is no evidence of malice or improper motive on the part of Officer Taylor, and the plaintiff certainly cannot establish that Officer Taylor acted in bad faith on the basis of another officer's knowledge. Savino, 331 F.3d at 74.

7. The "Discovery Rule" does not toll the statute of limitations on the MCRA claim

The plaintiff frivolously contends that the "discovery rule" should extend the statute of limitations on her state law claims, notwithstanding clear Massachusetts precedent that has soundly

19

rejected the plaintiff's theory.  In <u>Messere</u> v. <u>Murphy</u>, 32 Mass.App.Ct. 917, 585 N.E.2d 350 (1992), the Massachusetts Appeals Court held that the discovery rule did not toll the statute of limitations on the plaintiff's claims arising out of allegations that he was wrongfully convicted as a result of the defendant police officers conspiring to withhold crucial evidence, giving false testimony, and intimidating other witnesses.  In so holding, the Court found "implausible any contention that his allegations fall within the limited class of 'inherently unknowable wrongs' that do not accrue until actual discovery."  <u>Messere</u>, 32 Mass.App.Ct. at 918.  This reasoning was subsequently applied by this Court in <u>Mitchell</u> v. <u>City of Boston</u>, 130 F.Supp.2d 201, 214-215, 216 (D.Mass. 2001), which was cited in Officer Taylor's original summary judgment memorandum, and ignored by plaintiff.

III.    CONCLUSION

For these reasons, along with the detailed reasons set forth in her original summary judgment memorandum, Officer Taylor is entitled to summary judgment as to all claims set forth against her.

DEFENDANT,
NANCY TAYLOR-HARRIS
By her attorneys,

/s/Gregg J. Corbo
Joseph L. Tehan, Jr. (BBO # 494020)
Gregg J. Corbo (BBO # 641459)
 Town Counsel
Kopelman and Paige, P.C.
101 Arch Street, 12th Floor
Boston, MA  02110
(617) 556-0007

347851/AYER-WATERS/0053