UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10521-GAO

BETTY ANNE WATERS, as
Administratrix of the Estate of
KENNETH WATERS,
Plaintiff,

v.

TOWN OF AYER, NANCY TAYLOR-HARRIS,
and PHILIP L. CONNORS,
Defendants.

MEMORANDUM AND ORDER ON ASSESSMENT OF DAMAGES
September 17, 2009

O'TOOLE, D.J.

This is an action asserting claims under 42 U.S.C. § 1983 and state law by Betty Anne Waters as Administratrix of the Estate of her brother, Kenneth Waters (hereinafter "Waters"), to recover damages resulting from his wrongful arrest, prosecution, and conviction. After the defendants declared that they would not contest liability, a brief bench trial was held on the issue of damages. Testimony was received from Ms. Waters and Dr. Jerome Rogoff, a Board-certified psychiatrist. Certain medical records and other documentary evidence were also received.

Waters was arrested by the Ayer police on October 12, 1982, for a murder that had occurred in May, 1980. After a jury trial, he was convicted of the murder and sentenced to life imprisonment on May 12, 1983. A motion for a new trial was denied in 1985, and in 1987 his conviction and the denial of the new trial motion were both affirmed by the Massachusetts Supreme Judicial Court. A petition for a writ of habeas corpus filed in this Court pursuant to 28

U.S.C. § 2254 was dismissed on May 22, 1990. In early 2001, DNA testing of blood from the murder scene that inferentially belonged to the victim's assailant excluded Waters as a source of that blood. The test results tended not only to exclude him as the perpetrator but to imply that another person had in fact committed the crime. A new trial motion was granted, and the district attorney subsequently filed a nolle prosequi in the case. A few months later, Waters died in an accident.

The defendants' concession that their liability is uncontested supports and permits a finding that, acting under color of state law, they wrongfully deprived Waters of rights guaranteed to him by the Constitution of the United States. He was therefore wrongfully deprived of his liberty between the date of his arrest, October 13, 1982, and the date of his release from imprisonment, March 15, 2001, a period just shy of eighteen and a half years.

In Waters' case, this deprivation of liberty was not only harmful in its own right—denying him all the activities and relationships that normal life in the community entails—but also was specifically harmful to both his mental and physical health in substantial and, at times, life threatening ways. Dr. Rogoff, who reviewed Waters' prison records, especially including medical records, and interviewed family members, summarized his conclusions about Waters' health during his incarceration:

> [T]here can be no doubt that Kenny Waters suffered miserably the entire time he was incarcerated. Not only did he respond to imprisonment by regressing to an infantile, dependent, whining, complaining and hypochondriacal state, he became self-mutilative and at times suicidal. He contracted hepatitis C in prison, and lived with the fear of death from it. He was symptomatic with it, as described [in Dr. Rogoff's written report]. He lived with chronic severe anxiety and extreme anxiety (panic) attacks, chronic frustration and guilt over the trouble and anguish he was causing his family, intermittent severe depression, a pervasive feeling of hopelessness and a constant and impotent rage. In other words, he lived the entire time from May 1983, to March, 2001, in a state of

> abject misery and profound unhappiness and anguish, deprived of just about every joy, satisfaction and contentment an ordinary life might have provided.

(Pl.'s Ex. 2 at 9.) Dr. Rogoff's testimony, which I credit, explained and supported these conclusions with specific reference to Waters' prison medical records.

The records reflect that Waters' anguish was fed by his frustration with being imprisoned despite the fact of his innocence. At one point a therapist noted Waters' preoccupation with his attempts to reverse his conviction and said, with his own note of frustration, "It is difficult to help this man as all he wants to do is prove his innocence to me." (Pl.'s Ex. 1(a) at S621-22.) The records also suggest emotional reactions related to events in the course of the case. For instance, in mid-1985, during the time his first new trial motion was pending and after it was denied, he experienced repeated panic attacks. (Id. at S104, S106.) Perhaps more dramatically, after Wasters' habeas petition was dismissed, a prison mental health service progress note dated May 29, 1990, reported his despair:

> Pt. is finally past stage of being angry—is finally at the stage where he feels he should try to kill self . . . . Is more hopeless about legal matters . . . . Decided the struggle is over—panic is about dying here in prison—at least if he's dead, he'll no longer hassle his family.

(Id. at S636.)

Waters suffered physically as well while in prison. As Dr. Rogoff noted, his depression and anger led him not only to make several suicidal gestures but also to commit various acts of self-mutilation. In addition, Waters was diagnosed with hepatitis C, which he contracted while in prison. For various reasons, including his emotional state, effective treatment for his hepatitis C was delayed and he suffered unnecessarily as a result.

3

Dr. Rogoff's testimony was confirmed by that of Betty Anne Waters, who described the dramatic difference in Waters' dark and angry emotional condition during his imprisonment compared with the generally optimistic and upbeat personality he had previously displayed.

Placing an economic value on all this harm is not a matter of precise calculation. See Limone v. United States, Nos. 08-1327, 08-1328, -- F.3d -- , 2009 WL 2621536, at *24 (1st Cir. August 27, 2009) (stating that "there is no scientific formula or measuring device which can be applied to place a precise dollar value on matters such as restraint of freedom, fright, anxiety, loss of face, or emotional scarring") (quoting Wagenmann v . Adams, 829 F.2d 196, 216 (1st Cir. 1987)). "In the final analysis, it is for the trier of fact to resolve the difficult questions of quantification and monetization that lurk in the penumbra of cases such as this." Id. In this case, the task is made more difficult by the non-adversarial and relatively truncated damages assessment hearing that resulted from the settling defendants' decision not to participate actively in the hearing.

The plaintiff has urged the Court to follow the lead of other courts, including the district court opinion in Limone, and employ a benchmark in the range of approximately $1 million per year of unjust imprisonment. See, e.g., Limone v. United States, 497 F. Supp. 2d 143, 243–45 (D. Mass. 2007) (compiling cases and awarding $1 million per year of imprisonment); Sarsfield v. City of Marlborough, No. 03-CV-10319-RWZ, 2006 WL 2850359, at *1 (D. Mass. Oct. 4, 2006) (awarding $13 million for 9.5 years of wrongful incarceration). But while the court of appeals affirmed the district court's damages award in Limone, it also signaled strongly that it thought the award was "at the outer edge of the universe of permissible awards. . .." Limone,

2009 WL 2621536, at *25. The court further warned that "the $1,000,000 annuity selected by the district court as the baseline for its calculation should not be understood as a carob seed for measuring the harm caused by wrongful incarceration generally." Id.

As noted above, there are three aspects in which Waters suffered as a result of his wrongful conviction: his loss of liberty and the adverse consequences that typically attend incarceration, his extended and severe emotional distress as a consequence of his incarceration, and the physical illnesses and injuries he suffered because of his imprisonment.

As to the first aspect, I conclude that damages to compensate for Waters' loss of liberty during his incarceration should be assessed at the rate of $1,000 per day. I choose a rate, rather than a lump sum, to reflect that an element in the harm caused is the length of time spent in wrongful custody. The amount of the award for this aspect of the injury thus reflects the duration of the loss. The number of days from October 13, 1982 to March 15, 2001 (inclusive) is 6,729. This amounts to $6,729,000.

In addition, I award a lump sum of $1,000,000 for Waters' physical illnesses and injuries incurred during and because of his incarceration, and a further lump sum of $3,000,000 for his mental anguish, pain and suffering during and because of his incarceration.

Accordingly, I award damages in favor of the plaintiff and against the defendants in the total sum of $10,729,000. Judgment shall enter accordingly.

It is SO ORDERED.

   /s/ George A. O'Toole, Jr.
United States District Judge